IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (   ) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363, AND 507(a) FOR AN ORDER AUTHORIZING
THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, EMPLOYEE
BENEFITS, AND OTHER COMPENSATION; (II) REMIT WITHHOLDING
OBLIGATIONS; (III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS
PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND
(IV) HAVE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS
RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS PRESENTED FOR
<u>PAYMENT AND HONOR CERTAIN FUND TRANSFER REQUESTS</u>**

Solyndra LLC and 360 Degree Solar Holdings, Inc., the above-captioned debtors

and debtors in possession (the "Debtors") hereby file this motion (the "Motion") for entry of an

order, under sections 105(a), 363, and 507(a) of title 11 of the United States Code (the

"Bankruptcy Code"), authorizing, but not requiring, the Debtors, in their sole discretion and as

more thoroughly described below, to: (i) pay and/or reimburse certain unpaid prepetition wages

and salaries, business expense reimbursements, and associated prepetition administrative and

processing fees and costs in connection therewith; (ii) remit withholding obligations to

applicable third parties; and (iii) maintain and honor certain employee benefits programs and pay

certain related prepetition obligations as set forth herein. The Debtors also request that such

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488
Kato Road, Fremont, CA 94538.

order authorize their banks and other financial institutions to receive, process, honor and pay certain checks presented for payment and honor certain fund transfer requests related to the foregoing, as provided herein. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.    The statutory predicates for the relief sought by this Motion are Bankruptcy Code Sections 105(a), 363 and 507(a).

## General Background

3.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code. Although the Debtors' manufacturing operations have been discontinued while the company evaluates its restructuring options, the Debtors are continuing in possession of their property and are managing their business as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

4.    The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of W.G. Stover, Jr., Senior Vice*

*President and Chief Financial Officer, in Support of First Day Motions* (the "Stover Declaration") filed contemporaneously with this Motion and incorporated herein by reference.[2]

5.      As discussed in more detail in the Stover Declaration, the Debtors discontinued their manufacturing operations and filed these cases in order to evaluate all of their restructuring options, including a possible sale of their business. On August 31, 2011, the Debtors terminated approximately 900 regular full-time employees (the "Terminated Employees"), leaving a core group of 113 employees necessary to assist the Debtors with their restructuring efforts (the "Continuing Employees"). The Continuing Employees work at the Debtors' office in Fremont, California as well as other remote locations in the United States. The Continuing Employees perform administrative office and support services in assisting the Debtors with their go-forward business, including, for example, finance, research and development, operations, quality control, legal, and human resources. Six of the Continuing Employees are involved in sales and sales support roles. None of the Terminated or Continuing Employees are associated with a labor union.

### Relief Requested

6.      By this Motion, the Debtors seek to minimize the personal hardship to the Continuing Employees and Terminated Employees (collectively, the "Employees") as a result of the filing of these Chapter 11 Cases and to minimize the disruption to the Debtors' business for the benefit of the Debtors' creditors and their estates, by requesting, in their discretion, the authority (a) to pay and/or honor, *inter alia*, certain prepetition claims for, among other items,

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stover Declaration.

wages, and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits"), and to pay all costs incident to the foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. The Wages and Benefits for which this relief is sought are set forth in detail below.

7.     The Debtors represent that they have sufficient postpetition funding to pay promptly all Wages and Benefits to the extent described herein as well as sufficient postpetition financing to continue their operations on an ongoing basis. All payments made under this Motion will be made in accordance with the provisions of the proposed order for DIP financing and use of cash collateral filed concurrently herewith and its associated budget. *See Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing.* In addition, no payments made to any Employees on account of unpaid pre-petition wages or prepetition accrued paid time off will exceed the $11,725 cap per Employee provided under sections 507(a)(4) of the Bankruptcy Code.

8.     Consequently, there is no reason for the payment of the Wages and Benefits to the Employees as outlined below to be disrupted, which disruption would directly harm the Employees and the Debtors' efforts in these Chapter 11 Cases.

## Wages and Benefits

### A.    Wages and Salaries and Associated Withholding

9.    All Employees are paid in arrears bi-weekly through direct deposit or check by ADP. The last payroll occurred on September 2, 2011, which covered the period from August 15, 2011 through and including August 28, 2011.

10.    Historically, and prior to the termination of the Terminated Employees, the Debtors' average bi-weekly gross payroll was approximately $3.5 million, which figure included wages and salaries, taxes (including withholding taxes paid by Employees), and withholdings for various benefits (described more fully below). Going forward, with the significantly-reduced workforce, the Debtors estimate that their average bi-weekly gross payroll will be approximately $650,000, which amounts may be further reduced if the Debtors continue to reduce their workforce during these cases.

11.    In connection with the termination of the vast majority of the Debtors' workforce prepetition, the Debtors funded a special payroll (the "Special Payroll") to ADP on September 1, 2011 for amounts that were owed to Terminated Employees for wages that had accrued from August 29, 2011 through August 31, 2011 (the "Stub Payroll Period") in addition to other amounts payable upon termination, such as accrued vacation time (discussed below) in the total aggregate amount of $1,503,128. Although the Special Payroll occurred prepetition, the Debtors are aware of de minimus additional amounts owed to Terminated Employees on account of wages or paid time off due to miscalculation of time by Terminated Employees, failure to timely submit time cards, or other true-ups. Accordingly, the Debtors request authority to pay up

to $50,000 to Terminated Employees on account of any Special Payroll items that should have been paid in the Special Payroll, but were not.

12.     The next regularly scheduled payroll for Continuing Employees is scheduled to occur on September 16, 2011, and will cover the period of August 29, 2011 through September 11, 2011, which aggregate payroll on account of Wages will be approximately $650,000.   A portion of this payroll will be on account of pre-petition time periods (August 29, 2011 through September 5, 2011) for the Continuing Employees, or approximately $475,000. Therefore, the Debtors request authority to pay any accrued pre-petition Wages to Continuing Employees in the ordinary course of business up to $475,000.

13.     The Debtors' payroll is disbursed and processed by ADP.  Typically, ADP debits the Debtors' payroll account two or three days in advance of payroll.  Employees receive their direct deposits through ADP on the bi-weekly payday.  As of the Petition Date, the Debtors may owe ADP an estimated $25,000 in unpaid fees with respect to ADP's processing of the Debtors' payroll, previous payrolls for which ADP may not have yet been paid, and related administration (the "Administration Fees").  The Debtors request authority to pay ADP the Administration Fees that ADP may be owed in connection with the foregoing services not to exceed $25,000 and to continue to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

14.     In the ordinary course of their business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to taxing authorities for purposes such as Social Security and Medicare, federal and state or local income taxes (the

"Employer Tax Obligations"). The Employer Tax Obligations are remitted directly by ADP to the various governmental entities.

15.    The Debtors also withhold contributions to the Debtors' health, vision, dental benefit plans and insurance plans described more fully below, 401(k) contributions and 401(k) loan repayments, employee medical contributions, flexible spending contributions, garnishment, or child support or similar obligations pursuant to court order or law (collectively, with the Employer Tax Obligations, the "Withholding Obligations").[3] On average, the Withholding Obligations constitute 40% of each gross payroll. Because there may be some Withholding Obligations that have not yet been remitted as of the Petition Date on account of the last payroll or the Special Payroll for Terminated Employees, the Debtors request authority to remit any prepetition Withholding Obligations on account of all Employees up to $206,000.

## B.    Business Expense Reimbursements

16.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, employee credit card charges for business expenses, business lunches and entertainment expenses, telephone charges, and miscellaneous other allowed travel expenses (the "Reimbursement Obligations"). Certain of the

---

[3]    The Debtors manually process and transmit voluntary Employee Withholding Obligations for 401(k) withholdings, 401(k) loan repayment withholdings, and voluntary flexible spending account withholdings. ADP processes all other withholding obligations, including tax withholdings that ADP transmits to appropriate taxing authorities on the applicable pay date.

Terminated Employees who were terminated shortly before the Petition Date may have pending Reimbursement Obligations owing as of the Petition Date.

17.     It is difficult for the Debtors to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and when the Employee submits the corresponding expense report for processing. Based on historical experience, the Debtors anticipate that, as of the Petition Date, the Debtors owe an estimated $50,000 in Reimbursement Obligations for all Employees, which amount is based on an average monthly figure, but given the volume of Terminated Employees, the Debtors project that such pipeline Reimbursement Obligations may be as high as $100,000.

18.     The Debtors also pay relocation costs for two executives, their Chief Financial Officer and General Counsel, under their employment agreements in the amount of $7,700 per pay period in the aggregate for both employees. The Debtors seek authority to continue to offer the relocation costs in the ordinary course of business in their discretion.

19.     Thus, the Debtors seek authority (a) to pay any prepetition Reimbursement Obligations directly to the Employees up to $100,000[4]; (b) to pay any accrued prepetition relocation costs up to $7,700; and (c) and to continue to honor Reimbursement

---

[4] Prior to the Petition Date, the Debtors may have issued checks on account of Reimbursement Obligations that have not yet cleared. As part of this Motion, and in addition to the Reimbursement Obligations that the Debtors seek authority to pay in paragraph 7 of this Motion, the Debtors request authority for applicable banks and financial institutions to honor such checks or to reissue such checks to the extent necessary.

Obligations and relocation expenses incurred postpetition in the ordinary course of the Debtors' business.

## C.  **Health and Related Benefits**

20.    The Debtors provide premium-based health and related benefit plans to Continuing Employees, including medical, vision insurance, a flexible spending account, dental insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"). The Debtors believe that they have paid all premiums owed to Health Plans provides for the month of August on account of these Health Plans. However, the premium payments for September will be due and owing as of the Petition Date, a portion of which may fall within the pre-petition period. In an abundance of caution, the Debtors seek authority to pay any outstanding pre-petition premium amounts owing under the Health Plans as detailed below to ensure continued coverage of health insurance for the benefit of their Employees.

21.    The Debtors also anticipate that the amount of the monthly premiums will increase going forward on a per employee basis to reflect the reduced employee headcount, although the total aggregate premium amount paid on account of the Health Plans will be significantly reduced given the reduced headcount. Thus, the Debtors also request authority to pay any post-petition premiums that may be owing under the Health Plans as and when due in the ordinary course of business.

22.    As required by law, the Debtors also offer coverage under certain of the Health Plans to its Terminated Employees who have elected COBRA coverage. In the case of

the Terminated Employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Terminated Employees. Instead, such Terminated Employees pay the full amount of the premiums to a third-party COBRA administrator, ADP. Although the Debtors advance the premium amounts for these Terminated Employees when the Debtors pay their monthly invoices to the insurers, these amounts are reimbursed to the Debtors by ADP, which collects the premium amounts owing directly from the Terminated Employees and remits them to the Debtors. ADP retains 2% of the amounts collected from the Terminated Employees as a fee for their services as COBRA administrator. In addition, the Debtors pay a monthly administrative fee of approximately $1,100 to ADP as COBRA administrator. As part of the relief requested hereunder, the Debtors request authority to pay up to $1,100 to ADP for their services as COBRA administrator for the Health Plans, to remit any pre-petition premiums owed on account of the Terminated Employees (which will then be reimbursed to the Debtors by ADP) and to continue to make such payments postpetition in the ordinary course of business.

(i)     Medical Plans

23.     The Debtors offer medical coverage to Continuing Employees administered by Anthem Blue Cross (HMO and PPO) and Kaiser Permanente (HMO), which plans allows Employees to contribute pre-tax dollars to pay for medical claims not payable by Blue Cross or Kaiser (the "Medical Plans"). Continuing Employees are responsible for 20% of the premium costs payable under the Medical Plans (the "Medical Premiums") which are deducted as Withholding Obligations while the Debtors pay the remaining 80% of Medical Premiums. Historically, the total amount of Medical Premiums under the Medical Plans were

approximately $900,000 per month for all Employees. The Debtors seek authority to continue the Medical Plans in their discretion, to continue to pay any Medical Premiums in the ordinary course of business, and to pay any outstanding prepetition amounts that may be owed under the Medical Plans up to $200,000 for the Continuing Employees.

(ii)     Dental Plan

24.     The Debtors also provide their eligible Continuing Employees with dental insurance under a plan with MetLife (the "Dental Plan"). The Debtors pay 80% of the premium costs under the Dental Plan while the Continuing Employees pay 20% of the premium costs through voluntary Withholding Obligations deducted from the Continuing Employees' paychecks. Historically, the total premium contributions under the Dental Plan were $130,000 per month (collectively, the "Dental Plan Contributions"). The Debtors seek authority to continue to offer the Dental Plan postpetition in their discretion, to pay any Dental Plan Contributions in the ordinary course of business, and to pay any outstanding prepetition amounts that may be owed under the Dental Plan up to $25,000 for the Continuing Employees.

(iii)     Vision Plan

25.     The Debtors also offer their Continuing Employees a vision plan sponsored by Vision Service Plan (the "Vision Service Plan"). The Debtors are responsible for 80% of the premium costs under the Vision Plan while the Continuing Employees pay 20% of the premium cost through Withholding Obligation deductions (collectively, the "Vision Plan Contributions"). Historically, the total Vision Plan Contributions were approximately $20,000 per month in premium payments under the Vision Service Plan. The Debtors seek authority

continue to honor the Vision Service Plan in their discretion, to pay any Vision Plan

Contributions in the ordinary course of business, and to pay any prepetition amounts owing on

account of Vision Plan contributions up to $5,000 for the Continuing Employees.

        (iv)     Life, Accidental Death and Dismemberment,
                and Disability Insurance

     26.     The Debtors also provide their Continuing Employees with Basic Life and

Accidental Death & Dismemberment Insurance through Mutual of Omaha at no cost to the

Continuing Employees. Specifically, the Debtors provide life insurance benefits to their

Continuing Employees at two times the Continuing Employee's base salary, up to a maximum

amount of $500,000 (the "Life Insurance"). Continuing Employees may also purchase additional

life insurance coverage on behalf of themselves or their spouses beyond the basic Life Insurance

(the "Voluntary Life Insurance"). The Debtors do not incur any cost for additional coverage, but

if such additional voluntary life insurance is purchased, the Debtors may withhold the cost of

such premium as part of the Withholding Obligations and are obligated to remit such premiums

to Mutual of Omaha. The Debtors also provide accidental death and dismemberment insurance

("AD&D Insurance") at two times the Continuing Employees' base salary, up to a maximum of

$500,000.

     27.     The Debtors also provide all Continuing Employees with short- and long-

term disability coverage (the "Disability Insurance"). Short-term disability pays 66.67% of pre-

disability pay per week, for a period of 12 weeks up to a maximum of $2,309 per week, which

amount is offset by any federal or state disability benefits. Long-term disability pays 60% of

pre-disability pay per month (to a maximum of $10,000 per month), commencing after an employee has been continuously disabled for 90 days.

28.     The Debtors also provide Business Travel Accident Insurance to all Continuing Employees through Ace Insurance Company, which pays beneficiaries either $250,000 or $500,000 (for sales associates) if the Continuing Employee dies or is seriously injured while traveling on company business. If the Continuing Employee's spouse or children are accompanying the Continuing Employee on company business, the Business Travel Accident Insurance also pays out $25,000 for spouses and $10,000 for children who may be injured or die while accompanying covered Continuing Employees.

29.     The Debtors' premium contributions to the Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance are paid monthly, in advance, at a total cost of approximately $50,000 per month. The Debtors seek authority to pay any unpaid prepetition Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance premiums up to a maximum of $50,000 per month and continue to honor Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance premium contribution obligations incurred postpetition in the ordinary course of the Debtors' business and in their discretion. The Debtors also request leave to remit any Continuing Employee-paid voluntary premiums to the applicable insurance companies beyond the premiums paid by the Debtors in connection with the Withholding Obligations.

(v)     Holidays, Vacation, and Leave

30.     The Debtors provide their Continuing Employees with three forms of regular paid time off ("PTO") consisting of holidays, vacation, and sick leave time. In addition, Continuing Employees are eligible for other non-regular PTO, including, among other things, for funeral leave, jury duty, time off to vote, and bereavement. The Debtors also provide for 9 paid holidays for Continuing Employees.

31.     Vacation for all Continuing Employees is accrued starting as of the Continuing Employee's respective hire date and is based upon length of service. Regular employees who work more 36 hours per week accrue vacation on an annual basis as follows: employees with less than two years of service receive 12 days of paid vacation per year; employees with 3 or more years of service receive 15 days of paid vacation per year, with an additional day of paid vacation accruing for each additional year of service up to a cap of 21 days of paid vacation per year for 9 years of service. Unused vacation days are not paid out upon year-end, but employees may carry over up to 240 hours per year of unused vacation time to the next year.

32.     Employees who work less than 36 hours each week accrue vacation on a pro-rated basis as a percentage of their hours on an annual basis worked as follows:

| Regular Hours Per Week | Pro-Rated Vacation Accrual |
| --- | --- |
| 20 | 50% |
| 21-25 | 63% |
| 26-30 | 75% |
| 31-35 | 88% |
| 36-40 | 100% |

33.     Employees who work 36 or more hours accrue 80 hours of sick leave per year.  Employees who work less than 36 hours per week receive pro-rated sick time based on the Employees' number of regularly scheduled hours per week.  Unused sick time may not be carried over from year to year.

34.     As discussed, prior to the Petition Date, the Debtors paid out to Terminated Employees any accrued PTO time that had accrued within the 90 days prior to August 31, 2011 in the aggregate amount of $818,741.  Also, the Debtors paid to Continuing Employees vacation time that they had accrued during the 90-day period prior to August 31, 2011 an aggregate amount of $225,000, which amounts were funded to ADP on September 2, 2011.

35.     The Debtors seek authority to honor their existing PTO policies to permit Continuing Employees to use their accrued PTO in the ordinary course of business and, in the Debtors' discretion, to pay accrued PTO obligations upon termination of the Employees up to the priority wage cap amounts of $11,725, inclusive of any prepetition Wages made pursuant to this Motion.  In summary, the Debtors request authority, in their discretion, to honor, any accrued prepetition PTO, and also request authority to honor similar PTO policies regarding vacation time, sick time, personal time, and holidays on a post-petition basis and in the ordinary course of business and to pay out accrued PTO obligations up to the statutory cap.

(vi)    401(k) Plan

36.     Prior to the Petition Date, the Debtors offered their Employees a 401(k) retirement plan or a Roth 401(k) retirement plan (the "401(k) Plans") administered by Pension

Specialists. The Debtors have or will formally terminate the 401(k) Plans within the month of September 2011, but will require a period of several months to winddown the 401(k) Plans to allow Employees a period of time to rollover their funds.

37. As of the Petition Date, there may be some Employee 401(k) contributions outstanding that the Debtors are required to remit to Pension Specialists. Historically, the Employee contributions to the 401(k) Plans, including repayments of loans against the 401(k) Plans, were approximately $170,000 per pay period. The Debtors estimate that, as of the Petition Date, $16,000 in 401(k) Plans contributions may remain unremitted (collectively, the "401(k) Contributions"), which amount is included in the Withholding Obligations request amount above.

38. In addition, the Debtors incur approximately $55,000 per year in administrative and auditing costs to administer the 401(k) Plans (the "401(k) Fees"). The Debtors seek authority to honor the 401(k) Contributions and to pay any prepetition 401(k) Fees subject to a maximum cap of $55,000.

(vii)  Workers' Compensation Insurance

39. Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Continuing Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with Travelers Insurance pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer

liability. The Debtors are responsible for payment of any workers' compensation claims in excess of the $1 million up to $10 million under the Workers Compensation Insurance Policy.

40.     The current term of the Workers' Compensation Policy runs through November 15, 2011. Prepetition, the Debtors paid the entire year's cost of the Workers' Compensation Policy and no prepetition amounts on account of premiums are owed under the Workers Compensation Insurance Policy. The Workers' Compensation Policy is a deductible-based policy. The Debtors seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition and to pay all post-petition premium installments as they come due in the ordinary course of business.

(viii)  Flexible Spending Accounts

41.     Prior to the Petition Date, the Debtors offered a flexible spending account program administered by Ceridian (the "FSA Program") whereby Employees could contribute funds into a flexible spending account to pay for health care expenses that are not covered or only partially covered by the Medical Plans or Dental Plan up to $4,000 per year or up to $5,000 for dependants (the "FSA Contributions"). The Debtors terminated the FSA Program immediately prior to the Petition Date on August 31, 2011. However, going forward, the FSA Program will remain open for approximately 90 days to allow Employees to submit any final claims against their FSA accounts. In connection therewith, the Debtors anticipate that they will incur de minimis administrative costs of approximately $6,000 per month to wind down their FSA Program (the "FSA Administration Fees"). Accordingly, the Debtors request authority to pay any prepetition FSA Administration Fees to Ceridian up to $6,000.

(viii)  Claremont Employee Assistance Program

42.     The Debtors provide an Employee Assistance Program ("EAP") to all Employees through Claremont.  The EAP offers confidential counseling and assistance to Employees for resolving personal or professional situations where Continuing Employees may need counseling, such as dealing with loss and grief issues.  The Debtors provide EAP to Employees at no cost.  The cost to the Debtors to provide such program to Employees is $2,500 per month.  Going forward, the Debtors will maintain the EAP for the month of September only.  Accordingly, the Debtors request authority to pay any pre-petition amounts owed to Claremont on account of the EAP program up to $2,500 for the month of September.

(1)     Voluntary Benefits

43.     The Debtors provide several other voluntary benefits that the Employees are able to purchase at their own cost, including Group Legal Services, Pet Insurance, and Section 529 College Savings Plan (collectively, the "Voluntary Benefits").  Going forward, the Debtors will not be offering Voluntary Benefits.

44.     In sum, the Debtors seek the authority to pay or honor, in their sole discretion, the prepetition Wages and Benefits, including:

a.     the Wages;

b.     the Administration Fees;

c.     the Employer Tax Obligations;

d.     the Reimbursement Obligations;

e.     the COBRA administration fees;

f.     the Benefits Administration Fees;

g.     Dental Plan Contributions;

h.     Vision Plan Contributions;

i.     Medical Premiums;

j.     amounts due under the Life Insurance, AD&D Insurance,

Disability Insurance Plans, Business Travel Accident Insurance;

k.     Terminated Employee Wages;

l.     EAP;

m.     FSA Administration Fees;

n.     401(k) Fees; and

o.     Prepetition amounts due under any other benefit program described

in this Motion; each as described more fully above, and to continue, in their sole discretion, the

foregoing Benefits on a postpetition basis.[5]

### Basis for Relief

45.     Statutory support for the requested relief exists pursuant to

sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of

payment" doctrine (discussed *infra*). Bankruptcy Code section 363(b)(1) authorizes a debtor in

possession to use property of the estate other than in the ordinary course of business after notice

and a hearing. Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into

transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code

---

[5] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

46.     The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[6] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee morale—two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing*

---

[6] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the

"necessity of payment" doctrine applies to the payment of prepetition employee compensation

and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the

"necessity of payment" doctrine, bankruptcy court should defer to the debtor's business

judgment in permitting payment of certain workers' compensation claims).

47.    This Court similarly has approved the payment of prepetition claims of

employees for wages, salaries, independent contractor obligations, expenses, and benefits on the

grounds that the payment of such claims was necessary to effectuate a successful reorganization

or liquidation. *See, e.g., In re PTL Holdings LLC, et al.* Case No. 11-12676 (BLS) (Bankr. D.

Del. Aug. 25, 2009); *In re Point Blank Systems, Inc., et al.,* Case No. 10-11255 (PJW) (Bankr.

D. Del. April 14, 2010); *In re DHP Holdings II Corp., Case No. 08-183422* (Bankr. D. Del. Jan.

5, 2009); *In re EZ Lube, LLC., Case No. 08-13256 (CSS)* (Bankr. D. Del. Dec. 10, 2008); *In re*

*Filene's Basement, Inc.,*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re*

*NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western*

*Nonwovens Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. Jul. 15, 2008); *In re Global*

*Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del.  February 1, 2008); *In re*

*Answer Financial Inc.*, Case No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis*

*Mortgage Corporation*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007);  *In re*

*Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW);

*In re Global Home Products LLC, et al.*, Case No. 06-10340 (Bankr. D. Del. April 11,

2006)(KG); *In re Proxim Corp.*, Case No. 05-11639 (PJW) (Bankr. D. Del. June 15, 2005); *In re*

*Maxide Acquisition, Inc.*, Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.*, Case No. 03-13359 (MFW) (Bankr. D. Del. Nov. 5, 2003).

48.     The "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these Chapter 11 Cases.

49.     Pursuant to section 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, including vacation, severance, and sick leave pay" earned within 180 days before the Commencement Date are afforded priority unsecured status to the extent of $11,725 per Employee. The Debtors believe that most of the Wages relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) of the Bankruptcy Code. As priority claims, the Wages must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

50.     Pursuant to the relief requested herein, the Debtors request authority only to pay up to the $11,725 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all unpaid Wages collectively owing to such Employee.[7]

51.     Many Continuing Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to

---

[7] In the event any unpaid amounts owing to any Employee on account of unpaid Wages exceed the $11,725 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

continue to pay their daily living expenses. These Continuing Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Wages and the Benefits described above, employee morale and loyalty will be jeopardized at a time when employee support is critical.

52. With respect to Terminated Employees, many of the same concerns apply. The hardships facing the Terminated Employees are often even greater than those facing the Continuing Employees who still have their jobs. If the Debtors were to completely ignore its obligations to the Terminated Employees as a result of its chapter 11 filing, that likely would have reverberations within the remaining workforce, in terms of diminished morale, Continuing Employee anxiety, and an enhanced risk of losing Continuing Employees that may be critical to the Debtor's reorganization effort.

53. Additionally, the Withholding Obligations do not constitute property of the Debtors' estates and principally represent Employee earnings that governments (in the case of taxes), or Employees (in the case of voluntary Withholding Obligations) have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees.

54. Finally, the Debtors submit that, with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estates given that the relevant taxing authorities would have priority claims under

section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

55. The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during these cases and to insure continued, efficient operation in order to maximize value for all creditors.

56. Finally, Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Stover Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## No Assumption or Assignment of Employee Benefits

57.     To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code.  Moreover, authorization to pay all amounts on account of Employee Wages and Benefits shall not affect the Debtors' right to contest the amount or validity of these obligations.

### Request for Authority for Banks and Other Financial Institutions to Honor Checks Issued to Pay Wages and Benefits, to Honor All Fund Transfer Requests Relating to the Foregoing, and to Pay All Processing Fees Associated with Payment of Employee Wages and Benefits

58.     The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors to Employees, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Employee Wages and Benefits to the extent described herein, on an ongoing basis. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Employee Wages and Benefits.  Further, the Debtors seek to retain the discretion to decide which Employee Wages and Benefits they will

pay and honor, and nothing in this Motion shall be deemed an admission by the Debtors that any Employee Wages and Benefits will in fact be paid or honored.

59. Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Employee Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Employee Benefits as described herein.

## No Previous Request

60. No prior motion for the relief requested herein has been made to this or any other court.

## Notice

61. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; and (b) the Debtors' prepetition lenders. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order approving the relief requested above and granting such other relief as is just and proper.

Dated: September 6, 2011

PACHULSKI STANG ZIEHL & JONES LLP

Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:        rpachulski@pszjlaw.com
               dgrassgreen@pszjlaw.com
               bgrohsgal@pszjlaw.com
               jfried@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession