IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No. 11-12799 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION SECURED
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(III) GRANTING ADEQUATE PROTECTION (IV) MODIFYING THE
AUTOMATIC STAY, AND (V) SCHEDULING A FINAL HEARING**

Solyndra LLC ("Solyndra") and 360 Degree Solar Holdings, Inc. ("360"), the

above-captioned debtors and debtors in possession (collectively, the "Debtors"), submit this

motion (the "Motion"), for entry of an interim order on an expedited basis (the "Interim Order")

substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by

the Court (the "Final Hearing"), entry of a final order (the "Final Order"), pursuant to sections

105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"),

Rule 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (the

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court

for the District of Delaware (the "Local Rules"), authorizing the Debtors to (a) incur post-

petition, priming secured financing pursuant to the terms of a $4,000,000 Senior Secured,

Superpriority Debtor in Possession Term Loan, Guaranty and Security Agreement (the "DIP

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488
Kato Road, Fremont, CA 94538.

Agreement") substantially in the form attached hereto as **Exhibit B**, (b) use cash collateral in which the Debtors' prepetition lenders may have an interest, and (c) provide adequate protection to such lenders.

In support of this Motion, the Debtors rely on the *Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer, in Support of First Day Motions* (the "First Day Declaration"). In further support of this Motion, the Debtors represent as follows:

## JURISDICTION

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363(b), 364 and 507 of the Bankruptcy Code.

## OVERVIEW

2.     By this Motion, the Debtors seek the entry of an Interim Order and a Final Order, which:

a.     Authorize the Debtors to obtain credit and incur debt, pursuant to sections 363 and 364 of the Bankruptcy Code, up to the principal amount of $4,000,000, plus any interest, fees and other obligations accrued thereon (the "DIP Obligations"), of which up to $2,500,000 may be incurred prior to the Final Hearing, from a special purpose entity (the "DIP Lender") to be created by Argonaut Ventures I, L.L.C. and Madrone Partners, L.P.,[2] secured by priming first priority, valid, perfected and enforceable liens on property of the Debtors' estates pursuant to sections 105, 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions summarized herein;

---

[2] The principals of the DIP Lender are insiders of the Debtors by virtue of their direct or affiliated ownership of over 20% of the outstanding shares of common stock of 360 and representation on the board of directors of 360 and the board of managers of Solyndra. These parties also hold a substantial portion of the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche E Facility Obligations (both as defined below), and have equity ownership interests in the Inventory A/R Purchasers (both as defined below).

b. Authorize the Debtors to enter into and perform under the DIP Agreement, which provides for new postpetition loans up to the principal amount of $4,000,000;

c. Subject to the Carve-Out (as defined below), grant liens to secure the DIP Obligations in favor of the DIP Lender on all present and after-acquired assets and property of the Debtors pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, including subject to the entry of the Final Order, any actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or applicable state fraudulent transfer law ("Avoidance Actions") and the proceeds thereof;

d. Subject to the Carve-Out, grant to the DIP Lender superpriority administrative claim status in respect of all DIP Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, which superpriority claim may be paid, subject to entry of the Final Order, out of the proceeds of Avoidance Actions;

e. Authorize the use of "cash collateral" of the Debtors as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties (as defined below), have an interest, including the Restricted Funds (as defined below) and any amounts in the Master Collateral Agent Collections Account (as defined below);

f. Subject to the Carve-Out and junior to the DIP Obligations, grant the Prepetition Secured Parties, replacement liens and a superpriority claim in all of the Debtors' assets to the extent of any diminution in the secured value of the Prepetition Secured Parties' interests, if any, in the Prepetition Collateral (as defined below) as adequate protection for the use of Cash Collateral and for the imposition of the automatic stay, including subject to the entry of the Final Order, any actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or applicable state fraudulent transfer law ("Avoidance Actions") and the proceeds thereof;

g. Release the Inventory Accounts Receivable Trust Funds (as defined below) to the Inventory A/R Purchasers (as defined below);

h. Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Agreement and the Interim Order and the Final Order;

i. Schedule the Final Hearing within 21 days after the commencement of these cases to consider entry of the Final Order and approving the form of notice with respect to the Final Hearing; and

j. Waive any applicable stay as provided in the provisions of the Federal Rules of Bankruptcy Procedure and providing for immediate effectiveness of the Interim Order and the Final Order.

## CONCISE STATEMENT OF RELIEF REQUESTED

3.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary[3] of the terms of the proposed financing arrangements:

      a.    <u>Obligated Parties</u>: Solyndra, as borrower, and 360, as guarantor.

      b.    <u>DIP Lender</u>: A special purpose entity to be created by Argonaut Ventures I, L.L.C. and Madrone Partners, L.P.[4]

      c.    <u>Amount and Type of Facility</u>: A new, senior, priming debtor-in-possession credit facility in the amount of up to $4,000,000 in principal obligations, plus any interest, fees and other obligations accrued thereon.

      d.    <u>Availability</u>: Debtors' seek authority to borrow up to $2,500,000 under the DIP Agreement pursuant to the Interim Order. DIP Agreement at section 2.2(a); Interim Order at ¶2(b).

      e.    <u>Use of Proceeds</u>: Loan proceeds may be used to (a) pay interest, costs, and expenses incurred with respect to the DIP Obligations, and (b) finance the Debtors' chapter 11 restructuring process, including, but not limited to chapter 11 professional fees and expenses (in each case, not otherwise prohibited by the DIP Agreement), in accordance with the budget approved by the DIP Lender (the "<u>Budget</u>"), subject to certain variances and tested on a weekly basis. DIP Agreement at section 3.3. The initial Budget is attached hereto as **Exhibit C**.

      f.    <u>Priority and Security</u>: Subject to the Carve-Out, the DIP Obligations will be secured by first priority priming liens against all assets of the Debtors and their estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, including subject to the Final Order, Avoidance Actions and the proceeds thereof. Subject to the Carve-Out, the DIP Obligations also shall be treated as superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which superpriority claim may be paid upon entry of the Final Order out of the proceeds of Avoidance Actions. Interim Order at ¶2(g)(i).

---

[3] The summaries and descriptions of the terms and conditions of the DIP Agreement, the Interim Order and the Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the terms of the DIP Agreement, the Interim Order and the Final Order. In the event there is any conflict between this Motion and the DIP Agreement, the Interim Order or the Final Order, the DIP Agreement or Interim Order, as applicable, will control in all respects.

[4] The principals of the DIP Lender are insiders of the Debtors by virtue of their direct or affiliated ownership of over 20% of the outstanding shares of common stock of 360 and representation on the board of directors of 360 and the board of managers of Solyndra. These parties also hold a substantial portion of the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche E Facility Obligations (both as defined below), and have equity ownership interests in the Inventory A/R Purchasers (both as defined below).

g. <u>Maturity Date</u>: The maturity date of the DIP Obligations will be the earliest to occur of: (i) 180 days following the Petition Date, (ii) the failure of the Debtors to obtain a Final Order on or before the date which is 21 days after the Petition Date, or (iii) the occurrence of an event of default under the DIP Agreement (the "<u>Commitment Termination Date</u>"). Interim Order at ¶15.

h. <u>Interest Rate</u>: The interest rate for the DIP Obligations will be 15% per annum. DIP Agreement at section 2.3(a).

i. <u>Carve-Out</u>: The DIP Liens, DIP Superpriority Claim, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claims (all as defined in the Interim Order) shall be subordinate only to the following (the "<u>Carve-Out</u>"): (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; (b) allowed fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals employed by the Debtors and any official committee(s) of creditors pursuant to Sections 327 and 1103 of the Bankruptcy Code in the amounts set forth in the Budget accrued through the Commitment Termination Date, and up to the amount of $50,000 accrued thereafter. Interim Order at ¶11.

j. <u>Conditions Precedent</u>: The conditions precedent to borrowing under the DIP Agreement are generally customary, but include the requirements that (i) the Restricted Funds are released and made available to the Debtors, (ii) the Inventory Accounts Receivable Trust Funds (as defined below) are released by the Debtors to the Inventory A/R Purchasers (as defined below), (iii) the Buyer Inventory (as defined below) is released for the purpose of sale, and (iv) that a critical vendor is entered satisfactory to the DIP Lender. DIP Agreement at section 3.1.

k. <u>Covenants</u>: The DIP Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature. DIP Agreement at sections 5 through 6.

l. <u>Events of Default</u>: The DIP Agreement contains certain events of default. By way of example, and as more fully set forth in section 7 of the DIP Agreement, appointment of a trustee in the Debtors' cases, dismissal of the Debtors' cases, occurrence of a material adverse event, or failure to pay the DIP Obligations when due would constitute an event of default.

m. <u>Lender Fees</u>: 2% closing fee or $80,000 payable upon closing.

n. <u>Debtors' Stipulations, Waivers and Releases</u>: The Debtors propose to stipulate to the amount, validity and priority of the prepetition liens and claims of the Prepetition Secured Parties. The Debtors also seek to waive certain rights and causes of action and grant global releases in favor of the Prepetition Secured

Parties as to any and all prepetition claims, including the Debtors' rights under section 506(c) of the Bankruptcy Code, pending entry of the Final Order. Interim Order at Recital E; DIP Agreement at section 5.24. The Debtors' stipulations and waivers are subject to challenge by any party in interest or, if a committee is appointed, by such committee, filed within the earlier of (a) sixty (60) days following formation of a committee, (b) solely if a committee is not appointed, seventy-five (75) days following the Petition Date, or (c) such later date consented to by the prepetition agents, as applicable. Interim Order at ¶9.

     o.     <u>Waiver or Modification of the Automatic Stay</u>: Subject to five (5) business days' prior notice, the automatic stay will be vacated in the event of default under the DIP Agreement to permit the exercise of remedies by the DIP Lender. Interim Order at ¶20.

     p.     <u>Amount of Cash Collateral to Be Used</u>. The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Budget, including the Restricted Funds and any amounts in the Master Collateral Agent Collections Account.

     q.     <u>Parties with an Interest in Cash Collateral</u>. The parties with an interest in the Cash Collateral are the Prepetition Secured Parties. The Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders (as defined below) have consented to the use of the Cash Collateral.

     r.     <u>Cash Collateral Termination Date</u>. The Debtors' ability to use Cash Collateral shall end on the Commitment Termination Date.

     s.     <u>Adequate Protection to Master Collateral Agent and Prepetition Lenders</u>. The Debtors have agreed to provide adequate protection to the Prepetition Secured Parties, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to the extent of any diminution of the value of the interests of the Prepetition Secured Parties in the Prepetition Collateral, in the form of additional and replacement security interests and liens in all of the assets of the Debtors and their estates, subject to the Carve-Out and junior to the DIP Obligations. Upon entry of the Final Order, such replacement liens shall extend to the proceeds of Avoidance Actions and the proceeds thereof, and junior only to the DIP Obligations and any prior permitted liens. In addition, subject to the Carve-Out, the Prepetition Secured Parties will have superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code for any such diminution in value, which superpriority claims may be paid out of the proceeds of Avoidance Actions, junior only to the DIP Obligations. Interim Order at ¶6.

     t.     <u>Automatic Perfection</u>. The liens, security interests and adequate protection provided in the DIP Agreement, the Interim Order and the Final Order shall be valid, binding, enforceable, non-avoidable and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required

under the laws of any jurisdiction to validate or perfect such security interests and liens. Interim Order at ¶7.

## DISCLOSURES

4. Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use Cash Collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

a. Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. **The proposed Interim Order does not provide for the granting of cross-collateralization protection to any prepetition secured creditors, other than replacement liens with the same validity and priority as the Debtors' lenders' prepetition security interests**.

b. Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. **The proposed Interim Order, at Recital E, includes certain stipulations by the Debtors relating to the validity, perfection, enforceability and amount of the prepetition liens and claims of the Prepetition Secured Parties. Further, the DIP Agreement, at section 5.24, contains global releases of prepetition claims in favor of the foregoing parties. All such stipulations, waivers and releases are subject to challenge by any party in interest or, if a committee is appointed, by such committee as set forth in the Interim Order at ¶9.**

c. Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order contemplates a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code, subject to entry of the Final Order.**

d. Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims

and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The proposed Interim Order contemplates the grant of liens on Avoidance Actions and the proceeds thereof, subject to entry of the Final Order.**

     e.    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The proposed Interim Order does not contain provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).**

     f.    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The proposed Interim Order does not provide for disparate treatment for the professionals retained by a committee from those professionals retained by the Debtors, except that the Budget projects that fees and expenses of Committee professionals will be lower than fees and expenses of Debtor professionals.**

     g.    Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order provides for the priming of the Tranche B/D Agent and Tranche B/D Lenders. The Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders have consented to the priming proposed hereby.**

     h.    Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order, at ¶6, describes the forms of adequate protection provided to the Prepetition Secured Parties.**

     i.    Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order, at ¶20, describes the modification of the automatic stay in the event of default.**

     j.    Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order, at ¶7, include provisions that provide for the automatic perfection and validity of the liens, security interests and adequate protection provided in the DIP Agreement, the Interim Order and the Final Order without the necessity of any further filing or recording under the laws of any jurisdiction.**

## BACKGROUND

5.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code.

6.    Although the Debtors' manufacturing operations have been discontinued while the company evaluates its restructuring options, the Debtors are continuing in possession of their property and are managing their business as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.    No trustee or examiner has been appointed in these chapter 11 cases.

8.    The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of W.G. Stover, Jr. in Support of First Day Motions* filed contemporaneously with this Motion and incorporated herein by reference.

## PREPETITION CAPITAL STRUCTURE

9.    In February 2011, the Debtors undertook a capital restructuring that resulted in the following capital structure:

10.    As of the Petition Date, Solyndra had outstanding secured indebtedness in an aggregate principal amount of $783,755,765, consisting of (a) $69,302,901 in principal obligations under the Prepetition Tranche A Term Loan Facility (as defined below), (b) $142,808,544 in principal obligations constituting Tranche B Debt (as defined below), (c) $385,000,000 in principal obligations constituting Tranche D Debt (as defined below), and (d) $186,644,319 in principal obligations under the Prepetition Tranche E Facility (as defined below).  The foregoing obligations are secured by substantially all of the Debtors' assets, subject to the terms of the Prepetition Intercreditor Agreement (as defined below).

11.     **Prepetition Tranche A Term Loan Facility.** Pursuant to that certain Term Loan Agreement (Tranche A), dated as of February 23, 2011 (the "Prepetition Tranche A Term Loan Agreement" and together with all other loan and security documents executed in connection therewith, the "Prepetition Tranche A Credit Documents"), by and among Solyndra, the lender parties thereto (collectively, the "Prepetition Tranche A Lenders"), and Argonaut Ventures I, L.L.C., as Tranche A Representative (in such capacity, the "Prepetition Tranche A Term Loan Facility Representative"), the Prepetition Tranche A Lenders provided a first lien secured credit facility comprised of up to $75,000,000 in aggregate principal amount of term loan commitments (the "Prepetition Tranche A Term Loan Facility"). As of the Petition Date, the Debtors were indebted and liable to the Prepetition Tranche A Term Loan Facility Representative and the Prepetition Tranche A Lenders under the Prepetition Tranche A Credit Documents, in the principal amount of $69,302,901 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder (collectively, the "Prepetition Tranche A Term Loan Facility Obligations").

12.     **Prepetition Tranche B/D Term Loan Facility**. Pursuant to that certain Payment and Reimbursement Agreement (Tranches B and D), dated as of February 23, 2011 (the "Prepetition Tranche B/D Term Loan Agreement," and together with all other loan and security documents executed in connection therewith, the "Prepetition Tranche B/D Credit Documents"), by and between Solyndra, as borrower, and the U.S. Department of Energy, acting by and through the Secretary of Energy, as loan servicer (the "Prepetition Tranche B/D Agent"), Solyndra is obligated to repay amounts owing to Federal Financing Bank, and its guarantor, the U.S. Department of Energy (the "Prepetition Tranche B/D Lenders"), which consist of (i) the

Tranche B Total Principal Amount (as defined in the Prepetition Tranche B/D Term Loan Agreement) (the "Tranche B Debt"), and (ii) the Tranche D Total Principal Amount (as defined in the Prepetition Tranche B/D Term Loan Agreement) (the "Tranche D Debt") (collectively, the "Prepetition Tranche B/D Term Loan Facility"). As of the Petition Date, the Debtors were indebted and liable to the Prepetition Tranche B/D Lenders under the Prepetition Tranche B/D Term Loan Agreement (i) in the principal amount of $142,808,544 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder on account of the Tranche B Debt and (ii) in the principal amount of $385,000,000 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder on account of the Tranche D Debt (collectively, the "Prepetition Tranche B/D Term Loan Facility Obligations").

    13. **Prepetition Tranche E Facility.** Pursuant to that certain Tranche E Note Purchase Agreement, dated as of February 23, 2011 (the "Prepetition Tranche E Agreement" and together with all other loan and security documents executed in connection therewith, the "Prepetition Tranche E Credit Documents"), by and among Solyndra, as borrower, Argonaut Ventures I, L.L.C., as agent (the "Prepetition Tranche E Agent"), and each holder of a Tranche E note (together with the Tranche E Agent, the "Prepetition Tranche E Lenders"), Solyndra is obligated to repay amounts owing to the Prepetition Tranche E Lenders in the aggregate principal amount of $186,481,645 (the "Prepetition Tranche E Facility"). As of the Petition Date, the Debtors were indebted and liable to the Prepetition Tranche E Agent and the Prepetition Tranche E Lenders under the Prepetition Tranche E Credit Documents in the principal amount of $186,644,319 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder (collectively, the "Prepetition Tranche E Facility

Obligations" and, together with the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche B/D Term Loan Facility Obligations, the "Prepetition Secured Obligations"). The Prepetition Tranche A Term Loan Facility Representative, the Prepetition Tranche A Lenders, the Prepetition Tranche B/D Agent, and the Prepetition Tranche B/D Lenders, the Prepetition Tranche E Agent, and the Prepetition Tranche E Lenders are referred to collectively herein as the "Prepetition Secured Parties".

14.     **Prepetition Collateral**. As more fully set forth in the Prepetition Tranche A Credit Documents, the Prepetition Tranche B/D Credit Documents, the Prepetition Tranche E Credit Documents, and that certain First Amended & Restated Common Agreement, dated as of February 23, 2011 (the "Common Agreement"), prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, substantially all assets of the Debtors (collectively, the "Prepetition Collateral"), subject to certain limitations (the "Prepetition Liens") to U.S. Bank National Association, as master collateral agent (the "Master Collateral Agent") under the Common Agreement.

15.     **Priority of Prepetition Liens; Intercreditor Agreement.** The Prepetition Tranche A Term Loan Facility Representative, the Prepetition Tranche B/D Agent, the Prepetition Tranche E Agent, and the Master Collateral Agent are party to that certain Intercreditor Agreement, dated as of February 23, 2011 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Intercreditor Agreement"), that governs the respective rights, interests, obligations, priority, and positions of the various Prepetition Tranche A Lenders, Prepetition Tranche B/D Lenders, and Prepetition Tranche E Lenders. Pursuant to the Prepetition Intercreditor Agreement, as of the Petition Date,

(i) the Prepetition Tranche A Lenders' right to payment is senior to the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche B Debt, and (ii) the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche B Debt is senior to both (a) the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche D Debt, and (b) the Prepetition Tranche E Lenders' right to payment, which rights are *pari passu*.

16.    **Restricted Funds**.  Prior to the Petition Date, 360 issued $286,000,000 of preferred stock to investors, of which $198,000,000 (the "Restricted Funds") was placed in a segregated account (the "Restricted Account") controlled by the Master Collateral Agent to be used by the Debtors in combination with funds advanced pursuant to the Prepetition Tranche B/D Credit Documents in connection with the construction of a manufacturing facility.  As of the Petition Date, the Restricted Funds were not available to the Debtors to pay general operating expenses because the Prepetition Tranche B/D Agent has not yet instructed the Master Collateral Agent to release the funds to the Debtors.  As of September 2, 2011, the balance of Restricted Funds held in the Restricted Account was $3,040,311.51.  The Restricted Funds are property of the Debtors' estates and constitute Cash Collateral.  It is a condition to funding under the DIP Facility that the Restricted Funds being held in the Restricted Account are released to, and are authorized to be used by, the Debtors to pay general operating expenses in accordance with the Budget.

17.    **Inventory Accounts Receivable Trust Funds**.  As part of the Debtors' prepetition efforts in the months ahead of the Petition Date to raise additional capital and improve the Debtors' liquidity position, affiliates of the DIP Lender and other holders of the Prepetition Tranche A Term Loan Facility Obligations (together, the "AR/Inventory Buyers")

agreed to purchase certain accounts receivable and inventory from the Debtors. The Debtors created a special purpose entity, Solyndra Financing LLC, for the purpose of effectuating such sales. The Debtors transferred title to the subject accounts receivable and inventory to this special purpose entity. The AR/Inventory Buyers created two special purpose entities, Solyndra Solar LLC and Solyndra Solar II LLC (together, the "Inventory A/R Purchasers"), for the purpose of purchasing the subject accounts receivable and inventory, respectively. The transactions were governed by that certain (a) Amended and Restated Purchase and Sale Agreement dated as of July 29, 2011 among Solyndra Financing LLC, as Seller, Solyndra LLC, as Servicers, Solyndra Solar LLC, as A/R Buyer, and Argonaut Solar LLC, as Agent (the "A/R Sale Agreement");[5] and (b) Inventory Purchase and Sale Agreement dated as of July 29, 2011 among Solyndra Financing LLC, as Seller, Solyndra LLC, as Servicer, Solyndra Solar II LLC, as Inventory Buyer, and Argonaut Solar LLC, as Agent (the "Inventory Sale Agreement", and collectively with the A/R Sale Agreement, the "Sale Agreements").

18.     Pursuant to the A/R Sale Agreement, Solyndra Solar LLC (an affiliate of the DIP Lender), as A/R Buyer, would purchase Solyndra's conforming accounts receivable through Solyndra Financing LLC (an affiliate of Solyndra), as Seller, at 85% of the face amount of domestic accounts and 75% of the face amount of foreign accounts. The A/R Buyer also had the option to purchase "non-conforming" accounts receivables at a percentage agreed by the Seller and the Agent. Solyndra, as Servicer, would continue to service the accounts receivable for a fee of 1% of the account receivables purchased by the A/R Buyer, which was to be paid

---

[5] The A/R Sale Agreement superseded an earlier Purchase and Sale Agreement dated as of June 3, 2011 between the same parties.

monthly by the A/R Buyer based on the account receivables purchased during such month. Customers were directed to pay into an account of Argonaut Solar LLC, as Agent (an affiliate of the DIP Lender). As the sold accounts receivable were collected, and the collections received by the A/R Buyer, the A/R Buyer would be required to pay a purchase price adjustment to Solyndra Financing LLC in respect of such account receivable equal to the amount collected in excess of the purchase price previously paid by the Buyer less a retention of 9% for domestic accounts and a retention of 11% for foreign accounts. Hence, the net effect of the foregoing transactions is that Solyndra would receive an initial purchase price of 85% or 75% for each account receivable, plus a 1% service fee, plus an additional payment to the extent that collections on such accounts exceeded 94% for domestic accounts (85% initial purchase price plus the retention of 9% by the A/R Buyer) or 86% for foreign accounts (75% initial purchase price plus the retention of 11% by the A/R Buyer). In addition, the A/R Buyer has the right under the A/R Sales Agreement to offset losses from prior account receivables collections against proceeds that would otherwise be payable to the Seller as a purchase price adjustment based on the above payout percentages.

19.     Pursuant to the Inventory Sale Agreement, Solyndra Solar II LLC (an affiliate of the DIP Lender), as Inventory Buyer, would purchase Solyndra's confirming inventory through Solyndra Financing LLC (an affiliate of Solyndra), as Seller, at 50% of the estimated retail price of such inventory and Inventory Buyer at its option could purchase non-conforming inventory at a percentage agreed by Seller and Agent. Solyndra agreed to market, sell and ship the Inventory Buyer's inventory to customers on behalf of the Inventory Buyer for a servicing fee of 1% of the sales price. Customers were directed to pay into an account of Argonaut Solar LLC, as Agent (an affiliate of the DIP Lender). Upon sale of the inventory, an

account receivable was created that could be sold by the Inventory Buyer to the A/R Buyer under

a secondary A/R Sales Agreement entered into by the Inventory Buyer, the A/R Buyer, and

Solyndra LLC, as Servicer, dated as of July 29, 2011 (the "Secondary A/R Sales Agreement").

The terms of the Secondary A/R Sales Agreement were essentially identical to the A/R Sales

Agreement. The A/R Buyer would pay the Inventory Buyer either 85% or 75% of the face

amount of such account under arrangements similar to those described above. If the account

receivable was purchased under the Secondary A/R Sales Agreement, the Inventory Buyer would

pay the proceeds received from the A/R Buyer to the Seller, less the 50% purchase price

previously paid for the inventory, plus the servicing fee of 1% previously paid to Solyndra.

Once the account receivable was collected, Solyndra would be entitled to the same recovery as

under the A/R Sale Agreement. If, on the other hand, the account receivable resulting from the

sale of the inventory was not purchased under the Secondary A/R Sale Agreement, Solyndra

would be entitled to collect any proceeds received on such account after the Inventory Buyer was

reimbursed for its 50% purchase price, plus a retention of 10%. In addition, under the Inventory

Sales Agreement, Inventory Buyer has the right to retain for the proceeds otherwise payable to

Solyndra any losses it had incurred on the sale of the inventory. The net effect of the sale of

inventory under the Inventory Sale Agreement is that Solyndra can only expect to recover any

additional proceeds on account of such inventory if such inventory is sold for an amount greater

than 60% of estimated sales price used at the time of the sale of the inventory to the Inventory

Buyer to calculate the 50% purchase price, provided that the Inventory Buyer does not have any

other prior losses on sales to offset against such amounts.

20. As noted above, under both of the Sale Agreements, customers were directed to make payments to the account of Argonaut Solar LLC, as Agent (an affiliate of the DIP Lender), on behalf of Solyndra Solar LLC or Solyndra Solar II, LLC, as applicable. However, in certain instances, customers continued to remit such payments to Solyndra. As of the Petition Date, Solyndra held $3,501,934 in U.S. dollar collections in a collections account (acct. no. 133430002) held with the Master Collateral Agent (the "Master Collateral Agent Collections Account") and €256,421 in Euro collections held in an account at Wells Fargo Bank, N.A. (together with any additional receipts as noted in the following sentence hereof, the "Inventory Accounts Receivable Trust Funds") from accounts receivable that had been sold to the Inventory A/R Purchasers (both of which are affiliates of the DIP Lender). From and after the Petition Date, it is possible that the Debtors may continue to receive collections on account of accounts receivable and inventory belonging to the Inventory A/R Purchasers that do not constitute property of the Debtors' estates. Release of the Inventory Accounts Receivable Trust Funds to Argonaut Solar LLC, as Agent (an affiliate of the DIP Lender), is a condition to the availability of funding under the DIP Agreement. By this Motion, the Debtors seek an order directing the Master Collateral Agent (a) to release the Inventory Accounts Receivable Trust Funds in the Master Collateral Account to the Inventory A/R Purchasers, and (b) to the extent there are any other funds in the Master Collateral Account, to authorize the Debtors to use such cash collateral in accordance with the terms of the Interim Order.

21. Solyndra also continues to have custody to certain inventory that has been sold under the Inventory Sale Agreement to the Inventory Buyer, which inventory now comprises approximately 75% of the remaining inventory of the Debtors' products and has a

retail value of approximately $15,000,000 to $21,000,000 (the "Buyer Inventory"). Consistent with the terms of the Inventory Sale Agreement, the Debtors intend to continue to market and sell the Buyer Inventory in the ordinary course of business. The Debtors may also continue to make efforts to collect accounts receivable that have been sold to the A/R Buyer. The Buyer Inventory is presently held in multiple locations, but primarily in third party logistics facilities. Release of the Buyer Inventory for purposes of sale is a condition to the availability of funding under the DIP Agreement. Pursuant to the Sale Agreements, the Debtors' estates will be entitled to recover (out of the proceeds of such inventory sales and accounts receivable collections, as applicable) the excess proceeds, if any, otherwise payable to the Debtors under the Inventory Sale Agreement (i.e., the Debtors would be entitled to recoveries in excess of 60% of retail price less prior losses) and the A/R Sale Agreement (i.e., collections on accounts exceeding 94% for domestic accounts and 86% for foreign accounts).

## NEED FOR FINANCING

22.    As more fully set forth in the First Day Declaration, the Debtors have an urgent and immediate need for borrowings in the principal amount of up to $4,000,000 contemplated under the DIP Agreement and the use of Cash Collateral. Although the Debtors have ceased manufacturing operations in order to conserve capital, the Debtors are presently evaluating their options in these cases, which may include a "turnkey" sale of their business. In order for the Debtors to effectuate such sale process or other orderly restructuring of their assets in a manner that will maximize value for all constituents, the Debtors must have ample liquidity to meet their operational needs.

23.     Without the proposed postpetition financing and continued use of cash collateral, including the Restricted Funds, the Debtors will not have any liquidity to manage their chapter 11 cases, and therefore will be unable to fund their ordinary course expenditures or pay chapter 11 expenses.

24.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require postpetition financing and use of Cash Collateral to, among other things, proceed with an orderly restructuring of the Debtors' affairs and the payments and expenses attendant thereto, including the costs and expenses of administering these chapter 11 cases. The DIP Agreement has been negotiated in good faith and at arms length.

25.     The Debtors hereby request authority to incur credit in accordance with the DIP Agreement and to use Cash Collateral in compliance with the proposed Interim Order and the Budget. The Debtors believe the adequate protection provided for in the Interim Order protects the prepetition lenders' interests in their collateral. The DIP Lender is willing to extend financing in accordance with the terms of the DIP Agreement and, as part of such agreement and in accordance with the Interim Order and the Budget, the Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders have consented to the Debtors' use of Cash Collateral.

## BASIS FOR RELIEF

**A.     Approval Under Section 364(c) of the Bankruptcy Code**

26.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation

where debtor's best business judgment indicated financing was necessary and reasonable for

benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with

respect to postpetition credit, courts "permit debtors in possession to exercise their basic business

judgment consistent with their fiduciary duties.").

28. Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(l) of this title as an administrative expense, the
> court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt –
>
> (1)     with priority over any or all administrative expenses
> of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estates that is
> not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estates
> that is subject to a lien.

11 U.S.C. § 364(c).

28. In satisfying the standards of section 364(c) of the Bankruptcy Code, a

debtor need not seek credit from every available source, but should make a reasonable effort to

seek other sources of credit available of the type set forth in sections 364(a) and (b) of the

Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe

Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good-faith effort that

credit was not available without senior lien by unsuccessfully contacting other financial

institutions in immediate geographic area; "the statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable"); *Ames Dept. Stores*, 115 B.R.

at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions).

29.     Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices ... explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property ... because there is no property in the estate which is not already subject to a lien.").

30.     The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

31.     The Debtors believe that any restructuring of their business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Agreement and the use of Cash Collateral. The use of Cash Collateral

alone is insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Agreement.

32.     The Debtors believe that their efforts to obtain credit except as provided under the DIP Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered and would have required the "priming" of the existing lenders' "blanket" liens.

33.     After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Agreement represents the best financing presently available to the Debtors. Moreover, the Debtors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the DIP Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

**B.      Approval Under Section 364(d) and 364(e) of the Bankruptcy Code**

34.     When a debtor is not able to obtain financing pursuant to the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain such financing that is secured by a

"priming lien" that is senior or equal to existing liens against property of the estate. 11 U.S.C. §

364(d). Section 364(d)(1) of the Bankruptcy Code governs financing that is secured by a

priming lien and provides that a court may authorize a debtor to obtain such debt provided that

(i) the debtor is not able to obtain credit otherwise and (ii) the lien being primed is adequately

protected.

35.     In the context of section 364(d), collateral only requires adequate

protection to the extent that a priming lien will result in a decrease in the value of such entity's

interest in the subject property. *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The

goal of adequate protection is to safeguard the secured creditor from diminution in the value of

its interest during the Chapter 11 reorganization."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865

(Bankr. W.D. Pa. 2003) (quoting *In re Sharon Steel Corp.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993)

("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in

value essentially what he bargained for."); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr.

E.D.N.Y. 1996) (citing *In re 495 Central Park Ave. Corp.*). What constitutes adequate

protection is decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to

the vagaries of each case"); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y.

1992); *In re Becker Indus. Corp.*, 58 B.R. 725, 236 (Bankr. S.D.N.Y. 1986).

36.     The Debtors satisfy the standard under section 364(d) of the Bankruptcy

Code. Here, the Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders consent

to the "priming" contemplated under the DIP Agreement. The Debtors await confirmation from

the Prepetition B/D Lenders as to whether they will also support the relief requested by the

Motion. In the event that such consent is not obtained, the Debtors would submit that the Prepetition B/D Lenders are more than adequately protected notwithstanding the proposed priming under the DIP Agreement because, in the absence of use of Cash Collateral and access to financing, the Prepetition Collateral would be worth substantially less than in the context of an orderly sale process.

37.     Notwithstanding the foregoing, the Debtors are prepared to offer adequate protection to the Prepetition Secured Parties in the form of replacement liens to the extent of any diminution in value of the Prepetition Secured Parties' liens in the collateral from and after the Petition Date, subject to the Carve-Out and junior to the DIP Obligations.

38.     Further, the DIP Agreement was negotiated in good faith and at arms length for purposes of section 364(e) of the Bankruptcy Code. The DIP Lender has acted in good faith in connection with negotiating the DIP Agreement, extending credit under the DIP Facility and allowing the use of Cash Collateral, and its reliance on this Interim Order is in good faith.

39.     In light of the foregoing, the DIP Agreement is vital to maximizing the value of the Debtors' estates and should be approved by the Court.

**C.      Use of Cash Collateral**

40.     The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code. Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estates, in the ordinary course of business, without notice or hearing, and

may use property of the estates in the ordinary course of business without notice or hearing.

11 U.S.C. § 363(c)(1).

41.     The Bankruptcy Code establishes a special requirement, however, regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estates and an entity other than the estates have an interest . . .." 11 U.S.C. § 363(a). Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

42.     Here, for the same reasons noted above, the Prepetition Secured Parties either consent to the use of Cash Collateral or are otherwise adequately protected.

## INTERIM ORDER AND FINAL HEARING

43.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

44.     In order to avoid immediate and irreparable harm to the estates and allow the Debtors to proceed with an orderly restructuring, the Debtors should be authorized to access postpetition financing and use the Cash Collateral, pending the Final Hearing. Without the ability to borrow funds under the DIP Agreement and use Cash Collateral, the Debtors would be

unable to meet their postpetition obligations and would be unable to maximize the value of their assets, thus causing irreparable harm to the value of the Debtors' estates.

45.     Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## NOTICE OF MOTION

46.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty-five largest unsecured creditors on a consolidated basis; (vi) counsel to the Prepetition Tranche A Term Loan Facility Representative; (vii) counsel to the Prepetition Tranche B/D Agent, (viii) counsel to the Prepetition Tranche E Agent, (ix) all other known parties asserting a lien against the Debtors' assets, (x) the DIP Lender, and (xi) the Master Collateral Agent (each as defined herein), by telecopy, email, overnight courier and/or hand delivery. Because of the nature of the relief requested, the Debtors respectfully submit that no other or further notice of the relief requested in this Motion need be given.

## NOTICE WITH RESPECT TO FINAL HEARING

47.     No trustee, examiner or statutory committee has been appointed in the Debtors' cases. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with

the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) the Debtors' thirty-five largest unsecured creditors on a consolidated basis; (vi) counsel to the Prepetition Tranche A Term Loan Facility Representative; (vii) counsel to the Prepetition Tranche B/D Agent, (viii) counsel to the Prepetition Tranche E Agent, (ix) all other known parties asserting a lien against the Debtors' assets, (x) the DIP Lender, and (xi) the Master Collateral Agent (each as defined herein), by telecopy, email, overnight courier and/or hand delivery.; and (i) all parties that have filed notices of appearance and requests for notices in the Debtors' chapter 11 cases. The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## **NO PRIOR REQUEST**

48.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, based upon the foregoing, the Debtors request entry of the Interim Order and the Final Order under sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtors to (a) enter into and incur credit under the DIP Agreement, (b) use Cash Collateral, and (c) provide adequate protection to the Prepetition Secured Parties, in accordance with the provisions hereof, and (ii) scheduling the Final Hearing Date.

Dated: September 6, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_Bäm_

Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:       rpachulski@pszjlaw.com
              dgrassgreen@pszjlaw.com
              bgrohsgal@pszjlaw.com
              jfried@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession