# EXHIBIT B

## DIP Agreement

# $4,000,000 SENIOR SECURED, SUPERPRIORITY DEBTOR IN POSSESSION TERM LOAN, GUARANTY AND SECURITY AGREEMENT

THIS **$4,000,000 SENIOR SECURED, SUPERPRIORITY DEBTOR IN POSSESSION TERM LOAN, GUARANTY AND SECURITY AGREEMENT** (this "**Agreement**") dated as of September 6, 2011 among [_____], as lender (the "**Lender**"), **SOLYNDRA LLC**, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), and **360 DEGREE SOLAR HOLDINGS, INC.** (f/k/a Solyndra Inc.), a Delaware corporation, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, as Guarantor (the "**Parent**" and together with the Borrower, the "**Debtors**"), provides the terms on which the Lender shall lend to Borrower and Borrower shall repay the Lender.

WHEREAS, the Borrower, the Lenders party thereto, and Argonaut Ventures I, LLC ("**Argonaut**"), as Tranche A Representative, are parties to that certain Term Loan Agreement (Tranche A) (the "**Existing Term Loan Agreement**"), dated as of February 23, 2011, pursuant to which the Lender have extended or agreed to extend up to $75,000,000 in term loans to the Borrower subject to the terms and conditions contained therein;

WHEREAS, simultaneous with the execution of the Existing Credit Agreement, the Borrower entered into that certain First Amended and Restated Common Agreement, dated as of February 23, 2011 (the "**Common Agreement**"), among the Borrower, the U.S. Department of Energy, acting by and through the Secretary of Energy, for itself as a Restructured Debtor (as defined therein) and as guarantor of the FFB Obligations (as defined therein, in such capacity, "**DOE**"), the U.S. Department of Energy, acting by and through the Secretary of Energy, as the Loan Servicer (in such capacity, the "**Loan Servicer**"), U.S. Bank National Association, a national banking association, as the Master Collateral Agent (as defined therein), the Tranche A Representative (as defined therein), Argonaut, as the Tranche E Credit Facility Agent (as defined therein), and the Tranche C Credit Facility Agent (as defined therein);

WHEREAS, pursuant to the Tranche B Credit Facility (the "**Tranche B Credit Facility**"), the lenders party thereto (the "**Tranche B Lenders**") thereto have extended or, subject to the terms and conditions thereof, agreed to extend loans to the Borrower in an aggregate principal amount of up to $150,000,000;

WHEREAS, pursuant to the Tranche D Credit Facility (the "**Tranche D Credit Facility**"), the lenders party thereto (the "**Tranche D Lenders**") have extended or, subject to the terms and conditions thereof, agreed to extend loans to the Borrower in an aggregate principal amount of up to $385,000,000;

WHEREAS, pursuant to the Tranche E Credit Facility (the "**Tranche E Credit Facility**" and together with the Tranche A Credit Facility, the Tranche B Credit Facility and the Tranche D Credit Facility, the "**Pre-Petition Credit Facilities**"), the lenders party thereto (the "**Tranche E Lenders**" and together with the Tranche A Lenders, the Tranche B Lenders and the Tranche D Lenders, the "**Pre-Petition Lenders**") have extended or, subject to the terms and conditions thereof, agreed to extend loans to the Borrower in an aggregate principal amount of up to $186,481,645;

**WHEREAS,** on September 6, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Cases**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** an Event of Default has occurred and is continuing under Section 7.1 of the Existing Term Loan Agreement as a result of the filing of the Bankruptcy Cases (the "**Bankruptcy Defaults**");

**WHEREAS,** the Debtors have requested that the Lender provide up to an aggregate amount of $4,000,000 in a multiple draw, non-amortizing term loan pursuant to a senior secured, super-priority, debtor in possession credit agreement;

**WHEREAS,** the Lender has agreed to provide such loans the on the terms and conditions contained in this Agreement;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants contained herein, the parties agree as stated above and as follows:

**1      DEFINED TERMS.**

**1.1      Capitalized Terms.**  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 12.

**2      LOAN AND TERMS OF PAYMENT.**

**2.1      Promise to Pay.**  Borrower hereby unconditionally promises to pay the Lender the outstanding principal amount of the Obligations and accrued and unpaid interest thereon and any other amounts due hereunder as and when due in accordance with this Agreement.

**2.2      Multi-Draw Term Loan Facility.**

(a)      (i)      Availability.  Subject to the terms and conditions of this Agreement, the Lender agrees to make available to the Borrower a term loan (the "**DIP Loan**") in four borrowings (each a "**DIP Advance**") as follows:

(A)      on September 7, 2011, in an amount not to exceed $500,000;

(B)      on September 14, 2011, in an amount not to exceed $1,000,000;

(C)      on September 21, 2011, in an amount not to exceed $1,000,000; and

(D)      on September 28, 2011, in an amount not to exceed $1,500,000.

(ii)      The DIP Advances may be prepaid or repaid from time to time, subject to the terms and conditions hereof, and amounts repaid or prepaid may subsequently be

reborrowed. Any additional DIP Advance shall be in a minimum amount of $1,000,000 and incremental amounts of $500,000. In no event shall the outstanding amount of DIP Advances exceed the amount of the DIP Commitment.

(b)     Repayment. The unpaid principal amount in respect of the Obligations (including, without limitation, the DIP Advances (including interest thereon)) shall be due and payable on the Maturity Date. The Lender's DIP Commitment shall be shall be reduced immediately and without further action on each Funding Date in an amount equal to the amount of DIP Advances funded on such date after giving effect to such funding.

(c)     Voluntary Prepayments. Borrower shall have the option to prepay all, or any part, of the DIP Advances (together with accrued interest on the amount being repaid) at any time and from time to time, without premium or penalty. All such prepayments shall be made upon not less than two Business Day's prior written or telephonic notice given to the Lender by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to the Lender. Upon the giving of any such notice, the principal amount of the DIP Advances specified in such notice shall become due and payable on the prepayment date specified therein.

(d)     Mandatory Prepayments. Borrower shall repay the DIP Advances in whole or in part:

(i)     to the extent cash on hand exceeds $1,000,000 (the "**Mandatory Prepayment Amount**") for the duration of any period of five consecutive Business Days, pay to the Lender within 2 Business Days, the amount of any excess cash on hand above such Mandatory Prepayment Amount at the end of such five consecutive Business Day period; and

(ii)     within 2 Business Days upon receipt of Net Asset Sale Proceeds from any Permitted Disposition, pay to the Lender an amount equal to such Net Asset Sale Proceeds.

(iii)     if at any time the aggregate outstanding amount of DIP Advances exceeds the DIP Commitment, within 1 Business Day, pay to the Lender the amount of such excess.

(e)     Application of Prepayments. Any payments made under Sections 2.2(b), (c) or (d) hereof shall be applied as follows:

(i)     to prepay the DIP Advances; and

(ii)     to permanently reduce the DIP Commitments to the full extent thereof.

**2.3     Payment of Interest on the DIP Advances; Payment Terms**.

(a)     Interest Rate.  The principal amount outstanding for the DIP Advances shall accrue interest, which interest shall be payable as provided in clause (c) below, calculated daily at a per annum rate equal to 15% (the "**Interest Rate**").  Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

(b)     Default Rate.   Immediately upon the occurrence and during the continuance of an Event of Default under Section 7.1 hereof, the DIP Advances shall bear interest at a rate per annum which is two percentage points above the Interest Rate (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.3(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender.

(c)     Payments.  The accrued and unpaid interest due under this Agreement shall be payable in arrears, (i) simultaneously with the repayment or prepayment of any DIP Advances (on the principal amount of DIP Advances so repaid or prepaid) and (ii) on the first Business Day of each calendar month.  All payments of interest shall be made in United States dollars in immediately available funds on the date payable.  Payments of principal and/or interest and/or other amounts owing hereunder or under any other Loan Document to the Lender received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest, as applicable, shall continue to accrue.

**2.4     Fees.**  The Borrower shall pay to the Lender (a) on the Closing Date, a Closing Fee (the "**Closing Fee**") in an amount equal to 2% of the aggregate amount of the DIP Commitment, such Closing Fee to be fully earned on the Closing Date and payable upon the making of the initial DIP Advance and (b) such other fees in the amounts and at the times separately agreed.

**3     CONDITIONS OF LOANS**

**3.1     Conditions Precedent to Effectiveness.**  This Agreement shall become effective upon the date (the "**Closing Date**") of the satisfaction of, and the Lender's obligation to make the initial DIP Advance is subject to, the condition precedent that the Lender shall have received, in form and substance satisfactory to the Lender in its sole and absolute discretion evidence of satisfaction of the following conditions, any of which may be deemed satisfied or waived in whole or in part by the Lender:

(a)     Loan Documents.  The Lender shall have received copies duly executed by each of the parties thereto of this Agreement.

(b)     Organizational and Capital Structure.  The organizational structure and capital structure of the Debtors shall be as set forth on Schedule 3.1(b).

(c)     Note.  Borrower shall have delivered to Lender a promissory note, in the form of Exhibit A hereto, duly hereto (the "**Note**").

(d)    <u>Representations and Warranties</u>. The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; <u>provided</u> that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(e)    <u>No Event of Default</u>. No event shall have occurred and be continuing or would result from the consummation of the transactions contemplated herein that would constitute an Event of Default or a Default.

(f)    <u>Secretary's Certificate</u>. The Secretary of each Debtor shall have delivered to the Lender a certificate certifying (i) the bylaws or applicable governing document of each Debtor, (ii) the certificate of incorporation or applicable formation document of each Debtor, (iii) resolutions of the governing body of each Debtor authorizing the execution and delivery of the Loan Documents to which it is a party and authorizing the transactions contemplated herein and in each other Loan Document, (iv) the signature and incumbency certificates of the officers of each Debtor executing each Loan Document to which it is a party; and (v) a good standing certificate from the applicable Governmental Authority of each Debtor's jurisdiction of incorporation, organization or formation, and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date on or prior to the Closing Date.

(g)    <u>Budget</u>. The Lender shall have received the Initial Budget in form and substance satisfactory to the Lender in its sole discretion.

(h)    <u>Evidence of Insurance</u>. The Lender shall have received a certificate from the Debtors' insurance broker or other evidence satisfactory to it that all insurance set forth on Schedule is in full force and effect.

(i)    <u>Governmental Authority and Consents</u>. There shall be no pending or threatened in writing action by any Governmental Authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending.

(j)    <u>Interim Order</u>. The Interim Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion).

(k)    <u>Bid Packages</u>. The Borrower shall forward complete and accurate bid packages to nationally recognized inventory liquidation firms, nationally recognized liquidators of fixed assets, and nationally recognized real estate and lease disposition companies.

(l)    <u>Equity Funding Account</u>.  The Bankruptcy Court shall have entered an order satisfactory to the Lender requiring the release to, and authorizing the use by, the Borrower of the funds on account in the Equity Funding Account in an amount not less than $3,040,311.51.

(m)    <u>Dollar Revenue Account and Foreign Receivables Account</u>.  The Bankruptcy Court shall have entered an order satisfactory to the Lender (i) requiring the release to the Inventory and Receivables Purchaser of the funds in the Dollar Revenue Account in an amount not less than $3,501,934.46, (ii) requiring the release to the Inventory and Receivables Purchaser of the funds in the Foreign Receivables Account in an amount not less than €256,421.96 and (iii) ruling that such funds, and any additional funds, arising from the purchase by the Inventory and Receivables Purchaser of Inventory and Receivables under and in connection with the Inventory and Receivables Purchase Agreement, regardless of where such funds are deposited, are property of the Inventory and Receivables Purchaser and are not property of the estate of the Debtors.

(n)    <u>Release of Inventory</u>.  Any inventory in the possession of Menlo Logistics, Inc. that is owned by the Inventory and Receivables Purchaser shall be released to, and made available for use or sale by, the Inventory and Receivables Purchaser.

(o)    <u>Criticial Vendor Order</u>.  The Bankruptcy Court shall have entered a 'critical vendor' order in form and substance satisfactory to the Lender in its sole discretion.

(p)    <u>Fees</u>.  Borrower shall have paid to the Lender (i) the fees payable on the Closing Date referred to in Section 2.4 and (ii) the reasonable fees, expenses and disbursements of the Lender (including, without limitation, fees, costs and expenses of Gibson Dunn & Crutcher LLP, counsel to the Lender, in connection with the negotiation, preparation, execution and administration of the Loan Documents).

(q)    <u>No Litigation</u>.  The Lender shall have received a certificate from the Debtors listing (in sufficient detail) all litigation currently pending or threatened in writing where the claimant has alleged damages in excess of $100,000.  There are no judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably expected to have a Material Adverse Effect.

(r)    <u>Additional Documents</u>.  The Lender shall have received such additional documents and instruments as it may reasonably request.

**3.2    Conditions Precedent to all DIP Advances**.  The obligations of the Lender to make any DIP Advance, including the initial DIP Advance, are subject to the satisfaction, or waiver in whole or in part by the Lender, of the following conditions precedent:

(a)    <u>Funding Notice.</u>  At least one Business Day prior to any DIP Advance, the Lender shall have received a Funding Notice duly executed and delivered by a responsible officer of the Borrower.

(b)     Security Documents.  Each Security Document shall remain in full force and effect and continue to create a valid first priority security interest in, and Lien on, the personal property Collateral of each Debtor.

(c)     Financing Order.  The Financing Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion).

(d)     Representations and Warranties.  The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Funding Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(e)     No Event of Default.  No Event of Default or Default shall have occurred and be continuing or would result from the making of such DIP Advance.

**3.3     Use of Proceeds.**  The proceeds of the DIP Advances shall be used to (a) pay interest, fees and expenses associated with this Agreement, (b) pay ordinary course expenses of the Debtors' operations in accordance with the Budget (subject to the Variance) and (c) pay costs and expenses associated with the Bankruptcy Cases to the extent consistent with the Budget (subject to the Variance, and including professional costs incurred and paid in accordance with the Budget).  In no event shall the proceeds of any DIP Advance be used to bring any claim or suit against the Lender or to challenge the liens or claims of the Pre-Petition Lenders.

# 4     CREATION OF SECURITY INTEREST; GUARANTY.

4.1     **Security Agreement.**

(a)     Grant of Security Interest.  Each Debtor hereby grants the Lender, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to the Lender, all of such Debtor's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  Each Debtor represents, warrants, and covenants that, subject to the entry of the Financing Order, the security interest granted herein is and shall at all times continue to be a First Priority perfected security interest in the Collateral.  If any Debtor shall acquire a commercial tort claim (as defined in the Uniform Commercial Code as in effect in the State of New York (the "**Code**")), such Debtor shall promptly notify the Lender in a writing signed by such Debtor of the general details thereof (and further details as may be required by the Lender) and grant to the Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Lender.

If this Agreement is terminated, the Lender's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash.  Upon

payment in full in cash of the Obligations (other than inchoate indemnity obligations) and at such time as the Lender's obligation to make DIP Advances has terminated, the Lender shall, at Borrower's sole cost and expense, release its Lien in the Collateral and all rights therein shall revert to the applicable Debtor. The Lender shall take any action reasonably requested by the Borrower having the effect of releasing any Collateral to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document.

(b)     Authorization to File Financing Statements.     Each Debtor hereby authorizes the Lender to file financing statements, without notice to such Debtor, with all appropriate jurisdictions to perfect or protect the Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either a Debtor or any other Person, other than in accordance with this Agreement shall be deemed to violate the rights of the Lender under the Code.

(c)     Pledge of Collateral. Each Debtor hereby pledges, collaterally assigns and grants to the Lender, a security interest in, all of its Share Collateral, together with all proceeds and substitutions thereof, all cash, stock and other moneys and property paid thereon, all rights to subscribe for securities declared or granted in connection therewith, and all other cash and noncash proceeds of the foregoing, as security for the performance of the Obligations. On the Closing Date, the certificate or certificates for the Share Collateral will be delivered to the Lender, accompanied by an instrument of assignment duly executed in blank by the Parent. To the extent required by the terms and conditions governing the Share Collateral, the Parent shall cause the books of each entity whose Share Collateral is part of the Collateral and any transfer agent to reflect the pledge of the Share Collateral. Upon the occurrence and during the continuance of an Event of Default hereunder, the Lender may, in accordance with applicable law, effect the transfer of any securities included in the Collateral (including but not limited to the Share Collateral) into the name of the Lender and cause new certificates representing such securities to be issued in the name of the Lender or of any transferee thereof. The Parent will execute and deliver such documents, and take or cause to be taken such actions, as the Lender may reasonably request to perfect or continue the perfection of the Lender's security interest in the Share Collateral. Unless an Event of Default shall have occurred and be continuing, the Parent shall be entitled to exercise any voting rights with respect to the Share Collateral and to give consents, waivers and ratifications in respect thereof, provided that no vote shall be cast or consent, waiver or ratification given or action taken which would be inconsistent with any of the terms of this Agreement or which would constitute or create any violation of any of such terms. All such rights to vote and give consents, waivers and ratifications shall terminate upon the occurrence of an Event of Default.

4.2     **Guaranty.**

(a)     Guaranty of the Obligations.     The Guarantor hereby irrevocably and unconditionally guarantees to the Lender for the benefit of the Lender the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise  (collectively, the **"Guaranteed Obligations"**).

(b)     Payment by Guarantor.  The Guarantor hereby agrees, in furtherance of the foregoing and not in limitation of any other right which the Lender may have at law or in equity against the Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise , Guarantor will upon demand pay, or cause to be paid, in cash, to the Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations  and all other Guaranteed Obligations then owed to the Lender as aforesaid.

(c)     Liability of Guarantor Absolute.  The Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees as follows:

(i)     this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of the Guarantor and not merely a contract of surety;

(ii)     the Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and the Lender with respect to the existence of such Event of Default;

(iii)     the obligations of the Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against the Guarantor whether or not any action is brought against the Borrower or any of such other Guarantor and whether or not the Borrower is joined in any such action or actions;

(iv)     payment by the Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge the Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Lender is awarded a judgment in any suit brought to enforce the Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release the Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by the Guarantor, limit, affect, modify or abridge the Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(v)     Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of the Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the

Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of the Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the Lender may have against any such security, in each case as the Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against the Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(vi)     this Guaranty and the obligations of the Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not the Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though the Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the Lender's consent to the change, reorganization or termination of the corporate structure or existence of the Debtors or any of their Subsidiaries and to any corresponding

restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which any Borrower may allege or assert against the Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of the Guarantor as an obligor in respect of the Guaranteed Obligations.

(d)     Waivers by Guarantor.  The Guarantor hereby waives, for the benefit of the Lender:  (a) any right to require the Lender, as a condition of payment or performance by the Guarantor, to (i) proceed against the Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of the Lender in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of the Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon the Lender's errors or omissions in the administration of the Guaranteed Obligations; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to theBorrower and notices of any of the matters referred to herein and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(e)     Guarantor's Rights of Subrogation, Contribution, Etc.     Until the Guaranteed Obligations shall have been indefeasibly paid in full and the DIP Commitments shall have terminated, the Guarantor hereby waives any claim, right or remedy, direct or indirect, that the Guarantor now has or may hereafter have against the Borrower or any of its assets in connection with this Guaranty or the performance by the Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that the Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim,

right or remedy that the Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Lender. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the DIP Commitments shall have terminated, the Guarantor shall withhold exercise of any right of contribution the Guarantor may have against any other guarantor of the Guaranteed Obligations, including any such right of contribution as contemplated herein. The Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification the Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution the Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights the Lender may have against the Borrower, to all right, title and interest the Lender may have in any such collateral or security, and to any right the Lender may have against such other guarantor. If any amount shall be paid to the Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

(f) _Subordination of Other Obligations_. Upon the entry of the Financing Order, any Indebtedness of the Borrower or the Guarantor now or hereafter held by the Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

(g) _Continuing Guaranty_. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the DIP Commitments shall have terminated. The Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

(h) _Authority of Guarantor or Borrower_. It is not necessary for the Lender to inquire into the capacity or powers of the Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

(i) _Financial Condition of Borrower_. Any DIP Advance may be made to the Borrower without notice to or authorization from the Guarantor regardless of the financial or other condition of Borrower at the time of any such grant. The Lender shall have no obligation to disclose or discuss with the Guarantor its assessment, or Guarantor's assessment, of the financial condition of Borrower. The Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and their ability to perform its obligations under the Loan Documents, and the Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. The

Guarantor hereby waives and relinquishes any duty on the part of the Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by the Lender.

**5    REPRESENTATIONS AND WARRANTIES.**  In order to induce the Lender to enter into this Agreement and to make each DIP Advance to be made hereunder, each Debtor represents and warrants to the Lender, on the Closing Date and on each Funding Date, that the following statements are true and correct:

**5.1    Organization; Requisite Power and Authority; Qualification**.  Each Debtor (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified on Schedule 5.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and subject to the entry of the Financing Order, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and hereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**5.2    Equity Interests and Ownership**.  The Equity Interests of each Debtor have been duly authorized and validly issued and is fully paid and non-assessable.  As of the date hereof, other than in connection with equity issuances in connection with 2005 Amended and Restated 360 Degree Solar Holdings, Inc. Equity Incentive Plan, there is no existing option, warrant, call, right, commitment or other agreement to which any Debtor is a party requiring, and there is no membership interest or other Equity Interests of any Debtor outstanding which upon conversion or exchange would require, the issuance by any Debtor of any additional membership interests or other Equity Interests of any Debtor or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of any Debtor.  Schedule 5.2 correctly sets forth the ownership interest of each Debtor in their respective Subsidiaries as of the Closing Date.

**5.3    Due Authorization**.  The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action on the part of each Debtor that is a party thereto, subject to the entry of the Financing Order.

**5.4    No Conflict**.  Upon entry by the Bankruptcy Court of the Financing Order, the execution, delivery and performance by the Debtors of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to any Debtor, (ii) any of the Organizational Documents of any Debtor, or (iii) any order, judgment or decree of any court or other agency of government binding on any Debtor; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of any Debtor other than with respect to the Debtors, conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Bankruptcy Cases; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Debtor (other than any Liens created under any of the Loan

Documents in favor of Lender); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of any Debtor, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Lender.

**5.5    Governmental Consents**. Subject to the entry of the Financing Order, the execution, delivery and performance by the Debtors of the Loan Documents to which they are parties and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Lender for filing and/or recordation, as of the Closing Date or such as have been obtained or made and are in full force in effect prior to the Closing Date.

**5.6    Binding Obligation**. Subject to the entry of the Financing Order, each Loan Document has been duly executed and delivered by each Debtor that is a party thereto and is the legally valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (including, without limitation, the terms of the Financing Order).

**5.7    Financial Statements**. The Financial Statements were prepared in conformity with GAAP (subject, in the case of the unaudited financials, to the absence of footnotes and to normal year-end adjustments) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to the absence of footnotes and to changes resulting from audit and normal year-end adjustments.

**5.8    Adverse Proceedings, Etc**. There are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. No Debtor (a) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.9    Payment of Taxes; Pension Contributions**. Except as set forth on Schedule 5.9, all tax returns and reports of the Debtors required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon any Debtor and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. Except as set forth on Schedule 5.9, no Debtor knows of any proposed tax assessment against any Debtor which is not being actively contested by such Debtor in good faith and by

appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor. Each Debtor has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and no Debtor has withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of such Debtor, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

**5.10 Environmental Matters**. Neither any Debtor nor any of their respective properties or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Company Material Adverse Effect. Neither any Debtor nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law. There are and, to each Debtor's knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against any Debtor that, individually or in the aggregate, could reasonably be expected to have a Company Material Adverse Effect. Neither any Debtor nor, to any Debtor's knowledge, any predecessor of any Debtor treated Hazardous Materials at any property of the Debtors other than legally, and none of Debtors' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, other than legally under Environmental Laws or any state equivalent. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect. No event or condition has occurred or is occurring with respect to Debtor relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Company Material Adverse Effect.

**5.11 No Defaults**. Other than as a result of the Bankruptcy Cases, no Debtor is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably expected to have a Material Adverse Effect.

**5.12 Material Contracts**. Except as set forth on Schedule 5.12, there are no Material Contracts in effect on the Closing Date.

**5.13 Regulatory Compliance**. No Debtor is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. No Debtor is engaged as one of its important activities in extending credit for margin stock (under Regulations T and U of the Federal Reserve Board of Governors). Each Debtor has complied in all material respects with the Federal Fair Labor Standards Act. No Debtor is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a

"holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005. No Debtor has violated any laws, ordinances or rules, the violation of which could reasonably be expected to have a Material Adverse Effect.

5.14    **Margin Stock**. No Debtor owns any Margin Stock.

5.15    **Employee Matters**. No Debtor is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against any Debtor, or to the best knowledge of such Debtor, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Debtor or to the best knowledge of such Debtor, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving any Debtor, and (c) to the best knowledge of such Debtor, no union representation question existing with respect to the employees of any Debtor and, to the best knowledge of such Debtor, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably expected to have a Material Adverse Effect.

5.16    **Employee Benefit Plans**. Each Debtor and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by any Debtor or any of their ERISA Affiliates. No ERISA Event has occurred or is reasonably expected to occur. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor or any of their respective ERISA Affiliates. The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by any Debtor or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan. No Debtor has a Multiemployer Plan.

5.17    **Compliance with Statutes, Etc**. Each Debtor is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of any Debtor),

except such non-compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**5.18    Disclosure**.  No written representation, warranty or other statement of any Debtor in any certificate or written statement given to the Lender, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to the Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading (it being recognized that the projections and forecasts provided by any Debtor in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**5.19    Financial Condition**.  Since the Petition Date, there have been no changes in the assets, liabilities, financial condition or business of any Debtor other than changes in the ordinary course of business or those which have not had, and would not reasonably be expected to have, a Material Adverse Effect.

**5.20    Subsidiaries**.  The Debtors confirm that (a) Solyndra California Development LLC, a Delaware limited liability company and New Shape Solar LLC, a Delaware limited liability company, are non-operating Subsidiaries, have no assets or liabilities, and will be dissolved in connection with the Bankruptcy Cases and (b) all membership interests of Photon Solar LLC, a Delaware limited liability company, have been transferred to ProSun Project Company, LLC.

**5.21    Super-Priority Nature of Debtor's Obligations and Lender's Liens**.

(a)    Subject to the terms of the Financing Order, all Obligations of the Debtors hereunder and under the other Loan Documents, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall be:

(i)    Claims, entitled to the benefits of Bankruptcy Code § 364(c)(1), having a super-priority over any and all administrative expenses of the kind specified in Bankruptcy Code §§ 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 ("**Super-Priority Claims**"), subject only to a carve-out (the "**Carve-Out**") for (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; and (ii) the allowed and reasonable fees and expenses of professionals employed by the Debtors and the Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**") (x) until the issuance of a Carve Out Notice, in the amounts set forth in the Budget (the "**Pre-Default Carve-Out**"), and (y) from and after delivery of a Carve Out Notice, in an aggregate amount (the "**Residual Carve Out**") not to exceed $50,000, provided that (A) any payments made to Case Professionals for services rendered prior to the delivery of the Carve Out Notice and in accordance with the Budget and (B) any fees and expenses of Case Professionals accrued prior to the delivery of the Carve Out Notice in the amounts set forth in the Budget and properly included in the Pre-Default Carve Out and subsequently allowed, shall not reduce the Residual Carve Out.  The Lender may conclusively rely upon the Borrower's

certification of the Carve-Out and the Lender shall have no liability for any errors in the Borrower's calculation of the Carve-Out.

(ii)     Secured, pursuant to Bankruptcy Code § 364(c)(2), subject to the Carve-Out, by a perfected first-priority Lien on all Collateral of the Debtors not subject to a Lien on the Petition Date.

(iii)     Secured, pursuant to Bankruptcy Code § 364(d)(1), subject to the Carve-Out, by perfected first-priority senior "priming" Liens on all Collateral of the Debtors subject to valid and perfected liens existing on the Petition Date in favor of holders of the Prepetition Secured Debt, and immediately junior to any valid and perfected lien on such assets existing on the Petition Date that is senior to the liens in favor of holders of the Prepetition Secured Debt.

(iv)     Secured, pursuant to Bankruptcy Code § 364(c)(3), subject to the Carve-Out, by perfected junior liens on all Collateral of the Debtors subject to valid and perfected liens existing on the Petition Date other than the liens in favor of holders of the Prepetition Secured Debt or other applicable law.

(v)     Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 364(c)(1), 503(b), 506(c), 507(b) or otherwise, and those resulting from the conversion of the Bankruptcy Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or *pari passu* with, the Super-Priority Claims of the Lender arising out of the DIP Advances. Upon written notice by the Lender to the Borrower, the Borrower shall be deemed to have authorized the Lender to fund the Carve-Out in a segregated account, which account shall be maintained for the benefit of the professionals (and any such amounts funded shall be Obligations hereunder).

(b)     Upon the entry by the Bankruptcy Court of the Interim Order and subject to the terms thereof, the perfected, First Priority Lien on, and security interest in, the Collateral described in the Loan Documents in favor of the Lender shall continue to be a valid and enforceable perfected First Priority Lien on, and security interest in, all right, title and interest of the Debtors in such Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person, including, without limitation, the Liens securing the Pre-Petition Secured Debt (subject only to the Carve-Out).

**5.22**     Reorganization Matters.

(a)     The Bankruptcy Cases were commenced on the Petition Date and proper notice was given of (i) the motion seeking approval of the Loan Documents and the Interim Order, and (ii) the hearing for the approval of the Interim Order. The Debtors shall give, on a timely basis as specified in the Interim Order all notices required to be given to all parties specified in the Interim Order.

(b)     In accordance with the terms of the Financing Order, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including,

without limitation, all administrative expense claims of the kind specified in sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out.

        (c)     From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order, the Liens securing the Obligations will continue to be valid and enforceable perfected Liens on all of the Collateral of the Debtors in the priorities described therein and in Section 5.20 hereof, except as otherwise expressly provided in Section 5.20.

        (d)     The Interim Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Lender in its sole discretion).

**5.23    Payment of Obligations**.   Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

**5.24    No Discharge; Survival of Claims**.   To the extent that any Obligations (other than inchoate indemnity obligations) are then outstanding or the Lender then has any commitment to make DIP Advances hereunder, each Debtor agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming the sale of all or substantially all of the assets of the Debtors in the Bankruptcy Cases (and each Debtor pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Lender pursuant to the Financing Order, and the Liens granted to the Lender pursuant to the Financing Order shall not be affected in any manner by the entry of an order confirming such sale in the Bankruptcy Cases.

**5.25    Waiver of any Priming Rights**.   Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, other than as expressly set forth in the Financing Order each Debtor hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal priority to, or greater priority than, that of the Obligations.

**6      COVENANTS.**

**6.1**    <u>Affirmative Covenants</u>.   Each Debtor covenants and agrees, so long as any DIP Commitment is in effect and until payment in full of all Obligations, each Debtor shall, and shall cause its Subsidiaries to, perform all covenants in this Section 6.

        (a)     <u>Financial Statements and Other Reports</u>.  The Debtors will deliver to the Lender:

        (i)     <u>Budget</u>.  Not later than the first Business Day of each week commencing after the delivery of the Initial Budget, (i) a Supplemental Budget extending the

Initial Budget for an additional week and (ii) a comparison of each line item set forth in the most recent Budget for the week most recently ended against the actual performance for such week with respect to each line item (and on a cumulative basis from the Petition Date to the date of such report), in each case in form and substance reasonably satisfactory to the Lender and certified as complete and accurate by the chief financial officer of the Borrower. The Debtors shall not be permitted to change the Budget in any manner inconsistent with the Variance without the written consent of the Lender in its sole and absolute discretion.

        (ii)    Notice of Default. Promptly upon any officer of any Debtor obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Debtor with respect thereto or (ii) the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of an Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Debtors have taken, is taking and proposes to take with respect thereto;

        (iii)    Notice of Litigation. Promptly upon any officer of any Debtor obtaining knowledge of (i) any Adverse Proceeding not previously disclosed in writing by the Debtors to the Lender, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii), if adversely determined could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Debtors to enable the Lender and its counsel to evaluate such matters;

        (iv)    ERISA. (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action the Debtors or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Debtor or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Parent, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as the Lender shall reasonably request;

        (v)    Notice Regarding Material Contracts. Promptly, and in any event within three (3) Business Days (i) after any Material Contract of any Debtor or any of its Subsidiary is terminated or amended in a manner that is materially adverse to such Debtor or its Subsidiary, as the case may be, or (ii) any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to the Lender (to the extent such delivery is permitted by the terms of any such Material Contract, provided, no such prohibition on delivery shall be effective if it were

bargained for by the applicable Debtor with the intent of avoiding compliance with this Section 6.1(a)(v)), and an explanation of any actions being taken with respect thereto;

(vi)     Information Regarding Collateral. Each Debtor agrees promptly to notify the Lender if any portion of the Collateral is damaged, destroyed or impaired;

(vii)     Other Information. (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by any Debtor to its security holders acting in such capacity, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by any Debtor with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, (iii) all press releases and other statements made available generally by any Debtor to the public concerning material developments in the business of any Debtor, and (B) such other information and data with respect to any Debtor as from time to time may be reasonably requested by the Lender (provided, however, that with respect to any such information filed with the Securities and Exchange Commission, the Debtors may satisfy their obligations under this paragraph (o) by providing the Lender with copies of, or links to, the information so filed).

(b)     Existence. Each Debtor will at all times preserve and keep in full force and effect its existence and the existence of its Subsidiaries, and all of its and their rights and franchises, licenses and permits material to its business.

(c)     Maintenance of Properties. Each Debtor will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all vessels and all other material properties used or useful in the business of such Debtor and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, overhauls, renewals and replacements thereof.

(d)     Insurance. Each Debtor will, and will cause each of its Subsidiaries to, maintain or cause to be maintained, with financially sound and reputable insurers, the same insurance that is has in effect on the date immediately prior to the Petition Date as set forth on Schedule 6.1(d). Each Debtor will use its commercially reasonable efforts to add the Lender as an additional insured and loss payee on such insurance policies within 10 days of the Closing Date.

(e)     Books and Records; Inspections. Each Debtor will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities. Each Debtor will permit any authorized representatives designated by the Lender to visit and inspect any of the properties of any Debtor and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

(f)  Compliance with Laws. Each Debtor will, and will cause each of its Subsidiaries to, comply, and shall cause all other Persons, if any, on or occupying any properties to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), noncompliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)  Environmental.

(i)  Environmental Disclosure.  The Borrower will deliver to the Lender:

(A)  as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of any Debtor (or Subsidiary of such Debtor) or by independent consultants, governmental authorities or any other Persons, with respect to environmental matters at any property of the Debtors or with respect to any Environmental Claims that could reasonably be expected to have a Company Material Adverse Effect;

(B)  promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by any Debtor (or Subsidiary of such Debtor) or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Company Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Company Material Adverse Effect, and (3) any Debtor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any property of any Debtor (or Subsidiary of such Debtor) that could cause such property or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(C)  as soon as practicable following the sending or receipt thereof by any Debtor, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, that could reasonably be expected to give rise to a Company Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether any Debtor (or Subsidiary of such Debtor) may be potentially responsible for any Hazardous Materials Activity that could reasonably be expected to have a Company Material Adverse Effect;

(D)     prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by any Debtor (or Subsidiary of such Debtor) that could reasonably be expected to (A) expose any Debtor (or Subsidiary of such Debtor) to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect or (B) affect the ability of any Debtor (or Subsidiary of such Debtor) to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations other than any loss not reasonably likely to cause a Company Material Adverse Effect and (2) any proposed action to be taken by any Debtor (or Subsidiary of such Debtor) to modify current operations in a manner that could reasonably be expected to subject any Debtor to any additional material obligations or requirements under any Environmental Laws other than any additional obligations not reasonably likely to cause a Company Material Adverse Effect; and

(E)     with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Lender in relation to any matters disclosed pursuant to this Section 6.1(g).

(h)     Hazardous Materials Activities, Etc.  Each Debtor shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Debtor that could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Debtor and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(i)     Account Debtors.  The Debtors (i) within 3 days of the Petition Date, shall have notified, and shall have caused the Inventory and Receivables Seller to notify, each Account Debtor to make, and to direct any of its Affiliates to make, payments on account of purchased Inventory and Receivables to the Inventory and Receivables Purchaser and (ii) within 2 days of receipt, shall direct, and shall have caused the Inventory and Receivables Seller to direct, any payment incorrectly received by the Debtor or the Inventory and Receivables Seller from any Account Debtor on account of Inventory and Receivables to the Inventory and Receivables Purchaser.

(j)     Material Contracts.  Each Debtor will comply, and shall cause each of its Subsidiaries to comply, with each of their obligations and requirements under its Material Contracts.

(k)     Further Assurances.  At any time or from time to time upon the request of the Lender, each Debtor will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of the Loan Documents.  In furtherance and not in limitation of the foregoing, each Debtor shall take such actions as the Lender may reasonably request from

time to time to ensure that the Obligations are guaranteed by Guarantor and are secured by substantially all of the assets of the Debtors and all of the outstanding Equity Interests of each Debtor.

(l)     <u>Bankruptcy Milestones</u>.

(i)     No later than 21 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, and such Final Order shall be in effect and shall not have been reversed, modified, amended or stayed (other than with the written consent of the Lender in its sole discretion);

(ii)     No later than 45 days after the Petition Date, the Borrower shall have agreed with the Lender on bankruptcy milestones provided by the Lender on a good faith basis and consistent with Budget to be incorporated into this clause (l) of Section 6.1.

**6.2**     **Negative Covenants**. Each Debtor covenants and agrees that until the date all DIP Advances are paid in full and the DIP Commitment has terminated:

(a)     <u>Indebtedness</u>. The Debtors shall not, and shall not agree to incur and shall not permit their Subsidiaries to, or agree to, create, guarantee, assume, permit to exist or otherwise become liable for any Indebtedness (including any Indebtedness under Section 364 of the Bankruptcy Code), except any Indebtedness specifically permitted by the Financing Order and listed on Schedule 6.2(a) (collectively, the "**Permitted Indebtedness**").

(b)     <u>Liens</u>. The Debtors shall not, and shall not agree to, and shall not permit their Subsidiaries to or to agree to, create, assume or otherwise permit to exist any Lien upon any of the Collateral or any of its other property, whether now owned or hereafter acquired, or in any proceeds or income therefrom, other than the Liens specifically permitted by the Financing Order and listed on Schedule 6.2(b) (collectively, the "**Permitted Liens**").

(c)     <u>Leases</u>. The Debtors shall not, and shall not permit their Subsidiaries to, enter into any agreement or arrangement to acquire by Lease the use of any property or equipment of any kind, except for the Leases specifically permitted by the Financing Order and listed on Schedule 6.2(c) (collectively, the "**Permitted Leases**").

(d)     <u>Loans, Advances, Investments</u>. The Debtors shall not make or permit, and shall not permit their Subsidiaries to make or permit, to remain outstanding any loans, extensions of credit or advances by the Debtor or such Subsidiary to or investments by the Debtor or such Subsidiary in any Person (whether by acquisition of any stocks, notes or other securities or obligations), except for those specifically provided for in the Budget, subject to the Variance, and permitted by the Financing Order (collectively, the "**Permitted Investments**"). For the avoidance of doubt, the Debtors shall not be permitted to make any loans, extensions of credit, investments, advances or otherwise provide funds to Foreign Subsidiary in an amount in excess of $500,000 in the aggregate for all Foreign Subsidiaries.

(e)     Fundamental Changes; Dispositions of Assets; Acquisitions.  No Debtor shall, nor shall it permit any of its Subsidiaries to:

(i)     enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) except pursuant to approval of the Bankruptcy Court and with the consent of the Lender;

(ii)    convey, sell, lease or license, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever except for Permitted Dispositions; or

(iii)   acquire by purchase or otherwise the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person.

(f)     Restricted Payments.  The Debtors shall not and shall not permit their Subsidiaries to (i) reduce its capital or declare or (ii) make or authorize any dividend or any other payment or distribution of cash or property to its Equity Owners on account of any equity interest or (iii) make any payment in respect of the Pre-Petition Credit Facilities or any other indebtedness existing on or prior to the Petition Date (each a "**Restricted Payment**").

(g)     Redemption or Issuance of Stock.  The Debtors shall not and shall not permit their Subsidiaries to redeem, retire, purchase or otherwise acquire, directly or indirectly, any of its Equity Interests now or hereafter outstanding (or any options or warrants issued by any Debtor with respect to its Equity Interests) or set aside any funds for any of the foregoing or issue any Equity Interests to any other Person.

(h)     Corporate Existence.  No Debtor shall change its (i) corporate name or corporate structure, (ii) jurisdiction of organization or (iii) Federal Taxpayer Identification Number or state organizational identification number.

(i)     Margin Regulations.  Neither the Debtors nor any of their Subsidiaries shall directly or indirectly apply any part of the proceeds of any DIP Advance or other revenues to the purchasing or carrying of any margin stock within the meaning of Regulation T, U or X of the Board of Governors of the Federal Reserve of the United States, or any regulations, interpretations or rulings thereunder.

(j)     Environmental Laws.  Neither the Debtors nor any of their Subsidiaries shall undertake any action or Release any Hazardous Substances in violation of any Environmental Law and shall ensure that each of its properties shall be operated in compliance with all Environmental Laws and that the properties of the Debtors shall not be operated in any manner that would pose a hazard to public health or safety or to the environment, in each case unless such action could not reasonably be expected to have a Company Material Adverse Effect.

(k)     ERISA.  Neither the Debtors nor any ERISA Affiliate shall adopt, establish, participate in, or incur any obligation to contribute to, any Employee Benefit Plan or

incur any liability to provide post-retirement welfare benefits in violation of any rule of any Governmental Authority.

(l)     Investment Company Act. The Debtors shall not take any action that would result in any Debtors being required to register as an "investment company" under the Investment Company Act.

(m)     Approved Budget. No Debtor shall use the proceeds of any Collateral or the DIP Advances other than in accordance with the Budget, subject to the Variance. The Debtors shall not make any material change to the amounts indicated in the Budget (other than the Variance) without the prior written consent of the Lender in its sole discretion. In no case shall the Debtor use any proceeds of Collateral or any DIP Advance to bring any claim or suit against the Lender or any of its Affiliates or to challenge or contest the Liens in respect of the Pre-Petition Credit Facilities.

(n)     Return of Inventory. No Debtor shall enter into any agreement to return any of its Inventory outside the ordinary course of business to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under section 546(h) of the Bankruptcy Code.

(o)     Critical Vendor and Other Payments; Certain Receipts. No Debtor shall make (i) any payments on account of any creditor's claims against the Debtors, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by the Lenders in writing.

(p)     Exercise of Remedies. No Debtor shall obtain, or seek to obtain, any stay on the exercise of the remedies of the Lender hereunder, under any Loan Document or the Financing Order.

(q)     Bankruptcy Related Negative Covenants. Debtors and their Subsidiaries will not seek, consent to, or permit to exist any of the following:

(i)     any modification, stay, vacation or amendment to the Financing Order or any First Day Order as to which the Lender has not consented in writing;

(ii)     a priority claim or administrative expense claim or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Carve-Out;

(iii)    any Lien on any Collateral (other than Permitted Liens as may be granted by the Financing Order having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Carve-Out;

(iv)    any order that authorizes the return of any of the Debtors' property, which is not in the ordinary course of business and consistent with past practices, pursuant to Section 546(h) of the Bankruptcy Code without the Lender's consent;

(v)    any order which authorizes the payment of any Indebtedness (other than adequate protection payments on account of the DIP Advances) incurred prior to the Petition Date, unless such payments are in compliance with the Budget;

(vi)    any order which would have the effect of impairing the nature, priority or terms of the Obligations or the Liens securing the Obligations pursuant to the terms of the Loan Documents; or

(vii)    any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents, or the Financing Order or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents, or the Financing Order.

**6.3**    Press Releases; Public Disclosures.  Each Debtor hereto agrees that neither it nor its affiliates will in the future issue any press releases or other public disclosure referring to the Loan Documents and the restructuring and other transactions contemplated thereby without the prior written consent of Lender, except as required by law or the Bankruptcy Cases.

**7**    **EVENTS OF DEFAULT.**

**7.1**    Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Debtor, if any one or more of the following conditions or events shall occur:

(a)    Failure to Make Payments When Due.  Failure by Borrower to pay (i) when due any installment of principal of any DIP Advance, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within three days after the date due; or

(b)    Breach of Certain Covenants.  Failure of any Debtor to perform or comply with any term or condition contained in Sections 5 and 6; or

(c)    Breach of Representations, Etc.    Any representation, warranty, certification or other statement made or deemed made by any Debtor in any Loan Document or in any statement or certificate at any time given by any Debtor or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(d)     Other Defaults Under Loan Documents.  Any Debtor shall default in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other subsection of this Section 7.1, and such default shall not have been remedied or waived within 5 days after the earlier of (i) any Authorized Officer of any Debtor becoming aware of such default or (ii) receipt by any Borrower of notice from the Lender of such default; or

(e)     Dissolution.  Any order, judgment or decree shall be entered against any Debtor decreeing the dissolution or split up of such Debtor and such order shall remain undischarged or unstayed for a period in excess of thirty days; or

(f)     Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Parent, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $10,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code; or

(g)     Guarantees, Security Interest and other Loan Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or the Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the grant of security interest contained herein with the priority required herein and in the Financing Order, in each case for any reason other than the failure of the Lender to take any action within its control, or (iii) any Debtor shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered herein or in the Financing Order; or

(h)     Permits.  At any time there shall have occurred the loss or termination of, or the receipt by any Debtor of notice of the loss or termination of any Governmental Authorization of any Debtor other than any loss or termination not reasonably likely to cause a Company Material Adverse Effect; or

(i)     Failure to Obtain Final Order.  The failure of the Debtors to obtain the entry of the Final Order by the Bankruptcy Court in form and substance acceptable to the Lender in its sole discretion within 21 days of the Petition Date; or

(j)     Challenge to Liens.  The Debtors shall institute any proceeding or investigation or support same by any other person who may challenge the status and/or validity,

and/or perfection and/or priority of the Liens on the Collateral created by the Loan Documents, or the Financing Order securing the Obligations; or

(k)     Certain Debtor Filings.  The Debtors (or any of them) without the consent of the Lender, file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement, that does not provide for the payment in full in cash of the obligations under this Agreement upon, and as a condition to, consummation of such plan of reorganization or liquidation; or

(l)     Enlarged Powers.  The entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or

(m)     Dismissal or Conversion.   The entry of an order dismissing any Bankruptcy Case or converting any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

(n)     Superior Claims.  The entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender, other than the Carve-Out, without the Lender's prior written consent; or

(o)     Relief from Automatic Stay.  The entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset of any Debtor having a fair market value in excess of $500,000 in the aggregate; or

(p)     Financing Order.  The entry of an order staying, reversing, vacating or otherwise modifying the DIP Advances, any Liens securing the Obligations (or the validity or First Priority status thereof) or the Financing Order; or

(q)     Sale of Assets.  The entry of an Order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of the Debtors' assets, if the net cash consideration for such sales are not immediately applied to, payment in whole or in part in cash of the Obligations.

**THEN**, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any application, motion, or notice to, hearing before or order from, the Bankruptcy Court,

(1) upon the occurrence of any Event of Default described in Section 8.1(i) through (p), automatically (x) the DIP Commitments shall terminate and (y) all Obligations shall become immediately due and payable, and the Lender may enforce any and all Liens created pursuant to Security Documents and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law, all without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by any Debtor, and

(2) upon the occurrence and during the continuance of any other Event of Default, the Lender shall, upon five days' written notice to the Debtors, the United States Trustee and the Committee:

(A) declare the DIP Commitments, if any, immediately terminated; and

(B) declare all of the Obligations to be immediately due and payable; and

(C) enforce any and all Liens created pursuant to Security Documents and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law,

in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Debtor.

Upon the occurrence of an Event of Default and the exercise by the Lender of its rights and remedies under this Agreement and the other Loan Documents and applicable law, the Debtors shall assist the Lender in effecting a disposition of the Collateral upon such terms as are reasonably acceptable to the Lender. The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## 8    NOTICES

**8.1**    All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by facsimile or electronic transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number indicated below. Each party may change its address or facsimile number or electronic mailing address by giving the other parties written notice thereof in accordance with the terms of this Section 9.

| | |
|---|---|
| If to Borrower: | Solyndra LLC<br>47488 Kato Road<br>Fremont, CA  94538<br>Attn:  Chief Financial Officer<br>Tel.: (510) 440-2400<br>Fax:  (510) 440-2625 |
| with a copy to: | Pachulski Stang Ziehl & Jones LLP<br>Attn:  Bruce Grohsgal<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19801<br>Tel: (302) 652-4100<br>Fax: (302) 652-4400 |
| If to the Lender: | [TBD] |

**9      CHOICE OF LAW, VENUE, JURY TRIAL WAIVER.**

**9.1      Applicable Law.**   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**9.2      CONSENT TO JURISDICTION.**   EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE DEBTORS AND THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE LENDER AND THE DEBTORS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER. EACH DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH DEBTOR HEREBY WAIVES ANY OBJECTION THAT SUCH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

**9.3      WAIVER OF JURY TRIAL.**  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL

COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE DIP ADVANCES MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 10    GENERAL PROVISIONS

**10.1    Successors and Assigns.**  This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  The Debtors may not assign this Agreement or any rights or obligations under it without the prior written consent of the Lender (which may be granted or withheld in the Lender's sole and absolute discretion).

**10.2    Time of Essence.**  Time is of the essence for the performance of all obligations in this Agreement.

**10.3    Severability of Provisions.**  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**10.4    Waivers and Amendments; Integration.**  Any provision of this Agreement may be amended, waived or modified only upon the written consent of Borrower and the Lender, including, without limitation, any provisions related to the Maturity Date.

**10.5    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, constitute one Agreement.

**10.6    Survival.**  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Tranche A Debt (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement) have been satisfied.

**10.7    Electronic Execution of Documents**.  The words "execution," "signed," "signature" and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**10.8    Captions**.  The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**10.9   Construction of Agreement**.  The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**10.10   Relationship**.  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**10.11   Third Parties**.  Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**10.12   Expenses**.   Whether or not the transactions contemplated hereby are consummated, he Debtors agree to pay promptly (a) all the actual and reasonable costs and expenses of the Lender incurred in connection with the negotiation, preparation and execution of the Loan Documents, the Interim Order, the Final Order, the First Day Orders and any other documents in connection with the Bankruptcy Cases and any consents, amendments, waivers or other modifications thereto (whether or not any of the transactions contemplated hereby or thereby shall be consummated); (b) all the costs of furnishing all opinions by counsel for Debtors; (c) the reasonable fees, expenses and disbursements of counsel to the Lender (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Debtors; (d) all the actual costs and reasonable expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Lender; (e) all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers; (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Lender and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by the Lender in connection with the transactions contemplated by the Loan Documents and any consents, amendments, waivers or other modifications thereto and (h) all costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lender in enforcing any Obligations of or in collecting any payments due from any Debtor hereunder or under the other Loan Documents, including fees and expenses incurred by such parties in connection with the monitoring and participating in the Bankruptcy Cases.

**10.13   Indemnification**.   In addition to the payment of expenses pursuant to Section 10.12, whether or not the transactions contemplated hereby are consummated, each Debtor, jointly and severally with the other Debtors, agrees to defend (subject to Indemnitees'

selection of counsel), indemnify, pay and hold harmless, the Lender and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates of the Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, no Debtor shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.13 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Debtor shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

### 10.14  Release.

(a)  No Debtor has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Debtors' liability to repay the Lender as provided in this Agreement, or to seek affirmative relief or damages of any kind or nature from the Lender relating to this Agreement. Subject to entry of the Financing Order, Debtors, each in their own right and with respect to the Debtors, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever release and discharge the Lenders and all of the Lenders' past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Financing Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, provided that solely in the case of attorneys, the provisions of this Section 5.24 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

(b)  Subject to the terms of the Financing Order, specifically including the challenge provisions in paragraphs 7-8 thereof, no Debtor has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be

asserted to reduce or eliminate all of any part of the Debtors' liability to repay the Pre-Petition Lender as provided in any Pre-Petition Credit Facility, or to seek affirmative relief or damages of any kind or nature from the Pre-Petition Lenders. Subject to the terms of the Financing Order, specifically including the challenge provisions in paragraphs 7-8 thereof, the Releasing Parties hereby fully, finally and forever release and discharge the Pre-Petition Lenders and all of the Pre-Petition Lenders' past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Pre-Petition Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Pre-Petition Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to any Pre-Petition Credit Facility and any transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, provided that solely in the case of attorneys, the provisions of this Section 5.24 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

**10.15 Specific Performance**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at law or in equity.

**10.16 No Marshalling; Payments Set Aside**. The Lender shall not be under any obligation to marshal any assets in favor of any Debtor or any other Person or against or in payment of any or all of the Obligations. To the extent that any Debtor makes a payment or payments to the Lender, or the Lender enforces any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.17 Parties Including Trustees; Bankruptcy Court Proceedings**. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or

pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Bankruptcy Case or any case under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Bankruptcy Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Bankruptcy Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender file financing statements or otherwise perfect its Liens under applicable law. No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Lender. Any such purported assignment, transfer, hypothecation or other conveyance by any Debtor without the prior express written consent of the Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Debtor and the Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 11  DEFINITIONS

**11.1  Definitions.** As used in this Agreement, the following terms have the following meanings:

"**Account Debtor**" means any account debtor required to make any payments in respect of any Inventory and Receivables purchased under the Inventory and Receivables Purchase Agreement.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Debtor or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Debtor or any of its Subsidiaries, threatened against or affecting any Debtor or any of its Subsidiaries or any property of any Debtor or any of its Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" has the meaning assigned to such term in the preamble hereto."

"**Argonaut**" has the meaning assigned to such term in the preamble hereto.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer or treasurer of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to the Lender as to the authority of such Authorized Officer.

"**Bankruptcy Cases**" has the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" has the meaning assigned to such term in the recitals hereto.

"**Borrower**" has the meaning assigned to such term in the preamble hereto.

"**Budget**" means the Initial Budget or the Supplemental Budget, as applicable.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday in the State of California) on which banks are permitted or required to be open in San Francisco, California.

"**Carve-Out**" has the meaning assigned to such term in Section 5.20(a).

"**Carve-Out Notice**" means written notice from the Lender to the Debtors, their counsel, counsel to any Committee and the United States Trustee (i) of the occurrence of an Event of Default and (ii) of the termination of the Pre-Default Carve Out.

"**Case Professionals**" has the meaning assigned to such term in Section 5.20(a).

"**Closing Date**" has the meaning assigned to such term in Section 3.1.

"**Closing Fee**" has the meaning assigned to such term in Section 2.4.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests), whether existing on the Petition Date or thereafter acquired, in which Liens are purported to be granted pursuant to the Security Documents as security for the Obligations, including, without limitation, any vessels, cash, any investments of such cash, deposit accounts, inventory, equipment, goods, general intangibles, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests, and the proceeds of all of the foregoing.

"**Committee**" means, to the extent formed, appointed, or approved in the Bankruptcy Cases, any official committee of unsecured creditors appointed pursuant to Section 1102 of the Bankruptcy Code.

"**Common Agreement**" has the meaning assigned to such term in the recitals hereto.

**"Company Material Adverse Effect"** means a material adverse effect on and/or material adverse developments with respect to (i) the business, assets, properties, liabilities, or condition (financial or otherwise) of the Debtor, (ii) the ability of any Debtor to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against a Debtor of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, the Lender under any Loan Document.

**"Contractual Obligation"** means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

**"Debtors"** has the meaning assigned to such term in the recitals hereto.

**"Default"** means a condition or event that, after notice or lapse of time (or both), would give rise to an Event of Default.

**"Default Rate"** has the meaning assigned to such term in Section 2.3(b).

**"DIP Advance"** has the meaning assigned to such term in Section 2.2(a).

**"DIP Commitment"** is $4,000,000 Dollars ($4,000,000).

**"Dollar Revenue Account"** means that certain account (#133430002) in the name of the Borrower at US Bank National Association.

**"Employee Benefit Plan"** means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, Parent, any of its Subsidiaries or any of their respective ERISA Affiliates.

**"Environmental Claim"** means any investigation, notice, notice of violation, claim, action, complaint, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

**"Environmental Laws"** means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities, including common law, relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Parent or any of its Subsidiaries or any Facility.

"**Equity Funding Account**" means that certain account (#133430001) in the name of the Borrower at US Bank National Association.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Parent or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Parent or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Parent or such Subsidiary and with respect to liabilities arising after such period for which Parent or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Parent, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to Parent, any of its Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Parent, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Parent, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any

potential liability therefore, or the receipt by Parent, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Parent, any of its Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Parent, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"**Event of Default**" means each of the conditions or events set forth in Section 7.1.

"**Existing Term Loan Agreement**" has the meaning assigned to such term in the recitals hereto.

"**Final Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lender in its sole discretion, approving this Agreement and the DIP Loans and the other Credit Documents and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated hereby and thereby on a final basis as contemplated by the Interim Order, following a hearing as required by Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure or such other procedures so approved by the Bankruptcy Court that are acceptable to the Lender in its sole discretion, which shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion).

"**Financing Order**" means the Interim Order or, when applicable, the Final Order.

"**First Priority**" means, with respect to any security interest or other Lien on property, that such security interest or other Lien is superior to all other security interests and other Liens on such property.

"**Foreign Receivables Account**" means (a) that certain Euro MCA account (#776010832) in the name of the Borrower at Wells Fargo Bank National Association and (b) that certain Euro MCA account (#7770009087) in the name of the Borrower at Wells Fargo Bank National Association.

"**Foreign Subsidiaries**" means (a) Solyndra International AG, (b) Solyndra GmbH, (c) Solyndra (Cayman) Ltd., (d) Solyndra Korea, Ltd., and (e) Solyndra Services, Ltd.

"**Funding Date**" is the date on which any DIP Advance is made to the Borrower.

"**Funding Notice**" means a notice executed by an Authorized Officer of the Borrower setting forth (a) the amount of the requested DIP Advance, (b) the use of the proceeds of the requested DIP Advance and the Budget line-item authorizing such use of proceeds and certifying that such use of proceeds is authorized and provided for under the Budget, subject to the Variance, (c) the date of each proposed DIP Advance and (d) the aggregate amount of DIP Advances outstanding after giving effect to the proposed DIP Advance.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, registration, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guarantor**" means the Parent.

"**Guaranty**" means the guaranty made by the Guarantor set forth in Section 4.2.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may

be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lender's agreement to make DIP Advances or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)) or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Debtors.

"**Initial Budget**" means the cash flow budget, depicting on a weekly and entity by entity basis, line-items for projected (i) receipts, (ii) disbursements (including ordinary course operating expenses, bankruptcy related expenses, capital expenditures, asset sales and fees and expenses of the Lender and any other fees and expenses relating to the transactions contemplated hereby, including in connection with the Financing Order and (iii) liquidity consisting of unrestricted and available cash on hand, in each case for each week beginning with the Petition Date through the last day of the week that is 13 weeks thereafter, which is attached hereto as Exhibit B.

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Interest Rate**" has the meaning assigned to such term in Section 2.3(a).

"**Interim Order**" means the order of the Bankruptcy Court entered at the initial emergency hearing in the Bankruptcy Cases, approving this Agreement, the DIP Loans (up to the Interim DIP Advance Limit), the Loan Documents and the Liens and Guaranties granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement and the full amount of the DIP Loans, the Credit Documents and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Lender in its sole discretion).

"**Inventory and Receivables**" means any items purchased from the Inventory and Receivables Seller by the Inventory Receivables Purchaser under or in connection with the Inventory and Receivables Purchase Agreement.

"**Inventory and Receivables Purchase Agreement**" means each of (a) the Inventory Purchase and Sale Agreement, dated as of July 29, 2011, among the Inventory and Receivables Seller, the Inventory and Receivables Purchaser, the Borrower, as servicer and Argonaut Solar LLC, as agent, as amended, (b) the Amended and Restated Purchase and Sale Agreement, dated as of July 29, 2011, among the Inventory and Receivables Seller, the Inventory and Receivables Purchaser, the Borrower, as servicer and Argonaut Solar LLC, as agent, as amended and (c) any similar or related agreement entered into by the parties thereto for the sale of inventory and accounts receivable.

"**Inventory and Receivables Purchaser**" means each of Solyndra Solar LLC and Solyndra Solar II LLC.

"**Inventory and Receivables Seller**" means Solyndra Financing LLC.

"**Lender**" has the meaning assigned to such term in the preamble hereto.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan Documents**" means this Agreement and the Financing Order. For the avoidance of doubt, the term "Loan Documents" does not include the agreements and documents governing the Pre-Petition Credit Facilities.

"**Mandatory Prepayment Amount**" has the meaning assigned to such term in Section 2.2(d).

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the ability of any Debtor to fully and timely perform its Obligations; (ii) the legality, validity, binding effect or enforceability against a Debtor of a Loan Document to which it is a party; or (iii) the rights, remedies and benefits available to, or conferred upon, the Lender under any Loan Document.

"**Material Contract**" means any contract or other arrangement to which any Debtor or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Maturity Date**" means the earliest of (a) the date that is 180 days after the Petition Date, (b) the date of the consummation of the sale of all or substantially all of the Debtors' assets or the assets of any Affiliates of the Debtors and (c) the acceleration of the Loans hereunder after the occurrence of an Event of Default.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Net Asset Sale Proceeds**" means, with respect to any Permitted Disposition, an amount equal to: (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by any Debtor from such Permitted Disposition, minus (ii) any bona fide direct costs incurred in

connection with such Permitted Disposition, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Permitted Disposition.

"**Note**" has the meaning assigned to such term in Section 3.1(d).

"**Obligations**" means the DIP Advances, the DIP Commitments and any obligation of any nature of each Debtor and any other obligations from time to time owed to the Lender under this Agreement or any other Loan Document, whether for principal, interest, payments for fees, expenses, indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. For the avoidance of doubt, the term "Obligations" does not include obligations outstanding under the Pre-Petition Credit Facilities.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Permitted Disposition**" means, subject to Bankruptcy Court approval, (a) sales or other dispositions of worn, damaged or obsolete Equipment in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business and (c) Permitted Sales.

"**Permitted Indebtedness**" has the meaning assigned to such term in Section 6.2(a).

"**Permitted Investment**" has the meaning assigned to such term in Section 6.2(d).

"**Permitted Leases**" has the meaning assigned to such term in Section 6.2(c).

"**Permitted Lien**" has the meaning assigned to such term in Section 6.2(b).

"**Permitted Sales**" means (a) the sale of all or substantially all of the Debtors' assets as a going concern as approved by the Bankruptcy Court pursuant to applicable provisions of the Bankruptcy Code; provided that such sale shall be for cash consideration in an amount in excess of all outstanding Obligations and shall not be subject to any financing contingencies, (ii) a transaction or transactions combining the sale of all the Debtors' assets and the sale of all Collateral through the retention by the Debtors of one or more nationally recognized, independent, professional liquidation firms reasonably acceptable to the Lender and approved by the Bankruptcy Court pursuant to applicable provisions of the Bankruptcy Code , which shall include a payment at closing of an amount in excess of all the outstanding Obligations, such amount to be paid to the Lender; (iii) other sales and dispositions in connection with store closings and Collateral liquidation, in each case on terms reasonably satisfactory to the Lender, (iv) any other transaction approved by the Bankruptcy Court and in form and substance satisfactory to the Lender in its sole and absolute discretion pursuant to which a sale of all or substantially all of the assets of the Debtors is consummated, whether pursuant to (a) Section 363 of the Bankruptcy Code or (b) any other foreclosure sale or other exercise of remedies under the Uniform Commercial Code or otherwise is consummated, in each case, in which the outstanding Obligations are paid in whole or in part with the proceeds thereof.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

**"Petition Date"** has the meaning assigned to such term in the recitals hereto.

**"Pre-Default Carve-Out"** has the meaning assigned to such term in Section 5.20(a).

**"Pre-Petition Credit Facilities"** shall have the meaning given to such term in the recitals hereto.

**"Real Estate Asset"** means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Debtor in any real property.

**"Release"** means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

**"Released Parties"** has the meaning assigned to such term in Section 5.24.

**"Released Pre-Petition Parties"** has the meaning assigned to such term in Section 5.24.

**"Releasing Parties"** has the meaning assigned to such term in Section 5.24.

**"Residual Carve-Out"** has the meaning assigned to such term in Section 5.20(a).

**"Restricted Payment"** has the meaning assigned to such term in Section 6.2(g).

**"Securities"** means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

**"Share Collateral"** shall consist of (i) one hundred percent (100%) of the issued and outstanding Equity Interests of the Borrower owned or held of record by the Parent.

**"Subsidiary"** means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding, provided that in the event that a

foreign insolvency proceeding is commenced as to any Subsidiary, such entity shall no longer be considered a Subsidiary for purposes of this Agreement.

"**Super-Priority Claims**" has the meaning assigned to such term in Section 5.20(a).

"**Supplemental Budget**" means each supplemental or replacement budget to the Initial Budget, in each case in form and substance satisfactory to the Lender in its sole discretion, and in each case delivered in accordance with Section 6.1(a)(i) (covering any time period covered by a prior budget or covering additional time periods).

"**Tranche B Credit Facility**" has the meaning assigned to such term in the recitals hereto.

"**Tranche B Lender**" has the meaning assigned to such term in the recitals hereto.

"**Tranche D Credit Facility**" has the meaning assigned to such term in the recitals hereto.

"**Tranche D Lender**" has the meaning assigned to such term in the recitals hereto.

"**Tranche E Credit Facility**" has the meaning assigned to such term in the recitals hereto.

"**Tranche E Lender**" has the meaning assigned to such term in the recitals hereto.

"**Variance**" means, with respect to the Budget, a percentage variance with respect to projected disbursements in each then-current Budget; provided that the Variance shall not exceed 10% on an aggregate basis.

*[**Balance of Page Intentionally Left Blank**]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA LLC**

By_____
Name:
Title:

PARENT:

**360 DEGREE SOLAR HOLDINGS, INC.**

By_____
Name:
Title:

THE LENDER:

_____

By_____
Name:
Title: