IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No. 11-12799 (____) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

## DECLARATION OF W.G. STOVER, JR., SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY MOTIONS

I, W.G. Stover, Jr., hereby declare that the following is true to the best of my

knowledge, information and belief:

1.     I am the Chief Financial Officer and Senior Vice President for debtor

Solyndra LLC ("Solyndra") and 360 Degree Solar Holdings, Inc. ("Holdings," and together with

Solyndra, collectively, the "Debtors" or the "Company"). I submit this declaration (the

"Declaration") in support of the Debtors' petitions and "first day" motions and applications

described in Part II below (collectively, the "First Day Motions"). Except as otherwise

indicated, all statements in this Declaration are based upon my personal knowledge, my review

of the Debtors' books and records, relevant documents and other information prepared or

collected by the Debtors' employees at my direction, or my opinion based on my experience with

the Debtors' operations and financial condition. In making my statements based on my review

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees' accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

2.      I have been employed with the Debtors since December 2007. From June 1989 until August 2007, I served in various capacities at Micron Technology, Inc., a manufacturer of semiconductor devices, most recently as Vice President, Finance and Chief Financial Officer. I received a B.A. in business administration with an accounting emphasis from Washington State University. Prior to joining Micron Technology, I was employed by Coopers & Lybrand as a manager in the audit practice.

3.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of the Debtors' chapter 11 cases (the "Cases").

# PART I

## Overview of the Debtors and their Operations

### Introduction

4.     Founded in 2005, Solyndra is a U.S. manufacturer of solar photovoltaic

("PV") solar power systems specifically designed for large commercial and industrial rooftops

and for certain shaded agriculture applications.  The Company's worldwide headquarters and its

manufacturing operations are located in Fremont California.  Prior to September 6, 2011 (the

"Petition Date"), the Company maintained sales presences in Germany, Switzerland, France,

Italy, the United Kingdom, Australia, Belgium, the Czech Republic and the UAE. Solyndra's

innovative cylindrical solar PV panels are highly differentiated and unique in the PV industry.

Unlike conventional flat solar panels, Solyndra's panels are a series of cylindrical modules

connected to form a panel.  As a result of the form factor, Solyndra panels require no ballast,

tilting, or roof penetration and weigh approximately one-half of other solar panels per rooftop

unit of area.  In addition, Solyndra's current high-volume solar PV panels require no tools for

installation and can be installed more quickly than conventional solar panels, resulting in an

installation cost substantially below that of conventional solar panels.  Solyndra manufactured all

of its products in the United States with the support of a well-developed domestic supply chain.

Prior to the lay-off of substantially all of the Solyndra workforce that occurred on

August 31, 2011, and which I discuss further below, the Company had approximately 968 full

time employees and 211 temporary employees.  Solyndra has sold more than 500,000 of its

panels since 2008 and generated cumulative sales of over $250 million. Today, Solyndra panels are estimated to be installed on more than 1,000 commercial and industrial roofs in 20 countries.

5.     Solyndra has received numerous awards and recognition including appearing on the *MIT Technology Review* list of the "50 Most Innovative Companies in the World", the 2010 *Wall Street Journal* list of the "Top 10 Venture-backed Clean-Tech Companies", the *Wall Street Journal* list "The Next Big Thing: Top 50 Venture Backed Companies", and a 2009 Excellence in Renewable Energy Award from *Renewable Energy World Magazine*.

## Business Operations

6.     Solyndra sells three primary types of solar panels: (i) 100 Series; (ii) 150 Series for higher power density; and (iii) 200 Series. In addition, the Company developed new mounting solutions that allow some of the Solyndra panels to be used in new situations: these solutions include (a) Elevated Shade Structure (aka "Greenhouse") mounts, announced in February 2011; (b) mounts for metal roofs, announced in June 2011; and (c) an "Extreme Wind Solution", allowing for deployment of panels in areas with winds up to 180 miles per hour, announced in August 2011. The 100 Series is Solyndra's original PV system composed of panels and mounting hardware for low-slope, commercial rooftops. The 200 Series is Solyndra's second generation PV system, which has an enhanced form factor over the 100 Series thereby increasing its Watt peak performance and requires no tools for installation. The 150 Series is a hybrid product, using the advanced PV modules of the 200 Series, but the existing mounting solution of the 100 Series.

7.     From its inception in 2005 through 2007, Solyndra focused on its research and development efforts to refine its proprietary thin-film technology used to apply the copper, indium, gallium and selenium ("CIGS") PV material on its cylindrical glass tubes. In 2007, Solyndra leased its first fabrication facility ("Fab 1") and began to focus its efforts on commercializing its technology and designing and deploying the custom equipment needed to produce its innovative PV panels on a large scale. In July 2008, Solyndra began its first commercial shipments of PV panels.

8.     In December 2006, Solyndra submitted a pre-application for a loan to be guaranteed by the U.S. Department of Energy ("DOE") pursuant to Title XVII of the Energy Policy Act of 2005. In October 2007, the DOE invited Solyndra and 15 other applicants to submit full applications for loan guarantees. In March 2009, Solyndra received a conditional commitment from the DOE for a $535 million loan guarantee (the "DOE Loan Guarantee") to fund the construction of a second fabrication facility ("Fab 2"). The DOE Loan Guarantee closed and construction on the Fab 2 facility began in September 2009. Commercial production in Fab 2 began in January 2011.

9.     Solyndra's commercial shipments and production have grown year over year for every year since it started commercial shipments in 2008. Solyndra had annual revenues of approximately $142 million for the year ended January 1, 2011. For the fiscal year then ended, the Company incurred a net loss of approximately $329 million. As of the year ended January 1, 2011, Solyndra had assets with a book value of approximately $859 million and liabilities with a book value of approximately $749 million.

## Corporate Structure and Management

10.     The Debtors are two affiliated entities – Holdings and Solyndra.  Holdings (aka Solyndra, Inc.), is a Delaware corporation and has a 100% ownership interest in Solyndra. Solyndra (aka Solyndra Fab 2, LLC) is a Delaware limited liability company and, as of February 2011, became the Debtors' primary operating company.

11.     As noted above, Solyndra is 100% owned by Holdings.  Holdings,' significant investors include Argonaut Ventures (38.99%); Madrone Partners (13.00%), USVP Venture Partners (9.20%); and Rockport Capital Partners (7.33%).

12.     Solyndra's Chief Executive and President is Brian Harrison, who has served in such capacity since July 2010.  Solyndra's Executive Vice President of Operations and Engineering is Benjamin Bierman, who has served in such capacity since October 2009. Solyndra's General Counsel and Senior Vice President of Corporate Development is John Gaffney who has served in such capacity since January 2010.

## Initial Funding and the February 2011 Restructuring

### A.     Initial Funding

13.     Solyndra was initially funded with the proceeds of preferred stock. Specifically, between May 2006 and February 2009, Solyndra issued eight series of preferred stock (Series A-1, Series A-2, Series B, Series C-1, Series C-2, Series D-2, Series D-3, and Series E) to investors for total aggregate proceeds of $709.4 million.

14.     In September 2009, Solyndra received the DOE Loan Guarantee of $535 million loan (the "DOE Loan") from the U.S. Federal Financing Bank for the construction of Fab

2. In connection with the DOE Loan Guarantee, Solyndra was required to fund 27% of the $733 million estimated construction cost of the Fab 2 facility. In order to satisfy this requirement, Solyndra issued Series E Preferred stock to new and existing investors and $198 million of the proceeds of this issuance was placed into a segregated account (the "Restricted Account") described in more detail below.

15.     In July 2010, Solyndra, Inc. issued $175 million of convertible promissory notes to various investors, convertible into equity of Solyndra, Inc. (the "Convertible Promissory Notes").

**B.      February 2011 Restructuring/Current Capital Structure.**

16.     In February 2011, Solyndra and its secured lenders restructured all of Solyndra's outstanding indebtedness (the "February 2011 Restructuring") thereby resulting in the following capital structure: As of the Petition Date, Solyndra had outstanding secured indebtedness in an aggregate principal amount of $783,755,765, consisting of (a) $69,302,901 in principal obligations under the Prepetition Tranche A Term Loan Facility (as defined below), (b) $142,808,544 in principal obligations constituting Tranche B Debt (as defined below), (c) $385,000,000 in principal obligations constituting Tranche D Debt (as defined below), and (d) $186,644,319 in principal obligations under the Prepetition Tranche E Facility (as defined below). The foregoing obligations are secured by substantially all of the Debtors' assets, subject to the terms of the Prepetition Intercreditor Agreement (as defined below).

17.     **Prepetition Tranche A Term Loan Facility.** Pursuant to that certain Term Loan Agreement (Tranche A), dated as of February 23, 2011 (the "Prepetition Tranche A

Term Loan Agreement" and together with all other loan and security documents executed in

connection therewith, the "Prepetition Tranche A Credit Documents"), by and among Solyndra,

the lender parties thereto (collectively, the "Prepetition Tranche A Lenders"), and Argonaut

Ventures I, L.L.C., as Tranche A Representative (in such capacity, the "Prepetition Tranche A

Term Loan Facility Representative"), the Prepetition Tranche A Lenders provided a first lien

secured credit facility comprised of up to $75,000,000 in aggregate principal amount of term

loan commitments (the "Prepetition Tranche A Term Loan Facility"). As of the Petition Date,

the Debtors were indebted and liable to the Prepetition Tranche A Term Loan Facility

Representative and the Prepetition Tranche A Lenders under the Prepetition Tranche A Credit

Documents, in the principal amount of $69,302,901 plus interest accrued and accruing, costs and

any fees and expenses due and owing thereunder (collectively, the "Prepetition Tranche A Term

Loan Facility Obligations").

18. **Prepetition Tranche B/D Term Loan Facility**. Pursuant to that certain

Payment and Reimbursement Agreement (Tranches B and D), dated as of February 23, 2011 (the

"Prepetition Tranche B/D Term Loan Agreement," and together with all other loan and security

documents executed in connection therewith, the "Prepetition Tranche B/D Credit Documents"),

by and between Solyndra, as borrower, and the U.S. Department of Energy, acting by and

through the Secretary of Energy, as loan servicer (the "Prepetition Tranche B/D Agent"),

Solyndra is obligated to repay amounts owing to Federal Financing Bank, and its guarantor, the

U.S. Department of Energy (the "Prepetition Tranche B/D Lenders"), which consist of (i) the

Tranche B Total Principal Amount (as defined in the Prepetition Tranche B/D Term Loan

Agreement) (the "Tranche B Debt"), and (ii) the Tranche D Total Principal Amount (as defined in the Prepetition Tranche B/D Term Loan Agreement) (the "Tranche D Debt") (collectively, the "Prepetition Tranche B/D Term Loan Facility"). As of the Petition Date, the Debtors were indebted and liable to the Prepetition Tranche B/D Lenders under the Prepetition Tranche B/D Term Loan Agreement (i) in the principal amount of $142,808,544 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder on account of the Tranche B Debt and (ii) in the principal amount of $385,000,000 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder on account of the Tranche D Debt (collectively, the "Prepetition Tranche B/D Term Loan Facility Obligations").

19.     **Prepetition Tranche E Facility.** Pursuant to that certain Tranche E Note Purchase Agreement, dated as of February 23, 2011 (the "Prepetition Tranche E Agreement" and together with all other loan and security documents executed in connection therewith, the "Prepetition Tranche E Credit Documents"), by and among Solyndra, as borrower, Argonaut Ventures I, L.L.C., as agent (the "Prepetition Tranche E Agent"), and each holder of a Tranche E note (together with the Tranche E Agent, the "Prepetition Tranche E Lenders"), Solyndra is obligated to repay amounts owing to the Prepetition Tranche E Lenders in the aggregate principal amount of $186,481,645 (the "Prepetition Tranche E Facility"). As of the Petition Date, the Debtors were indebted and liable to the Prepetition Tranche E Agent and the Prepetition Tranche E Lenders under the Prepetition Tranche E Credit Documents in the principal amount of $186,644,319 plus interest accrued and accruing, costs and any fees and expenses due and owing thereunder (collectively, the "Prepetition Tranche E Facility

Obligations" and, together with the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche B/D Term Loan Facility Obligations, the "Prepetition Secured Obligations"). The Prepetition Tranche A Term Loan Facility Representative, the Prepetition Tranche A Lenders, the Prepetition Tranche B/D Agent, and the Prepetition Tranche B/D Lenders, the Prepetition Tranche E Agent, and the Prepetition Tranche E Lenders are referred to collectively herein as the "Prepetition Secured Parties".

20. **Prepetition Collateral**. As more fully set forth in the Prepetition Tranche A Credit Documents, the Prepetition Tranche B/D Credit Documents, the Prepetition Tranche E Credit Documents, and that certain First Amended & Restated Common Agreement, dated as of February 23, 2011 (the "Common Agreement"), prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, substantially all assets of the Debtors (collectively, the "Prepetition Collateral"), subject to certain limitations (the "Prepetition Liens") to U.S. Bank National Association, as master collateral agent (the "Master Collateral Agent") under the Common Agreement.

21. **Priority of Prepetition Liens; Intercreditor Agreement.** The Prepetition Tranche A Term Loan Facility Representative, the Prepetition Tranche B/D Agent, the Prepetition Tranche E Agent, and the Master Collateral Agent are party to that certain Intercreditor Agreement, dated as of February 23, 2011 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Intercreditor Agreement"), that governs the respective rights, interests, obligations, priority, and positions of the various Prepetition Tranche A Lenders, Prepetition Tranche B/D Lenders, and Prepetition

Tranche E Lenders. Pursuant to the Prepetition Intercreditor Agreement, as of the Petition Date, (i) the Prepetition Tranche A Lenders' right to payment is senior to the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche B Debt, and (ii) the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche B Debt is senior to both (a) the Prepetition Tranche B/D Lenders' right to payment with respect to the Tranche D Debt, and (b) the Prepetition Tranche E Lenders' right to payment, which rights are *pari passu*.

   22. **Restricted Funds**. Prior to the Petition Date, Holdings issued $286,000,000 of preferred stock to investors, of which $198,000,000 (the "Restricted Funds") was placed in a segregated account (the "Restricted Account") controlled by the Master Collateral Agent to be used by the Debtors in combination with funds advanced pursuant to the Prepetition Tranche B/D Credit Documents in connection with the construction of Fab 2.

### Circumstances Leading to the Commencement of the Chapter 11 Cases

   23. Prior to the Petition Date, the combination of general business conditions and an oversupply of solar panels dramatically reduced solar panel pricing world-wide. The oversupply was due, in part, to the growing capacity of foreign manufacturers that utilized low cost capital provided by their governments to expand their operations. In response, Solyndra was forced to reduce its average selling prices to remain competitive. In addition, the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Europe, negatively impacted the availability of capital for PV system owners, further reducing demand for Solyndra's panels. Finally, Solyndra's ability to timely collect on its accounts receivables was negatively impacted as foreign competitors offered extended

payment terms, resulting in Solyndra's customers refusing to honor their previously agreed payment terms.

24. In February 2011, as the aforementioned competitive pressures were emerging, Solyndra entered into the February 2011 Restructuring. Although the February 2011 Restructuring provided for an infusion of $75 million, it left the Company with more than $783 million in senior secured debt and the need to raise further incremental capital to fund operations until the Company could generate positive cash flow from operations.

25. Prior to the Petition Date, Solyndra reached out to multiple strategic and financial investors in an attempt to attract the necessary incremental capital. However, Solyndra was unable to find any parties that would be willing to fund the increased capital requirements of the Company in light the size and structure of Solyndra's debt.

26. Solyndra then approached certain existing holders of the Tranche A Debt to explore alternative financing arrangements. In June and July of 2011, Solyndra and certain holders of the Tranche A Debt entered into an arrangement whereby Solyndra would sell up to $75 million of its existing and future accounts receivables and inventory at a negotiated discount in order to provide interim working capital for the Company through an accounts receivable purchase and sale facility (the "A/R Sale Agreement") and an inventory purchase and sale facility (the "Inventory Sale Agreement").

27. In early August, Solyndra, certain holders of Tranche A Debt, and representatives of the DOE undertook negotiations regarding a further restructuring that would allow Solyndra to attract necessary new investment. The negotiations over the terms of the

further restructuring continued throughout August 2011. During this time, the parties to the Inventory Facility continued to purchase Solyndra inventory to provide critically needed liquidity. In the final weeks prior to the Petition Date, the DOE and certain existing investors engaged in negotiations for bridge financing to allow Solyndra additional time to find a new source of capital (the "Bridge Financing"). Solyndra believed that with sufficient time and an agreement to restructure the Company's obligations by the existing lenders, there was a reasonable prospect of obtaining the necessary incremental financing.

28. With the Bridge Financing discussions proceeding, the parties to the Inventory Sale Agreement purchased approximately $3 million in inventory from the Company on Monday, August 29, 2011. However, on August 30, 2011, Solyndra was informed that the contemplated Bridge Financing would not occur. Without the Bridge Financing, Solyndra was unable to continue operations. As a result, on August 31, 2011, Solyndra suspended its manufacturing operations and terminated the vast majority of its workforce. Solyndra retained key employees to operate the business while restructuring options are explored.

29. Following the suspension of operations, the Company began negotiations with certain existing Tranche A investors who are prepared to enter into a DIP financing arrangement for $4 million (the "DIP Financing") and are willing to consent to the company's use of their cash collateral subject to the satisfaction of certain conditions. The DIP Financing and use of cash collateral is critical to allow Solyndra adequate time to explore restructuring alternatives and is discussed further below.

## Chapter 11 Goals

30. On September 6, 2011, the Debtors filed these Cases. The Debtors intend to use the Chapter 11 process to evaluate all of their restructuring options and to maximize the return for creditors.

31. The Debtors are pursuing a two-pronged strategy to effectuate either a sale of their business to a "turnkey" buyer who may acquire substantially all of Solyndra's assets or, if the Debtors are unable to identify any such potential buyers, an orderly liquidation of the Debtors' assets for the benefit of their creditors. To that end, the proposed DIP Financing budget provides for a four-week exploratory period during which time the Debtors will both determine whether a robust sale process is likely to identify a turnkey buyer and also explore all available restructuring opportunities. The Debtors intend to pursue all potential turnkey buyers, specifically interested parties in both the United States and overseas who may have a particular interest in acquiring the Debtors' business.

32. The Debtors believe that pursuing a sale on a turnkey basis offers the best chance for the Debtors to maximize the value of their assets and reemploy the employees who were terminated prior to the Petition Date. The Debtors believe that this process would yield a far greater return to the Debtors' creditors than a piecemeal liquidation of the Debtors assets. However, to the extent that the Debtors are not successful in these restructuring efforts during the time period provided under the DIP Financing budget, the budget provides sufficient funding to enable the Debtors to conduct an orderly wind-down of their operations and to sell their assets on a piecemeal basis for the benefit of the Debtors' creditors.

## PART II – First Day Motions and Applications

33.     In order to enable the Debtors to minimize the adverse effects of the

commencement of the Cases, the Debtors have requested various types of relief in the First Day

Motions filed concurrently with this Declaration.  A summary of the relief sought in each First

Day Motion is set forth below.

34.     I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors'

assets for the benefit of their estates and creditors.

## A.     Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases

35.     The Debtors in these cases are affiliated entities.  I am informed by

counsel that the joint administration of the chapter 11 cases will permit the Clerk of the Court to

utilize a single general docket for these cases and combine notices to creditors of the Debtors'

respective estates and other parties in interest, which will result in significant savings to the

estates.  Accordingly, I believe that the relief requested in the joint administration motion is in

the best interests of the Debtors' estates.

## B.     Debtors' Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code ("Interim Compensation Procedures Motion")

36. The Debtors request approval of certain procedures for compensating and reimbursing court-approved professionals on a monthly basis, which I am informed, are comparable to the procedures established in other similar-sized chapter 11 cases in this district.

37. With the first day motions, the Debtors seek approval to employ PSZJ as their bankruptcy counsel. Thereafter, the Debtors intend to seek authority to retain certain other professionals in the Cases as the need arises. In addition, I am informed that an official committee of unsecured creditors (the "Committee") may be appointed, and that the Committee also may seek to retain various professionals (the "Committee Professionals").

38. I am informed that entry of an interim compensation order will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in the Cases. Further, it will avoid forcing professionals to finance the Cases while awaiting final approval of their fees and expenses. I believe that such relief is in the best interests of the Debtors' estates.

**C.      Motion of Debtors for Order Under 11 U.S.C. §§ 105, 345, 363, 364, 1197 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, and (IV) Limited Waiver of Section 345(b) Deposit and Investment Requirements ("Cash Management Motion")**

39. Just prior to the Petition Date, the Debtors terminated their manufacturing operations and have begun the process of restructuring their financial affairs. The Debtors have closed, or are in the process of closing, a significant number of their bank accounts. However, the Debtors wish to maintain a few bank accounts, each of which is held in the name of Solyndra, to continue to make ordinary course disbursements, including payment of payroll

obligations, to collect customer receipts and to hold cash collateral pledged to secure the Debtors' corporate credit card obligations.

40.     From and after the Petition Date, the Debtors propose to have a simplified cash management system (the "Cash Management System") that contains the following bank accounts (together, the "Bank Accounts"):

(a)  one principal operating account in the name of Solyndra LLC (acct. no. 412-3021453) (the "Operating Account") at Wells Fargo Bank, N.A. ("Wells Fargo") that will be used for disbursements;

(b)  one zero balance payroll account in the name of Solyndra LLC (acct. no. 412-4817313) at Wells Fargo that is linked to the Operating Account and debited by Solyndra's payroll service as and when payroll comes due;

(c)  three customer collections accounts in the name of Solyndra LLC (acct. no. 777-6010832 at Wells Fargo for customer collections in Euros and acct. nos. 13343002 and 153910672036 at U.S. Bank N.A. ("U.S. Bank") for U.S. customer collections ) (together, the "Collections Accounts").  Account No. 13343002 is a securities account that invests cash collections in money market shares.  The remaining two Collections Accounts are deposit accounts.  The Collections Account at U.S. Bank is presently subject to the control of U.S. Bank as the master collateral agent for the holders of Solyndra's secured debt (the "Master Collateral Agent");[2] and

_____

[2]  The Debtors have separately sought to access the funds in the U.S. Bank Collections Account.

(d) one restricted account (acct. no. 4123508939) at Wells Fargo the ("Restricted

Account") containing approximately $110,000 pledged to secure the

Debtors' credit card-related obligations to Wells Fargo.

41.     The Debtors manually transfer funds from the Collections Accounts to the

Operating Account as and when needed to fund the Debtors' business or otherwise in the

discretion of the Debtors, except that the Debtors gain access to funds in the U.S. Bank

Collections Account by instructing the U.S. Department of Energy, as loan servicer of certain

secured debt obligations of Solyndra, to direct the Master Collateral Agent to disburse funds to

the Operating Account.  In the past, monthly receipts in the range of $5,000,000 to $8,000,000

flowed through the Cash Management System.

42.     The Debtors' Bank Accounts and Cash Management System facilitates the

timely and efficient collection, management and disbursement of funds used in the Debtors'

business.  Because of the disruption to the business that would result if the Debtors were forced

to close these accounts, it is critical that the Debtors' maintain the Bank Accounts and existing

Cash Management System.

43.     Prior to the Petition Date and in the ordinary course of business, the

Debtors had corporate credit cards made available to their employees by Wells Fargo up to an

aggregate credit limit of $300,000 that was fully secured by a certificate of deposit.  This

prepetition account has been terminated and, upon Debtors' instruction, Wells Fargo has paid the

estimated balance of the credit cards from the Operating Account.  Due to potential processing

delays, charges made on such credit cards may not have been processed on or before the Petition

Date and the Debtors seek the Court's approval to permit Wells Fargo to process and honor such prepetition charges, if any, after the Petition Date. Given the Debtors' reduced operations, the Debtors propose to reduce their credit limit under the corporate credit cards to $100,000. The Debtors believe that Wells Fargo is willing to continue this program provided that the Debtors' obligations thereunder are fully cash collateralized and Wells Fargo is authorized to continue to process any prepetition charges made on the credit cards and deduct the amounts charged from the Operating Account. The Debtors presently have the Restricted Account at Wells Fargo that contains sufficient cash to cover any postpetition credit card exposure. The Debtors seek authority to continue to have access to corporate credit cards issued by Wells Fargo on a postpetition basis and for postpetition business charges up to an aggregate limit of $100,000, which amount shall be collateralized by cash on hand in the Restricted Account in an amount not less than $110,000 at Wells Fargo.

44.    It is my understanding that United States Trustee requirements mandate that prepetition bank accounts of chapter 11 debtors be closed and new debtor-in-possession bank accounts opened postpetition. The Debtors seek a waiver of this requirement in the Cases. It is my belief that, if strictly enforced in this case, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.

45.    I believe that maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment

procedures for payments into and out of those accounts which would completely disrupt the flow of the Debtors' receipt of revenues and the Debtors' payment of debts incurred postpetition. In addition, it is my understanding that closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances. I believe that these disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business and effectuate a sale of their assets for the benefit of their creditors.

**D.**     **Debtors' Motion Pursuant to Bankruptcy Code Sections 105(A), 363, And 507(A) for an Order Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Commissions, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ("Wage Motion")**

46.     On August 31, 2011, the Debtors terminated approximately 900 regular full-time employees (the "Terminated Employees"), leaving a core group of 113 employees necessary to assist the Debtors with their restructuring efforts (the "Continuing Employees"). The Continuing Employees work at the Debtors' office in Fremont, California as well as other remote locations in the United States. The Continuing Employees perform administrative office and support services in assisting the Debtors with their go-forward business, including, for example, finance, research and development, operations, quality control, legal, and human resources. Six of the Continuing Employees are involved in sales and sales support roles. None of the Terminated or Continuing Employees are associated with a labor union.

## Wages and Salaries and Associated Withholding

47.     All Employees are paid in arrears bi-weekly through direct deposit or check by ADP. The last payroll occurred on September 2, 2011, which covered the period from August 15, 2011 through and including August 28, 2011.

48.     Historically, and prior to the termination of the Terminated Employees, the Debtors' average bi-weekly gross payroll was approximately $3.5 million, which figure included wages and salaries, taxes (including withholding taxes paid by Employees), and withholdings for various benefits (described more fully below). Going forward, with the significantly-reduced workforce, the Debtors estimate that their average bi-weekly gross payroll will be approximately $650,000, which amounts may be further reduced if the Debtors continue to reduce their workforce during these cases.

49.     In connection with the termination of the vast majority of the Debtors' workforce prepetition, the Debtors funded a special payroll (the "Special Payroll") to ADP on September 1, 2011 for amounts that were owed to Terminated Employees for wages that had accrued from August 29, 2011 through August 31, 2011 (the "Stub Payroll Period") in addition to other amounts payable upon termination, such as accrued vacation time (discussed below) in the total aggregate amount of $1,503,128. Although the Special Payroll occurred prepetition, the Debtors are aware of de minimus additional amounts owed to Terminated Employees on account of wages or paid time off due to miscalculation of time by Terminated Employees, failure to timely submit time cards, or other true-ups. Accordingly, the Debtors request authority to pay up

to $50,000 to Terminated Employees on account of any Special Payroll items that should have been paid in the Special Payroll, but were not.

50.     The next regularly scheduled payroll for Continuing Employees is scheduled to occur on September 16, 2011, and will cover the period of August 29, 2011 through September 11, 2011, which aggregate payroll on account of Wages will be approximately $650,000.  A portion of this payroll will be on account of pre-petition time periods (August 29, 2011 through September 5, 2011) for the Continuing Employees, or approximately $475,000. Therefore, the Debtors request authority to pay any accrued pre-petition Wages to Continuing Employees in the ordinary course of business up to $475,000.

51.     The Debtors' payroll is disbursed and processed by ADP.  Typically, ADP debits the Debtors' payroll account two or three days in advance of payroll.  Employees receive their direct deposits through ADP on the bi-weekly payday.  As of the Petition Date, the Debtors may owe ADP an estimated $25,000 in unpaid fees with respect to ADP's processing of the Debtors' payroll, previous payrolls for which ADP may not have yet been paid, and related administration (the "Administration Fees").  The Debtors request authority to pay ADP the Administration Fees that ADP may be owed in connection with the foregoing services not to exceed $25,000 and to continue to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

52.     In the ordinary course of their business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to taxing authorities for purposes such as Social Security and Medicare, federal and state or local income taxes (the

"Employer Tax Obligations"). The Employer Tax Obligations are remitted directly by ADP to the various governmental entities.

53.  The Debtors also withhold contributions to the Debtors' health, vision, dental benefit plans and insurance plans described more fully below, 401(k) contributions and 401(k) loan repayments, employee medical contributions, flexible spending contributions, garnishment, or child support or similar obligations pursuant to court order or law (collectively, with the Employer Tax Obligations, the "Withholding Obligations").[3]  On average, the Withholding Obligations constitute 40% of each gross payroll.  Because there may be some Withholding Obligations that have not yet been remitted as of the Petition Date on account of the last payroll or the Special Payroll for Terminated Employees, the Debtors request authority to remit any prepetition Withholding Obligations on account of all Employees up to $206,000.

## Business Expense Reimbursements

54.  The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, employee credit card charges for business expenses, business lunches and entertainment expenses, telephone charges, and miscellaneous other allowed travel expenses (the "Reimbursement Obligations").  Certain of the

---

[3]  The Debtors manually process and transmit voluntary Employee Withholding Obligations for 401(k) withholdings, 401(k) loan repayment withholdings, and voluntary flexible spending account withholdings.  ADP processes all other withholding obligations, including tax withholdings that ADP transmits to appropriate taxing authorities on the applicable pay date.

Terminated Employees who were terminated shortly before the Petition Date may have pending Reimbursement Obligations owing as of the Petition Date.

55.     It is difficult for the Debtors to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and when the Employee submits the corresponding expense report for processing.  Based on historical experience, the Debtors anticipate that, as of the Petition Date, the Debtors owe an estimated $50,000 in Reimbursement Obligations for all Employees, which amount is based on an average monthly figure, but given the volume of Terminated Employees, the Debtors project that such pipeline Reimbursement Obligations may be as high as $100,000.

56.     The Debtors also pay relocation costs for two executives, their Chief Financial Officer and General Counsel, under their employment agreements in the amount of $7,700 per pay period in the aggregate for both employees.  The Debtors seek authority to continue to offer the relocation costs in the ordinary course of business in their discretion.

57.     Thus, the Debtors seek authority (a) to pay any prepetition Reimbursement Obligations directly to the Employees up to $100,000; (b) to pay any accrued prepetition relocation costs up to $7,700; and (c) and to continue to honor Reimbursement Obligations and relocation expenses incurred postpetition in the ordinary course of the Debtors' business.

### Health and Related Benefits

58. The Debtors provide premium-based health and related benefit plans to Continuing Employees, including medical, vision insurance, a flexible spending account, dental insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"). The Debtors believe that they have paid all premiums owed to Health Plans for the month of August on account of these Health Plans. However, the premium payments for September will be due and owing as of the Petition Date, a portion of which may fall within the pre-petition period. In an abundance of caution, the Debtors seek authority to pay any outstanding pre-petition premium amounts owing under the Health Plans as detailed below to ensure continued coverage of health insurance for the benefit of their Employees.

59. The Debtors also anticipate that the amount of the monthly premiums will increase going forward on a per employee basis to reflect the reduced employee headcount, although the total aggregate premium amount paid on account of the Health Plans will be significantly reduced given the reduced headcount. Thus, the Debtors also request authority to pay any post-petition premiums that may be owing under the Health Plans as and when due in the ordinary course of business.

60. As required by law, the Debtors also offer coverage under certain of the Health Plans to its Terminated Employees who have elected COBRA coverage. In the case of the Terminated Employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Terminated Employees. Instead, such Terminated Employees pay the

full amount of the premiums to a third-party COBRA administrator, ADP. Although the Debtors advance the premium amounts for these Terminated Employees when the Debtors pay their monthly invoices to the insurers, these amounts are reimbursed to the Debtors by ADP, which collects the premium amounts owing directly from the Terminated Employees and remits them to the Debtors. ADP retains 2% of the amounts collected from the Terminated Employees as a fee for their services as COBRA administrator. In addition, the Debtors pay a monthly administrative fee of approximately $1,100 to ADP as COBRA administrator. As part of the relief requested hereunder, the Debtors request authority to pay up to $1,100 to ADP for their services as COBRA administrator for the Health Plans, to remit any pre-petition premiums owed on account of the Terminated Employees (which will then be reimbursed to the Debtors by ADP) and to continue to make such payments postpetition in the ordinary course of business.

(i)     Medical Plans

61.     The Debtors offer medical coverage to Continuing Employees administered by Anthem Blue Cross (HMO and PPO) and Kaiser Permanente (HMO), which plans allows Employees to contribute pre-tax dollars to pay for medical claims not payable by Blue Cross or Kaiser (the "Medical Plans"). Continuing Employees are responsible for 20% of the premium costs payable under the Medical Plans (the "Medical Premiums") which are deducted as Withholding Obligations while the Debtors pay the remaining 80% of Medical Premiums. Historically, the total amount of Medical Premiums under the Medical Plans were approximately $900,000 per month for all Employees. The Debtors seek authority to continue the Medical Plans in their discretion, to continue to pay any Medical Premiums in the ordinary

course of business, and to pay any outstanding prepetition amounts that may be owed under the Medical Plans up to $200,000 for the Continuing Employees.

(ii)    Dental Plan

62.    The Debtors also provide their eligible Continuing Employees with dental insurance under a plan with MetLife (the "Dental Plan"). The Debtors pay 80% of the premium costs under the Dental Plan while the Continuing Employees pay 20% of the premium costs through voluntary Withholding Obligations deducted from the Continuing Employees' paychecks. Historically, the total premium contributions under the Dental Plan were $130,000 per month (collectively, the "Dental Plan Contributions"). The Debtors seek authority to continue to offer the Dental Plan postpetition in their discretion, to pay any Dental Plan Contributions in the ordinary course of business, and to pay any outstanding prepetition amounts that may be owed under the Dental Plan up to $25,000 for the Continuing Employees.

(iii)    Vision Plan

63.    The Debtors also offer their Continuing Employees a vision plan sponsored by Vision Service Plan (the "Vision Service Plan"). The Debtors are responsible for 80% of the premium costs under the Vision Plan while the Continuing Employees pay 20% of the premium cost through Withholding Obligation deductions (collectively, the "Vision Plan Contributions"). Historically, the total Vision Plan Contributions were approximately $20,000 per month in premium payments under the Vision Service Plan. The Debtors seek authority to continue to honor the Vision Service Plan in their discretion, to pay any Vision Plan

Contributions in the ordinary course of business, and to pay any prepetition amounts owing on account of Vision Plan contributions up to $5,000 for the Continuing Employees.

(iv)    Life, Accidental Death and Dismemberment,
and Disability Insurance

64.    The Debtors also provide their Continuing Employees with Basic Life and Accidental Death & Dismemberment Insurance through Mutual of Omaha at no cost to the Continuing Employees. Specifically, the Debtors provide life insurance benefits to their Continuing Employees at two times the Continuing Employee's base salary, up to a maximum amount of $500,000 (the "Life Insurance"). Continuing Employees may also purchase additional life insurance coverage on behalf of themselves or their spouses beyond the basic Life Insurance (the "Voluntary Life Insurance"). The Debtors do not incur any cost for additional coverage, but if such additional voluntary life insurance is purchased, the Debtors may withhold the cost of such premium as part of the Withholding Obligations and are obligated to remit such premiums to Mutual of Omaha. The Debtors also provide accidental death and dismemberment insurance ("AD&D Insurance") at two times the Continuing Employees' base salary, up to a maximum of $500,000.

65.    The Debtors also provide all Continuing Employees with short- and long-term disability coverage (the "Disability Insurance"). Short-term disability pays 66.67% of pre-disability pay per week, for a period of 12 weeks up to a maximum of $2,309 per week, which amount is offset by any federal or state disability benefits. Long-term disability pays 60% of pre-disability pay per month (to a maximum of $10,000 per month), commencing after an employee has been continuously disabled for 90 days.

66. The Debtors also provide Business Travel Accident Insurance to all Continuing Employees through Ace Insurance Company, which pays beneficiaries either $250,000 or $500,000 (for sales associates) if the Continuing Employee dies or is seriously injured while traveling on company business. If the Continuing Employee's spouse or children are accompanying the Continuing Employee on company business, the Business Travel Accident Insurance also pays out $25,000 for spouses and $10,000 for children who may be injured or die while accompanying covered Continuing Employees.

67. The Debtors' premium contributions to the Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance are paid monthly, in advance, at a total cost of approximately $50,000 per month. The Debtors seek authority to pay any unpaid prepetition Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance premiums up to a maximum of $50,000 per month and continue to honor Life Insurance, AD&D Insurance, Disability Insurance, and Business Travel Accident Insurance premium contribution obligations incurred postpetition in the ordinary course of the Debtors' business and in their discretion. The Debtors also request leave to remit any Continuing Employee-paid voluntary premiums to the applicable insurance companies beyond the premiums paid by the Debtors in connection with the Withholding Obligations.

(v) Holidays, Vacation, and Leave

68. The Debtors provide their Continuing Employees with three forms of regular paid time off ("PTO") consisting of holidays, vacation, and sick leave time. In addition, Continuing Employees are eligible for other non-regular PTO, including, among other things, for

funeral leave, jury duty, time off to vote, and bereavement. The Debtors provide for 9 paid holidays for Continuing Employees.

69.    Vacation for all Continuing Employees is accrued starting as of the Continuing Employee's respective hire date and is based upon length of service. Regular employees who work more 36 hours per week accrue vacation on an annual basis as follows: employees with less than two years of service receive 12 days of paid vacation per year; employees with 3 or more years of service receive 15 days of paid vacation per year, with an additional day of paid vacation accruing for each additional year of service up to a cap of 21 days of paid vacation per year for 9 years of service. Unused vacation days are not paid out upon year-end, but employees may carry over up to 240 hours per year of unused vacation time to the next year.

70.    Employees who work less than 36 hours each week accrue vacation on a pro-rated basis as a percentage of their hours on an annual basis worked as follows:

| Regular Hours Per Week | Pro-Rated Vacation Accrual |
|---|---|
| 20 | 50% |
| 21-25 | 63% |
| 26-30 | 75% |
| 31-35 | 88% |
| 36-40 | 100% |

71.    Employees who work 36 or more hours accrue 80 hours of sick leave per year. Employees who work less than 36 hours per week receive pro-rated sick time based on the Employees' number of regularly scheduled hours per week. Unused sick time may not be carried over from year to year.

72.     As discussed, prior to the Petition Date, the Debtors paid out to Terminated Employees any accrued PTO time that had accrued within the 90 days prior to August 31, 2011 in the aggregate amount of $818,741. Also, the Debtors paid to Continuing Employees vacation time that they had accrued during the 90-day period prior to August 31, 2011 an aggregate amount of $225,000, which amounts were funded to ADP on September 2, 2011.

73.     The Debtors seek authority to honor their existing PTO policies to permit Continuing Employees to use their accrued PTO in the ordinary course of business and, in the Debtors' discretion, to pay accrued PTO obligations upon termination of the Employees up to the priority wage cap amounts of $11,725, inclusive of any prepetition Wages made pursuant to the Wage Motion. In summary, the Debtors request authority, in their discretion, to honor, any accrued prepetition PTO, and also request authority to honor similar PTO policies regarding vacation time, sick time, personal time, and holidays on a post-petition basis and in the ordinary course of business and to pay out accrued PTO obligations up to the statutory cap.

(vi)     401(k) Plan

74.     Prior to the Petition Date, the Debtors offered their Employees a 401(k) retirement plan or a Roth 401(k) retirement plan (the "401(k) Plans") administered by Pension Specialists. The Debtors have or will formally terminate the 401(k) Plans within the month of September 2011, but will require a period of several months to wind down the 401(k) Plans to allow Employees a period of time to rollover their funds.

75.     As of the Petition Date, there may be some Employee 401(k) contributions outstanding that the Debtors are required to remit to Pension Specialists. Historically, the Employee contributions to the 401(k) Plans, including repayments of loans against the 401(k) Plans, were approximately $170,000 per pay period. The Debtors estimate that, as of the Petition Date, $16,000 in 401(k) Plans contributions may remain unremitted (collectively, the "401(k) Contributions"), which amount is included in the Withholding Obligations request amount above.

76.     In addition, the Debtors incur approximately $55,000 per year in administrative and auditing costs to administer the 401(k) Plans (the "401(k) Fees"). The Debtors seek authority to honor the 401(k) Contributions and to pay any prepetition 401(k) Fees subject to a maximum cap of $55,000.

(vii)   Workers' Compensation Insurance

77.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Continuing Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Insurance Policy") with Travelers Insurance pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability. The Debtors are responsible for payment of any workers' compensation claims in excess of the $1 million up to $10 million under the Workers Compensation Insurance Policy.

78.     The current term of the Workers' Compensation Policy runs through November 15, 2011. Prepetition, the Debtors paid the entire year's cost of the Workers' Compensation Policy and no prepetition amounts on account of premiums are owed under the Workers Compensation Insurance Policy. The Workers' Compensation Policy is a deductible-based policy. The Debtors seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition and to pay all post-petition premium installments as they come due in the ordinary course of business.

(viii)  Flexible Spending Accounts

79.     Prior to the Petition Date, the Debtors offered a flexible spending account program administered by Ceridian (the "FSA Program") whereby Employees could contribute funds into a flexible spending account to pay for health care expenses that are not covered or only partially covered by the Medical Plans or Dental Plan up to $4,000 per year or up to $5,000 for dependants (the "FSA Contributions"). The Debtors terminated the FSA Program immediately prior to the Petition Date on August 31, 2011. However, going forward, the FSA Program will remain open for approximately 90 days to allow Employees to submit any final claims against their FSA accounts. In connection therewith, the Debtors anticipate that they will incur de minimis administrative costs of approximately $6,000 per month to wind down their FSA Program (the "FSA Administration Fees"). Accordingly, the Debtors request authority to pay any prepetition FSA Administration Fees to Ceridian up to $6,000.

(viii)  Claremont Employee Assistance Program

80. The Debtors provide an Employee Assistance Program ("EAP") to all Employees through Claremont. The EAP offers confidential counseling and assistance to Employees for resolving personal or professional situations where Continuing Employees may need counseling, such as dealing with loss and grief issues. The Debtors provide EAP to Employees at no cost. The cost to the Debtors to provide such program to Employees is $2,500 per month. Going forward, the Debtors will maintain the EAP for the month of September only. Accordingly, the Debtors request authority to pay any pre-petition amounts owed to Claremont on account of the EAP program up to $2,500 for the month of September.

81. Pursuant to the relief requested herein, the Debtors request authority only to pay up to the $11,725 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all unpaid Wages collectively owing to such Employee.

82. Many Continuing Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Continuing Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Wages and the Benefits described above, employee morale and loyalty will be jeopardized at a time when employee support is critical.

83. With respect to Terminated Employees, many of the same concerns apply. The hardships facing the Terminated Employees are often even greater than those facing the

Continuing Employees who still have their jobs. If the Debtors were to completely ignore its obligations to the Terminated Employees as a result of its chapter 11 filing, that likely would have reverberations within the remaining workforce, in terms of diminished morale, Continuing Employee anxiety, and an enhanced risk of losing Continuing Employees that may be critical to the Debtor's reorganization effort.

84.     The Continuing Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Continuing Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the efficient operation in order to maximize value for all creditors.

85.     I believe that the Debtors have (or will have) sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described herein on an ongoing basis.

E.      **Motion Of The Debtors For An Order (I) Authorizing The Debtors To Pay Prepetition Sales And Use And Similar Sales Taxes In The Ordinary Course Of Business And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto ("Sales and Use Tax Motion")**

86.     In connection with the normal operation of their business, the Debtors pay an assortment of sales taxes (the "Sales Taxes") and use, and similar types of taxes (the "Use Taxes" and, together with the Sales Taxes, the "Sales and Use Taxes") to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities").

87.     The Debtors incur Use Taxes in California for the use of products purchased and internally consumed by the Debtors in the operation of their business and for which no Sales Taxes were paid to the seller of such products.  Most of the Debtors' internal consumption of products for which Use Taxes are paid relate to research and development.  The Debtors also incur Use Taxes on non-inventory related purchase in cases where a vendor has not charged the Debtors any sales tax.  Because of the scope of the Debtors' prepetition operations, the Debtors accrued Use Tax amounts between $230,000 and $260,000 per month owed to the State of California.  The Debtors seek authority to remit unpaid Use Taxes to the applicable California taxing authority.

88.     In the normal course of their business in States where the Debtors are required to collect such taxes, the Debtors collect and remit or otherwise pay Sales Taxes to the Taxing Authorities.  For the most part, the Debtors sell almost all of their products to resellers and obtain reseller certificates and do not collect Sales Taxes on such sales.  The Debtors believe that as of the Petition Date, they do not owe more than $5,000 in prepetition Sales Taxes.  The Debtors remit the Sales Taxes on a periodic basis to the applicable Taxing Authorities.  Such Sales Taxes could include both amounts not yet due and amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, although the Debtors are not aware of any such checks that have not cleared.

89.     The Debtors estimate that current unpaid prepetition Sales and Use Taxes total no more than $300,000, plus any amounts for previously issued checks that have not yet

cleared. The Debtors seek authority, in their discretion, to pay any such unpaid Sales and Use

Taxes

**F.**     **Motion Of The Debtors For Entry Of An Order Authorizing The Debtors To Maintain And Administer Warranty Program And Honor Prepetition Obligations Related Thereto ("Warranty Motion")**

90.     Pursuant to the Warranty Motion, the Debtors respectfully request that the

Court enter an order authorizing, but not directing, the Debtors to: (a) honor certain obligations

under the Debtors' warranty program for product sold prepetition, as described below (the

"Warranty Program"); (b) continue to administer its Warranty Program in a manner consistent

with past practices and in the ordinary course of business for such product; and (c) continue,

renew, replace, implement new and/or terminate their Warranty Program, in the ordinary course

of business, without further application to the Court.

91.     The Debtors budget 1.5% of revenue for Warranty Program obligations

(collectively, the "Warranty Program Obligations"), but the actual cost of Warranty Program

Obligations have historically been far lower than the budgeted amount. The Debtors do not

anticipate paying any Customers cash on account of Warranty Program Obligations, but rather

making available replacement product at their discretion. Honoring such obligations is critical to

the Debtors' business and customer relationships as the Debtors attempt to restructure their

business and the total expected cost to make replacement product available is small compared to

the damage which would be suffered by the Debtors as a result of failing to honor the Warranty

Program Obligations and maintain the Warranty Program in the ordinary course of business.

<u>**Summary of the Debtors' Warranty Program**</u>

92.     In connection with its manufacturing and distribution of its solar power

systems, it is critical that the Debtors maintain positive customer relationships and a reputation

for reliability as it attempts to restructure its business. Achieving these goals will be particularly

important while the company evaluates its restructuring options in chapter 11. Indeed, the

Debtors believe that the ability to maintain the Warranty Program and to honor Customer

Program Obligations in the ordinary course of business is necessary to retain its customer base

and reputation for reliability, thereby not only preserving, but likely enhancing the going-concern

value of the Debtors and their estates.

93.     The Debtors' solar systems are primarily sold to corporations with large

commercial or industrial spaces where the Solyndra panels can be installed or to companies that

re-sell the Solyndra panels to such customers (collectively, the "Customers"). To maintain the

loyalty and goodwill of its Customers, in the ordinary course of business and consistent with

industry practice, the Debtors must maintain the Warranty Program and to honor the Warranty

Program Obligations to attract new Customers, enhance customer satisfaction, sustain goodwill

and ensure that the Debtors remain competitive.

94.     Prior to the Petition Date, the Debtors offered a "Limited Product

Warranty" and a "Limited Power Warranty" (the "Warranties"). Under the Limited Product

Warranty, Solyndra LLC ("Solyndra") offers a five-year warranty from the installment date of

their system for defects in materials and workmanship. Under the Limited Power Warranty,

Solyndra offers a 10-year warranty from the installation date if any Solyndra products perform at

less than 90% of their labeled power rating and such failure is due to defects in material or workmanship in the solar panel. Under the Limited Power Warranty, Solyndra also offers a 25-year warranty from the installation date, if any Solyndra products perform at less than 80% of their labeled power rating and such failure is due to defects in material or workmanship in the solar panels.

95.     The Warranties are subject to specified limitations and conditions. Upon the timely filing of a claim and verification that such claim is a valid claim under the Warranties, the Debtors will, honor their Warranty Program Obligation in accordance with the terms of the Warranties at their sole option, including making available replacement product for any defective product.

96.     The ability to continue to fulfill its obligations under the Warranties is vital to the Debtors' ongoing relationship with its Customers and to maintain the going-concern value of the Debtors' business. The Debtors believe that the preservation of Customer loyalty generated by the Warranties far outweighs the costs of such programs. In contrast, the Debtors believe that any failure to maintain the Warranties, and to honor the Customer Obligations accrued thereunder for product sold prepetition, will cause Customers to lose confidence in the Debtors and their products, resulting in significant deterioration in sales, which may drastically impact any reorganization efforts. Accordingly, the Debtors seek authorization, but not direction, to continue to honor the prepetition obligations under the Warranties in the ordinary course of business.

**G. Motion Of The Debtors For Entry Of An Order (A) Authorizing But Not Directing The Debtors To Pay Prepetition Claims Of Essential Service Providers, (B) Authorizing But Not Directing The Debtors To Pay Prepetition Claims Of Essential Parts Suppliers, And (C) Authorizing But Not Directing, The Debtors To Pay Prepetition Claims Of Shippers And Warehousemen ("Essential Service Providers Motion")**

97.     By the Motion, the Debtors seek the entry an order authorizing, but not directing, the Debtors to pay prepetition claims of (a) Service Providers necessary for the maintenance of the Debtors' manufacturing facilities (the "Service Claims"), (b) authorizing, but not directing, the Debtors to pay prepetition claims of Warehousemen, (the "Warehousemen Claims" and, with the Service Claims, the "Critical Vendor Claims") in an amount not to exceed $3,150,000.

98.     <u>Claims of Service Providers</u>.  The Debtors require the services of a number of Service Providers essential to the safe and proper maintenance of the Debtors manufacturing facilities, including for the clean-up of hazardous substances and materials, waste water treatment, chemical and chemical waste disposal, safe disconnection of tooling utilized in manufacture, and maintenance of life and fire safety systems at the facilities.  The Service Providers are familiar with the Debtors operations and replacing any of the Service Providers would require significant additional costs to the Debtor to obtain a replacement provider.  Timely provision of the services provided by the Service Providers is essential to the safe and proper maintenance of the Debtors' manufacturing facilities.

99.     The Debtors are seeking a turnkey purchaser of the business, among other restructuring alternatives.  The safe and proper maintenance of the Debtors' manufacturing facilities during the period in which the Debtors are seeking a buyer is essential to the

preservation of the value of those facilities and the Debtors' ability to maximize the value of their assets through the sale of their business.

100. Any failure or delay in the provision of those essential services could result significant harm to the Debtors' equipment, tools, tooling, machinery and facilities, and will increase the risk to the Debtors' remaining employees, and consequently could result in immediate, significant and irreparable harm to the Debtors' estates and creditors.

101. The Debtors estimate that, as of the Petition Date, they owe approximately $1.63 million to essential Service Providers on account of services provided prepetition which remain unpaid. The Debtors further estimate that the essential Service Providers will be willing to continue to provide such services to the Debtors postpetition, on the same terms that they provided such services prepetition if the Debtors make payments to the essential Service Providers on account of their prepetition claims in the aggregate amount of up to $389,000.

102. To avoid undue delay and disruption in the provision of such essential services, and the consequent harm to the Debtors' property, estates and creditors, and to maximize the value of the Debtors' assets, the Debtors seek immediate authority, but not direction, to pay and discharge, on a case-by-case basis, the claims of Service Providers in the aggregate amount of up to $389,000.

103. <u>Claims of Warehousemen</u>. The Debtors contract with a number of Warehousemen for the provision of logistics services and storage of the goods that they sell. A significant amount of the Debtors' manufactured goods were stored by Warehousemen on the Petition Date. The immediate availability of manufactured goods owned by the Debtors that are

being stored with Warehousemen is critical to the sale by the Debtors' of their manufactured

inventory.

104.    The Debtors also have stored with the Warehousemen (a) a significant

amount of manufactured goods that were sold to third parties prepetition, the sale of which by

the Debtors to end-users under the Debtors' agreements with those third parties likely will result

in payments to the Debtors,[3] as well as (b) materials, equipment and parts owned by the Debtors,

all of which the Debtors need access to in order sell.

105.    The Debtors estimate the sale of the manufactured goods owned by the

Debtors, those owned by the third parties, and the other materials, equipment and parts owned by

the Debtors that are stored with the Warehousemen could raise from $6.5 to $10.6 million in

proceeds to the Debtors.

106.    Moreover, the Warehousemen could potentially assert liens against the

Debtors and their property for amounts the Debtors owe to those parties.  Indeed, pursuant to

section 362(b)(3) of the Bankruptcy Code, the act of perfecting such a lien, to the extent

consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic

---

[3] As more particularly set forth in the motion for postpetition financing from Argonaut Ventures I, L.L.C. (the "DIP Lender") and authorization to use cash collateral filed in this case (the "DIP Motion"), the Debtor, as Servicer, entered into a prepetition inventory sale agreement with Solyndra Financing LLC (an affiliate of the Debtors), as Seller, Solyndra Solar II LLC (an affiliate of the DIP Lender), as Inventory Buyer, and Argonaut Solar LLC, as Agent (also an affiliate of the DIP Lender) (the "Inventory Sale Agreement").  The Debtor, Solyndra, continues to have custody to the inventory that was sold under the Inventory Sale Agreement, which inventory now comprises approximately 75% of the remaining inventory with a retail value of up to approximately $15 million to $21 million (the "Buyer Inventory").  Pursuant to the Inventory Sale Agreement, the Debtors are entitled to the proceeds on the sales of the Buyer Inventory in excess of 60% of the retail price that was projected at the time of purchase by Buyer, determined on a cumulative basis, and subject to certain cost offsets.  The amounts set forth in paragraph 17 of that motion take into account the Debtors' projections of proceeds both from the sale of the Debtor's inventory and other property that is in transit or warehoused and the net amounts to be realized by the Debtors on the Debtors' sale of the Buyer's Inventory.  Consistent with the terms of the Inventory Sale Agreement, the Debtors intend to continue to market and sell such inventory in the ordinary course of business.

stay. Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are

subject to any generally applicable law that . . . permits perfection of an interest in property to be

effective against an entity that acquires rights in such property before the date of perfection . . . ."

11 U.S.C. § 546(b)(1)(A).

107.    To avoid undue delay and to facilitate the sale and delivery by the Debtors

of their existing inventory of manufactured goods and the other saleable items, the Debtors seek

immediate authority, but not direction, to pay and discharge, on a case-by-case basis, the claims

of Warehousemen, including those that could give rise to a lien against the Debtors or the

Debtors' customers (regardless of whether such claimants have already have perfected their

interests), up to the aggregate amount of $2,761,000.

108.    Terms and Conditions of Payment of Critical Vendor Claims. Subject to

the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent

necessary to preserve their businesses and maximize the value of their assets for the benefit of

their estates and creditors.  To that end, in return for paying the Critical Vendor Claims, the

Debtors will use their reasonable best efforts to require the applicable Service Provider and

Warehouseman (each a "Critical Vendor") to provide favorable trade credit terms for the

postpetition delivery of goods and services.  Specifically, the Debtors propose to condition the

payment of Critical Vendor Claims upon each Critical Vendor's agreement to continue supplying

goods and services on terms that are acceptable to the Debtors.  In some circumstances, the

Debtors may require certain Critical Vendors to enter into a contractual agreement evidencing

such terms.

109.    Additionally, the Debtors request that if a Critical Vendor accepts payment pursuant to an order granting the relief requested in that motion and thereafter does not continue to provide goods or services on prepetition trade terms that: (a) any payment to that Critical Vendor on account of a Critical Vendor Claim may be deemed to be an improper postpetition transfer, and, therefore, recoverable by the Debtors in cash upon written request; and (b) upon recovery of the payment by the Debtors, the Critical Vendor Claim shall be reinstated as if the payment had not been made.  If there exists an outstanding postpetition balance due from the Debtors to a Critical Vendor, the Debtors may elect to recharacterize and apply any payment made pursuant to an order granting the relief requested in that motion to such outstanding postpetition balance and such Critical Vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

110.    As described in greater detail in the Essential Service Providers Motion, the Debtors require a steady stream of services from their Critical Vendors to maintain their manufacturing facilities in a safe and recoverable condition, to preserve and maximize the value of, and avoid irreparable harm to, those facilities and their other assets while they seek a turnkey purchaser of their business, among other restructuring alternatives, and to complete the manufacture, sale and delivery of the manufactured inventory and the other saleable items to satisfy customer demand and maximize the value of the Debtors' estates.  The proposed payments to Critical Vendors are essential to the Debtors' ability to obtain a turnkey purchaser of the Debtors' business, to maximize the value of that business and the Debtors' facilities and

existing manufactured inventory and other saleable items, to prevent unnecessary liabilities, and to maximize the value of the Debtors' estates for the benefit of their creditors.

111.    The Debtors' failure to pay the Critical Vendor Claims could also prolong the Debtors' inability to obtain necessary services, prevent the Debtors from preserving favorable trade terms, and increase the likelihood for significant disruptions to the Debtors' distribution chain.  This failure, in turn, could jeopardize and significantly impair the value of the Debtors' assets and business.  As such, the Debtors' fiduciary obligations would be better served by authorizing the limited relief requested herein, thereby ensuring the Debtors' access to services, saleable manufactured inventory and other saleable items at this critical stage of these chapter 11 cases.  For these reasons, the Debtors believe the relief requested herein is vitally necessary to preserve and maximize the value of their estates for the benefit of all stakeholders in these chapter 11 cases and should be granted.

**H.    Motion Of The Debtors For An Order Under Section 366 Of The  Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service, (B) Deeming Utilities Adequately Assured Of Future Performance, And (C) Establishing Procedures For Determining Adequate Assurance Of Payment ("Utility Motion")**

112.    In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services").  The Utility Providers include, without limitation, the entities set forth on Exhibit A attached to the Utility Motion.  The Debtors estimate that their average monthly postpetition payments to the Utility Providers will aggregate approximately $344,500.00.

113.     Uninterrupted Utility Services are critical to the Debtors' ongoing operations.  The Debtors propose to provide adequate assurance to the Utility Providers by maintaining an aggregate deposit of $172,250.  This amount, which is equal to approximately two weeks of the Debtors' estimated average postpetition monthly aggregate cost of utility services, will be held in a newly created and segregated account (the "Deposit Account"), within (20) business days of the Petition Date (the "Adequate Assurance Deposit").  The allocation of the Adequate Assurance Deposit amongst the Debtors' respective Utility Providers is set forth on Exhibit A to the Utilities Motion.  The Adequate Assurance Deposit shall be maintained with a minimum balance equal to the Debtors' estimated two-week cost of utility services, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company.

114.     In addition, as set forth in the Utilities Motion, the Debtors seek to establish reasonable procedures (the "Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Adequate Assurance Deposit does not provide it with satisfactory adequate assurance.

I.    **Motion For Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 And 364 And Rules 2002, 4001 And 9014 Of The Federal Rules Of Bankruptcy Procedure (I) Authorizing Incurrence By The Debtors Of Postpetition Secured Indebtedness With Priority Over All Secured Indebtedness And With Administrative Superpriority, (II) Granting Liens, (III) Authorizing Use Of Cash Collateral By The Debtors Pursuant To 11 U.S.C. § 363 And Providing For Adequate Protection, (IV) Modifying The Automatic Stay And (V) Scheduling A Final Hearing ("DIP Financing Motion")**

115.     Pursuant to the DIP Financing Motion, the Debtors seek the entry of an

Interim Order and a Final Order, which:

a.      Authorize the Debtors to obtain credit and incur debt, pursuant to sections 363 and 364 of the Bankruptcy Code, up to the principal amount of $4,000,000, plus any interest, fees and other obligations accrued thereon (the "DIP Obligations"), of which up to $2,500,000 may be incurred prior to the Final Hearing, from a special purpose entity (the "DIP Lender") to be created by Argonaut Ventures I, L.L.C. and Madrone Partners, L.P.,[3] secured by priming first priority, valid, perfected and enforceable liens on property of the Debtors' estates pursuant to sections 105, 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions summarized herein;

b.      Authorize the Debtors to enter into and perform under the DIP Agreement, which provides for new postpetition loans up to the principal amount of $4,000,000;

c.      Subject to the Carve-Out (as defined below), grant liens to secure the DIP Obligations in favor of the DIP Lender on all present and after-acquired assets and property of the Debtors pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, including subject to the entry of the Final Order, any actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or applicable state fraudulent transfer law ("Avoidance Actions") and the proceeds thereof;

d.      Subject to the Carve-Out, grant to the DIP Lender superpriority administrative claim status in respect of all DIP Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, which superpriority claim may be paid, subject to entry of the Final Order, out of the proceeds of Avoidance Actions;

e.      Authorize the use of "cash collateral" of the Debtors as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties (as defined below), have an interest, including the Restricted Funds (as defined below) and any amounts in the Master Collateral Agent Collections Account (as defined below);

---

[3] The principals of the DIP Lender are insiders of the Debtors by virtue of their direct or affiliated ownership of over 20% of the outstanding shares of common stock of 360 and representation on the board of directors of 360 and the board of managers of Solyndra. These parties also hold a substantial portion of the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche E Facility Obligations (both as defined below), and have equity ownership interests in the Inventory A/R Purchasers (both as defined below).

f.     Subject to the Carve-Out and junior to the DIP Obligations, grant the Prepetition Secured Parties, replacement liens and a superpriority claim in all of the Debtors' assets to the extent of any diminution in the secured value of the Prepetition Secured Parties' interests, if any, in the Prepetition Collateral (as defined below) as adequate protection for the use of Cash Collateral and for the imposition of the automatic stay, including subject to the entry of the Final Order, any actions maintained or taken pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or applicable state fraudulent transfer law ("Avoidance Actions") and the proceeds thereof;

g.     Release the Inventory Accounts Receivable Trust Funds (as defined below) to the Inventory A/R Purchasers (as defined below);

h.     Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Agreement and the Interim Order and the Final Order;

i.     Schedule the Final Hearing within 21 days after the commencement of these cases to consider entry of the Final Order and approving the form of notice with respect to the Final Hearing; and

j.     Waive any applicable stay as provided in the provisions of the Federal Rules of Bankruptcy Procedure and providing for immediate effectiveness of the Interim Order and the Final Order.

116.     In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary[4] of the terms of the proposed financing arrangements:

a.     <u>Obligated Parties</u>:  Solyndra, as borrower, and 360, as guarantor.

b.     <u>DIP Lender</u>:  A special purpose entity to be created by Argonaut Ventures I, L.L.C. and Madrone Partners, L.P. [5]

---

[4] The summaries and descriptions of the terms and conditions of the DIP Agreement, the Interim Order and the Final Order set forth in the DIP Financing Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the terms of the DIP Agreement, the Interim Order and the Final Order.  In the event there is any conflict between the DIP Financing Motion and the DIP Agreement, the Interim Order or the Final Order, the DIP Agreement or Interim Order, as applicable, will control in all respects.

c. <u>Amount and Type of Facility</u>: A new, senior, priming debtor-in-possession credit facility in the amount of up to $4,000,000 in principal obligations, plus any interest, fees and other obligations accrued thereon.

d. <u>Availability</u>: Debtors' seek authority to borrow up to $2,500,000 under the DIP Agreement pursuant to the Interim Order. DIP Agreement at section 2.2(a); Interim Order at ¶2(b).

e. <u>Use of Proceeds</u>: Loan proceeds may be used to (a) pay interest, costs, and expenses incurred with respect to the DIP Obligations, and (b) finance the Debtors' chapter 11 restructuring process, including, but not limited to chapter 11 professional fees and expenses (in each case, not otherwise prohibited by the DIP Agreement), in accordance with the budget approved by the DIP Lender (the "Budget"), subject to certain variances and tested on a weekly basis. DIP Agreement at section 3.3. The initial Budget is attached hereto as **Exhibit C**.

f. <u>Priority and Security</u>: Subject to the Carve-Out, the DIP Obligations will be secured by first priority priming liens against all assets of the Debtors and their estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, including subject to the Final Order, Avoidance Actions and the proceeds thereof. Subject to the Carve-Out, the DIP Obligations also shall be treated as superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which superpriority claim may be paid upon entry of the Final Order out of the proceeds of Avoidance Actions. Interim Order at ¶2(g)(i).

g. <u>Maturity Date</u>: The maturity date of the DIP Obligations will be the earliest to occur of: (i) 180 days following the Petition Date, (ii) the failure of the Debtors to obtain a Final Order on or before the date which is 21 days after the Petition Date, or (iii) the occurrence of an event of default under the DIP Agreement (the "Commitment Termination Date"). Interim Order at ¶15.

h. <u>Interest Rate</u>: The interest rate for the DIP Obligations will be 15% per annum. DIP Agreement at section 2.3(a).

i. <u>Carve-Out</u>: The DIP Liens, DIP Superpriority Claim, the Adequate Protection Replacement Liens, and the Adequate Protection Superpriority Claims (all as defined in the Interim Order) shall be subordinate only to the following (the "Carve-Out"): (a) quarterly fees required to be paid

---

[5] The principals of the DIP Lender are insiders of the Debtors by virtue of their direct or affiliated ownership of over 20% of the outstanding shares of common stock of 360 and representation on the board of directors of 360 and the board of managers of Solyndra. These parties also hold a substantial portion of the Prepetition Tranche A Term Loan Facility Obligations and the Prepetition Tranche E Facility Obligations (both as defined below), and have equity ownership interests in the Inventory A/R Purchasers (both as defined below).

pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; (b) allowed fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals employed by the Debtors and any official committee(s) of creditors pursuant to Sections 327 and 1103 of the Bankruptcy Code in the amounts set forth in the Budget accrued through the Commitment Termination Date, and up to the amount of $50,000 accrued thereafter. Interim Order at ¶11.

j.    Conditions Precedent: The conditions precedent to borrowing under the DIP Agreement are generally customary, but include the requirements that (i) the Restricted Funds are released and made available to the Debtors, (ii) the Inventory Accounts Receivable Trust Funds (as defined below) are released by the Debtors to the Inventory A/R Purchasers (as defined below), (iii) the Buyer Inventory (as defined below) is released for the purpose of sale, and (iv) that a critical vendor order is entered satisfactory to the DIP Lender. DIP Agreement at section 3.1.

k.    Covenants: The DIP Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature. DIP Agreement at sections 5 through 6.

l.    Events of Default: The DIP Agreement contains certain events of default. By way of example, and as more fully set forth in section 7 of the DIP Agreement, appointment of a trustee in the Debtors' cases, dismissal of the Debtors' cases, occurrence of a material adverse event, or failure to pay the DIP Obligations when due would constitute an event of default.

m.    Lender Fees: 2% closing fee or $80,000 payable upon closing.

n.    Debtors' Stipulations, Waivers and Releases: The Debtors propose to stipulate to the amount, validity and priority of the prepetition liens and claims of the Prepetition Secured Parties. The Debtors also seek to waive certain rights and causes of action and grant global releases in favor of the Prepetition Secured Parties as to any and all prepetition claims, including the Debtors' rights under section 506(c) of the Bankruptcy Code, pending entry of the Final Order. Interim Order at Recital E; DIP Agreement at section 5.24. The Debtors' stipulations and waivers are subject to challenge by any party in interest or, if a committee is appointed, by such committee, filed within the earlier of (a) sixty (60) days following formation of a committee, (b) solely if a committee is not appointed, seventy-five (75) days following the Petition Date, or (c) such later date consented to by the prepetition agents, as applicable. Interim Order at ¶9.

o.    Waiver or Modification of the Automatic Stay: Subject to five (5) business days' prior notice, the automatic stay will be vacated in the event of

default under the DIP Agreement to permit the exercise of remedies by the DIP Lender. Interim Order at ¶20.

p.     <u>Amount of Cash Collateral to Be Used</u>. The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Budget, including the Restricted Funds and any amounts in the Master Collateral Agent Collections Account.

q.     <u>Parties with an Interest in Cash Collateral</u>. The parties with an interest in the Cash Collateral are the Prepetition Secured Parties. The Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders (as defined below) have consented to the use of the Cash Collateral.

r.     <u>Cash Collateral Termination Date</u>. The Debtors' ability to use Cash Collateral shall end on the Commitment Termination Date.

s.     <u>Adequate Protection to Master Collateral Agent and Prepetition Lenders</u>. The Debtors have agreed to provide adequate protection to the Prepetition Secured Parties, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to the extent of any diminution of the value of the interests of the Prepetition Secured Parties in the Prepetition Collateral, in the form of additional and replacement security interests and liens in all of the assets of the Debtors and their estates, subject to the Carve-Out and junior to the DIP Obligations. Upon entry of the Final Order, such replacement liens shall extend to the proceeds of Avoidance Actions and the proceeds thereof, and junior only to the DIP Obligations and any prior permitted liens. In addition, subject to the Carve-Out, the Prepetition Secured Parties will have superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code for any such diminution in value, which superpriority claims may be paid out of the proceeds of Avoidance Actions, junior only to the DIP Obligations. Interim Order at ¶6.

t.     <u>Automatic Perfection</u>. The liens, security interests and adequate protection provided in the DIP Agreement, the Interim Order and the Final Order shall be valid, binding, enforceable, non-avoidable and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required under the laws of any jurisdiction to validate or perfect such security interests and liens. Interim Order at ¶7.

## **Need for Financing**

117.     As more fully set forth in the First Day Declaration, the Debtors have an urgent and immediate need for borrowings in the principal amount of up to $4,000,000

contemplated under the DIP Agreement and the use of Cash Collateral. Although the Debtors have ceased manufacturing operations in order to conserve capital, the Debtors are presently evaluating their options in these cases, which may include a "turnkey" sale of their business. In order for the Debtors to effectuate such sale process or other orderly restructuring of their assets in a manner that will maximize value for all constituents, the Debtors must have ample liquidity to meet their operational needs.

118. Without the proposed postpetition financing and continued use of cash collateral, including the Restricted Funds, the Debtors will not have any liquidity to manage their chapter 11 cases, and therefore will be unable to fund their ordinary course expenditures or pay chapter 11 expenses.

119. Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require postpetition financing and use of Cash Collateral to, among other things, proceed with an orderly restructuring of the Debtors' affairs and the payments and expenses attendant thereto, including the costs and expenses of administering these chapter 11 cases. The DIP Agreement has been negotiated in good faith and at arms length.

120. As set forth more fully in the DIP Financing Motion, the Debtors seek authority to incur credit in accordance with the DIP Agreement and to use Cash Collateral in compliance with the proposed Interim Order and the Budget. The Debtors believe the adequate protection provided for in the Interim Order protects the prepetition lenders' interests in their collateral. The DIP Lender is willing to extend financing in accordance with the terms of the DIP Agreement and, as part of such agreement and in accordance with the Interim Order and the

Budget, the Prepetition Tranche A Lenders and the Prepetition Tranche E Lenders have consented to the Debtors' use of Cash Collateral.

121.    The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

122.    The Debtors believe that any restructuring of their business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Agreement and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Agreement.

123.    The Debtors believe that their efforts to obtain credit except as provided under the DIP Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered and would have required the "priming" of the existing lenders' "blanket" liens.

124.    After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Agreement represents the best financing presently available to the Debtors. Moreover, the Debtors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the DIP Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

**J.    Debtors' Motion for Order Under Section 365(a) of the Bankruptcy Code Authorizing the Debtors (A) to Reject Unexpired Lease and (B) Abandon any Personal Property Located at Such Premises and Fixing a Bar Date for Claims of Counterparty ("Lease Rejection Motion")**

125.    The Debtors seek an Order approving the rejection of the unexpired lease of non-residential real property located at 400-472 Kato Terrace (Building 5) listed on Exhibit A attached to the Lease Rejection Motion (the "Rejected Lease") and authorizing the Debtors to abandon any personal property located at the premises leased by the Rejected Lease (the "Leased Premises") among other things.

126.    Just prior to the Petition Date, the Debtors terminated their manufacturing operations, and have continued to streamline their financial affairs. Previously, the Debtors operated their business: (1) at leased premises at 47700 Kato Road and 1055 Page Avenue (Buildings 1 and 2), 901 Page Avenue (Building 3), 400-472 Kato Terrace (Building 5) and 1210 California Circle (Building 6), in Fremont, and Milpitas, California, and (2) at premises owned by the Debtors at 47488 Kato Terrace, also in Fremont, California.

127. The Debtors have determined that they have no further use for the Leased Premises located at 400-472 Kato Terrace (Building 5), Fremont, California. Therefore, the Debtors, in the exercise of their business judgment, have determined to reject the Rejected Lease for the Leased Premises as follows, effective on the Rejection Effective Date:

- Industrial Lease dated 9/16/03 between Walton CWCA Scott Creek 28, L.L.C. (lessor) and Solyndra, Inc. (lessee), as amended.

128. The Debtors have no further use for the Leased Premises under any of the restructuring alternatives that they are considering, including the possible sale of the business or by licensing of their technology. The Debtors vacated the Leased Premises prior to the Petition Date. Accordingly, the Debtors submit that the relief sought in the Lease Rejection Motion is in the best interest of their estates and creditors.

*[Remainder of Page Intentionally Left Blank]*

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 5, 2011

_____
W.G. Stover, Jr.