IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

Objection Deadline (Requested): September 23, 2011 at 4:00 p.m. (ET)
Hearing (Requested): September 27, 2011 at 9:30 a.m. (ET)

**MOTION OF SOLYNDRA LLC FOR AN ORDER
(A) APPROVING PROCEDURES FOR SALE OF BUSINESS ASSETS ON
TURNKEY BASIS; (B) SCHEDULING AUCTION AND HEARING TO
CONSIDER APPROVAL OF SALE AND ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C)
APPROVING FORMS OF NOTICE; AND (D) GRANTING RELATED RELIEF**

Solyndra LLC ("Solyndra"), one of the above-captioned debtors and debtors

in possession (collectively, the "Debtors"), hereby moves this Court for entry of an order

approving procedures for the sale of Solyndra's business assets on a "turnkey" basis; (b)

scheduling an auction and a hearing to consider approval of the sale and the assumption and

assignment of certain executory contracts and unexpired leases (the "Sale Hearing"); (c)

approving forms of notice; and (d) granting related relief (the "Motion"). In support of this

Motion, Solyndra respectfully states as follows:

**Introduction**

1.      Solyndra seeks offers for the sale of substantially all of Solyndra's

assets utilized in the ordinary course operation of its business (or any portion thereof),

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

including Solyndra's manufacturing plant and land, all associated fixtures and equipment, intellectual property, rights under executory contracts and leases, and any other business assets necessary for a "turnkey" sale of Solyndra's enterprise (together, the "Assets").[2] Solyndra holds all of the Assets necessary to operate the company's business. Solyndra proposes to sell the Assets to the highest and best bidder at auction. The sale will be on an "as is," "where is," and "with all faults" basis.

## Jurisdiction

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

3.      Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

---

[2] The Assets exclude certain non-core assets and de minimis assets that Solyndra intends to liquidate either through the engagement of an auctioneer or by private sale, which matters will be the subject of separate motions. The Assets also exclude certain of Solyndra's inventory, which Solyndra is continuing to sell in the ordinary course of business usually at a discount from historical pricing.

## Background

5.     On September 6, 2011 (the "Petition Date"), the Debtors commenced

the above-captioned cases (the "Cases") by filing voluntary petitions for relief under chapter

11 of the Bankruptcy Code. The Debtors have continued in the possession of their property

and to manage their affairs as debtors and debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

On September 15, 2011, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Committee") in the Cases.

6.     Founded in 2005, Solyndra is a U.S. manufacturer of solar

photovoltaic ("PV") solar power systems specifically designed for large commercial and

industrial rooftops and for certain shaded agriculture applications. Solyndra's worldwide

headquarters and its manufacturing operations are located in Fremont California. Prior to

the Petition Date, Solyndra maintained sales presences in Germany, Switzerland, France,

Italy, the United Kingdom, Australia, Belgium, the Czech Republic and the UAE.

Solyndra's innovative cylindrical solar PV panels are highly differentiated and unique in the

PV industry. Unlike conventional flat solar panels, Solyndra's panels are a series of

cylindrical modules connected to form a panel. As a result of the form factor, Solyndra

panels require no ballast, tilting, or roof penetration and weigh approximately one-half of

other solar panels per rooftop unit of area. In addition, Solyndra's current high-volume

solar PV panels require no tools for installation and can be installed more quickly than

conventional solar panels, resulting in an installation cost substantially below that of

conventional solar panels. Solyndra manufactured all of its products in the United States with the support of a well-developed domestic supply chain. Prior to the lay-off of substantially all of the Solyndra workforce that occurred on August 31, 2011, Solyndra had approximately 968 full time employees and 211 temporary employees. Solyndra has sold more than 500,000 of its panels since 2008 and generated cumulative sales of over $250 million. Today, Solyndra panels are estimated to be installed on more than 1,000 commercial and industrial roofs in 20 countries.

## Business Operations

7.      Solyndra sells three primary types of solar panels: (i) 100 Series; (ii) 150 Series for higher power density; and (iii) 200 Series. In addition, Solyndra developed new mounting solutions that allow some of the Solyndra panels to be used in new situations: these solutions include (a) Elevated Shade Structure (aka "Greenhouse") mounts, announced in February 2011; (b) mounts for metal roofs, announced in June 2011; and (c) an "Extreme Wind Solution", allowing for deployment of panels in areas with winds up to 180 miles per hour, announced in August 2011. The 100 Series is Solyndra's original PV system composed of panels and mounting hardware for low-slope, commercial rooftops. The 200 Series is Solyndra's second generation PV system, which has an enhanced form factor over the 100 Series thereby increasing its Watt peak performance and requires no tools for installation. The 150 Series is a hybrid product, using the advanced PV modules of the 200 Series, but the existing mounting solution of the 100 Series.

8.     From its inception in 2005 through 2007, Solyndra focused on its research and development efforts to refine its proprietary thin-film technology used to apply the copper, indium, gallium and selenium ("CIGS") PV material on its cylindrical glass tubes. In 2007, Solyndra leased its first fabrication facility ("Fab 1") and began to focus its efforts on commercializing its technology and designing and deploying the custom equipment needed to produce its innovative PV panels on a large scale. In July 2008, Solyndra began its first commercial shipments of PV panels.

9.     In December 2006, Solyndra submitted a pre-application for a loan to be guaranteed by the U.S. Department of Energy ("DOE") pursuant to Title XVII of the Energy Policy Act of 2005. In October 2007, the DOE invited Solyndra and 15 other applicants to submit full applications for loan guarantees. In March 2009, Solyndra received a conditional commitment from the DOE for a $535 million loan guarantee (the "DOE Loan Guarantee") to fund the construction of a second fabrication facility ("Fab 2"). The DOE Loan Guarantee closed and construction on the Fab 2 facility began in September 2009. Commercial production in Fab 2 began in January 2011.

10.     Solyndra's commercial shipments and production have grown year over year for every year since it started commercial shipments in 2008. Solyndra had annual revenues of approximately $142 million for the year ended January 1, 2011. For the fiscal year then ended, the Company incurred a net loss of approximately $329 million. As of the year ended January 1, 2011, Solyndra had assets with a book value of approximately $859 million and liabilities with a book value of approximately $749 million.

## Circumstances Leading to the Commencement of the Cases

11.    Prior to the Petition Date, the combination of general business conditions and an oversupply of solar panels dramatically reduced solar panel pricing world-wide. The oversupply was due, in part, to the growing capacity of foreign manufacturers that utilized low cost capital provided by their governments to expand their operations. In response, Solyndra was forced to reduce its average selling prices to remain competitive. In addition, the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Europe, negatively impacted the availability of capital for PV system owners, further reducing demand for Solyndra's panels. Finally, Solyndra's ability to timely collect on its accounts receivables was negatively impacted as foreign competitors offered extended payment terms, resulting in Solyndra's customers refusing to honor their previously agreed payment terms.

12.    In February 2011, as the aforementioned competitive pressures were emerging, Solyndra entered into a restructuring of its debts. Although such restructuring provided for an infusion of $75 million, it left Solyndra with more than $783 million in senior secured debt and the need to raise further incremental capital to fund operations until Solyndra could generate positive cash flow from operations.

13.    Prior to the Petition Date, Solyndra reached out to multiple strategic and financial investors in an attempt to attract the necessary incremental capital. However, Solyndra was unable to find any parties that would be willing to fund its increased capital requirements in light the size and structure of Solyndra's debt.

14.     Solyndra then approached certain existing holders of Tranche A Debt to explore alternative financing arrangements.  In June and July of 2011, Solyndra and certain holders of the Tranche A Debt entered into an arrangement whereby Solyndra would sell up to $75 million of its existing and future accounts receivables and inventory at a negotiated discount in order to provide interim working capital for Solyndra through an accounts receivable purchase and sale facility (the "A/R Sale Agreement") and an inventory purchase and sale facility (the "Inventory Sale Agreement").

15.     In early August, Solyndra, certain holders of Tranche A Debt, and representatives of the DOE undertook negotiations regarding a further restructuring that would allow Solyndra to attract necessary new investment.  The negotiations over the terms of the further restructuring continued throughout August 2011.  During this time, the purchasers to the Inventory Sale Agreement continued to purchase Solyndra inventory to provide critically needed liquidity.  In the final weeks prior to the Petition Date, the DOE and certain existing investors engaged in negotiations for bridge financing to allow Solyndra additional time to find a new source of capital (the "Bridge Financing").  Solyndra believed that with sufficient time and an agreement to restructure its obligations by the existing lenders, there was a reasonable prospect of obtaining the necessary incremental financing.

16.     With the Bridge Financing discussions proceeding, the parties to the Inventory Sale Agreement purchased approximately $3 million in inventory from Solyndra on Monday, August 29, 2011.  However, on August 30, 2011, Solyndra was informed that

the contemplated Bridge Financing would not occur. Without the Bridge Financing, Solyndra was unable to continue operations. As a result, on August 31, 2011, Solyndra suspended its manufacturing operations and terminated the vast majority of its workforce. Solyndra retained key employees to operate the business while restructuring options are explored.

17.     Following the suspension of operations and with the Court's approval on an interim basis, Solyndra and certain existing Tranche A investors entered into a debtor in possession financing arrangement for $4 million (the "DIP Financing") and consensual use of cash collateral subject to the satisfaction of certain conditions. The DIP Financing and use of cash collateral was critical to providing Solyndra an opportunity to explore restructuring alternatives, including the possibility of a "turnkey" sale of Solyndra's business..

18.     Shortly after the Petition Date and subject to the approval of the Court, the Debtors engaged Imperial Capital, LLC ("Imperial") as their financial advisors and investment bankers for purposes of the turnkey sale. Imperial has commenced the marketing process for Solyndra's business assets by contacting over 100 prospective buyers, preparing a "teaser" and information memorandum, and updating an online dataroom with due diligence information about the Debtors. The proposed bid procedures below contemplate that the sale and marketing process will take longer than the initial four-week period projected in Solyndra's initial DIP Financing/cash collateral budget. Solyndra believes that such additional time will allow Solyndra to fully test the market for its assets

and thereby maximize the possibility of consummating a turnkey sale that will yield the highest and best value for creditor constituents, maintain Solyndra's going concern business, and create the potential of re-employing some of Solyndra's work force.

## Bid Procedures

19.     Solyndra proposes to sell the Assets in accordance with the bid procedures (the "Bid Procedures") attached hereto as **Exhibit A**. The following is a summary of pertinent terms of the Bid Procedures. Bidders and parties in interest are urged to review the Bid Procedures in their entirety and should not rely on this summary. Capitalized terms not defined herein have the meanings ascribed to such terms in the Bid Procedures.

20.     As more fully discussed below, all bids shall be made by a letter or other writing ("Offer Letter") RECEIVED by the Notice Parties (defined below) on or before **October 25, 2011 at 4:00 p.m. (prevailing Pacific time)** (the "Bid Deadline") by mail, delivery service, fax or email summarizing the material terms of the bid. Each Offer Letter must be accompanied by a proposed Purchase and Sale Agreement (the "Agreement") in substantially the form prepared by Solyndra, subject to review by the Notice Parties, which will be available from Solyndra's financial advisors, Imperial Capital, LLC, 55 Second Street, Suite 1950, San Francisco, CA 94105, Attn: Eric Carlson (email: ecarlson@imperialcapital.com). Each bidder must submit a clean copy and a redlined copy of the Agreement that is marked for any changes proposed by the bidder. The Offer Letter must, in substance:

(a) state that the Potential Bidder's offer is IRREVOCABLE until the closing of the purchase of the Assets if such Potential Bidder is the Successful Bidder or a Back-Up Bidder (as such terms are defined below);

(b) that the Good Faith Deposit (defined below) is NONREFUNDABLE if the Potential Bidder is designated the Successful Bidder;

(c) state that the Potential Bidder shall be ready, willing and able to close the purchase of the Assets by December 1, 2011, subject to any necessary governmental approvals;

(d) to the extent that the Bid is for a portion of the Assets, specify a percentage and/or dollar amount allocation of the total consideration offered among the Assets; and

(e) state the Potential Bidder's intention with respect to operating the Assets, including the extent, location and scope of such anticipated operations and the potential for hiring employees or re-employing Solyndra's workforce.

21. The Offer Letter shall not contain any due diligence or other contingencies. The clean copy of the Agreement accompanying the Offer Letter shall be executed by the Potential Bidder and evidence of due authority of the signatory shall also be provided with the Offer Letter.

22. An Offer Letter should not request a "break-up fee," "overbid fee" or similar payment or any payment or reimbursement of any fee to its advisor(s), but may indicate a willingness to become a "stalking horse" bidder or bidders (collectively, a "Stalking Horse Bidder"). Solyndra reserves the right, after consultation with the Notice Parties (defined below), to enter into a separate agreement with a Potential Bidder that is separate from an Offer Letter under which the Potential Bidder's Qualified Bid (defined below) would be deemed the Baseline Bid (defined below) for the Auction (defined below) of the Assets. Solyndra has discretion to designate a Stalking Horse Bidder and to grant the Stalking Horse protections in the form of payment, at any closing of the sale of such assets

to a Successful Bidder that is not the Stalking Horse Bidder, of a break-up fee (the "Break-Up Fee") payable solely out of the proceeds of sale that would not exceed three percent (3%) of the Stalking Horse Bidder's Baseline Bid, plus reimbursement of reasonable out-of-pocket expenses ("Expense Reimbursement") payable solely out of proceeds of sale in an amount not to exceed $250,000. Any Break-Up Fee may be credit bid in an Overbid by the Stalking Horse Bidder, if any. Notwithstanding the foregoing, Solyndra may not designate any holder of the Debtors' prepetition secured debt as the Stalking Horse Bidder without specific approval of the Bankruptcy Court.

23. Each Bid must be accompanied by a cash deposit (the "Good Faith Deposit") received by Solyndra at or prior to the Bid Deadline by a wire transfer or bank check payable to the order of "Solyndra LLC" in an amount equal to at least five percent (5%) of the proposed purchase price for the Assets contained in such Bid. The Good Faith Deposit is NONREFUNDABLE if the Potential Bidder is designated the Successful Bidder (whether initially or after being previously designated a Back-Up Bidder) unless Solyndra defaults under any executed and delivered Agreement.

24. Also, each Potential Bidder shall provide written evidence that demonstrates that it has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction, as more specifically described in the Bid Procedures.

25. Each Potential Bidder shall deliver written copies of its Bid by the Bid Deadline to Solyndra's financial advisors, Imperial Capital, LLC, 55 Second Street,

Suite 1950, San Francisco, CA 94105, Attn: Eric Carlson (email: ecarlson@imperialcapital.com), with a copy to: (a) Solyndra's counsel, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111, Attn: Debra I. Grassgreen (email: dgrassgreen@pszjlaw.com); (b) counsel to AE DIP 2011, LLC, as the DIP Lender, and Argonaut Ventures I, L.L.C., as the Prepetition Tranche A Representative and the Prepetition Tranche E Agent, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Michael A. Rosenthal (email: mrosenthal@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, DE 19899, Attn: Sean M. Beach, Esq. (email: sbeach@ycst.com); (c) counsel to the U.S. Department of Energy, acting by and through the Secretary of Energy, as the Prepetition Tranche B/D Credit Facility Agent, U.S. Department of Justice, Civil Division, 1100 L Street NW, Room 10030, Washington, D.C. 20530, Attn: Matthew J. Troy (email: matthew.troy@usdoj.gov); (d) counsel to the Official Committee of Unsecured Creditors, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, DE 19801, Attn: Bonnie Glantz Fatell (email: fatell@blankrome.com); and (e) Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy (email: jane.m.leamy@usdoj.gov) (collectively, the "Notice Parties"). Bids received by any of the Notice Parties may be shared with any of the other Notice Parties without prior notice to the Potential Bidder.

26.    A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bid ("Qualified Bid") for the Assets do not overlap and who shall

also be referred to herein as a single Qualified Bidder) that timely delivers the documents and Good Faith Deposit described above, and that Solyndra determines, after consultation with the Notice Parties, has made a *bona fide* offer that the Potential Bidder would be able to timely consummate the purchase of the Assets, if selected as a Successful Bidder or a Back-Up Bidder. Solyndra shall have the right to reject any and all Bids that Solyndra believes in its reasonable discretion, after consultation with the Notice Parties, do not comply with the Bid Procedures or for any reason or no reason.

27.     If Solyndra has received more than one Qualifying Bid for the Assets, Solyndra shall conduct an auction (the "Auction") for the Assets to determine the highest and best bid with respect to the Assets.

28.     At least 24 hours prior to the Auction, after consultation with the Notice Parties, Solyndra shall determine in its reasonable discretion which Qualified Bid, if any, constitutes the "Baseline Bid," if any, for the Assets based on the Bid Assessment Criteria set forth in the Bid Procedures.

29.     Solyndra shall provide all Qualified Bidders (a) notice of the identity of any Qualified Bidder that has been selected by Solyndra, after consultation with the Notice Parties, to make the Baseline Bid for the Assets and (b) copies of all Qualified Bids at least 24 hours prior to the Auction, which may exclude any confidential financial information, as determined by Solyndra in their sole reasonable discretion, after consultation with the Notice Parties, or which has been so designated by a Qualified Bidder in writing.

30.     The Auction shall commence at **10:00 a.m. (prevailing Pacific time) on October 28, 2011**, at the offices of Solyndra's counsel, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111, or at such other date, time and place as determined and announced by Solyndra.  The Auction shall be conducted according to the following procedures:

31.     Solyndra and/or its professionals shall direct and preside over the Auction.  Solyndra may conduct the Auction in the manner Solyndra determines in its reasonable discretion, after consultation with the Notice Parties, could result in the highest and best offer for the Assets.  Solyndra, after consultation with the Notice Parties, shall have the discretion to determine which Qualifying Bid is the highest and best bid at the Auction.

32.     At the start of the Auction, Solyndra shall describe the material business terms of the Baseline Bid.  All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material non-confidential terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  Solyndra shall maintain a list or other compilation of the Baseline Bid and Overbids, or may have a transcript made of the Auction instead of or in addition to making such a list or compilation.

33.     An "Overbid" is any bid made before or at the Auction subsequent to Solyndra's announcement of the Baseline Bid.  At the Auction, the bidding shall begin with a minimum Overbid, if any, that is, at a minimum, equal to the Baseline Bid *plus* an initial overbid incremental amount, in cash, equal to the sum of (i) any Break-Up Fee and/or Expense Reimbursement and (ii) $1,000,000, and continue in subsequent minimum overbid

incremental amounts of at least $500,000 in cash. Any Break-Up Fee and/or Expense Reimbursement may be credit bid in an Overbid by the Stalking Horse Bidder, if any.

34.     Upon conclusion of the bidding (as determined by Solyndra in its reasonable discretion after consultation with the Notice Parties), the Auction shall be closed, and Solyndra shall identify the highest and best offer *(i.e.*, providing the greatest value to Solyndra's estates) for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), and the next highest and best offer after the Successful Bid (the "Back-up Bid") and the entity submitting the Back-Up Bid (the "Back-Up Bidder"), and advise the Qualified Bidders of such determination.

35.     The Sale Hearing shall be conducted by the Court on a date after the Auction. Solyndra requests that the Court set the Sale Hearing on November 2, 2011, at 11:30 a.m. prevailing Eastern time, and that any objections or responses to the sale must be filed and served by October 19, 2011, at 4:00 p.m. prevailing Eastern time.

36.     Solyndra shall endeavor to close the sale of the Assets to the Successful Bidder(s) as soon as reasonably practicable after the entry of an order of the Bankruptcy Court after the Sale Hearing approving such sale unless the Bankruptcy Court or the United States District Court for the District of Delaware enters a stay of such sale. Solyndra's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Solyndra's acceptance of such Qualified Bid.

37.    If a Successful Bidder fails to consummate an approved sale in accordance with the applicable Agreement or such Agreement is terminated, Solyndra shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and Solyndra shall be authorized, but not required, after consultation with the Notice Parties, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court. Any Back-Up Bidder that is notified by Solyndra that it has become the Successful Bidder shall be the "Successful Bidder" as that defined term is used herein.

### Notice of Sale

38.    In order to ensure that all parties in interest are provided with adequate notice of the Bid Procedures and the sale, Solyndra proposes to serve the *Notice of Bid Procedures, Auction Date and Sale Hearing*, substantially in the form attached hereto as **Exhibit B**, on the parties provided notice of this Motion (as identified below). The Debtors' investment bankers would also send such notice to potential bidders.

39.    In addition, Solyndra proposes to serve the *Notice of Auction and Sale Hearing*, substantially in the form attached hereto as **Exhibit C**, on all of the Debtors' known creditors and equity security holders.

40.    As to counter-parties to executory contracts and unexpired leases that may be assumed and assigned as part of a sale of the Assets, at least twenty-one days prior to the Sale Hearing, Solyndra proposes to serve the *Notice to Counterparties to Executory*

*Contracts and Unexpired Leases That May Be Assumed and Assigned* (the "Cure Notice"), substantially in the form attached hereto as **Exhibit D**.

### Procedures for the Assumption and Assignment of Assumed Executory Contracts

41.     As noted above, Solyndra may seek to assume certain specified executory contracts and unexpired leases to be identified on schedules to the Agreement (the "Assumed Executory Contracts").

42.     At least initially, the Assumed Executory Contracts shall be those executory contracts and unexpired leases that Solyndra believes should be assumed and assigned as part of the orderly transfer of the Assets. The Successful Bidder may choose to exclude (or to add) certain executory contracts or unexpired leases from (or to) the list of Assumed Executory Contracts, subject to further notice.

43.     The Cure Notice referenced above shall identify the amounts, if any, that Solyndra believes are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts"). If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless the counterparty to such contract or lease properly and timely files and serves an objection to the Cure Amount contained in the Cure Notice, such counterparty shall receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Agreement, as executed and delivered at closing by Solyndra. If an objection is filed by a counterparty to an Assumed Executory Contract, Solyndra proposes that such objection

must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by Solyndra in the Cure Notice.

44.     If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract, Solyndra proposes that the counterparty must file the objection by no later than (i) 4:00 p.m. prevailing Eastern time at least five days before the date of the Sale Hearing, or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Sale Hearing); *provided, however,* that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.

45.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, as shall be provided in the Sale Motion.  Solyndra proposes that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any counterparty shall be resolved by the Court at the Sale Hearing.

46.     Except to the extent otherwise provided in the Agreement with the

Successful Bidder, subject to the payment of any Cure Amounts, the assignee of the

Assumed Executory Contracts shall not be subject to any liability to the assigned contract

counterparty or lessor that accrued or arose before the closing date of the sale of the Assets

and Solyndra shall be relieved of all liability accruing or arising thereafter pursuant to

section 365(k) of the Bankruptcy Code.

## Relief Requested

47.     Pursuant to this Motion, Solyndra seeks the entry of an Order: (a)

approving the Bid Procedures; (b) scheduling or setting the Bid Deadline, the Auction, the

Sale Hearing and the deadline for objections to the sale and assumption and assignment of

the Assumed Executory Contracts; (c) approving the forms of notice thereof; and (d)

granting related relief.

## Basis for Relief

48.     This Court has the authority to grant the relief requested herein.  The

Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1).  A debtor in possession's decisions to use, sell, or lease assets outside

the ordinary course of business must be based upon the sound business judgment of the

debtor in possession. *See Official Committee of Unsecured Creditors of LTV Aerospace and*

*Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992)

(holding that a court determining a section 363(b) application must find from the evidence

presented before it a good business reason to grant such application); *see also Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (court may approve the sale of property outside of the ordinary course of business where it finds a good business reason for such sale); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith."), citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

49.     The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts, absent a showing of bad faith,

self-interest, or gross negligence, will uphold a board's decisions as long as they are

attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

50.     The paramount goal of any proposed sale of property of a debtor is to

maximize the proceeds received by the estate. *See, e.g., Four B. Corp. v. Food Barn Stores,*

*Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (with reference to

bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at

hand."); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy

law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or

greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l*

*Corn (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

51.     To that end, courts uniformly recognize that procedures intended to

enhance competitive bidding are consistent with the goal of maximizing the value received

by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g.,*

*Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and maximize the

value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156

(Bankr. S.D.N.Y 1991) ("court-imposed rules for the disposition of assets. . . [should]

provide an adequate basis for comparison of offers, and [should] provide for a fair and

efficient resolution of bankrupt estates").

52.     One important component of the Bid Procedures is the "overbid"

provision, pursuant to which any minimum initial Overbid for the Assets must be in an

amount of at least $1,00,000 more than the Baseline Bid plus any Break-Up Fee and

Expense Reimbursement, and each minimum Overbid increment thereafter must be at least $500,000. Indeed, a minimum initial Overbid is necessary not only to compensate Solyndra for the risk that it might assume in foregoing a known, willing, and able purchaser (a Stalking Horse Bidder, if any) for a new potential acquirer, but also to ensure that there is an increase in the net proceeds received by the estates, after deducting the Break-Up Fee and Expense Reimbursement to be paid to the Stalking Horse Bidder in the event of a prevailing Overbid.

53.     The case law also supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable. As the District Court stated in *In re Wintex, Inc.*, 158 B.R. 540 (D. Mass. 1992):

> A debtor may avoid the increased costs and complexity
> associated with considering additional bids unless the
> additional bids are high enough to justify their pursuit. The
> 10% increase requirement is one example of a reasonable
> litmus test.

*Id.* at 543. *See e.g., Financial News Network,* 126 B.R. at 154 (requiring minimum overbids to exceed purchaser's offer of $105 million by at least $10 million) (9.5%); *In re Colony Hill Associates*, 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000 (8.6%); *In re Tempo Technology Corp.*, 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities).

54. Here, the proposed initial minimum Overbid is $1,000,000 plus any Break-Up Fee and Expense Reimbursement. The Break-Up Fee would be a maximum of three percent of the Baseline Bid and the Expense Reimbursement would not exceed $250,000. Given the anticipated value of Solyndra's assets, such initial minimum Overbid is reasonable under the circumstances.

55. Also, as stated above, to compensate any Stalking Horse Bidder for subjecting its bid to higher or better offers, Solyndra seeks approval of a Break-Up Fee of up to three percent of any Stalking Horse Bidder's Qualified Bid in the Assets are sold to a third party, other than as a result of the Stalking Horse Bidder's material breach of the Agreement with it. Solyndra believes that a three percent Break-Up Fee is reasonable, given the benefits to the estates of having a definitive Agreement with a Stalking Horse Bidder and the risk to any Stalking Horse Bidder that a third-party Overbid ultimately may be accepted, and that the Break-Up Fee is necessary to preserve and enhance the value of Solyndra's estate. Solyndra needs to provide incentive to induce a potential Stalking Horse Bidder, if any, to expend the necessary time and incur expenses in order to negotiate the purchase of the Assets from Solyndra.

56. Break-up fees and other termination fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact, because the... corporation ha(s) a duty to encourage bidding, break-up

> fees can be <u>necessary</u> to discharge [such] duties to maximize
> values.

*Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); <u>*see also*</u> *Integrated Res.*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

57.    Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

58.    In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a

business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estates. *See id.*, at 533.

59. The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

60. Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the maximum Break-Up Fee of three percent proposed and modest Expense Reimbursement proposed here pass muster. The Agreement and Solyndra's potential agreement to pay a Break-Up Fee and Expense Reimbursement would be the product of good faith, arm's-length negotiations between Solyndra and a potential Stalking Horse Bidder. The maximum Break-Up Fee and Expense Reimbursement is fair and reasonable in amount, and is reasonably intended to compensate for the risk to a potential Stalking Horse Bidder of being used as a stalking horse.

61.     Solyndra is not currently obligated to pay anyone a Break-Up Fee or

Expense Reimbursement.  So, if Solyndra agrees to a Break-Up Fee or Expense

Reimbursement, Solyndra would only do so if in its judgment such buyer protections would

encourage competitive bidding (for example, because the selected Stalking Horse Bidder

would not have entered into its Agreement with Solyndra without a Break-Up Fee or

Expense Reimbursement).  The Break-Up Fee and Expense Reimbursement thus would

have "induc[ed] a bid that otherwise would not have been made and without which bidding

would [be] limited."  *O'Brien*, 181 F.3d at 537.  Similarly, a Stalking Horse Bidder's offer

would provide a minimum bid on which other bidders can rely, thereby "increasing the

likelihood that the price at which the [Assets will be] sold will reflect [their] true worth."

*Id.*

62.     Finally, the Bid Procedures are fair and reasonable procedures

reasonably intended to encourage competitive bidding, and any agreed upon Break-Up Fee

or Expense Reimbursement would permit Solyndra to insist that competing bids for the

Assets made in accordance with the Bid Procedures be materially higher or otherwise better

than the Qualified Bid of any Stalking Horse Bidder, to the benefit of Solyndra's estate.

63.     Furthermore, a three percent maximum Break-Up Fee is within the

spectrum of termination fees approved by bankruptcy courts in chapter 11 cases, particularly

when compared to sales of a similar magnitude.  *See e.g., In re Global Motorsport Group,*

*Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (court approved a

break up fee of approximately 4%, or $ 500,000 in connection with sale); *In re Global*

*Home Product*s, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del., April 28, 1998) (court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *see also Integrated Res.*, 147 B.R. at 648. For the reasons set forth above, Solyndra respectfully requests approval of the proposed maximum Break-Up Fee to facilitate any negotiations with a potential Stalking Horse Bidder for the Assets.

    64.    Solyndra believe that the Bid Procedures, including provisions for providing any Stalking Horse Bidder with a Break-Up Fee and Expense Reimbursement,

will increase the likelihood that Solyndra will receive the greatest possible consideration for the Assets because such procedures will ensure a competitive and fair bidding process. The Bid Procedures also allow Solyndra to undertake the Auction process in as expeditious a manner as possible, which Solyndra believes is essential to maximizing the value of its estate.

65. Solyndra submits that the proposed Bid Procedures are reasonable under the facts and circumstances of this case, especially in light of the extensive marketing of the Assets that Solyndra and its professionals have commenced. Solyndra will continue its marketing efforts through the time of the Auction.

66. Hence, approval of the Bid Procedures will provide Solyndra with the best possibility of maximizing the value of the Assets for the benefit of creditors, and, accordingly, request that the Court approve the Bid Procedures.

### No Prior Request

67. No prior request for the relief sought in this Bid Procedures Motion has been made to this or any other court.

### Notice

68. Notice of this Motion either has been or will be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) counsel to the Prepetition Tranche A Term Loan Facility Representative; (d) counsel to the Prepetition Tranche B/D Agent, (e) counsel to the Prepetition Tranche E Agent; (f) counsel to the Master Collateral Agent and (g) all parties

that have filed notices of appearance and requests for notices in the Cases, by telecopy, email, overnight courier and/or hand delivery. Solyndra submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, Solyndra respectfully requests that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: September 16, 2011

PACHULSKI STANG ZIEHL & JONES LLP

Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:        rpachulski@pszjlaw.com
               dgrassgreen@pszjlaw.com
               bgrohsgal@pszjlaw.com
               mlitvak@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession