# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Hearing Date: October 17, 2011, 2011 at 2:00 p.m. (ET)**
**Objection Deadline: October 10, 2011 at 4:00 p.m. (ET)**

## APPLICATION OF THE DEBTORS PURSUANT TO SECTION 327(A) AND 328 OF THE BANKRUPTCY CODE, RULES 2014 AND 6005 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL RULE 2014-1 FOR AUTHORIZATION TO EMPLOY AND RETAIN HERITAGE GLOBAL PARTNERS AS SALES AGENT AND AUCTIONEER TO THE DEBTORS AND DEBTORS IN POSSESSION NUNC PRO TUNC TO SEPTEMBER 19, 2011

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby seek entry of an order pursuant to section 327(a) and 328 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and 6005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules" or "Del. Bankr. LR") authorizing the Debtors' retention and employment of Heritage Global Partners ("HGP") as sales agent and auctioneer for the Debtors, *Nunc Pro Tunc* to September 19, 2011 (the "Application"). In support of the Application, the Debtors rely on the *Declaration of Ross M. Dove in Support of Application of the Debtors Pursuant to Section 327(a) and 328 of the Bankruptcy Code, Rules 2014 and 6005 of the Federal Rules of Bankruptcy Procedure and Local*

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

1

*Rule 2014-1 to Employ and Retain Heritage Global Partners as Sales Agent and Auctioneer to the Debtors and Debtors in Possession nunc pro tunc to September 19, 2011* (the "Dove Affidavit"), which are being submitted concurrently with the Application. In support of this Application, the Debtors respectfully represent as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief sought herein are sections 327(e), 330 and 331 of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 6005.

## Background

3.      On September 6, 2011 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The factual background relating to the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of W.G. Bill Stover, Jr., Senior Vice President and Chief Financial Officer, in Support of First Day Motions* (the "Stover Declaration") filed concurrently with this Application and incorporated herein by reference.[2]

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Stover Declaration.

5.     The Debtors are continuing in possession of their property and are managing their business as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     No request has been made for the appointment of a trustee or an examiner in this case. On September 15, 2011, the Office of the United States Trustee appointed a committee of unsecured creditors and appointed seven initial members thereto (the "Committee").

## Relief Requested

7.     By this Application, the Debtors seek to employ and retain HGP as their sales agent in connection with the auction of their non-core assets as more fully set forth in the *Debtors' Motion (I) Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authority to (A) Conduct An Auction For All of Their Noncore Assets, and (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances* (the "Non-Core Auction Motion"). Accordingly, the Debtors respectfully request the entry of an order pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rules 2014 and 6005, and Local Rule 2014-1 authorizing them to employ and retain HGP as their sales agent and auctioneer, *nunc pro tunc* to September 19, 2011, to perform the services that will be necessary in order to effectuate the sale of the assets by auction described in the Non-Core Auction Motion, pursuant to the terms set forth in this Application and the Dove Affidavit.

8.     The Debtors seek to retain HGP because of HGP's extensive experience and knowledge with respect to the auction of property. HGP is a leading, world-wide, full

3

service, global auction and asset advisory firm. Its managing partners have more than a half-century of experience and have expertise in virtually every industry sector and have conducted over 4,000 industrial auctions, spanning 30 countries. HGP's staff brings significant industrial, technical, and professional experience in the asset advisory and auction practice. Such representation has included large sales and brokerage of major machine tools, photovoltaic equipment, other industrial assets, and much more, including auctions in the solar power industry. HGP also has considerable experience and knowledge in the field of distressed asset management, liquidation and auctions and is well qualified to undertake such representation. Based on the qualifications and experience of HGP, the Debtors believe that HGP is well qualified to perform the services described herein and to represent the Debtors.

**A.    Disinterestedness of HGP**

9.     To the best of the Debtors knowledge, information and belief, (a) HGP is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code and referenced by section 328(c) of the Bankruptcy Code, and holds no interest materially adverse to the Debtors, their creditors, and shareholders for the matters for which HGP is to be employed; and (b) HGP has no connection to the Debtors, their creditors, their shareholders or related parties herein except as noted in the Dove Affidavit. Moreover, the retention and employment of HGP is necessary and in the best interest of the Debtors, their estates and creditors.

10.    Also to the best of the Debtors' knowledge, information and belief, and based entirely and in reliance upon the Dove Affidavit, HGP does not have an interest materially

4

adverse to the interest of the Debtors, their creditors, or equity security holders in these cases and, as such, the Debtors believe that HGP are disinterested and hold no material adverse interest as to the matters upon which they are to be retained. To the extent HGP discovers any facts bearing on the matters described herein during the period of their retention, HGP will supplement the information contain in the Dove Affidavit.

**B.  Scope of Services to be Provided and Compensation**

11.    The parties have entered into the engagement agreement attached hereto as **Exhibit A** (the "HGP Engagement Agreement"), which governs the relationship between HGP and the Debtors. The terms and conditions of the HGP Engagement Agreement reflect the parties' mutual agreement as to the efforts that will be required to liquidate the Solyndra's non-core assets at auction, which assets are not necessary to the continued operation of the Solyndra's business and are listed substantially in the form to the exhibit attached to the Non-Core Auction Motion (collectively, the "Non-Core Assets").[3]

12.    The material terms of the proposed engagement include:

- HGP will conduct an auction of the Non-Core Assets pursuant to the terms of the Non-Core Auction Motion, as approved by the Court.

- HGP Will charge a buyer's premium of fifteen percent (15%) of the aggregate gross proceeds for the sale of a Non-Core Asset or lot of Non-Core Assets, payable by the buyers of such assets (the "Buyer's Premium"). Neither of the Debtors' estates shall be liable for any unpaid portion of the Buyer's Premium if HGP cannot collect such premium from the buyer(s) of the Non-Core Assets.

- HGP will receive a 5% sales commission the aggregate gross proceeds from the sale of each Non-Core Asset (the "Sales Commission").

---

[3] Notwithstanding the date of the auction in HGP Engagement Agreement, the proposed auction is scheduled to commence on November 2, 2011, as set forth in the Non-Core Auction Motion, subject to approval by the Court.

- HGP shall receive reimbursement of actually incurred and reasonable expenses (including, without limitation, labor, advertising, travel and lodging, digital photography of the Non-Core Assets, print and electronic media production, brochure and catalog production, and telemarketing) up to $40,000.00.

13. The Debtors believe that the foregoing terms are reasonable, in accordance with the applicable industry standards and legal standards, and that the HGP Engagement Agreement should be approved and HGP should be employed on the terms set forth in the HGP Engagement Agreement pursuant to 11 U.S.C. § 327(a) and 11 U.S.C. § 328(a).

14. It is necessary that the Debtors employ HGP. The Debtors believe that the sale of the Non-Core Assets at auction is the best way to maximize value for Solyndra's estate. HGP's services will not duplicate the services that other professionals will be providing the Debtors in these cases. Specifically, HGP will carry out unique functions and will use reasonable efforts to coordinate the Debtors and other professionals retained in these cases to avoid the unncesessary duplication of services.

15. In lieu of filing a fee application for the allowance of compensation and reimbursement of expenses, HGP proposed that it file with the Court and serve a notice (the "Fee Notice") describing (i) a list of the proposed Buyer's Premium charged on account of the sale on each Non-Core Asset and the total Buyer's Premium HGP believes is owed to it, (ii) the Sales Commission charged on account of the sale of each Non-Core Asset the amount of total Sales Commission HGP believes is owed to it, and (iii) an itemized list of each of the expenses for which HGP seeks reimbursement. The Fee Notice shall be served on the following parties: (a) counsel to AE DIP 2011, LLC, the DIP Lender, and Argonaut Ventures I, L.L.C., as the

6

Prepetition Tranche A Representative and the Prepetition Tranche E Agent, Gibson, Dunn &

Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Michael A. Rosenthal (email:

mrosenthal@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street,

17th Floor, Wilmington, DE 19899, Attn: Sean M. Beach, Esq. (email: sbeach@ycst.com); (b)

counsel to the U.S. Department of Energy, acting by and through the Secretary of Energy, as the

Prepetition Tranche B/D Agent, U.S. Department of Justice, Civil Division, 1100 L Street NW,

Room 10030, Washington, D.C. 20530, Attn: Matthew J. Troy (email:

matthew.troy@usdoj.gov); (c) counsel to the Official Committee of Unsecured Creditors

appointed in these chapter 11 cases (the "Committee"), Blank Rome LLP, 1201 Market Street,

Wilmington, DE 19801, Attn: Bonnie Fatell (email: fatell@blankrome.com); and (d) Office of

the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE

19801, Attn: Jane M. Leamy (email: jane.m.leamy@usdoj.gov) (collectively, the "Notice

Parties").

  16. If no objection is received by any Notice Party within 20 days from the

date of the service of the Fee Notice, HGP proposes that it be authorized to receive payment of

the requested Sales Commissions, Buyer's Premium, and reimbursement of the requested

expenses set forth in the Fee Notice (together, the "HGP Compensation") without the necessity

of filing any application for payment of fees and reimbursement of expenses. To the extent an

objection is filed to HGP's requested payment of the HGP Compensation, HGP proposes that it

be allowed to receive payment of the portion of the HGP Compensation that is not the subject of

any objection and will file, on notice, an application for payment of the portion of the HGP

Compensation that is the subject of any objection.

## Notice

17.     Notice of this Motion has been or will be given to the following parties or,

in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; and (ii) the

Debtors' prepetition lenders; (iii) proposed counsel to the Committee; and (iv) those persons who

have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The

Debtors submit that, in light of the nature of the relief requested, no other or further notice need

be given.

**No Prior Request**

18.     No prior request for the relief sought in this Application has been made to

this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the

Application in all respects, and grant such other and further relief it deems just and proper.

Dated: September 29, 2011                    PACHULSKI STANG ZIEHL & JONES LLP

_____
Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:     rpachulski@pszjlaw.com
            dgrassgreen@pszjlaw.com
            bgrohsgal@pszjlaw.com
            jfried@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

# EXHIBIT A



# Heritage Global Partners
## Asset Advisory and Auction Services
### *A Legacy since 1937*

## EXCLUSIVE AUCTION AND SALES AGREEMENT

This Exclusive Auction Agreement ("Agreement") is made as of September 19, 2011 ("Effective Date")

BETWEEN:

      Solyndra LLC
      47488 Kato Road
      Fremont, CA  94538
      Attention:     Ben Bierman
      Telephone:    (510) 440-3535
      Fax:           (510) 440-2799


      ("Seller"),

AND

      Heritage Global Partners, a California corporation
      Hacienda Del Mar
      12625 High Bluff Drive Suite 211
      San Diego, CA  92130
      Attention:     Kirk Dove
      Telephone:    (858) 847-0650
      Fax:           (858) 847-0660


      ("Auctioneer")


      WHEREAS, Seller wishes to sell certain assets, and Auctioneer has agreed to conduct a public auction on the terms and conditions set forth below;

      NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, Auctioneer and Seller agree as follows:

      **1. REPRESENTATION**: Seller agrees to retain Auctioneer on an exclusive basis to offer for sale and conduct an auction (the "Auction") of the assets (the "Assets") set forth on Exhibit A to this Agreement.

      **2. CONDUCT OF THE AUCTION:**  The Auction will be conducted on or about the week of ~~November 14, 2011~~, the exact date to be determined by mutual agreement.  At all times the Auction will be conducted on site and over the Internet using webcast technology. Seller agrees that Auctioneer may use its name, street address and logo in its advertising in accordance with Auctioneer's customary practice, including on its Website as well as in any press release, solely to perform services under this Agreement.  Unsold items, if any, shall revert back to the Seller at the conclusion of the post auction removal period.  Auctioneer shall not be responsible for the removal of any unsold items.

*[handwritten: October 24, 2011 S.D.]*

**3. DISCLAIMERS OF WARRANTIES:** Auctioneer shall state both in its advertising for the Auction and at the Auction that all Assets are being sold "as is, where is and with all faults," without any licenses and with any additional disclaimers of warranty, including disclaimers of the warranties of merchantability and fitness for a particular purpose (but excluding any in-place transferable maintenance agreements).. Seller acknowledges and agrees that Auctioneer has no knowledge with respect to, and has no obligation to investigate, the merchantability or fitness for any particular use of any Asset. Auctioneer shall be entitled to indemnification from claims and liabilities asserted against Auctioneer by any third party based on the alleged existence or breach of any alleged warranties or from or against any expenses actually incurred by Auctioneer, in accordance with the limitations and the terms of the order approving the Auctioneer's application for employment to be filed with the United States Bankruptcy Court for the District of Delaware where the Seller's chapter 11 case is pending (the "Bankruptcy Court").

**4. COMPENSATION:** Seller shall pay Auctioneer a 5% Seller's Commission (the "Seller's Commission"). Additionally, Auctioneer shall charge each successful bidder a 15% buyer's premium (the "Buyer's Premium") for its own account as compensation for auction services provided up to and including the actual Auction event. The Buyer's Premium shall be collected by Auctioneer directly from the purchaser in addition to the purchase price as bid for such Auction services. Payment to the Auctioneer of such Buyer's Premium by the successful bidder is not dependent on any other service provided by the Auctioneer in connection with the Auction subsequent to the actual Auction event, if any. Seller shall not be liable to Auctioneer for Buyer's Premium under any circumstances, including in the event that a purchaser fails to live up to its agreement and complete a purchase. Payment of the Seller's Commission and the Buyer's Premium to the Auctioneer shall be made in accordance with and pursuant to any order entered by the Bankruptcy Court authorizing such payment.

**5. AUCTION EXPENSES:**

(a) Advertising and Direct Marketing: Seller shall provide Auctioneer an allowance toward certain Auction reasonable advertising expenses, which may include digital photography of the Assets, print and electronic media production, creative services, ad placement fees, brochure and catalog production, telemarketing, data list purchases, fax and email advertising and postage incurred in connection with the Auction.

(b) Labor: Seller agrees to reimburse Auctioneer for reasonable labor expenses related to the Auction. Such labor includes services rendered in connection with the collection and disbursement of Auction proceeds (as discussed under Section 7 below). Seller has the right to provide its own labor in part or in whole (or subcontract to third parties) in connection with such services at its election as long as such persons demonstrate adequate competencies related to such services.

(c) Travel and Lodging: Seller agrees to reimburse Auctioneer for Auctioneer's reasonable actual travel expenses related to the Auction.

(d) Miscellaneous: Seller also agrees to reimburse Auctioneer for reasonable miscellaneous expenses related to the Auction, including transportation of equipment to HGP warehouse, accounting, equipment rental, insurance, permits, UCC searches/lien releases and security/armored cars.

Reasonable expenses incurred pursuant to subsections (a) through (d) (collectively referred to as the "Auction Allowance") shall not exceed $40,000.00.

(e) Seller acknowledges and agrees that the Auction Allowance shall in all events be deducted from the gross proceeds and paid to Auctioneer following the Auction, in accordance with and pursuant to any order entered by the Bankruptcy Court. For purposes of this Agreement, 'gross proceeds' means all revenue from the sale of Assets pursuant to this Agreement, excluding (i) any sales taxes collected by Auctioneer, and (ii) any Buyer's Premium collected pursuant to Section 4.

**6. PRE- AUCTION ASSET TRANSACTIONS:** Prior to the Auction, Seller may not withdraw, sell or otherwise dispose of any of the Assets listed in Exhibit A, unless otherwise agreed by the parties.

Unless such withdrawal is agreed by the parties, any withdrawals prior to the Auction shall be subject to full compensation to Auctioneer pursuant to this Agreement. Notwithstanding the foregoing, Auctioneer shall not be entitled to any compensation for Assets listed on Exhibit A that cannot be sold in the Auction due to Seller's warehousemen or logistics providers refusing to allow access or to release Assets to be sold or shipped.

## 7. COLLECTION AND DISBURSEMENT OF AUCTION PROCEEDS:

(a) Auctioneer shall collect from the purchasers of the Assets the gross proceeds, any applicable sales taxes and amounts due as Buyer's Premium and deposit such funds into a segregated bank depository account to be opened and maintained for the benefit Seller All applicable sales taxes collected by Auctioneer shall be paid by the Auctioneer to the appropriate taxing authorities out of the account. Thereafter, no later than 15 calendar days after the Auction, Seller shall be issued a check from the account (a 'Settlement Check'), in the amount of the net auction sale proceeds (after Auctioneer has reserved for payment from the account its asserted reimbursable expenses pursuant to Section 5 and asserted amounts allocable to Seller's Commission and Buyer's Premium, which amounts may be distributed to Auctioneer in accordance with and pursuant to any order entered by the Bankruptcy Court., subject to open items or uncollected accounts, if any.

(b) Auctioneer shall provide, in accordance with the provisions of any order entered by the Bankruptcy Court approving the proposed auction procedures governing the sale of the Assets, a list of each successful bidder, backup bidder, the Asset(s) purchased by such bidder, the price to be paid by each bidder; A declaration of Auctioneer stating that the Auction was run without collusion, in good faith and at arms' length with each successful bidder or backup bidder; and A declaration from a representative of the Seller stating that no successful bidder is an insider of the Seller

## 8. ASSET TRANSPORTATION, SUBSEQUENT AUCTIONS AND RIGHT OF SURRENDER: If needed, Asset transportation to the sale facility prior to the Auction shall be arranged and paid for by Seller. In the event that walls or other structures must be removed or modified to remove the Assets sold at the Auction, all supervision and expense of such removal and modification shall be borne directly by the Seller and are not included in the Auction Allowance. Any labor costs that Seller directly or indirectly incurs in connection with the Auction shall be borne directly by Seller and are not included in the Auction Allowance. In the event that some Assets remain unsold at the conclusion of the Auction, or a purchaser fails to perform his obligation to pay the purchase price of an Asset, such Assets shall remain with Seller, unless it agrees that Auctioneer may include those Assets in a subsequent auction, as agreed by the parties..

## 9. UTILITY DISCONNECTION AND ASSET REMOVAL: As soon as reasonably possible after a sale at the Auction, Seller shall disconnect all utilities to the sold Assets, including electric, gas, waste and water lines, in a reasonable manner designed to protect the Asset and the facility, at Seller's sole cost. Thereafter, the purchaser shall be solely responsible for rigging and shipping the sold Assets. Under no circumstances shall Auctioneer be responsible for any loss, damage or destruction associated with asset removal or disconnection, except to the extent that such loss damage or destruction results from the negligence or intentional acts of Auctioneer. Seller acknowledges that with respect to any export transaction involving any of the Assets sold hereunder, and unless Seller and purchaser agree otherwise, Seller shall be the U.S. principal party in interest. Accordingly, Seller authorizes Auctioneer to provide Seller's federal employer identification number ('EIN') to buyers, their agents, customs officials or similar parties for the purposes of completing a Shipper's Export Declaration form or any documentation necessary to facilitate the respective purchaser's export of the purchased Assets.

## 10. INSURANCE: Seller shall be solely responsible for maintaining adequate insurance coverage pertaining to the Assets and their transfer to and from, and storage at, Auction sites. If the Auction is to occur at premises owned or leased by Seller, Seller also shall maintain adequate liability insurance for the

duration of the Auction and related activities. Auctioneer shall carry adequate liability insurance for the duration of the Auction and related activitiesand all workers' compensation insurance for Auctioneer's employees in compliance with all applicable state and local laws.

**11. DESTRUCTION OF ASSETS**: In the event of any loss, damage or destruction of any Assets, whether before or after the Auction, Seller shall remain liable to Auctioneer for Auctioneer's reimbursable expenses under Section 5. In the event of loss, damage or destruction of any Assets after sale at the Auction, Auctioneer shall not be entitled to its Buyer's Premium under Section 4, unless Seller receives collection of any insurance proceeds payable on account of the destruction of any or all of the Assets after sale but prior to payment by a purchaser, Seller shall pay to Auctioneer a portion of such proceeds sufficient to pay Auctioneer's reimbursable expenses under Section 5, any applicable sales taxes and amounts payable as Buyer's Premium under Section 4 (collectively, the 'Recovery Obligations'). Seller shall have no obligation to pay such charges unless and until it receives insurance proceeds covering such lost Assets.

**12. USE OF PREMISES**:

(a) For the purposes of this Agreement, the "Premises" shall mean 47488 Kato Rd, Fremont, CA or such other location as determined by mutual agreement of both Seller and Auctioneer. Seller authorizes Auctioneer and its representatives to enter upon and use the Premises for the purposes of (i) storing the Assets thereupon, (ii) preparing for and conducting sales of the Assets, (iii) otherwise exhibiting the Assets to prospective purchasers, and (iv) for such other purposes as are reasonable and necessary to conduct the Auctions. Seller agrees that Auctioneer shall not be charged a fee for the use of the Premises. Seller further agrees that it shall furnish utilities to the Premises, at Seller's sole expense.

(b) Seller acknowledges and agrees that Auctioneer has no interest of any kind or nature in the Premises, and that Auctioneer has no knowledge as to any previous use or occupancy of the Premises. Seller acknowledges and agrees that Auctioneer shall not be responsible for damage or injury to the Premises resulting from or arising in connection with the sale or removal of the Assets, except to the extent that such damage or injury is caused by Auctioneer's negligence or intentional acts.

**13. REPRESENTATIONS AND WARRANTIES**: Seller represents and warrants to Auctioneer as follows:

(a) Seller is authorized to execute and perform this Agreement, and this Agreement constitutes a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to approval by the Bankruptcy Court.

(b) Seller now holds (and, up to the moment of the Auction or other sale provided for under this Agreement, will hold) good and marketable title to all Assets.

(c) To the best of Seller's knowledge, none of the Assets infringes or violates (or contains any parts or components which infringe or violate) any third party's copyright, patent, trademark, trade secret or other proprietary rights.

(d) To the best of Seller's knowledge, no sale of the Assets will constitute a bulk sale subject to the Bulk Transfer Article of the Uniform Commercial Code for any state in which any of the Assets are located (the ' Bulk Transfer Article').

(e) Intentionally Left Blank [note – the assets include manufacturing equipment.

(f) To the best of Seller's knowledge, none of the Assets or any components thereof, or related software or technology requires a U.S. Government license for export from the United States to countries other than those which are subject to comprehensive embargoes or support for terrorism (currently, Cuba, Iran, North Korea, Sudan, or Syria, as the same may change from time to time) except those specifically

listed in writing delivered by Seller to Auctioneer, with the respective Export Control Classification Numbers for such listed Assets.

Seller acknowledges and agrees that Auctioneer is relying on the foregoing representations and warranties in proceeding to conduct the Auction and/or sales provided for under this Agreement. Seller agrees to defend and indemnify Auctioneer and hold Auctioneer harmless from and against any claim, demand, cause of action, liability or expense (including attorneys' fees) asserted against or incurred by Auctioneer in connection with Seller's breach of any of its representations, warranties or obligations in this Agreement, in accordance with the limitations and the terms of the order approving the Auctioneer's application for employment to be filed with the Bankruptcy Court. If any action at law or in equity is brought to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs from the other party.

**14. Intentionally Left Blank**

**15. TECHNOLOGY DISCLAIMER: AUCTIONEER DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN THE WEBSITE, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH THE WEBSITE, WILL BE TIMELY, SECURE, UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.**

**16. INDEPENDENT PARTIES**: This Agreement shall not be construed (i) to create a partnership or joint venture between Seller and Auctioneer, or (ii) to imply that Auctioneer is buying the assets of, or any interest in, Seller.

**17. ARBITRATION:** The Bankruptcy Court shall have original jurisdiction to determine any disputes arising from or related to this Agreement. Notwithstanding the foregoing, and to the extent permitted by the Bankruptcy Court, the parties agree to submit all controversies, claims and matters of difference arising out of or relating to this Agreement and the Auction to arbitration in San Mateo County, California in accordance with the Commercial Arbitration Rules of the American Arbitration Association from time to time in effect (the "Rules"). The parties may agree on a retired judge as sole arbitrator. In the absence of such agreement, there will be three arbitrators, selected in accordance with the Rules. If there are three arbitrators, a decision reached by at least two of the three arbitrators will be the decision of the arbitration panel; provided, however, that in the case of monetary damages, if there is no agreement of two arbitrators as to the amount of the award, then the highest and lowest amounts will be disregarded, and the remaining amount will be the final award of the arbitration panel. Any award of the arbitrator(s) will include costs and reasonable attorneys' fees to the successful party. The parties agree to abide by any decisions reached and awards rendered in such arbitration proceedings, and all such decisions and awards will be final and binding on both parties. There will be no appeal from any such decision or award other than for fraud or misconduct in connection with the arbitration proceedings. Judgment upon such award or decision may be entered in any court having jurisdiction thereof..

**18. COUNTERPARTS; FACSIMILE SIGNATURES**: This Agreement may be executed in any number of counterparts, each of which, when executed, will be deemed to be an original and all of which, when taken together, will be deemed to be but one and the same instrument. Delivering Signatures via facsimile shall be an acceptable means of executing] this Agreement, and signatures so delivered shall be fully binding on the signing party.

**19. GOVERNING LAW; JURISDICTION**: This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of California as applied to agreements made in California, without regard to choice at law principles. Each party consents to jurisdiction of the Bankruptcy Court for any action or proceeding arising under this Agreement. To the extent permitted by the Bankruptcy Court, venue in any such action will lie in San Mateo County, California.

**20. SEVERABILITY**: The provisions of this Agreement shall be severable. Should any part, term or provision of this Agreement be construed by any court of competent jurisdiction to be illegal, invalid or

unenforceable for any reason, the legality, validity and enforceability of the remaining parts, terms and provisions shall not be affected thereby.

    **21. COMPLETE AGREEMENT**: This Agreement constitutes the entire understanding between the parties and replaces any and all prior agreements related to the Auction. This Agreement may not be modified or amended except in writing signed by both parties.

Seller:  Solyndra LLC
F.E.I.N. 30-055-9771

By: _____

Name: _Ben Bierman_

Title: _EVP Ops + Eng._

Date: _9/20/11_

Heritage Global Partners
California Bond Number 6150320

By: _____

Name: _Stephon Gross_

Title: _CFO_

Date: _9/19/11_

**EXHIBIT A**


**ASSETS**

The following is a preliminary asset list created by Heritage Global Partners in approximately July, 2011. This list does not include the approximately 3,000+/- individual lots which are to be forthcoming for inclusion in any planned sale. These assets may include and are not limited to: solar panel manufacturing equipment, semiconductor fabrication and manufacturing equipment, clean-room equipment, facility and support equipment, furniture, computers, office equipment, machinery, spare parts, inventory, tooling, production equipment, patents, rights, and technology if any.

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|---|---|---|---|---|---|---|
| 1 | Von Ardenne | GC 120H/ CS | GC 120H/ CS automated inline TCO glass coating system. 12 chamber system consisting of (1) entry chamber, (2) process chambers, (7) sputtering chambers, and (2) load lock and buffering chambers; autoload and unload stations. Includes (9) RSM/ RSM 1300 dual rotatable magnetron modules, (7) pumping lids, (4) Polycold PFC 1102HC chiller units; Producing 1.23MW solar tubes, 3.14cm diameter, 120 x 120cm substrate, @ 16% efficiency. Professionally decommissioned and crated. Contents of 114 crates. Mfg date 2007. Located in Fremont, CA. | | | Fremont, CA |
| 1 | Von Ardenne | GC 120H/ CIGS | GC 120H/ CIGS inline PV coating system. 10 chamber system consisting of (8) sputtering chambers and (2) load lock and buffering chambers. Professionally decommissioned, palletized and banded. Contents of _____ crates. Mfg date 2007. Located in Newark, CA. | | | Newark, CA |
| 1 | Mydax | 2VLH60W | High performance chiller unit, 2 channel water cooled chiller/ heater. Professionally decommissioned and crated. Located in Fremont, CA. | s/n S/A 31486. | | Fab 2 Back End |
| 1 | Elma | LRS -10-LRS-S-WLT | Ultra fine cleaning machine #4, 10 station inline substrate washing system, 2400 tubes/ hour capacity, includes 9 tanks, 1 dryer module, automated loader and unloader track assemblies. | | | Fab 1 Front End |
| 1 | | | Large quantity of support equipment, spare parts, and supplies for Von Ardenne coating systems. | | | |
| 1 | Elma | LRS 530-10-LRS3/2-S | Ultra fine cleaning machine #3, Inline substrate washing system. | | | Fab 1 Front End |
| 1 | | | Lot: (3) Vibratory parts feeders includes metal enclosures & metal support structures. | | Fab 2 Back End | Fremont, CA |
| 1 | | | Tube Assembly module on skid. | | Fab 2 Back End | Fremont, CA |
| 1 | | | Small Vacuum Chamber, manual. | | Fab 2 Back End | Fremont, CA |
| 1 | | | Polypropylene utility hood w/ top ventilation ports, 6 ft. D x 82" H x 10 ft. W. | | Fab 2 Back End | Fremont, CA |
| 1 | Mydax | 2VLH60W | High performance chiller unit, 2 channel water cooled chiller/ heater. Professionally decommissioned and crated. Located in Fremont, CA. | S/A 31486. | Fab 2 Back End | Fremont, CA |
| 1 | | | Lot: Assorted conveyor lines, assembly equipment, robotic arm assembly, and aluminum and metal scrap. Parts only, as is. | | Fab 2 Back End | Fremont, CA |

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|---|---|---|---|---|---|---|
| 1 | Air Flow Systems, Inc. | DCH2-BI-HOPPER-EXTME-PG10 | Airflow unit, 5 hp, 3450 rpm, 3 ph, 460V. Brand new, never used. Mfg. Dec 2009. | | Bldg # 3 | Fremont, CA |
| 1 | White | TE 2660-130 | Vertical Storage Carousel w/ White Series 2400 controller. 20 ft. H x 13 ft. W x 6 ft. D. | | Fab 2 Back End | Fremont, CA |
| 1 | ATS | 07176-02 | Glass measuring line for inspection w/ auto reject system. Includes Advantech controller, auto load/ unload. Mfg. 2008. | | Fab 1 Front End | Fremont, CA |
| 1 | Elma | LRS -10-LRS-S-WLT | Ultra fine cleaning machine #4, 10 station Inline substrate washing system, 2400 tubes/ hour capacity, includes 9 tanks, 1 dryer module, automated loader and unloader track assemblies. | | Fab 1 Front End | Fremont, CA |
| 1 | Elma | LRS 530-10-LRS3/2-S; LRS 630-10-LRS-S; LRS 630-10-LRS-S-WLT | Ultra fine cleaning machine #3, Inline substrate washing system. | | Fab 1 Front End | Fremont, CA |
| 1 | R&M | 2 Ton | Overhead Bridge crane and hoist. | | Fab 1 Front End | Fremont, CA |
| 1 | ATS | | 7 station pick and place machine/ stacking system for glass tubing. Includes Cox Automation electronics, Gudel ZP-3 overhead track conveyor, Allen-Bradley VersaView 1500P controller. | | 2 Binning # 1 | Fremont, CA |
| 1 | Savant Automation | DC-25 | Lot: Complete AGV system to include (10) automated guided vehicles, 48V, 200 amps, 2500 lb. standard capacity, with bi-directional guidance. Mfg. 2008. Includes (10) GNB Technologies batteries 48V, 200 amp hour, 24 cells, 1055 lbs each, and (Qty___) GNB SCR 200 battery chargers, PC controller unit and electronics cabinet includes CSM & Vehicle Manager System, Virtual Path Navigation, RF Base Station, and AGView System monitor. | | | Fremont, CA |
| 1 | Rotary Lift | SP010N905 | Rotary lift system for AGV maintenance and repair. 10,000 lb capacity. | | | Fremont, CA |
| 1 | Muratec | MCR-10 | Automated Storage and Retrieval System consisting of (2) rows of 18 ft. H racks, 25 bays, 3 levels, 155 openings, includes stacker crane model UL06, Max. height 6M, Load Dimensions: 800-1500mm W x 800-1500mm D x 200-2000mm H, max load weight 1000 kg, running speed 160m/min, max lifting speed 45m/min, max forking speed 50m/min. Includes Muratec VCR-1 CD controller. Mfg. 2009. | | | Fremont, CA |
| 1 | AMC | Modu-Con MX2 | Lot: Assorted automated and modular overhead elevators and conveyor systems for VAAT; includes (1) automated load and (1)unload elevator modules and 100 ft. L overhead conveyor line. | | | Fremont, CA |
| 1 | | | Lot: Metal layout assembly tables. | | | Fremont, CA |
| 1 | Process Technology | TY-072-480-3 | Tytan water heater system, 480V, 70,000W, 87 amp, 3 ph. | | | Fremont, CA |
| 1 | | | 5 chamber chemical dispensing system. | | | Fremont, CA |
| 1 | AMC | Modu-Con MX2 | Lot: Assorted automated and modular conveyor lines, elevator/ overhead conveyor systems. Consisting of (?) _____ft. L conveyors and (?) elevator modules. | | | Fremont, CA |

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|-----|-------------|-------|-------------|-------|---------------|----------|
| 1 | | | Lot: 8 door metal structure, parts only. ____ft. L x ____ft. W x ____ft. D. | | | Fremont, CA |
| 1 | Fischer | XDV-SD | Fischerscope, X-ray machine. Coating thickness measurement system. | | | Fremont, CA |
| 1 | Fischer | XDAL | X-ray system w/ PC controller for coating thickness measurement. | | | Fremont, CA |
| 1 | ENI | MKS Optima DCG-200Z | Lot: (10) ENI power supplies. Contents of pallet. | | | Fremont, CA |
| 1 | Neslab | DI Max | DEI water to water chiller. | | | Fremont, CA |
| 1 | Neslab | DI Max | DEI water to water chiller. | | | Fremont, CA |
| 1 | AMC | Modu-Con MX2 | Lot: Automated and modular overhead conveyor system. | | | Fremont, CA |
| 1 | AMC | Modu-Con MX2 | Lot: Automation and modular assembly systems. | | | Fremont, CA |
| 2 | R&M | 5 Ton | Bridge crane and hoist. | | | Fremont, CA |
| 1 | | | Lot: assorted automation tables. | | | Fremont, CA |
| 1 | | | Large quantity of support equipment, spare parts, and supplies for Von Ardenne coating systems. | | | Fremont, CA |
| 1 | | | Loader/ Unloader gantry unit. Parts only. | | Fab 1 Front End | Fremont, CA |
| 1 | Matsuura | MC 800V | Vertical Milling Machine, CNC, 3 Axis, 1 spindle, 1986, s/n 85065046, Yasnac MX2 control. Includes (2) coolant tanks and assorted part. | | | American Rigging, San Jose, CA |
| 1 | Despatch | TAD3-17-1E | Oven #1, Middle tube bake walk in oven. 480V, 3ph, 60hz, 48kw heater capacity, s/n 177990. Includes Protocol Plus controller. | | | American Rigging, San Jose, CA |
| 1 | Despatch | TAD3-17-1E | Oven #2, Middle tube bake walk in oven. 480V, 3ph, 60hz, 48kw heater capacity, s/n 177929. Includes Protocol Plus controller. | | | American Rigging, San Jose, CA |
| 1 | Xenon | | Xenon entrance table w/ Siemens controller. | 35469 | | American Rigging, San Jose, CA |
| 1 | Lansmount | System Station | Controller unit. | | | American Rigging, San Jose, CA |
| 1 | Mydax | 1VLH7W-FT | Chiller unit. | | | American Rigging, San Jose, CA |
| 1 | Schmid | | Lot: (3) Schmid Combi Line modules. | | | American Rigging, San Jose, CA |
| 1 | Telemark Cryogenics | | Control cabinet w/ Scroll controller. Cryo trap (B6) polycold lines. | | | American Rigging, San Jose, CA |
| 6 | Solvix | Magix | DC sputtering power supplies. PDU cabinets w/ plasma power supplies. | | | American Rigging, San Jose, CA |

# Solyndra Surplus Equipment

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|-----|-------------|-------|-------------|-------|--------------|----------|
| 2 | | | Evap recovery tanks. | | | American Rigging, San Jose, CA |
| 1 | | XRF | X-Ray fluorescence machine. | | | American Rigging, San Jose, CA |
| 1 | Solyndra | | Tray swapper system BE, 15A, 120 VAC. Includes Allen-Bradley PanelView Plus 600 controller and Sierra conveyor. s/n TSS01. | | | American Rigging, San Jose, CA |
| 1 | Solyndra | | Tray swapper system FE, 15A, 120 VAC. Includes Allen-Bradley PanelView Plus 1500 controller and Sierra conveyor. s/n TSS02. | | | American Rigging, San Jose, CA |
| 1 | Elma Tool | | Main Unit X-tra 800 Hi Elmasonic, 7 tank ultrasonic cleaner. 16 ft. L x 50" D. | | | American Rigging, San Jose, CA |
| 1 | Elma Tool | | Vertical Tank | | | American Rigging, San Jose, CA |
| 1 | CDS Tool | | Main Unit, 8 pieces. | | | American Rigging, San Jose, CA |
| 1 | TCO Tool | | (1crate) anchor plates for TCO tool | 33672 | | American Rigging, San Jose, CA |
| 1 | Pack World | | Bagge/ sealer. H/E pressure vessel. | 35016 | | American Rigging, San Jose, CA |
| 1 | | | CRATE WITH PARTS - see comments for details | 40017 | | American Rigging, San Jose, CA |
| 2 | | | Oven Rack (22 trays, 2 junction, 1 AC, 24 pcs, 1 ext ac 24 pcs) | 35973 | | American Rigging, San Jose, CA |
| 1 | | | Conditioner Trays (1 pallet). Total qty 30. Located upper landing area. | 35973 | | American Rigging, San Jose, CA |
| 1 | | | Xenon Conveyor From VAAT CIGS w/ Siemens controller. | 35469 | | American Rigging, San Jose, CA |
| 1 | Dayton | | 15in. metal bandsaw, PO/ Part # 200601. | 27236 | | American Rigging, San Jose, CA |

# Solyndra Surplus Equipment

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|---|---|---|---|---|---|---|
| 1 | CDS | | CDS manuel I/O tray | 45067 | | American Rigging, San Jose, CA |
| 1 | | | Module P (Encap 3) assembly module. | 43056 | | American Rigging, San Jose, CA |
| 1 | Youngberg Industries | | Lot: Degas Tanks w/pumps and frame. 25 MAWP, 300 PSI, mfg. 2007, 2 sets with 2 tanks each w/ topside mixing motors. (2) 5 ft. x 8 ft. metal stands, missing lower pumps. | 40915 | | American Rigging, San Jose, CA |
| 1 | Busch | DS 160 | Busch Dry Pump 160, DS 160 Cobra pumps, PO/ Part # C0714000151. | 40057 | | American Rigging, San Jose, CA |
| 1 | Busch | DS 160 | Busch Dry Pump 160, DS 160 Cobra pumps, PO/ Part # C0714000153. | 40057 | | American Rigging, San Jose, CA |
| 1 | Busch | DS 2012 | Busch Dry WZ 1000 Pump on cart, Fomblin type, VAAT Busch pump. DS2012 model, PO/ Part # C0402000804. | 40057 | | American Rigging, San Jose, CA |
| 2 | | | Incline conveyors, stainless steel. | | Upper Landing | American Rigging, San Jose, CA |
| 5 | | | Middle Tube Garages from CC. Custom middle tube garage cabinets, 41" W x 57" H x 72" D, polyprop. | | Upper Landing | American Rigging, San Jose, CA |
| 1 | CDS | | DIW tank, standalone recirculator pump for CDS w/ Mettler Toledo 200 CR controller. | | storage trailer | Menlo Logistics, Fremont, CA. |
| 3 | | | Glass tray tables, middle tube trays, 44" x 46" 31" H. | | storage trailer | Menlo Logistics, Fremont, CA. |
| 1 | | | Lot: (1) pallet silicon material, 50 x 50 x70 polycarbonate enclosure. | | storage trailer | Menlo Logistics, Fremont, CA. |
| 1 | Endural (D. Adams Co., Costa Mesa, CA) | | Lot: (3) pallets of black bins w/ handles. Total qty approx. 165+ bins. Consisting of (1) pallet of 27 bins, (1) pallet of 66 bins, and (1) pallet of 75 bins. 78" L x 8" D x 12" W. | | storage trailer | Menlo Logistics, Fremont, CA. |
| 1 | | | 2 tier workbench. | | storage trailer | Menlo Logistics, Fremont, CA. |
| 10 | | | 5-shelf worktables w/ wheels, 32" D x 54" H x 72" L. | | storage trailer | Menlo Logistics, Stewart, Fremont, CA. |

## Solyndra Surplus Equipment

| Qty | Manufacturer | Model | Description | S/A # | Bldg Location | Location |
|-----|-------------|-------|-------------|-------|---------------|----------|
| 5 | | | Metal storage boxes, 21" W x 64" L. | | storage trailer | Menlo Logistics, Stewart, Fremont, CA. |
| 1 | | | Assembly Conveyor elevator. 50" L x 83" W x 117" H. | SOL0079 | | RB High Tech, Fremont, CA. |
| 1 | | | Assembly Conveyor elevator. 50" L x 83" W x 117" H. | SOL0080 | | RB High Tech, Fremont, CA. |