EXHIBIT A



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105-2669

tel +1-415-773-5700
fax +1-415-773-5759

WWW.ORRICK.COM

September 20, 2011

Walter F. Brown, Jr.
(415) 773-5995
wbrown@orrick.com

The Honorable Clifford B. Stearns
Chairman, Subcommittee on Oversight and Investigations
U.S. House Committee on Energy and Commerce
2175 Rayburn House Office Building
Washington, DC 20515-6115

The Honorable Diane DeGette
Ranking Minority Member, Subcommittee on Oversight and Investigations
U.S. House Committee on Energy and Commerce
2322A Rayburn House Office Building
Washington, DC 20515-6115

Re:    Testimony of Brian Harrison, CEO of Solyndra, before the House Energy & Commerce Committee, Subcommittee on Oversight and Investigations

Dear Chairman Stearns and Ranking Member DeGette:

I write regarding the appearance of Mr. Brian Harrison, the current Chief Executive Officer of Solyndra, who I represent. As you know, Mr. Harrison will appear voluntarily before the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations on Friday, September 23, 2011.

Mr. Harrison has great respect for the work of this Subcommittee and its oversight role. Mr. Harrison looks forward to the day when he can cooperate fully with this Subcommittee's investigation and present the facts known to him.

I have advised Mr. Harrison that he should decline to answer questions put to him by this Subcommittee based on his rights under the Fifth Amendment to the United States Constitution. Therefore, Mr. Harrison intends to invoke his Fifth Amendment rights in response to any questions asked by this Subcommittee and will not provide testimony.

This is not a decision arrived at lightly, but it is a decision dictated by current circumstances. On September 8, 2011, federal agents executed a search warrant at Solyndra's facilities. Moreover, the United States Department of Justice has initiated an investigation into Solyndra. In light of these circumstances, I had no choice but to advise Mr. Harrison to assert his Fifth Amendment rights in response to any questions posed by the Subcommittee. While I have instructed my client not to



**ORRICK**

testify at the hearing, it would be a mistake to infer anything from this other than that it is the act of a prudent lawyer who is newly engaged to represent a witness in ongoing government investigations.

Mr. Harrison regrets that these circumstances prevent him from offering full and complete answers to this Subcommittee. He respects the role that this Subcommittee plays in our Constitutional system. I know, however, that this Subcommittee understands the reasons and basis for my advice in the context of an ongoing Department of Justice investigation—even when ultimately it is found that there is no cause for charges.

Mr. Harrison hopes to have the opportunity to offer his views on the events at Solyndra. He cannot do so presently given the current circumstances.

Very truly yours,

Walter F. Brown, Jr.

cc:    The Hon. Lee Terry
        The Hon. John Sullivan
        The Hon. Tim Murphy
        The Hon. Michael Burgess
        The Hon. Marsha Blackburn
        The Hon. Sue Myrick
        The Hon. Brian Bilbray
        The Hon. Phil Gingrey
        The Hon. Steve Scalise
        The Hon. Cory Gardner
        The Hon. Morgan Griffith
        The Hon. Joe Barton
        The Hon. Fred Upton
        The Hon. Jan Schakowsky
        The Hon. Mike Ross
        The Hon. Kathy Castor
        The Hon. Edward J. Markey
        The Hon. Gene Green
        The Hon. Donna Christensen



ORRICK



The Honorable Clifford B. Stearns
The Honorable Diane DeGette
September 20, 2011
Page 3

The Hon. John D. Dingell
The Hon. Henry A. Waxman

# KEKER & VAN NEST LLP

Jan Nielsen Little
(415) 676-2211
jlittle@kvn.com

September 20, 2011

**VIA FACSIMILE AND U.S. MAIL**

The Honorable Clifford B. Stearns
Chairman, Subcommittee on Oversight and
Investigations
House Energy and Commerce Committee
2175 Rayburn House Office Building
Washington, DC 20515-6115
*Facsimile: (202) 225-3977*

The Honorable Diana DeGette
Ranking Member, Subcommittee on Oversight
and Investigations
House Energy and Commerce Committee
2322A Rayburn House Office Building
Washington, DC 20515-6115
*Facsimile: (202) 225-5657*

Re:    Testimony of W.G. Stover, Jr. before the House Energy & Commerce Committee,
       Subcommittee on Oversight and Investigations

Dear Chairman Stearns and Ranking Member DeGette:

I represent W.G. "Bill" Stover, Jr., Senior Vice President and Chief Financial Officer of
Solyndra, Inc. Mr. Stover has been invited to testify before the House Energy and Commerce
Committee's Subcommittee on Oversight and Investigations on Friday, September 23, 2011.

Mr. Stover agreed to appear at Friday's hearing voluntarily, and will do so. However, I have
advised Mr. Stover to decline to answer any questions put to him by this or any other
congressional committee or subcommittee, based on his rights under the Fifth Amendment to the
United States Constitution. Acting on my advice, Mr. Stover plans to invoke his Fifth
Amendment rights in response to any questions put to him during Friday's Subcommittee
hearing, and he will not provide testimony.

Our decision that Mr. Stover would assert his Fifth Amendment rights was taken with care and
deliberation. On September 8, 2011, the Federal Bureau of Investigation executed a highly-
publicized search warrant at Solyndra's offices, seizing documents, computers, and other
materials. The United States Department of Justice has initiated a criminal investigation into
Solyndra. Under these circumstances, Mr. Stover must invoke his rights under the Fifth
Amendment of the U.S. Constitution; indeed, it would be irresponsible for anyone in his position
not to do so.

Nothing of substance should be read into Mr. Stover's decision to heed his counsel's advice and assert his Fifth Amendment rights. As this Subcommittee's members well know, witnesses involved in ongoing inquiries often invoke their rights under the Fifth Amendment. It is a privilege afforded every American, and it applies with equal force to testimony given at a congressional hearing, as it does in a court of law. Our United States Supreme Court has made clear that one of the Fifth Amendment's "basic functions ... is to protect innocent men" and affords them protection because "truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." *Ohio v. Reiner,* 532 U.S. 17, 21 (2001).

Mr. Stover respects the important role this Subcommittee plays in performing its constitutional oversight function in service to the American people. He looks forward to a time when he can assist the Subcommittee's efforts, and make known his perspective about events at Solyndra. Unfortunately, the current circumstances do not permit it.

Respectfully submitted,

Jan Nielsen Little

JNL/csh

cc: The Hon. Lee Terry
    The Hon. John Sullivan
    The Hon. Tim Murphy
    The Hon. Michael Burgess
    The Hon. Marsha Blackburn
    The Hon. Sue Myrick
    The Hon. Brian Bilbray
    The Hon. Phil Gingrey
    The Hon. Steve Scalise
    The Hon. Cory Gardner
    The Hon. Morgan Griffith
    The Hon. Joe Barton
    The Hon. Fred Upton
    The Hon. Jan Schakowsky
    The Hon. Mike Ross
    The Hon. Kathy Castor
    The Hon. Edward J. Markey
    The Hon. Gene Green
    The Hon. Donna Christensen
    The Hon. John D. Dingell
    The Hon. Henry A. Waxman

EXHIBIT B

# House Energy and Commerce Subcommittee on Oversight and Investigations Holds Hearing on Solyndra Energy Loan Investigation

**LIST OF PANEL MEMBERS AND WITNESSES**

STEARNS:

Good morning, everybody. The Committee on Oversight and Investigation of Energy and Commerce Committee will come to order.

My colleagues, before we begin today I'd like to address the procedures used at this hearing.

I called Ranking Member DeGette yesterday evening to consult with her about today's hearing. Ranking Member DeGette and I agreed to the following process for opening statements and questions; I will recognize myself and Ranking Member DeGette for five minute opening statements. Then each member of the committee will be able to give a two minute opening statement.

After swearing in the witnesses, the majority and the minority each will have 10 minutes to ask questions of today's witnesses. This time will be allotted amongst members who wish to ask questions at the discretion of the chair and the ranking member.

We'll start with five minutes for questions from majority members then five minutes for minority members, then repeat. I'd like to thank the ranking member, distinguished member for her support and now I recognize myself for a five minute opening.

Good morning everybody, we convene this hearing of the Subcommittee on Oversight Investigations to examine what Solyndra's executives knew about the company's financial condition and how it represented that condition to the Department of Energy, the White House and members of this committee.

Just two years ago after Solyndra received its $535 million loan guarantee and six months after the Department of Energy restructured the deal, Solyndra had laid off over 1,000 workers, filed for bankruptcy and has been raided by the FBI.

Yet only two months ago, Solyndra's CEO, Brian Harrison met with me and the committee officers. He looked me in the eye and assured me that everything was just fine and the company was on track to be cash flow positive. Mr. Harrison told me and other members of this committee that Solyndra was continuing to make excellent progress.

That it was meeting all of its cost and performance milestones and that revenues were projected to nearly double in 2011. I was hoping that Mr. Harrison would testify today and explain to me and to this committee, how he could make those representations in late July, about Solyndra improving prospects when the company was on the path to bankruptcy just 30 days later.

It seems clear to me that Mr. Harrison knew, or should have known in July that the company was going to restate its financial projections to reflect increasing market and pricing pressure on its product resulting in decreased revenue.

When the committee invited Mr. Harrison and Mr. Stover to testify at last week's hearing, Solyndra's counsel said that Mr. Harrison would appear voluntarily and would answer the committee's questions. However, Solyndra's counsel asked the committee to postpone their testimony by one week claiming that Mr. Harrison and Mr. Stover were involved in active negotiations to potentially sell the company and that an earlier sale might potentially result in a better recovery for the taxpayer at the company's bankruptcy.

I agreed to this request and provided -- provided that Mr. Harrison appear this week and testify. In return for postponing his testimony for one week, I was provided written assurance by Solyndra's counsel that Mr. Harrison would answer the committee's questions.

Unfortunately we won't get those answers today. Mr. Harrison and Mr. Stover's counsel informed

the committees three days ago that they would decline to answer the committee's questions and would invoke their right under the Fifth Amendment to the United States Constitution.

I respect the witnesses rights under the Fifth Amendment, but want to make it clear today though that this subcommittee's investigation will continue. We have been asking questions about this deal since February of this year. We will get to the bottom of why this loan was pushed out to a company whose liquidity issues were a major issue to Department of Energy staff reviewing the loan back in 2009 and which ultimately caused its bankruptcy.

We'll also figure out just how DOE concluded that restructuring the Solyndra deal positioned the U.S. taxpayer for "maximum recovery" end quote, when documents produced to the committee showed that OMB staff doubted that it would prevent a Solyndra bankruptcy or result in greater recovery for the government.

We are also determined to know why DOE allowed the taxpayers to be subordinated to the private investors during that restructuring in violation of the clear letter of the law. What we do not know is whether the Solyndra executives here today have something to hide. Was all the information they submitted to DOE accurate and complete?

What did they know about their financial situation and when did they know it? And how did they represent it to others, including this committee? What did DOE understand about Solyndra's financial situation? Did DOE know what they were doing and did they properly monitor Solyndra and the taxpayer's money being used to prop Solyndra up?

My colleagues these are all the questions I would have liked to received answers from our witnesses today. Congress and the American taxpayers have a right to know whether this loan guarantee was rushed out the door before it was ready for primetime, whether the administration doubled down on a bad debt after knowing of the company's dubious commercial prospects, or even worse, whether $535 million of taxpayers' dollars were wasted on false or incomplete information.

We intended to get those answers. And that concludes my statement. With that, I recognize the Ranking Member, Ms. DeGette for her opening statement.

DEGETTE:

Thank you Mr. Chairman. Mr. Chairman two weeks ago Ranking Member Waxman and I requested that this subcommittee seek testimony from Solyndra President and CEO, Brian Harrison, so I'm pleased that the subcommittee sought the testimony of Mr. Harrison and his colleague, Mr. Stover, for today's hearing.

I respect that our witnesses appearing before the committee have the right to invoke their Constitutional rights under the Fifth Amendment, but I'm disappointed that the executives here today won't be responding to questions.

I believe that their testimony would greatly inform the subcommittee's investigation of the Department of Energy loan guarantee to Solyndra and I hope that once those Constitutional questions are resolved, that they will be able to return and testify voluntarily. Nonetheless, Mr. Chairman I'm glad that the subcommittee will continue to examine key questions relation to the Solyndra loan guarantees.

As I noted in my statement at the September 14th subcommittee hearing, it's critically important that we understand a number of factors. First, whether the Bush and Obama administrations conducted due diligence on the loan guarantee. Whether Solyndra made accurate representations to the government. Whether the administration sufficiently monitored the financial status of Solyndra, particularly as market forces seemed to be against the company.

And finally whether the government made correct decisions about restructuring the loan. But in addition to our specific concerns around this loan, it's also imperative that the subcommittee examine these issues the broader context of how government should support development of our nation's clean energy technology industry.

DEGETTE:

The United States has an unparalleled history of innovation and at the beginning of the 21st century, it would be to our long-term economic peril, if we cede leadership to any other nation in clean energy technology development.

To advance the subcommittee's understanding of these issues, Ranking Member Waxman and I have urged you, Mr. Chairman, to take several additional steps in this investigation.

First, we've asked that the subcommittee convene hearings to ensure whether U.S. policies and incentives are adequate to ensure that U.S. manufacturers can compete in the global clean energy market.

We've already heard testimony in our investigation, that (inaudible) share of the solar market has jumped from 6 percent in 2005 to 54 percent just six years later. And we've heard that half of the 10 largest solar panel manufacturers are now based in China.

At the same time, just last week, some of the country's business leaders, including the CEOs of General Electric and Xerox stated that, quote, "The federal government has a vital role to play in energy innovation," and warned, quote, "If the U.S. fails to invent new technologies and create new markets and new jobs, that will drive the transformation and revitalization of the $5 trillion global energy industry.

"We will have lost an opportunity to lead in what is arguably the largest and most pervasive technology sector in the world."

Accordingly, review of the Solyndra loan guarantee should go hand in hand with review of the appropriate path our nation can take to avoid ceding leadership of the clean energy technology market to China and other countries.

Second, Mr. Waxman and I have asked Chairman Stearns to obtain the testimony of representatives from the two private equity firms, Argonaut and Madrone, which were the most significant investors in Solyndra.

Private investors invested twice as much as the government in Solyndra. The subcommittee should understand -- should understand why Solyndra attracted so much private capital and what representations the company made to private investors as well as to the government.

I'm certain the chairman sees the merits of these requests, Mr. Chairman, and I look forward to working together on these and other issues as the investigation continues, and I yield back the balance of my time.

STEARNS:

Thank the gentlelady. And now the full chairman of the Energy and Commerce, the distinguished gentleman from Michigan, Mr. Upton is recognized for five minutes.

UPTON:

Well, thank you, Mr. Chairman. In 1963, there was a great train robbery in England. At the time, I think it might have been the largest heist ever, and because of its cleverness, the legend continues. The take was 2.6 million pounds -- that's about $7-1/2 million in 1963 dollars.

But now we have our own modern-day great train robbery. But it appears we have a great heist of over half a billion dollars, and possibly even willing collaborators and maybe even coconspirators (inaudible) the U.S. government who rushed out a $535 million loan to Solyndra.

It is a very sad commentary that we met resistance every step of the way, as this subcommittee has tried to seek answers to basic questions overseeing the approval process of this project. We finally had to resort to a subpoena.

And now the outright resistance of getting answers that both of you -- our two witnesses -- assured us only last week that you would provide. Let me just warn you and other folks involved in this taxpayer rip-off: we're not done. No, we're not.

In 2009, Solyndra was the very first company to receive a Department of Energy loan guarantee funded with stimulus dollars. The company was touted in statements by the president, the vice president, the Secretary of Energy as a model for the government's investment in green technology.

And now less than two years later, Solyndra has filed for bankruptcy and was raided by the FBI. I understand that our two witnesses today, Mr. Harrison and Mr. Stover, intend to invoke their rights under the 5th Amendment, and will not testify.

Solyndra has left taxpayers holding the bag for a $535 million guarantee, and we still can't get answers. Last week, we learned even more troubling facts about the administration's review of the Solyndra guarantee, concerns about the liquidity and cash flow were ignored.

The financial model showed that the company would run out of cash by September of 2011,

which, as it turns out, it precisely did. OMB felt pressured to complete its review in time for a groundbreaking event with the vice president.

And when Solyndra faced default at the end of last year, the administration restructured the guarantee and put the taxpayers behind the investors, despite concerns by OMB staff that the restructuring would not be a better deal for the government, and frankly, in direct contradiction to the law.

These facts clearly show that the committee was right to start asking questions about Solyndra when we opened up our investigation seven months ago. The administration's actions in this case are deeply troubling, and so is their response to our findings.

Rather than engage in a dialogue about their efforts to protect the taxpayer from the risks posed by Solyndra, they are arguing to the press the clean energy and DOE projects that Republicans on this committee have supported, they believe that this somehow undermines our basis for asking tough questions about Solyndra.

According to "Politico," quote, "Obama administration officials have spent the last week digging up letters, sound bites and media stories from Republican lawmakers who had previously begged for clean energy spending in their districts," end quote.

First, let's talk about clean energy. Yes, Republicans do support innovation and we are uniform in our support of any solution that improves our energy security.

While we may question whether the federal government is capable of selecting the most promising companies and technologies, we have concerns about the stimulus when it passed in 2009 and we have concerns now that it failed to deliver the jobs that were promised.

This is not a debate about the virtues of clean energy. It is a serious inquiry into reckless use of taxpayer dollars on a company that was known to pose serious risks before a single dime went out the store. Yield back.

STEARNS:
The chairman yields back.

Schakowsky, the gentlelady from Illinois, is recognized for two minutes. And as I told all the members, we're trying to strictly enforce that two minutes. I'd appreciate your support. Thank you.

SCHAKOWSKY:
Thank you, Mr. Chairman.

I am saddened that a company in which both the Bush and Obama Departments of Energy saw such promise has filed for bankrupt, causing the loss of more than 1,000 high-tech jobs.

I also seek answers from Solyndra's executives about the possibly misleading or incomplete assessment of the company's financial position, and the cause and circumstances behind the FBI raid on Solyndra facilities and executives' homes earlier this month.

And it's unfortunate that Mr. Harrison and Mr. Stover have elected not to testify or answer questions today, so that our subcommittee together might have answers to those questions. However, I think it is important that as we work to address the Solyndra situation that we don't throw the baby out with the bathwater.

Last night, exploiting the Solyndra case, this House voted to cut the DOE loan guarantee program. This is a short-sighted mistake that will undermine our ability to compete in the global energy sector. As a demand for energy rises, emerging technologies will need our support to compete with businesses in China, whose solar industry was provided with $30 billion in government subsidies just last year.

Conceding the green energy race to China would be a reckless and irreversible decision. In a "Politico" op-ed last week, a group of leading American venture capitalists said that the, quote, "nascent clean energy needs more than venture capital to succeed," unquote.

They insist that only a program like the loan guarantee program has the resources required to fully promote our green energy. As we move forward with our investigation of Solyndra, we should ensure that the loan guarantee program remains a priority for this Congress and our country. And now I yield back the remainder of my time.

STEARNS:

I thank the gentlelady.

And the chairman emeritus of the full committee, the distinguished gentleman from Texas, recognized for an opening statement for two minutes.

BARTON:

Thank you, Mr. Chairman.

Let's set the scene. It's a sunny day in Northern California, should be a good day for a solar energy company, especially a solar energy company who's just received a government guaranteeing (ph) loan of over a half a billion dollars, a solar energy company that has been paid a visit by the President of the United States himself, a solar energy company that President Obama called, "the true engine of economic growth," and touted as a green energy success story, a stimulus success story and a job-creating success story.

As it turns out, that day was not a good day for the company. Instead that company, after taking a half a billion dollars of taxpayer money, closed its doors, laid off over a thousand employees and declared bankruptcy. The next week, the FBI knocked down the doors -- the company's door to secure its files.

The question before the subcommittee today, Mr. Chairman, is how does a company go from having the President of the United States visit it, to having the FBI come in and confiscate its files? The American people deserve an answer to that question, Mr. Chairman.

The two gentlemen who sit before the committee today, told us informally and in meetings with the staff, that they were ready to answer questions. They had nothing to hide. They made a deal with this committee to delay the date of the hearing with a promise that when they came, they would answer our questions.

Now, they're going to assert their 5th Amendment right, and refuse to answer our questions, because those questions -- the answers to those questions might be incriminating.

However, I am sure that the members of this subcommittee will still ask those questions so at least the American people, Mr. Chairman, know what questions should be answered. With that, I yield back.

STEARNS:

Thank the gentleman.

The gentleman from California, the ranking member of the full committee, Mr. Waxman, is recognized for five minutes.

WAXMAN:

Two weeks ago, Ranking Member DeGette and I requested the senior executives from Solyndra appear before our committee, and I'm pleased that Chairman Stearns agreed and invited Brian Harrison, CEO, and Bill Stover, the CFO, to testify before us today.

The attorneys for Mr. Harrison and Mr. Stover have indicated that both witnesses will invoke their constitutional rights under the 5th Amendment. I respect that they have this constitutional prerogative, but I'm disappointed they will not answer our questions.

WAXMAN:

When Mr. Harrison was in my office in July, he said that Solyndra's future was bright, with sales and production booming. And I'd like to know why he told me that in July, and then filed for bankruptcy one month later. Unfortunately, I will not get an answer today.

As this investigation continues, one key question is whether the Department of Energy made a mistake in investing in Solyndra. Chairman Upton and Chairman Stearns said they already know the answer to this question. They said last week that Solyndra was a, quote, "bad bet from the beginning." end quote. A lot of smart people thought otherwise.

In March 2010, the Wall Street Journal announced the ranking of the top 10 venture-backed clean-technology companies. Solyndra was number one on that list. Some very successful and experienced private venture capitalists invested over a billion dollars in Solyndra, twice the support of the federal government. They obviously did not share Chairman Upton's views.

Our next step in this investigation should be to hear from these investors. That's why Ranking

Member DeGette and I wrote Chairman Stearns and Chairman Upton early this week to request a hearing with Argonaut Private Equity and Madrone Capital Partners, Solyndra's two largest private investors. They will be able to tell us what private investors thought about the company and its business prospects.

We need to put our investigation into perspective. Republicans in Congress are now dancing on Solyndra's grave, but they seem to have a case of collective amnesia. It wasn't too long ago they were urging the Department of Energy to award loans and loan guarantees to companies in their districts.

One Republican member of our committee, Representative Blackburn, welcomed the award of $1.6 million loan to a Japanese company in her district. Another member, Representative Bass, said he believed in the subsidies received by Granite Reliable Power in his district. Two other members, Representative Bilbray and Representative Connie Mack (ph), wrote the Speaker earlier this year to support DOE's loan guarantee program.

Even Chairman Upton pressed for clean energy loans in his state. Risk is an inherent component of the loan guarantee program. That is necessarily the case with a program designed to help new technology to get off the ground. The alternative is to simply give up on the important role that government can play in supporting development of these technologies.

We need to face reality and stop denying science. Climate change is real and it is caused by man. In the past year alone extreme weather has caused record floods, droughts, and fires that have turned much of our nation into disaster areas. The future will belong to the countries that recognize reality and invest in clean energy. China knows this and invested $30 billion in Chinese solar manufacturers last year alone.

We need an effective strategy to compete. That is why Ranking Member DeGette and I wrote the Chairman yesterday to ask for a hearing. Unfortunately, we seem intent on denying the future. Last night, Republicans voted to block funding for clean vehicles and they voted to take away funding for innovative renewable energy projects. That's not an economic plan for the future. It's a job-destroying strategy that keeps us tied to our fossil fuel past.

STEARNS:

Gentleman yields back the balance of his time. We are in opening statements.

The gentleman from Nebraska, Mr. Terry, is recognized for two minutes.

TERRY:

Thank you, Mr. Chairman.

And this was to be an important hearing, as the chairman of the full committee said, we want clean jobs. We like clean energy. All of us want jobs to be created in our own district. Some of the districts mentioned by Mr. Waxman have very high unemployment rates. So when you combine the two it only makes sense that members would encourage job growth in their own communities.

And I think it's a tactic that's being used by the White House, and now by members of this committee, to deflect attention away from the real issues. And that's whether or not the fundamental question was DOE and OMB and the White House duped by Solyndra? Or, did they ignore the information that was available to them for whatever purposes, whether it was to put green energy in a better light than it was currently in the markets for press availability? Or, even more onerous, for one of its major shareholders, Mr. Kaiser, who had 16 contacts with the White House, some of which were during important times of consideration for Solyndra's request.

Those are all legitimate questions that we need answered that could have been answered here today. So it is disturbing that when the taxpayers have been duped out of 500 -- over $500 million -- that we are not receiving the information on their behalf that could resolve questions and fix the problems for the future.

And I yield back.

STEARNS:

Gentleman yields back.

The gentleman from Massachusetts is recognized for a two minute opening statement.

MARKEY:

Last night the Republican House passed a bill that would destroy the Advanced Technology

Vehicle Loan Program, and destroy the Renewable Energy Loan Guarantee Program, and destroy thousands of jobs. And what was the rationale? They used Solyndra.

Is this just a failed company that could not compete when faced with a 42 percent decline in the price of solar energy, or was wrongdoing involved? We don't know the answer to that, but the Republican majority is recklessly exploiting this one case to advance a political agenda that is very clearly aimed at killing the solar, wind, and renewable industries.

It is reckless to toss around accusations of illegality on the part of the Department of Energy officials who agreed to restructure the Solyndra loan guarantee by putting some private investors ahead of taxpayers in the reimbursement line.

I sent Mr. Upton and Mr. Stearns a letter this morning that provides a bit of a history lesson. The loan guarantee program was created at 2:30 a.m. in this room in July of 2005 in the conference between the House and Senate on what would become the Energy Policy Act of 2005. Senator Domenici authored the provision, largely as a way to pay for the nuclear power plant that Wall Street had no interest in financing.

I offered an amendment to strike, but the amendment was opposed by the Republican majority and the provision became law. The nuclear industry hailed the new law, but soon everyone started complaining. Republican members of this committee, along with the nuclear industry, excoriated DOE for not getting the loan guarantee out the door more quickly.

And the nuclear industry said repeatedly that if DOE did not allow private investors to jump ahead of taxpayers in the reimbursement line, Wall Street wouldn't give them the money to build any new nuclear power plants. DOE finally acceded to the nuclear industry's wishes and changed the rules...

STEARNS:

Gentleman's time has expired.

MARKEY:

...but it wasn't secret, it wasn't...

STEARNS:

Gentleman's time has expired.

MARKEY:

...sudden, and it followed the right regulatory (inaudible)...

STEARNS:

With that, I recognize...

MARKEY:

We should hold hearings on the nuclear industry's attempts to change these rules.

STEARNS:

The gentleman from Pennsylvania, Mr. Murphy, is recognized for an opening statement.

MARKEY:

Thank you, Mr. Chairman.

MURPHY:

Thank you, Mr. Chairman.

On January 2009, the Department of Energy Bush administration credit committee unanimously rejected the Solyndra loan. Three weeks later the process began again. In March they said this deal is not ready for prime time, and by August DOE employees warned that the Solyndra model runs out of cash.

And yet, what happened next was pretty incredible. There's two major factors that suggested strongly the focus was on protecting the money of the investors and executives, not the taxpayers. It was an airtight scheme that trumps the Bernie Madoff scheme.

First, Solyndra executives filed with the SEC in December of 2009 this additional public offering, which could ensure them a strong financial return by being able to profit from stock sales. The

New York Times said behind the pomp and pageantry of a presidential visit, Solyndra was rotting inside, hemorrhaging cash so quickly that within weeks of Mr. Obama's visit the company canceled plans to offer shares to the public.

Secondly, the law clearly and unequivocally states that taxpayers will not be subordinate to other financing in these loans. But the executives and the investors arranged the contract to put themselves first, in January of 2011.

It appears you knew the Titanic was sinking, and you made sure you got to the lifeboats first. I'm very disappointed we will not get answers to this today, but the taxpayers deserve answers and they deserve to get their money back.

I yield back.

STEARNS:

Gentleman yields back.

For an opening statement, the gentleman from Texas, Mr. Green, is recognized for five minutes -- two minutes -- two minutes.

GREEN:

Thank you, Mr. Chairman. I thought you were giving me extra time because we're kind of slow talkers.

Today's hearing should be an opportunity for Solyndra to clear its name. However, due to the ongoing investigation and the witnesses exercising their constitutional right, they will not shed any light on the events surrounding the loan guarantee or the restructuring of the loan.

It's their right to do so, but I'm disappointed we will not get the information. Like other members of the Congress, in July shortly after this issue was first raised by this subcommittee, our staff met with the representatives of Solyndra. During this meeting our office was assured that Solyndra was solvent and well-positioned to grow. Only days later Solyndra filed bankruptcy.

It's clear that they were disingenuous at best. They misled our office and other members of this subcommittee. This leads me to believe that there is a good chance they similarly misled investors and the federal government throughout the loan guarantee process.

What is important to recognize is that no entity, even the federal government, is immune to fraud. The case of Solyndra should not lead anyone to believe that our country should not stop exploring the development of alternative energy sources, particularly solar. Loan guarantees need to be thoroughly vetted, but if a mistake is made, if fraud happens, we can't simply turn and run away.

Wrongdoing should be thoroughly and vigorously investigated and perpetrators should be punished, but we must continue to explore ways to derive energy from alternative sources. For instance, 90 percent of the Israeli water is heated with solar power. Other countries are doing this and so should we.

If we are not aggressively pursuing these technologies, we will be left behind. If we lose our competitive edge, if our nation ceases to be the world leader in technological development innovation, the financial losses we're experiencing due to the Solyndra incident will be dwarfed by our inability to compete.

While I am shocked at the conduct of this company, I welcome the investigations by this subcommittee and the Department of Justice of the allegations that have been made, and maybe in this case cannot be used as a pretext for abolishing federal programs that have enormous potential.

And I yield back my one second.

STEARNS:

I thank the gentleman.

And for an opening statement, Dr. Burgess is recognized for two minutes.

BURGESS:

I thank the chairman for the recognition.

And I want to thank the witnesses for appearing today, and do note that they are here voluntarily and not under subpoena. I am obviously disappointed, as is every other member of the committee, that we will not be able to get our questions answered today, as the assertion is that you will assert your privileges under the 5th -- or your rights -- under the 5th Amendment.

Mr. Chairman, we have been trying for months to get this information out of the Department of Energy and Office of Management and Budget. And it is a shame that this committee has been stonewalled. It is a shame that this committee had to resort to a subpoena in July of this year in order to get this information and that that subpoena passed on a party-line vote.

I suspect there's several members of the other side of the dais that would like to have that vote back in light of what we know.

Yes, last night the money for further disbursements of cash to these energy programs was corralled in the continuing resolution, I think that was a good thing, I only wish we could have gotten more.

And Mr. Markey, in March of 2010, at this very table, at one of your subcommittee hearings, Cathy Zoi, Assistant Secretary in the Department of Energy told this Committee that all of the money for the energy programs was obligated and out the door to the Department of Energy.

That was 15 months ago and now we learn that rapidly approaching the end of the fiscal year, they're trying to cram $8 billion more out the door, hell yes, we took that money back, the DOE is going to continue to be chumps, we ought to at least try to corral what they're doing.

I only wish we could've appropriated a little bit more money, invested in some crime scene tapes and taken it down there and circle their building.

I hope that they will be forthcoming in the future. I hope Secretary Chu will be down here to our Committee to testify, it is only the right thing to do. You owe it to the taxpayers, come to our Committee, bring the document and tell us what you know.

I yield back.

STEARNS:

Gentleman yields back.

The chair recognizes the gentleman, the distinguished gentleman from Michigan, Mr. Dingell, for two minutes of an opening statement.

(UNKNOWN)
(inaudible)

DINGELL:

Like every other member of this Committee, I am disappointed and we feel that we should be able to ask questions of today's witnesses.

If we're going to look into this issue, we need to get both sides of the story and in all truth, I believe the witnesses today have much to tell us, actually in their interests but their behavior is (inaudible) in the Constitution and like everybody else I have the support and protect those rights because they were wisely given by great men.

Now, having said this, I am (inaudible) wrongdoing on the part of the Department of Energy's Loan Program Office.

I believe that that agency has documented that fact over the course of three years and two Administrations, one of each, the Republican and Democratic and I believe that they've showed that due diligence was done by the Loan Program Office and by outside engineering and market consultants.

And I know how hard it is to get loans because I have had the support for a number of occasions, constituents of mine who had needs of this kind of assistance.

In any way in any event members of the Subcommittee were assured, earlier this year, the company was striving, and on track to success and it concerns me that we may have been given inaccurate information.

I did hope that we could hear Solyndra's story at some point as we went through these matters.

How many of my colleagues on this Subcommittee support renewable energy is very clear.

Many members on both side of the aisle submitted letters and supported Recovery Act (ph) fund -- funding projects for this district -- for their district, Republicans and Democrats.

And I hope that we don't take the failure for whatever reason of this project to mean that all renewable energy projects are bad investments or that the Congress or that the government should not establish programs that enable the government to support new technology to keep this country competitive.

I thank you for the time Mr. Chairman.

I yield back.

STEARNS:
I thank the gentleman. We recognize the gentlelady from Tennessee, Ms. Blackburn for opening statement of two minutes.

BLACKBURN:
Thank you Mr. Chairman and welcome to our witnesses.

We are pleased that you're here but we are very disappointed that you're not going to answer the questions that we have on behalf of our constituents and the American taxpayers that wanna know what happened to the money.

And Mr. Harrison and Mr. Stover, I think it's important that you realize, this hearing is not about science or energy policy, it is not about previous legislation.

This hearing is about you, the Department of Energy and your interaction with the Administration.

There is a desire to be accountable. We want to be accountable to the taxpayers, we need to have these answers from you.

There are plenty of questions to go around. Mr. Chairman, did Mr. Harrison plead the Fifth?

If he interacted with the White House?

Did he find it necessary to plead the Fifth when he visited with some of my colleagues and said that, "you were on pace to triple your output."?

In fact, if we have learned anything about Mr. Harrison, it is that until this morning, he has had no problem talking about the company.

In fact, it makes you wonder what you're trying to hide or cover up.

Did your 1,100 former employees know that they were going to be laid off on the morning of August 31st?

Did they know that there was going to be difficulty with the financial bearings of your company?

Did they understand that there are plenty of questions that are yet to be answered?

I think another part of this story, that causes concern is, what is going to happen with the $783 million you owe the creditors that trusted you.

I yield back.

STEARNS:
Gentle lady yields back. There is no one on the Democrat side, so I moved to the Republican side.

The gentlelady from North Carolina, Sue Myrick, is recognized for an opening statement, for two minutes.

MYRICK:

Thank you Mr. Chairman. I appreciate that and it goes without saying that I am like everyone else on this committee, very disappointed that we aren't going to get any answers today.

We appreciate your being here and we respect your Fifth Amendment rights, no problem about that but, you know, I'm confident that the Committee will get to the bottom of this in the future because we want to find out exactly what went on and how this loan guarantee was handled and also what was the real reason for the company's eventual failure after the federal government provided support.

I'd also be very interested to hear about the -- the financial controls internally or lack thereof because in -- September 22nd, Washington Post article by Carol Lanning (ph) and Joe Stephens (ph)cited former employees who saw Solyndra's executives (inaudible) through cash after receiving the federal loan guarantee.

The article also mentions that inventory continued to pile out in Solyndra's (inaudible) spaces at the same time they were building their $340 million plus facility around the corner.

Like most Americans, I'd be very interested to know how Solyndra spent so much money so quickly and if the company's management team really believed in the financial picture that they painted at the same time the company was evidently spiraling towards ruin.

I'd also like to ask our witnesses if they could point to anything that Solyndra did, that will ultimately benefit the American people.

Unfortunately, these questions will be answered this morning, however as I said before, it's not the end of the investigation and I know we'll get these questions answered in due time.

It's the least we can do for the taxpayers who have been left holding the bag on this one.

I yield back.

STEARNS:
Gentlelady yields back. The gentleman from Georgia, Dr. Gingrey is recognized for an opening statement, two minutes.

GINGREY:
Mr. Chairman, I wanna thank you for calling today's hearing as we attempt to get answers from the executives of Solyndra.

Unfortunately, despite assurances from Solyndra's executives, an e-mail dated September the 10th, 2011 that they would testify before this Subcommittee.

I'm extremely disappointed the CEO Brian Harrison and CFO, Doug G Stover (ph) have reneged on this pledge to provide us with answers and instead chose to invoke their constitutional rights under the Fifth Amendment to avoid self-incrimination.

Mr. Chairman, hundreds of millions of taxpayers are owed an explanation as to how they were swindled out of $535 million in loan guarantee money.

My constituents in Northwest Georgia, deserves to know why did this company whose financial outlook in August of 2009 indicated that they will be out of cash in September of 2011, in fact, the time that they declared bankruptcy and yet received a hefty loan in a rush to judgment about unproven technology.

Yet today we hear nothing.

Even more frustrating, than the carelessness with which Solyndra acted after putting taxpayers on the hook (ph) for over half a billion dollars is the fact that these executives, sitting before us today, had the audacity to tell Members of this Subcommittee, two months ago the merits of Solyndra, only to see its doors closed leaving another thousand people out of work.

Now, as we all know, Solyndra is the subject of a criminal investigation by the FBI.

Mr. Chairman, my constituents would like to know the answers to several questions.

How did Solyndra managed to obtain this loan in the first place, given the shaky financial outlook?

What interactions did Solyndra have with the White House during this process?

How did Solyndra restructure its finances in February this year and obtain Obama Administration's approval to return $75 million to private investors before taxpayers were paid back?

Was this a violation of federal law?

Mr. Chairman, these questions will be answered with nothing but silence, as you can see.

This subcommittee deserves better (inaudible)

(CROSSTALK)

STEARNS:
And the gentleman from Colorado, Mr. Gardner is recognized for an open statement, for two minutes.

GARDNER:
Thank you Mr. Chairman and I thank you for being here today.

You've received the full faith and credit of the United States. The American people deserve answers.

What went wrong?

What could've been done?

(inaudible) to know?

Was information hidden from the Department of Energy?

Did the Department of Energy paint a rosy picture, hiding from Congress?

Half a billion dollars was taken from the American people, they won't get it back.

This morning this Congress passed a continuing resolution and you've managed to do something that few Congresses have.

You've killed the program.

We don't have answers but we will continue to ask.

We will restore the full faith and credit of this country and the answers that they deserve.

Yield back.

STEARNS:
Gentleman yields back and we recognize the gentleman from Virginia, Mr. Griffith for opening statement, two minutes.

GRIFFITH:
I respect your decision to invoke your constitutional Fifth Amendment rights.

That stated, the American people, deserves to know the answers to a lot of questions. After all, it's their money, we're talking about.

If I had the opportunity to ask questions which would be answered today, I would ask, in light of the fact the Justice Department got a search warrant for your records shortly after the unflattering e-mails from within the Obama Administration, were giving this Committee, do you feel you've been unfairly targeted by the Obama Administration's Justice Department in order to keep you from testifying here today?

Or, do you believe the Justice Department's investigation in this matter is a smokescreen by the Administration to shield the Administration's gross negligence in giving you and possibly others, questionable loan guarantees in the first place?

Or, do you believe it is a smokescreen for the Administration's decision to subordinate $75 million of taxpayer's money against a clear meaning of the law?

GRIFFITH:

Secondly, did you or anyone at your direction, speak with anyone particularly Legal Counsel at the Department of Energy in an attempt to persuade or educate them that there was a legal theory that would allow subordination of taxpayer loan guaranteed money?

Also, I would like to know if you had knowledge of anyone else possibly speaking to, particularly Legal Counsel at the Department of Energy in an attempt to persuade or educate them that there was a legal theory that would allow such a subordination.

I would also have inquired whether you could affirmatively state that you don't have any knowledge of representatives from Argonaut or Madrone speaking to anyone, particularly legal counsel, at the Department of Energy in an attempt to persuade or educate them that there was a legal theory that would allow a subordination.

Thank you, Mr. Chairman, I yield back.

STEARNS:

The gentleman yields back. We have completed our opening statements at this point, so now we'll move to the witnesses.

(CROSSTALK)

STEARNS:

Mr. Sullivan is recognized for two minutes for an opening statement.

SULLIVAN:

Thank you Mr. Chairman. This is a critical hearing to examine Solyndra's representation of its financial status to this committee and the Department of Energy. Mr. Harrison, on July 21, you came into my office to meet with me and -- and I -- I quote from your meeting request to my office "To discuss Solyndra's continued success in the global marketplace." I guess a lot can change in five weeks.

In our meeting, you lied to me about the financial health of your company because just five weeks later your company was bankrupt. What happened? Today I want to know how your now bankrupt company got $535 million taxpayer funded loan guarantee from DOE. And I also want to know how your Chief Financial Officer, Mr. Stover, duped the Obama administration and others on the financial health of your company?

The American people deserve answers because they footed the bill. Did you know when you were meeting with me and other members that your company would be bankrupt five weeks after your Hill visits? As a long time critic of the Solyndra loan guarantee, I want to know what happened. Americans deserve to know their taxpayer dollars are being spent wisely.

And I yield back.

STEARNS:

The gentleman yields back. I think at this point we are complete with our opening statements. Now we will move to our witnesses. My colleagues, my understanding is that Mr. Harrison and Mr. Stover authorized their counsels to advise the committee that they will rely on their Constitutional right not to testify at today's hearing.

I believe that this privilege should be personally exercised before the members as we have done in the past. And that is why we have requested Mr. Harrison and Mr. Stover's appearance today. I request that given the importance of their testimony, they reconsider their decision to invoke the Fifth -- their Fifth Amendment rights.

Especially because the American people deserve answers about what happened to half a billion dollars of their money. And because Mr. Harrison met with many of us and made statements to us that we think we should answer our questions. In addition, both of you and your company, Solyndra have made statements that you don't know of any wrongdoing and that you are cooperating with the Department of Justice.

If you are not aware of any wrongdoing, how can you plead the Fifth Amendment and say that answers to our questions will expose you to criminal liability? I ask you today, both of you to reconsider. I'm not going to place both of the witnesses under oath.

Mr. Harrison, you are aware that the subcommittee is holding an investigative hearing and in doing so we have the practice of taking testimony under oath. Do you have any objection to being under oath during your testimony?

HARRISON:

No.

STEARNS:

Mr. Stover, you are aware that the subcommittee is holding an investigative hearing and in doing so we have the practice of taking testimony under oath. Do you have any objection to being under oath during your testimony?

STOVER:

No.

STEARNS:

The chair also advises you that under the Rules of the House and the Rules of the Committee, you are entitled to be advised by counsel. Do you desire to be advised by counsel during your testimony today? Mr. Harrison?

HARRISON:

Yes.

STEARNS:

Mr. Stover?

STOVER:

Yes.

STEARNS:

In that case would you please identify your counsel for the record, each of you? Mr. Harrison please identify your attorney by name?

HARRISON:

Mr. Walt Brown.

STEARNS:

Mr. Stover?

STOVER:

Jan Little.

STEARNS:

Thank you. At this time will you both please rise and raise your right hand, I will swear you in. And I need you to make sure your mike is on if you don't mind. OK.

Do you both swear that the testimony that you are about to give is the whole truth and nothing but the truth so help you God?

HARRISON:

Yes.

STOVER:

Yes.

STEARNS:

Thank you Mr. Harrison and thank you Mr. Stover. The chairman recognizes himself for questioning of the witnesses and I should be less than two minutes, hopefully.

Mr. Harrison and Mr. Stover, we're very -- was every document and piece of information you submitted to the Department of Energy and the White House Office of Management and Budget, the United States Congress and your investors accurate and complete to the best of your knowledge?

HARRISON:

Mr. Chairman I have tremendous respect for this subcommittee and the important oversight role that it plays. I -- as much as I wish to be able to answer the member's questions, I have been advised by my counsel that it is a better course for me to assert my Constitutional right to decline to answer questions under the Fifth Amendment.

While I hope to have an opportunity to assist this committee's inquiry in the future, on the advice of my attorney, I must respectfully decline to answer any questions put forth to me by this committee.

STEARNS:

Mr. Stover?

STOVER:

Mr. Chairman on the advice of my counsel, I must invoke the privilege afforded by the Fifth Amendment to the U.S. Constitution and I respectfully decline to answer any questions put to me by this committee and subcommittee. I have great respect the crucial oversight role that Congress plays in our democracy.

I trust that the members of your subcommittee similarly have great respect for the privilege afforded very citizen by the Fifth Amendment.

STEARNS:

Mr. Stover, knowing the financial conditions of the company in mid July, where you aware of Mr. Harrison coming to Congress and painting such a rosy picture of the company? Did you review all the financial information being presented to members of Congress, the Department of Energy and OMB? And did you discuss it with Mr. Harrison?

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment to the U.S. Constitution and I respectfully decline to answer any questions.

STEARNS:

My time has expired. We will now go to the gentleman from Texas, Mr. Barton, is recognized for a minute and a half. I'm sorry, we recognize -- I think what we're going to do is go five minutes on this side and then five minutes on their side.

So, Mr. Barton you're recognized for a minute and a half.

BARTON:

Before my time starts could I inquire of the chair if the witnesses -- witnesses were given an opportunity to give an opening statement? They didn't but where they offered that?

STEARNS:

No they were not.

BARTON:

They were not offered an opportunity?

STEARNS:

They're certainly welcome -- opportunity to speak today.

BARTON:

I would -- I would ask unanimous consent that we give them the opportunity to give a statement if they -- either of them wishes to?

(OFF-MIKE)

BARTON:

Normally we give witnesses an opportunity to ...

STEARNS:

It's my understanding, Mr. Barton that when you're taking the Fifth, there is no opportunity for opening statements. The gentlelady?

DEGETTE (?):

If the gentleman will yield. We were -- the way the subcommittee has operated for, as you know Mr. Chairman (inaudible) for the last number of years is when witnesses appear to take the Fifth, they generally don't give an opening statement, but I would certainly have no objection if either of these witnesses decided ...

BARTON:

I just think we should give them that opportunity to show that we're fair and balanced, as they say.

(OFF-MIKE)

STEARNS:

Mr. Barton, we're told by their counsel that met with our counsel, they did not wish to give an opening statement and that is what we're hearing from their counsel, so ...

BARTON:

But we were also told that they were going to answer questions, so ...

STEARNS:

Well, I think it's a defined point, but I think judging from the counsel's reaction here, they do not wish to give opening statements. I think if you look at their nodding heads, I think that should be apparent to you, they do not wish to give opening statements.

Do you wish to give an opening statement?

BARTON:

I wish to ask questions, Mr. Chairman.

STEARNS:

You go ahead and give your -- excuse me, ask your questions, yes.

BARTON:

I want to ask Mr. Harrison if he thinks the American people who have invested over a half a billion dollars deserve to know what happened to that money?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment of the Constitution and I respectfully decline to answer any questions.

BARTON:

I want to ask the same question to Mr. Stover.

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment to the U.S. Constitution. I respectfully decline to answer any questions.

BARTON:

I don't understand what's self-incriminating about a "yes" or "no" answer as to whether the American people deserve to know what happened to over a half a billion dollars of their money, but then I'm not a -- I'm not a defense lawyer, Mr. Chairman. I would secondly like to know what changed between January of 2009 when the Bush administration DOE rejected the loan application to March of 2009 when the Obama administration reversed course and approved this half a billion dollar loan.

Mr. Harrison? Would you care to answer that question?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment of the Constitution of the United States and I respectfully decline to answer any questions.

BARTON:

And I'd like to ask the same question to Mr. Stover?

STOVER:

On the advice of counsel, I invoke the privilege afforded by the Fifth Amendment to the U.S. Constitution and I respectfully decline to answer any questions.

BARTON:

Again Mr. Chairman I'm puzzled by the assertion of right against self-incrimination which the only obvious thing that changed is the occupant in the White House and that's certainly not illegal for the American people to decide to put a new president in the White House.

I've got time for one more question. Is it not true, Mr. Harrison, that the former CEO and other investors of Solyndra, met frequently with officials in the Obama White House?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment of the Constitution of the United States and I respectfully decline to answer any questions.

STEARNS:

The gentleman's time has expired.

BARTON:

I would like Mr. Stover to be given the opportunity to answer that question.

STEARNS:

Mr. Stover, answer the question.

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the Fifth Amendment to the U.S. Constitution and respectfully decline to answer any questions.

BARTON:

Again Mr. Chairman I see nothing that's incriminating ...

(CROSSTALK)

STEARNS:

The gentleman's time has expired.

BARTON:

... going to see folks in the White House. I will say this Mr. Chairman I hope on a bipartisan basis we get to the bottom of this. I hope our staffs look at the Constitutionality of invoking a broad privilege when in fact there doesn't appear to be any reason for these gentleman to answer the questions of the subcommittee.

STEARNS:

I thank the gentleman.

And the gentleman from Nebraska is recognized for one minute.

TERRY:

Thank you, Mr. Chairman.

To Mr. Harrison and Mr. Stover, did you or someone on Solyndra's behalf discuss with investor, Mr. Kaiser, of the perilous financial position before February 21, 2011 when the DOE and OMB agreed to subordinate the United States position to recover funds in a bankruptcy to investors like Mr. Kaiser?

Mr. Harrison?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the United States Constitution, and I respectfully decline to answer any questions.

TERRY:

Mr. Stover?

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the 5th Amendment of the U.S. Constitution, and respectfully decline to answer the question.

TERRY:

(OFF-MIKE)

STEARNS:

The gentleman yields back.

The gentlelady, the ranking member, is recognized for two minutes.

DEGETTE:

Five minutes?

STEARNS:

Five minutes. Five minutes.

DEGETTE:

Gentlemen, based on the answers that you have given to the other members of this committee, Mr. Harrison, I'd like to ask you first, it's my understanding that, upon the advice of counsel, you intend to exercise your 5th Amendment right to not answer any questions on any subject put to you by this committee today. Is that correct?

HARRISON:

Yes.

DEGETTE:

Mr. Stover, I'm going to ask you the same question. Based on the -- your responses to the questions asked you by the other members of this committee, it is your intention, based on this -- the advice of your counsel that you do not intend to answer any questions, based on exercise of your 5th Amendment right. Is that correct?

STOVER:

Yes.

DEGETTE:

Both of you gentlemen, I will just say, these are important constitutional rights that we all treasure. And while we are frustrated today, particularly because you told a number of us in August that the company was strong, that it was doing well -- and this was only five weeks before the bankruptcy -- we'd like to get to the bottom of that.

We have the utmost respect for the United States Constitution. And so, therefore, based on that, I will decline to ask you any further questions today.

However, Mr. Chairman, as I said in my opening statement, I would be hopeful that these witnesses, once their legal issues are cleared up, and based upon the advice of their counsel, they will voluntarily come back and answer all of the questions put to them by both sides of this committee.

And with that, Mr. Chairman, I'll just ask the other members on my side if they if any questions for these witnesses at this time.

OK. Mr. Chairman, in that case, we will yield back the first five minutes, and reserve our second five minutes.

STEARNS:

All right. I understand, then, you're yielding back your little over three minutes, and you'll get another five minutes.

At this point, we'll go to our side, and recognize for one minute the gentleman from Pennsylvania, Mr. Murphy, for one minute.

MURPHY:

Thank you, Mr. Chairman.

To both witnesses: in this question, I am not asking or compelling you to be witness against yourself, nor am I depriving you of life, liberty or property without due process of law. This question is not a criminal base or anything, but it is important.

What is your plan to pay back the taxpayers $535 million you owe them? And when will you pay it back?

Mr. Harrison?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the United States Constitution, and I respectfully decline to answer any questions.

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the 5th Amendment of the U.S. Constitution, and respectfully decline to answer any questions.

MURPHY:

Mr. Chairman.

STEARNS:

I thank the gentleman, and now we recognize Dr. Burgess, the gentleman from Texas, for one minute.

BURGESS:

Thank you, Mr. Chairman.

Again, thank the gentlemen for being here. Question for both of you, Mr. Harris and Mr. Stover, in today's "New York Times" article about this problem, administration officials lay blame for Solyndra's problems on part of the global collapse.

Some lawmakers on Capitol Hill question whether firm's executives (inaudible) cover-up of their precarious financial condition. An aide to a top White House official, Valerie Jarrett, was met with three times to push for loans.

Would you be willing to provide to this committee communications between yourselves or your senior executives with members of the West Wing of the White House, specifically Ms. Jarrett, Carol Browner, and Rahm Emanuel, or their staffs?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the United States Constitution, and I respectfully decline to answer any question.

BURGESS:

Mr. Stover, same question.

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the 5th Amendment of the U.S. Constitution. I respectfully decline to answer any questions.

STEARNS:

The gentleman's time has expired.

The gentlelady from Tennessee is recognized for one minute.

BLACKBURN:

Thank you, Mr. Chairman. And to both Mr. Harrison and Mr. Stover, what we would like to know is who is the first in your company to realize that you were not going to be profitable and when you became aware, was this discussed at a board meeting? And were DOE staff members present?

Were White House employees or administration appointees present for such a board meeting? And prior to your bankruptcy filing and your awareness of your financial straits, did you issue bonuses to your senior management, your leadership team or your board? And was this discussed as an agenda item in a board meeting?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the United States Constitution, and I respectfully decline to answer any questions.

BLACKBURN:

Mr. Stover?

STOVER:

On the advice of my counsel, I invoke the privilege afforded by the 5th Amendment of the U.S. Constitution. I respectfully decline to answer the question.

BLACKBURN:

Yield back.

STEARNS:

Gentlelady yields back.

The gentleman from Virginia, Mr. Griffith, is recognized for one minute.

GRIFFITH:

Thank you, Mr. Chairman.

Gentlemen, I would like to know what role you all played in the subordination and whether or not your company or agents of your company came up with the legal theory that allowed subordination in direct conflict with what the statute asked by this Congress says. So if each of you could answer that, I would appreciate it.

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the U.S. Constitution, and I respectfully decline to answer any questions.

STOVER:

On advice of my counsel, I invoke the privilege afforded by the 5th Amendment of the U.S. Constitution. I respectfully decline to answer the question.

GRIFFITH:

Thank you, Mr. Chairman. I yield back.

STEARNS:

Yield back.

I understand that -- right -- when I did my questions, we had one minute left on our side. And I'll ask this question for Mr. Harrison.

In relation to Solyndra's February 2011 restructuring agreement with DOE, did anyone from DOE or OMB ever once discuss with you the issue that subordinating taxpayers to Solyndra's primary investors was a violation of the law?

Mr. Harrison?

HARRISON:

On the advice of my counsel, I invoke the privilege afforded to me by the 5th Amendment of the United States Constitution, and I respectfully decline to answer any questions.

STEARNS:

All right. We have completed our questions on this side, and we recognize the minority for five minutes. Who wishes -- the gentleman -- Ranking Member Mr. Waxman is recognized for five minutes.

WAXMAN:

Thank you very much, Mr. Chairman.

The chairman could easily have asked a few questions to ascertain whether the first -- whether the 5th Amendment was going to be asserted. That's consistent with other situations in which we've faced witnesses invoking the 5th Amendment right.

But what we have instead heard today is a line of questions that seem designed to create catchy sound bites rather than establish a clear record regarding the witnesses' intent to assert their constitutional rights.

And these questions constitute witness badgering that's both unseemly and inconsistent with a long line of precedent under which courts have recognized the protections of the 5th Amendment would be meaningless if prosecutors could require criminal defendants to repeatedly assert their privilege in the face of incriminating questions.

According to a Supreme Court ruling, it's considered prosecutorial misconduct when the government calls witnesses in a conscious and flagrant attempt to build its case out of inferences arising from the use of testimonial privilege.

And a federal appeals court has written that misconduct may yet arise if the prosecution continues to question a witness once her consistent refusal, legitimate or otherwise, has become apparent.

So I just want to take this moment to assert the fact that I think it's unseemly and inappropriate for members to be asking questions that we know you will not answer. You do have a privilege under the U.S. Constitution, not to give us testimony.

Should you answer of these questions, you may well then have waived your right. And so therefore it seems to me when members ask questions like when are you going to pay back the money, when did you tell the White House this information, when did you tell your board about it, when did you subordinate the loans from others, that is a -- that is, to me, is a -- an improper line of questioning.

They're sound bites. They're attempts not to get real answers. I think our committee is better than this. But this is an important inquiry. We must find out what happened to ensure that similar companies do not suffer the same fate, and let's not put our desire for media attention above our duty to conduct fair and balanced investigations into matters of national importance. I yield back the...

(CROSSTALK)

STEARNS:

Would the distinguished former chairman yield for a question to himself?

WAXMAN:

Yes, certainly.

STEARNS:

I am told...

WAXMAN:

I will not take the 5th Amendment.

STEARNS:

OK, good.

(LAUGHTER)

I was told that you appeared on "The Today Show" this morning, and said that the committee deserved the right to ask questions. And you wanted to ask questions. Is -- was I told that erroneously?

WAXMAN:

Well, you were told that erroneously. I did not appear on "The Today Show." I came to this hearing directly from home. But I've told the press, and I've told everyone else that's asked me, that I, in fact, I requested these witnesses be brought to our committee because I do have questions I would like to ask them, and I think we're entitled to get answers to these questions.

But we do have the Constitution of the United States and there may be other ways we can elicit some of the information. And I'm willing to work...

(CROSSTALK)

STEARNS:

I'm not...

WAXMAN:

Excuse me, it's my time.

STEARNS:

It is your time.

WAXMAN:

I'm willing to work with the chairman of the committee and the members of this committee to pursue other ways to get the information. But if they've asserted the 5th Amendment, there's nothing else we can do. And to badger them with questions that are simply sound bites for the press does not strike me as a fair way or a balanced way for a committee to conduct its business.

STEARNS:

The chairman yields back the balance of his time.

WAXMAN:

I do.

STEARNS:

OK. I would point out to the ranking member that this format today was agreed to by your side, the ranking member...

DEGETTE:

Well...

STEARNS:

... Ms. DeGette and I both...

DEGETTE:

If the gentleman will yield...

STEARNS:

Sure.

DEGETTE:

... just because I -- just because I agreed to the format doesn't mean I agreed to the witnesses being badgered by...

STEARNS:

No, no, I understand...

DEGETTE:

... sound bite questions...

STEARNS:

... but I'm just saying the format we did, I just pointed out.

Let me move to close here.

Mr. Harrison, before we -- let's see. Do you want to do a U.C. before we...

(UNKNOWN)

(Inaudible).

STEARNS:

OK.

Mr. Harrison, will you invoke your 5th Amendment rights in response to all questions here today?

HARRISON:

Yes.

STEARNS:

Then you are excused from the witness table at this time, but I advise you that you remain subject to the process of the committee and if the committee's need is as such, then we may recall you. You may leave.

Mr. Stover, let me be clear Mr. Stover are you refusing to answer the questions on the basis of the protections afforded to you under the 5th Amendment of the Constitution? Yes or no?

STOVER:

Yes.

(OFF-MIKE)

STEARNS:

Can the press step down a little bit so we can see each other? Do you want me to repeat the question for you?

(UNKNOWN)

He heard and answered.

STEARNS:

Let me be clear, are you refusing to answer the question on the basis of the protections afforded to you under the 5th Amendment to the United States Constitution?

STOVER:

Yes.

STEARNS:

Mr. Stover, will you invoke your 5th Amendment rights in response to all of the questions here today?

STOVER:

Yes.

STEARNS:

Then you are excused from the witness table at this time, but I advise you that you remain subject to the process of the committee and that if the committee's need is such, then we may recall you.

And with that, my colleagues I ask unanimous consent to enter documents -- the document binder and majority supplemental.

DEGETTE:

No objection.

STEARNS:

No objection. I thank the members for coming today and for the questions. I'm sorry that Solyndra executives were unable to provide any answers. Nonetheless, the committee's investigation will continue to go forward.

The committee sent three document requests this week; one to the Department of Energy seeking their communications with the White House on Solyndra and two to Solyndra's investors, Argonaut and Madrone. We're continuing to get documents from the Department of Energy and the White House about their involvement in the guarantee.

We will get to the bottom of what the administration understood about Solyndra's financial position and why they continued to believe Solyndra was a good bet for $535 million in taxpayer's money, even though DOE and OMB staff raised repeated concerns during the reviews about the very same financial problems that resulted in Solyndra's bankruptcy two years later.

We will also press forward to understand the political and time pressures that may have pushed this loan out the door before it was ready for primetime. And despite Mr. Harrison's and Mr.

Stover's inability to answer questions today, we will determine whether Solyndra played any part in the government's failure to accurately assess the risks this deal presented to the government and the United States taxpayers.

This hearing ...

DEGETTE:
Mr. Chairman.

STEARNS:
Yes?

DEGETTE:
If you'll yield?

STEARNS:
I will yield.

DEGETTE:
The chairman has -- has stated about the -- the continuing document requests that are outstanding. I'm wondering if the chairman has reviewed the request that Mr. Waxman and I have made about having general hearings about our policies and incentives about -- about whether U.S. manufacturers can compete in the global clean energy market.

And also the request that Mr. Waxman and I had made to obtain the testimony of the representatives of Argonaut and Madrone, the two private investment -- or private equity companies that invested in Solyndra so we can get a more clear picture from that angle?

STEARNS:
We are taking both of your suggestions under advisement. We think they're very good suggestions.

DEGETTE:
Thank you.

STEARNS:
And with that, the hearing is now adjourned.

CQ Transcriptions, Sept. 23, 2011

---

## List of Panel Members and Witnesses

PANEL MEMBERS:
REP. CLIFF STEARNS, R-FLA. CHAIRMAN

REP. LEE TERRY, R-NEB.

REP. JOHN SULLIVAN, R-OKLA.

REP. TIM MURPHY, R-PA.

REP. MICHAEL C. BURGESS, R-TEXAS

REP. MARSHA BLACKBURN, R-TENN.

REP. SUE MYRICK, R-N.C.

REP. BRIAN P. BILBRAY, R-CALIF.

REP. PHIL GINGREY, R-GA.

REP. STEVE SCALISE, R-LA.

REP. CORY GARDNER, R-COLO.

REP. MORGAN GRIFFITH, R-VA.

REP. JOE L. BARTON, R-TEXAS EX OFFICIO

REP. FRED UPTON, R-MICH. EX OFFICIO

REP. DIANA DEGETTE, D-COLO. RANKING MEMBER

REP. EDWARD J. MARKEY, D-MASS.

REP. GENE GREEN, D-TEXAS

REP. JAN SCHAKOWSKY, D-ILL.

REP. MIKE ROSS, D-ARK.

REP. JOHN D. DINGELL, D-MICH.

REP. CHARLIE GONZALEZ, D-TEXAS

REP. HENRY A. WAXMAN, D-CALIF. EX OFFICI0

WITNESSES:

BRIAN HARRISON, PRESIDENT AND CEO, SOLYNDRA INC.

W.G. STOVER JR., SENIOR VICE PRESIDENT AND CFO, SOLYNDRA INC.

Source: **CQ Transcriptions**

*All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.*
© 2011 CQ Roll Call All Rights Reserved.

EXHIBIT C



## PACHULSKI
## STANG
## ZIEHL
## JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

SAN FRANCISCO, CA
LOS ANGELES, CA
WILMINGTON, DE
NEW YORK, NY

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263-7000

FACSIMILE: 415/263-7010

LOS ANGELES
10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
788 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Debra I. Grassgreen

September 22, 2011

415.217.5102
dgrassgreen@pszjlaw.com

**VIA EMAIL**

T. Patrick Tinker
Assistant United States Trustee
U.S. Department of Justice
Office of the United States Trustee
District of Delaware
J. Caleb Boggs Federal Building
844 King Street, Room 2207,
Lockbox 35
Wilmington, DE 19801

Dear Mr. Tinker:

We are in receipt of your letter dated September 22, 2011 regarding Solyndra's Section 341 Meeting of Creditors. The Debtors will have witnesses present at the Section 341(a) Meeting of Creditors that will testify about the extent and nature of Solyndra's customer contracts and such other matters as are appropriate pursuant to Bankruptcy Code section 341(a). You have also requested that we identify today the specific individuals who will testify at the Section 341(a) Meeting of Creditors. Inasmuch as that meeting is not scheduled until October 18, 2011, the Debtors have not yet identified the specific individual or individuals that will be available to testify but will advise your office once that determination is made.

The Debtors are responding in a timely manner to the information requests from your office which we received at the Initial Debtor Interview and subsequently. In addition, the Debtors are cooperating with all of the information requests made by the Official Committee of Unsecured Creditors ("Committee") appointed in these cases. We met with the Committee advisors in person on Monday, September 19, 2011 (just two business days after the Committee was appointed), and have responded expeditiously to their information requests. Similarly, we have been responding to the information requests from the Department of

DOCS_SF:78314.2 80368-002



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

T. Patrick Tinker
U.S. Department of Justice
September 22, 2011
Page 2

Justice on behalf of the Department of Energy and their advisors in a timely manner. I am unaware of any information or documents that have been withheld in response to requests from these creditor constituents or your office.

If you have any further questions. Please feel free to contact me.

Regards,

Debra I. Grassgreen

cc:     Ben Schwartz
        Richard M. Pachulski
        Joshua M. Fried