| | |
|---|---|
| In re: | Chapter 11 |
| Solyndra LLC, *et al.*,[1] | Case No. 11-12799 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: October 17, 2011 at 2:00 p.m. (ET)**<br>**Objection Deadline: October 10, 2011 at 4:00 p.m. (ET)**<br>**(Deadline Extended to October 12, 2011 at 12:00 p.m.)** |
| | **Ref. No. 150** |

## LIMITED OBJECTION OF VON ARDENNE ANLAGENTECHNIK GMBH TO MOTION OF DEBTORS FOR AUTHORITY TO (A) CONDUCT AN AUCTION FOR NON-CORE ASSETS, AND (B) SELL ASSETS TO THE SUCCESSFUL BIDDERS AT AN AUCTION FREE AND CLEAR OF ALL ENCUMBRANCES

VON ARDENNE Anlagentechnik GmbH ("Von Ardenne"), by and through its undersigned counsel, hereby makes and files this Limited Objection to the *Motion of Solyndra LLC Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authority to (A) Conduct and Auction for Non-Core Assets, and (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances* (the "Non-Core Sale Motion") filed on September 26, 2011. As and for its Limited Objection, Von Ardenne respectfully states as follows:

### PRELIMINARY STATEMENT

1.    By its Non-Core Sale Motion, Solyndra seeks permission to auction various assets in its possession, including several assets that are not property of the bankruptcy estate, but rather belong to Von Ardenne (the "Von Ardenne Assets"). As further set forth below, Von

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9711) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

Ardenne objects to the Non-Core Sale Motion to the extent that it seeks permission to sell Von Ardenne Assets.

**RELEVANT FACTS**

**A.    The Parties**

2.     Solyndra LLC ("Solyndra") is a manufacturer of solar photovoltaic (PV) products, headquartered in Fremont, California.  Unlike conventional flat solar panels, Solyndra's solar "panels" are actually an array of cylinders.  Each cylinder is comprised of an elongated glass tube on which ultra-thin layers of PV and conductive materials have been deposited by vacuum deposition.

3.     Von Ardenne is a world-class supplier of vacuum deposition equipment used in a range of industrial applications, including thin-film PV technologies.  Von Ardenne is based in Dresden, Germany.

**B.    Early Relationship and Von Ardenne's Invention of the Rope Drive**

4.     In late 2005 and early 2006, Solyndra — at that time a small start-up company — approached Von Ardenne about developing customized vacuum deposition equipment for use in the high-volume manufacture of cylindrical PV modules.  Solyndra approached Von Ardenne because of Von Ardenne's extensive experience building vacuum deposition equipment systems for leading solar panel manufacturers.  Following initial discussions, Solyndra expressed interest in purchasing one or more of Von Ardenne's "GC120H" model vacuum coating systems, to be

customized by Von Ardenne as specified in the parties' contracts and used by Solyndra in coating glass cylinders (tubes).[2] (Strümpfel Decl. ¶ 5.)

5.     Before committing to this project, Von Ardenne needed to develop a specialized transport system to simultaneously (A) transport the glass tubes through the GC120H, and (B) rotate the tubes, allowing the entire surface of the tubes to be coated evenly and at the desired thickness and deposition rates. Given the extreme conditions in the process chambers (e.g., high vacuum pressures, extreme temperatures, and the presence of debris from the coating process), the need to simultaneously rotate and transport the tubes at finely controlled operating speeds presented a formidable engineering challenge. In May, 2006, Von Ardenne's engineers devised an ingenious solution — a drive system employing circulating wire cables ("ropes") that rotate the individual tubes using friction while a separate set of ropes provides independent transportation of a pallet ("carrier") that carries the tubes from the entry lock through the process chambers to the exit lock. This transport system, which came to be known as the "rope drive," is the subject of patent applications currently pending in Germany and the United States for which Von Ardenne is the sole assignee. (Strümpfel Decl. ¶ 6.)

6.     The only intellectual property agreement in place between Von Ardenne and Solyndra at the time of Von Ardenne's invention of the rope drive was a Non-Disclosure Agreement (the "NDA"), dated November 8, 2005. (Strümpfel Decl. ¶ 7 and Ex. A.) The NDA

---

[2] Von Ardenne's GC120H is a state-of-the-art equipment system for coating glass substrates about 1 meter in length. The GC120H consists of multiple chambers assembled horizontally in a line and stretching 25 or more meters in length. In-line coating systems like the GC120H are used in high volume manufacturing. Air locks on each end of the tool allow the operator to raise and lower the pressure on the glass substrates as they move between atmospheric pressure on one side of the lock and high vacuum pressure on the other side. In this way, the coating process can run continuously — fresh substrates are fed continuously into the entry load lock, processed at high vacuum pressures within the tool, then removed from the exit lock.

prohibited either party from using confidential information obtained from the other party for any purpose other than to evaluate and engage in discussions regarding a potential business relationship between the parties. (Strümpfel Decl., Ex. A at 1 (Clause 3), 3 (Clause 12).) The NDA also prohibited either party from disclosing the other party's confidential information to any third party. (*Id.*)

## C.    The Sales Agreements

7.      After Von Ardenne had invented and developed the rope drive concept, Solyndra decided to purchase from Von Ardenne a line of GC120H coaters for vacuum deposition on glass tubes. Although the GC120H was a mature product, the customized systems for Solyndra would be first generation prototypes, incorporating the newly invented rope drive transport system and customized in numerous other ways to accommodate Solyndra's novel cylindrical substrates. (Strümpfel Decl. ¶ 8.)

8.      On August 10, 2006, Von Ardenne and Solyndra concluded a sales agreement for the development and manufacture by Von Ardenne of a GC120H to be customized for thermal evaporation of CIGS[3] on glass tubes (the "CIGS Coater"). (Strümpfel Decl. ¶ 9 and Ex. B.) The purchase price for the CIGS Coater was six million, two-hundred sixty thousand Euros (€6,260,000). (Strümpfel Decl., Ex. B.) Von Ardenne and Solyndra subsequently concluded agreements for two additional customized GC120H systems — one for deposition of a contact layer of molybdenum (Moly) by a process known as rotatable magnetron sputtering,[4] entered

---

[3] CIGS refers to the compound of copper-indium-gallium-(di)selenide, the PV material in Solyndra's solar cells.

[4] Rotatable magnetron sputtering refers to a kind of vacuum deposition in which the substrates are coated by atoms of the source material that have been ejected from a rotating "target" in vacuum by applying direct current to a magnetic field array to form a plasma loop around the target. The rotating target is attached to the electrical current and cooling water supply via

Footnote continued on next page

into on September 29, 2006 (the "Moly Coater"), and one for deposition of transparent

conductive oxide (TCO) materials, also by rotatable magnetron sputtering, concluded on March

1, 2007 (the "TCO Coater"). (Strümpfel Decl., Ex. C (Moly Agreement); Ex. D (TCO

Agreement).) The purchase price for the TCO Coater was six million, nine-hundred thirty

thousand Euros (€6,930,000). (Strümpfel Decl., Ex. D.)

9.      The Von Ardenne CIGS Coater (GC 120H/CIGS) and TCO Coater (GC 120H/

CS), as well as a "large quantity of support equipment, spare parts, and supplies" for those

coating systems (the Von Ardenne Assets), are listed by Solyndra as "Non-Core Assets" of its

own that Solyndra is seeking to sell at auction. (Non-Core Assets Sale Motion, Ex. B at 1, 3, 4

(multiple line entries).)[5] As described below, these items belong to Von Ardenne and are not

properly part of the Solyndra estate.

10.     The three sales agreements, which are governed by English law (Strümpfel Decl.,

Exs. B, C, D, Clause 22), contain identical payment and delivery terms, according to which

Solyndra was obligated to pay:

- 30% of the purchase price upon entering into the contract;

- 60% of the purchase price following successful completion at Von Ardenne's

  facilities in Dresden of demonstration tests specified in an annex to the

  agreement; after receipt of this 60% payment, Von Ardenne would disassemble

  the equipment and ship it to Solyndra in California;

---

Footnote continued from previous page

magnetron "end blocks." Von Ardenne has significant expertise and patented and proprietary
technology related to the design of such magnetron and end block components.

[5] The Von Ardenne Moly Coater is among Solyndra's claimed "Core" assets.

- 5% of the purchase price following re-assembly, installation, and successful demonstration testing of the equipment at Solyndra's facility; and

- The final 5% of the purchase price in twelve (12) monthly installments spread out over the warranty period.

(Strümpfel Decl., Exs. B, C, D, Clause 4.1.)[6]

11.     Significantly, pursuant to Clause 6 of the agreements, title to the equipment does not pass to Solyndra until after successful demonstration testing of the equipment at Solyndra's facility and after Solyndra has made payments totaling 95% of the purchase price.  (Strümpfel Decl., Exs. B, C, D, Clause 6 ("Title shall pass to Solyndra upon payment of the amounts set forth in Sections 4.1.1 [30%] and 4.1.2 [60%] and 4.1.3 [5%].").)

12.     As discussed below, Solyndra rejected and refused to accept the CIGS Coater and the TCO Coater before having made 95% of the purchase price for either Coater.  Accordingly, as of the Petition Date (September 6, 2011), Von Ardenne retained title to the CIGS Coater and the TCO Coater, which have been held in storage pending resolution of various disputes between Von Ardenne and Solyndra.  Because Solyndra did not own the CIGS Coater or the TCO Coater as of the Petition Date, the Coaters are not properly part of the Solyndra estate.

**D.     Solyndra Systematically Misappropriated Von Ardenne's Intellectual Property and Know-How**

13.     Von Ardenne began detailed design work on the CIGS Coater even before the sales agreement was signed in August 2006, on the basis of a Letter of Intent concluded by the

---

[6] For each of the three contracts, the parties entered into formal amendments modifying the timing of the 60% payment, as described below.

parties in June 2006 following Von Ardenne's invention of the rope drive. (Strümpfel Decl. ¶ 12.)

14.     From the very outset of the project, Solyndra asked repeatedly for access to the engineering drawings Von Ardenne was using in the design and manufacture of the CIGS Coater (and later the Moly Coater and TCO Coater). Von Ardenne considered these requests extraordinary and viewed them with suspicion, and initially refused. The drawings Solyndra was requesting reflected Von Ardenne's intellectual property and proprietary know-how, which Von Ardenne had accumulated over a period of many years and which held tremendous economic and competitive value for Von Ardenne. Von Ardenne takes extensive steps to protect such information from falling into the hands of competitors or potential competitors. Those steps include withholding this information from customers — even where, as here, an NDA is in place — to prevent the customer from "shopping" the drawings to a competitor or from hiring engineers that could use the information to learn how to build vacuum deposition equipment in competition with Von Ardenne. (Strümpfel Decl. ¶ 13.)

15.     Solyndra, however, argued to Von Ardenne that it needed the drawings to construct a test research-and-development-only version of the coating system. Solyndra said it needed to do so to develop and optimize Solyndra's CIGS evaporation process (which Solyndra had never previously implemented in a production-level vacuum coating system) and the other, separate sub-systems that Solyndra was responsible for designing in parallel with Von Ardenne's work (such as certain automation and monitoring systems). Although Von Ardenne recognized there could be value in developing such a research and development system, and that Solyndra was a solar panel customer rather than a competitor equipment manufacturer, Von Ardenne still was not comfortable providing the requested documents to Solyndra. (Strümpfel Decl. ¶ 14.)

16.     Solyndra continued to plead for the drawings. It claimed having the drawings for use in the test system was critical to the project moving forward in a successful fashion, as the two parties would be working in parallel on the equipment (Von Ardenne) and the evaporation source (Solyndra). Solyndra promised expressly, in writing, that it would not use the drawings to make production tools or to have production tools made by third parties, instead of buying additional tools from Von Ardenne. On the basis of these promises, and the NDA in place between the parties, Von Ardenne ultimately agreed to provide *some* of the drawings requested, as well as *some* of the other proprietary information that Solyndra had requested. In doing so, however, Von Ardenne was very clear about the non-use and non-disclosure restrictions under which it was providing the drawings, as illustrated by an important email exchange between Solyndra principal Ratson Morad and Von Ardenne's CEO, Robin Schild, on July 12, 2006. (Strümpfel Decl. ¶ 15.)

17.     On that day, Mr. Morad wrote to Mr. Schild to request that Mr. Schild authorize disclosure to Solyndra of Von Ardenne's 3-D computer assisted design (CAD) drawings for certain components of the CIGS Coater, including most urgently the evaporation chambers. Such CAD drawings show every significant detail of the design that is necessary to build a copy of that particular component of the CIGS Coater. Mr. Morad wrote as follows:

> The CIGS system is unique and the design of different sub-systems is done at the same time in both companies. We [Solyndra] design the process technology part, the evaporator sources, the flux monitoring, the temp[erature] profile and some other power and control sub-systems. In order to move fast on the design we need the CAD drawing of the system and mainly the CIGS chamber. So far we received only several PDF files that are not sufficient for us to design our part of the system.
>
> *We understand that VAAT is concerned about the IP and want to make sure that it won't leak out and reach any of their*

> *competitors. Solyndra is committed to keeping that IP safe and*
> *secured and to use it only for design of our part of the system. . . .*

> Please give your approval for your team to release the drawings.

(Strümpfel Decl. ¶ 16 and Ex. E (emphasis added).)

18.    Von Ardenne's CEO, Mr. Schild, responded:

> [W]e are committed to your project. I trust you, that the CAD
> drawings will not be used to our disadvantage.

> *Especially they should not be used [by] Solyndra or a third party,*
> *to build systems instead of VAAT.*

> Under these circumstances, I give approval to send the respective
> CAD files to Solyndra.

(Strümpfel Decl., Ex. E (emphasis added).)

19.    Von Ardenne and Solyndra further memorialized this agreement regarding the limited purpose for which Solyndra could use any Von Ardenne confidential information in the sales agreements. For example, under Clause 14.3 of the sales agreements, Von Ardenne granted to Solyndra a limited license to use Von Ardenne's confidential and proprietary information only in the ordinary course "operation, upgrades and maintenance" of vacuum deposition equipment *purchased from Von Ardenne*, and for no other purpose. (Strümpfel Decl., Exs. B, C, Clause 14.3 (emphasis added).) Similarly, Clause 16 prohibited Solyndra from disclosing Von Ardenne confidential information to any third party without Von Ardenne's prior written consent, and obligated Solyndra to return all of Von Ardenne's confidential information upon receipt of a request from Von Ardenne following termination of the agreement. (Strümpfel Decl., Exs. B, C, D, Clause 16.)

20.     Beginning with the exchange quoted above, and continuing throughout the early part of the projects, Von Ardenne provided to Solyndra a significant amount of select confidential and proprietary information relating to the Von Ardenne CIGS, Moly, and TCO Coaters and to various of their component parts, sub-systems, and consumables, and to the carriers and "tube transfer station (TTS)" system developed by Von Ardenne and its sub-supplier, Xenon. Each such disclosure was made with the understanding and on condition that the terms of the parties' confidentiality, non-disclosure, and non-use agreements would apply, and accordingly that Solyndra would not be permitted to use the information to obtain or build production-level vacuum deposition equipment independent of Von Ardenne. Moreover, in each such case, Von Ardenne provided only the minimum amount of detail that was deemed necessary for the limited purposes Solyndra claimed as the basis for its requests. (Strümpfel Decl. ¶ 19.) As discussed further below, Von Ardenne never provided Solyndra with a complete set of the final manufacturing drawings for the GC120H Coaters.

21.     At the outset of the parties' relationship, Solyndra represented itself to be an aspiring solar cell module manufacturer. Solyndra did not know how to build industrial scale in-line vacuum deposition systems, and needed to purchase such systems from Von Ardenne. Solyndra repeatedly represented that it had no intention of becoming a manufacturer of vacuum deposition equipment, and used that as an argument why Von Ardenne should be willing to share proprietary designs and know-how with Solyndra. That Von Ardenne was the equipment manufacturer and Solyndra the solar cell manufacturer was the entire premise of the parties' relationship, or so Von Ardenne was led by Solyndra to believe. (Strümpfel Decl. ¶ 20.)

22.     Solyndra went forward with its plan to build a "test system," which later became known within Solyndra as the "In-Line Development System," or ILDS. As described above,

Von Ardenne had provided Solyndra with drawings and information necessary to build a test system for research and development purposes only, under strict limitations on use and disclosure of that information. In building the ILDS, Solyndra copied Von Ardenne's designs closely, so that the ILDS would be a smaller-scale model of the customized GC120H systems Von Ardenne was building for Solyndra. (Strümpfel Decl. ¶ 21.)

23.     Whatever may have been Solyndra's intentions at the outset, the concept of building a "test" tool was short-lived. Using Von Ardenne's confidential drawings and information as a guide, Solyndra built three ILDS systems (one each for CIGS, Moly, and TCO), and developed a plan to use these systems not only for research as promised, but also as a "mini" *production* line, with an annual production capacity equivalent to 12MW of solar power (as compared to the 60MW capacity of the full-scale production line Von Ardenne was building). Solyndra *concealed* this plan from Von Ardenne, knowing it was in direct contravention of the parties' agreement concerning the permitted use of Von Ardenne's confidential information. (Strümpfel Decl. ¶ 22.)

24.     Solyndra built and used in production the entire "mini" production line of deposition systems using Von Ardenne's designs. Solyndra built up a very large group of equipment engineers, who further used Von Ardenne's confidential and proprietary drawings and know how to build additional vacuum deposition equipment. Many of these engineers came from Applied Materials, which is a major competitor of Von Ardenne in the PV equipment manufacturing space. Solyndra's engineering group was led by Dan Marohl, who before joining Solyndra had experience in the semiconductor equipment engineering industry while working at Applied Materials. (Strümpfel Decl. ¶ 23.)

25.     Led by its CEO, Chris Gronet, and Mr. Marohl, Solyndra completed a major shift in what it represented as its business model over the course of 2007 and 2008, from a solar cell manufacturer that purchased its vacuum deposition equipment from Von Ardenne to a company that manufactured such equipment itself using Von Ardenne's intellectual property.  With the exception of the one Von Ardenne-manufactured system that Solyndra accepted and put into production (the Von Ardenne Moly Coater), Solyndra ultimately built all of its vacuum deposition equipment in-house and with participation by various third party sub-suppliers, using Von Ardenne's designs, drawings, and other confidential information.  Notwithstanding Von Ardenne's repeated request for information about Solyndra's disclosure of Von Ardenne confidential and proprietary information to these and other third parties, Solyndra has repeatedly refused to provide it.  Von Ardenne has discovered, however, that Solyndra built at least 12 equipment systems, all of which incorporate features that are either exact copies or are clearly derived from or based upon the design of the Von Ardenne GC120H Coaters, including without limitation the rope drive system invented by Von Ardenne and that is the subject of Von Ardenne's patent applications pending in the United States and Germany.[7]  (Strümpfel Decl. ¶ 24.)

---

[7] In 2007, Solyndra sought to induce Von Ardenne to grant Solyndra a license to the rope drive and certain related technology by promising to make Von Ardenne Solyndra's "preferred supplier" for its vacuum deposition equipment.  Von Ardenne initially was interested, but withdrew its offer to enter into this arrangement — before acceptance by Solyndra — upon learning that Solyndra had been acting in bad faith and, in fact, did not intend to make Von Ardenne its "preferred supplier." (Strümpfel Decl. ¶ 24 n.6.)  To the extent Solyndra attempts to assume or assign any purported intellectual property rights under this so-called "Preferred Supplier Agreement" in these proceedings, Von Ardenne will object on the grounds, *inter alia*, that no contract was ever formed or entered by the parties, and Solyndra acted fraudulently. Moreover, even if ultimately Von Ardenne and Solyndra had entered the proposed arrangement (which they did not), it would have been an intellectual property license agreement that, under applicable law, may not be assumed or assigned in bankruptcy without Von Ardenne's consent. 11 U.S.C. § 365(c).

26.     Solyndra committed these acts of misappropriation in clear breach of the parties'

agreements and governing English law of confidential information. In December 2009, Von

Ardenne initiated an arbitration proceeding before the International Chamber of Commerce

International Court of Arbitration (ICC), in accordance with the arbitration clause in the sales

agreements (the "Arbitration"), seeking among other things a return of Von Ardenne's drawings

and other confidential information, an order prohibiting Solyndra from further misappropriation

and misuse of Von Ardenne's confidential information, damages for Solyndra's past and

ongoing misappropriation and misuse of Von Ardenne's confidential information, and damages

for breach and repudiation of the parties' sales agreements. The Arbitration was still pending on

the Petition Date. (Strümpfel Decl. ¶ 25.)

**E.      Solyndra Rejected and Refused to Make Full Payment for the CIGS Coater**

27.     By June 2007, the CIGS Coater was fully built and installed at Von Ardenne's

facilities in Dresden, and all components and sub-systems of the tool were installed and

functioning properly. In accordance with the terms of the sales agreement, Von Ardenne

conducted preliminary acceptance testing (PAT) of the Coater in July 2007. The PAT

demonstrated that the Coater was in substantial compliance with the contract specifications, with

some identified exceptions that needed correction, the most important of which related to the

functioning of the carriers (the metal trays that hold the glass tubes) when temperatures in the

coating chambers reached in excess of 500°C. (Strümpfel Decl. ¶ 26.)

28.     Von Ardenne and Solyndra agreed to an amendment to the sales contract that

allowed for shipment of the Coater without a certificate of PAT completion, following payment

by Solyndra of a reduced progress payment toward the purchase price (€2,500,000 (40% of the

total), rather than €3,756,000 (60% of the total)). (Strümpfel Decl., Ex. F.) The amendment also

stated that Solyndra would make up the remainder of that progress payment (€1,256,000 (20% of the total)) as soon as Von Ardenne had reassembled the tool at Solyndra's site and successfully completed a re-demonstration of PAT using carriers that could consistently accommodate temperatures in excess of 500°C. (*Id.*) The remaining provisions of the contract, including the provision for transfer of title only upon payment of 95% of the purchase price, expressly remained unchanged. (*Id.*)

29.     After receiving Solyndra's payment of €2,500,000, bringing Solyndra's total payments to 70% of the purchase price, Von Ardenne disassembled the CIGS Coater, packed it into shipping containers, and shipped it to Fremont, California in accordance with the terms of the contract. (Strümpfel Decl. ¶ 28.)

30.     As is its usual practice, Von Ardenne included with the shipment a set of highly confidential manufacturing drawings for the CIGS Coater, organized in lever-arch binders and locked in an aluminum security box (for which only Von Ardenne had a key), for use solely by the Von Ardenne installation team in installing and upgrading the Coater at Solyndra's site.[8] These drawings show, in minute detail, the dimensions, sizes, tolerances, materials and other detailed information for virtually every component of the Coater. Printed out, they fill more than one dozen lever-arch binders. Many of the drawings were so detailed that they had to be printed on over-sized "A0" format paper, which is about 3 feet by 4 feet in dimension. This complete set of manufacturing drawings can be used as a detailed and comprehensive roadmap by anyone with the requisite engineering skills to make a copy of the Coater, or to have a copy made by a

---

[8] The Von Ardenne GC120H is a very large, complex, state-of-the art equipment system. Von Ardenne's customers do not assemble or install such equipment themselves; rather, they rely on Von Ardenne to supply a team of skilled engineers to professionally assemble and install the equipment at the customer's site. Von Ardenne's engineers use the manufacturing drawings for that purpose.

third party. These drawings therefore reflect some of Von Ardenne's most highly confidential trade secrets. The drawings have an express confidentiality legend that states: "Copying of this document, and giving it to others and the use or communication of the contents thereof, are forbidden without express authority." Unlike Von Ardenne's equipment user manuals and the like, these drawings are not part of the documentation sold with the Coater. Von Ardenne at no time permitted Solyndra access to, or shared with Solyndra, this set of manufacturing drawings. To the contrary, Von Ardenne informed Solyndra that Von Ardenne would *not* provide Solyndra such documents or any access thereto. The drawings were shipped to Von Ardenne's own attention at Solyndra's site, for exclusive use by Von Ardenne's engineers, and to be returned to Von Ardenne following successful installation and acceptance of the Coater. In short, Solyndra does not have, and never has had, any right, title, or interest in these manufacturing drawings. (Strümpfel Decl. ¶ 29.)

31.    By mid-September, 2007, the CIGS Coater had been delivered to Solyndra and a team of Von Ardenne engineers had begun reassembling and installing the tool at Solyndra's facilities in Fremont. In the period between shipment of the Coater in August and further acceptance testing at Solyndra's site in December 2007, Von Ardenne completed significant additional modifications and upgrades to various components of the system. As a result, the December 2007 testing successfully demonstrated that the main mechanical problem experienced during the July 2007 testing in Dresden had been solved, and that the tool was in substantial compliance with the contract specifications (and in certain respects *exceeded* those specifications). The parties agreed that only a very short list of minor open issues remained to be closed out prior to final acceptance of the Coater. (Strümpfel Decl. ¶ 30.)

32.     Nevertheless, in breach of its contractual obligations, Solyndra refused to acknowledge that the Coater had successfully completed pre-acceptance testing, or to make the 20% payment due under the contract, as amended.  Solyndra took the position that it should not be required to accept or make any further payment toward the CIGS Coater until Von Ardenne had demonstrated that the Coater had met *all* of Solyndra's latest and new *production* requirements, which went far beyond the parties' agreed upon *contractual* requirements. (Strümpfel Decl. ¶ 31.)

33.     Further acceptance testing in March 2008 again successfully demonstrated the Coater's performance, but Solyndra again refused to accept or make any further payment for the Coater.  This time, Solyndra's refusal was on the ground that Von Ardenne had halted the reliability demonstration several hours short of 24-hours duration because of a minor mechanical issue.  Solyndra again did this in breach of the sales agreement, which required only a 6-hour demonstration period, not 24-hours.  (Strümpfel Decl. ¶ 32 and Ex. B, Annex 4.)

34.     Notwithstanding Solyndra's contractual breaches, Von Ardenne endeavored to satisfy Solyndra's continued requests for design changes, and completed additional upgrades to the mechanical reliability of the Coater at Von Ardenne's own expense and without receiving any further payment from Solyndra.  Solyndra had promised to allow Von Ardenne to attempt one more final acceptance test (FAT) demonstration after completing these upgrades, and to accept and make full payment for the Coater upon successful completion of FAT.  (Strümpfel Decl. ¶ 33.)

35.     When Von Ardenne announced its readiness to conduct the FAT in June 2008, however, Solyndra refused to allow any further testing, having decided to reject and return the fully-functional Von Ardenne CIGS Coater and replace it with a new second-generation system

{908.001-W0017107.}
30990886

to be built from scratch by Solyndra (at an incremental cost to Solyndra of about $10 million). Shortly thereafter, Solyndra hurriedly disassembled the CIGS Coater and removed it from its manufacturing facilities. Solyndra demanded that Von Ardenne take the Coater back and provide a full refund of the 70% of the purchase price already paid, now on the pretext that Von Ardenne purportedly had not met the contractual timetable for delivery of the equipment. (Strümpfel Decl. ¶ 34.)

36.     Following an unsuccessful attempt by the parties to reach a settlement of their dispute, Von Ardenne provided Solyndra with notice and an opportunity to cure its material default by allowing Von Ardenne to complete final acceptance testing of the equipment in accordance with the contract. After Solyndra refused, Von Ardenne terminated the sales agreement for cause and initiated the Arbitration, seeking damages, among other relief. (Strümpfel Decl. ¶ 35.)

37.     The CIGS Coater has been held in a third-party storage facility pending resolution of the parties' disputes. (Strümpfel Decl. ¶ 36.)

38.     Although the parties dispute who breached the contract, there is no dispute that Solyndra rejected and refused to accept the CIGS Coater, and never made payments totaling 95% of the purchase price. Accordingly, there can be no dispute that title to the CIGS Coater remains with Von Ardenne, not Solyndra.

39.     To the extent that any confidential and proprietary Von Ardenne engineering drawings or other information are included in the crates containing the decommissioned CIGS Coater, those drawings also belong to Von Ardenne and must be returned to Von Ardenne and not sold or disclosed to any third party. Von Ardenne has formally demanded return of all of its confidential documents on numerous occasions, but Solyndra has wrongfully refused all such

demands. When Von Ardenne returned to collect its belongings from Solyndra's facilities in October 2008, Solyndra denied Von Ardenne any access to the storage areas where the TCO and CIGS Coaters were kept.

**F.    Solyndra Rejected and Refused to Make Full Payment for the TCO Coater**

40.    Between April 15 and 21, 2008, Von Ardenne conducted extensive PAT testing on the fully-assembled TCO Coater in Dresden, with a team of Solyndra representatives present and participating. This testing demonstrated that the Coater was in substantial compliance with the contract specifications, and also was very close to meeting all of Solyndra's new and enhanced "production requirements" beyond the agreed contract specifications. After analyzing the test results, Solyndra signed off on a Pre-Acceptance Certificate on April 23, 2008, which stated:

> Solyndra hereby acknowledges that the Equipment has passed the
> PAT successfully and agrees that the Equipment will be
> disassembled in Dresden and shipped to Fremont CA, USA.

(Strümpfel Decl. ¶ 37 and Ex. G at 5.)

41.    Before signing this Certificate, however, Solyndra extracted from Von Ardenne a concession that Von Ardenne would ship the Coater upon receipt of 50% of the purchase price, as opposed to 60% under the contract. This meant that 15% of the purchase price, rather than 5%, would be due upon completion of final acceptance testing. (The final 5% would still be due in monthly installments over the warranty period). Von Ardenne did not believe that any such deferral in payment was warranted, but agreed out of concern that Solyndra would otherwise attempt to cancel the contract and build a TCO system itself, as Solyndra had earlier threatened to do if its demands were not met. (Strümpfel Decl. ¶ 38.) This modification to the payment and

delivery terms of the contract was memorialized in a Second Amendment, dated as of April 24,

2008, which provided in relevant part:

> Solyndra shall pay 3,465,000 Euro immediately after signature of
> this agreement. The payment must be credited to VAAT's account
> not later than May 5, 2008. Upon receipt of this payment VAAT
> will ship the Equipment according to the terms and conditions of
> the Contract and the first Amendment dated April 21, 2008
> [specifying the terms of shipment by sea to Solyndra's facility in
> Fremont, California].

(Strümpfel Decl., Ex. H at 1.)

  42. The parties proceeded to perform under the terms of the Second Amendment.

Solyndra made payment of €3,465,000 (50% of the purchase price) in May 2008. As of the time

of this payment, Solyndra had paid a total of €5,554,000 for the TCO Coater, representing

approximately 80% of the purchase price. As described below, Solyndra never made any further

payments for the Coater. (Strümpfel Decl. ¶ 39.)

  43. Von Ardenne shipped the TCO Coater to Solyndra upon receipt of the 50%

payment. As is its usual practice, Von Ardenne included with the shipment a set of highly

confidential manufacturing drawings for the TCO Coater, organized in lever-arch binders and

locked in an aluminum security box (for which only Von Ardenne had a key), for use solely by

the Von Ardenne installation team in installing and upgrading the Coater at Solyndra's site.

(Strümpfel Decl. ¶ 40.) As described above (*supra*, ¶ 30), these drawings, which were shipped to

Von Ardenne's own attention at Solyndra's site, reflect some of Von Ardenne's most highly

confidential trade secrets and were kept confidential from Solyndra for that reason. Solyndra

does not have, and never has had, any right, title, or interest in these manufacturing drawings.

  44. The Coater was delivered to Solyndra's Fremont facility on June 30, 2008, shortly

after Solyndra's sudden announcement that it would not allow a final acceptance test

demonstration of the Von Ardenne CIGS Coater. Notwithstanding the parties' dispute with respect to the CIGS Coater, Solyndra and Von Ardenne made plans for a team of engineers from Von Ardenne to travel to Fremont in August 2008 to assemble and install the TCO Coater and prepare it for final acceptance testing. (Strümpfel Decl. ¶ 41.)

45.     On August 1, 2008, however, just as Von Ardenne's installation team in Germany was preparing to depart for California, Solyndra's CEO, Chris Gronet, phoned Von Ardenne's North American agent and informed him that Solyndra had decided to cancel the TCO Coater installation. The reason had nothing to do with the performance of the TCO Coater, which was in exactly the same condition (packed professionally in shipping crates) as when Solyndra decided to have it shipped to California. Rather, the reason offered by Gronet was that Solyndra could not proceed with the installation unless Von Ardenne agreed to provide a complete refund of Solyndra's payments for the CIGS Coater, which Solyndra had rejected in June. (Strümpfel Decl. ¶ 42.)

46.     Von Ardenne responded by pointing out that the parties had separate contracts for each Coater, and that as a result, Solyndra had no right to stop installation of the TCO Coater pending resolution of issues related to the CIGS Coater. Von Ardenne requested that Solyndra give written confirmation that Von Ardenne would be permitted to commence installation of the TCO Coater as originally agreed. Solyndra refused to provide any such confirmation. (Strümpfel Decl. ¶ 43.)

47.     Following unsuccessful settlement discussions, Von Ardenne provided Solyndra with notice and an opportunity to cure its material default by allowing Von Ardenne to complete final acceptance testing of the equipment in accordance with the contract. After Solyndra

refused, Von Ardenne terminated the sales agreement for cause and initiated the Arbitration, seeking damages, among other relief. (Strümpfel Decl. ¶ 44.)

48.     The TCO Coater has been held in a third-party storage facility pending resolution of the parties' disputes. (Strümpfel Decl. ¶ 45.)

49.     Although the parties dispute who breached the contract, there is no dispute that Solyndra rejected and refused to accept the TCO Coater, and never made payments totaling 95% of the purchase price. Accordingly, there can be no dispute that title to the TCO Coater remains with Von Ardenne, not Solyndra.

50.     To the extent that any confidential and proprietary Von Ardenne engineering drawings or other information are included in the crates containing the decommissioned TCO Coater, those drawings also belong to Von Ardenne and must be returned to Von Ardenne and not sold or disclosed to any third party. Von Ardenne has formally demanded return of all of its confidential documents on numerous occasions, but Solyndra has wrongfully refused all such demands. When Von Ardenne returned to collect its belongings from Solyndra's facilities in October 2008, Solyndra denied Von Ardenne any access to the storage areas where the TCO and CIGS Coaters were kept.

**G.     Solyndra Unlawfully Accessed, Took Possession of and Retained A Set of Von Ardenne Manufacturing Drawings**

51.     As described above, as of the time of the Solyndra projects, it was Von Ardenne's usual practice to ship a complete hard-copy set of manufacturing drawings to Von Ardenne's own attention at the customer's site, for use only by Von Ardenne's engineers in assembling and installing the equipment. Solyndra was not granted access to this set of manufacturing drawings, which were kept under lock and key and intended solely for use by the Von Ardenne installation

team. At the conclusion of a project, Von Ardenne's usual practice was to ship these documents back to Von Ardenne, where they would be destroyed upon arrival (Von Ardenne retains only an electronic copy for its records). (Strümpfel Decl. ¶ 46.)

52. There was no orderly conclusion of the Solyndra projects, however, in light of the various disputes between the parties. In October 2008, Von Ardenne sent a representative to Solyndra's facilities to collect Von Ardenne's belongings for shipment back to Von Ardenne. Von Ardenne's representative attempted to collect all Von Ardenne drawings, but Solyndra wrongfully denied him access to various spaces in which Von Ardenne property was stored, including shipping containers and third party storage facilities. Von Ardenne has demanded on numerous occasions that Solyndra return or confirm that it has destroyed all Von Ardenne confidential information, but Solyndra has refused to comply with these demands. Despite this, Von Ardenne believed that the hard-copy sets of manufacturing drawings that it had maintained under lock and key at Solyndra's premises for purposes of installing the Von Ardenne CIGS, Moly, and TCO Coaters either (1) had been returned to Von Ardenne and destroyed in accordance with the normal document retention policy and procedures, or (2) remained stored securely in locked aluminum boxes together with other items of Von Ardenne property held temporarily in third party storage facilities pending resolution of the parties' dispute in the Arbitration. (Strümpfel Decl. ¶ 47.)

53. Von Ardenne was thus alarmed and gravely concerned to learn for the first time, in July 2011, that Solyndra had secretly accessed and taken possession of the complete set of manufacturing drawings for the Von Ardenne Moly Coater (the "Moly Manufacturing Drawings") in October 2008 and has been using those drawings — without Von Ardenne's

knowledge or permission — ever since.[9] Upon learning of this theft, Von Ardenne immediately demanded that Solyndra return the Moly Manufacturing Drawings (and any other Von Ardenne manufacturing drawings still in Solyndra's possession). To date, Solyndra has refused to return the Drawings. (Strümpfel Decl. ¶ 48.) To the extent that Solyndra attempts to sell the Moly Manufacturing Drawings as part of a Turnkey Sale or any sale, Von Ardenne intends to object vigorously, and reserves all of its rights in that regard.

**H.** **Solyndra Kept and Used Spare Parts for Which it Never Paid**

54. The Non-Core Sale Motion also lists among the Non-Core Assets the following: "Large quantity of support equipment, spare parts, and supplies for Von Ardenne coating systems." (Non-Core Sale Motion, Ex. B, at 1, 3.) It is not clear from this description what equipment, parts or supplies are referenced.

55. Over the course of the parties' relationship, Von Ardenne maintained a stock of spare parts for the Von Ardenne equipment at Solyndra's facilities, on a consignment basis. Those spare parts belong to Von Ardenne, until paid for by Solyndra. On information and belief, Solyndra has consumed a large quantity of such spare parts without paying for them. (Strümpfel Decl. ¶ 49.)

56. To the extent that the equipment, parts, and supplies referenced in the sale motion consist of equipment supplied by Von Ardenne on a consignment or other basis and not paid for by Solyndra, such parts belong to Von Ardenne and may not be sold by Solyndra.

---

[99] In the Arbitration, Solyndra falsely represented to Von Ardenne and to the Arbitral Tribunal that it had no detailed drawings of Von Ardenne's Moly Coater. In its Answer to Von Ardenne's Request for Arbitration, Solyndra stated: "Solyndra has *never received* detailed drawings or models of the TCO or Moly chambers from Von Ardenne." (Solyndra's Answer to Claimant's Request for Arbitration, ¶ 139; emphasis added.)

57.     Finally, the Non-Core Sale Motion also lists the following items that also were supplied by Von Ardenne: "Xenon entrance table w/ Siemens controller" and "Xenon Conveyor from VAAT CIGS w/ Siemens controller." (Non-Core Sale Motion, Ex. B, at 3, 4.) Von Ardenne does not have sufficient information at this time to ascertain whether Solyndra or Von Ardenne held title to these parts as of the Petition Date. Von Ardenne believes there is an issue as to title of these items and on that basis objects to their sale to the extent that Solyndra did not own such items as of the Petition Date. (Strümpfel Decl. ¶ 50.)

## LIMITED OBJECTION TO SALE

58.     The Debtors do not have any right or basis to sell the Von Ardenne Assets.

59.     In their Sale Motion, the Debtors propose to sell various assets owned by Von Ardenne, as enumerated below, with such sale to be free and clear of liens, claims, and encumbrances. *See* Sale Motion, 20. The Debtors base their request for relief on 11 U.S.C. § 363(b) and § 363(f). But these Sections, by their terms, only permit sale of "property of the estate." The Von Ardenne Assets enumerated below are *not* estate property, and must for that reason be excluded from any sale pursuant to Sections 363(b) and 363(f). *See SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230, 232 (3d Cir. 2008) (disputed property may not be sold absent determination, made in context of adversary proceeding, that property belongs to bankruptcy estate).

60.     **Von Ardenne GC 120H/ CS (TCO Coater).** The TCO Coater was not owned by Solyndra on the Petition Date (or at any other time). Under the plain terms of the sales contract, which is governed by English law, title to the Coater does not pass to Solyndra until Solyndra has paid 95% of the purchase price. (Strümpfel Decl., Ex. D, Clause 6.1 ("Title shall pass to Solyndra upon payment of the amounts set forth in Sections 4.1.1 [30%] and 4.1.2 [60%]

and 4.1.3 [5%].").) As described above, Solyndra rejected and refused to accept the TCO Coater after having paid only 80% of the purchase price, which is less than the amount required for title to transfer. Thus, under the terms of the parties' contracts, title to the TCO Coater remains with Von Ardenne.

61.     Even in the absence of this contractual provision, title to the TCO Coater would remain with Von Ardenne by operation of law because Solyndra rejected the Coater and is seeking in the Arbitration a complete refund of payments made for the Coater. *See* Cal. Comm. Code § 2401(4) ("A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'")

62.     **Von Ardenne GC 120H/ CIGS (CIGS Coater).**  The CIGS Coater was not owned by Solyndra on the Petition Date (or at any other time). Under the plain terms of the sales contract, which is governed by English law, title to the Coater does not pass to Solyndra until Solyndra has paid 95% of the purchase price. (Strümpfel Decl., Ex. B, Clause 6.1 ("Title shall pass to Solyndra upon payment of the amounts set forth in Sections 4.1.1 [30%] and 4.1.2 [60%] and 4.1.3 [5%].").) As described above, Solyndra rejected and refused to accept the CIGS Coater after having paid only 70% of the purchase price, which is less than the amount required for title to transfer. Thus, under the terms of the parties' contracts, title to the CIGS Coater remains with Von Ardenne. .

63.     Even in the absence of this contractual provision, title to the CIGS Coater would remain with Von Ardenne by operation of law because Solyndra rejected and refused to retain the Coater, and has demanded that Von Ardenne accept return of the Coater and provide a full refund of payments made for the Coater. *See* Cal. Comm. Code § 2401(4) ("A rejection or other

refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'").

64. **Support Equipment, Spare Parts, and Supplies for Von Ardenne Coating Systems.** Solyndra has not particularized the "support equipment, spare parts, and supplies for Von Ardenne coating systems" that it claims as estate property and intends to sell as Non-Core Assets. To the extent that any such equipment, spare parts, or supplies are items supplied by Von Ardenne on a consignment basis and not paid for by Solyndra, title to such items remains in Von Ardenne, the consignor, during the consignment. *See In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, *4-7 (Bankr. D. Del. July 28, 2008) (upholding objection to sale of consigned goods where Debtor had failed to establish ownership over consigned goods in face of competing claim to ownership by consignors).

65. **Von Ardenne Confidential Drawings.** Solyndra has not listed any Von Ardenne drawings as assets of the Solyndra estate, but, for the reasons discussed above, Von Ardenne has reason to believe that confidential Von Ardenne drawings may be included in the crates in which the TCO Coater and/or CIGS Coater are stored. Such engineering drawings were shipped with the TCO and CIGS Coaters, in locked aluminum security boxes, to Von Ardenne's attention and for use exclusively by Von Ardenne's engineers working on-site at Solyndra. Such drawings have always been, and remain, the property of Von Ardenne, and are not part of the Solyndra estate.

66. Von Ardenne is very concerned about the security of its drawings that remain (wrongfully) in the possession of Solyndra, despite numerous requests for their return. Such drawings reflect Von Ardenne's most confidential and proprietary information, which Von

Ardenne has at all times taken appropriate steps to keep confidential, and which provides an important competitive advantage to Von Ardenne. If such drawings were to fall into the hands of a competitor or potential competitor, Von Ardenne would suffer irreparable harm.

67.     Von Ardenne's concerns are heightened by the fact that prior to its insolvency, Solyndra engaged in systematic misuse and misappropriation of Von Ardenne's confidential and proprietary information. Von Ardenne accordingly has no faith in Solyndra's ability or willingness to preserve the integrity and confidentiality of such information or to protect against unauthorized disclosure to third parties.

## CONCLUSION

Von Ardenne objects to any attempt by Solyndra to sell the Von Ardenne Assets, which belong to Von Ardenne and are not properly part of the Solyndra estate.

WHEREFORE, for the foregoing reasons, Von Ardenne respectfully requests that this Court enter an Order:

A. Sustaining this Objection;

B. Excluding from any sale of the Debtors' Non-Core Assets any confidential Von Ardenne engineering drawings or related information, and requiring that such confidential drawings and information be physically segregated from the Solyndra estate;

C. Excluding from any sale of the Debtors' Non-Core Assets the following items listed on Exhibit B to the Solyndra Sale Motion:

  i.     Von Ardenne GC 120H/ CS, located in Fremont, CA;

  ii.    Von Ardenne GC 120H/ CIGS, located in Newark, CA;

  iii.  Large quantity of support equipment, spare parts, and supplies for Von Ardenne coating systems, located in Fremont, CA, to the extent such parts were supplied by Von Ardenne and not paid for by Solyndra; and

  iv.  Xenon entrance table w/ Siemens controller and Xenon Conveyor from VAAT CIGS w/ Siemens controller, to the extent such items were supplied by Von Ardenne and not paid for by Solyndra.

D. In the alternative to request for relief (C), declaring that any sale of the Debtors' Non-Core Assets listed in request for relief (C) is expressly subject to and without prejudice to the rights and claims asserted by Von Ardenne, all of which rights and claims are expressly preserved, and segregating any funds obtained in any such sale pending resolution of Von Ardenne's claims to ownership of such items; and

E. Grant such other and further relief as may be just and fitting under the circumstances.

Dated: October 12, 2011
   Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

**ARNOLD & PORTER LLP**
Maria Chedid
One Embarcadero Center
San Francisco, California 94111-3711
Telephone: (415) 356-3000
Facsimile: (415) 356-3099

Lisa Hill Fenning
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199

*Counsel for Creditor VON ARDENNE
Anlagentechnik GmbH*