# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>SOLYNDRA LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 11-12799 (MFW)<br><br>Jointly Administered<br><br>Ref. Docket No. 176 |

**OBJECTION BY ARGONAUT VENTURES I, L.L.C. AND AE DIP 2011, LLC
TO UNITED STATES TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE UNDER
11 U.S.C. § 1104 OR, IN THE ALTERNATIVE, CONVERSION OF THE
CASE TO CHAPTER 7 UNDER 11 U.S.C. § 1112(b)**

      Argonaut Ventures I, L.L.C. ("**Argonaut**"), as Tranche A Representative under that certain Term Loan Agreement (Tranche A), dated as of February 23, 2011 (the "**Prepetition Tranche A Term Loan Agreement**"),[2] and as Tranche E Agent under that certain Tranche E Note Purchase Agreement, dated as of February 23, 2011 (the "**Prepetition Tranche E Agreement**"),[3] and AE DIP 2011, LLC (the "**DIP Lender**"), the Debtors' debtor-in-possession financing lender pursuant to that certain $4,000,000 Senior Secured, Superpriority Debtor In Possession Term Loan, Guaranty and Security Agreement, dated as of September 6, 2011 [Docket No. 90] (the "**DIP Credit Agreement**"), hereby object to the *United States Trustee's*

---

[1]     The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

[2]     The Prepetition Tranche A Term Loan Agreement was by and among Solyndra LLC, the lender parties thereto (collectively, the "**Prepetition Tranche A Lenders**"), and Argonaut, as Tranche A Representative.

[3]     The Prepetition Tranche E Agreement was by and among Solyndra LLC, as borrower, Argonaut, as agent, and each holder of a Tranche E note (together with the Tranche E Agent, the "**Prepetition Tranche E Lenders**").

*Motion for Entry of An Order Directing the Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104 or, In the Alternative, Conversion of the Case to Chapter 7 Under 11 U.S.C. § 1112(b)* [Docket No. 176] (the "**Motion**") and in support thereof respectfully represent as follows:[4]

## PRELIMINARY STATEMENT

1. In moving for the appointment of a chapter 11 trustee, the U.S. Trustee has not alleged that the Debtors' officers have engaged in any wrongdoing or mismanagement. Nor has the U.S. Trustee identified any bankruptcy-related obligations that the Debtors have failed to meet. Instead, the U.S. Trustee has advanced two arguments to support its request for the appointment of a chapter 11 trustee: (i) current management may be distracted from its management duties as a result of pending Congressional and other investigations; and (ii) current management might be unable to fulfill the disclosure obligations required by the Bankruptcy Code. Neither of these allegations supports the extreme remedy of displacing management and board members for the appointment of a chapter 11 trustee in these cases and, even if they could, the Debtors' appointment of a chief restructuring officer will cure any management or disclosure concern issues.

2. First, the U.S. Trustee cites the decision by two of the Debtors' officers to exercise their Constitutional rights not to testify before a Congressional committee. Based on this fact, the U.S. Trustee jumps to the conclusion that the corporate Debtors will somehow be unable to meet their disclosure obligations under the Bankruptcy Code—despite the Debtors'

---

[4] Subsequent to the filing of the Motion, the U.S. Trustee withdrew its request to convert these cases to cases under chapter 7 of the Bankruptcy Code. *See United States Trustee's Notice of (A) Supplement to the Motion for Entry of An Order Directing the Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104 or, In the Alternative, Conversion of the Case to Chapter 7 Under 11 U.S.C. § 1112(b) and (B) Withdrawal of the Request for Alternative Relief Seeking Conversion of the Case to Chapter 7 Under 11 U.S.C. § 1112(b)* [Docket No. 195].

assurances to the contrary. In fact, one of the officers who chose not to testify before the Congressional committee has already filed a declaration and testified at length in these proceedings and the other has resigned from the Debtors. The individual decisions made by two of the Debtors' officers in an unrelated Congressional investigation have no bearing on whether the Debtors' boards of directors—which are each controlled by five independent members—are fit to remain in control of the Debtors.

3. Second, the U.S. Trustee relies on the fact that during the course of answering numerous questions relating to the Debtors' financial affairs at the initial debtor interview, an officer of the Debtors declined to answer one question posed by the U.S. Trustee with respect to the Debtors' prepetition contracts. Subsequently, however, the U.S. Trustee was provided with copies of the contracts in question and the Debtors have assured the U.S. Trustee that a representative will be made available to testify under oath at the section 341 meeting of creditors.

4. Undeterred, the U.S. Trustee seeks to impose a chapter 11 trustee before the Debtors even get the chance to provide testimony at the 341 meeting on the theory that the Debtors will be unable to do so. What makes the U.S. Trustee's Motion particularly puzzling is that it seems to be premised on the idea that the appointment of an unrelated chapter 11 trustee who knows nothing about the Debtors' affairs is somehow going to aid testimonial disclosure. No allegations have been made that the Debtors have refused or will in the future refuse to provide appropriate access to their books and records.

5. Although no good reason has been advanced to support the appointment of a chapter 11 trustee, there are numerous sound reasons *not* to appoint a trustee. First and foremost, if the U.S. Trustee is successful, the value of the estates would be substantially harmed by the expenses associated with employing a trustee. For either a sale of the Debtors' businesses or an

orderly liquidation of their assets, the selling party must be facile with the Debtors' highly-specialized and technical business, and it would take an unrelated trustee substantial time and effort to put his- or herself in such a position. The resulting delays in the sale process—without the benefit or insight of the Debtors' current management team—and significant additional administrative costs would impose enormous burdens on already fragile estates.

6. To make matters worse, the appointment of a chapter 11 trustee would be an event of default under the DIP Credit Agreement and the Final DIP Order (defined below), causing the Debtors to lose access to badly needed cash. As a result, the Debtors could be forced into a fire-sale liquidation of their assets for mere scrap value, at the expense of the Debtors' secured lenders, which collectively hold nearly $800 million of secured claims against the Debtors. Thus, for no apparent reason, the U.S. Trustee is seeking the appointment of a trustee or the conversion of the cases without regard to the best interests of the Debtors' largest economic stakeholders—indeed, both Argonaut and the DIP Lender believe that either the appointment of a trustee or the conversion of these cases would have deleterious consequences to recoveries.

7. In any event, the U.S. Trustee's concerns will be adequately addressed by the appointment of a Chief Restructuring Officer. The Debtors' boards have approved the appointment of a chief restructuring officer to assist the Debtors in complying with their duties as debtors in possession under the Bankruptcy Code. This proposed appointment addresses any concerns the U.S. Trustee may have and, at the same time, will avoid the dire consequences to recoveries that would likely obtain if the Motion were granted.

8. Accordingly, Argonaut and the DIP Lender respectfully request that the Motion be denied.

**ARGUMENT**

9. A trustee may only be appointed "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor," or if the appointment of a trustee "is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a). There is a "strong presumption against appointing an outside trustee." *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004) (quoting *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998)). Consequently, "[i]t is settled that appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][b][i] (15th ed. rev. 2011) (noting that "appointment of a trustee in a Chapter 11 case is an extraordinary remedy"). Indeed, "the party seeking the appointment of an outside trustee must face" a "heavy burden of persuasion." *G-I Holdings, Inc.*, 385 F.3d at 318. That burden of persuasion means that the U.S. Trustee must show by "'clear and convincing evidence'" that the appointment of a trustee is warranted. *Id.* at 318-19 (quoting *Marvel Entm't Group,* 140 F.3d at 473).[5]

---

[5] The U.S. Trustee argues that "motions to appoint a trustee are governed by a preponderance of the evidence standard," and that rulings to the contrary "typically rely on decisions pre-dating the Supreme Court's ruling in *Grogan v. Garner*, 498 U.S. 279, 286 (1991)." *See* Motion at 5 n.4. But the *G-I Holdings* case, the Third Circuit case that the U.S. Trustee cites for this proposition, was itself decided thirteen years *after Grogan* and is binding precedent regarding the standard in the Third Circuit—clear and convincing evidence. *See G-I Holdings*, 385 F.3d at 317-18 (quoting *Marvel Entm't Group,* 140 F.3d at 473). In fact, *G-I Holdings* squarely addressed the question of which standard should apply and held that there is "no support for the proposition that the burden of persuasion in a case of this nature is ever reduced from clear and convincing evidence to a preponderance of the evidence." 385 F.3d at 314. Other cases in this District confirm this standard. *See, e.g.*, *In re W.R. Grace & Co.*, 285 B.R. 148, 157-58 (Bankr. D. Del. 2002) (rejecting appointment of a trustee, noting that certain "facts must be established by clear and convincing evidence" under § 1104(a) "before the Court may order the appointment of a trustee"). Furthermore, the U.S. Trustee's reliance on *Grogan* is entirely misplaced. In *Grogan*, the Court merely addressed the "appropriate burden of proof" for

10. Here, as shown below, the facts and circumstances of these cases plainly counsel against appointing a trustee and are far from showing by "clear and convincing evidence" that the appointment of a trustee is warranted.

### A. Appointment of a Trustee Will Cause the Debtors to Default Under the DIP Credit Agreement and the Final DIP/Cash Collateral Order

11. Pursuant to section 7.1(l) of the DIP Credit Agreement, "[t]he entry of an order appointing a trustee in any Bankruptcy Case or an examiner having enlarged powers…" constitutes an Event of Default. Upon the occurrence of that Event of Default: "automatically (x) the DIP Commitments shall terminate and (y) all Obligations shall become immediately due and payable, and the Lender may enforce any and all Liens created pursuant to Security Documents and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law, all without presentment, demand, protest or other requirements of any kind…." DIP Credit Agreement § 7.1. The occurrence of an Event of Default under the DIP Credit Agreement also "constitutes an event of default under" the *Final Order (i) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Modifying the Automatic Stay* [Docket No. 161] the ("**Final DIP Order**"). *See* Final DIP Order at ¶ 19(a).

12. On more than one occasion, the Bankruptcy Court for the Southern District of New York has severely criticized motions to appoint a trustee when such appointment would

---

discharge exceptions under section 523. *See* 498 U.S. at 286. The *Grogan* decision does not once mention section 1104 of the Bankruptcy Code or the standard that applies to appointment of a trustee. *See generally id.* Attempts in other courts to apply *Grogan*'s "preponderance of the evidence" standard to provisions other than section 523 of the Bankruptcy Code have been criticized and rejected. *See, e.g.*, *Holmes Limestone Co. v. United States*, 946 F. Supp. 1310, 1326 (N.D. Ohio 1996).

result in default under a DIP agreement. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 20 (Bankr. S.D.N.Y. 2010) (denouncing a "motion to appoint a chapter 11 trustee . . . when that would result in a default under the DIP financing facility"); *In re DBSD N. Am., Inc.*, 421 B.R. 133, 141 (Bankr. S.D.N.Y. 2009) (describing as "disgraceful," a group of investors' motion to appoint a trustee, "knowing that such would cause a default on the Debtors' DIP financing facility and a default on the sale of the company upon which all of the creditors' recoveries would rest").

13. If a chapter 11 trustee is appointed, the DIP Lender will not waive this event of default or provide any additional funding to the Debtors. Moreover, if a chapter 11 trustee is appointed, the Debtors cannot demonstrate that their prepetition secured lenders are adequately protected pursuant to section 363 of the Bankruptcy Code. Argonaut, as agent, will not consent to the continued use of the Prepetition Tranche A Lenders' and the Prepetition Tranche E Lenders' cash collateral. Argonaut does not believe that, if a trustee is appointed, the estates can demonstrate that it is adequately protected because such a trustee would impose tremendous additional administrative burdens on the estates without any corresponding benefits. To the contrary, Argonaut believes that a chapter 11 trustee will not be able to maximize the value of the Debtors' estates. As described in more detail below, Argonaut believes, consistent with the testimony of the Debtors' chief financial officer, that displacement of the Debtors' management team will significantly impair the Debtors' ability to maximize the value of their inventory.

14. Furthermore, on the occurrence of an Event of Default, the DIP Lender will "declare all of the [DIP] Obligations to be immediately due and payable" and will "enforce any and all Liens created…and otherwise exercise any and all rights and remedies provided under the [DIP Credit Agreement] and/or applicable law…." DIP Credit Agreement § 7.1(2). And, this

Court has already declared that the automatic stay "as to the DIP Lender, shall automatically terminate" at the end of a five-day notice period to enable the DIP Lender to exercise its rights and remedies with respect to the Debtors' assets. Final DIP Order ¶ 20.

B.  **Appointment of a Trustee Will Harm the Debtors' Efforts to Maximize the Value of Their Estates**

15. The Debtors are seeking to conduct a sale of their businesses on a "turnkey" basis or, if there are no interested buyers, an orderly liquidation of the Debtors' remaining inventory. To do this in a way that maximizes the value of the assets, the Debtors need the experience and expertise of their existing management team. The Debtors' production processes and inventory are "highly differentiated and unique in the [solor photovoltaic] industry." Declaration of W.G. Stover, Jr., Senior Vice President and Chief Financial Officer, In Support of First Day Motions at ¶ 4 [Docket No. 13] (the "**Stover Declaration**"). Indeed "no one else in the industry or in the world builds panels" the way the Debtors do. Transcript of Sept. 7, 2011 Hr'g at 36 (the "**First Day Tr.**",).[6] As a result, certain of the Debtors' employees "are required" "to make the sale a viable sale." Transcript of Sept. 27, 2011 Hr'g at 45 (the "**Sept. 27 Tr.**").[7] If these employees are displaced by a chapter 11 trustee, the Debtors' efforts to sell their operations as a going concern may be stymied.

16. Moreover, if the Motion is granted, the Debtors will immediately lose their access to funding under the DIP Credit Agreement and cash collateral, without which, according to the Debtors' chief financial officer, "you would have to move to a very abrupt raw liquidation of assets." First Day Tr. at 34. Worse, the Debtors would have to do so without *any* of their experienced employees. *See id.* at 34-35 ("Q. You [would] have to let go of the remaining

---

[6]  A copy of the First Day Tr. is attached hereto as **Exhibit A**.

[7]  A copy of the Sept. 27 Tr. is attached hereto as **Exhibit B**.

employees. Correct? A. Yes."). In fact, the following testimony aptly demonstrates that such an abrupt liquidation would result in the Debtors' highly specialize assets being sold for scrap value:

> Q. Do you believe that that orderly liquidation value is still better than what the estate would do in the context of a hard stop liquidation without any financing?
>
> A. Yes. Just as an example, we have the engineers in place right now who could demonstrate to a potential asset acquirer the working state of various pieces of equipment and tools. Without those engineers in place, someone would look at it much closer to just scrap value. They wouldn't be able to discern its utility.
>
> ∗∗∗
>
> Q. So would it be fair to conclude that in your view, the company will generate more value by having someone there who knows the assets, rather than in a context of a liquidation or conversion to Chapter 7 where you have an independent trustee trying to sell those assets?
>
> A. Yes.

*Id.* at 35-36.

17. Finally, even in the unlikely event that the Debtors' key employees are not displaced by a chapter 11 trustee, the stigma associated with the appointment of such a trustee may make prospective purchasers leery of bidding on the enterprise or purchasing the Debtors' products because chapter 11 trustees are almost always appointed as a consequence of some wrongdoing or mismanagement.[8] The sale process has already been chilled by the negative publicity surrounding the commencement of these cases. The process should not be further jeopardized by the dislocation of the Debtors' management at such a crucial time in the sale process.

---

8   The absence of any wrongdoing is reason alone to deny the Motion.

**C.       Appointment of a Trustee Will Add Unnecessary Administrative Expense**

18.     "In determining whether a § 1104 appointment is warranted or in the best interests of creditors, the bankruptcy court must bear in mind that the appointment of a trustee may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code, by incurring the expenditure of substantial administrative expenses…." *In re Bayou Group, LLC*, 564 F.3d 541, 546-47 (2d Cir. 2009) (quotation marks and citations omitted).  Accordingly, "the Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders, and other interests of the estate." *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980); *see also In re Liberal Market, Inc.*, 11 B.R. 742, 744 (Bankr. S.D. Ohio 1981) ("Since the economic and financial conditions are so desperate and critical, it is obvious that the appointment of a statutory trustee with full powers, authority and duties would be ill-advised, if not foolhardy, because of the consequent, overwhelming drain on assets for the nonproductive, administrative expenses of a trustee….").

19.     Here, it is no secret that the Debtors have a limited number of assets from which to satisfy nearly $800 million of secured debt.  Every dollar spent administering the estates is a dollar taken out of the hands of creditors.  Thus, if appointed, a chapter 11 trustee would result in the diversion of even more of the Debtors' assets away from the Debtors' creditors—and for no good reason.  Any investigation into the financial affairs of the Debtors that might be conducted by a chapter 11 trustee is already being conducted by Congress and the Creditors' Committee.  There is no reason to burden the Debtors' estates with the expense of hiring yet another party to engage in an investigation especially where, as here, the result would be a tremendous reduction in the value of the Debtors' estates, to the detriment of the Debtors' creditors.

**D.     The Debtors' Proposed Retention of a CRO Will Adequately Address the United States Trustee's Concerns**

20.     The Debtors intend to appoint a Chief Restructuring Officer ("**CRO**") to replace their outgoing CEO and to assist the Debtors in their duties as debtors in possession under the Bankruptcy Code.[9] Argonaut has been told that the CRO will report directly to the Debtors' boards of directors, which have five independent members, and will assume responsibility for making the required disclosures and filings in the bankruptcy proceedings. Other courts have held that where a CRO is appointed, the appointment of a trustee is not warranted. *See, e.g.*, *In re Tanglewood Farms, Inc.*, Nos. 10-06719-8-JRL, 10-06745-8-JRL, 2011 WL 606820, at *2 (Bankr. E.D.N.C. Feb. 10, 2011) (denying motion for appointment of a trustee in part because a CRO had been appointed and "the broad powers given to the CRO "insure[d] that current operations [were] in compliance with chapter 11"); *In re Appleridge Ret. Cmty., Inc.*, 422 B.R. 383, 393 (Bankr. W.D.N.Y. 2010) (noting that the court had denied a motion to appoint a trustee because, "[a]mong [other] reasons . . . a Chief Restructuring Officer was involved in the management of the Debtor"); *In re RNI Wind Down Corp.*, Case No. 06-10110 (Sontchi, J.) (Transcript of September 16, 2006 Hr'g at 77, a copy of which is attached hereto as **Exhibit C**) (denying a motion to appoint a trustee on the basis that the U.S. Trustee failed to meet its burden of establishing cause where there was no showing that the debtor's current management had committed fraud because upon learning of the potential fraud committed by the debtor's sole officer, the debtor's board replaced the officer with an independent interim CEO against whom no such allegations had been made, and finding that the board acted appropriately in replacing the officer).

---

[9]     The Debtors' have filed a motion to approve R. Todd Neilson as the CRO. *See* Docket No. 210. The CRO's appointment has been approved by the independent members of the Debtors' boards of directors, who selected Mr. Neilson after interviewing several candidates.

11

21. Essentially, the U.S. Trustee has only advanced two reasons why a chapter 11 trustee should be appointed: (1) current management may be distracted from its management duties as a result of pending Congressional and other investigations; and (2) current management might be unable to fulfill the disclosure obligations required by the Bankruptcy Code. *See* Motion at 7-10. Even before the appointment of the CRO, the Debtors' management has been keenly focused on conducting a robust sale process. Nonetheless, the appointment of a CRO resolves both of the U.S. Trustee's concerns because the CRO will devote his full attention to maximizing the value of the Debtors' estates and will ensure that the Debtors timely make all required filings and disclosures.

***Remainder of page intentionally left blank***

# CONCLUSION

22. Mere speculation that circumstances *may* arise in the future that *could* justify appointment of a chapter 11 trustee does not constitute "cause" for the appointment of a trustee within the meaning of section 1104 of the Bankruptcy Code. The U.S. Trustee has not presented any evidence that supports the appointment of a chapter 11 trustee. To the contrary, the facts and circumstances of these cases strongly counsel against the appointment of a chapter 11 trustee. Therefore, Argonaut and the DIP Lender respectfully request that the Court deny the Motion and grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       October 12, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Sean M. Beach (No. 4070)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West St., 17th Floor
Wilmington, DE 19801
Telephone:   302.571.6600
Facsimile:   302.571.1253

---- and ----

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Mitchell A. Karlan (*pro hac vice* pending)
Matthew K. Kelsey (admitted *pro hac vice*)
200 Park Ave, 47th Floor
New York, NY 10166-0193
Telephone:   212.351.4000
Facsimile:   212.351.4035

ATTORNEYS FOR ARGONAUT VENTURES I, L.L.C. AND AE DIP 2011, LLC