IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Solyndra LLC, *et al.*,[1] | ) Case No. 11-12799 (MFW) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Related Docket Nos. 176, 195** |

## DEBTORS' OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104 OR, IN THE ALTERNATIVE, CONVERSION OF THE CASE TO CHAPTER 7 UNDER 11 U.S.C. § 1112(B)

Solyndra LLC ("Solyndra") and 360 Degree Solar Holdings, Inc. ("Holdings"),

the debtors and debtors in possession (together, the "Debtors"), in these bankruptcy cases hereby

submit this opposition (the "Opposition") to the *United States Trustee's Motion for Entry of an*

*Order Directing the Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104 or, in the*

*Alternative, Conversion of the Case to Chapter 7 Under 11 U.S.C. § 1112(b)* [Docket No. 176]

(the "Motion") filed by the United States Trustee (the "UST") on September 30, 2011.[2] Each of

the Debtors, as they were created and taking into account any name changes, are referred to

herein together or separately, as the context may require as the "Company." The UST filed a

supplement to the Motion on October 7, 2011 [Docket No. 195], withdrawing the alternative

relief requested in the Motion to convert the Debtors' cases to chapter 7 and acknowledging the

witnesses identified by the Debtors for the initial creditors' meeting scheduled for October 18,

2011.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.
[2] Unless otherwise noted, capitalized terms used herein have the meanings ascribed in the Motion.

## **Preliminary Statement**

1.      Prior to these bankruptcy cases, there were no allegations of any irregularities in Solyndra's management and operations.  To the contrary, Solyndra maintained a high level of transparency with its sophisticated creditors making full financial disclosures and opening itself to close scrutiny.  The Department of Energy ("<u>DOE</u>"), in particular, was intimately familiar with Solyndra's business affairs:  The DOE conducted extensive diligence prior to approving the DOE loan guarantee in 2009 and monitored the loan closely thereafter.  Not only did it participate in both the successful restructuring that was implemented in February 2011 and the unsuccessful pre-bankruptcy negotiations, but one or more DOE representatives attended all preptition Board meetings since February 2011 and received all information provided to the Board.  At no time since the DOE loan guarantee was approved did the DOE raise any concerns about improprieties.

2.      Speculation and innuendo began only when Solyndra's bankruptcy became a political spectacle.  Three days after the bankruptcy filing, armed FBI agents in bulletproof vests (acting in conjunction with the DOE's Inspector General) staged an unannounced (but televised) raid on Solyndra's offices, fostering the impression that management misdeeds are to blame for the default on the DOE loan and that Solyndra's bankruptcy was a hostile act, when in fact the DOE had inside access to financial information and management plans and was fully aware of the impending bankruptcy.

3.      The Motion is cut from the same cloth.  It requests that Solyndra's management be replaced by a chapter 11 trustee, an extraordinary remedy typically reserved for cases involving clear and convincing evidence of fraud, gross mismanagement, or breach of

fiduciary duty, fostering the impression that management cannot be trusted to act in the best interests of creditors. ***Yet the UST alleges no misconduct of any kind***. The nominal basis for the Motion is that a trustee is required because in the wake of the FBI raid and the partisan windstorm that followed the bankruptcy filing, Solyndra's CEO, Brian Harrison, and its CFO, W.G. Stover, Jr., followed the advice of counsel and invoked their Fifth Amendment right not to testify before a Congressional subcommittee. The UST fears that those officers' cautious response to the investigation will prevent them from exercising their fiduciary responsibilities, and that the investigation will "distract those officers from the performance of their duties in the bankruptcy cases."

      4.    The substantive basis of the Motion is so weak as to suggest that the UST had little discretion in bringing the Motion. The Motion posits that clear and convincing cause exists to appoint a trustee based on a ***possibility*** that the Debtors will fail to make required disclosures – ***a possibility that Solyndra had already advised the UST would not occur, even before the Motion was filed***. In response to an unusual request by the UST that the Debtors identify ***thirty days in advance*** who would testify at the Section 341(a) Meeting of Creditors ("<u>Meeting of Creditors</u>"), the Debtors advised the UST on September 29, 2011, the day before the Motion was filed, that two senior officers - Benjamin Bierman, the Executive Vice President of Operations, and Shig Hamamatsu, the Vice President of Finance – would be available to testify and that both are well qualified in all areas of inquiry. The fact that Messrs. Harrison and Stover are not testifying does not mean that ***Solyndra*** will not testify or make all appropriate disclosures: there is no authority that an officer's inability to testify warrants appointment of a trustee where other persons are qualified and willing to testify. Indeed, Mr. Harrison is no longer

an officer, having resigned on October 7, 2011 as contemplated even before these cases were commenced. His position was effectively replaced with that of the new Chief Restructuring Officer, R. Todd Neilson.

5. The Initial Debtor Interview on September 15, 2011, cited by the UST as evidence that her concerns are justified, says more about the unusual treatment of these cases than it does about the Debtors' ability to fulfill their duties. The analyst ranged far afield of the customary scope of questioning, asking the Debtors' representative to comment on statements in a news story about the federal investigation and the Debtors' customer contracts. The Debtor's representative stated that he was uncomfortable discussing the subject *at that time* (a week after the FBI raid and in the face of a Congressional Investigation). A week later, the UST wrote and demanded an answer *that same day* to the question of whether witnesses at the Meeting of Creditors would respond to questions regarding the nature and extent of the Debtors' customer contracts. *The Debtors said yes, and have reiterated to the UST that they will answer such questions.*[3]

6. What may be most striking about the Motion – besides the lack of any sound basis for turning out current management – is the extent to which the Motion is so plainly *contrary to the interests of creditors*. By all accounts, Solyndra is already acting in the best interests of creditors. It is implementing a process for a turnkey sale endorsed by creditors. To that end, Solyndra obtained debtor in possession financing and use of cash collateral to fund the sale process, retained financial advisors and investment bankers, and commenced marketing.

---

[3] Inasmuch as the Debtors' customer contracts are complex, the Debtors also asked the UST to provide the questions about customer contracts in advance of the Meeting of Creditors. The UST responded that they would rather ask the questions "orally," leading the Debtors to question whether the UST is actually interested in obtaining full and complete answers to the UST's questions.

Solyndra has also begun to negotiate the terms of a plan with key creditor constituents and started to prepare a draft plan and disclosure statement for a prompt exit from bankruptcy.

7.    Appointing a chapter 11 trustee will set these cases back by months, will be costly and will almost surely devastate the prospects of a turnkey sale. Solyndra's assets are technically advanced and highly customized. A chapter 11 trustee with no access to financing is unlikely to have the experience or knowledge needed to effectively market and sell Solyndra's assets on a turnkey basis in a manner that will preserve jobs and realize going concern value. Further, prospective buyers have been dealing with representatives of Solyndra and its investment bankers during the course of the sale process to date, which process has included numerous communications with Solyndra personnel and management presentations. Sale efforts have already been hindered by widespread negative publicity (including this Motion) and political maneuvering, which create a climate of uncertainty and risk for investors and potential buyers. Based on the intial progress in the turnkey sale process, the Debtors were able to obtain consent from the DIP Lender to extend the sale timeline, but that consent is conditioned upon no trustee being appointed. Furthermore, appointing a trustee would trigger an event of default under the Debtors' post-petition financing facility. If the goal of the federal government (whether acting through the Department of Justice on behalf of the DOE or the Department of Justice on behalf of the UST) is to see Solyndra's assets put back in service, that goal is undermined by this Motion: -- the most likely result of appointing a trustee will be that any prospects of maximizing value will be lost, jobs will not be reinstated, the Debtors' assets will be dismantled and sold piecemeal and the federal government will receive little or no recovery on account of its claims.

## Background

8.      On September 6, 2011 (the "Petition Date"), the Debtors commenced the captioned cases (the "Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and are managing their affairs as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On September 15, 2011, the UST appointed an Official Committee of Unsecured Creditors (the "Committee") in the Cases.

10.     On September 30, 2011, the UST filed the Motion.

## Statement of Facts

**A.      Historical Business Operations and Debt Structure**

11.     *Early Development Stage and Deployment of Fab 1.*  Solyndra, Inc. (now Holdings)[4] was formed in 2005.  From 2005 through 2007, the Company focused on research and development efforts.  In 2007, the Company leased its first fabrication facility ("Fab 1") and began to commercialize its technology.  In July 2008, the Company began its first commercial shipments from Fab 1.[5]

12.     *The DOE Loan and Construction of Fab 2.*  In 2006, the Company applied for a loan from the U.S. Federal Financing Bank (the "DOE Loan") which was guaranteed by the DOE under Title XVII of the Energy Policy Act of 2005, which was enacted

---

[4]  Solyndra, Inc. changed its name to 360 Degree Solar Holdings, Inc. on June 28, 2011.
[5]  Bierman Declaration, ¶8.

to promote the commercial deployment of clean and renewable energy technologies that were not already in general use in the United States.[6]

13.     The DOE Loan closed and construction of a new state of the art fabrication facility ("Fab 2") began in September 2009.  The total cost of Fab 2 was projected to be $733 million, of which $535 million would be funded by the DOE Loan and the remaining $198 million by private investors.  Fab 2 was completed ahead of schedule and within budget. At the time of the closing of the DOE Loan, a project entity was formed, Solyndra Fab 2, LLC (now Solyndra), and the DOE Loan was secured by substantially all assets of such entity.[7]

14.     In June 2010, in order to meet Holdings' additional working capital needs, Holdings raised an additional $175 million in convertible debt (the "Notes").  The Notes were secured by substantially all of the assets of Fab 1 and other personal property of Holdings, including intellectual property.[8]

15.     ***February 2011 Restructuring.***  In late 2010, a dramatic decline in the cost of competing silicon-based photovoltaic products and a worldwide oversupply of photovoltaic panels severely impacted the Company's capital requirements and the anticipated time to reach positive cash flow from operations.  As a result, the Company found itself in need of additional capital.  The Company approached both existing and new potential investors and the DOE. Ultimately, the Company's investors came forward with a proposal for a new $75 million loan

---

[6] *See* Testimony of Jonathan Silver, Executive Director Loan Programs Office, U.S. Department of Energy before the Subcommittee on Oversight and Investigations Committee on Energy and Commerce, U.S. House of Representatives, September 14, 2011, attached hereto as Exhibit "1" ("Silver Testimony"). *See also* Bierman Declaration, ¶9.
[7] Bierman Declaration, ¶10.
[8] Hamamatsu Declaration, ¶8.

on terms that were more favorable to the Company and its creditors than any other financing options that were available to the Company at the time. As is customary in cases where distressed companies seek new debt financing, the lenders required, as a condition to providing the new capital, that the new financing had priority, in the event of liquidation, over the Company's existing debt, including the DOE Loan. However, almost $1 billion of original equity investment in the Company was, and remains, subordinated to the debt owed to the DOE.[9]

16.    Specifically, in February 2011, the Debtors' investors and creditors agreed to a global out-of-court restructuring (the "February Restructuring") summarized as follows:[10]

- The Company received a new $75 million loan from private investors ("the Tranche A Debt") with a liquidation priority over all other secured debt;

- The assets of Holdings (including the Fab 1 assets and the Debtors' intellectual property) were transferred to Solyndra (resulting in the consolidation of Fab 1 and Fab 2) to secure the new Tranche A Debt as well as the DOE Loan which was previously only secured by assets of Fab 2 and did not include liens on the Company's intellectual property;

- The DOE Loan was split into two tranches: Tranche B and Tranche D with Tranche B having a first priority security interest in all assets of the combined Company;

- The Notes were exchanged for Tranche E debt,

- All preferred stock was converted to common equity; and

- The DOE obtained the right to have an observer attend all board meetings of the Company and to receive all board materials.

---

[9] *See* Silver Testimony, at 4.
[10] Hamamatsu Declaration, ¶9.

17.     As a result of the February Restructuring, all Fab 1 and Fab 2 assets, including the ownership of the intellectual property, were consolidated into Solyndra with that entity becoming obligated on the following four tranches of secured debt:[11]

| | |
|---|---|
| Tranche A Secured Debt | $69 million drawn/$75 million committed |
| Tranche B Secured Debt (DOE) | $142 million drawn/$150 million committed |
| Tranche D Secured Debt (DOE) | $385 million |
| Tranche E Secured Debt | $187 million |
| **Total:** | $783 million |

18.     At the time of the February Restructuring, the Company and its existing investors and creditors understood that the Company required further incremental capital beyond the Tranche A funding to fund operations until the Company could generate positive cash flow. Thus, the documents provided for further Tranche C funding of up to $75 million. As is set forth below, the Debtors were unable to raise such additional capital.

## B.     Circumstances Leading to the Commencement of the Cases

19.     Notwithstanding the February Restructuring, a combination of general business conditions, a steep drop in the cost of competing crystalline silicon panels, and an oversupply of solar panels dramatically reduced solar panel pricing world-wide.[12] The oversupply was due, in part, to the growing capacity of foreign manufacturers that utilized low cost capital provided by their governments to expand operations.[13] In response to a reduction in foreign government subsidies and aggressive competition, the Company was forced to reduce

---

[11] Hamamatsu Declaration, ¶10.

[12] There was a 42% drop in solar cell prices in the first eight months of 2011. *See* Silver Testimony, citing Bloomberg New Energy Finance, August 2011 Solar Spot Price Index Update, August 31, 2011.

[13] A number of foreign governments operate government-backed clean energy lending programs. No country has been as aggressive as China in this regard, which last year alone provided more than $30 billion in credit to Chinese solar manufacturers through the China Development Bank. *See* Silver Testimony, citing Bloomberg New Energy Finance, China Development Bank – how it came to be a giant lender to clean energy, March 11, 2011.

prices more quickly than originally anticipated. In addition, the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Germany, Italy and France, negatively impacted the availability of capital for prospective customers, further reducing demand for the Company's panels. Finally, the Company's ability to timely collect on its accounts receivables was negatively impacted as foreign competitors offered extended payment terms, resulting in the Company's customers refusing to honor their previously agreed payment terms.[14]

20.     Although the February Restructuring provided for a commitment of an incremental $75 million (the Tranche A debt), it left the Company with more than $783 million in senior secured debt and the need to raise further incremental capital to fund operations until the Company could generate positive cash flow from operations.[15]

21.     Unfortunately, since the February Restructuring, the decline in solar panel pricing accelerated as Chinese companies flooded the market with inexpensive panels and Europe's deepening economic crisis reduced demands for solar panels. In early August, the Company and its creditors undertook negotiations regarding a further restructuring that would have enabled the Company to attract the necessary new investment. Ultimately, the parties were unable to agree upon the terms of such incremental financing necessary to accomplish an overall restructuring.[16]

---

[14] Hamamatsu Declaration ¶11.
[15] Hamamatsu Declaration ¶12.
[16] Hamamatsu Declaration ¶14.

22.     As a result, on August 31, 2011, the Company suspended its manufacturing operations and terminated the vast majority of its workforce.  Inasmuch as the Company's assets include complex equipment and intellectual property, the Company retained key employees to maintain its assets with the ability to re-start operations while restructuring options are explored, to assist with sales of assets and, as necessary, to wind-down the business following a sale or liquidation of assets. [17]  A week later, on the Petition Date, the Debtors commenced these Cases.

23.     One or more representatives of the DOE attended every pre-petition meeting of the Company's board since February 2011.[18]  Through weekly financial reports, the DOE was provided detailed information about Company's finances, operations, and prospects.[19]

24.     Prior to the commencement of these Cases, notwithstanding extensive diligence by the DOE and it outside consultants, the DOE did not raise any allegations of impropriety with respect to the application for the DOE Loan or the use of the proceeds from the DOE Loan.[20]

## C.     Significant Events Since the Petition Date

25.     *The Congressional Hearings and FBI Raid.*  The "First Day Hearings" in these Cases were held on September 7, 2011.  The next morning, with no prior notice, armed agents from the Federal Bureau of Investigation (the "FBI"), working in cooperation with the Office of the Inspector General of the DOE, raided the Company's facilities, shutting down

---

[17] Bierman Declaration, ¶11.
[18] Schwartz Declaration, ¶3.
[19] Hamamatsu Declaration, ¶6.
[20] Schwartz Declaration, ¶4; See also Silver Testimony (setting forth extensive diligence conducted by DOE through internal and external sources).

operations for the day, seizing computers, documents and electronic files and visiting the homes of current and former Company officers and employees (the "FBI Raid"). Due to the opportune presence of television cameras at this unannounced raid, the FBI Raid was captured on camera and broadcast worldwide – within hours, photographs of FBI agents in bullet proof vests appeared in newspapers and on television.[21]

26.     The Debtors have also been advised that the Department of Justice has initiated a criminal investigation into Solyndra. The Company continues to cooperate fully with the office of the United States Attorney for the Northern District of California in this investigation.[22]

27.     Although the House Committee on Energy and Commerce (the "Congressional Committee") had been investigating the DOE Loan since February 2011 and had not previously made any request for documents or interviews with the Company, on September 7, 2011, after the commencement of the criminal investigation, Mr. Harrison and Mr. Stover (the Debtors' Chief Financial Officer) were invited to appear before the Congressional Committee.[23]

28.     Messrs. Harrison and Stover agreed to appear before the Congressional Committee voluntarily, but on the advice of their personal counsel invoked the privilege afforded to them by the Fifth Amendment of the United States Constitution and respectfully declined to

---

[21] Bierman Declaration, ¶12.
[22] Schwartz Declaration ¶7.
[23] See Motion, ¶14.

answer any questions. The Congressional Committee was informed of Mr. Harrison and Mr. Stover's position in writing in advance of the hearing.[24]

29.   ***DIP Financing and Use of Cash Collateral.***  Following the suspension of operations, the Company and certain existing Tranche A investors entered into a debtor in possession financing arrangement for $4 million (the "DIP Financing") and consensual use of cash collateral subject to the satisfaction of certain conditions. The DIP Financing and use of cash collateral was critical to providing the Company with an opportunity to explore restructuring alternatives, including the possibility of a "turnkey" sale of its business. The DOE did not oppose the DIP Financing or use of cash collateral on a final basis. This Court entered a final order approving the DIP Financing and cash collateral usage on September 27, 2011 [Docket No. 161].

30.   ***Engagement of Imperial Capital to Sell Assets on "Turnkey Basis".***
Shortly after the Petition Date, the Debtors engaged Imperial Capital, LLC ("Imperial") as their financial advisors and investment bankers for purposes of the turnkey sale. The Court subsequently approved Imperial's engagement [Docket No. 164]. Imperial has commenced the marketing process for the Company's business assets by contacting over 140 prospective buyers, preparing a "teaser" and confidential information memorandum, and updating an online dataroom with due diligence information about the Company. Approximately twenty (20) parties have signed non-disclosure agreements and received confidential information to date.[25]

---

[24] See Motion, ¶14.
[25] Carlson Declaration, ¶5.

31.    ***Proposed Turnkey and Non-Core Asset Sales.***  On September 28, 2011,

this Court approved procedures for the sale of the Company's assets on a turnkey basis,

including a proposed bid deadline of October 25, 2011 and an auction on October 28, 2011

[Docket No. 164].  In light of the level of interest in the assets during the initial stages of the

process, the Company, after consultation with its creditor constituencies, elected to extend the

bid deadline to November 16, 2011 and the auction date to November 18, 2011.  The Company

believes that such additional time will allow it to fully test the market for its assets and thereby

maximize the possibility of consummating a turnkey sale that will yield the highest and best

value for creditor constituents, maintain the Company's going concern business, and create the

potential of re-employing some of the Company's work force.  The lenders under the DIP

Financing and the Tranche A lenders consented to the adjusted schedule for the turnkey sale on

the condition that no chapter 11 trustee is appointed.  Notably, appointment of a chapter 11

trustee with expanded powers is an event of default under the DIP Financing.  *See* DIP Credit

Agreement Section 7.1(1).

32.    In addition, the Company has engaged, subject to Court approval, an

auctioneer to sell certain non-core assets that are not necessary to restart manufacturing

operations, plus other *de minimis* assets.  The Company has sought approval of procedures

related to such sales.  [Docket No. 150]

33.    ***Engagement of R. Todd Neilson as CRO.***  On October 6, 2011, the

Company retained, subject to Court approval, R. Todd Neilson, as CRO.  Mr. Neilson is a highly

experienced restructuring professional and certified public accountant who frequently serves in

the capacity of a chapter 11 trustee, liquidating agent or responsible officer for companies in bankruptcy. The CRO's engagement was approved by the independent directors and managers of a subcommittee of Holdings Board of Directors and Solyndra's Board of Managers.[26]

34.     On October 7, 2011, consistent with the Company's budget and status of its wind-down effort, the Company's Chief Executive Officer and Chairman of the Board, Brian Harrison, resigned from the Company.[27]

35.     The CRO will effectively supersede the position of Chief Executive Officer and will report directly to the Company's board. The duties of the CRO are broad-ranging and will include general supervisory responsibilities over the Company's chapter 11 sale and restructuring efforts.[28]

### Cooperation With Creditors and Office of United States Trustee

36.     Since the commencement of these Cases, the Debtors have been under an almost unprecedented level of scrutiny. As set forth above, the Debtors have learned that they are presently the subject of multiple investigations by various arms of the federal government relating to the DOE Loan. The Debtors and certain of their representatives also may be targets of a federal criminal investigation, though no charges have been brought, and the Debtors' representatives have been called to appear at a Congressional hearing. Notwithstanding the foregoing, the Debtors have continued to conscientiously fulfill their statutory and fiduciary duties to creditors and other parties in interest.

---

[26] Neilson Declaration, ¶¶4, 5.
[27] Neilson Declaration, ¶5.
[28] Neilson Declaration, ¶¶6,7.

37. Specifically, the Debtors have promptly and diligently responded to numerous inquiries for documents and information from (a) the UST, (b) the DIP Financing and Tranche A lenders, (c) the Committee and its proposed advisor, BDO Seidman, (d) the U.S. Department of Justice acting on behalf of the DOE and its advisor, Lazard Freres & Co., and (e) other creditor constituents.[29]

38. The information requests from the UST have been far more extensive than is customary for chapter 11 debtors, even in high profile cases. Nonetheless, the Debtors have complied with each of these requests in a timely manner.[30]

39. Among other things, the UST requested *thirty days in advance* that the Debtors identify the specific witnesses who would testify at the Meeting of Creditors. Despite statements to the contrary in the Motion, the Debtors complied with this highly unusual request. In a telephone call on September 29, 2011, Roberta DeAngelis and Patrick Tinker of the UST were advised of the specific identities of the individuals who would be available to testify at the Meeting of Creditors (Benjamin Bierman and Shig Hamamatsu - both senior officers of the Debtors) and their job titles and responsibilities. Specifically, the UST was advised that Mr. Bierman (a) is the Executive-Vice President of Operations and Engineering for the Company, (b) was then the second highest ranking officer of the Debtors (he now reports to the CRO), (c) has been with the company for almost five years, and (d) is the person most knowledgeable about the Company's fabrication facilities and operations. The UST also was advised that Mr. Hamamatsu is the Vice President of Finance for the Company, is well-versed in the Debtors'

---

[29] Hamamatsu Declaration, ¶15; Grassgreen Declaration ¶9 and Exhibit F.
[30] *See* Grassgreen Declaration, Exhibit F.

financial affairs, and is responsible for coordinating the preparation of the Debtors' schedules of assets and liabilities and statement of financial affairs. *The statement in paragraph 16 of the Motion that the Debtors did not and would not identify who would testify at the Meeting of Creditors was simply untrue and was corrected by the UST in the supplement filed on October 7, 2011.*[31]

  40. On September 8, 2011, the UST wrote to Debtors regarding the "Initial Debtor Interview." The September 8 letter advised the Debtors that "[t]he purpose of the interview is to discuss monthly reporting requirements and the duties and responsibilities of the Debtor." Going well beyond the UST's own stated scope, at the Initial Debtor Interview on September 15, 2011, one week after the FBI Raid, the analyst on the Cases showed the Debtors' representative a news story about the criminal investigation and asked him to comment on statements in the news story regarding the Debtors' customer contracts. The Debtors' representative responded that he did not believe a discussion of those contracts was appropriate *at that time* (just one week after the FBI Raid), and counsel for the Debtors suggested that the interview move on to other topics.[32]

  41. One week after the Initial Debtor Interview, the UST wrote to the Debtors' counsel and asked for a response by the close of business that day to the question of whether the witnesses at the Meeting of Creditors would respond to questions regarding the nature and extent of the Debtors' customer contracts. *The Debtors said yes.*[33] A week later, the UST asked for

---

[31] *See* Grassgreen Declaration, ¶5 and Exhibits C and F; Bierman Declaration; Hamamatsu Declaration.
[32] Schwartz Declaration, ¶5.
[33] *See* Grassgreen Declaration , ¶3 and Exhibits A and B.

copies of certain customer contracts. Those contracts were provided to the UST that same business day.[34]

42.     After the filing of the Motion, surprised to see that the issue of questions regarding customer contracts was raised as a concern in the Motion, the Debtors again wrote to the UST advising that they would respond to such questions at the Meeting of Creditors and also offering to respond in advance to any questions presented.[35] The UST responded on October 7, 2011 and indicated a preference to ask the questions orally, where the answers could be more fully explored.[36] As requested, the Debtors' representatives will be prepared to answer questions about the Debtors' customer contracts at the Meeting of Creditors.

43.     The Debtors and their counsel are unaware of any outstanding information requests from the UST, the Committee[37], or other creditor constituencies that have not been addressed or that will not be addressed in the near term.

## Applicable Standard

44.     Section 1104(a) of the Bankruptcy Code authorizes the appointment of a trustee (1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor," (2) "if such appointment is in the best interests of creditors, any equity security holders, and other interests of the estate," or (3) if grounds exist for dismissal of the case or conversion to chapter 7, but the court determines that the appointment of a trustee is in the best interests of creditors and the estate. 11 U.S.C. § 1104(a). The UST's Motion in these Cases

---

[34] *See* Grassgreen Declaration, Exhibit F.
[35] *See* Grassgreen Declaration, Exhibit D.
[36] *See* Grassgreen Declaration, Exhibit E.
[37] *See* Grassgreen Declaration, ¶ 9. Certain information requested by the Committee does not exist.

is based solely on sections 1104(a)(1) and (2) of the Bankruptcy Code (and not section

1104(a)(3), which was added by the recent amendments to the Bankruptcy Code in October

2005).

       45.    "It is settled that the appointment of a trustee should be the exception,

rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) (citations

omitted); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998). The

"standard for § 1104 appointment is very high." *Smart World Techs., LLC. v. Juno Online

Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 (2d Cir. 2005). The

appointment of a chapter 11 trustee represents an "extraordinary remedy." *In re Ionosphere

Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990); *In re Adelphia Communications Corp.*,

336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006). Accordingly,

the movant "must prove the need for a trustee by clear and convincing evidence." *Sharon Steel*,

871 F.2d at 1226; *see also Marvel*, 140 F.3d at 471 (same); *Adelphia*, 336 B.R. at 656 (same);

*Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385

F.3d 313, 317-318 (3d Cir. 2004) (same).[38]

      46.    Moreover, there is "a strong presumption" against the appointment of a

trustee. *Ionosphere*, 113 R.R. at 167; *Marvel*, 140 F.3d at 471. This "strong presumption" is

based on the fact that there is no need for a trustee in most cases because the debtor-in-

possession is already a fiduciary for the estate and has an obligation to refrain from acting in a

---

[38] The UST cites *Grogan v. Garner* in support of the argument that the standard of proof is a "preponderance of the evidence." *Grogan v. Garner* 498 U.S. 279, 111 S.Ct. 634 (1991). *Grogan* held that the preponderance of the evidence standard applies in actions under section 523 of the Bankruptcy Code. This Court is bound by the Third Circuit precedent cited here, including *G-I Holdings* (decided after *Grogan*), that provides that the clear and convincing standard applies to motions to appoint a trustee.

manner that could damage the estate. *Marvel*, 140 F.3d at 471. "The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization." *Id.*

48.     In the instant case, the UST has not come close to demonstrating by clear and convincing evidence that the extraordinary remedy of appointing a chapter 11 trustee is warranted in these Cases.

### There is *No* "Cause" to Appoint a Chapter 11 Trustee

48.     Under section 1104(a)(1), the appointment of a trustee is mandatory upon a finding of "cause," but a determination of whether "cause" exists is within the discretion of the court. *Sharon Steel*, 871 F.2d at 1226 (citations omitted). "[T]he language of section 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must be appointed, but rather provides that a trustee shall be appointed 'for cause, including fraud, dishonesty, incompetence, or gross mismanagement[.]'" *Marvel*, 140 F.3d at 472.

49.     The Motion is an extraordinary over-reaction to the political tempest that has bedeviled the Debtors since the Petition Date. The UST is clear that ***the Motion does not allege any specific wrongdoing*** (Motion at 2). Nonetheless, the UST contends that there is "cause" to appoint a trustee in these Cases because of the "inability or refusal of corporate officers to answer material questions." There is simply no evidentiary support for this contention.

50.    First, the Debtors have and will continue to answer questions and provide information requested by the UST, notwithstanding the non-customary nature of such requests, or any other creditor constituent.  The questions in these Cases that the UST asserts were not answered are:

- The Debtor representative at the Initial Debtor Interview did not answer a question about customer contracts in response to a news article;

  o   *When the UST subsequently raised this concern, the Debtors assured the UST in writing that a representative of the Debtors would testify at the Meeting of Creditors about the nature and extent of customer contracts and provided copies of the requested customer contracts to the UST.*

  o   *Inasmuch as the customer contracts are voluminous and span a number of years, the Debtors also offered to answer specific questions in advance of the Meeting of Creditors.  The UST declined that offer.*

- The Debtors did not identify the officers who will appear and testify at the Meeting of Creditors a month before that meeting.

  o   ***Not true****.  The Debtors identified Messrs. Bierman and Hamamatsu, and reviewed their qualifications and job responsibilities with the UST.*

51.    Second, the individual decisions of Messrs. Harrison and Stover to assert the Fifth Amendment privilege at a Congressional hearing does not equate to the Debtors' inability to meet their fiduciary obligations in these Cases.  Mr. Harrison is no longer an officer of the Debtors.  As had been contemplated since prior to the Petition Date, he resigned effective October 7, 2011.  Mr. Harrison will be effectively replaced by the CRO, an independent and well-respected restructuring professional with no prior affiliations to the Debtors.  Mr. Stover remains Chief Financial Officer and is actively assisting the CRO and other remaining officers of the Company.  The Debtors have designated two high-ranking officers (Messrs. Bierman and

Hamamatsu) to testify at the Meeting of Creditors. Both of these officers are extremely familiar with the Debtors' operations, finances, and business affairs. The Debtors' CRO (Mr. Neilson) and investment banker (Eric Carlson) also will be present to testify.

52.     While asserting that the Motion is not based on Mr. Harrison's or Mr. Stover's exercise of their Fifth Amendment rights, the UST nonetheless argues that these individuals' exercise of their constitutional rights "raises serious doubt" about "whether" the Debtors can make comprehensive disclosures. The UST is not citing any *actual* failure to make the required disclosures – because none exists. Instead the UST is concerned about a *hypothetical* failure to make a required disclosure at some point in the future. Such conjecture cannot possibly meet the strict standard of establishing "cause" for the appointment of a trustee by clear and convincing evidence, particularly given the UST's acknowledgement that there are no allegations of wrongdoing here.

53.     Not surprisingly, the UST has not cited a single case to support the proposition that Mr. Harrison and Mr. Stover's refusal to answer questions about the Debtors' finances at a Congressional hearing equates to *the Debtors'* failure to provide information or to be transparent. The cases cited in the Motion related to circumstances where either an individual debtor or an officer of a closely held corporation did not answer questions *and* the answer is not otherwise provided.

54.     The U.S. Trustee cites three cases where trustees were appointed in situations involving a debtor or a debtor's principal asserting the Fifth Amendment privilege against self-incrimination. *See* discussion, *infra.* None of these authorities is applicable here.

First, each of these decisions involved serious wrongdoing on the part of the debtor or its

principals or other suspicious and unexplained *circumstances beyond the failure to testify*.

Second, the party that refused to testify was the debtor himself or, in the case of debtor

corporations, the sole shareholder and principal of such debtor. Unlike the situation at hand, the

cases on which the U.S. Trustee relies involved egregious conduct in the context of smaller

cases. The Debtors here are a complex enterprise who, prior to August 31, 2011, had over 1,100

employees, annual revenues in excess of $140 million, hundreds of millions of dollars of debt,

and multiple layers of management and staff. No one person employed by the Debtors has total

control over the company's operation or knows the answer to every business-related question.

     55.    The principal cases the U.S. Trustee relies upon are factually

distinguishable:

- *In re PRS Ins. Group, Inc.*, 274 B.R. 381 (Bankr. D. Del. 2001) (Walrath J.). The debtor in this case was a holding company with no business operations and two employees, one of whom was the president, sole director and sole shareholder. *Id.* at 383. The debtor owned interests in an insurance company that had been placed in receivership. *Id.* An internal investigation revealed that the president of the debtor had funneled $3.5 million of insurance company funds to himself and his family for personal expenses. *Id.* at 385-86. The president refused to testify regarding the outcome of this investigation. *Id.* at 386. This Court found that there was "compelling evidence" that funds of the debtor's subsidiary were diverted and appointed a trustee in the debtor's case. *Id.* at 387. The Court noted that it was not appointing a trustee merely because the president refused to testify, but rather because the debtor could provide no explanation for the diversion of funds from its subsidiaries. *Id.*

- *In re Vaughan*, 429 B.R. 14 (Bankr. D.N.M. 2010). This case involved an individual debtor who ran an elaborate Ponzi scheme. As noted by the Court, this scheme was done through "deceit, misrepresentations, omissions and outright fraud." *Id.* at 16. The debtor then filed chapter 11 "to ward off his creditors, but refused to participate in the bankruptcy in a meaningful way." *Id.* The debtor refused to testify at the first meeting of creditors. *Id.* at 27-28. In light of the fraud that had been committed and history of questionable

transactions, the court held that such refusal to testify constituted additional grounds to appoint a chapter 11 trustee. *Id.*

- *Tradex Corp. v. Morse*, 339 B.R. 823 (D. Mass. 2006). This case also involved a situation where the president and sole shareholder of the debtor refused to testify to inaccuracies and inconsistencies in the company's bankruptcy disclosures. *Id.* at 824, 833-835. The evidence indicated that the debtor, through its principal, failed to accurately disclose the debtor's assets, liabilities and intercompany transfers; the debtor and its principal were under investigation for fraud; serious inconsistencies existed between the debtor's tax returns and bankruptcy disclosures; the debtor's principal had siphoned excessive management fees from the debtor; and creditors had levied substantial allegations of bad faith, fraud and law enforcement violations. *Id.* at 832-33. Based on this clear record, the district court affirmed the bankruptcy court's decision to appoint a chapter 11 trustee. *Id.* at 835.

56.     The circumstances of these Cases could not be more different from the cases cited by the U.S. Trustee. There is no allegation in the Motion of any wrongdoing by the Debtors. The Debtors have fully and diligently complied with all information requests of the U.S. Trustee and other parties in interest. The Debtors also have not refused to testify at the Meeting of Creditors or to respond to any relevant inquiry about the Debtors' legal or financial affairs. The Debtors have (a) appointed an independent CRO (R. Todd Neilson) who will, subject to Court approval, effectively replace the Debtors' former Chief Executive Officer (Brian Harrison), and (b) designated witnesses who will be made available to testify at the Meeting of Creditors.

57.     The fact that one remaining officer of the Debtors (W.G. Stover, Jr.) has asserted the Fifth Amendment in the context of a Congressional hearing does not come close to satisfying the heightened standard for appointment of a chapter 11 trustee in these cases. *See McCormick v. Banc One Leasing Corp (In re McCormick)*, 49 F.3d 1524, 1526 (11th Cir. 1995) ("The Bankruptcy Code does not dictate nor have we found any other court to have held that a

bankruptcy court may deny confirmation of a reorganization plan solely because the debtor refused to testify on the basis of the privilege in a related proceeding during the pendency of a Chapter 11 case."). The Debtors comprise a sophisticated enterprise with numerous officers and other senior personnel who, particularly with the assistance of the CRO, are more than capable of ensuring that the Debtors fulfill their statutory and fiduciary duties in these cases.

58.     As stated by the court in *McCormick*, "[a]s long as [the debtor's] failure to testify . . . did not impede the basic administration of [the] case, . . . assertion of [the] Fifth Amendment privilege alone cannot be the basis for denying confirmation of [the] plan." 49 F.3d at 1527. The same reasoning applies here. One remaining officer's decision to rely on the Fifth Amendment cannot be the sole basis for appointment of a chapter 11 trustee in these Cases.

59.     Further, it bears emphasis that the Debtors have fulfilled their statutory and fiduciary duties in these Cases to date and have made substantial progress in the short time since the Petition Date. Among other things, the Debtors have already accomplished the following: (a) obtained access to the DIP Financing and cash collateral to fund a sale process; (b) retained Imperial as financial advisors and investment bankers, (c) commenced the marketing process for a turnkey sale, (d) continued with sales of inventory in the ordinary course of business, (e) retained an auctioneer and sought approval of the Court for sales of non-core and *de minimis* assets either through auction or private sale, subject to procedures that would be approved by the Court, (e) begun to negotiate the terms of a plan of reorganization or liquidation with key creditor constituents, and (f) started to prepare a draft plan and disclosure statement for a prompt exit from bankruptcy.

60. The progress made by the Debtors to date, particularly the prospects of a successful turnkey sale, would be significantly diminished through the appointment of a chapter 11 trustee.[39] Such appointment also would trigger an immediate event of default under the DIP Financing, creating further uncertainty in these Cases. As a practical matter, appointing a chapter 11 trustee will set these Cases back by months and could devastate the prospects of a turnkey sale. The sale process will necessarily grind to a halt because there will be no one with sufficient knowledge to assist in marketing the Debtors' highly technical assets. The trustee will start from scratch with a new set of professionals and a new agenda that could take weeks, if not months, to crystallize. The most likely result is that any prospects of maximizing value will be lost, jobs will not be reinstated, and the Debtors' assets will be dismantled and sold piecemeal.

### Appointing a Chapter 11 Trustee Is *Not* in the Best Interests of the Estates

61. Section 1104(a)(2) envisions a "flexible standard" for the appointment of a trustee when to do so would serve the "the interests of the creditors, equity security holders, and other interests of the estate." *Sharon Steel*, 871 F.2d at 1226; *Marvel*, 140 F.3d at 474; *In re G-I Holdings, Inc.*, 385 F.3d 313, 320 (3d Cir. 2004) ("As *Sharon Steel* stated, the party asking for appointment of a trustee bears the burden of persuasion by clear and convincing evidence. This burden does not shrink or shift.").

62. In reconciling the "interests" standard with the "cause" standard, a key commentator notes

> "the 'interests' standard may initially seem less stringent than the 'cause' standard. After all, no showing of wrongful behavior on the part of management is required, as long as interested parties

---

[39] *See* Carlson Declaration, ¶ 7.

can show a meaningful benefit from the appointment of a trustee. However, it is important to remember that the 'interests' standard requires a finding that appointment of a trustee would be in the interest of essentially **all interested constituencies**."

7 *Collier on Bankruptcy* ¶1104.02 at 1104-14 (Alan N. Resnick & Henry J.Sommer eds., 16th ed.). (emphasis added). Creditors cannot on their own obtain the appointment of a trustee under this provision in order to disenfranchise other interests. Instead, appointment of a trustee must be in the interest of the estate generally in order to satisfy the statutory "interests" standard. Thus, when creditors properly and in good faith support the debtor's current management, the Court cannot appoint a trustee under the "interests" standard.

63.     In these Cases, the DIP Lenders, Tranche A/E Lenders and the Creditors' Committee all oppose the appointment of a Trustee. The UST, who asserts that it is not representing a creditor - - the DOE - - but instead acting as an independent caretaker of the bankruptcy system, nonetheless asserts that a trustee is in creditors' best interests.

64.     Courts often consider the following factors, among others, in determining whether to appoint a chapter 11 trustee under section 1104(a)(2) of the Bankruptcy Code: (a) the trustworthiness of the debtor; (b) the debtor in possession's past and present performance, (c) the confidence – or lack thereof – of the business community and of creditors in present management; and (d) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *In re Adelphia Communications Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. S.D.N.Y. 2010); *Taub v. Taub (In re Taub)*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010); *In re Sundale, Ltd.*, 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009). Applying this standard, courts have appointed trustees under

section 1104(a)(2) where there was extreme acrimony between the debtor and creditors that hampered reorganization prospects or where the debtor in possession was facing material conflicts of interest. *See Taub*, 427 B.R. at 227 (citing *Marvel* and other cases).

66. Here, there are no allegations of acrimony amongst parties in interest or any asserted conflicts of interest. The Debtors' trustworthiness also has not been raised as an issue. As to prepetition and postpetition performance, the Debtors have certainly suffered losses in the past, but this is an inherent risk of every startup business. The Court can take judicial notice of the fact that not all new businesses and new technologies succeed. Given their circumstances, however, the Debtors as debtors-in-possession are in the best possible position for maximizing the value of the estate for the benefit of all constituents. There is also no lack of support for the Debtors either from the business community generally or from creditors specifically, as the Debtors' senior lenders and the Committee are opposed to the appointment of a trustee.

66. Further, there are no obvious benefits associated with the appointment of a chapter 11 trustee under the circumstances here. The Debtors have an effective and experienced CRO in place and knowledgeable staff and professionals in the midst of an effective sale process. Appointment of a chapter 11 trustee at this critical stage in these Cases would significantly hinder the sales process and adversely impact the Debtors' ability to maximize creditor recoveries and preserve American jobs. Accordingly, the interests of creditors, equity holders, and other parties in interest strongly weigh against the appointment of a chapter 11 trustee.

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order denying the Motion and issuing such other and further relief as is just and proper under the circumstances.

Dated: October *12*, 2011

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bruce Grohsgal*
_____

Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        bgrohsgal@pszjlaw.com
        mlitvak@pszjlaw.com

Counsel for the Debtors and
Debtors in Possession