IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, et al.,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF BENJAMIN BIERMAN IN SUPPORT OF THE DEBTORS'
OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION FOR ENTRY
OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11
TRUSTEE UNDER 11 U.S.C. SECTION 1104 OR, IN THE ALTERNATIVE,
CONVERSION OF THE CASE TO CHAPTER 7 UNDER 11 U.S.C. SECTION 1112(B)**

Benjamin Bierman, under penalty of perjury, deposes and says:

1. This Declaration is submitted in support of the opposition (the "Opposition") of Solyndra LLC and 360 Degree Solar Holdings, Inc., the above-captioned debtors and debtors in possession (together, the "Debtors"), to the motion filed by the Office of United States Trustee to appoint a chapter 11 trustee in these cases or, alternatively, to convert these cases to chapter 7 under the Bankruptcy Code. The facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto. Each of the Debtors, as they were created and taking into account any name changes, are referred to herein together or separately, as the context may require, as the "Company." Capitalized terms not defined herein shall have the meanings set forth in the Opposition.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

DOCS_SF:78478.5 80368-002

2. I am the Executive Vice President of Operations and Engineering for the Company. I have been employed with the Company since August 2006.

3. In my capacity as Executive Vice President of Operations and Engineering, I am generally familiar with, and am responsible for, most aspects of the Company's manufacturing operations and technical engineering work. Specifically, prior to the Company's lay-offs on August 31, 2011, the following department heads of the Company reported directly to me: (a) manufacturing, (b) supply chain, (c) information technology, (d) facilities and environmental health and safety, (e) field operations, (f) product design, (h) equipment technology and manufacturing, and (i) quality, reliability and certification. I had eight vice presidents of the Company reporting to me and over 900 employees working under my supervision. In connections with my oversight of the Company's manufacturing operations, I worked closely with the sales team to meet customer demand and as a result am generally familiar with the terms and conditions of our customer contacts. In the past, I reported directly to the Chief Executive Officer. I will now report to the Company's Chief Restructuring Officer.

4. In my capacity as Executive Vice President of Operations and Engineering, I have had significant input on the Company's financial projections and budgeting. Most significantly, my input has been required on issues such as employee head count, critical vendor payments, facilities charges, utility obligations, and environmental remediation. In this regard, I frequently coordinate with the Company's finance department.

5. During the course of these cases, I have retained sufficient employees to safely maintain, decommission, and store the Company's manufacturing equipment and to retain

a sufficient knowledge base for purposes of the Company's ongoing "turnkey" sale effort so that a buyer could potentially re-start manufacturing operations without significant delay.

6. Also in my capacity as Executive Vice President of Operations and Engineering, I have played a supervisory role in maintaining, assembling, and otherwise preparing the Company's non-core equipment assets for sale.

7. Based on the foregoing, I have extensive experience and familiarity with most aspects of the Company's operations. I am ready, willing, able and intend to testify on behalf of the Company at the creditors' meeting currently scheduled for October 18, 2011 without invoking my Fifth Amendment rights.

8. Solyndra, Inc. (now Holdings)[2] was formed in 2005. From 2005 through 2007, the Company focused on research and development efforts. In 2007, the Company leased its first fabrication facility ("Fab 1") and began to commercialize its technology. In July 2008, the Company began its first commercial shipments from Fab 1.

9. In 2006, the Company applied for a loan from the U.S. Federal Financing Bank which was guaranteed by the Department of Energy. The Company was the recipient of the first loan guarantee under Title XVII of the Energy Policy Act of 2005 which was enacted to promote the commercial deployment of clean and renewable energy technologies that were not already in general use in the United States. The sole purpose of the DOE Loan was to fund the construction of a new state of the art fabrication facility ("Fab 2").

---

[2] Solyndra, Inc. changed its name to 360 Degree Solar Holdings, Inc. on June 28, 2011.

10. The DOE Loan closed and construction of Fab 2 began in September 2009. The total cost of Fab 2 was projected to be $733 million, of which $535 million would be funded by the DOE Loan and the remaining $198 million funded by private investors. Fab 2 was completed ahead of schedule and within budget. At the time of the closing of the DOE Loan, a project entity was formed, Solyndra Fab 2, LLC (now Solyndra), and the DOE Loan was secured by substantially all assets of such entity. The collateral for the DOE Loan included the property, plant and equipment and license use at Fab 2.

11. On August 31, 2011, the Company suspended its manufacturing operations and terminated the vast majority of its workforce. Inasmuch as the Company's assets include complex equipment and intellectual property, the Company retained key employees to maintain its assets with the ability to re-start operations while restructuring options are explored, to assist with sales of assets and, as necessary, to wind-down the business following a sale or liquidation of assets.

12. I was present when, on September 8, 2011, with no prior notice, armed agents from the Federal Bureau of Investigation (the "FBI"), working in cooperation with the Office of the Inspector General of the DOE, raided the Company's facilities, shutting down operations for the day, seizing computers, documents and electronic files. I am informed and believe that the FBI also visited the homes of current and former Company officers and employees that day and seized documents. Due to the opportune presence of television cameras at this unannounced raid, the FBI Raid was captured

4

on camera and broadcast worldwide – within hours, photographs of FBI agents in bullet proof vests appeared in newspapers and on television.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of October 2011.

Benjamin Bierman

5

DOCS_SF:78478.5 80368-002