IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related Docket No. 220** |

**JOINT STIPULATION OF FACTS IN CONNECTION WITH
THE UNITED STATES TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
DIRECTING THE APPOINTMENT OF A CHAPTER 11
TRUSTEE UNDER 11 U.S.C. SECTION 1104 OR, IN THE ALTERNATIVE,
CONVERSION OF THE CASE TO CHAPTER 7 UNDER 11 U.S.C. SECTION 1112(B)**

Except as noted herein, the United States Trustee and the captioned debtors ("Debtors'"

and collectively, the "Parties") hereby stipulate to the facts set forth in the following paragraphs.

The Parties also stipulate to the authentication of each exhibit that is referenced in the stipulated

facts and attached hereto, but the stipulated facts do not thereby extend to the entire contents of

the referenced exhibits. These stipulations are limited and solely for the purpose of the Court's

determination with respect to the relief sought in the United States Trustee's motion seeking the

appointment of a trustee, and may arise from a decision not to challenge certain factual

statements set forth in declarations because a party may not have personal knowledge of the

stipulated facts or they appear to be irrelevant to the Court's determination. For that reason, the

Parties agree that these stipulations may not be used for any other purpose.

The Parties reserve the right to contest the relevance of any particular factual assertion or

exhibit. The United States Trustee stipulates to the factual assertions and the admissibility of the

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

exhibits solely in her official capacity as United States Trustee, as she does not represent the Government as a creditor or in any other capacity

Since not all facts have been stipulated to by the Parties, in addition to the stipulated facts set forth below, the Parties have agreed that the Declarations of Benjamin Bierman, Debra I. Grassgreen, Shig Hamamatsu, R. Todd Neilson and Benjamin Schwartz (filed at Docket No. 219), Eric Carlson (filed at Docket No. 220) ; Supplemental Declaration of Eric Carlson (filed at Docket 242); Supplemental Declaration of Shig Hamamatsu (filed at Docket 240); Supplemental Declaration of R. Todd Neilson (filed at Docket 245); and Declaration of Jeffrey Heck (filed at Docket No. 234) will be admitted as direct testimony. The parties anticipate that in addition to the declarations of Jeff Heck and Ben Schwartz, there will be live testimony of those two witnesses and all evidentiary objections to such live testimony are preserved.

**Stipulations of Fact:**

1.      On September 6, 2011, the Debtors (the "Company") commenced the captioned cases (the "Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and are managing their affairs as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 15, 2011, the United States Trustee appointed an Official Committee of Unsecured Creditors in the Cases. On September 30, 2011, the United States Trustee filed her motion seeking the appointment of a trustee (the "Motion").

2.      Solyndra, Inc. (now Holdings) was formed in 2005. From 2005 through

2007, the Company focused on research and development efforts. In 2007, the Company leased its first fabrication facility ("Fab 1") and began to commercialize its technology. In July 2008, the Company began its first commercial shipments from Fab 1.

3. In 2006, the Company applied for a loan from the U.S. Federal Financing Bank (the "DOE Loan") which was guaranteed by the DOE under Title XVII of the Energy Policy Act of 2005, which was enacted to promote the commercial deployment of clean and renewable energy technologies that were not already in general use in the United States.

4. The DOE Loan closed and construction of a new state of the art fabrication facility ("Fab 2") began in September 2009.

5. The total cost of Fab 2 was projected to be $733 million, of which $535 million would be funded by the DOE Loan and the remaining $198 million by private investors. Fab 2 was completed ahead of schedule and within budget.

6. At the time of the closing of the DOE Loan, a project entity was formed, Solyndra Fab 2, LLC (now Solyndra), and the DOE Loan was secured by substantially all assets of such entity.

7. In June 2010, in order to meet Holdings' additional working capital needs, Holdings raised an additional $175 million in convertible debt (the "Notes"). The Notes were secured by substantially all of the assets of Fab 1 and other personal property of Holdings, including intellectual property.

8. In late 2010, a dramatic decline in the cost of competing silicon-based photovoltaic products and a worldwide oversupply of photovoltaic panels severely impacted the

Company's capital requirements and the anticipated time to reach positive cash flow from operations. As a result, the Company found itself in need of additional capital.

9.      The Company approached both existing and new potential investors and the DOE. Ultimately, the Company's investors came forward with a proposal for a new $75 million loan.

10.     The lenders required, as a condition to providing the new capital, that the new financing had priority, in the event of liquidation, over the Company's existing debt, including the DOE Loan. However, almost $1 billion of original equity investment in the Company was, and remains, subordinated to the debt owed to the DOE.

11.     Specifically, in February 2011, the Company's investors and creditors agreed to a global out-of-court restructuring (the "February Restructuring") summarized as follows:

- The Company received a new $75 million loan from private investors ("the Tranche A Debt") with a liquidation priority over all other secured debt;

- The assets of Holdings (including the Fab 1 assets and the Company's intellectual property) were transferred to Solyndra (resulting in the consolidation of Fab 1 and Fab 2) to secure the new Tranche A Debt as well as the DOE Loan which was previously only secured by assets of Fab 2 and did not include liens on the Company's intellectual property;

- The DOE Loan was split into two tranches: Tranche B and Tranche D with Tranche B having a first priority security interest in all assets of the combined Company;

- The Notes were exchanged for Tranche E debt;

- All preferred stock was converted to common equity; and

- The DOE obtained the right to have an observer attend all board meetings of the Company and to receive all board materials.

12. As a result of the February Restructuring, all Fab 1 and Fab 2 assets, including the ownership of the intellectual property, were consolidated into Solyndra with that entity becoming obligated on the following four tranches of secured debt:

| | |
|---|---|
| Tranche A Secured Debt | $69 million drawn/$75 million committed |
| Tranche B Secured Debt (DOE) | $142 million drawn/$150 million committed |
| Tranche D Secured Debt (DOE) | $385 million |
| Tranche E Secured Debt | $187 million |
| **Total:** | $783 million |

13. The documents provided for further Tranche C funding of up to $75 million. As is set forth below, the Company was unable to raise such additional capital.

14. Notwithstanding the February Restructuring, a combination of general business conditions, a steep drop in the cost of competing crystalline silicon panels, and an oversupply of solar panels dramatically reduced solar panel pricing world-wide. The oversupply was due, in part, to the growing capacity of foreign manufacturers that utilized low cost capital provided by their governments to expand operations.

15. In response to a reduction in foreign government subsidies and aggressive competition, the Company was forced to reduce prices more quickly than originally anticipated. In addition, the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Germany, Italy and France, negatively impacted the availability of capital for prospective customers, further reducing demand for the Company's panels. Finally, the Company's ability to timely collect on its accounts receivable

was negatively impacted as foreign competitors offered extended payment terms, resulting in the Company's customers refusing to honor their previously agreed payment terms.

16.     Although the February Restructuring provided for a commitment of an incremental $75 million (the Tranche A debt), it left the Company with more than $783 million in senior secured debt and the need to raise further incremental capital to fund operations until the Company could generate positive cash flow from operations.

17.     Since the February Restructuring, the decline in solar panel pricing accelerated as Chinese companies flooded the market with inexpensive panels and Europe's deepening economic crisis reduced demands for solar panels.

18.     In early August, the Company and its creditors undertook negotiations regarding a further restructuring that would have enabled the Company to attract the necessary new investment.  Ultimately, the parties were unable to agree upon the terms of such incremental financing necessary to accomplish an overall restructuring.

19.     On August 31, 2011, the Company suspended its manufacturing operations and terminated the vast majority of its workforce.

20.     The Company retained key employees to maintain its assets with the ability to re-start operations while restructuring options are explored, to assist with sales of assets and, as necessary, to wind-down the business following a sale or liquidation of assets.

21.     The Company asserts that one or more representatives of the DOE attended every pre-petition meeting of the Company's board since February 2011.

22.     The Company asserts that through weekly financial reports, the DOE was provided detailed information about Company's finances, operations, and prospects.

23.     A DOE official testified before Congress that, prior to the commencement of these Cases, the DOE and its outside consultants exercised extensive diligence in connection with the Company. [See Exhibit 1]. The Company asserts that DOE did not raise any allegations of impropriety with respect to the application for the DOE Loan or the use of the proceeds from the DOE Loan.

24.     On September 6, 2011, the Company commenced the Cases and filed various motions, including a motion seeking authorization for post-petition financing of $4 million (the "DIP Financing") and consensual use of cash collateral subject to the satisfaction of certain conditions. [Docket No. 11].

25.     On September 7, 2011, the Court conducted the "First Day Hearings" in the Cases. The Court approved the post-petition financing on an interim basis. [Docket No. 40]. The Court approved the financing on a final basis on September 27, 2011. [Docket No. 161]. Appointment of a chapter 11 trustee is an event of default under the DIP Financing. *See* DIP Credit Agreement Section 7.1(1).

26.     On September 8, 2011, with no prior notice, armed agents from the Federal Bureau of Investigation (the "FBI"), working in cooperation with the Office of the Inspector General of the DOE, executed search warrants for the Company's facilities, seizing computers, documents and electronic files.

27.     On September 8, 2011, the United States Trustee sent a letter to the

Company's counsel regarding the initial debtor interview, requesting documents, and

referencing certain responsibilities of the Company.  [See Exhibit 2 ].

28.     On September 14, 2011, the Company filed its application to employ

Imperial Capital, LLC as financial advisor and investment banker for purposes of a turnkey sale.

[Docket No. 80].  The Court subsequently approved Imperial's engagement [Docket No. 164].

Imperial has commenced the marketing process for the Company's business assets by

contacting over 140 prospective buyers, preparing a "teaser" and confidential information

memorandum, and updating an online data room with due diligence information about the

Company.  Approximately twenty (20) parties have signed non-disclosure agreements and

received confidential information to date.

29.     On September 15, 2011, Jeffrey Heck, an analyst in the Office of the

United States Trustee, conducted an Initial Debtor Interview with a representative of the

Debtors to review the Company's duties as debtor in possession and to begin to gather

information about the Company's assets and liabilities. Vice President and Deputy General

Counsel, Benjamin Schwartz, appeared as the Company's representative.  He was accompanied

by counsel, Joshua Fried and Bruce Grohsgal.

30.     On September 16, 2011, the Company filed its motion seeking approval

of sale procedures and a "turnkey" sale.  [Docket No. 91].

31.     On September 20, 2011, the House Committee on Energy and Commerce

was informed that Mr. Harrison and Mr. Stover were, on the advice of their personal counsel,

invoking the privilege afforded to them by the Fifth Amendment of the United States Constitution and declining to answer any questions at a Congressional hearing scheduled for September 23, 2011. [See Exhibits 3 and 4].

32.     On September 22, 2011, the Assistant United States Trustee wrote a letter to the Company's Counsel noting their understanding that Messrs Harrison and Stover would not be testifying at a Congressional Hearing and stating that the corporate representative refused at the IDI to answer questions regarding the extent and nature of Solyndra's contracts with customers. The letter asked the Company to respond, ASAP with respect to who will testify at the Section 341 meeting of creditors and asked the Company to identify, if possible by the close of business that day, whether the debtors will testify at the 341 meeting about the extent and nature of Solyndra's contracts with customers. [See Exhibit 5].

33.     On September 22, 2011, the Company's counsel sent a letter to the United States Trustee stating that the Company will have witnesses present at the meeting of creditors who will testify about the extent and nature of Solyndra's customer contracts and such other matters as are appropriate pursuant to Bankruptcy Code Section 341(a). The letter also indicated that inasmuch as that meeting was not scheduled until October 18, 2011, the Company had not yet identified the specific individual or individuals who will be available to testify and stated that counsel will advise the United States Trustee once that determination was made. [See Exhibit 6].

34.     Messrs. Harrison and Stover appeared at the Congressional Committee hearing on September 23, 2011, and exercised the privilege afforded to them under the Fifth

Amendment of the U.S. Constitution and respectfully declined to answer any questions [See Exhibit 7].

35.     On September 23, 2011, a United States Trustee attorney sent an email to the Company's counsel requesting copies of the debtors' purchase contracts with GeckoLogic, Solar Power, Inc. and Phoenix Solar.  Copies of three contracts with those customers were delivered on the next business day.

36.     On September 24, 2011, the Company's counsel, the United States Trustee and the Assistant United States Trustee had a conference call regarding the debtors' cases and discussed the roles of Messrs. Harrison and Stover in the cases and whether they would testify at the Section 341 meeting of creditors.  At that time, no decision regarding their testimony had been made.

37.     On September 27, 2011, the Company's counsel, the Assistant United States Trustee, and a United States Trustee trial attorney had a meeting where they discussed whether Messrs. Harrison and Stover would testify at the meeting of creditors.  The Company's counsel advised that a decision had not yet been made, and that other officers would be able to testify depending on the topics.  She advised that Mr. Harrison would not remain with the Company long-term, but only as needed to assist with the sale process.  She also described certain responsibilities of Mr. Bierman and of Mr. Hamamatsu, the Company's Vice President of Finance.

38. On September 27, the Company filed its motion for authority to conduct an auction of certain non-core assets. [Docket 150], and is retaining an auctioneer for that purpose.

39. On September 28, 2011, this Court approved the procedures for the sale of the Company's core assets on a turnkey basis, including a proposed bid deadline of October 25, 2011 and an auction on October 28, 2011 [Docket No. 167].

40. On September 29, 2011, the Company's counsel, the United States Trustee and the Assistant United States Trustee had a conference call to discuss the status of Harrison's and Stover's ability to testify in the case. Ms. Grassgreen advised that no determination had yet been made as to their testimony. Ms. Grassgreen described the roles of Benjamin Bierman and Shig Hamamatsu in the companies as follow: Mr. Bierman (a) is the Executive-Vice President of Operations and Engineering for the debtors, (b) was then the second highest ranking officer of the debtors, (c) had been with the debtors for almost five years, and (d) was the person most knowledgeable about the debtors' fabrication facilities and operations. She also advised the United States Trustee that Mr. Hamamatsu is the Vice President of Finance for the debtors, is well-versed in the debtors' financial affairs, and is responsible for coordinating the preparation of the debtors' schedules of assets and liabilities and statement of financial affairs. She acknowledged that Mr. Hamamatsu reports to Mr. Stover. She advised the United States Trustee that Messrs. Bierman and Hamamatsu were available to testify.

41.     The United States Trustee and the Assistant United States Trustee assert that it was not clear to them during the September 29, 2011 conversation that the Company was designating Messrs. Bierman and Hamamatsu as the corporate representatives who would in fact testify at the meeting of creditors.

42.     On September 30, 2011, the United States Trustee filed her motion seeking the appointment of a chapter 11 trustee or, in the alternative, conversion.

43.     On September 30, 2011, the Company also filed its motion for entry of an order extending the time for the Company to file schedules and statements.  [See Exhibit 8.]

44.     On October 3, 2011, the Company's counsel emailed a letter to the United States Trustee stating her position that she had advised the United States Trustee in the September 29 conversation of the specific identities of the individuals who would testify at the Section 341 meeting of creditors.  [Exhibit 9].

45.     On October 6, 2011, Ms. Grassgreen emailed a follow-up letter to the United States Trustee that again addressed the identities of persons who would testify.   She also advised that the Company intended to file a motion for the retention of Todd Neilson as CRO and she stated the willingness of the Company to respond to written questions regarding customer contracts about which the Company had been questioned at the IDI. [See Exhibit 10].

46.     On October 7, 2011, the United States Trustee notified the Company's counsel that the United States Trustee was filing a supplement to the motion for the appointment of a trustee.  The United States Trustee advised that while she appreciated the offer to respond to written questions about the contracts, the questions would most appropriately be

made orally where the responses could be fully explored. [See Exhibit 11]. On the same date, the United States Trustee filed the supplement to her motion for the appointment of a trustee giving notice that: (a) the United States Trustee was withdrawing without prejudice her request for conversion as an alternative form of relief; and (b) advising that the Company had identified Messrs. Bierman and Hamamatsu as persons who will testify at the meeting of creditors.

47.     On October 11, 2011, the Company filed its motion seeking authorization to retain Mr. Neilson as CRO. The motion represented that Mr. Harrison resigned as CEO on October 7, 2011. The CRO's retention was approved by the boards of the Company, and the CRO will report to them. All officers report to the CRO. Mr. Neilson's qualifications and his responsibilities are set forth in the motion together with its attachments. [Docket No. 210].

48.     Exhibit 12 accurately reflects the requests for information presented by the Office of the United States Trustee and the Company's responses thereto.

The Parties stipulate to the authenticity of the attached documents, but reserve the right to object

to the documents or their content for any other reason, including lack of relevancy:

## Exhibits

1. September 14, 2011 Testimony of Jonathan Silver before Hearing of the Subcommittee on Oversight and Investigation, U.S. House Committee on Energy and Commerce
2. September 8, 2011 Letter from Jeffrey Heck to Bruce Groshgal
3. Letter dated September 20, 2011, from Walter F. Brown, Jr., as counsel for Mr. Harrison, to the Chairman and Ranking Minority Member of the Subcommittee on Oversight and Investigation, U.S. House Committee on Energy and Commerce.
4. Letter dated September 20, 2011, from Jan Nielsen Little, as counsel for Mr. Stover, to the Chairman and Ranking Minority Member of the Subcommittee on Oversight and Investigation, U.S. House Committee on Energy and Commerce.
5. September 22, 2011 Letter from T. Patrick Tinker to Debra Grassgreen
6. September 22, 2011 Letter from Debra Grassgreen to T. Patrick Tinker
7. Transcript of the September 23, 2011, Hearing of the Subcommittee on Oversight and Investigation, U.S. House Committee on Energy and Commerce, as prepared by CQ Congressional Transcripts.
8. Debtors' Motion for Entry of Order Granting Extension of Time to File Schedules and Statement of Financial Affairs, filed September 30, 2011.
9. Letter from Debra Grassgreen to Roberta DeAngelis dated October 3, 2011
10. Letter from Debra Grassgreen to Roberta De Angelis dated October 6, 2011
11. Letter from Roberta DeAngelis to Debra Grassgreen dated October 7, 2011
12. Chart of United States Trustee Information Requests and Debtor's Responses

Dated: October 17, 2011

Office of the United States Trustee
LISA D. TINGUE

Counsel for Debtors and Debtors in Possession
Bruce Grohsgal