IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**Deadline for Submitting Bids: November 16, 2011 at 4:00 p.m. PT**
**Auction Date: November 18, 2011 at 10:00 a.m. PT**
**Deadline for Objections to Sale Motion: November 21, 2011 at 12:00 p.m. ET**
**Hearing Date on Sale Motion: November 22, 2011 at 4:00 p.m. ET**

## MOTION OF SOLYNDRA LLC FOR AN ORDER: (I) APPROVING SALE OF BUSINESS ASSETS ON TURNKEY BASIS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Solyndra LLC ("Solyndra"), one of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), hereby moves this Court (this "Sale Motion") for entry

of an Order (a) approving the sale of Solyndra's business assets (or any portion thereof) on

turnkey basis free and clear of all liens, claims, encumbrances and other interests pursuant to

section 363 of title 11 of the United States Code (the "Bankruptcy Code"); (b) assuming and

assigning certain executory contracts and unexpired leases pursuant to section 365 of the

Bankruptcy Code; and (c) granting related relief.

In support of this Sale Motion, Solyndra respectfully states as follows:

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

# Introduction

1.    Solyndra seeks offers for the sale of substantially all of Solyndra's assets utilized in the ordinary course operation of its business (or any portion thereof), including Solyndra's manufacturing plant and land, all associated fixtures and equipment, intellectual property, rights under executory contracts and leases, and any other business assets necessary for a "turnkey" sale of Solyndra's enterprise (together, the "Assets").[2]  Solyndra holds all of the Assets necessary to operate the company's business.  Solyndra proposes to sell the Assets to the highest and best bidder at auction.  The sale will be on an "as is," "where is," and "with all faults" basis.  The proposed form of Purchase and Sale Agreement (the "Agreement") for the Assets will be submitted at a later date.  Solyndra does not presently have a "stalking horse" buyer for the Assets.

# Jurisdiction

2.    The Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

3.    Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The statutory predicates for the relief sought herein are sections 363 and 365 of title 11 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure

---

[2] The Assets exclude certain non-core assets and de minimis assets that Solyndra intends to liquidate through the engagement of an auctioneer, which matters were the subject of separate motions.  The Assets also exclude certain of Solyndra's inventory, which Solyndra is continuing to sell in the ordinary course of business at a discount from historical pricing.

2

of the United States Bankruptcy Court for the District of Delaware.

## Background

5. On September 6, 2011 (the "Petition Date"), the Debtors commenced the above-captioned cases (the "Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and to manage their affairs as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases. On September 15, 2011, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Cases.

6. On September 28, 2011, Court entered the *Order (A) Approving Procedures For Sale of Business Assets on Turnkey Basis; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice; and (D) Granting Related Relief* [Docket No. 167] (the "Bid Procedures Order").

7. Founded in 2005, Solyndra is a U.S. manufacturer of solar photovoltaic ("PV") solar power systems specifically designed for large commercial and industrial rooftops and for certain shaded agriculture applications. Solyndra's worldwide headquarters and its manufacturing operations are located in Fremont California. Prior to the Petition Date, Solyndra maintained sales presences in Germany, Switzerland, France, Italy, the United Kingdom, Australia, Belgium, the Czech Republic and the UAE. Solyndra's innovative cylindrical solar PV panels are highly differentiated and unique in the PV industry. Unlike conventional flat solar panels, Solyndra's panels are a series of cylindrical modules connected to form a panel. As a

3

result of the form factor, Solyndra panels require no ballast, tilting, or roof penetration and weigh approximately one-half of other solar panels per rooftop unit of area. In addition, Solyndra's current high-volume solar PV panels require no tools for installation and can be installed more quickly than conventional solar panels, resulting in an installation cost substantially below that of conventional solar panels. Solyndra manufactured all of its products in the United States with the support of a well-developed domestic supply chain. Prior to the lay-off of substantially all of the Solyndra workforce that occurred on August 31, 2011, Solyndra had approximately 968 full time employees and 211 temporary employees. Solyndra has sold more than 500,000 of its panels since 2008 and generated cumulative sales of over $250 million. Today, Solyndra panels are estimated to be installed on more than 1,000 commercial and industrial roofs in 20 countries.

## Business Operations

8.  Solyndra sells three primary types of solar panels: (i) 100 Series; (ii) 150 Series for higher power density; and (iii) 200 Series. In addition, Solyndra developed new mounting solutions that allow some of the Solyndra panels to be used in new situations: these solutions include (a) Elevated Shade Structure (aka "Greenhouse") mounts, announced in February 2011; (b) mounts for metal roofs, announced in June 2011; and (c) an "Extreme Wind Solution", allowing for deployment of panels in areas with winds up to 180 miles per hour, announced in August 2011. The 100 Series is Solyndra's original PV system composed of panels and mounting hardware for low-slope, commercial rooftops. The 200 Series is Solyndra's second generation PV system, which has an enhanced form factor over the 100 Series thereby increasing its Watt peak performance and requires no tools for installation. The 150 Series is a hybrid product, using the advanced PV modules of the 200 Series, but the existing mounting

4

solution of the 100 Series.

9.      From its inception in 2005 through 2007, Solyndra focused on its research and development efforts to refine its proprietary thin-film technology used to apply the copper, indium, gallium and selenium ("CIGS") PV material on its cylindrical glass tubes. In 2007, Solyndra leased its first fabrication facility ("Fab 1") and began to focus its efforts on commercializing its technology and designing and deploying the custom equipment needed to produce its innovative PV panels on a large scale. In July 2008, Solyndra began its first commercial shipments of PV panels.

10.     In December 2006, Solyndra submitted a pre-application for a loan to be guaranteed by the U.S. Department of Energy ("DOE") pursuant to Title XVII of the Energy Policy Act of 2005. In October 2007, the DOE invited Solyndra and 15 other applicants to submit full applications for loan guarantees. In March 2009, Solyndra received a conditional commitment from the DOE for a $535 million loan guarantee (the "DOE Loan Guarantee") to fund the construction of a second fabrication facility ("Fab 2"). The DOE Loan Guarantee closed and construction on the Fab 2 facility began in September 2009. Commercial production in Fab 2 began in January 2011.

11.     Solyndra's commercial shipments and production have grown year over year for every year since it started commercial shipments in 2008. Solyndra had annual revenues of approximately $142 million for the year ended January 1, 2011. For the fiscal year then ended, the Company incurred a net loss of approximately $329 million. As of the year ended January 1, 2011, Solyndra had assets with a book value of approximately $859 million and liabilities with a book value of approximately $749 million.

5

## Circumstances Leading to the Commencement of the Cases

12.     Prior to the Petition Date, the combination of general business conditions and an oversupply of solar panels dramatically reduced solar panel pricing world-wide. The oversupply was due, in part, to the growing capacity of foreign manufacturers that utilized low cost capital provided by their governments to expand their operations. In response, Solyndra was forced to reduce its average selling prices to remain competitive. In addition, the reduction or elimination of governmental subsidies and incentives for the purchase of solar energy, particularly in Europe, negatively impacted the availability of capital for PV system owners, further reducing demand for Solyndra's panels. Finally, Solyndra's ability to timely collect on its accounts receivables was negatively impacted as foreign competitors offered extended payment terms, resulting in Solyndra's customers refusing to honor their previously agreed payment terms.

13.     In February 2011, as the aforementioned competitive pressures were emerging, Solyndra entered into a restructuring of its debts. Although such restructuring provided for an infusion of $75 million, it left Solyndra with more than $783 million in senior secured debt and the need to raise further incremental capital to fund operations until Solyndra could generate positive cash flow from operations.

14.     Prior to the Petition Date, Solyndra reached out to multiple strategic and financial investors in an attempt to attract the necessary incremental capital. However, Solyndra was unable to find any parties that would be willing to fund its increased capital requirements in light the size and structure of Solyndra's debt.

DOCS_SF:78209.3 80368-002

15.    Solyndra then approached certain existing holders of Tranche A Debt to explore alternative financing arrangements.  In June and July of 2011, Solyndra and certain holders of the Tranche A Debt entered into an arrangement whereby Solyndra would sell up to $75 million of its existing and future accounts receivables and inventory at a negotiated discount in order to provide interim working capital for Solyndra through an accounts receivable purchase and sale facility (the "A/R Sale Agreement") and an inventory purchase and sale facility (the "Inventory Sale Agreement").

16.    In early August, Solyndra, certain holders of Tranche A Debt, and representatives of the DOE undertook negotiations regarding a further restructuring that would allow Solyndra to attract necessary new investment.  The negotiations over the terms of the further restructuring continued throughout August 2011.  During this time, the purchasers to the Inventory Sale Agreement continued to purchase Solyndra inventory to provide critically needed liquidity.  In the final weeks prior to the Petition Date, the DOE and certain existing investors engaged in negotiations for bridge financing to allow Solyndra additional time to find a new source of capital (the "Bridge Financing").  Solyndra believed that with sufficient time and an agreement to restructure its obligations by the existing lenders, there was a reasonable prospect of obtaining the necessary incremental financing.

17.    With the Bridge Financing discussions proceeding, the parties to the Inventory Sale Agreement purchased approximately $3 million in inventory from Solyndra on Monday, August 29, 2011.  However, on August 30, 2011, Solyndra was informed that the contemplated Bridge Financing would not occur.  Without the Bridge Financing, Solyndra was unable to continue operations.  As a result, on August 31, 2011, Solyndra suspended its

7

manufacturing operations and terminated the vast majority of its workforce. Solyndra retained key employees to operate the business while restructuring options are explored.

18.     Following the suspension of operations and with the Court's approval on an interim basis, Solyndra and certain existing Tranche A investors entered into a debtor in possession financing arrangement for $4 million (the "DIP Financing") and consensual use of cash collateral subject to the satisfaction of certain conditions. The DIP Financing and use of cash collateral was critical to providing Solyndra an opportunity to explore restructuring alternatives, including the possibility of a "turnkey" sale of Solyndra's business..

19.     Shortly after the Petition Date and subject to the approval of the Court, the Debtors engaged Imperial Capital, LLC ("Imperial") as their financial advisors and investment bankers for purposes of the sale. Imperial is currently in the midst of the marketing process for Solyndra's business assets. Imperial has contacting over 100 prospective buyers, prepared a "teaser" and information memorandum, updated an online dataroom with due diligence information about the Debtors, effectuated the execution of over 20 non-disclosure agreements with prospective buyers, and continues to coordinate and facilitate the Debtors' marketing efforts with prospective buyers.

## The Proposed Agreement

20.      As noted above, Solyndra is currently proceeding towards a sale without a

stalking horse bidder.  The form of Agreement for the sale has not yet been finalized and will be

submitted at a later date.

21.      The principal terms of the Agreement that would be acceptable to

Solyndra are summarized as follows (actual terms with a prospective buyer may differ):[3]

**Purchase Price.**  The Agreement will contemplate cash or other
consideration in an amount to be determined.

**Assets to be Sold.**  As set forth above, the Assets consist of all of
Solyndra's assets utilized in the ordinary course operation of its business (or any
portion thereof), including Solyndra's manufacturing plant and land, all
associated fixtures and equipment, intellectual property, rights under executory
contracts and leases, and any other business assets necessary for a sale of
Solyndra's enterprise.

**Excluded Assets.**  The Assets generally exclude (a) Solyndra's rights
under the Agreement, (b) all of Solyndra's cash, cash equivalents and prepaid
items, (c) all tax refunds, rebates, credits and similar items to which Solyndra may
be entitled, (d) certain non-core assets and inventory, (e) the equity interests in
Solyndra, (f) all tax records, minute books, stock transfer books and corporate
seal of Solyndra; (g) all preference or avoidance claims and actions of Solyndra,
including, without limitation, any such claims and actions arising under Sections
544, 547, 548, 549, and 550 of the Bankruptcy Code; and (h) those additional
excluded assets that may be specifically identified in the Agreement.

**Assumed Liabilities.**  Liabilities to be assumed by the buyer generally
include liabilities associated with ownership or operation of the Assets.

**Excluded Liabilities.**  All liabilities of Seller that are not included in
Assumed Liabilities, such as liabilities associated with outstanding loan
obligations or prepetition accounts payable of Solyndra.

**Assumed Executory Contracts**.  Solyndra shall assign to the buyer
written contracts, contractual rights, interests and other written agreements and
instruments covering or affecting any or all of the Assets and necessary for the
operation of Solyndra's business.

**Representations and Warranties.**  Solyndra would represent and warrant
that the Agreement has been duly authorized, executed and delivered and is
binding and enforceable against Solyndra, subject to orders of this Court.  The
buyer would acquire the Assets on an "AS IS, WHERE IS, WITH ALL

---

[3]   The description of the Agreement herein is merely a summary of certain provisions.  In the event of any
inconsistency between this Sale Motion and the actual Agreement, the terms of the Agreement shall control.

9

FAULTS" basis and waive rights of indemnification, contribution or recourse it may have against or from Solyndra or any of its associated parties.

**Release.** The Agreement will contain a general release by the buyer in favor of Solyndra that includes any unknown matters.

**Access to Records**. The Agreement provides that the buyer must afford Solyndra access to original or last-remaining copies of data or records provided to Buyer, at reasonable times and upon reasonable notice during regular business hours for three years following the closing of the sale.

**Closing**. The sale of the Assets is contemplated to occur on or before January 16, 2012, or on such other date as the parties may agree.

## Assumption and Assignment of Assumed Executory Contracts

22.     In accordance with the Agreement, and subject to, and at the time of, the Closing, Solyndra seeks to assume and assign to the Successful Bidder certain executory contracts and unexpired leases to be designated by the Successful Bidder (*i.e.*, the "Assumed Executory Contracts").

23.     Solyndra intends to serve this Sale Motion and the cure notice substantially in the form authorized under the Bid Procedures Order (the "Cure Notice") upon each counterparty to the Assumed Executory Contracts (each a "Counterparty"). Pursuant to the Bid Procedures Order, the Cure Notice shall state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served. The Cure Notice also shall identify the amounts, if any, that Solyndra believes are owed to each Counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").

## Use of Proceeds

24.     The proceeds from sale of the Assets shall be distributed, first, to satisfy the Debtors' outstanding debtor-in-possession financing obligations, if any, and thereafter, shall

be held by Solyndra pending further order of the Court and will be subject to any valid liens, claims or interests with respect to such proceeds.

## Relief Requested

25.     By this Sale Motion, Solyndra requests that this Court, among other things, (a) authorize the sale of the Assets to the Successful Bidder (or Back-Up Bidder) pursuant to the terms of the Agreement, as revised or amended in accordance with the Bid Procedures Order, free and clear of all liens, claims, encumbrances or other interests (except for Assumed Liabilities under the express terms of the Agreement) pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; and (b) approve the assumption and assignment of the Assumed Executory Contracts under section 365 of the Bankruptcy Code, subject to, and at the time of, the Closing under the Agreement.  Pursuant to Del. Bankr. L.R. 6004-1(b)(ii), Solyndra's proposed order granting the relief requested herein (the "Sale Order") accompanies this Sale Motion.

## Basis for Relief

26.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

DOCS_SF:78209.3 80368-002

27.     A sale of the debtor's assets should be authorized pursuant to section 363

of the Bankruptcy Code if a sound business justification exists for doing so.  *See, e.g., Meyers v.*

*Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In*

*re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*,

788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.

1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R.

396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the assets; and whether the asset is decreasing or
> increasing in value.

124 B.R. at 176.

28.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Successful

Bidder is proceeding in good faith." *Id.*

12

29.     Solyndra has proposed the sale of the Assets after thorough consideration of all viable alternatives, having concluded that the sale is supported by a number of sound business reasons.

30.     Solyndra believes that a sale has the potential to maximize value for all constituents.  The alternative to a sale is a liquidation of Solyndra's assets, which result is likely to yield less value to creditors than the proposed sale.  In either scenario, Solyndra expects that there will be insufficient proceeds generated to satisfy existing secured claims.  However, an orderly sale could result in a variety of assumed contractual obligations and diminish potential deficiency claims against Solyndra's estate.  Hence, Solyndra has determined that the proposed sale would provide the best and most efficient means for reorganizing Solyndra's affairs at this time.

31.     By the time that the proposed sale is presented for approval by the Court, Solyndra, with the assistance of Imperial, will have extensively marketed the Assets and, to the extent multiple bids are received, will have conducted an auction, all consistent with procedures that Solyndra has requested that the Court approve pursuant to the Bid Procedures Motion.  As a result of such marketing efforts and the proposed bid procedures, Solyndra believes that the Successful Bidder's (or Back-Up Bidder's) offer will be fully tested by the market and will constitute fair and reasonable consideration for the Assets.

32.     Based on the foregoing, the sale of the Assets is justified by sound business reasons and is in the best interests of Solyndra and its estate.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, Solyndra requests approval of the sale to any Successful Bidder (or Back-Up Bidder) as set forth herein.

**The Asset Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free And Clear of Liens, Claims, and Interests**

33.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if —

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Assets;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

34.     As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000).

35.     In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id*. at 258 (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).

DOCS_SF:78209.3 80368-002

36.     As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

37.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all liens, claims, rights, interests or encumbrances as provided in the Agreement (collectively, the "Interests"), except with respect to any Interests that are Assumed Liabilities under the Agreement. *See Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

38.     Solyndra submits that each Interest that is not an Assumed Liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of Closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses Solyndra may possess with respect thereto. Solyndra proposes to sell or transfer the Assets in a commercially reasonable manner that will maximize value, and expects that the value of the proceeds from such sale to fairly reflect the value of the Assets. Solyndra accordingly requests authority to convey the Assets to any Successful Bidder (or Back-Up Bidder), free and clear of all Interests (except for the Interests that are Assumed Liabilities under the express terms of the Agreement), with such Interests to attach to the proceeds of the sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the sale.

15

39.     Solyndra anticipates that certain of its secured lenders will affirmatively consent to the sale of their collateral (which will satisfy 11 U.S.C. § 365(f)(2)).  Solyndra has conducted lien searches in applicable jurisdictions and will serve any purported lienholders and other interest owners notice of this Sale Motion, and will serve such parties with notice of any Sale Order entered by this Court.  Solyndra submits that any failure of a secured creditor to object to this Sale Motion should be deemed "consent" to a sale of the Assets within the meaning of section 362(f)(2) of the Bankruptcy Code.

40.     Accordingly, this Court should approve the sale of the Assets to the Successful Bidder (or Back-Up Bidder), free and clear of Interests (except for the Interests that are Assumed Liabilities under the express terms of the Agreement) under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code

41.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

42.     While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), has stated:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.

16

> Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

43.      Here, Solyndra intends to make an appropriate showing at the Sale Hearing that the Agreement with any Successful Bidder (or Back-Up Bidder) is the result of a negotiated, arm's-length transaction, in which such bidder at all times acted in good faith under the standard set forth in *Abbotts Dairies*. Solyndra will request that the Court find that the Successful Bidder (or Back-Up Bidder) will be purchasing the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of the Assumed Executory Contracts

44.      As required by the Agreement, and in order to enhance the value to Solyndra's estate, Solyndra requests approval of the assumption and assignment of the Assumed Executory Contracts to the Successful Bidder (or Back-Up Bidder), subject to, and at the time of, the Closing of the transactions contemplated under the Agreement.

45.      The Assumed Executory Contracts are those contracts or leases that are to be assumed by Solyndra and assigned to any Successful Bidder (or Back-Up Bidder) as part of the sale transaction under the Agreement. Solyndra requests that the Sale Order provide that the Assumed Executory Contracts will be assigned to, and remain in full force and effect for the benefit of, the Successful Bidder (or Back-Up Bidder), notwithstanding any provisions in the Assumed Executory Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

46.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of
the debtor only if –

(A)     the trustee assumes such contract or lease in accordance
with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee
of such contract or lease is provided, whether or not there has been
a default in such contract or lease.

11 U.S.C. § 365(f)(2).

47.     Under section 365(a) of the Bankruptcy Code, a debtor "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  Section 365(b)(1), in turn, codifies the requirements for assuming an

unexpired lease or executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee may not assume such
contract or lease unless, at the time of assumption of such contract
or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will
promptly cure, such default . . . ;

(B) compensates, or provides adequate assurance that the trustee
will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

(C) provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

48.     Although section 365 of the Bankruptcy Code does not set forth standards

for courts to apply in determining whether to approve a debtor in possession's decision to

assume an executory contract, it is well established that the decision to assume or reject an

18

executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40.

49. The assumption and assignment of the Assumed Executory Contracts will be a necessary part of the Agreement and, as stated above, will benefit Solyndra's estate.

50. Solyndra will send the Cure Notices to all Counterparties in accordance with the Bid Procedures Order, notifying such Counterparties of the potential assumption by Solyndra and assignment to the Successful Bidder (or Back-Up Bidder) of the Assumed Executory Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts, if any, owing on each of the Assumed Executory Contracts, according to Solyndra's books and records.

51. Counterparties to the Assumed Executory Contracts will have a sufficient opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease counterparty. The payment of the cure amounts specified in the Cure Notices (or a different amount either agreed to by Solyndra or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless Solyndra determines that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder or,

19

alternatively, the Successful Bidder subsequently elects not to have any Assumed Executory

Contract assumed or assigned to it prior to the Closing.

52. The Successful Bidder will be responsible for providing evidence of

"adequate assurance of future performance" to the extent required in connection with the

assumption and assignment of any Assumed Executory Contract. The meaning of "adequate

assurance of future performance" for the purpose of the assumption of executory contracts and

unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and

circumstances of each case, but should be given "practical, pragmatic construction." *See*

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean an absolute assurance that debtor will thrive and

pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If

necessary, the Successful Bidder will provide evidence of its ability to provide adequate

assurance to Counterparties to the Assumed Executory Contracts at the Sale Hearing.

## Notice

53. Solyndra has served, or will serve, this Sale Motion and the Notice of Sale

Motion, by hand delivery or U.S. mail, on: (i) the Office of the United States Trustee; (ii) the

United States Securities and Exchange Commission; (iii) the Office of the United States

Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the

Official Committee of Unsecured Creditors; (vi) counsel to the Prepetition Tranche A Term

Loan Facility Representative; (vii) counsel to the Prepetition Tranche B/D Agent, (viii) counsel

to the Prepetition Tranche E Agent, (ix) all other known parties asserting a lien against the

20

Debtors' assets, (x) the DIP Lender, (xi) the Master Collateral Agent; (xii) the counterparties to the Assumed Executory Contracts (defined below); and (xiii) all parties that have filed notices of appearance and requests for notices in the Debtors' chapter 11 cases.[15]

54. Solyndra has served, or will serve, the Notice of Auction and Sale Hearing, as proposed in the Bid Procedures Motion, on the Debtors' known creditors.

55. Solyndra submits that the notice of this Sale Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

56. Solyndra requests, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

**Conclusion**

57. Solyndra's proposed sale of the Assets as described in this Sale Motion, including the assumption and assignment of the Assumed Executory Contracts, is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of Solyndra, its estate, its creditors and all parties in interest. Solyndra thus requests that the Court approve the proposed sale of the Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities (but excluding Assumed Liabilities under the express terms of the Agreement), as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Successful Bidder or Back-Up Bidder.

---

[15] To maintain confidentiality, Imperial will send a copy of this Sale Motion to potential bidders.

## No Prior Request

58.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, Solyndra respectfully requests that this Court (i) grant this Sale Motion and authorize the sale of the Assets to the Successful Bidder (or Back-Up Bidder) on substantially the terms of the proposed Agreement in accordance with the Sale Procedures Order; (ii) approve the assumption and assignment of the Assumed Executory Contracts in accordance with the Agreement and the Sale Procedures Order entered by the Court; and (iii) grant such other and further relief as is just and proper.

Dated: November 1, 2011                    PACHULSKI STANG ZIEHL & JONES LLP

/s/ Bruce Grohsgal
Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:       rpachulski@pszjlaw.com
                    dgrassgreen@pszjlaw.com
bgrohsgal@pszjlaw.com
                    mlitvak@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

DOCS_SF:78209.3 80368-002