# EXHIBIT C

# PIPELINE PRODUCT SUPPLY AGREEMENT

**AIR PRODUCTS**

This AGREEMENT, made as of the 25th day of November, 2009 ("Effective Date"), between AIR PRODUCTS MANUFACTURING CORPORATION ("Seller") and SOLYNDRA INCORPORATED ("Solyndra") and, Solyndra's wholly-owned subsidiary, SOLYNDRA FAB 2 LLC ("Solyndra Fab 2")(collectively "Buyer"). For sake of clarity, the obligations of Solyndra and Solyndra Fab 2 shall be each entity's own obligation, but to the extent that Solyndra Fab 2 does not meet its obligations hereunder, its parent company, Solyndra shall guarantee the performance of all such obligations.

## RECITAL

WHEREAS, Solyndra has requirements for Gaseous Nitrogen ("Product") at its plant located on 47700 Kato Road, Fremont, CA 94538, including any expansions or modifications thereto (hereinafter called "Buyer's Plant"), and is desirous of obtaining such requirements for Product from Seller; and

WHEREAS, Solyndra Fab 2 will have requirements for Gaseous Nitrogen ("Product") at a new plant to be located on 47488 Kato Road, Fremont, CA 94538, including any expansions or modifications thereto (hereinafter called "Buyer's New Plant"), and is desirous of obtaining such requirements for Product from Seller;

WHEREAS, in order for Seller to furnish such Product requirements to Buyer, it will be necessary for Seller to fabricate, install and/or operate production facilities, equipment, meters, pipelines and related equipment (the "Facilities") for the production and delivery of Product to Buyer; and

WHEREAS, Seller is willing to supply Product to Buyer's Plant and Buyer's New Plant;

WHEREAS, Seller and Buyer are parties to a certain Pipeline Product Supply Agreement dated 27 February 2006 (the "2006 Supply Agreement") for supply of Product to Buyer's facility located on 3260 Scott Boulevard, Santa Clara, CA 95054 and desire to terminate the 2006 Supply Agreement upon the execution of this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, it is mutually agreed as follows:

1. **SALE AND PURCHASE**

   Seller shall sell to Buyer and Buyer shall purchase from Seller Buyer's requirements of Product for use at Buyer's Plant and Buyer's New Plant pursuant to the terms and conditions set forth herein.

2. **TERM**

   This Agreement shall be effective as of the date first set forth above ("Effective Date"). The initial term of this Agreement shall be seven years (the "Initial Term") from the "Commencement Date", as defined in this paragraph, and the Supply Period shall be such Initial Term and any additional one-year periods pursuant to Section 16(b). The 2006 Supply Agreement shall terminate upon execution of this Agreement by both parties, provided that Buyer shall remain obligated to pay all charges accrued under the 2006 Supply Agreement until its termination hereunder. After the Effective Date Seller will begin construction of the second pipeline spur to Buyer's New Plant per Section 6 (e) of this Agreement. The Commencement Date of this Agreement shall be the first day of the month following the earlier of: (i) the date the Facilities for Buyer's New Plant are installed and ready for operation and Buyer requests the commencement of the supply of Product to its New Plant, and such supply commences, or (ii) the date the Facilities for Buyer's New Plant are installed, but not sooner than May 1, 2010. Seller will provide Buyer with written notice of when

©2001 - Air Products and Chemicals, Inc.
All Rights Reserved

the Equipment for Buyer's New Plant is ready for operation, and Seller will provide written notice of the Commencement Date.

3. **FACILITIES**

    (a) Seller will design or will cause to have designed, procured, and constructed all equipment and materials required for the commercial operation of the Facilities. Title to such Facilities shall at all times remain with Seller and Seller shall have the right to remove any such Facilities which are located at Buyer's Plant following the expiration or termination of this Agreement. Buyer shall not suffer or permit the Facilities to become subject to any lien or encumbrance for any debt or liability of any kind, which may be owed by or demanded of Buyer.

    (b) Seller will own, operate, maintain, and repair the Facilities necessary to produce and deliver the Product in accordance with good industrial practice at its expense, except for damage to the Facilities caused by Buyer, which damage shall be paid for by Buyer. If Seller is required to do any of the following: (i) modify the Facilities or their operations, (ii) install additional equipment, perform tests or studies or take any other additional action with respect to the Facilities or the manufacture of Product thereby, to comply with any law, regulation, order, decree or other requirements of any governmental authority, Seller will make such modifications, tests or other action following consultation with Buyer concerning the anticipated costs and expenses thereof. Buyer's pro rata share (based on the percentage of the total output of the Facilities actually taken by Buyer) of the total costs and expenses of such modifications, tests or other action, including both fixed and variable costs, additional operating costs, applicable overheads, general and administrative expenses, financing charges and a reasonable fee, all determined in accordance with Seller's normal accounting practices, shall be promptly reimbursed to Seller by Buyer as such costs and expenses are incurred. Seller shall provide Buyer with copies of all supporting documentation reasonably requested to verify (i) the necessity of the modification or additional equipment and (ii) the charges made to Buyer hereunder. For purposed of clarification, it is not the intent of the parties that this sub-section (b) would apply in the case of the Facilities being damaged or destroyed, whether such was due to Seller or a Force Majeure event as defined below.

    (c) Buyer shall provide to Seller at no cost a right-of-way on Buyer's New Plant and Buyer's Plant Site for Seller to construct, operate, maintain, repair, remove and replace the pipeline, meter and related appurtenances, which are part of the Facilities ("Right of Way"), along with the right to ingress and egress to and from such right-of-way, solely for the purposes of performing its obligations hereunder. These Rights of Way shall be in location shown in Exhibit B. The parties agree to cooperate to obtain and record any necessary documents under applicable state law to evidence the grant of such right to Seller.

    (d) Buyer shall furnish a clear and level site for the installation of the meters by Seller to measure the flow of Product to Buyer. Buyer shall also furnish all utilities required at the meter site, including without limitation electricity, instrument air, nitrogen, and telephone service.

    (e) Buyer shall install, operate and maintain all equipment and piping necessary to transport the Product from the Delivery Point to the point of use at Buyer's Plant and shall be responsible for the final tie-in to Seller's pipeline to connect such pipelines and equipment. In addition, Buyer shall install, operate and maintain equipment to prevent the backflow of any material from Buyer's Plant into Seller's pipeline, meters and related equipment. In addition, Seller shall install a double check valve as part of the Facilities to provide additional protection to its pipeline and other facilities.

    (f) Buyer shall install, operate and maintain any safety relief devices required to protect Buyer's internal piping and equipment from Product delivery pressures up to the maximum allowable operating pressure of Seller's Facilities, or to protect Seller's Facilities from the maximum allowable operating pressure of Buyer's Plant, as the case may be. Seller will install a safety relief to protect the Seller's Facilities relieving any pressure over 200 psig or lower pressure necessary to protect Seller's Facilities.

4. **SPECIFICATIONS**

    (a) All Product delivered by Seller to Buyer hereunder will meet the following specifications:

    | PARAMETER | |
    | --- | --- |
    | Product | Nitrogen |

| Purity Minimum | 99.999 mole % (pipeline product) |
|---|---|
| Oxygen | < 2 ppm |
| THC | < 1 ppm |
| Moisture | < 1 ppm |
| Delivery Pressure +/-5 psig | 115 psig minimum at Delivery Point |
| Particles | 20 particles/cu.ft. 0.2 micron and greater Filtration at 0.02 microns absolute |

(b) If Seller tenders Product having specifications which fails to meet one or more of the specifications set forth in Section 4(a) and Buyer knowingly agrees to accept such Product, then such Product will be delivered to Buyer and will be deemed to meet the specifications set forth herein.

5. **DELIVERY**

(a) Delivery of Product purchased hereunder will be made by Seller to Buyer at the "Delivery Point". "Delivery Point" shall mean the point of connection between Seller's pipeline and the pipeline furnished by Buyer at the tie-in point as described in Exhibit A attached hereto.

(b) Title to Product and risk of loss shall pass to Buyer from Seller at the Delivery Point.

6. **QUANTITY**

(a) Beginning on the Effective Date, Seller will supply Buyer with Product up to an instantaneous rate of <u>10,000</u> standard cubic feet ("SCF") per hour. SCF per hour shall mean an instantaneous rate of flow of gas which would be equivalent to one (1) SCF if continued for a one hour period under the conditions described in Article 11. Said rate of delivery shall be hereinafter referred to as the "Dedicated Quantity." Beginning on the Commencement Date, Seller will supply Buyer with Product up to an instantaneous rate of 36,000 standard cubic feet ("SCF") per hour, which shall be the Dedicated Quantity on and after the Commencement Date. If Buyer develops an on-going future requirement in excess of the Dedicated Quantity, Buyer has the right to make a one time increase in Dedicated Quantity of up to 60,000 SCF per hour (which also increases the Minimum Quantity), at a price equal to the then prevailing product charge as adjusted. If Buyer requires Product in excess of the Dedicated Quantity or continues to have requirements during Facility outages other than an outage caused by Seller's breach of its obligations in 12(b) (said additional or continual requirements are referred to as "Supplemental Product"), Buyer shall purchase such requirements from Seller and Seller shall supply such requirements to Buyer if and to the extent such Product is available from the Facilities, as determined by Seller.

(b) Beginning on the Effective Date and continuing to the Commencement Date, Buyer will take from Seller and pay for, or pay for if not taken, a minimum quantity of 66% of the Dedicated Quantity (the "Minimum Quantity"). Beginning on the Commencement Date and for the twelve (12) month period following the Commencement Date Buyer will take from Seller and pay for, or pay for if not taken, 25% of the Dedicated Quantity (the "Minimum Quantity"). After such one (1) year period, the Minimum Quantity shall be 60% of the Dedicated Quantity for the remainder of the Supply Period, unless Buyer increases the Dedicated Quantity above 36,000 due to a subsequent phase of the New Plant. If Buyer requests such an increase, the Minimum Quantity for any incremental increase in the Dedicated Quantity shall be 25% of such amount for the twelve (12) month period after such increase. Seller may invoice Buyer for the Minimum Quantity at the beginning of each month. Seller may, without affecting the Supply Period or any other provisions hereunder, invoice Buyer on the Commencement Date a prorata share of the Minimum Quantity for the period the Equipment operated in the prior month. Invoices for other sums due hereunder shall be submitted monthly.

(c) During the Supply Period, Seller will operate the Facilities within the limits of the capability of such Facilities to produce and deliver Product at reasonably uniform rates of flow. If Buyer develops an on-going future requirement in excess of the current Dedicated Quantity, Buyer and Seller shall attempt in good faith to negotiate the prices, terms, and conditions for an increase in the Dedicated Quantity. Should Buyer and Seller be unable to reach agreement, Buyer may obtain offers from other suppliers of nitrogen and afford Seller a reasonable opportunity to meet the price submitted by any such supplier, and if Seller does meet such price, such quantity shall be deemed included in this Agreement at the price so determined. Regardless of such obligation, Buyer

must purchase pursuant to this Agreement all of its requirements for Product at the Designated Location up to the Dedicated Quantity prior to receiving any Product from another supplier or from Buyer's own facilities. For increases in delivery rates not contemplated in this Agreement, Seller will make Product available to Buyer as soon as possible and will apply the Product Charges to the actual Product delivered.

(d) Should Seller be required to curtail the operation of the Facilities, Seller shall allocate any remaining supply of Product among Buyer, Seller's other customers and Seller's dedicated internal requirements in such a manner as to fairly prorate the supply. After such proration to Buyer, Seller and Seller's other customers, should any remaining Product be available for distribution or should any of Seller's customers not require its full allocation, Seller shall distribute such remaining Product in a manner as to fairly prorate the available supply.

(e) From the Effective Date of this Agreement Supplier will initiate a project to install Facilities suitable for supplying up to 60,000 SCFH for Buyer's New Plant Should Buyer request that Seller cancel the project for a new pipeline spur to be installed at Buyer's New Plant, Buyer shall be obligated to reimburse, calculated by a time and material basis, any of Seller's project costs to include materials, vendor cancellation costs, applicable overheads and general and administrative expenses, interest costs, financial and other charges, all determined in accordance with Seller's standard accounting practices. Notification of cancellation of the project will not relieve Buyer of their obligations under the existing terms of this Agreement and the Product Charge for "Dedicated Quantity of 10,000 SCFH" as described in Paragraph 7(a) shall remain in effect for the Supply Period.

(f) In the event that Seller fails to meet any of its supply obligations under this Agreement (either by non-delivery or delivery of off-specification product), Buyer shall be entitled to purchase any shortfall from another supplier, but shall remain obligated to purchase Product hereunder to the extent Seller is able to supply. The term of this Agreement shall be extended for the same period as Buyer was relieved of its minimum purchase requirements.

## 7. PRICING

(a) Beginning on the Effective Date and continuing through the end of the Supply Period, Buyer shall pay Seller a Product Charge based on the Dedicated Quantity:

Dedicated Quantity of 10,000 SCFH.

> $0.33 per 100 SCF for Product delivered or deemed delivered up to and including the Dedicated Quantity

Dedicated Quantity of 36,000 SCFH after Commencement Date

> Tier 1 – $0.33 per 100 SCF for Product delivered or deemed delivered up to and including 10,000 SCF per hour.
>
> Tier 2 – $0.29 per 100 SCF for Product delivered or deemed delivered above 10,000 SCF per hour up to and including 36,000 SCF per hour.

Increased Dedicated Quantity of up to 60,000 SCFH

> Tier 1 – $0.33 per 100 SCF for Product delivered or deemed delivered up to and including 10,000 SCF per hour.
>
> Tier 2 – $0.29 per 100 SCF for Product delivered or deemed delivered above 10,000 SCF per hour up to and including 30,000 SCF per hour.
>
> Tier 3 – $0.25 per 100 SCF for Product delivered or deemed delivered above 30,000 SCF per hour up to and including the Dedicated Quantity.

(b) Beginning on the Effective Date and continuing until the end of the Supply Period, Buyer shall pay Seller a fixed Monthly Charge of $2,000, in addition to any Product Charges or charges for the Minimum Quantity. Beginning on the Commencement Date, Buyer shall pay Seller an additional fixed Monthly Charge of $2,500, in addition to any Product Charges or charges for the Minimum Quantity.

(c) Beginning on the Effective Date and continuing through the end of the Supply Period, Buyer shall pay Seller a Product Charge of $0.40 per 100 SCF for all Supplemental Product or Product delivered in excess of the Dedicated Quantity.

(d) Buyer shall be responsible for any subscription costs, licenses, transaction fees, set up fees, commissions, costs, expenses, obligations, taxes, evaluation fees or other charges levied by, imposed on or incurred by Seller, or imposed on transactions pursuant to this Agreement, that result from the use of an intermediary, broker, purchasing cooperative, exchange or e-business reseller, distributor or remarketer, or the use of a computer, electronic or internet-enabled infrastructure, software, process, agent or entity, if Buyer requests, adopts or requires any such use.

8. **PRICE ADJUSTMENT**

(a) The Product Charge described in Section 7(a) and 7(c) shall be adjusted semiannually on January 1 and July 1 after the Effective Date in accordance with the following formula:

$$P = P_o + 0.5 P_o \left( \frac{ECI_n - ECI_b}{ECI_b} \right) + (SCP_n - SCP_b)$$

Where:

$P_o$ = Base Unit Price ($/100 SCF)

$ECI_n$ = The latest available Employment Cost Index (ECI) for Total Compensation for Private Industry Workers, Manufacturing, Not Seasonally Adjusted as final for the month.

$ECI_b$ = The Employment Cost Index (ECI) for Total Compensation for Private Industry Workers, Manufacturing, Not Seasonally Adjusted published as final for the month of October 2009.

$SCP_n$ = Current Firm Power Cost for Santa Clara Plant ($/KWH)

$SCP_b$ = Base Firm Power Cost for Santa Clara Plant ($/KWH) published as final for the month of October 2009.

(b) If the indices used herein cease to be available as presently constituted, the parties shall substitute a suitable and reasonably comparable indices.

(c) Seller will use the latest available values for ECI and SCP at the time the adjustment calculation is performed.

9. **TAXES**

(a) Seller will bear and pay all federal, state, and local taxes based upon or measured by its net income, and all franchise taxes based upon its corporate existence or its general corporate right to transact business.

(b) The prices as stated herein do not include any taxes, charges, or fees other than as stated in Section 9(a) above. If any other taxes, charges, or fees howsoever denominated and howsoever measured (including but not limited to sales and use taxes and ad valorem taxes) are imposed on the Facilities, the real property related thereto, the inventory, or upon the construction, installation, operation, or maintenance of the Facilities, or upon the production, manufacture, storage, sale, transportation, delivery, use, or consumption of Product, Buyer's pro rata

share of such taxes, charges, or fees shall be paid directly by Buyer, or, if paid by Seller, shall be invoiced to Buyer as a separate item and paid by Buyer to Seller.

(c) Seller agrees to cooperate in a reasonable manner with Buyer for the purpose of minimizing all taxes which, pursuant to this Section 9, are to be paid directly or indirectly by Buyer.

10. **INVOICING AND PAYMENT**

   (a) Seller will invoice Buyer monthly for the Product Charges and any Supplemental Product Charges applicable to the previous month's deliveries and any other amounts due hereunder. Fixed Monthly Charge and charges for Minimum Quantities will be invoiced at the beginning of the month. Seller may, without affecting the Supply Period or any other provisions hereunder, invoice Buyer for Product delivered or deemed delivered prior to the Commencement Date. Seller may deliver invoices by mail, facsimile, electronic data interchange or other mutually acceptable means. Seller shall have the right to send a single invoice to Solyndra for all amounts due under this Agreement, and Solyndra shall be obligated to pay such invoice. Any apportionment of the invoiced amount between Solyndra and Solyndra Fab 2 shall be handled by Solyndra and Solyndra Fab 2. If Buyer desires a credit account with Seller, Buyer agrees to provide all information requested by Seller that may include, but may not be limited to, Business Plan, Income Statements, Balance Sheet, Statement of Cash Flows, statement footnotes, auditor's letter, and any other information requested at Seller's sole discretion, at which point Seller will evaluate Buyer's credit. All payments due to Seller hereunder shall be made to Seller at the location indicated on the invoice and are payable within fifteen (15) days from date of invoice. In case of failure by Buyer to pay any invoice within such time period, a late payment charge shall be assessed against the unpaid portion of such invoice amount, at a rate equal to two (2) points plus the prime rate as published in the Wall Street Journal which is in effect on the date of the issuance of the invoice.

   (b) It is agreed that the timely payment by Buyer of all amounts due and owing to Seller hereunder is an express condition to the continued performance by Seller of its obligations hereunder. A deposit equal to the estimated monthly payment less minimum payments and monthly service charges will be made by Buyer to Seller. An initial deposit of $15,000 will be made within 30 days from the Effective Date of this Agreement. If after the initial year of this Agreement the payment owed by Buyer at the end of the month exceeds the deposit amount, Buyer will make the additional deposit necessary. If credit account is established per Section 10(a), such deposit will no longer be required and the existing deposit may be applied to a future invoice. If Buyer shall fail to make payments in accordance with the terms of this Agreement, or if in Seller's opinion Buyer's credit has been impaired, Seller may, at its option, terminate this Agreement by written notice to Buyer or impose such new payment terms, including but not limited to advanced payment, auto pay, or a security agreement as it deems adequate to protect its interest. If Seller terminates this Agreement, Seller, or its agent, may enter Buyer's premises and remove any of Seller's equipment or Facilities with reasonable advanced written notice to protect its interests.

11. **MEASUREMENT**

   (a) The unit of measurement for all purposes hereunder shall be a standard cubic foot ("SCF"), measured as one (1) cubic foot of gas, dry, at a temperature of 70°F and at a pressure of 14.7 psia.

   (b) Seller will make readings, calibrations, and adjustments of Product meters as it deems necessary. Buyer may challenge the accuracy of said meters at any time by providing thirty (30) days written notice to Seller. Seller shall promptly test such meters following notice by Buyer. For inaccuracies greater than 2% of full scale flow rate, billings will be corrected at the rate of such inaccuracy for the period of inaccuracy known or agreed upon, or if the period of inaccuracy is unknown or not agreed upon, then for a period extending back one-half (½) of the time elapsed since the last calibration. For inaccuracies greater than two percent (2%) of full scale flow rate, Seller will pay the costs related to any tests. For inaccuracies of two percent (2%) or less of full scale flow rate, Buyer will pay for the costs of any tests.

   (c) The quantity of Product delivered shall be deemed conclusively to be the quantity indicated by Seller's meters, except where the meters have ceased to function, in which case the quantity will be determined by the best available data using the first of the following methods: (i) by correcting the error if the percentage error is ascertainable by calibration, test or mathematical calculation; (ii) by use of Buyer's check meters, if installed and operating, (iii) by using Seller's total Product balance; (iv) by using Buyer's total system balance; (v) by

estimating the quantity based on the rate of delivery requested by Buyer or (vi) by estimating the quantity of the basis of deliveries under similar conditions.

(d) The parties acknowledge that there is a minimum and maximum instantaneous rate of flow beyond which the Meter Station will not be accurate (the "Minimum Accurate Flow" and "Maximum Accurate Flow"). Seller shall install and calibrate the Meter Station such that the Minimum Accurate Flow and Maximum Accurate Flow encompass Buyer's mutually agreed upon expected range of Product demand. In the event that Buyer's instantaneous demand of Product is less than the Minimum Accurate Flow, Buyer shall continue taking delivery of Product but have such flow be deemed to be equal to the Minimum Accurate Flow. Under no circumstances shall Seller be required to deliver Product at an instantaneous rate in excess of the Maximum Accurate Flow. If Seller, at its sole option, grants the Buyer's request to deliver Product at an instantaneous rate in excess of the Maximum Accurate Flow, the parties agree to estimate in good faith the quantity of Product delivered in excess of the Maximum Accurate Flow. Initially, the Minimum Accurate Flow shall be 1,000 SCFH and the Maximum Accurate Flow shall be 100,000 SCFH. Modifications to the Meter Station to adjust the Minimum Accurate Flow and the Maximum Accurate Flow will be made upon the mutual agreement of the parties. Under no circumstances shall this Section 11(d) relieve Buyer of its obligations under Section 6 to purchase Product from Seller.

12. **SELLER'S WARRANTY**

    (a) Seller warrants that Product delivered to Buyer will conform to the specifications set forth in Section 4 and that at the time of delivery Seller will have good title and the right to transfer the same, and that the same will be delivered free of encumbrances.

    (b) Seller warrants that when performing the design, installation, operation and maintenance of the Facilities located at Buyer's Plant or New Plant hereunder that it will exercise that degree of care, skill and judgment that is commensurate with that which is normally exercised by prominent firms of national reputation performing services of a similar nature, but in no event less than reasonable care.

    (c) THE WARRANTIES SET FORTH IN SECTION 12(a) and (b) ARE IN LIEU OF ALL OTHER WARRANTIES BY SELLER, EXPRESS OR IMPLIED, IN FACT OR BY LAW, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

13. **LIMITATION OF LIABILITY**

    (a) Determination of the suitability of Product furnished hereunder for the use contemplated by Buyer is the sole responsibility of Buyer, and Seller shall have no responsibility in connection therewith.

    (b) Buyer acknowledges that there are hazards associated with the use of Product, that it understands such hazards, and that it is the responsibility of Buyer to warn and protect its employees and others exposed to such hazards through Buyer's use of Product. Seller will provide Buyer with copies of Material Safety Data Sheets relating to Product for Buyer to make such warnings, and Buyer shall hold harmless, indemnify and defend Seller and its affiliates from and against any liability incurred by Seller and its affiliates because such warnings were not made. Buyer assumes all risk and liability for loss, damages or injury to persons or to property of Buyer or others arising from the failure to make such warnings or out of the presence or use of Product past the Delivery Point after delivery by Seller.

    (c) Buyer acknowledges that it can obtain and install devices to sample Product delivered to determine its compliance with specifications prior to use.

    (d) NO CLAIM OF ANY KIND ARISING FROM THE PRODUCT (INCLUDING CLAIMS FOR NONDELIVERY OF PRODUCT OR DELIVERY OF OFF-SPECIFICATION PRODUCT) SHALL BE GREATER IN AMOUNT THAN THE PURCHASE PRICE OF THE QUANTITY OF PRODUCT WITH RESPECT TO WHICH SUCH CLAIM RELATES AND SUCH REMEDY SHALL BE SELLER'S AND ITS AFFILIATES' SOLE LIABILITY AND BUYER'S AND ITS AFFILIATES' SOLE AND EXCLUSIVE REMEDY.

    (e) EXCEPT AS EXPRESSLY PROVIDED IN SECTION 13(d), SELLER AND ITS AFFILIATES SHALL NOT BE LIABLE IN CONTRACT (INCLUDING BREACH OF WARRANTY), TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE FOR ANY OTHER DIRECT DAMAGES. NOTWITHSTANDING

ANYTHING HEREIN TO THE CONTRARY, BUT EXCEPT IN THE CASE OF WILLFUL MISCONDUCT, BUYER, SELLER AND THEIR RESPECTIVE AFFILIATES SHALL NOT BE LIABLE IN CONTRACT (INCLUDING BREACH OF WARRANTY), TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BY WAY OF ILLUSTRATION AND NOT OF LIMITATION, LOSS OF USE, LOSS OF WORK IN PROCESS, DOWN TIME, CLAIMS BY CUSTOMERS OR LOSS OF PROFITS, AND SUCH LIMITATION ON DAMAGES SHALL SURVIVE FAILURE OF AN EXCLUSIVE REMEDY; provided however that nothing in this Section 13(e) shall (i) limit a party's obligation to pay indirect, special, incidental, punitive or consequential damages to the extent such party is obligated to pay such damages as an indemnitor with respect to a third-party claim, or (ii) relieve Buyer of any obligation to make specified payments due pursuant to the terms and conditions of this Agreement.

(f) Claims for non-delivery of Product or delivery of non-specification Product shall be void unless notification is given in writing to Seller's operating personnel within sixty days of the date of delivery or the date fixed for delivery, as the case may be. Notwithstanding the forgoing, this limit shall not apply to the extent the Seller knew within such sixty day period it was delivering or had delivered non-specification Product and did not inform Buyer.

14. **FORCE MAJEURE**

(a) Neither party hereto shall be considered in default in the performance of its obligations hereunder or be liable in damages or otherwise for any failure or delay in performance which is due to strike, lockout, concerted act of workers or other industrial disturbance, fire, explosion, flood, or other natural catastrophe, civil disturbance, riot, or armed conflict whether declared or undeclared, curtailment, shortage, rationing, allocation, or failure of normal sources of supply of labor, materials, transportation, energy, or utilities, machinery and equipment failures, inability or delay in obtaining or maintaining any easement, rights-of-way, permit or license, accident, act of God, delay of subcontractor or vendor, sufferance of or voluntary compliance with an act of government and government regulation (whether or not valid), embargo, or due to any other cause whether similar or dissimilar to any of the causes or categories of causes described above and which is beyond the reasonable control of the party affected.

(b) Neither party hereto shall be required to make any concession or grant any demand or request to bring to an end any strike or other concerted act of workers.

(c) The party affected by an event described in Section 14(a) shall, promptly upon learning of such event and ascertaining that it has affected or will affect such party's performance hereunder, give notice to the other party, stating the nature of the event, its anticipated duration and any action being taken to avoid or minimize its effect.

(d) Nothing contained in Section 14(a) shall relieve Buyer of its obligation to make the payments to Seller for Product actually delivered to Buyer as described herein. Buyer shall be relieved of its obligation to pay for the Minimum Quantity only if: (i) Buyer's requirements for the Minimum Quantity of Product are suspended for a period of longer than one month due to an event described in Section 14(a), provided that the Supply Period shall be extended for a period of time three times the period of time for which the payment obligation is suspended, and in no event shall Buyer be relieved of its obligation to pay for the Minimum Quantity for a period of time in excess of 6 months; or (ii) where the supply of the Minimum Quantity of Product is not available due to an event described in Section 14(a), provided that the Supply Period shall be extended for a period of time equal to the period of time for which the payment obligation is suspended.

15. **ASSIGNMENT**

(a) Upon notice to Buyer, this Agreement may be assigned by Seller to any affiliate and any or all of Seller's rights, title, and interest under this Agreement (including without limitation any payments by Buyer hereunder) may be assigned by Seller to any bank, trust, company, insurance company, financial institution, or other entity or groups thereof under the terms of financing arrangements; provided, however, that any such assignment will not relieve Seller of any of its obligations hereunder.

(b) This Agreement shall not otherwise be assignable or transferable by either Buyer or Seller without the prior written consent of the other, which consent shall not be unreasonably withheld, and any attempted assignment

or transfer without such consent shall be void. All covenants and provisions of this Agreement by and for the benefit of the parties hereto shall bind and inure to the benefit of their respective successors and assigns as permitted by the provisions of this Section.

(c) In the event of the sale, lease, assignment or transfer of Buyer's Plant, Buyer will assign its interest in this Agreement to such other entity who will assume all of Buyer's obligations hereunder, subject to the consent rights set forth in Section 15(b) hereof.

16. **TERMINATION**

    (a) This Agreement may be terminated by either party on account of any material default of the other party in carrying out the terms hereof; provided, however, that if the party so in default shall, within sixty (60) business days after receipt of written notice thereof from the other party, cure or commence curing such default, then the right of termination shall be nullified and be of no effect. Such termination shall be effective as of the date stated in the notice thereof, which shall not be less than sixty (60) business days or more than one (1) year from the date of such notice.

    (b) Unless sooner terminated as hereinabove provided, this Agreement may be terminated upon the expiration of the Initial Term by not less than twelve (12) months' prior written notice given by either party to the other party. If notice of termination is not given as aforesaid, the Agreement shall remain in full force and effect until terminated at any subsequent anniversary following the end of the Initial Term thereafter by either party by not less than twelve (12) months' prior written notice.

    (c) Upon termination of this agreement, if Buyer requests that Seller remove any of the Facilities upon its premises, Buyer will pay Seller for its reasonable and actual costs of the removal of the appropriate portions of the Facilities from Buyer's premises.

17. **NOTICES**

    (a) Any notice or request given under this Agreement, if given to Seller, shall be addressed to:

    <u>AIR PRODUCTS MANUFACTURING CORPORATION</u>
    7201 Hamilton Boulevard
    Allentown, PA 18195-1501
    Attention: Corporate Secretary

    and if given to Buyer, shall be addressed to:

    Solyndra Incorporated
    47700 Kato Road
    Fremont, CA 94538
    Attention: <u>Director of Operations</u>

    and in either case shall be sent by registered or certified mail, return receipt requested.

    (b) Either party may give written notice of change of address, in which event notice shall thereafter be given to it at such changed address.

    (c) Unless otherwise specified in this Agreement, the date of mailing shall be deemed to be the date on which notice is given and the postal receipt shall be conclusive evidence between the parties as to the fact and time of mailing.

18. **GOVERNING LAW**

    This Agreement shall be construed under the laws of the Commonwealth of Pennsylvania, without giving effect to its conflicts of laws principles.

19. **DISPUTE RESOLUTION**

Any dispute between the parties relating to this Agreement which cannot be resolved with reasonable promptness shall be referred to each party's senior manager in an effort to obtain prompt resolution. Neither party shall commence any action against the other until the expiration of 60 days from the date of referral to such senior managers; provided however, this shall not preclude a party from instituting an action seeking injunctive relief to prevent irreparable damage to such party.

20. **GENERAL PROVISIONS**

    (a) This Agreement, together with all documents incorporated herein by reference, constitutes the entire agreement between the parties hereto, and supersedes all previous agreements and understandings, whether oral or written, relating to the subject matter hereof. No terms and conditions in any form of purchase order, order acknowledgment or other acceptance forms of Buyer or any invoice or any other Seller document issued with respect to this transaction shall alter the terms hereof and objection is hereby made to all such additional or different terms and conditions. Acceptance is expressly limited to the terms offered herein. No modification or waiver of this Agreement shall bind either party unless in writing and signed and accepted by an executive officer of such party.

    (b) If this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

    (c) Buyer's and its affiliates' remedies set forth herein are exclusive of any remedy available to Buyer and its affiliates by operation of law or equity.

    (d) Should any provisions of this Agreement become unenforceable, invalid, or be declared illegal, then that provision shall be considered severed from the rest of this Agreement and shall not affect the validity of the remainder of this Agreement.

    (e) This Agreement is intended solely for the benefit of the Buyer and Seller and their respective affiliates and is not intended to confer any benefits upon, or create any rights in favor of, any other person or entity.

    (f) Neither party shall disclose the terms and conditions set forth herein to any third party without obtaining the prior written consent of the other party, except as may be required by law.

    (g) In this Agreement, the singular shall include the plural and the masculine shall include the feminine and neuter, as the context requires, and "include," "includes" and "including" shall mean "includes [includes][including], without limitation."

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

SOLYNDRA INCORPORATED

By: _[signature]_
Title: EVP Operations + Eng.
Date: 12/9/09

AIR PRODUCTS MANUFACTURING CORPORATION

By: _[signature]_
Title: Director, Global Acts
Date: 12/18/09

SOLYNDRA FAB 2 LLC

By: _[signature]_
Title: CFO
Date: 2 DEC '09

# EXHIBIT A
## PIPELINE DESCRIPTION OF WORK

### AIR PRODUCTS MANUFACTURING CORPORATION (APMC)
### PIPELINE GASEOUS NITROGEN (GAN) SUPPLY SYSTEM SCOPE OF WORK

Date: 8/10/2009
Revision: 0

| Buyer Name: | Solyndra | System Location: | 47488 Kato Road |
|---|---|---|---|
| Product/Purity: | Pipeline Nitrogen / High Purity | City, State: | Fremont, CA |

### A. EQUIPMENT CAPABILITIES

| | | | | |
|---|---|---|---|---|
| Anticipated Buyer Total Monthly Volume (SCF/Month) | 17,870,400 | | | |
| Product Used As (Gas or Liquid) | Gas | | | |
| Design Monthly Usage (SCF/Month): | 65,700,000 | | | |
| Design Supply Pressure (psig, ±5) | 115 | | | |
| Design Continuous Flow Rate (SCFH): | 90,000 | | | |
| Design Maximum Flow Rate (SCFH): | 120,000 | | | |
| Product Usage Pattern (hr/day, days/wk): | 24/7 | | | |

### B. PRODUCT SPECIFICATION

N2 (plus trace inerts) 99.999 mole %
O2 2.0 ppm maximum
Moisture <1 ppm
Pressure (±5) 115 psig

### C. MAJOR EQUIPMENT DESCRIPTION

1 ea    3" Meter Station with pressure control valve and particle filtration.
1 ea    Flow Meter (integral part of meter station)

### D. MATERIALS OF CONSTRUCTION

Product Piping (upstream of Meter Station): Approximately 450 feet of 6" Carbon Steel Pipe APL 5L GR.B, 0.250" Wall, Double Random Lengths, Butt-weld End Prep, Pipe will be FBE Coated

Meter Station Valves: Copper/Bronze

| | |
|---|---|
| Meter Station Piping: | 3" SS 304 |
| Particle Filtration: | Stainless Steel Housing with Teflon Elements, 0.02 micron absolute rated. |
| Instrument Tubing: | Copper |

E. **SELLER'S NITROGEN PIPELINE SUPPLY SYSTEM INSTALLATION RESPONSIBILITIES**

1. Conduct site visit/site evaluation. A technical representative of seller must approve the installation site prior to the initiation of civil work by the buyer.

2. The Air Products meter station to be located approximately midway at the North side of the Kato Road facility. The point of connection to the existing nitrogen pipeline shall be at Kato Road, approximately 450' West from North side of Buyer's facility.

3. Provide all materials not explicitly highlighted under the buyer's scope of work to commission and start-up the nitrogen pipeline supply system and associated piping in accordance with seller specifications and standards.

4. Assist the Buyer in obtaining all right of ways (ROWs)/easements required to install the nitrogen pipeline supply system and meter station.

5. Coordinate for the shipment of all major equipment to the Buyer's installation site.

6. Schedule and coordinate seller approved crane and rigging contractor(s) to off load all major equipment at the Buyer's installation site. Schedule and coordinate Seller approved mechanical contractor(s) to assist the Seller's on-site representative in the nitrogen pipeline supply system installation.

7. Schedule construction activities to ensure that the agreed-to on-stream date between Seller and the Buyer are satisfied.

8. Perform all possible shop prefabrication and cleaning of nitrogen pipeline supply system components prior to arrival on-site at the Buyer's facility.

9. Obtain encroachment permit for construction activity within Kato Road from the City of Fremont.

10. Provide all labor and materials not highlighted in the Buyer's scope of work to commission and start-up the nitrogen pipeline supply system. This will include the following:

    a. Prepare the installation site and coordinate safety training with external Seller contractor(s). Control access to the installation area and inspect the crane prior to initiating the nitrogen pipeline supply system installation.

    b. Rig, set, level, and anchor all major equipment.

    c. Install piping, piping supports, decals, valve tags, piping labels, cathodic protection, and all other minor equipment required to commission the nitrogen pipeline supply system.

d. Installation of the nitrogen pipeline supply system piping to be run underground and/or above ground as required from the existing Seller's nitrogen pipeline to the meter station location.

e. Conduct an Operational Readiness Inspection (ORI) of the nitrogen pipeline supply system.

f. Pressure test/Leak test nitrogen pipeline supply system field installed piping.

g. Perform product certification at the outlet of the meter station consisting of moisture and oxygen impurity analysis.

h. Initiate nitrogen supply by commissioning the nitrogen pipeline supply system following the product certification.

11. Provide labor and material(s) required to perform routine maintenance and repair of the Seller-owned portions of the nitrogen pipeline supply system in accordance with Seller's standard operating procedures.

## F. BUYER'S NITROGEN PIPELINE SUPPLY SYSTEM INSTALLATION RESPONSIBILITIES

1. CIVIL
   a. Provide a site for the pipeline and delivery station through right-of-ways (ROW) easement(s). If Buyer does not own the property at this site, then the Buyer shall cause such a ROW easement to be provided by the landowner at no cost to Seller. Seller must inspect and approve the installation site

   b. Provide a suitable site that does not block means of ingress or egress. Seller must inspect and approve the installation site prior to the initiation of any civil work by the Buyer.

   c. Provide all required state and local installation and operating permits for the installation of the nitrogen pipeline within the Buyer's property boundaries.

   d. Provide a concrete foundation for the meter station. The concrete pad should be a minimum of 6 inches thick with wire mesh or # 4 rebar, Seller will need an area approximately 17'(L) x 6'(W) x 6' (H), with a minimum of 3 feet clearance surrounding the meter station for maintenance access. Equipment cannot be set on foundations with cure times less than two weeks without prior approval by the Seller's responsible Engineer. If existing concrete is to be utilized provide as-built design drawings. Information to include concrete depth, rebar size and spacing. Provide any special screening requirements that may be mandated by the City of Fremont, Planning Department.

   e. Provide a secure location for the meter station that is accessible by Seller to perform periodic maintenance and meter readings by installing a 6' high chain link fence with at least one access gate with a hasp that can be locked using a padlock. Seller requires the installation of Air Products owned padlocks.

2. ELECTRICAL
   a. Provide adequate lighting for the area for system maintenance

b. Provide a dedicated 110 VAC, 20A electrical power outlet within 5' of the nitrogen meter station. This is to be used to power the meter station's flow meter.

3. MECHANICAL
   a. The point of connection between the Buyer's piping distribution system and the Seller's nitrogen pipeline supply system is referred to as the "Buyer's Tie-in point". Installation of the Buyer's nitrogen piping distribution line should be within close proximity to the outlet of the paymeter station. Buyer will make the final tie-in connection. The desired end connection is a 3" VALVE WITH 12 INCH STUB TO TIE IN TO. Communicate a different choice of end connection to Seller's Construction representative at least one week prior to Seller's on-site date.
   b. Ensure that the maximum allowable working pressure of the Buyer's nitrogen piping distribution system and its components, downstream of the buyer tie-in point, is greater than 200 psig. If not, provide a safety relief valve set at the maximum allowable working pressure of the lowest rated component in the buyer's nitrogen piping distribution line. Size the safety relief valve for the maximum flow capacity of the system. All relief valves should vent out of doors to a safe location. It is the Buyer's responsibility for the installation and maintenance of pressure relief devices.

4. GENERAL
   a. Provide APMC and its subcontractors unimpeded access at the site for pipeline installation.
   b. Allow Seller and Seller's contractor(s), unescorted access to the nitrogen pipeline meter station on a periodic basis for maintenance and meter readings.
   c. Keep area clean and free of all debris and weeds.
   d. Prohibit the storage of oil, grease, lubricants or any flammable or combustible material on or within the nitrogen pipeline supply system meter station area.
   e. Provide any Buyer required site specific safety training for Seller personnel and contractor(s) in accordance with OSHA guidelines.
   f. Prevent any Buyer's employee(s) or third party(s) not properly trained in the operation of the Seller's nitrogen pipeline supply system from altering, repairing, adjusting or tampering with the nitrogen supply meter station.
   g. If any Buyer's scope items are not completed prior to the agreed upon installation date and Seller needs to make a return visit(s) to complete the installation, the Buyer agrees to reimburse Seller, at Seller's standard service rates prevailing when such services are rendered, for additional expenses incurred due to the return visit(s).
   h. Any special site conditions or requirements not specifically listed in this document will be a change in original scope. These include, but are not limited to, building or zoning codes and restrictions, height, noise, or delivery restrictions, corrosive atmospheres, special materials of construction, emergency shutoff requirements, special instrumentation or control, sampling or analytical services, painting or color specifications, reserve supply requirements, details of existing concrete foundations, temporary supply requirements, requirements for excess flow or earthquake valves, soil bearing capacity, special design requirements, requirements for union labor,

special cleaning requirements, special piping codes such as ANSI, special installation or maintenance procedures, or special site restrictions.

## G. INSTALLATION STRATEGY

1. Site / equipment layout to be finalized by Seller and the Buyer.
2. Seller to determine pipeline routing from existing nitrogen pipeline network to the meter station.
3. Buyer/Seller to obtain all easements and Right of Ways (ROW's) required to install nitrogen pipeline supply system.
4. Interconnect piping between the existing nitrogen pipeline and the meter station to be completed by Seller or its contractor(s).
5. Meter station to be delivered and set by Seller or its contractor(s).
6. Interconnect piping between the meter station and Buyer's tie-in point (the final weld at the outlet of the meter station) to be completed by Buyer.
7. Commission the Seller's installed nitrogen pipeline supply system, i.e. pressure test, cleaning, product certification, etc.
8. Once the product is qualified the nitrogen pipeline supply system may be put on-line by the Seller.

## H. SCHEDULE

| | |
|---|---|
| Long Lead Time Materials (Meter station) | 10 to 12 weeks ARO |
| ROW/Easements | 30 to 90 days ARO |
| Encroachment Permits | 2 to 8 weeks ARO |
| Nitrogen Pipeline Construction | 4 to 6 weeks from receipt of ROW/Easements and encroachment permit. |
| Nitrogen Pipeline Commissioning | 1 week from construction completion |

Submitted By:

_____   _____
Air Products and Chemicals, Inc.    Date
Dan Bolio
Project Engineer

Accepted By:

_____   _____
Buyer                                Date

_____
Title

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

8R6WS2VS

DATE (MM/DD/YYYY): 02/03/2010

**PRODUCER**
Lockton Companies, LLC
444 West 47th Street, Suite 900
Kansas City, MO 64112-1906

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Indemnity Insurance Co of NA | |
| INSURER B: ACE American Insurance Company | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

**INSURED**
Air Products and Chemicals, Inc.
7201 Hamilton Blvd.
Allentown, PA 18195-1501

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| B | | GENERAL LIABILITY [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS MADE [X] OCCUR [X] Combined Single Limit GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PROJECT [ ] LOC | HDOG24929590 | 06/01/2009 | 06/01/2010 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ |
| | | | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| B | | AUTOMOBILE LIABILITY [X] ANY AUTO [X] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [X] HIRED AUTOS [X] NON-OWNED AUTOS [X] Phy Dam self-insured | ISAH08577390 | 06/01/2009 | 06/01/2010 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY [ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ $ |
| | | EXCESS/UMBRELLA LIABILITY [ ] OCCUR [ ] CLAIMS MADE DEDUCTIBLE RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| A B B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | WLRC45696285 (All States) WLRC45696297 (Calif.) SCFC45696303 (Wisc.&NJ) | 06/01/2009 | 06/01/2010 | [X] WC STATUTORY LIMITS [ ] OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ 2,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 2,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 2,000,000 |
| | | OTHER | | | | | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

**CERTIFICATE HOLDER**

Solyndra
Susan L. Ross
47700 Kato Road
Fremont, CA 94538

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

**AUTHORIZED REPRESENTATIVE** *Ronald J. Lockton* (signature)

Page 1 of 1

ACORD 25 (2001/08) © ACORD CORPORATION 1988