# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| SOLYNDRA LLC, *et al.*, | ) | Case No. 11-12799 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Re: Docket Nos. 287, 288, 289, 290, 310 and 315 |

## VDL ENABLING TECHNOLOGIES GROUP EINDHOVEN BV'S RENEWED OMNIBUS OBJECTION TO DEBTORS' SALE AND AUCTION MOTIONS AND CURE NOTICE

VDL Enabling Technologies Group Eindhoven BV ("VDL"), by and through its undersigned counsel, hereby files this omnibus objection (the "Objection") to the above-captioned debtors' (the "Debtors") sale and auction motions and cure notice, specifically (1) the Motion of Solyndra LLC for an Order: (I) Approving Sale of Business Assets on Turnkey Basis Free and Clear of all Liens, Claims, Encumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 289] (the "Turnkey Sale Motion"); (2) Notice to Counterparties to Executory Contracts and Unexpired Leases That May be Assumed and Assigned [Docket No. 290] (the "Cure Notice"); (3) Notice of Auction Results and Auction Report [Docket No. 310] (the "Auction Results Notice"); and (4) Motion of Solyndra LLC Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authority to (A) Conduct a Supplemental Auction for Additional Non-core Assets, (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of all Encumbrances, and (C) Expand Retention of Heritage Global Partners as Auctioneer and Sales Agent [Docket No. 315] (the "Supplemental Auction Motion", together with the Turnkey Sale Motion, the Cure Notice and the Auction Results Notice, referred to herein the Sale And Auction Motions"), as follows:

609533.1 11/15/11

## PROCEDURAL BACKGROUND AND RELEVANT FACTS

1. On September 6, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. On September 15, 2011, the United States Trustee appointed a statutory committee of unsecured creditors (the "Committee"). VDL sits on the Committee.

3. Since the Petition Date, the Debtors have operated their businesses and managed their assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. According to the various pleadings filed by the Debtors in these cases, Solyndra LLC (a "Debtor") is a U.S. manufacturer of solar photovoltaic solar power systems specifically designed for large commercial and industrial rooftops and for certain shaded agriculture applications. The Debtors' worldwide headquarters and manufacturing operations are located in Fremont, California (the "Fremont Facility").

5. Based in the Netherlands, VDL is a tier one contract manufacturing partner, delivering high tech capital equipment to leading OEM companies and users of advanced production lines. Among other equipment, VDL is experienced in the design and building of elongated glass tubing manufacturing equipment.

6. On or about December 11, 2009, the Debtor and VDL entered into an Equipment Design and Manufacturing Agreement (the "VDL Agreement"), pursuant to which VDL would design, build and install two encapsulation lines with agreed upon specifications at the Debtor's Fremont Facility. Due to the confidential nature of the VDL Agreement, VDL will seek to file the VDL Agreement under seal prior to the hearing on the Sale and Auction Motions. The Debtors have a copy of the VDL Agreement, and the VDL Agreement is listed on the Cure Notice as one of the executory contracts that the Debtors assert may be assumed and assigned

pursuant to the Turnkey Sale Motion. The VDL Agreement provides this "Agreement shall be governed by and interpreted pursuant to the internal laws of the State of California (excluding its conflict of laws rules which would refer to and apply the substantive laws of another jurisdiction)." (VDL Agreement §31.2).

7. VDL proceeded to design and build the manufacturing equipment in its factory in the Netherlands, which culminated with an extensive test of the equipment. At great expense to VDL, VDL then shipped the encapsulation lines (the "Encapsulation Lines") for installation at the Freemont Facility.

8. Certain VDL proprietary software (the "VDL Software") is absolutely necessary to operate the Encapsulation Lines. To that end, section 14.4 of the VDL Agreement includes a **nonexclusive, nontransferable software license** (the "VDL Software License"), as follows:

> 14.4 Software and Software License Included at No Additional Charge. VDL shall license or provide fully paid licenses for all Software for the life of the Equipment, as stated herein. VDL hereby grants to [the Debtor] a **nonexclusive, nontransferable** [emphasis added], fully aid, royalty free, perpetual license (the "Software License") to use all Software on all [Debtor] Equipment, whether acquired under the terms of this Agreement or otherwise. During the applicable warranty period, VDL will provide all service for the Software at no additional charge. VDL shall include all Software Maintenance Services for all Software to [the Debtor] as part of the Maintenance Services purchased by [the Debtor]. [The Debtor] may install the Software on a backup server, database and/or operating system located at any [Debtor] facility only for use in the case of backup disaster recovery purposes by [the Debtor]. In addition, [the Debtor] may make copies of the Software for archival or backup purposes as reasonably required by [the Debtor].

9. In addition to the Encapsulation Lines, VDL also shipped to the Freemont Facility certain VDL owned equipment including, spare parts, tools and even a machine shop in a large shipping container (collectively, the "VDL Owned Equipment"). A list of the VDL Owned Equipment is attached hereto as **Exhibit A** and incorporated by reference herein.

10. Up to the Petition Date, VDL maintained a staff of 20-25 engineers and technicians at the Fremont Facility. The VDL Owned Equipment was used by VDL personnel at the Fremont Facility to, *inter alia*, install, calibrate and test the Encapsulation Lines and to train the Debtor's employees on the Encapsulation Lines.

11. Prior to the Petition Date, VDL worked diligently to install and operate the Encapsulation Lines for the Debtor, eventually transferring the operation of line 1 to the Debtor.

12. As of the Petition Date, VDL continued to operate line 2 and work on both lines using the VDL Owned Equipment.

13. As of the Petition Date, the Debtors owed VDL approximately $12.7 million (US) under the VDL Agreement, with additional amounts due upon certain events and completion and ultimate acceptance of the Encapsulation Lines. Accordingly, the Cure Notice should list VDL's cure amount at $12.7 million (US), not $148,278.75 which the Cure Notice now erroneously lists for VDL.

14. Both the Debtors and VDL agreed that upon the conclusion of the VDL Agreement, VDL would ship the VDL Owned Equipment back to its factory in the Netherlands. At no time did either of the parties intend that the VDL Owned Equipment would remain at the Freemont Facility. The VDL Owned Equipment is general purpose items that VDL typically uses to assemble and work on large scale assemblies and is not specifically designed for the manufacture of the solar panels.

15. Early in this bankruptcy proceeding, the Debtors filed sale motions aimed at selling certain *de minimis* assets and certain "non-core" assets. The Debtors filed the Motion of Solyndra LLC for Entry of an Order Approving Procedures for the Sale, Transfer and Abandonment of De Minimis Assets and Ordinary Course Sales of Inventory and Raw Materials

[Docket No. 148] (the "De Minimis Asset Sale Motion") and the Motion of Solyndra LLC Pursuant to Section 105(a) and 363 of the Bankruptcy Code, for Authority to (A) Conduct an Auction for Non-Core Assets, and (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances [Docket No. 150] (the "Non-Core Asset Sale Motion")

16. VDL filed a timely Omnibus Objection to both the De Minimis Asset Sale Motion and the Non-Core Asset Sale Motion [Docket No. 204], asserting its undeniable ownership of the VDL Owned Equipment. Accordingly, in light of such VDL Objection, the Debtors specifically carved the VDL Owned Equipment out of the Orders approving both the De Minimis Asset Sale Motion and the Non-Core Asset Sale Motion [Docket Nos. 251 and 260] and agreed not to sell the VDL Owned Equipment in its upcoming auctions of de minimis and non-core assets.

17. On November 4, 2011, the Debtors filed the Auction Results Notice, listing the property auctioned in the first auction. Thereafter, the Debtors filed the Supplemental Auction Motion, listing additional property they intend to sell at another auction. VDL cannot tell from the listing contained in the Auction Results Notice or the Supplemental Auction Motion if any of the property sold or to be sold could mistakenly be VDL Owned Equipment, but VDL reminds the Debtors that they do not have authority to sell VDL Owned Equipment in either auction, and must segregate and hold such VDL Owned Equipment aside for pickup by VDL.

## RENEWED OBJECTIONS TO SALE AND AUCTION MOTIONS

18. VDL strenuously objects to the Sale and Auction Motions for the reasons set forth below.

### Renewed Objection to Cure Amount under the VDL Agreement

19. First and foremost, VDL objects to the Cure Notice and the Turnkey Sale Motion under Section 365(b) of the Bankruptcy Code to the extent the Debtors' seek to assume and

assign the VDL Agreement to a third party, absent payment of all amounts due VDL under the VDL Agreement and adequate assurance that the proposed assignee can perform under the VDL Agreement going forward. <u>The current cure amount due VDL is $12,661,972.91</u>, as set forth in the invoices attached hereto as **Exhibit B** and incorporated by reference herein, not the $148,278.75 as erroneously set forth on the Cure Notice.

### Renewed Objection to Sale and Assignment of VDL Software and VDL Software License

20. Second, VDL strongly objects to the Turnkey Sale Motion to the extent the Debtors seek to transfer the VDL Software or the VDL Software License to a third-party without VDL's consent. The law is clear: The VDL Software and the VDL Software License cannot be transferred without VDL's consent, and VDL does not consent to any transfer of this intellectual property.

21. Section 365(c) of the Bankruptcy Code provides that a debtor may not assume and assign an executory contract if (A) applicable nonbankruptcy law precludes assignment and (B) the non-debtor contract counterparty does not consent to assignment. See 11 U.S.C. 365(c). With regard to an assignment of a license of intellectual property, the issue of whether applicable law prohibits assignment turns on whether the license is exclusive or nonexclusive. In re Golden Books Family Entertainment, Inc., 269 B.R. 311, 314 (D. Del. 2001).

22. The determination of whether a license is exclusive or nonexclusive is made from the license agreement itself. Id. ("To determine whether the Madeline Agreement is an exclusive or nonexclusive license, the court must examine the terms of the agreement itself."). Here, the agreement between VDL and the Debtor is *explicitly* nonexclusive. Also, the license grant is explicitly **nontransferable**, further adding to the parties' clear intent to make such license grant limited to Debtors' use only.

23. Because the VDL Software License is nonexclusive, the Debtor may not assign the license without VDL's consent. See 11 U.S.C. § 365(c)(1); see, e.g., In re Golden Books Family Entertainment, Inc., 269 B.R. at 316 ("Prevailing case law holds that nonexclusive intellectual property licenses do not give rise to ownership rights and are not assignable over the objection of the licensor."); see also, e.g., Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.), 165 F.3d 747, 750–51 (9th Cir. 1999) (holding that patent law renders nonexclusive patent licenses personal and non-assignable under § 365(c)(1)) (cited favorably by In re ANC Rental Corp., Inc., 277 B.R. 226, 235–36 (Bankr. D. Del. 2002) (Walrath, J.)); In re CFLC, Inc., 89 F.3d 673, 679 (9th Cir. 1996) ("Federal law holds a nonexclusive patent license to be personal and nonassignable and therefore would excuse [the non-debtor contract counterparty] from accepting performance from, or rendering it to, anyone other than [the debtor]."); In re Patient Educ. Media, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) ("Ownership is the sine qua non of the right to transfer, and the copyright law distinguishes between exclusive and nonexclusive licenses. A 'transfer of copyright ownership' includes the grant of an exclusive license, but not a nonexclusive license." (citations omitted)); see generally, MacLean Assocs., Inc. v. William M. Mercer–Meidinger–Hansen, Inc., 952 F.2d 769, 778–79 (3d Cir.1991) (discussing the Copyright Act and exclusive / non-exclusive licenses in the context of an asserted license of software).

24. Accordingly, absent VDL's consent—and VDL does not and will not consent—the Debtor cannot transfer the VDL Software License and the VDL Software, and both must be removed from any Debtor owned assets before such assets are sold and transferred to any buyers. Indeed, VDL has filed this Renewed Objection prior to the Bid Deadline, even though such

objection was not due until November 21, 2011, in order to alert potential bidders of VDL's irrefutable interest in the VDL Software and VDL Software License.

### Renewed Objection to Sale of Encapsulation Lines

25. Finally, VDL asserts that the Encapsulation Lines never became property of the Debtors' estates under sections 541 or 363 of the Bankruptcy Code, because title did not transfer to Debtors prior to the Petition Date.[1] Because the Debtors lacked title on the Petition Date, the Encapsulation Lines never became property of the Debtors' estates, and therefore may not be sold pursuant to section 363 of the Bankruptcy Code.

26. In addition, VDL assumed all risk of loss, arranged and paid for all customs and import duties as well as delivery to Solyndra, unpacking, assembling, installing and otherwise expending significant engineering efforts to ensure that the Encapsulation Lines would achieve the required performance required by the VDL Agreement (collectively the "Performance Requirements") (VDL Agreement §10.1).

27. VDL's extensive and focused efforts at this point in the process dovetailed with Solyndra's dedicated engineering support, creating a cohesive team effort aimed at one thing: Ensuring that the Encapsulation Lines met the Performance Requirements and performed according to contract, so that they could be accepted by the Debtors and become their property. Of course the converse is true as well: Neither party intended or expected title to the Encapsulation Lines to pass to the Debtors unless and until the Encapsulation Lines were functional, tested, smoothly operating, impeccable, at which point the Debtors would contractually accept them.

---

[1] The VDL Agreement does not provide explicit language as to when title passes but when it is read with the California Commercial Code in mind, the issue of when or whether title transfers becomes clear.

28. While the parties' efforts were thus focused on the Encapsulation Lines, the Debtors retained the right to issue a final acceptance document known as a Site Acceptance Document, which would be issued when the Encapsulation Lines met the Site Acceptance Criteria (VDL Agreement §8.1). Upon meeting the Site Acceptance Criteria, Solyndra was required to "immediately provide VDL with the site acceptance document" (VDL Agreement.§8.1). If this Site Acceptance Document had been issued by the Debtors pre-petition, title to the Encapsulation Lines would have passed to the Debtors and into their estates. However, the Debtors never issued any Site Acceptance Document, so the Encapsulation Lines remain VDL's property.

29. The California Commercial Code—governing law for this transaction—also dictates this result. CA. Com. Code §2401 (2) states that "unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller *completes* his performance with reference to the physical delivery of the goods..." (emphasis added). "Physical delivery" can be an abstract concept: VDL made physical delivery of parts and materials but the actual physical delivery of the Encapsulation Lines themselves would have occurred when the teams finished working on them, tested them, found them operational, and the Site Acceptance Document was issued. Instead, the Debtors never accepted the Encapsulation Lines and, along with VDL, continued to operate and work on them without yet accepting them and issuing a Site Acceptance Document. Further, the Debtors never made certain contractual payments that would have been triggered had the Encapsulation Lines been accepted and title transferred to the Debtors, further evidence that the Encapsulation Lines remained at all times property of VDL.

30. Accordingly, because title to the Encapsulation Lines remains in VDL under the VDL Agreement, the Debtors may not sell the Encapsulation Lines pursuant to the Turnkey Sale

Motion. Further, if the Debtors understandably dispute VDL's position on title to the Encapsulation Lines, title must be determined in an adversary proceeding, concluded prior to any attempted sale of the Encapsulation Lines, and cannot be determined as part of the Debtors' Sale and Auction Motions.

31. The Whitehall Jewelers Holdings case (In re Whitehall Jewelers Holdings, Inc., No. 08-11261(KG), 2008 WL 2951974 (Bankr. D. Del July 28, 2008)) controls the issue over title to the Encapsulation Lines, and must be followed by this Court as controlling procedural and substantive precedent in this case. In Whitehall Jewelers, Judge Gross was presented with a motion of Whitehall Jewelers, the debtor, to sell all its assets in a fast-track sale process. Consignors of jewelry, gems and precious metals objected to the sale motion, arguing that title in their consigned inventory had never passed to the debtor under their consignment agreements, and that without the passage of title the property never became property of the debtor's estate, and was therefore not able to be sold by the debtor under section 363 of the Bankruptcy Code. The debtor in return argued that title to the consigned property was "in bona fide dispute" and as such could be sold under section 363(f) of the Bankruptcy Code.

32. Judge Gross recognized squarely that the first issue he must determine was whether the contested consigned inventory constituted "property of the estate," and he further held that "the Court cannot determine whether the Consigned Goods are property of the estate through a contested matter, such as a sale motion under Section 363." Id. at 12. Further, he held that 'Federal Rule of Bankruptcy Procedure 7001(2) requires that an adversary proceeding be commenced to "determine the validity, priority or extent of [an] interest in property."' Id. He observed that a "recent case in our Circuit dictates that a lien can only be invalidated by an adversary proceeding commenced pursuant to Rule 7001(2), and not by motion." Id. (citing

SLW Capital, LLC. v. Mansaray-Ruffin (*In re* Manasaray-Ruffin), 2008 WL 2498048, at *1 (3d. Cir. June 24, 2008)). Judge Gross denied the debtor's sale motion, on the basis that the "Debtors have not met their burden of establishing that the Cosigned Goods are property of the estate under Section 363(b) and therefore are not permitted to sell the goods under Section 363(f)(4)." Id. at 13. He added that "the debtors have also utilized the "wrong procedural tool, i.e., a contested matter." Id.

33. Whitehall Jewelers controls the case before this Court and requires that the Debtors here establish in an adversary proceeding that the Encapsulation Lines are property of the estate under sections 541 and 363 of the Bankruptcy Code, only then capable of being sold pursuant to the Turnkey Sale Motion. The Debtors have glibly asserted their right to sell the Encapsulation Lines in the Turnkey Motion, but they have not presented evidence meeting their burden of proving that the Encapsulation Lines constitute property of the estate, capable of being sold under section 363(f). VDL on the other hand has in this Renewed Objection and will at the hearing on this matter present evidence supporting its argument that title to the Encapsulation Lines at all times remained with VDL.

34. Such evidence presented by VDL is not to enable the Court to decide the issue now, in a contested matter; that procedural stance was soundly rejected by the Whitehall Jewelers Court, compelling Delaware precedent over this matter. Instead, VDL presents evidence supporting its argument to urge the Court that an adversary proceeding is required to determine ownership of the Encapsulation Lines, and that it is the Debtors' burden to bring one and to prove title before an attempted sale of the Encapsulation Lines may go forward.

35. For all these reasons, VDL asserts title over the Encapsulation Lines and urges this Court to refuse to approve any sale of such lines until the dispute over whether the

Encapsulation Lines ever became property of the Debtors' estate is firmly resolved in the proper procedural manner.

## Renewed Objection to Sale of VDL Owned Equipment

36. VDL also objects to the Turnkey Sale Motion, the Auction Results Notice and the Supplemental Auction Motion to the extent the Debtors seek once again to sell the VDL Owned Equipment, despite the two prior Court Orders carving the VDL Owned Equipment out of the Debtors' sale process.. <u>Simply stated, the VDL Owned Equipment is owned by VDL</u>. The Debtors have no right, title or interest in the VDL Owned Equipment, it is not property of the Debtors' estates, and the Debtors are without authority to sell such equipment.

37. The Auction Results Notice craftily listed all property purported to be sold by the Debtors at their auction, and the Supplemental Auction Motion does the same, attempting to put the onus back on parties in interest who have already objected, requiring them to comb the listing and compare the generalized categorization of assets to be sold to their own asset lists. VDL need not engage in this backdoor process, for it already objected and had the VDL Owned Equipment carved out of the earlier auction. VDL reiterates its objection here and reminds the Debtors what the Court has already ruled: They may not sell the VDL Owned Equipment, in the Auction Results Notice or in the Supplemental Auction Motion.

WHEREFORE, VDL prays that the Court enter an order (a) denying the Turnkey Sale Motion to the extent it seeks to assume and assign the VDL Agreement without appropriate cure (provided herein) and adequate assurance and to the extent that it attempts to sell and transfer the VDL Software and VDL Software License without VDL's consent; and (b) denying the Turnkey Sale Motion to the extent that it seeks to sell the Encapsulation Lines without a prior determination in an appropriate adversary proceeding that such Encapsulation Lines constitute

property of the Debtors' estate pursuant to sections 363 and 541 of the Bankruptcy Code; and (c) denying any of the Sale and Auction Motions to the extent that they attempt to sell the VDL Owned Equipment; and (d) granting VDL such additional relief as is just and proper.

SAUL EWING LLP

By: _____
Mark Minuti (No. 2659)
Teresa K.D. Currier (No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
(302) 421-6840 and (302)421-6826

-and-

David Dornblaser, Esquire
Law Offices of David Dornblaser
890 Hillview Court, Suite 260
Milpitas, CA 95035
(408) 209-5879

*Attorneys for VDL Enabling Technologies Group*

Dated: November 15, 2011