## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Solyndra LLC, *et al.*,[1] | ) Case No.: 11-12799 (MFW) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |

**Objection Deadline: December 1, 2011 at 4:00 p.m. (prevailing Eastern time)**
**Hearing: December 8, 2011 at 9:30 a.m. (prevailing Eastern time)**

## MOTION OF SOLYNDRA LLC PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, FOR AUTHORITY TO (A) CONDUCT AN AUCTION FOR CORE ASSETS, AND (B) SELL ASSETS TO THE SUCCESSFUL BIDDERS AT AN AUCTION FREE AND CLEAR OF ALL ENCUMBRANCES

Solyndra LLC ("Solyndra"), one of the above captioned debtors and debtors in possession along with its affiliate 360 Degree Holdings, Inc. (collectively, the "Debtors"), by and through its undersigned counsel, files this motion (the "Motion") for entry of an order, in the form annexed hereto as **Exhibit A**, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing Solyndra to (a) conduct an auction for all of its core assets that were used to conduct and run its business prior to commencement of its chapter 11 case, as substantially described on **Exhibit B** hereto (collectively, the "Core Assets"), and (b) sell the Core Assets to the successful bidder(s) at an auction free and clear of all encumbrances in accordance with the auction procedures described herein, all subject to a determination by Solyndra to not proceed with a sale of its assets on a turnkey basis under the proposed Turnkey Sale (as defined below). In support of the Motion, Solyndra respectfully represents as follows:

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

## PRELIMINARY STATEMENT

1.      Since the Petition Date, Solyndra has been actively engaged in efforts to effectuate a sale of its business to a "turnkey" buyer who will acquire all or substantially all of the assets used in Solyndra's business, including Solyndra's manufacturing plant and land, associated fixtures and equipment, intellectual property, rights under executory contracts and leases, and any other business assets (the "Turnkey Sale"). Solyndra believes that the Turnkey Sale would provide the best chance for Solyndra to maximize the value of its assets and to reemploy certain of the employees who were terminated prior to the commencement of these chapter 11 cases. To that end, Solyndra filed its *Motion of Solyndra LLC for an Order (A) Approving Procedures for Sale of Business Assets on Turnkey Basis: (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice and (D) Granting Related Relief* [Docket No. 91] ("Sales Procedures Motion') in order to market its business for a Turnkey Sale. On September 28, 2011, the Court entered an order approving the Sales Procedures Motion [Docket No. 167], which approved certain bid procedures for the Turnkey Sale.

2.      On November 1, 2011, Solyndra filed its *Motion of Solyndra LLC for an Order (I) Approving Sale of Business Assets on Turnkey Basis Free and Clear of All Liens, Claims, Encumbrances and Other Interest, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases and (III) Granting Related Relief* (the "Turnkey Sale Motion") and initially scheduled the Turnkey Sale for November 22, 2011 (the "Turnkey Sale Hearing").

3.      While no acceptable Turnkey Sale bid was received by the bid deadline, parties continue to express interest in acquiring the Solyndra's assets on a turnkey basis.

2

Accordingly, Solyndra, in consultation with its key creditor constituencies, determined that an extension of the dates and deadlines for the Turnkey Sale hearing was necessary and appropriate and, on November 16, 2011, filed its *Notice of Continued Bid Deadline, Auction, and Sale Hearing for Sale of Solyndra LLC's Business Assets on Turnkey Basis and Assumption and Assignment of Related Contracts and Leases* [Docket No. 344] (the "Continued Sale Hearing Notice"). Pursuant to the Continued Sale Hearing Notice, the Debtors continued (i) the bid deadline to January 17, 2012 at 4:00 p.m. (Prevailing Pacific Time), (ii) the auction date for the Turnkey Sale to January 19, 2012 at 10:00 a.m. (Prevailing Pacific Time), (iii) the objection deadline to the Turnkey Sale Motion to January 20, 2012 at 12:00 p.m. (Prevailing Eastern Time), and (iv) the Turnkey Sale Hearing to January 23, 2012 at 11:30 a.m. (Prevailing Eastern Time). Accordingly, the Debtors believe that the prudent approach is to allow parties to conduct additional due diligence with respect to the continued Turnkey Sale hearing while at the same time moving forward with an alternative auction process for the sale of the Core Assets if the Turnkey Sale does not occur. The Debtors believe that this "dual track" process will maximize value.

4. In furtherance of the dual-track process to concurrently seek approval of the Turnkey Sale and proceed with a potential auction of the Core Assets, Solyndra has filed this Motion to schedule an auction of the Core Assets to potentially take place in during the week of January 23, 2012 ("Auction")[2] if the Turnkey Sale does not occur. Solyndra believes that it is imperative to immediately market the Core Assets for sale in order to obtain the highest possible returns given the amount of solar-related equipment from other companies that is currently on

---

[2] The Debtors will file a supplement to this Motion disclosing the exact proposed date and time of the Auction once such date and time is determined.

3

the market or that will soon come on the market. Thus, Solyndra believes that the sale of the Core Assets pursuant to the procedures set forth in this Motion (the "Auction Procedures") is the most cost-effective and efficient manner to sell the Core Assets if an Auction is to occur.

5.     Solyndra has reviewed several proposals submitted to it by various parties. Solynda ultimately accepted a bid submitted jointly by Heritage Global Partners; Counsel RB Capital, LLC; Hilco Industrial, LLC; and the Branford Group, Inc. to serve as proposed sales agents and auctioneers for the sale and auction of the Core Assets (collectively, the "Auctioneers"). Solyndra will file a separate application to seek Court authority to employ the Auctioneers (the "Auctioneer Retention Application").

## JURISDICTION

6.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this district is proper pursuant to 28 U.S,C. §§ 1408 and 1409. The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, Rules 6004(h) and 6005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6005-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## RELIEF REQUESTED

7.     By this Motion, Solyndra seeks entry of an order (the "Order"), in the form annexed hereto as **Exhibit A**, (a) authorizing Solyndra to conduct the Auction for the Core Assets; (b) authorizing Solyndra to sell the Core Assets to the successful bidders at the Core

4

Assets Auction free and clear of all Encumbrances (defined below) if the Turnkey Sale does not occur; and (c) approving the Auction Procedures.

## CASE BACKGROUND

8.     On September 6, 2011 (the "Petition Date"), each of the Debtors commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code.

## THE DEBTORS' BUSINESS

9.     Solyndra is a U.S. manufacturer of solar photovoltaic ("PV") solar power systems specifically designed for large commercial and industrial rooftops and for certain shaded agriculture applications. The Debtors' worldwide headquarters and its manufacturing operations are located in Fremont, California. Solyndra's innovative cylindrical solar PV panels are highly differentiated and unique in the PV industry. Unlike conventional flat solar panels, Solyndra's panels are a series of cylindrical modules connected to form a panel. As a result of the form factor, Solyndra panels require no ballast, tilting, or roof penetration and weigh approximately one-half of other solar panels per rooftop unit of area. In addition, Solyndra's current high-volume solar PV panels require no tools for installation and can be installed more quickly than conventional solar panels, resulting in an installation cost substantially below that of conventional solar panels. Solyndra manufactured all of its products in the United States with the support of a well-developed domestic supply chain.

10.     Prior to the lay-off of substantially all of the Solyndra workforce that occurred on August 31, 2011, Solyndra employed approximately 968 full time employees and 211 temporary employees.

11.     Solyndra has sold more than 500,000 of its panels since 2008 and has generated cumulative sales of over $250 million.  Solyndra panels are estimated to be installed on more than 1,000 commercial and industrial roofs in 20 countries.  Solyndra sells three primary types of solar panels: (i) 100 Series; (ii) 150 Series for higher power density; and (iii) 200 Series.  In addition, the Company developed new mounting solutions that allow some of the Solyndra panels to be used in new situations: these solutions include (a) Elevated Shade Structure (aka "Greenhouse") mounts, announced in February 2011; (b) mounts for metal roofs, announced in June 2011; and (c) an "Extreme Wind Solution," allowing for deployment of panels in areas with winds up to 180 miles per hour, announced in August 2011.  The 100 Series is Solyndra's original PV system composed of panels and mounting hardware for low-slope, commercial rooftops.  The 200 Series is Solyndra's second generation PV system, which has an enhanced form factor over the 100 Series, thereby increasing its Watt peak performance, and requires no tools for installation.  The 150 Series is a hybrid product, using the advanced PV modules of the 200 Series, but the existing mounting solution of the 100 Series.

12.     For the fiscal year ended January 1, 2011, Solyndra had annual revenues of approximately $142 million and incurred a net loss of approximately $329 million.  As of the year ended January 1, 2011, Solyndra had assets with a book value of approximately $859 million and liabilities with a book value of approximately $749 million.

6

13.     On October 19, 2011, the Court entered an order granting the *Motion of Solyndra LLC Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, For Authority to (A) Conduct an Auction for Non-Core Assets, and (B)Sell Assets to the Successful Bidders at an Auction Free and Clear of all Encumbrances* [Docket 150] (the "Non-Core Auction Motion"). In addition, the Non-Core Auction was held on November 2 and 3, 2011 and is expected to generate over $6,000,000 in proceeds.  On November 7, 2011, Solyndra filed its *Motion of Solyndra LLC Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authority to (A) Conduct a Supplemental Auction for Additional Non-Core Assets, (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances, and (C) Expand Retention of Heritage Global Partners as Auctioneer and Sales Agent* [Docket 315] (the "Supplemental Non-Core Auction Motion") to auction certain Non-Core Assets that were not sold at the Non-Core Auction.  The Court has scheduled a hearing on the Supplemental Non-Core Auction Motion for November 22, 2011 at 4:00 p.m.

## THE AUCTION PROCEDURES

14.     To facilitate the Auction, the Debtors propose the implementation and approval of the following Auction Procedures:

a.      Assets.  The Auction will include all Core Assets, including the assets set forth on **Exhibit B**[3] hereto.

b.      Pricing.  The Auction will be conducted on an asset-by-asset basis or in lots or combinations of lots as determined by Solyndra and Auctioneers in their discretion.  Solyndra, in consultation with Auctioneers, will set the initial bid on each Core Asset or lot of Core Assets.

c.      Participation Requirements.  Any person that wishes to participate in the Auction must become a "Qualified Bidder."  As a prerequisite to becoming a Qualified Bidder, a potential Qualified Bidder must deliver to the satisfaction of Solyndra:

---

[3] Solyndra reserves the ability to add additional Core Assets to the list of assets to be sold at the Auction.

(i)     A list of Core Asset(s) on which the bidder seeks to bid; and

(ii)     Sufficient information, as requested by Solyndra, to allow Solyndra to determine that the potential Qualified Bidder has the financial wherewithal and any required authorizations to close the sale, including without limitation, such entity's current audited (if applicable) financial statements and a good faith, cash deposit (the amount of which shall to be set by Solyndra in consultation with Auctioneers) (the "Good Faith Deposit").

     d.    <u>Auction:</u>  The Auction shall commence during the week of January 23, 2012 and continue to the extent necessary to sell the Core Assets, at 47700 Kato Road, Fremont, CA 94538 as well as other locations where the Core Assets are stored ("Auction Period") and shall be administered by Auctioneers.  The Auction shall be conducted on-site and over the Internet using webcast technology.  Only Qualified Bidders will be permitted to participate in the Auction.  The Auction shall be conducted on the following terms:

(i)     In order to participate in the Auction, each Qualified Bidder shall, to Solyndra's satisfaction, register its acknowledgement of the Auction terms (which shall include a statement that such Qualified Bidders do not have any connection to the Debtors).

(ii)     Each Core Asset, lot of Core Assets or combinations of such lots will be auctioned either separately or in lots determined by Auctioneers and Solyndra at the Auction. During the Auction Period, bidding shall begin at an amount set by Solyndra and Auctioneers and subsequently continue in minimum bid increments of no less than 5% of the suggested purchase price.

(iii)     None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Successful Bidder will be binding whether or not (a) the Successful Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred.

(iv)     <u>Pre-Auction Bidding</u>.  All bidding for the Core Assets will occur at the Auction.  Notwithstanding the foregoing, a Qualified Bidder shall be permitted to submit a bid to Auctioneers prior to the Auction and designate Auctioneers as their proxy to make such a bid on its behalf at the Auction.

(v) The Auction shall be conducted openly and all creditors will be permitted to attend.

(vi) <u>Terms of Sale</u>. The Core Assets are being sold, (i) **"AS IS, WHERE IS, AND WITH ALL FAULTS AND WITH NO LICENSE,"** and the Debtors expressly disclaim all warranties, including (but not limited to) warranties of merchantability, warranties of non-infringement, and warranties of fitness for a particular purpose or use, and (ii) **"THERE IS NO WARRANTY RELATING TO QUIET ENJOYMENT, OR THE LIKE IN THE DISPOSITION OF ANY OF THE ASSETS."** Bidders are advised, and by submitting a bid each bidder is deemed to acknowledge, that Auctioneers, the Debtors and each of their respective directors, officers, managers, employees, agents, advisors and attorneys have no knowledge with respect to, and have no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Assets. **NO WARRANTY OR REPAIR PROGRAM FOR THE ASSETS IS BEING OFFERED AS PART OF THE SALE.**

(vii) <u>Bid(s); Backup Bid(s)</u>. Upon the conclusion of the Auction, Auctioneers and Solyndra shall (a) identify and certify the bid or bids that constitutes the highest or best offer or offers for the Core Assets (each bid a "Prevailing Bid" and each person submitting such bid a "Successful Bidder") and (b) identify and may, in its discretion, certify the bid or bids that constitute the next highest or best offer or offers for the Assets (each bid a "Backup Bid" and each person submitting such a bid a "Backup Bidder"), and, in each case, notify the Successful Bidder(s) and Backup Bidder(s).

(viii) Within two (2) business days of the conclusion of the Auction Period, Solyndra shall file with the Court the following (as described below, the "Post-Auction Disclosures"):

1. A list of each Successful Bidder, Backup Bidder (if any), the Core Asset(s) purchased by such bidder, and the price to be paid by each Successful Bidder for each Core Asset or lot(s) of Core Assets;

2. A declaration of one of the Auctioneers stating that the Auction was run without collusion, in good faith

and at arms' length with each Successful Bidder or Backup Bidder; and

3.   A declaration from a representative of Solyndra stating that no Successful Bidder is an insider of either Debtor.

(ix)   Contemporaneously with the filing of the Post-Auction Disclosures, Solyndra will serve the Post-Auction Disclosures by email and/or facsimile on: (a) counsel to AE DIP 2011, LLC, the DIP Lender, and Argonaut Ventures I, L.L.C., as the Prepetition Tranche A Representative and the Prepetition Tranche E Agent, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Michael A. Rosenthal (email: mrosenthal@gibsondunn.com) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, DE 19899, Attn: Sean M. Beach, Esq. (email: sbeach@ycst.com); (b) counsel to the U.S. Department of Energy, acting by and through the Secretary of Energy, as the Prepetition Tranche B/D Agent, U.S. Department of Justice, Civil Division, 1100 L Street NW, Room 10030, Washington, D.C. 20530, Attn: Matthew J. Troy (email: matthew.troy@usdoj.gov); (c) counsel to any Official Committee of Unsecured Creditors (the "Committee"); and (d) Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy (email: jane.m.leamy@usdoj.gov) (collectively, the "Notice Parties").

(x)   No earlier than two (2) business days after Solyndra files the Post Auction Disclosures with the Court and if no timely objection is received by any of the Notice Parties prior to the expiration of such period, then Solyndra is authorized to immediately consummate the proposed sales contemplated under the Post Auction Disclosures upon entry of an order approving such Sale filed under certification of counsel.

(xi)   No Successful Bid will be subject to higher and better offers. The highest cash bid at the Auction is the Successful Bid.

(xii)   All sales of Core Assets shall be, subject to section 363 of the Bankruptcy Code, free and clear of all third-party liens, claims, encumbrances and security interests (each an "Encumbrance" and collectively, "Encumbrances");

10

provided that such Encumbrances shall attach to the net proceeds of the sale of such Core Assets with the same enforceability, validity and priority as such Encumbrances had against the Core Assets.

e. Sales Commission, Buyer's Premium, Auction Expenses Reimbursement Procedures:

(i) The Auctioneers will charge a buyer's premium of fifteen percent (15%) of the aggregate gross proceeds for the sale of a Core Asset or lot of Core Assets, payable by the buyers of such assets (the "Buyer's Premium"), and which Buyer's Premium shall be split as follows: 7.5% to be remitted to the Debtors and the remaining 7.5% to be remitted to the Auctioneers.

(ii) No sales commission shall be paid to any of the Auctioneers proceeds from the sale of any Core Assets.

(iii) The Auctioneers shall receive reimbursement of actually incurred and reasonable expenses (including, without limitation, labor, advertising, travel and lodging, digital photography of the Core Assets, print and electronic media production, brochure and catalog production, and telemarketing) up to $40,000.00 (the "Auction Expenses").

(iv) The Auctioneers guarantee that the Debtors will receive a minimum of $4.25 million in net proceeds from the Auction, after payment of the Auctioneers' portion of the Buyer's Premium and Auction Expenses that are ultimately allowed by the Court and paid to the Auctioneers (the "Guaranteed Minimum Net Proceeds"). The Guaranteed Minimum Net Proceeds shall be paid to the Debtors upon the later of (i) entry of an order by the Court approving Auctioneer Retention Application or (ii) January 1, 2012. If either (i) a Break-up Fee (as described below), is paid to the Auctioneer, or (ii) the Auction does not occur on or before an outside date of March 31, 2012, unless such outside date is otherwise extended by agreement of the Debtors and Auctioneer, the Debtors will promptly refund the Guaranteed Minimum Net Proceeds to the Auctioneers.

(v) The Debtors and the Auctioneers each agree and acknowledge that the Debtors may continue to pursue a sale of the Debtors assets pursuant to the Turnkey Sale up to and including the week of January 16, 2012. To the extent the Core Assets are sold pursuant to the Turnkey Sale, the Auctioneers will be entitled to a breakup fee of

11

$250,000 (the "Breakup Fee") plus reimbursement of the Auction Expenses. The Breakup Fee and Auction Expenses represent the Auctioneer's sole compensation to the extent the Turnkey Sale is approved by the Court.

f.     Closing Deadline; Asset Removal Deadline. The sale(s) contemplated by the Successful Bid(s) shall be closed within two (2) business days after entry of the order approving sales contemplated under the Post-Auction Disclosures as provided herein or by such other deadline agreed to between Solyndra and the Successful Bidder(s) (the "Closing Deadline"). At the closing of the sale of any Core Asset, the purchaser shall (a) pay Auctioneers with a certified check, bank check or wire transfer for the full outstanding cash balance of the purchase price, and (b) pay Auctioneers with a certified check, bank check or wire transfer in favor of Auctioneers for any Buyer's Premium due to Auctioneers in accordance with these Auction Procedures and the Court's order approving Auctioneers' employment. Each Successful Bidder's or Backup Bidder's sole remedy in the event that a sale fails to close as a result of Solyndra's refusal or inability to close shall be a refund of the monies deposited by such bidder.

g.     Disbursement of Proceeds. Following the Closing Deadline(s), Auctioneer shall promptly disburse to Solyndra the net Auction proceeds owed to Solyndra not including Auctioneers' asserted 7.5% Buyer's Premium amounts, and Expense Reimbursement, which amounts shall be paid to Auctioneers pursuant to further order of the Court. For avoidance of doubt, Auctioneer will not be required to remit to Solyndra the Guaranteed Minimum Net Proceeds previously paid pursuant to section 14.e.(iv) above.

h.     Removal of Core Assets. Any Successful Bidder that is purchasing any Core Assets shall be required to remove such Core Assets from Solyndra's facility immediately and, in any event, by no later than 21 days after the Auction or by such other deadline agreed to between Solyndra and such Successful Bidder. Each Successful Bidder shall be solely responsible for any and all fees, costs and expenses associated with any purchased Core Assets on and immediately after the Closing Deadline, including, without limitation, any costs and expenses attributable to rent and related expenses for the period of time following the Closing Deadline (regardless of when payment of such rent became due or related expenses of Solyndra were incurred in connection with such Core Asset following the Closing Deadline).

i.     Customs and Taxes. Purchasers of the Core Assets shall be solely responsible for paying any customs duties and taxes due and owing on any of the Core Assets including, without limitation, any sales taxes, stamp taxes, recording taxes or transfer taxes.

j.     Publicity. Auctioneers may, in their discretion, distribute a prospectus (the "Prospectus") to all persons who have previously shown an interest in purchasing the Core Assets or whom Auctioneers have identified as a potential bidder. The Prospectus will include, among other things, a listing of the Core Assets, the associated suggested pricing, and a copy of the Order specifying the date and time of the Auction and the participation requirements. Solyndra may, in its discretion but without any obligation, publish a notice of the Auction in the national edition of *The Wall Street Journal* or similar publication.

k.     Return of Good Faith Deposit. All Good Faith Deposits will be held in a non-interest-bearing account and will be returned to any Qualified Bidder who is not a

12

Successful Bidder; provided, however, that if a Successful Bidder fails to consummate a transaction within five (5) days of the conclusion of the Auction with respect to a Successful Bid (other than as a result of the failure of Solyndra to convey title to the applicable Core Asset to the applicable Successful Bidder), Solyndra will not have any obligation to return the Good Faith Deposit and such Good Faith Deposit shall irrevocably become the property of Solyndra.

l.     <u>Additional Requirements</u>.  Solyndra shall be permitted to adopt such additional reasonable rules and procedures that will serve to maximize the value of the Core Assets.

m.     <u>Modification</u>.  Auctioneers may determine, in their business judgment, but only following the receipt of Solyndra's consent, which bid or bids, if any, constitute the highest or otherwise best offer(s) for the Core Assets, and may reject at any time any bid that, in Auctioneers' discretion, but subject to Solyndra's consent, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Auction Procedures or the terms and conditions of Solyndra, or (c) contrary to the best interests of Solyndra.  At any time before or at the Auction, and subject to the consent of Solyndra, Auctioneers (y) may impose such other bidding procedures and terms and conditions as they may determine are in the best interests of Solyndra and other parties in interest, and (z) may modify or amend these Auction Procedures.

n.     <u>Additional Procedures for Disassembly and sale and auction of the encapsulation lines manufactured by VDL</u> (the "VDL Encapsulation Lines").  There is an actual dispute by and between Solyndra and VDL Enabling Technologies Group Eindhoven BV ("VDL") over their respective rights and title to the VDL Encapsulation Lines and other equipment and property, as well as claims by and against the parties in connection with that certain *Equipment Design and Manufacturing Agreement*, by and between VDL and Solyndra (collectively, the "VDL Disputes").  Solyndra and VDL are negotiating a potential agreement over procedures by which the VDL Encapsulation Lines may be sold pending the adjudication of the VDL Disputes.  To the extent that the parties are able to agree on any such procedures, Solyndra reserves the right to supplement this Motion to propose additional procedures with respect to the potential sale of the VDL Encapsulation Lines and/or other property that are the subject of the VDL Disputes.

## BASIS FOR RELIEF

**B.     <u>Applicable Legal Standards for the Auction and the Auction Procedures</u>**

15.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363(b) does not set forth a standard for determining when it is appropriate for a court to authorize the

13

disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon a debtor's sound business judgment. *See In re Martin,* 911 F.3d 389, 395 (3d Cir. 1996); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del, 1991); *In re Trans World Airlines Inc.,* No, 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr, 2, 2001).

16.     In structuring bidding procedures, auctions and sales pursuant to section 363(b) of the Bankruptcy Code, a debtor has broad discretion to construct a transaction that, in its business judgment, will deliver the most value to the entire estate, including its creditors and all stakeholders. *See In re Quality Stores, Inc.,* 272 B.R. 643, 647 (Bankr. W.D. Mich. 2002) (noting that debtors have "wide business discretion" in selling assets under section 363); *In re Wilson Freight Co.,* 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (in approving a debtor's right to set a minimum price threshold at an auction conducted pursuant to section 363(b), the court noted that "the Code grants the debtor substantial discretion as to the method of conducting the sale and as to negotiating and obtaining bids."); *see also In re Williams,* 152 B.R. 123, 127 (Banks. N.D. Tex. 1992) (holding that a debtor in possession has fiduciary obligations to the entire estate).

17.     Furthermore, a debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071. A sound business purpose for

14

the sale of a debtor's assets outside the ordinary course of business may be found where the sale maximizes the value of the debtor's estate. *See In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (citing *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the... [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

18.     In evaluating whether a debtor has exercised sound business judgment in the context of section 363(b), courts often scrutinize the propriety of the sale process. *See In re Summit Global Logistics, Inc.,* No 08-11566, .2008 WL 819934, at *14 (Bankr. D.N.J. March 26, 2008) ("The Debtors and the Secured Lenders have proposed a transaction that is the result of a fair and open sale process facilitated by the investment bankers that maximizes value and return to interested parties,"); *In re Castre, Inc.,* 312 B.R. 426, 428 (Bankr. D. Colo, 2004) (citing *In re Gulf States Steel Inc. of Alabama,* 285 B.R. 497 (Bankr. D. Ala. 2002) (noting that most of the factors considered by courts for § 363(b) purposes focus on "process" issues — such as adequate procedures, proper notice to interested parties, proper market exposure and the preparation for and conduct during the auction "rather than the business rationale for why the successful bid was chosen."); *Quality Stores,* 272 B.R. at 643 ("a sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.").

19.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) whether adequate and reasonable notice has

15

been provided to interested persons; (c) whether the debtor has obtained a fair and reasonable price; and (d) whether the parties have acted in good faith. *See Abbotts Dairies*, 788 F.2d 143 (3d Cir. 1986); *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987); *In re Sovereign Estates. Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

20. Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *In re Pincus,* 280 B.R. 303, 312 (Bank. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F. 2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

16

**C.**    **The Auction and the Auction Procedures Should Be Approved:  A "Sound Business Purpose" Justifies the Auction and the Sale of the Core Assets**

21.    Solyndra submits that the Auction Procedures set forth herein are a sound exercise of its business judgment, which is in the best interests of its estate and all parties in interest.  If the Turnkey Sale does not occur, then Solyndra must sell its Core Assets in order to maximize the value of its property.  The Auction Procedures would allow Solyndra to expeditiously liquidate the Core Assets in the most efficient and cost-effective manner in the event that there is no Turkey Sale.

22.    The Auction Procedures provide sufficient protections for Solyndra's estate.  First, Solyndra developed the Auction and the Auction Procedures in order to maximize return to its estate.  Second, immediately after the Auction, Solyndra will make the requisite disclosures to the Court and key parties, which will be required to show that (a) the Auction was conducted in good faith, (b) no prospective purchasers are insiders of the Debtors, and (c) the Auction complied with the Auction Procedures.  In addition, Solyndra will not be permitted to close on any Successful Bid until the Post-Auction Disclosures are filed with the Court and served on the Notice Parties and the Court enters an order authorizing the sale of Core Assets.

23.    Solyndra submits that the Auction is a sound exercise of its business judgment.  At this stage of Solyndra's chapter 11 cases, a fair and expedited sale process is crucial to maximizing creditor recoveries by selling the Core Assets and minimizing costs.  Accordingly, Solyndra submits that the Auction and the related procedures are in the best interests of Solyndra's estate and all parties in interest.

17

**D.**     **To the Extent Applicable, the Sale of Encumbered Core Assets**
**Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

24.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may

sell all or any part of its property free and clear of any and all liens, claims or interests in such

property if:

> (i)     such a sale is permitted under applicable non-bankruptcy
>          law;
>
> (ii)    the party asserting such a lien, claim or interest consents to
>          such sale;
>
> (iii)   the interest is a lien and the purchase price for the property
>          is greater than the aggregate amount of all liens on the
>          property;
>
> (iv)   the interest is the subject of a *bona fide* dispute; or
>
> (v)    the party asserting the lien, claim or interest could be
>          compelled, in a legal or equitable proceeding, to accept a
>          money satisfaction for such interest.

*See* 11 U.S.C. § 363(1); *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),* 94 B.R.

343, 345 (ED. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a

court may approve a sale "free and clear" provided at least one of the subsections is met).  Any

secured creditor that fails to object to the Auction procedures can be deemed by the Court to

have consented to the Auction procedures.  Furthermore, regarding the interests of holders of

Encumbrances, such interests are adequately protected by the terms of the Order.  Specifically,

all Encumbrances on the Core Assets will attach with the same priority, enforceability and

validity to the consideration paid by the applicable Successful Bidder to Solyndra as such

Encumbrances currently have with respect to the Core Assets.

**E.**     **Approval of the Breakup Fee And Auction Expenses is Appropriate**

25.     Also, as stated above, to compensate the Auctioneers if the Auction does

not occur because of the Turnkey Sale, Solyndra seeks approval of a Breakup Fee of $250,000

18

plus payment of the Auction Expenses. The Debtors believe that the Break-Up Fee is

reasonable, given the benefits to the estates of having a definitive Engagement Agreement and a

guaranteed receipt of at least $4.25 in Guaranteed Minimum Net Proceeds and the risk to the

Auctioneers that a third-party may ultimately purchase the Core Assets as part of the Turnkey

Sale. Solyndra believes that the Breakup Fee would enhance any competitive bidding for a

Turnkey Sale because potential buyers will already know that the Auction is a viable option to

the sale of the Core Assets and will occur at a definitive time if no acceptable bids for the

Turnkey Sale are received. In addition, potential bidders will also know that the Debtors will

have received at least $4.25 million as Guaranteed Minimum Net Proceeds from any prospective

Auction in advance of the bid deadline for the Turnkey Sale.

      26.     Break-up fees and other termination fees are a normal and, in many cases,

necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to
> maximize the value of the debtor's assets.... In fact, because the...
> corporation ha(s) a duty to encourage bidding, break-up fees can
> be <u>necessary</u> to discharge [such] duties to maximize values.

*Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and other

strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding

by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R.

at 28 (quotations omitted); *see also Integrated Res.*, 147 B.R. at 660-61 (break-up fees can

prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In*

*re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders

would be reluctant to make an initial bid for fear that their first bid will be shopped around for a

higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

       27.    Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

       28.    In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estates. *See id.*, at 533.

       29.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,

"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

30.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the modest Breakup Fee of $250,000 and reimbursement of the Auction Expenses pass muster. The Agreement and Solyndra's potential agreement to pay a Breakup Fee and Expense Reimbursement is the product of good faith, arm's-length negotiations between Solyndra and the Auctioneers. The Breakup Fee and Auction Expenses are fair and reasonable in amount, and is reasonably intended to compensate for the risk to the Auctioneers of being used as a stalking horse by a purchaser of the Core Assets under the Turnkey Sale.

### F.     Relief From the Fourteen Day Waiting Period Under Bankruptcy Rule 6004(h) Is Appropriate

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Solyndra requests that the Sale Order be effective immediately by providing that the fourteen day stay under Bankruptcy Rule 6004(h) is waived.

32.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. F. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen day stay period, *Collier on Bankruptcy* suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been

21

no objection to the procedure." 10 *Collier on Bankruptcy* 15th Ed. Rev., ¶ 6064.09 (1996),

Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the

objecting party informs the court of its intent to appeal, the stay may be reduced to the amount

of time actually necessary to file such appeal. *Id.*

33.     Waiver of the Rule 6004(h) automatic stay is equally critical to the success

of the Auction.  Absent a waiver of the Rule 6004(h) automatic stay, it is likely that many

bidders will refrain from participating in the Auction, or, in the alternative, demand reduced

purchase prices.  Thus, Solyndra requests that the Court waive the fourteen-day stay period under

Bankruptcy Rule 6004(b).

34.     No previous request for the relief sought herein has been made to this or

any other Court.

## NOTICE

Notice of this Motion has been or will be given to the following parties or, in lieu

thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors'

prepetition lenders; (iii) counsel for the Committee; and (iv) those persons who have requested

notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, Solyndra respectfully requests that the Court enter an order,

substantially in the form annexed hereto as **Exhibit A**, authorizing Solyndra to (i) conduct the

Auction for the Core Assets pursuant to the Auction Procedures; (ii) sell the Core Assets to

the successful bidders at an Auction free and clear of all Encumbrances; approval of the

Auction Procedures and Breakup Fee, and (iii) granting such other and further relief as the

Court deems just and proper.

Dated: November 22, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_B ʒ m_

Richard M. Pachulski (CA Bar No. 90073)
Bruce Grohsgal (DE Bar No. 3583)
Debra I. Grassgreen (CA Bar No. 169978)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:    rpachulski@pszjlaw.com
           bgrohsgal@pszjlaw.com
           dgrassgreen@pszjlaw.com
           jfried@pszjlaw.com

Attorneys for the Debtors and Debtors in Possession

DOCS_DE:173603.4 80368-00001