# EXHIBIT A



# Heritage Global Partners
## Asset Advisory and Auction Services
### *A Legacy since 1937*

## EXCLUSIVE AUCTION AND SALES AGREEMENT

This Exclusive Auction Agreement ("Agreement") is made as of November 21, 2011 ("Effective Date")

BETWEEN:

>  Solyndra LLC
>  47488 Kato Road
>  Fremont, CA  94538
>  Attention:      Ben Bierman
>  Telephone:     (510) 440-3535
>  Fax:              (510) 440-2799

>  ("Seller"),

AND

>  Heritage Global Partners, a California corporation
>  Hacienda Del Mar
>  12625 High Bluff Drive Suite 211
>  San Diego, CA  92130
>  Attention:      Kirk Dove
>  Telephone:     (858) 847-0650
>  Fax:              (858) 847-0660;

>  Counsel RB Capital, LLC;
>  10618 Pico Blvd.
>  Los Angeles, CA 90064
>  Phone: (310) 248 2979;

>  Hilco Industrial, LLC
>  Suite 207
>  31555 West Fourteen Mile Road
>  Farmington Hills, MI 48334
>  Phone: 248-254-9999 Ext.15; and

>  The Branford Group
>  896 Main Street
>  Branford, CT 06405
>  P: 203-483-2225

>  (collectively, the "Auctioneer")

WHEREAS, Seller wishes to sell certain assets, and Auctioneer has agreed to conduct a public auction on the terms and conditions set forth below;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, Auctioneer and Seller agree as follows:

**1. REPRESENTATION**: Seller agrees to retain Auctioneer on an exclusive basis to offer for sale and conduct an auction (the "Auction") of the assets (the "Assets") set forth on Exhibit A to this Agreement. For purposes of clarification, the Auctioneer is being retained to sell all assets deemed "core assets".

**2. CONDUCT OF THE AUCTION**: The Auction will be conducted in January, 2011, the exact date to be determined by mutual agreement. At all times the Auction will be conducted on site and over the Internet using webcast technology. Seller agrees that Auctioneer may use its name, street address and logo in its advertising in accordance with Auctioneer's customary practice, including on its Website as well as in any press release, solely to perform services under this Agreement. Unsold items, if any, shall revert back to the Seller at the conclusion of the post auction removal period. Auctioneer shall not be responsible for the removal of any unsold items.

**3. DISCLAIMERS OF WARRANTIES**: Auctioneer shall state both in its advertising for the Auction and at the Auction that all Assets are being sold "as is, where is and with all faults," without any licenses and with any additional disclaimers of warranty, including disclaimers of the warranties of merchantability and fitness for a particular purpose (but excluding any in-place transferable maintenance agreements).. Seller acknowledges and agrees that Auctioneer has no knowledge with respect to, and has no obligation to investigate, the merchantability or fitness for any particular use of any Asset. Auctioneer shall be entitled to indemnification from claims and liabilities asserted against Auctioneer by any third party based on the alleged existence or breach of any alleged warranties or from or against any expenses actually incurred by Auctioneer, in accordance with the limitations and the terms of the order approving the Auctioneer's application for employment to be filed with the United States Bankruptcy Court for the District of Delaware where the Seller's chapter 11 case is pending (the "Bankruptcy Court").

**4. UP-FRONT GUARANTEED MINIMUM NET PROCEEDS AND COMPENSATION**:

(a)     The Auctioneer guarantees that the Seller will receive a minimum of Four Million Two Hundred Fifty Thousand Dollars ($4,250,000 USD) in net proceeds from the Auction, after all Compensation and Auction Expenses that are paid to the Auctioneer (the "Guaranty"). The Guaranty will be payable to the Seller upon the later of (i) approval of the Auctioneer's retention by the Bankruptcy Court or (ii) January 1, 2012. If either (i) a Break-up Fee, as described below, is paid to the Auctioneer, or (ii) the Auction does not occur on or before an outside date of March 31, 2012, unless such outside date is otherwise extended by agreement of the Seller and Auctioneer, the Seller will promptly refund the Guaranty to the Auctioneer.

(b)     The Auctioneer understands and agrees that the Debtors may continue to pursue a turn-key sale of their assets up to and including the week of January 16, 2012 ("Turn-Key Sale"). To the extent the Assets are sold pursuant to a Turn-key Sale, the Auctioneer will be entitled to a Break-up Fee of $250,000 (the "Break-up Fee") payable from the sale proceeds received in a Turn-Key Sale. The Break-up Fee and reimbursement of Auction Expenses represent the Auctioneer's only compensation to the extent a Turn-key Sale is approved by the Bankruptcy Court.

(c)     Seller shall not pay Auctioneer any Seller's commission. Auctioneer shall charge each successful bidder a 15% buyer's premium (the "Buyer's Premium") for its own account as compensation for auction services provided up to and including the actual Auction event and through removal of the Assets from the premises. The Buyer's Premium shall be collected by Auctioneer directly from the purchaser in addition to the purchase price as bid for such Auction services. Payment to the Auctioneer of such Buyer's Premium by the successful bidder is not dependent on any other service provided by the Auctioneer in connection with the Auction subsequent to the actual Auction event, if any. Seller shall not be liable to Auctioneer for Buyer's Premium under any circumstances, including in the event that a purchaser fails to live up to its agreement and complete a purchase. Payment of the Buyer's Premium to

the Auctioneer shall be made in accordance with and pursuant to any order entered by the Bankruptcy Court authorizing such payment. Notwithstanding anything contained in this section to the contrary, Auctioneer shall remit fifty percent (50%) of each collected Buyer's Premium to the Seller.

**5. AUCTION EXPENSES:**

(a) Advertising and Direct Marketing: Seller shall provide Auctioneer an allowance toward certain Auction reasonable advertising expenses, which may include digital photography of the Assets, print and electronic media production, creative services, ad placement fees, brochure and catalog production, telemarketing, data list purchases, fax and email advertising and postage incurred in connection with the Auction.

(b) Labor: Seller agrees to reimburse Auctioneer for reasonable labor expenses related to the Auction. Such labor includes services rendered in connection with the collection and disbursement of Auction proceeds (as discussed under Section 7 below). Seller has the right to provide its own labor in part or in whole (or subcontract to third parties) in connection with such services at its election as long as such persons demonstrate adequate competencies related to such services.

(c) Travel and Lodging: Seller agrees to reimburse Auctioneer for Auctioneer's reasonable actual travel expenses related to the Auction.

(d) Miscellaneous: Seller also agrees to reimburse Auctioneer for reasonable miscellaneous expenses related to the Auction, including transportation of equipment to HGP warehouse, accounting, equipment rental, insurance, permits, UCC searches/lien releases and security/armored cars.

Reasonable expenses incurred pursuant to subsections (a) through (d) (collectively referred to as the "Auction Allowance") shall not exceed $40,000.00.

(e) Seller acknowledges and agrees that the Auction Allowance shall in all events be deducted from the gross proceeds and paid to Auctioneer following the Auction, in accordance with and pursuant to any order entered by the Bankruptcy Court. For purposes of this Agreement, 'gross proceeds' means all revenue from the sale of Assets pursuant to this Agreement, excluding (i) any sales taxes collected by Auctioneer, and (ii) any Buyer's Premium collected pursuant to Section 4.

**6. PRE- AUCTION ASSET TRANSACTIONS**: Prior to the Auction, Seller may not withdraw, sell or otherwise dispose of any of the Assets listed in Exhibit A, unless otherwise agreed by the parties. Unless such withdrawal is agreed by the parties, any withdrawals prior to the Auction shall be subject to full compensation to Auctioneer pursuant to this Agreement. Notwithstanding the foregoing, Auctioneer shall not be entitled to any compensation for Assets listed on Exhibit A that cannot be sold in the Auction due to Seller's warehousemen or logistics providers refusing to allow access or to release Assets to be sold or shipped.

**7. COLLECTION AND DISBURSEMENT OF AUCTION PROCEEDS:**

(a) Auctioneer shall collect from the purchasers of the Assets the gross proceeds, any applicable sales taxes and amounts due as its share of the Buyer's Premium and deposit such funds into a segregated bank depository account to be opened and maintained for the benefit Seller. All applicable sales taxes collected by Auctioneer shall be paid by the Auctioneer to the appropriate taxing authorities out of the account. Thereafter, no later than 15 calendar days after the Auction, Seller shall be issued a check from the account (a 'Settlement Check'), in the amount of the net auction sale proceeds (after Auctioneer has reserved for payment from the account its asserted reimbursable expenses pursuant to Section 5 and asserted amounts allocable to its share of the collected Buyer's Premium, which amounts may be distributed to Auctioneer in accordance with and pursuant to any order entered by the Bankruptcy Court, subject to open items or uncollected accounts, if any.

(b) Auctioneer shall provide, in accordance with the provisions of any order entered by the Bankruptcy Court approving the proposed auction procedures governing the sale of the Assets, a list of each successful bidder, backup bidder, the Asset(s) purchased by such bidder, the price to be paid by each bidder; A declaration of Auctioneer stating that the Auction was run without collusion, in good faith and at arms' length with each successful bidder or backup bidder.

**8. ASSET TRANSPORTATION, SUBSEQUENT AUCTIONS AND RIGHT OF SURRENDER**: If needed, Asset transportation to the sale facility prior to the Auction shall be arranged and paid for by Seller. In the event that walls or other structures must be removed or modified to remove the Assets sold at the Auction, all supervision and expense of such removal and modification shall be borne directly by the Seller and are not included in the Auction Allowance. Any labor costs that Seller directly or indirectly incurs in connection with the Auction shall be borne directly by Seller and are not included in the Auction Allowance. In the event that some Assets remain unsold at the conclusion of the Auction, or a purchaser fails to perform his obligation to pay the purchase price of an Asset, such Assets shall remain with Seller, unless it agrees that Auctioneer may include those Assets in a subsequent auction, as agreed by the parties. Any expenses incurred pursuant to this Paragraph 8 shall constitute Auction Allowance expenses as described in paragraph 6 of this Agreement, which Auction Allowance expenses shall not exceed $40,000 in the aggregate.

**9. UTILITY DISCONNECTION AND ASSET REMOVAL**: As soon as reasonably possible after a sale at the Auction, Seller shall disconnect all utilities to the sold Assets, including electric, gas, waste and water lines, in a reasonable manner designed to protect the Asset and the facility, at Seller's sole cost. The Auctioneer will be responsible for overseeing the asset removal program, with no less than fifteen (15) people staffed overseeing the entire asset removal process. Once certified funds have been received and "paid in full" invoices have been issued, the purchaser shall be solely responsible for rigging and shipping the sold Assets. Rigging companies will be the responsibility of the purchaser but the Auctioneer will ensure that they are licensed and insured. Paid in full purchasers will be escorted through the Premises to each of their purchased assets to ensure an orderly, safe and clean asset removal program. No assets will be allowed from the Premises without a "paid in full" invoice. Under no circumstances shall Auctioneer be responsible for any loss, damage or destruction associated with asset removal or disconnection, except to the extent that such loss damage or destruction results from the negligence or intentional acts of Auctioneer. Seller acknowledges that with respect to any export transaction involving any of the Assets sold hereunder, and unless Seller and purchaser agree otherwise, Seller shall be the U.S. principal party in interest. Accordingly, Seller authorizes Auctioneer to provide Seller's federal employer identification number ('EIN') to buyers, their agents, customs officials or similar parties for the purposes of completing a Shipper's Export Declaration form or any documentation necessary to facilitate the respective purchaser's export of the purchased Assets.

**10. INSURANCE**: Seller shall be solely responsible for maintaining adequate insurance coverage pertaining to the Assets and their transfer to and from, and storage at, Auction sites. If the Auction is to occur at premises owned or leased by Seller, Seller also shall maintain adequate liability insurance for the duration of the Auction and related activities. Auctioneer shall carry adequate liability insurance for the duration of the Auction and related activities and all workers' compensation insurance for Auctioneer's employees in compliance with all applicable state and local laws.

**11. DESTRUCTION OF ASSETS**: In the event of any loss, damage or destruction of any Assets, whether before or after the Auction, Seller shall remain liable to Auctioneer for Auctioneer's reimbursable expenses under Section 5. In the event of loss, damage or destruction of any Assets after sale at the Auction, Auctioneer shall not be entitled to its Buyer's Premium under Section 4, unless Seller receives collection of any insurance proceeds payable on account of the destruction of any or all of the Assets after sale but prior to payment by a purchaser, Seller shall pay to Auctioneer a portion of such proceeds sufficient to pay Auctioneer's reimbursable expenses under Section 5, any applicable sales taxes and amounts payable as its share of the Buyer's Premium under Section 4 (collectively, the 'Recovery

Obligations'). Seller shall have no obligation to pay such charges unless and until it receives insurance proceeds covering such lost Assets.

**12. USE OF PREMISES**:

(a) For the purposes of this Agreement, the "Premises" shall mean 47488 Kato Rd, Fremont, CA or such other location as determined by mutual agreement of both Seller and Auctioneer. Seller authorizes Auctioneer and its representatives to enter upon and use the Premises for the purposes of (i) storing the Assets thereupon, (ii) preparing for and conducting sales of the Assets, (iii) otherwise exhibiting the Assets to prospective purchasers, and (iv) for such other purposes as are reasonable and necessary to conduct the Auctions. Seller agrees that Auctioneer shall not be charged a fee for the use of the Premises. Seller further agrees that it shall furnish utilities to the Premises, at Seller's sole expense.

(b) Seller acknowledges and agrees that Auctioneer has no interest of any kind or nature in the Premises, and that Auctioneer has no knowledge as to any previous use or occupancy of the Premises. Seller acknowledges and agrees that Auctioneer shall not be responsible for damage or injury to the Premises resulting from or arising in connection with the use or removal of the Assets, except to the extent that such damage or injury is caused by Auctioneer's negligence or intentional acts.

**13. REPRESENTATIONS AND WARRANTIES:** Seller represents and warrants to Auctioneer as follows:

(a) Seller is authorized to execute and perform this Agreement, and this Agreement constitutes a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to approval by the Bankruptcy Court.

(b) Seller may transfer title to the Assets listed on Exhibit B to the Motion of Solyndra LLC Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authority to (A) to Conduct an Auction for Core Assets, and (B) Sell Assets to the Successful Bidders at an Auction Free and Clear of All Encumbrances.

(c) To the best of Seller's knowledge, none of the Assets infringes or violates (or contains any parts or components which infringe or violate) any third party's copyright, patent, trademark, trade secret or other proprietary rights.

(d) To the best of Seller's knowledge, no sale of the Assets will constitute a bulk sale subject to the Bulk Transfer Article of the Uniform Commercial Code for any state in which any of the Assets are located (the ' Bulk Transfer Article').

(e) To the best of Seller's knowledge, none of the Assets or any components thereof, or related software or technology requires a U.S. Government license for export from the United States to countries other than those which are subject to comprehensive embargoes or support for terrorism (currently, Cuba, Iran, North Korea, Sudan, or Syria, as the same may change from time to time) except those specifically listed in writing delivered by Seller to Auctioneer, with the respective Export Control Classification Numbers for such listed Assets.

(f) Seller acknowledges and agrees that Auctioneer is relying on the foregoing representations and warranties in proceeding to conduct the Auction and/or sales provided for under this Agreement. Seller agrees to defend and indemnify Auctioneer and hold Auctioneer harmless from and against any claim, demand, cause of action, liability or expense (including attorneys' fees) asserted against or incurred by Auctioneer in connection with Seller's breach of any of its representations, warranties or obligations in this Agreement, in accordance with the limitations and the terms of the order approving the Auctioneer's application for employment to be filed with the Bankruptcy Court. If any action at law or in equity is brought to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs from the other party.

**14. TECHNOLOGY DISCLAIMER: AUCTIONEER DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN THE WEBSITE, INCLUDING ANY THIRD-PARTY SOFTWARE, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH THE WEBSITE, WILL BE TIMELY, SECURE, UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.**

**15. INDEPENDENT PARTIES**: This Agreement shall not be construed (i) to create a partnership or joint venture between Seller and Auctioneer, or (ii) to imply that Auctioneer is buying the assets of, or any interest in, Seller.

**16. CO-VENTURE AGREEMENT**: This Auctioneer has disclosed to the Seller that it will co-venture the Auction with Counsel RB Capital, LLC, Hilco Industrial, LLC and The Branford Group (the CO-VENTURE"). All parties to the CO-VENTURE will share all compensation payable under this Agreement and will not look to the Seller or its estate for any further compensation to the CO-VENTURE or any individual party in the CO-VENTURE.

**17. ARBITRATION:** The Bankruptcy Court shall have original jurisdiction to determine any disputes arising from or related to this Agreement. Notwithstanding the foregoing, and to the extent permitted by the Bankruptcy Court, the parties agree to submit all controversies, claims and matters of difference arising out of or relating to this Agreement and the Auction to arbitration in San Mateo County, California in accordance with the Commercial Arbitration Rules of the American Arbitration Association from time to time in effect (the "Rules"). The parties may agree on a retired judge as sole arbitrator. In the absence of such agreement, there will be three arbitrators, selected in accordance with the Rules. If there are three arbitrators, a decision reached by at least two of the three arbitrators will be the decision of the arbitration panel; provided, however, that in the case of monetary damages, if there is no agreement of two arbitrators as to the amount of the award, then the highest and lowest amounts will be disregarded, and the remaining amount will be the final award of the arbitration panel. Any award of the arbitrator(s) will include costs and reasonable attorneys' fees to the successful party. The parties agree to abide by any decisions reached and awards rendered in such arbitration proceedings, and all such decisions and awards will be final and binding on both parties. There will be no appeal from any such decision or award other than for fraud or misconduct in connection with the arbitration proceedings. Judgment upon such award or decision may be entered in any court having jurisdiction thereof.

**18. COUNTERPARTS; FACSIMILE SIGNATURES**: This Agreement may be executed in any number of counterparts, each of which, when executed, will be deemed to be an original and all of which, when taken together, will be deemed to be but one and the same instrument. Delivering Signatures via facsimile shall be an acceptable means of executing] this Agreement, and signatures so delivered shall be fully binding on the signing party.

**19. GOVERNING LAW; JURISDICTION**: This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of California as applied to agreements made in California, without regard to choice at law principles. Each party consents to jurisdiction of the Bankruptcy Court for any action or proceeding arising under this Agreement. To the extent permitted by the Bankruptcy Court venue in any such action will lie in San Mateo County, California.

**20. SEVERABILITY**: The provisions of this Agreement shall be severable. Should any part, term or provision of this Agreement be construed by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, the legality, validity and enforceability of the remaining parts, terms and provisions shall not be affected thereby.

**21. COMPLETE AGREEMENT**: This Agreement constitutes the entire understanding between the parties and replaces any and all prior agreements related to the Auction. This Agreement may not be modified or amended except in writing signed by both parties.

Seller: Solyndra LLC

F.E.I.N. _____

By: _____

Name: _____

Title: _____

Date: _____

Heritage Global Partners
California Bond Number 6150320

By: _____

Name: STEPHEN BROW

Title: CFO

Date: 11-22-11

# Solyndra LLC
## Fixed Assets - M&E
### As of 11/02/11

| Summary Description | Location |
|---|---|
| BE Binning Tool (4) | B6 - 1210 California Circle, Milpitas |
| CATS201 | B4 - 47488 Kato Road, Fremont |
| CdS Chemical Bath Deposition Tools (8) | B4 - 47488 Kato Road, Fremont |
| CIGS Deposition Tool: Complete (7) | B4 - 47488 Kato Road, Fremont |
| CIGS Deposition Tool: Partial (1) | B4 - 47488 Kato Road, Fremont |
| ELMA Glass Clean Workcell (3) | B4 - 47488 Kato Road, Fremont |
| Bulk Chemical Mixing System (2) | B4 - 47488 Kato Road, Fremont |
| Robotic Tray Handler (Cosmetic inspection) (2) | B6 - 1210 California Circle, Milpitas |
| Cox Encapsulation Tool (4) | B6 - 1210 California Circle, Milpitas |
| Bulk Liquid Storage and Dispensing system ~30K gallons | B3 - 901 Page Ave, Fremont |
| VDL Encapsulation Lines (2) | B3 - 901 Page Ave, Fremont |
| Environmental Chambers - Reliability Lab (2) | B3 - 901 Page Ave, Fremont |
| Fab 1:  Computer Equipment Individually < $100K | All Facilities |
| Fab 1:  Furniture and Fixtures Individually < $100K | All Facilities |
| Fab 1:  Machinery and Equipment Individually < $100K | All Facilities |
| Murata Building Wide Automatic Material Handling System | B3 - 901 Page Ave, Fremont |
| Murata Building Wide Automatic Material Handling System | B4 - 47488 Kato Road, Fremont |
| FAB 2 FE Intial Furniture & Fixtures | B4 - 47488 Kato Road, Fremont |
| FAB 2 Offline Fisher XRF Module | B4 - 47488 Kato Road, Fremont |
| FAB 2 Offline Raman & Photoluminescence | B4 - 47488 Kato Road, Fremont |
| FAB 2 Offline Reflectometer | B4 - 47488 Kato Road, Fremont |
| FAB 2 Wet Lab | B4 - 47488 Kato Road, Fremont |
| Fab 2:  Computer Equipment Individually < $100K | All Facilities |
| Fab 2:  Machinery and Equipment Individually < $100K | All Facilities |
| Fab 2:  Other Equipment Individually < $100K | All Facilities |
| Stand Alone IVT System (Solar Simulator) (5) | B4 - 47488 Kato Road, Fremont |
| FEI SEM | B4 - 47488 Kato Road, Fremont |
| Orihiro Gas Bag Formation Tools (11) | B6 - 1210 California Circle, Milpitas |
| Gas Bag Insertion Workcell (2) | B3 - 901 Page Ave, Fremont |
| Glass Tube Machine Vision Inspection Workcell (2) | B3 - 901 Page Ave, Fremont |
| TCO Sputtering Tool Workcell (3) | B4 - 47488 Kato Road, Fremont |
| Immersion Polariscope | B4 - 47488 Kato Road, Fremont |
| Integrated Solar Simulator Module on VDL tool (2) | B3 - 901 Page Ave, Fremont |
| Automated IVT tool with Overhead Gantry (3) | B4 - 47488 Kato Road, Fremont |
| Overhead Gantry Tray and Tube Handling Robot (2) | B3 - 901 Page Ave, Fremont |
| Molybdenum Sputtering Workcell (3) | B4 - 47488 Kato Road, Fremont |
| Laser Scribe Workcells (2) | B4 - 47488 Kato Road, Fremont |
| Mechanical Scribe Workcells (6) | B4 - 47488 Kato Road, Fremont |
| Hybrid Scribe Workcells (2) | B4 - 47488 Kato Road, Fremont |
| Overhead Gantry Machine Vision Inspection Tools (3) | B4 - 47488 Kato Road, Fremont |
| Panel Framing Line for 150 Series Panels | B6 - 1210 California Circle, Milpitas |
| Panel Framing Line for 200 Series Panels (3) | B3 - 901 Page Ave, Fremont |
| Sierratherm conveyor ovens (3) with Automated load/unload | B6 - 1210 California Circle, Milpitas |
| Gas Bag Leak Detection Workcell (2) | B3 - 901 Page Ave, Fremont |
| SCRF201 | B4 - 47488 Kato Road, Fremont |
| Solar Simulator Room | B4 - 47488 Kato Road, Fremont |
| Solar Simulator Room | B3 - 901 Page Ave, Fremont |
| Overhead Gantry Tray Handling Robot (6) | B4 - 47488 Kato Road, Fremont |
| Stand Alone XRF System (2) | B4 - 47488 Kato Road, Fremont |

Note: Parenthetical figures represent quantity.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Solyndra LLC, *et al.*,[1] | ) Case No.: 11-12799 (MFW) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |

**Hearing Date: October 17, 2011, 2011 at 2:00 p.m. (ET)**
**Objection Deadline: October 10, 2011, 2011 at 4:00 p.m. (ET)**

### DECLARATION OF ADAM M. REICH IN SUPPORT OF APPLICATION OF THE DEBTORS PURSUANT TO SECTION 327(A) AND 328 OF THE BANKRUPTCY CODE, RULES 2014 AND 6005 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL RULE 2014-1 TO EMPLOY AND RETAIN HERITAGE GLOBAL PARTNERS, COUNSEL RB CAPITAL, LLC., HILCO INDUSTRIAL, LLC AND THE BRANFORD GROUP, INC. AS SALES AGENT AND AUCTIONEER TO THE DEBTORS AND DEBTORS IN POSSESSION NUNC PRO TUNC TO NOVEMBER 23, 2011 FOR SALE AND AUCTION OF CORE ASSETS

I, Adam M. Reich, declare as follows:

1.      I am the Co-CEO of Counsel RB Capital. LLC. ("CRB"), an asset recovery firm specializing in the auction and liquidation of industrial equipment, inventories, accounts receivable and intellectual property assets.  The principals of CRB, including myself and Jonathan Reich are the former principals of Go Industry, the largest industrial auctioneer in the world today.  After selling my interest in Go Industry in 2006, I formed Greystone Private Equity which specializes in the identical liquidation business. In February 2009, the principals of Greystone Private Equity also formed Counsel RB Capital ("CRB") to take advantage of principal distressed asset disposition opportunities. I make this Declaration in support of the *Application of the Debtors Pursuant to Section 327(a) and 328 of the Bankruptcy Code, Rules*

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583).  The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

*2014 and 6005 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 to Employ*
*and Retain Heritage Global Partner, Counsel RB Capital, LLC, Hilco Industrial, LLC. and The*
*Branford Group, Inc. as Sales Agent and Auctioneer to the Debtors and Debtors in Possession*
(the "Application"). Except as otherwise noted, I have personal knowledge of the matters set
forth herein.

### CRB's Qualifications

2.      CRB is qualified to represent the Debtors in these cases due to the
considerable experience that its principals have in (i) selling by public auction sale the assets of
entities in bankruptcy; (ii) selling by public auction sale the assets of industrial companies,
including photovoltaic equipment and (iii) selling by public auction sale industrial machinery
and equipment.   This industry experience is crucial to the Debtors in maximizing the recovery to
the estates because many of the interested buyers are located overseas and will not be known to
the Debtors. Most recently, CRB was involved in the sale of similar assets for BP Solar and
SpectraWatt together with Heritage Global Partners. Additionally, Hilco and The Branford
Group have also recently been involved in the sale of similar assets, most notably, Evergreen
Solar. Due to the scope the scope of the subject sale program, Heritage Global Partners, CRB,
Hilco and The Branford group have agreed to pool their collective industry expertise and
customer lists in an effort to maximize the recovery to creditor (together, the "Sales Agent").

## CRB's Disinterestedness

3.      Neither I, CRB nor any principal or professional thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, or any other parties-in-interest in these bankruptcy cases, or the respective attorneys except as set forth herein. Specifically, and as a matter of routine course in bankruptcy proceedings, we have manually analyzed the creditor lists attached provided by the Debtors and have determined that no conflicts exists.  CRB does not hold nor represent any entity having an adverse interest in connection with this bankruptcy cases.

4.      To the best of my knowledge, CRB is a "disinterested person" as the term is defined in section 101(14) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), as modified by section 1107(b) of the Bankruptcy Code.  CRB and its members and employees:

(a)      do not hold or represent any interests adverse to the estates, are disinterested, and are eligible to serve as sales consultant for the Debtors under the Bankruptcy Code;

(b)      are not creditors, equity security holders, or insiders of the Debtors and do not represent any entity (or its attorneys and accountants) other than the Debtors, in connection with this case;

(c)      are not, and were not within the past two years, a director, officer, or employee of the Debtors;

(d)      have no interests materially adverse to the interests of the Debtors or of any class of creditors or equity security holders of the Debtors; and

(e)      have no connections, other than as disclosed herein, with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee.

5. As part of its regular practice, CRB appears in numerous cases, proceedings and transactions involving attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Further, CRB has in the past, and may in the future, be represented by attorneys and law firms in the legal community, some of whom may be involved in these proceedings. In addition, CRB has in the past and will likely in the future be working with or against other professionals involved in this case in matters unrelated to this case. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors regarding matters upon which CRB is to be employed.

6. CRB may have in the past represented, may currently represent, and likely in the future will represent parties-in-interest of the Debtors in connection with matters unrelated to the Debtors and their chapter 11 cases.

### Professional Services Compensation

7. Pursuant to the Engagement Agreement annexed as Exhibit A to the Application, the Sales Agent will not receive a seller's commission payable by the Debtor. The Sales Agent will charge a buyer premium equal to fifteen percent (15%) of the aggregate gross proceeds for the sale of an asset (the "Buyer's Premium"). A Buyer's Premium is a standard in the auction industry. The Debtors' estate is not responsible for any unpaid portion of the Buyer's Premium. The collected Buyer's Premium will be allocated 50% to the Sales Agent and 50% to the Debtor. The Sales Agent also has a right of reimbursement of actually incurred reasonable

expenses (including, without limitation, labor, advertising, travel and lodging, digital photography of the Non-Core Assets, print and electronic media production, brochure and catalog production, and telemarketing) up to the amount of $40,000.00, and upon the terms and conditions stated in the Sales Agent Engagement Agreement. Reimbursement of such expenses is also standard in this industry. CRB does not have any rights of compensation, or reimbursement of expenses from the Debtors' estate, except as stated above. There is no indemnification provision in favor of CRB.

8. Based on its experience and independent analysis, CRB believes that the fees set forth herein are fair and reasonable. CRB believes that the fees set forth herein reflect the nature and scope of the services to be provided by CRB.

9. No promises have been received by CRB or by any shareholder or professional thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

10. There are no outstanding bills due and owing to CRB for professional services performed for the Debtors or for reimbursement of charges and disbursements.

11. As of the Petition Date, CRB was not a creditor of the Debtor.

12. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of November 2011.

_____
Adam M. Reich

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Solyndra LLC, *et al.*,[1] | ) Case No.: 11-12799 (MFW) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |

Hearing Date: October 17, 2011, 2011 at 2:00 p.m. (ET)
Objection Deadline: October 10, 2011, 2011 at 4:00 p.m. (ET)

## DECLARATION OF JAMES F. GARDNER IN SUPPORT OF APPLICATION OF THE DEBTORS PURSUANT TO SECTION 327(A) AND 328 OF THE BANKRUPTCY CODE, RULES 2014 AND 6005 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND LOCAL RULE 2014-1 TO EMPLOY AND RETAIN HERITAGE GLOBAL PARTNERS, COUNSEL RB CAPITA, LLC., HILCO INDISTRIAL, LLC AND THE BRANFORD GROUP, INC. AS SALES AGENT AND AUCTIONEER TO THE DEBTORS AND DEBTORS IN POSSESSION NUNC PRO TUNC TO NOVEMBER 23, 2011 FOR SALE AND AUCTION OF CORE ASSETS

I, James F Gardner, declare as follows:

1.     I am a Principal and Partner of Branford Auctions, LLC ("TBG"), an asset recovery firm specializing in the auction and liquidation of industrial equipment, inventories, accounts receivable and intellectual property assets. The principals of TBG, including myself, William J. Gardner and Scott Lonkart are former executives of Dovebid. After leaving Dovebid in 2005, I formed The Branford Group specializing in global auctions and liquidations. I make this Declaration in support of the *Application of the Debtors Pursuant to Section 327(a) and 328 of the Bankruptcy Code, Rules 2014 and 6005 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 to Employ and Retain Heritage Global Partner, Counsel RB Capital, LLC, Hilco Industrial, LLC. and The Branford Group, Inc. as Sales Agent and Auctioneer to the*

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Fremont, CA 94538.

*Debtors and Debtors in Possession* (the "Application"). Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## CRB's Qualifications

2.      CRB is qualified to represent the Debtors in these cases due to the considerable experience that its principals have in (i) selling by public auction sale the assets of entities in bankruptcy; (ii) selling by public auction sale the assets of industrial companies, including photovoltaic equipment and (iii) selling by public auction sale industrial machinery and equipment. This industry experience is crucial to the Debtors in maximizing the recovery to the estates because many of the interested buyers are located overseas and will not be known to the Debtors. Most recently, CRB was involved in the sale of similar assets for BP Solar and SpectraWatt together with Heritage Global Partners. Additionally, Hilco and The Branford Group have also recently been involved in the sale of similar assets, most notably, Evergreen Solar. Due to the scope the scope of the subject sale program, Heritage Global Partners, CRB, Hilco and The Branford group have agreed to pool their collective industry expertise and customer lists in an effort to maximize the recovery to creditor (together, the "Sales Agent").

## CRB's Disinterestedness

3.      Neither I, CRB nor any principal or professional thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, or any other parties-in-interest in these bankruptcy cases, or the respective attorneys except as set forth herein. Specifically, and as a matter of routine course in bankruptcy proceedings, we have manually

analyzed the creditor lists attached provided by the Debtors and have determined that no conflicts exists. CRB does not hold nor represent any entity having an adverse interest in connection with this bankruptcy cases.

4.      To the best of my knowledge, CRB is a "disinterested person" as the term is defined in section 101(14) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), as modified by section 1107(b) of the Bankruptcy Code. CRB and its members and employees:

(a)      do not hold or represent any interests adverse to the estates, are disinterested, and are eligible to serve as sales consultant for the Debtors under the Bankruptcy Code;

(b)      are not creditors, equity security holders, or insiders of the Debtors and do not represent any entity (or its attorneys and accountants) other than the Debtors, in connection with this case;

(c)      are not, and were not within the past two years, a director, officer, or employee of the Debtors;

(d)      have no interests materially adverse to the interests of the Debtors or of any class of creditors or equity security holders of the Debtors; and

(e)      have no connections, other than as disclosed herein, with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee.

5.      As part of its regular practice, CRB appears in numerous cases, proceedings and transactions involving attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Further, CRB has in the past, and may in the future, be represented by attorneys and law firms in the legal community, some of whom may be involved in these

proceedings. In addition, CRB has in the past and will likely in the future be working with or against other professionals involved in this case in matters unrelated to this case. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors regarding matters upon which CRB is to be employed.

6. CRB may have in the past represented, may currently represent, and likely in the future will represent parties-in-interest of the Debtors in connection with matters unrelated to the Debtors and their chapter 11 cases.

## Professional Services Compensation

7. Pursuant to the Engagement Agreement annexed as Exhibit A to the Application, the Sales Agent will not receive a seller's commission payable by the Debtor. The Sales Agent will charge a buyer premium equal to fifteen percent (15%) of the aggregate gross proceeds for the sale of an asset (the "Buyer's Premium"). A Buyer's Premium is a standard in the auction industry. The Debtors' estate is not responsible for any unpaid portion of the Buyer's Premium. The collected Buyer's Premium will be allocated 50% to the Sales Agent and 50% to the Debtor. The Sales Agent also has a right of reimbursement of actually incurred reasonable

expenses (including, without limitation, labor, advertising, travel and lodging, digital photography of the Non-Core Assets, print and electronic media production, brochure and catalog production, and telemarketing) up to the amount of $40,000.00, and upon the terms and conditions stated in the Sales Agent Engagement Agreement. Reimbursement of such expenses is also standard in this industry. TBG does not have any rights of compensation, or reimbursement of expenses from the Debtors' estate, except as stated above. There is no indemnification provision in favor of TBG

8. Based on its experience and independent analysis, TBG believes that the fees set forth herein are fair and reasonable. TBG believes that the fees set forth herein reflect the nature and scope of the services to be provided by TBG.

9. No promises have been received by TBG or by any shareholder or professional thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

10. There are no outstanding bills due and owing to TBG for professional services performed for the Debtors or for reimbursement of charges and disbursements.

11. As of the Petition Date, TBG was not a creditor of the Debtor.

12. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of November 2011.

James F. Gardner

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No.: 11-12799 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## DECLARATION OF IAN S. FREDERICKS IN SUPPORT
OF APPLICATION OF THE DEBTORS PURSUANT TO
SECTION 327(A) AND 328 OF THE BANKRUPTCY CODE, RULES 2014
AND 6005 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND
LOCAL RULE 2014-1 TO EMPLOY AND RETAIN HERITAGE GLOBAL
PARTNERS, COUNSEL RB CAPITAL, LLC, HILCO INDISTRIAL, LLC AND THE
BRANFORD GROUP, INC. AS SALES AGENT AND AUCTIONEER TO THE
DEBTORS AND DEBTORS IN POSSESSION

I, Ian S. Fredericks, declare as follows:

1.     I am the Vice President and Assistant General Counsel of Hilco Trading,

LLC, the Managing Member of Hilco Industrial, LLC ("Hilco"). I make this Declaration in

support of the *Application of the Debtors Pursuant to Section 327(a) and 328 of the Bankruptcy*

*Code, Rules 2014 and 6005 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-*

*1 to Employ and Retain Heritage Global Partners, Counsel RB Capital, LLC, Hilco Industrial,*

*LLC, and The Branford Group, Inc. as Sales Agent and Auctioneer to the Debtors and Debtors*

*in Possession* (the "Application"). Except as otherwise noted, I have personal knowledge of the

matters set forth herein.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488
Kato Road, Fremont, CA 94538.

## Hilco's Qualifications

2.      Hilco is well-qualified to serve as the Debtors' auctioneer/liquidator in connection with the sale of the non-real property owned by Solyndra. Hilco is an experienced full service national auctioneer/liquidation/appraisal firm.   Hilco is prepared to put forth extensive efforts to market and promote the auction.  Additionally, Hilco and The Branford Group have also recently been involved in the sale of similar assets, most notably, Evergreen Solar. Due to the scope the scope of the subject sale program, Heritage Global Partners, Counsel RB Capital, Hilco and The Branford group have agreed to pool their collective industry expertise and customer lists in an effort to maximize the recovery to creditor (together, the "Sales Agent").

## Hilco's Disinterestedness

3.      Neither I, Hilco nor any principal or professional thereof, insofar as I have been able to ascertain, has any connection with the Debtors, their creditors, or any other parties-in-interest in these bankruptcy cases, or the respective attorneys, except as set forth herein and as listed on Exhibit B.  Specifically, and as a matter of routine course in bankruptcy proceedings, we have manually analyzed the creditor list attached as Exhibit A provided by the Debtors and have determined that no conflicts exist.  Hilco does not hold nor represent any entity having an adverse interest in connection with this bankruptcy cases.

4.      To the best of my knowledge, Hilco is a "disinterested person" as the term is defined in section 101(14) of title 11 of the United States Code (as amended, the "Bankruptcy

Code"), as modified by section 1107(b) of the Bankruptcy Code. Hilco and its members and employees:

(a)     do not hold or represent any interests adverse to the estates, are disinterested, and are eligible to serve as sales consultant for the Debtors under the Bankruptcy Code;

(b)     are not creditors, equity security holders, or insiders of the Debtors and do not represent any entity (or its attorneys and accountants) other than the Debtors, in connection with this case;

(c)     are not, and were not within the past two years, a director, officer, or employee of the Debtors;

(d)     have no interests materially adverse to the interests of the Debtors or of any class of creditors or equity security holders of the Debtors; and

(e)     have no connections, other than as disclosed herein and on Exhibit B, with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee or any person employed in the office of the United States Trustee.

5.     As part of its regular practice, Hilco appears in numerous cases, proceedings and transactions involving attorneys, accountants, investment bankers and financial consultants, some of which may represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Further, Hilco has in the past, and may in the future, be represented by attorneys and law firms in the legal community, some of whom may be involved in these proceedings. In addition, Hilco has in the past and will likely in the future be working with or against other professionals involved in this case in matters unrelated to this case. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors regarding matters upon which Hilco is to be employed.

6. Hilco may have in the past represented, may currently represent, and likely in the future will represent parties-in-interest of the Debtors in connection with matters unrelated to the Debtors and their chapter 11 cases.

## Professional Services Compensation

7. Pursuant to the Engagement Agreement annexed as Exhibit A to the Application, the Sales Agent will not receive a seller's commission payable by the Debtors. The Sales Agent will charge a buyer premium equal to fifteen percent (15%) of the aggregate gross proceeds for the sale of an asset (the "Buyer's Premium"). A Buyer's Premium is a standard in the auction industry. The Debtors' estate is not responsible for any unpaid portion of the Buyer's Premium. The collected Buyer's Premium will be allocated 50% to the Sales Agent and 50% to the Debtors. The Sales Agent also has a right of reimbursement of actually incurred reasonable expenses (including, without limitation, labor, advertising, travel and lodging, digital photography of the Non-Core Assets, print and electronic media production, brochure and catalog production, and telemarketing) up to the amount of $40,000.00, and upon the terms and conditions stated in the Sales Agent Engagement Agreement. Reimbursement of such expenses is also standard in this industry. Hilco does not have any rights of compensation, or reimbursement of expenses from the Debtors' estate, except as stated above. There is no indemnification provision in favor of Hilco.

8. Based on its experience and independent analysis, Hilco believes that the fees set forth herein are fair and reasonable. Hilco believes that the fees set forth herein reflect the nature and scope of the services to be provided by Hilco.

9.     No promises have been received by Hilco or by any shareholder or professional thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

10.     There are no outstanding bills due and owing to Hilco for professional services performed for the Debtors or for reimbursement of charges and disbursements.

11.     As of the Petition Date, Hilco was not a creditor of the Debtors.

12.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of November 2011.

_____
Ian S. Fredericks

**EXHIBIT A**

Creditor List

List of disclosure parties

I.    Employees

Abad, Honorato
Abad, Juan
Abad, Wilfredo U
Abalos, Ronnel E.
Abelian, Jonathan
Abinsay, Arnel C.
Ablao, Edgar
Achkire, Younes
Adams, Robert
Adre, Noel
Afalla, John
Afsari, Gholam Reza
Aguilar, Ernesto
Aguilar, Marita F.
Ahern, Michael M
Akramy, Mohammad
Alamyar, Paktina
Albers, Holger
Alcause, Jovanne G
Alima, Sakera
Alter, Karen L.
Amigable, Manuelito
Amoroso, Juan
Andersen, Peter
Anderson, Mark R.
Andres, Marites
Apodaca, Gerard
Aquino, Bernabe
Arase, Tomney
Arghestani, Jawid
Arluck, Jack A
Armas, Juan
Arnold, Gary D
Arrasmith, James
Ashraf, Kazi Najib
Audetto, Gregory
Aung, Hlwan
Aung, Thaung H
Aureguy, Andrew

Avila, Roberto
Awayan, Henrietto
Aye, Daniel L
Ayele, Seneserat
Aynalem, Mel
Babakhan, Edgard
Bachiri, Khalid
Badall, Ator
Baird, Aaron
Bajwa, Jatinder
Baker, Michael
Balan, Vinay S
Balatayo, Nereo A.
Balatayo, Nereo V
Baltodano, Reynaldo A
Bamnolker, Hanna
Barbera, Brandon Nicholas
Barlow, Stephen
Barnes, Susan
Bar-Ness, Leslie
Bartolome, Elenita Lantin
Bauer, David A
Baumann, Erik Glen
Bautista, Dante
Bautista, Ferdinand
Bautista, Leonard Tommy
Bava Anantharam, Venkat
Raman
Baxter, Bruce B
Beaudry, Christopher
Behm, Patricia A
Belliveau, James
Belvisi, Sandro
Benitez Jr, Claudio A
Bento, Michael
Berania, William
Bergis, Sharon A.
Bergmans, Christian
Bernard, Lisa
Beylin, Victor
Bhardwaj, Rajiv Kumar
Biagtan, Edilberto
Bierman, Benjamin

Bigolin, Rodolfo
Bockelman, Bryan
Bola, Santokh
Bolden, Sherry Lee
Boloor, Manjunath
Borchers, Gannon Michael
Borges, Daciano
Bortone, Alessio
Bosma, Walter
Botros, Adel
Botros, Christopher
Bowman, Brian
Boyer, Steven James
Brani, Francesco Maria
Braun, Dan W.
Breen, John Dennis
Brennecke, Nathan
Brewer, Donnie Alan
Briceno, Rene
Bringas, Maureen
Britton, Feng
Brock, Gregory Joseph
Brown, Christopher Michael
Brown, Julia M.
Brown, Michael Cordell
Brudny, Alexander
Buck, Douglas
Buck, Jeffrey
Bui, Helen Andrea
Bunot, Roldan
Burrows, Craig
Butler, Brandon
Butterfuss, Andrea
Byers, Robert Edward
Cabral, Manuel E
Cabrera, Wayne T
Cahandig, Frank
Cahiles, Manuel B.
Cahill, James M.
Calantoc, Cesar F
Camporaso, Paula
Campson, Keegan
Canonizado, Nicasio S.

Cantada, Randolph
Carothers, Bruce M
Cartago, Nicolas
Castillano, John
Castillo, Alfredo
Castillo, Clifford
Castillo, Joselito
Castillo, Juan
Castillo, Raynaud
Castro, Gerardo
Cayabyab, Gina M
Certiberi, Suzanne
Cervantes, Edwin
Cervantes, Nubia
Chaidez, Antonio Munoz
Chandra, Manish
Chatterjee, Saugata
Chau, Annie T
Chau, Anthony
Chau, Douglas
Chau, Hao
Chavez, Lorenzo
Chavez, Rafael
Chavez, Senon
Chavez, Stephen
Chelette, Elizabeth
Cheng, Mao Xun
Chew, Vincent
Chi, David
Ching, Benedict G.
Chipman, Frank S.
Chizhov, Ilya
Choi, Jean
Chok, James Edward
Christian, Carlos
Chu, Gary C
Chuvessiriporn, Jonathan
Ciocon, Emilio Felicito Villa
Clarke, Edgar B.
Clifford, Gary
Clow, Patrick
Colmer, Mark S
Colon, Tito

Conway, Ryan
Cook, Kelvin F.
Cooper, John S
Coopernurse, Robbie M
Cordero, Ana M
Cordero, Annie
Corpuz, Maynard
Corpuz, Michael
Corpuz, Rommel
Correa, Rene T.
Cortez, John
Costa, Jose Leon Mariano
Cowern, Joseph
Craig, Joseph
Creely, Michael
Criminale, Phillip
Crittendon, Kyle
Cronin, Zachary Ronald Philip
Cross, Kawika Kyle
Crowley, Gavin L.
Cruz Perez, Maria Gabriela
Cruz, Maria
Cumpston, Brian
Daconceicao, Francisco X
Dailey, Scott
Daily, Robert F.
Dalmar, Liban A.
Dalsania, Kiran M.
Danemayer, Scott M.
Dang, Danny
Dang, Ho
Dang, Johnathan
Dang, Steven Ngoc
Daniels, James David
Danley, Bryan Alexander
Dao, Dan
Darrow, Christopher B
Darrow, David
Dave, Sanat
David, Gerard
Davis, John Kennedy
Davis, Waymon
De Cordova, Arthur E.

De Leon, Michael
De Teglassy, Rodolphe
De Vera, Rolando O.
Deacon, Robert G
Dela Cruz, Eugene
Dela Cruz, Joselito
Delgadillo, Blanca C
Deo, Sachin Jayant
Depew, Dana Lee
Depiano, Michael
Desai, Rekha R
Desai, Ronak Rohitkumar
Detjen, Bradley Scott
Devera, John
Dhir, Usha
Dietrich, Jacob A.
Dion, Timothy W
Dixon, Mark T
Dizon, Perchy
Do, Eric
Do, Tim Hung
Doan, Jonathan C.
Doan, Linh
Doll, Steve
Dolorfo, Nicolas
Dominguez, Robert John
Drahos, Pavel
Dumlao, Jimmy
Duncan, Robert S
Dunphy, James C
Duong, Daren
Duong, Tim
Duran, Gilberto
Duran, Jose
Dvorsky, Randolph
Eastburn, Lindsey
Ebert, Scott W.
Ebreo, Efren Q
Ebreo, Jonathan
Edmunson, Ronald
Eichelbronner, Martin
Ekanayake, Christopher M.
Elizaga, Rolly

Emperador, Martin T.
Enrile, Jonas Y.
Epshteyn, Genny
Escobar, Javier
Espanol, Joel M.
Estela, Rosalinda
Evans, Martin
Evon, Michael
Ewing, Craig
Fagrey, Tyler Joseph
Fajardo, Selinda
Faltiquera, Luis B
Fang, Zhengmin
Farver, Adam C
Feltner, Thomas
Fernandez, Arnel
Fernandez, Janet E.
Fernandez, Vernon
Ferrer, Ernesto
Fischbach, Adam
Fitzgerald, David Patrick
Fleming, Russell
Fleming, Victoria P
Fletcher, Sara R.
Flores, Ivan B.
Flores, Ricardo
Floris, David
Fo, Nathan J
Fong, Garman
Foong, Lynda
Foster, Anthony Brian
Foster, Lee Michael
Fox, Peter
Francisco, Paolo A
Franklin, Walter B.
Frey, Christopher
Fritton, Joseph Edward
Frye, Charles D.
Fuentes, Arturo
Fukai, Daniel
Fumagalli, Domenico
Gaddipati, Triveni
Gadige, Bhaskar V