## EXHIBIT A

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") dated as of October __, 2012 among **ARGONAUT VENTURES I, L.L.C.** and **MADRONE PARTNERS, LP** (each, a "**Secured Party**" and collectively, the "**Secured Parties**") and the **SOLYNDRA RESIDUAL TRUST**, a liquidating trust created under the Plan, as (the "**Borrower**"), is executed and delivered pursuant to that certain **$3,500,000 LIMITED RECOURSE WARN SETTLEMENT LOAN AGREEMENT** dated the date hereof (the "**Loan Agreement**") among the Borrower and the Secured Parties.

**WHEREAS,** Solyndra LLC ("**Solyndra**") and 360 Degree Solar Holdings, Inc. (collectively, the "**Debtors**") are debtors and debtors-in-possession in jointly administered cases, Case No. 11-12799, pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in In re: Solyndra LLC, et al. under Chapter 11 of the Bankruptcy Code (as defined herein);

**WHEREAS,** the Debtors' Amended Joint Chapter 11 Plan (as amended, supplemented, or modified from time to time, the "**Plan**") provides for, among other items, the establishment of the Borrower and the granting of the Liens pursuant to this Agreement;

**WHEREAS,** the parties hereto have agreed to the terms and conditions contained in this Agreement;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants contained herein, and for good and valuable consideration, the parties agree as stated above and as follows:

**1**     **DEFINED TERMS.**  Capitalized terms shall have the meaning set forth in this Section 1 and Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Loan Agreement and in the Plan.

"**Collateral**" means, collectively, all of the Retained Rights of Action against third parties set forth on Schedule 2.2(c) of the Loan Agreement.

**2**     **SECURITY INTEREST.**

**2.1**     Grant of Security Interest.  The Borrower hereby grants the Secured Parties, to secure the payment and performance in full of the Obligations, a continuing security interest in, and pledges to the Secured Parties, all of the Borrower's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  The Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a First Priority perfected security interest in the Collateral.  If the Borrower shall acquire a commercial tort claim (as defined in the Uniform Commercial Code as in effect in the State of New York (the "**Code**")), the Borrower shall promptly notify the Secured Parties in a writing signed by the Borrower of the general details thereof (and further details as may be required by the Secured Parties) and grant

to the Secured Parties in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Secured Parties.

**2.2**    Release of Liens.  Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) or the occurrence of the Maturity Date, the Secured Parties shall, at Borrower's sole cost and expense, release its Lien in the Collateral and all rights therein shall revert to the Borrower.  The Secured Parties shall take any action reasonably requested by the Borrower having the effect of releasing any Collateral to the extent necessary to permit consummation of any transaction not prohibited by the Loan Agreement.

**2.3**    Authorization to File Financing Statements.  The Borrower hereby authorizes the Secured Parties to file financing statements, without notice to the Borrower, with all appropriate jurisdictions to perfect or protect the Secured Parties' interest or rights hereunder, including a notice that any disposition of the Collateral, by either a Borrower or any other Person, other than in accordance with this Agreement shall be deemed to violate the rights of the Secured Parties under the Code.

**2.4**    Borrower Cooperation.  The Borrower shall provide such information, execute and deliver such documents and instruments, and take actions to secure, perfect and protect the Collateral as the Secured Parties may request from time to time.

**3**        **EVENTS OF DEFAULT; REMEDIES.**

**3.1**    Defaults and Events of Default.  The occurrence of an Event of Default under the Loan Agreement shall constitute an Event of Default hereunder.

**3.2**    Rights and Remedies of the Secured Parties Upon Event of Default.  If any Event of Default shall occur the Secured Parties may declare the Obligations secured by this Agreement to be due and payable, whereupon such Obligations shall become immediately due and payable, all without notice of any kind.  In addition, upon the occurrence of an Event of Default, the Secured Parties may exercise the rights, powers and remedies set forth below.

(a)    In addition to all of their other rights, powers and remedies under this Agreement, the other Loan Documents, and other applicable law, the Secured Parties shall have all of the rights, powers and remedies of a secured party under the Uniform Commercial Code of the state in which such rights, powers and remedies are asserted.

(b)    The Secured Parties shall have the right: (i) to enter upon the premises of the Borrower or any other place or places where Collateral is located, without breaking the peace, through self-help and without judicial process or giving the Borrower notice; (ii) to prepare, assemble, or process Collateral for sale, lease, or other disposition; (iii) to remove Collateral to the premises of the Secured Parties or any agent of the Secured Parties, for such time as the Secured Parties may desire, in order to collect or dispose of Collateral; and (iv) to require the Borrower to assemble Collateral and make it available to the Secured Parties at a place to be designated by the Secured Parties.

(c)     Until the Secured Parties are able to effect a sale, lease, or other disposition of Collateral or any part thereof, the Secured Parties shall have the right to use, process or operate Collateral or any part thereof to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Secured Parties.

(d)     The Secured Parties shall have the right to sell, lease, license, or otherwise dispose of all or any Collateral in its then existing condition, or after any further assembly, manufacturing, or processing thereof, at public or private sale or sales, in lots or in bulk, for cash or on credit, all as the Secured Parties, in their sole reasonable discretion, may deem advisable. Without limitation, the Secured Parties may specifically disclaim any warranties of title and the like. The Secured Parties shall not be obligated to clean up or otherwise prepare the Collateral for sale. Such sales may be adjourned and continued from time to time with or without notice. The Secured Parties shall have the right to conduct such sales on the Borrower's premises or elsewhere and shall have the right to use the Borrower's premises without charge for such sales (or preparation for sales) for such time or times as the Secured Parties deem necessary or advisable. The Secured Parties are hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any property of a similar nature as it pertains to Collateral, in advertising for sale or lease or the disposition of any Collateral. The Secured Parties may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price may set off the amount of such Obligations whether or not such Obligations are matured. The Borrower agrees that any sale of Collateral conducted by the Secured Parties in accordance with the foregoing provisions of this Section shall be deemed to be a commercially reasonable sale under the UCC. The Secured Parties may comply with any applicable laws and regulations in connection with any exercise of remedies hereunder and such compliance shall not be considered to adversely affect the commercial reasonableness of such exercise of remedies.

3.3     Application of Proceeds. Any proceeds received by the Secured Parties in respect of any sale of, collection from, or other realization upon all or any part of the Collateral following the occurrence of an Event of Default may, in the discretion of the Secured Parties, be held by the Secured Parties as collateral for, and/or then or at any time thereafter applied by the Secured Parties as follows: (i) first, to pay all reasonable costs, expenses and charges of every kind (including reasonable attorneys' fees and costs) for pursuing, searching, protecting, taking, removing, storing, safekeeping, caring, preparing for sale, advertising, selling and delivering the Collateral and otherwise enforcing this Agreement and the other Loan Documents; (ii) second, to pay the Obligations in order determined by the Secured Parties in accordance with the Loan Agreement and the Plan.

3.4     Appointment of Secured Parties as Lawful Attorney; Other Rights Upon Event of Default. The Borrower hereby irrevocably makes, constitutes and appoints the Secured Parties and all persons designated by the Secured Parties true and lawful attorneys (and agents-in-fact) upon and after the occurrence of an Event of Default for the purposes set forth in the following sentences of this Section. Upon and after the occurrence of an Event of Default, the Secured Parties or their agent may, without notice to the Borrower and at such time or times thereafter as the Secured Parties or said agent in its sole discretion may determine, in the Borrower's or the

Secured Parties' name, (i) enforce payment and exercise all of the Borrower's rights and remedies with respect to the collection of the Collateral, (ii) settle, adjust, compromise, discharge, release, extend or renew obligations of the Borrower; and (iii) receive and direct the disposition of any proceeds of any Collateral.

**3.5**   Remedies Not Exclusive; Foreclosures.   No right or remedy hereunder is exclusive of any other right or remedy.   Each and every right and remedy shall be cumulative and shall be in addition to and without prejudice to every other remedy given hereunder, under any other agreement between the Borrower and the Secured Parties or now or hereafter existing at law or in equity, and may be exercised from time to time as often as deemed expedient, separately or concurrently.   The giving, taking or enforcement of or execution against any other or additional security, collateral, or guaranty for the payment of the Obligations shall not operate to prejudice, waive or affect any rights, powers or remedies hereunder, nor shall the Secured Parties be required to first look to, enforce, exhaust or execute against such other or additional security, or guarantees prior to so acting against the Collateral.   The Secured Parties may foreclose on or execute against the items of Collateral in such order as the Secured Parties may, in their sole and unfettered discretion, determine.

**3.6**   Waivers.   The failure or delay of the Secured Parties to insist in any instances upon the performance of any of the terms, covenants or conditions of this Agreement or other Loan Documents, or to exercise any right, remedy or privilege herein or therein conferred, shall not impair or be construed as thereafter waiving any such covenants, remedies, conditions or provisions, but every such term, condition and covenant shall continue and remain in full force and effect; nor shall any waiver of an Event of Default suspend, waive or affect any other Event of Default, whether the same is prior or subsequent thereto and whether of the same or of a different type.

**3.7**   Waivers by the Borrower.   The Borrower waives: (i) presentment, demand, and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension, or renewal of any or all Loan Documents under or pursuant to which the Borrower may in any way be liable and hereby ratifies and confirms whatever the Secured Parties may do in this regard; (ii) notice prior to taking possession or control of Collateral or any bond or security that might be required by any court prior to allowing the Secured Parties to exercise any of the Secured Parties' remedies; (iii) the benefit of all valuation, appraisement, and exemption laws; (iv) any right to require the Secured Parties to proceed against any other person or collateral held from any other person; (v) any right to require the Secured Parties to pursue any other remedy in the Secured Parties' power whatsoever; or (vi) any defense arising out of any election by Secured Party to exercise or not exercise any right or remedy it may have against the Borrower, any other person or any security held by it, even though such election operates to impair or extinguish any right of reimbursement to subrogation or other right or remedy of the Borrower against any other person or any such security

**3.8**   Miscellaneous.   The provisions of Section 7, 8 and 9 of the Loan Agreement are hereby incorporated herein *mutatis mutandis*.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA RESIDUAL TRUST**

By_____
Name:
Title:

THE SECURED PARTIES:

**ARGONAUT VENTURES I, L.L.C.**


By_____
Name:
Title:



**MADRONE PARTNERS, LP**




By_____
Name:
Title:

# **TAB 4**

**$3,175,000 SENIOR SECURED SETTLEMENT FUND LOAN AGREEMENT**

**THIS $3,175,000 SENIOR SECURED SETTLEMENT FUND LOAN AGREEMENT** (this "**Agreement**") dated as of October __, 2012 among **ARGONAUT VENTURES I, L.L.C.** and **MADRONE PARTNERS, LP** (each, a "**Lender**" and collectively, the "**Lenders**") and the **SOLYNDRA RESIDUAL TRUST**, a liquidating trust created under the Plan, as (the "**Borrower**"), provides the terms on which the Lenders shall lend to Borrower and Borrower shall repay the Lenders.

**WHEREAS**, Solyndra LLC ("**Solyndra**") and 360 Degree Solar Holdings, Inc. (collectively, the "**Debtors**") are debtors and debtors-in-possession in jointly administered cases, Case No. 11-12799, pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in In re: Solyndra LLC, et al. under Chapter 11 of the Bankruptcy Code (as defined herein);

**WHEREAS**, the Debtors' Amended Joint Chapter 11 Plan (as amended, supplemented, or modified from time to time, the "**Plan**") provides for, among other items, the establishment of the Borrower and the provision of a term loan in the aggregate principal amount of $3,175,000 (the "**Solyndra Settlement Fund Loan**"), the proceeds of which shall be used and transferred pursuant to the Plan as follows: (A) $175,000 in amount of the proceeds of the Solyndra Settlement Fund Loan to the Solyndra Settlement Trust to fund the Solyndra Settlement Trust Contribution and (B) $3,000,000 in amount of the Solyndra Settlement Fund Loan to the Solyndra Settlement Trust to fund the Solyndra Settlement Fund;

**WHEREAS**, the Lenders have agreed to provide such loans on the terms and conditions contained in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants contained herein, the parties agree as stated above and as follows:

**1      DEFINED TERMS.**

**1.1      Capitalized Terms.**  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Annex A hereof and in the Plan.

**2      LOAN AND TERMS OF PAYMENT.**

**2.1      Promise to Pay.**  Borrower hereby unconditionally promises to pay the Lenders the outstanding principal amount of the Obligations and accrued and unpaid interest thereon and any other amounts due hereunder as and when due in accordance with this Agreement.

**2.2      Term Loan Facility.**

(a)      Term Loan.  Subject to the terms and conditions of this Agreement, the Lenders agree to make available to the Borrower the Solyndra Settlement Fund Loan on the Closing Date.

(b)    Repayment.  The unpaid principal amount in respect of the Obligations shall be due and payable on the Maturity Date

(c)    Voluntary Prepayments.  Borrower shall have the option to prepay all, or any part, of the Solyndra Settlement Fund Loan (together with accrued interest on the amount being repaid) at any time and from time to time, without premium or penalty.  All such prepayments shall be made upon not less than two Business Days' prior written or telephonic notice given to the Lenders by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to the Lenders. Upon the giving of any such notice, the principal amount of the Solyndra Settlement Fund Loan specified in such notice shall become due and payable on the prepayment date specified therein.

(d)    Mandatory Prepayments.  Borrower shall repay the Solyndra Settlement Fund Loan in whole or in part within 2 Business Days upon receipt of Net Asset Sale Proceeds from any Disposition of Collateral in an amount equal to such Net Asset Sale Proceeds.

(e)    Application of Prepayments.  Any payments made under Sections 2.2(b), (c) or (d) hereof shall be applied to prepay the Solyndra Settlement Fund Loan and for payments of distributions, each in accordance with the Plan.  The Lien on the Collateral shall be *pari passu* with the Lien on the collateral granted to secure the Tranche I Exit Facility and the Net Asset Sale Proceeds from the sale of any such Collateral pursuant to this Agreement shall be applied, *first*, to the obligations outstanding pursuant to the Tranche I Exit Facility until paid in full and, *second*, to the Obligations pursuant to the Solyndra Settlement Fund Loan until paid in full, and otherwise in accordance with the Plan.

**2.3    Payment of Interest on the Solyndra Settlement Fund Loan; Payment Terms**.

(a)    Interest Rate.  The principal amount outstanding for the Solyndra Settlement Fund Loan shall accrue interest, which interest shall be payable in kind as provided in clause (c) below, calculated daily at a per annum rate equal to 15.0% (the "**Interest Rate**"). Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

(b)    Default Rate.  Immediately upon the occurrence and during the continuance of an Event of Default under Section 6.1 hereof, the Solyndra Settlement Fund Loan shall bear interest at a rate per annum which is two percentage points above the Interest Rate (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.3(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lenders.

(c)    Payments.  The accrued and unpaid interest due under this Agreement shall be payable in kind in arrears on each March 31, June 30, September 30 and December 31 and simultaneously with the repayment or prepayment of the Solyndra Settlement Fund Loan (on the principal amount of Solyndra Settlement Fund Loan so repaid or prepaid), including repayment on the Maturity Date.  Payments of principal and/or interest and/or other amounts owing hereunder or under any other Loan Document to the Lenders received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day.  When

a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest, as applicable, shall continue to accrue.

## 3    CONDITIONS OF LOANS AND USE OF PROCEEDS

**3.1    Conditions Precedent to Effectiveness.**  This Agreement shall become effective upon the date (the "**Closing Date**") of the satisfaction of, and the Lenders' obligation to make the Solyndra Settlement Fund Loan is subject to, the condition precedent that the Lenders shall have received, in form and substance satisfactory to the Lenders in their sole and absolute discretion evidence of satisfaction of the following conditions, any of which may be deemed satisfied or waived in whole or in part by the Lenders:

(a)    _Loan Documents_.  The Lenders shall have received copies duly executed by each of the parties thereto of this Agreement, the Security Agreement and any other Loan Document.

(b)    _Security Interest_.  The security interests described in the Security Agreement shall have or been or shall concurrently be granted and shall create a valid First Priority security interest in, and Lien on, the Collateral.

(c)    _Representations and Warranties_.  The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; _provided_ that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(d)    _No Event of Default_.  No event shall have occurred and be continuing or would result from the consummation of the transactions contemplated herein that would constitute an Event of Default or a Default.

(e)    _Confirmation of Plan_.  The Lenders shall have received evidence that the Bankruptcy Court has entered a confirmation order (the "**Confirmation Order**"), which shall not have been stayed, reversed, vacated or otherwise modified in any manner that is materially adverse to the rights or interests of the Lenders, providing for the approval of the Plan and the execution of this Agreement and the other Loan Documents.

**3.2    Use of Proceeds.**  The proceeds of the Solyndra Settlement Fund Loan shall be used and transferred pursuant to the Plan as follows: (A) $175,000 in amount of the proceeds of the Solyndra Settlement Fund Loan to the Solyndra Settlement Trust to fund the Solyndra Settlement Trust Contribution and (B) $3,000,000 in amount of the Solyndra Settlement Fund Loan to the Solyndra Settlement Trust to fund the Solyndra Settlement Fund.

## 4    REPRESENTATIONS AND WARRANTIES.  In order to induce the Lenders
to enter into this Agreement and to make the Solyndra Settlement Fund Loan to be made

hereunder, the Borrower represents and warrants to the Lenders that the following statements are true and correct as of the Closing Date:

**4.1     Organization; Requisite Power and Authority; Qualification.** The Borrower (a) is a validly organized and existing liquidating trust and (b) has all requisite power and authority to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and hereby.

**4.2     Due Authorization.** The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action on the part of the Borrower, subject to the entry of the Confirmation Order.

**4.3     No Conflict.** Upon entry by the Bankruptcy Court of the Confirmation Order, the execution, delivery and performance by the Borrower of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to the Borrower, (ii) any of the Organizational Documents of the Borrower, or (iii) any order, judgment or decree of any court or other agency of government binding on the Borrower; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of the Borrower; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Borrower (other than any Liens created under any of the Loan Documents in favor of Lenders); or (d) require any approval of beneficiaries or any approval or consent of any Person under any Contractual Obligation of the Borrower, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Lenders.

**4.4     Binding Obligation.** Subject to the entry of the Confirmation Order, each Loan Document has been duly executed and delivered by the Borrower and is the legally valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (including, without limitation, the terms of the Confirmation Order). The Confirmation Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Lenders in their sole discretion).

**5     COVENANTS.** The Borrower covenants and agrees, until payment in full of all Obligations, the Borrower shall perform all covenants in this Section 5.

**5.1     Existence.** The Borrower will at all times preserve and keep in full force and effect its existence and all of its rights and franchises, licenses and permits material to its business.

**5.2     Compliance with the Plan and Confirmation Order.** The Borrower will comply in all material respects with the terms and conditions of the Plan and the Confirmation Order.

**5.3     Compliance with Organizational and Trust Documents.** The Borrower will comply in all material respects with the terms and conditions of its organizational documents and

any other document or instrument executed in connection with creation and maintenance of the Solyndra Residual Trust as provided for in the Plan.

**6    EVENTS OF DEFAULT.**

    **6.1    Events of Default**. Any one or more of the following conditions or events shall constitute an "**Event of Default**":

        (a)    <u>Failure to Make Payments When Due</u>.  Failure by Borrower to pay (i) when due any installment of principal of the Solyndra Settlement Fund Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on the Solyndra Settlement Fund Loan or any fee or any other amount due hereunder within three days after the date due; or

        (b)    <u>Breach of Certain Covenants</u>.  Failure of the Borrower to perform or comply with any term or condition contained in Sections 4 or 5; or

        (c)    <u>Breach of Representations, Etc.</u>  Any representation, warranty, certification or other statement made or deemed made by the Borrower in the Solyndra Settlement Fund Loan Document or in any statement or certificate at any time given by the Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

        (d)    <u>Failure to Comply With or Amendment, Reversal or Modification of, Confirmation Order</u>. The Borrower shall fail to comply in all material respects with the Plan or the Confirmation order or the Plan or the Confirmation Order is otherwise amended, reversed or modified in a manner not approved by the Lenders; or

        (e)    <u>Cross Default</u>.  The Borrower shall (A) fail to make any payment in respect of any Indebtedness and such failure continues after the applicable grace or notice period, if any, specified in the relevant document governing such Indebtedness; or (B) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness, and such failure continues after the applicable grace or notice period, if any, specified in the relevant document on the date of such failure if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or administrative agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable or to be repurchased, prepaid, defeased or redeemed prior to its stated maturity; or

        (f)    <u>Challenge to, or Invalidity of, Loan Documents</u>.  Any of the Loan Documents, including the Security Agreement, shall cease, for any reason, to be in full force and effect in any material respect, or the Borrower or any Affiliate of the Borrower shall so assert in writing, or any Lien created by any of the Loan Documents, including pursuant to the Security Agreement, on any Collateral or property purported to be Collateral shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(g)    <u>Dissolution</u>.    The Borrower shall take any action or enter into any Agreement the effect of which is to cause, or any other act or circumstance shall result in, the winding up, liquidation, dissolution or similar termination of the existence of the Borrower.

**6.2    Remedies**.

(a)    <u>Acceleration</u>.    Upon the occurrence of any Event of Default the Lenders may, upon five days' written notice to the Borrower, and in accordance with the Plan and the Confirmation Order,

(i)    declare all of the Obligations to be immediately due and payable; and

(ii)    enforce any and all Liens securing such Obligations and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law,

in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower.

Upon the occurrence of an Event of Default and the exercise by the Lenders of their rights and remedies under this Agreement and the other Loan Documents and applicable law, the Borrower shall assist the Lenders in effecting a disposition of the Collateral upon such terms as are reasonably acceptable to the Lenders.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7    **NOTICES.**    All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by facsimile or electronic transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number indicated below.  Each party may change its address or facsimile number or electronic mailing address by giving the other parties written notice thereof in accordance with the terms of this Section 7.

If to the Borrower:

Solyndra Residual Trustee
R. Todd Neilson
Berkeley Research Group, LLC
2049 Century Park East, Suite 2525
Los Angeles, CA  90067
e-mail: tneilson@brg-expert.com
Fax:  310-557-8982

With copy to:

Pachulski Stang Ziehl & Jones LLP
Attn:  Maxim B. Litvak, Esq.
150 California Street, 15th Floor
San Francisco, CA  94111
e-mail:  mlitvak@pszjlaw.com
Fax:  415-263-7010

| | |
|---|---|
| If to the Lenders: | Attention:  Steve Mitchell |
| | 6733 South Yale Avenue |
| | Tulsa, OK 74137 |
| | Tel: (918) 494-0000 |
| | Fax: (918) 491-4694 |
| | |
| | US Mail to: |
| | PO Box 21468 |
| | Tulsa, OK 74121 |
| | |
| with a copy to: | Gibson, Dunn & Crutcher LLP |
| | Attn:  J. Eric Wise, Esq. |
| | and Matthew K. Kelsey |
| | 200 Park Avenue |
| | New York, New York 10166 |
| | Tel: (212) 351-4000 |
| | Fax: (212) 351-4035 |

## 8    CHOICE OF LAW, VENUE, JURY TRIAL WAIVER.

**8.1    Applicable  Law**.    THIS  AGREEMENT  AND  THE  RIGHTS  AND OBLIGATIONS  OF  THE  PARTIES  HEREUNDER  SHALL  BE  GOVERNED  BY,  AND SHALL  BE  CONSTRUED  AND  ENFORCED  IN  ACCORDANCE  WITH,  THE  LAWS  OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**8.2    CONSENT  TO  JURISDICTION**.    EACH  PARTY  HERETO  HEREBY CONSENTS  AND  AGREES  THAT  THE  BANKRUPTCY  COURT  SHALL  HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER AND THE LENDERS PERTAINING TO THIS AGREEMENT

OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE LENDERS AND THE BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDERS.   THE BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE BORROWER HEREBY WAIVES ANY OBJECTION THAT SUCH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

**8.3**     **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDERS/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.   EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.3 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE SOLYNDRA SETTLEMENT FUND LOAN MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**9**     **GENERAL PROVISIONS**

**9.1    Successors and Assigns.**  This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  The Borrower may not assign this Agreement or any rights or obligations under it without the prior written consent of the Lenders (which may be granted or withheld in the Lenders' sole and absolute discretion).

**9.2    Time of Essence.**  Time is of the essence for the performance of all obligations in this Agreement.

**9.3    Severability of Provisions.**  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**9.4    Waivers and Amendments; Integration.**  Any provision of this Agreement may be amended, waived or modified only upon the written consent of Borrower and the Lenders, including, without limitation, any provisions related to the Maturity Date.

**9.5    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, constitute one Agreement.

**9.6    Survival.**  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement) have been satisfied.

**9.7    Electronic Execution of Documents.**  The words "execution," "signed," "signature" and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**9.8    Captions.**  The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**9.9    Construction of Agreement.**  The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**9.10    Relationship.**  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**9.11    Third Parties.**  Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and

assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**9.12    Expenses.**    Whether or not the transactions contemplated hereby are consummated, the Borrower agree to pay promptly (a) all the actual and reasonable costs and expenses of the Lenders incurred in connection with the negotiation, preparation and execution of the Loan Documents; (b) the reasonable fees, expenses and disbursements of counsel to the Lenders (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (c) all other actual and reasonable costs and expenses incurred by the Lenders in connection with the transactions contemplated by the Loan Documents and any consents, amendments, waivers or other modifications thereto and (d) all costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lenders in enforcing any Obligations of or in collecting any payments due from the Borrower hereunder or under the other Loan Documents.

**9.13    Indemnification.**    In addition to the payment of expenses pursuant to Section 9.12, whether or not the transactions contemplated hereby are consummated, the Borrower agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the Lenders and the officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates of the Lenders (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, the Borrower shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 9.13 may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

**9.14    Release.** The Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrowers' liability to repay the Lenders as provided in this Agreement, or to seek affirmative relief or damages of any kind or nature from the Lenders relating to this Agreement. The Borrower, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Lenders and all of the Lenders' past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise, whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen,

suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Plan, the Confirmation Order and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, provided that solely in the case of attorneys, the provisions of this Section 9.14 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

**9.15    Specific Performance**.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at law or in equity.

**9.16    No Marshalling; Payments Set Aside**.  The Lenders shall not be under any obligation to marshal any assets in favor of the Borrower or any other Person or against or in payment of any or all of the Obligations.  To the extent that the Borrower makes a payment or payments to the Lenders, or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA RESIDUAL TRUST**

By_____
Name:
Title:

THE LENDERS:

**ARGONAUT VENTURES I, L.L.C.**

By_____
Name:
Title:

**MADRONE PARTNERS, LP**

By_____
Name:
Title:

### Annex A - Definitions

Capitalized terms not otherwise defined in this Agreement, including in this Annex A, shall have the meaning set forth in the Plan.

**"Affiliate"** means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

**"Agreement"** has the meaning assigned to such term in the preamble hereto."

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as now in effect or hereafter amended.

**"Bankruptcy Court"** has the meaning assigned to such term in the recitals hereto.

**"Borrower"** has the meaning assigned to such term in the preamble hereto.

**"Business Day"** means any day (other than a Saturday, Sunday or legal holiday in the State of California) on which banks are permitted or required to be open in San Francisco, California.

**"Closing Date"** has the meaning assigned to such term in Section 3.1.

**"Collateral"** has the meaning set forth in the Security Agreement.

**"Confirmation Order"** has the meaning set forth in Section 3.1(e).

**"Contractual Obligation"** means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

**"Debtors"** has the meaning assigned to such term in the recitals hereto.

**"Default Rate"** has the meaning assigned to such term in Section 2.3(b).

**"Default"** means a condition or event that, after notice or lapse of time (or both), would give rise to an Event of Default.

**"Disposition"** means any sale or disposition.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, complaint, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities, including common law, relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Borrower.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Event of Default**" means each of the conditions or events set forth in Section 6.1.

"**First Priority**" means, with respect to any security interest or other Lien on property, that such security interest or other Lien is superior to all other security interests and other Liens on such property.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, registration, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Solyndra Settlement Fund Loan or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral)) or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Borrowers.

"**Indemnitee**" has the meaning assigned to such term in Section 9.13.

"**Interest Rate**" has the meaning assigned to such term in Section 2.3(a).

"**Lenders**" has the meaning assigned to such term in the preamble hereto.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan Documents**" means this Agreement, the Security Agreement and any document, instrument or agreement executed and delivered hereby.

"**Mandatory Prepayment Amount**" has the meaning assigned to such term in Section 2.2(d).

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, assets, properties, liabilities, or condition (financial

or otherwise) of the Borrower, (ii) the ability of the Borrower to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against the Borrower of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, the Lenders under the Solyndra Settlement Fund Loan Document.

"**Maturity Date**" means the earlier of (a) the date of the sale or disposition of any remaining Collateral such that substantially all of the Collateral has been sold or otherwise disposed of and applied as required by this Agreement and (b) the date of the sale or disposition, in any one or series of related transactions, of all or substantially all of the assets of the Borrower.

"**Net Asset Sale Proceeds**" means, with respect to any Disposition, an amount equal to: (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower from such Disposition, minus (ii) any bona fide direct costs incurred in connection with such Disposition, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Disposition.

"**Obligations**" means any obligation of any nature of the Borrower and any other obligations from time to time owed to the Lenders under this Agreement or any other Loan Document in connection with the Solyndra Settlement Fund Loan, whether for principal, interest, payments for fees, expenses, indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Plan**" has the meaning set forth in the Recitals hereof.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Parties**" has the meaning assigned to such term in Section 9.14.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means the security agreement to be executed by the Borrower in favor of the Lenders in form and substance attached as <u>Exhibit A</u> hereto.

"**Solyndra Settlement Fund Loan**" has the meaning assigned to such term in Section 2.2(a).

**EXHIBIT A**

**SECURITY AGREEMENT**

**THIS SECURITY AGREEMENT** (this "**Agreement**") dated as of October __, 2012 among **ARGONAUT VENTURES I, L.L.C.** and **MADRONE PARTNERS, LP** (each, a "**Secured Party**" and collectively, the "**Secured Parties**") and the **SOLYNDRA RESIDUAL TRUST**, a liquidating trust created under the Plan, as (the "**Borrower**"), is executed and delivered pursuant to that certain **$3,175,000 SENIOR SECURED SETTLEMENT FUND LOAN AGREEMENT** dated the date hereof (the "**Loan Agreement**") among the Borrower and the Secured Parties.

**WHEREAS**, Solyndra LLC ("**Solyndra**") and 360 Degree Solar Holdings, Inc. (collectively, the "**Debtors**") are debtors and debtors-in-possession in jointly administered cases, Case No. 11-12799, pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in In re: Solyndra LLC, et al. under Chapter 11 of the Bankruptcy Code (as defined herein);

**WHEREAS,** the Debtors' Amended Joint Chapter 11 Plan (as amended, supplemented, or modified from time to time, the "**Plan**") provides for, among other items, the establishment of the Borrower and the granting of the Liens pursuant to this Agreement;

**WHEREAS,** the parties hereto have agreed to the terms and conditions contained in this Agreement;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants contained herein, and for good and valuable consideration, the parties agree as stated above and as follows:

**1      DEFINED TERMS.**  Capitalized terms shall have the meaning set forth in this Section 1 and Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Loan Agreement and in the Plan.

"**Collateral**"[1] means, collectively, the Collateral identified on <u>Schedule 1</u> hereto, including, without limitation, all of the real, personal and mixed property (including Equity Interests), whether now existing or hereafter acquired, including, without limitation, any vessels, cash, any investments of such cash, Deposit Accounts (as defined in the Code), Inventory (as defined in the Code), Equipment (as defined in the Code), Goods (as defined in the Code), General Intangibles (as defined in the Code), Accounts (as defined in the Code) and other accounts receivable, other rights to payment whenever arising, Contracts (as defined in the Code), properties, plants, equipment, Documents (as defined in the Code), Instruments (as defined in the Code), interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests, Commercial Tort Claims (as defined in the Code and specified on <u>Schedule 1</u> hereto) and the proceeds of all of the foregoing. Notwithstanding the foregoing, the Collateral shall not include any Distributable Assets of

---

1 Commercial Tort Claims to include:  Any antitrust and other claims against certain defendants for, inter alia, such defendants' anticompetitive or tortious conduct.

Solyndra as of the Effective Date that are not encumbered by any Liens, including, without limitation, any Retained Rights of Action, but not including the Trust Avoidance Claims or any other Solyndra Settlement Trust Assets.

## 2    SECURITY INTEREST.

**2.1**    Grant of Security Interest.  The Borrower hereby grants the Secured Parties, to secure the payment and performance in full of the Obligations, a continuing security interest in, and pledges to the Secured Parties, all of the Borrower's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  The Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a First Priority perfected security interest in the Collateral.  If the Borrower shall acquire a commercial tort claim (as defined in the Uniform Commercial Code as in effect in the State of New York (the "**Code**")), the Borrower shall promptly notify the Secured Parties in a writing signed by the Borrower of the general details thereof (and further details as may be required by the Secured Parties) and grant to the Secured Parties in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Secured Parties.

**2.2**    Release of Liens.  Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) or the occurrence of the Maturity Date, the Secured Parties shall, at Borrower's sole cost and expense, release its Lien in the Collateral and all rights therein shall revert to the Borrower.  The Secured Parties shall take any action reasonably requested by the Borrower having the effect of releasing any Collateral to the extent necessary to permit consummation of any transaction not prohibited by the Loan Agreement.

**2.3**    Authorization to File Financing Statements.  The Borrower hereby authorizes the Secured Parties to file financing statements, without notice to the Borrower, with all appropriate jurisdictions to perfect or protect the Secured Parties' interest or rights hereunder, including a notice that any disposition of the Collateral, by either a Borrower or any other Person, other than in accordance with this Agreement shall be deemed to violate the rights of the Secured Parties under the Code.

**2.4**    Borrower Cooperation.  The Borrower shall provide such information, execute and deliver such documents and instruments, and take actions to secure, perfect and protect the Collateral as the Secured Parties may request from time to time.

## 3    EVENTS OF DEFAULT; REMEDIES.

**3.1**    Defaults and Events of Default.  The occurrence of an Event of Default under the Loan Agreement shall constitute an Event of Default hereunder.

**3.2**    Rights and Remedies of the Secured Parties Upon Event of Default.  If any Event of Default shall occur the Secured Parties may declare the Obligations secured by this Agreement to be due and payable, whereupon such Obligations shall become immediately due and payable, all without notice of any kind.  In addition, upon the occurrence of an Event of Default, the Secured Parties may exercise the rights, powers and remedies set forth below.

(a)     In addition to all of their other rights, powers and remedies under this Agreement, the other Loan Documents, and other applicable law, the Secured Parties shall have all of the rights, powers and remedies of a secured party under the Uniform Commercial Code of the state in which such rights, powers and remedies are asserted.

(b)     The Secured Parties shall have the right: (i) to enter upon the premises of the Borrower or any other place or places where Collateral is located, without breaking the peace, through self-help and without judicial process or giving the Borrower notice; (ii) to prepare, assemble, or process Collateral for sale, lease, or other disposition; (iii) to remove Collateral to the premises of the Secured Parties or any agent of the Secured Parties, for such time as the Secured Parties may desire, in order to collect or dispose of Collateral; and (iv) to require the Borrower to assemble Collateral and make it available to the Secured Parties at a place to be designated by the Secured Parties.

(c)     Until the Secured Parties are able to effect a sale, lease, or other disposition of Collateral or any part thereof, the Secured Parties shall have the right to use, process or operate Collateral or any part thereof to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Secured Parties.

(d)     The Secured Parties shall have the right to sell, lease, license, or otherwise dispose of all or any Collateral in its then existing condition, or after any further assembly, manufacturing, or processing thereof, at public or private sale or sales, in lots or in bulk, for cash or on credit, all as the Secured Parties, in their sole reasonable discretion, may deem advisable. Without limitation, the Secured Parties may specifically disclaim any warranties of title and the like. The Secured Parties shall not be obligated to clean up or otherwise prepare the Collateral for sale. Such sales may be adjourned and continued from time to time with or without notice. The Secured Parties shall have the right to conduct such sales on the Borrower's premises or elsewhere and shall have the right to use the Borrower's premises without charge for such sales (or preparation for sales) for such time or times as the Secured Parties deem necessary or advisable. The Secured Parties are hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any property of a similar nature as it pertains to Collateral, in advertising for sale or lease or the disposition of any Collateral. The Secured Parties may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price may set off the amount of such Obligations whether or not such Obligations are matured. The Borrower agrees that any sale of Collateral conducted by the Secured Parties in accordance with the foregoing provisions of this Section shall be deemed to be a commercially reasonable sale under the UCC. The Secured Parties may comply with any applicable laws and regulations in connection with any exercise of remedies hereunder and such compliance shall not be considered to adversely affect the commercial reasonableness of such exercise of remedies.

**3.3**     <u>Application of Proceeds</u>. Any proceeds received by the Secured Parties in respect of any sale of, collection from, or other realization upon all or any part of the Collateral following the occurrence of an Event of Default may, in the discretion of the Secured Parties, be held by the Secured Parties as collateral for, and/or then or at any time thereafter applied by the

Secured Parties as follows: (i) first, to pay all reasonable costs, expenses and charges of every kind (including reasonable attorneys' fees and costs) for pursuing, searching, protecting, taking, removing, storing, safekeeping, caring, preparing for sale, advertising, selling and delivering the Collateral and otherwise enforcing this Agreement and the other Loan Documents; (ii) second, to pay the Obligations in order determined by the Secured Parties in accordance with the Loan Agreement and the Plan.

      **3.4**    Appointment of Secured Parties as Lawful Attorney; Other Rights Upon Event of Default. The Borrower hereby irrevocably makes, constitutes and appoints the Secured Parties and all persons designated by the Secured Parties true and lawful attorneys (and agents-in-fact) upon and after the occurrence of an Event of Default for the purposes set forth in the following sentences of this Section. Upon and after the occurrence of an Event of Default, the Secured Parties or their agent may, without notice to the Borrower and at such time or times thereafter as the Secured Parties or said agent in its sole discretion may determine, in the Borrower's or the Secured Parties' name, (i) enforce payment and exercise all of the Borrower's rights and remedies with respect to the collection of the Collateral, (ii) settle, adjust, compromise, discharge, release, extend or renew obligations of the Borrower; and (iii) receive and direct the disposition of any proceeds of any Collateral.

      **3.5**    Remedies Not Exclusive; Foreclosures. No right or remedy hereunder is exclusive of any other right or remedy. Each and every right and remedy shall be cumulative and shall be in addition to and without prejudice to every other remedy given hereunder, under any other agreement between the Borrower and the Secured Parties or now or hereafter existing at law or in equity, and may be exercised from time to time as often as deemed expedient, separately or concurrently. The giving, taking or enforcement of or execution against any other or additional security, collateral, or guaranty for the payment of the Obligations shall not operate to prejudice, waive or affect any rights, powers or remedies hereunder, nor shall the Secured Parties be required to first look to, enforce, exhaust or execute against such other or additional security, or guarantees prior to so acting against the Collateral. The Secured Parties may foreclose on or execute against the items of Collateral in such order as the Secured Parties may, in their sole and unfettered discretion, determine.

      **3.6**    Waivers. The failure or delay of the Secured Parties to insist in any instances upon the performance of any of the terms, covenants or conditions of this Agreement or other Loan Documents, or to exercise any right, remedy or privilege herein or therein conferred, shall not impair or be construed as thereafter waiving any such covenants, remedies, conditions or provisions, but every such term, condition and covenant shall continue and remain in full force and effect; nor shall any waiver of an Event of Default suspend, waive or affect any other Event of Default, whether the same is prior or subsequent thereto and whether of the same or of a different type.

      **3.7**    Waivers by the Borrower. The Borrower waives: (i) presentment, demand, and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension, or renewal of any or all Loan Documents under or pursuant to which the Borrower may in any way be liable and hereby ratifies and confirms whatever the Secured Parties may do in this regard; (ii) notice prior to taking possession or control of Collateral or any bond or security that might be required by any court prior to allowing the Secured Parties to

exercise any of the Secured Parties' remedies; (iii) the benefit of all valuation, appraisement, and exemption laws; (iv) any right to require the Secured Parties to proceed against any other person or collateral held from any other person; (v) any right to require the Secured Parties to pursue any other remedy in the Secured Parties' power whatsoever; or (vi) any defense arising out of any election by Secured Party to exercise or not exercise any right or remedy it may have against the Borrower, any other person or any security held by it, even though such election operates to impair or extinguish any right of reimbursement to subrogation or other right or remedy of the Borrower against any other person or any such security

    **3.8**   <u>Miscellaneous</u>.  The provisions of Section 7, 8 and 9 of the Loan Agreement are hereby incorporated herein *mutatis mutandis*.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA RESIDUAL TRUST**

By_____
Name:
Title:

THE SECURED PARTIES:

**ARGONAUT VENTURES I, L.L.C.**

By_____
Name:
Title:

**MADRONE PARTNERS, LP**

By_____
Name:
Title:

**Schedule 1 to Security Agreement**

# **TAB 5**

## SENIOR SECURED EXIT FACILITY LOAN AGREEMENT

**THIS SENIOR SECURED EXIT FACILITY LOAN AGREEMENT** (this "**Agreement**") dated as of October __, 2012 among **ARGONAUT VENTURES I, L.L.C.** and **MADRONE PARTNERS, LP** (each, a "**Lender**" and collectively, the "**Lenders**") and the **SOLYNDRA RESIDUAL TRUST**, a liquidating trust created under the Plan, as (the "**Borrower**"), provides the terms on which the Lenders shall lend to Borrower and Borrower shall repay the Lenders.

**WHEREAS,** Solyndra LLC ("**Solyndra**") and 360 Degree Solar Holdings, Inc. (collectively, the "**Debtors**") are debtors and debtors-in-possession in jointly administered cases, Case No. 11-12799, pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in In re: Solyndra LLC, et al. under Chapter 11 of the Bankruptcy Code (as defined herein);

**WHEREAS,** the Debtors entered into that certain $7,000,000 Senior Secured, Superpriority Debtor in Possession Term Loan, Guaranty and Security Agreement, dated as of September 6, 2011 (as amended, supplemented, or modified from time to time, the "**DIP Credit Facility**"), by and among the Debtors, as borrowers, and AE DIP 2011, LLC, as lender;

**WHEREAS,** the Debtors' Amended Joint Chapter 11 Plan (as amended, supplemented, or modified from time to time, the "**Plan**") provides for, among other items, the establishment of the Borrower and the provision of the financing facilities set forth in this Agreement, including (i) the Tranche I Exit Facility in the principal amount of $11,500,000, or such higher amount to which the Plan Sponsors agree (the "**Tranche I Exit Facility**"), the proceeds of which shall be used to repay the DIP Credit Facility, fund payment of Allowed Administrative Expenses, Priority Tax Claims (except any Secured Claims), Priority Non-Tax Claims (other than WARN Priority Claims) and Solyndra's Plan Expenses, in each case not funded and paid through the Tranche II Exit Facility and (ii) a Tranche II Exit Facility in the principal amount of $3,500,000, or such higher amount to which the Plan Sponsors agree (the "**Tranche II Exit Facility**"), the proceeds of which shall be used to satisfy certain Claims and expenses, including, without limitation, Priority Claims of current or former employees of Solyndra (other than the WARN Priority Claims), Claims under section 503(b)(9) of the Bankruptcy Code, and Priority Tax Claims (except any Secured Claims);

**WHEREAS,** the Lenders have agreed to provide such loans the on the terms and conditions contained in this Agreement;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants contained herein, the parties agree as stated above and as follows:

## 1   DEFINED TERMS.

**1.1   Capitalized Terms.** Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Annex A hereof and in the Plan.

**2      LOAN AND TERMS OF PAYMENT.**

**2.1      Promise to Pay.**  Borrower hereby unconditionally promises to pay the Lenders the outstanding principal amount of the Obligations and accrued and unpaid interest thereon and any other amounts due hereunder as and when due in accordance with this Agreement.

**2.2      Multi-Tranche Term Loan Facility.**

(a)      Term Loan.  Subject to the terms and conditions of this Agreement, the Lenders agree to make available to the Borrower a term loan consisting of the Tranche I Exit Facility and the Tranche II Exit Facility (collectively, the "**Exit Facility Loan**") on the Closing Date.

(b)      Repayment.  The unpaid principal amount in respect of the Obligations shall be due and payable on the Maturity Date

(c)      Voluntary Prepayments.  Borrower shall have the option, to prepay all, or any part, of the Exit Facility Loan (together with accrued interest on the amount being repaid) at any time and from time to time, without premium or penalty.  All such prepayments shall be made upon not less than two Business Day's prior written or telephonic notice given to the Lenders by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to the Lenders.  Upon the giving of any such notice, the principal amount of the Exit Facility Loan specified in such notice shall become due and payable on the prepayment date specified therein.

(d)      Mandatory Prepayments.  Borrower shall repay the Tranche I Obligations in whole or in part within 2 Business Days upon receipt of Net Asset Sale Proceeds from any Disposition of Tranche I Collateral and shall repay the Tranche II Obligations in whole or in part within 2 Business Days upon receipt of Net Asset Sale Proceeds from any Disposition of Tranche II Collateral, in each case in an amount equal to such Net Asset Sale Proceeds.

(e)      Application of Prepayments.  Any payments made under Sections 2.2(b), (c) or (d) hereof shall be applied to prepay the applicable tranche of the Exit Facility Loan and for payments of distributions, each in accordance with the Plan.  The Lien on the Tranche I Collateral shall be *pari passu* with the Lien on the collateral granted pursuant to the Solyndra Settlement Fund Loan and the Net Asset Sale Proceeds applied from the sale of any such Collateral pursuant to this Agreement shall be applied, *first,* to the Tranche I Obligations until paid in full and, *second,* to the obligations pursuant to the Solyndra Settlement Fund Loan.

**2.3      Payment of Interest on the Exit Facility Loan; Payment Terms.**

(a)      Interest Rate.  The principal amount outstanding for the Exit Facility Loan shall accrue interest, which interest shall be payable in kind as provided in clause (c) below, calculated daily at a per annum rate equal to 15% (the "**Interest Rate**").  Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

(b)      Default Rate.  Immediately upon the occurrence and during the continuance of an Event of Default under Section 6.1 hereof, the Exit Facility Loan shall bear

interest at a rate per annum which is two percentage points above the Interest Rate (the "**Default Rate**"). Payment or acceptance of the increased interest rate provided in this Section 2.3(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lenders.

(c)     Payments.   The accrued and unpaid interest due under this Agreement shall be payable in kind in arrears on each March 31, June 30, September 30 and December 31 and simultaneously with the repayment or prepayment of the Exit Facility Loan (on the principal amount of Exit Facility Loan so repaid or prepaid), including repayment on the Maturity Date. Payments of principal and/or interest and/or other amounts owing hereunder or under any other Loan Document to the Lenders received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest, as applicable, shall continue to accrue.

**2.4     Fees.** The Borrower shall pay to the Lenders on the Closing Date, a Closing Fee (the "**Closing Fee**") in an amount equal 2.0% of the aggregate principal amount of the Exit Facility Loan, such Closing Fee to be fully earned on the Closing Date and payable upon the making of the Exit Facility Loan and (b) such other fees in the amounts and at the times separately agreed.

**3     CONDITIONS OF LOANS AND USE OF PROCEEDS**

**3.1     Conditions Precedent to Effectiveness.** This Agreement shall become effective upon the date (the "**Closing Date**") of the satisfaction of, and the Lenders' obligation to make the Exit Facility Loan is subject to, the condition precedent that the Lenders shall have received, in form and substance satisfactory to the Lenders in their sole and absolute discretion evidence of satisfaction of the following conditions, any of which may be deemed satisfied or waived in whole or in part by the Lenders:

(a)     Loan Documents.   The Lenders shall have received copies duly executed by each of the parties thereto of this Agreement, the Security Agreement and any other Loan Document.

(b)     Security Interest.   The security interests described in the Security Agreement shall have or been or shall concurrently be granted and shall create a valid First Priority security interest in, and Lien on, the Collateral.

(c)     Representations and Warranties.   The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(d)    No Event of Default. No event shall have occurred and be continuing or would result from the consummation of the transactions contemplated herein that would constitute an Event of Default or a Default.

(e)    Confirmation of Plan. The Lenders shall have received evidence that the Bankruptcy Court has entered a confirmation order (the "**Confirmation Order**"), which shall not have been stayed, reversed, vacated or otherwise modified in any manner that is materially adverse to the rights or interests of the Lenders, providing for the approval of the Plan and the execution of this Agreement and the other Loan Documents.

(f)    Payment of Fees and Expenses. The Lenders shall have received payment of the fees and expenses required hereby.

(g)    Other Documents. The Lenders shall have received such other documents and instruments, including legal opinions, as such Lenders may request.

**3.2    Use of Proceeds.** The proceeds of (i) the Tranche I Exit Facility shall be used to repay the DIP Credit Facility, to pay the fees hereunder, fund payment of Allowed Administrative Expenses, Priority Tax Claims (except any Secured Claims), Priority Non-Tax Claims (other than WARN Priority Claims) and Solyndra's Plan Expenses, in each case not funded and paid through the Tranche II Exit Facility and (ii) the Tranche II Exit Facility shall be used to satisfy certain Claims and expenses, including, without limitation, Priority Claims of current or former employees of Solyndra (other than the WARN Priority Claims), Claims under section 503(b)(9) of the Bankruptcy Code, and Priority Tax Claims (except any Secured Claims), in each case in accordance with the Plan.

**4    REPRESENTATIONS AND WARRANTIES.** In order to induce the Lenders to enter into this Agreement and to make each Exit Facility Loan to be made hereunder, the Borrower represents and warrants to the Lenders, that the following statements are true and correct as of the Closing Date:

**4.1    Organization; Requisite Power and Authority; Qualification.** The Borrower (a) is a validly organized and existing liquidating trust and (b) has all requisite power and authority to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and hereby.

**4.2    Due Authorization.** The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action on the part of the Borrower, subject to the entry of the Confirmation Order.

**4.3    No Conflict.** Upon entry by the Bankruptcy Court of the Confirmation Order, the execution, delivery and performance by the Borrower of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to the Borrower, (ii) any of the Organizational Documents of the Borrower, or (iii) any order, judgment or decree of any court or other agency of government binding on the Borrower; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of the Borrower; (c) result in or require the creation or imposition of any

Lien upon any of the properties or assets of the Borrower (other than any Liens created under any of the Loan Documents in favor of Lenders); or (d) require any approval of beneficiaries or any approval or consent of any Person under any Contractual Obligation of the Borrower, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to the Lenders.

**4.4     Binding Obligation**.  Subject to the entry of the Confirmation Order, each Loan Document has been duly executed and delivered by the Borrower and is the legally valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (including, without limitation, the terms of the Confirmation Order).  The Confirmation Order is in full force and effect has not been reversed, stayed, modified or amended (other than with the consent of the Lenders in their sole discretion).

**5      COVENANTS.**  The Borrower covenants and agrees, until payment in full of all Obligations, the Borrower shall perform all covenants in this Section 5.

**5.1     Existence.**  The Borrower will at all times preserve and keep in full force and effect its existence and all of its rights and franchises, licenses and permits material to its business.

**5.2     Compliance with the Plan and the Confirmation Order.**  The Borrower will comply in all material respects with the terms and conditions of the Plan and the Confirmation Order.

**5.3     Compliance with Organizational and Trust Documents.**  The Borrower will comply in all material respects with the terms and conditions of its organizational documents and any other document or instrument executed in connection with creation and maintenance of the Solyndra Residual Trust as provided for in the Plan.

**6      EVENTS OF DEFAULT.**

**6.1     Events of Default**.  Any one or more of the following conditions or events shall constitute an "**Event of Default**":

(a)     Failure to Make Payments When Due.  Failure by Borrower to pay (i) when due any installment of principal of the Exit Facility Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on the Exit Facility Loan or any fee or any other amount due hereunder within three days after the date due; or

(b)     Breach of Certain Covenants.  Failure of the Borrower to perform or comply with any term or condition contained in Sections 4 or 5; or

(c)     Breach of Representations, Etc.  Any representation, warranty, certification or other statement made or deemed made by the Borrower in the Exit Facility Loan Document or in any statement or certificate at any time given by the Borrower pursuant hereto or

thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(d)    Failure to Comply With or Amendment, Reversal or Modification of, the Confirmation Order.  The Borrower shall fail to comply in all material respects with the Plan or the Confirmation Order or the Plan or the Confirmation Order is otherwise amended, reversed or modified in a manner not approved by the Lenders; or

(e)    Cross Default.  The Borrower shall (A) fail to make any payment in respect of any Indebtedness and such failure continues after the applicable grace or notice period, if any, specified in the relevant document governing such Indebtedness; or (B) fails to perform or observe any other condition or covenant, or any other event shall occur or condition exist, under any agreement or instrument relating to any such Indebtedness, and such failure continues after the applicable grace or notice period, if any, specified in the relevant document on the date of such failure if the effect of such failure, event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Indebtedness (or a trustee or administrative agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause such Indebtedness to be declared to be due and payable or to be repurchased, prepaid, defeased or redeemed prior to its stated maturity; or

(f)    Challenge to, or Invalidity of, Loan Documents.  Any of the Loan Documents, including the Security Agreement, shall cease, for any reason, to be in full force and effect in any material respect, or the Borrower or any Affiliate of the Borrower shall so assert in writing, or any Lien created by any of the Loan Documents, including pursuant to the Security Agreement, on any Collateral or property purported to be Collateral shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(g)    Dissolution.  The Borrower shall take any action or enter into any Agreement the effect of which is to cause, or any other act or circumstance shall result in, the winding up, liquidation, dissolution or similar termination of the existence of the Borrower.

**6.2    Remedies.**

(a)    Acceleration.  Upon the occurrence of any Event of Default the Lenders may, upon five days' written notice to the Borrower, and in accordance with the Plan and the Confirmation Order,

(i)    declare all of the Tranche I Obligations and/or the Tranche II Obligations to be immediately due and payable; and

(ii)    enforce any and all Liens securing such Obligations and otherwise exercise any and all rights and remedies provided under the Loan Documents and/or applicable law,

in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrower.

Upon the occurrence of an Event of Default and the exercise by the Lenders of their rights and remedies under this Agreement and the other Loan Documents and applicable law, the Borrower shall assist the Lenders in effecting a disposition of the Collateral upon such terms as are reasonably acceptable to the Lenders. The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7    **NOTICES.**    All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by facsimile or electronic transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number indicated below. Each party may change its address or facsimile number or electronic mailing address by giving the other parties written notice thereof in accordance with the terms of this Section 7.

If to the Borrower:

> Solyndra Residual Trustee
> R. Todd Neilson
> Berkeley Research Group, LLC
> 2049 Century Park East, Suite 2525
> Los Angeles, CA  90067
> e-mail: tneilson@brg-expert.com
> Fax: 310-557-8982

With copy to:

> Pachulski Stang Ziehl & Jones LLP
> Attn:  Maxim B. Litvak, Esq.
> 150 California Street, 15th Floor
> San Francisco, CA  94111
> e-mail:  mlitvak@pszjlaw.com
> Fax:  415-263-7010

If to the Lenders:

> Attention:  Steve Mitchell
> 6733 South Yale Avenue
> Tulsa, OK 74137
> Tel: (918) 494-0000
> Fax: (918) 491-4694
>
> US Mail to:

PO Box 21468
Tulsa, OK 74121

with a copy to:                    Gibson, Dunn & Crutcher LLP
                                   Attn:  J. Eric Wise, Esq.
                                   and Matthew K. Kelsey
                                   200 Park Avenue
                                   New York, New York 10166
                                   Tel: (212) 351-4000
                                   Fax: (212) 351-4035

## 8      CHOICE OF LAW, VENUE, JURY TRIAL WAIVER.

**8.1      Applicable Law.**    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

**8.2      CONSENT TO JURISDICTION.**    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER AND THE LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE LENDERS AND THE BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDERS.    THE BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE BORROWER HEREBY WAIVES ANY OBJECTION THAT SUCH DEBTOR MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

**8.3      WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDERS/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE

OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.    EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.    EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.    THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.3 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE EXIT FACILITY LOAN MADE HEREUNDER.    IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 9    GENERAL PROVISIONS

**9.1    Successors and Assigns.**  This Agreement binds and is for the benefit of the successors and permitted assigns of each party.  The Borrower may not assign this Agreement or any rights or obligations under it without the prior written consent of the Lenders (which may be granted or withheld in the Lenders' sole and absolute discretion).

**9.2    Time of Essence.**  Time is of the essence for the performance of all obligations in this Agreement.

**9.3    Severability of Provisions.**  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**9.4    Waivers and Amendments; Integration.**  Any provision of this Agreement may be amended, waived or modified only upon the written consent of Borrower and the Lenders, including, without limitation, any provisions related to the Maturity Date.

**9.5    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, constitute one Agreement.

**9.6    Survival.**  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement) have been satisfied.

**9.7    Electronic Execution of Documents**.    The words "execution," "signed," "signature" and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**9.8    Captions**.    The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**9.9    Construction of Agreement**.    The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.    In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**9.10    Relationship**.    The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.    The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**9.11    Third Parties**.    Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**9.12    Expenses**.    Whether or not the transactions contemplated hereby are consummated, the Borrower agree to pay promptly (a) all the actual and reasonable costs and expenses of the Lenders incurred in connection with the negotiation, preparation and execution of the Loan Documents and the Other Exit Loan Documents; (b) the reasonable fees, expenses and disbursements of counsel to the Lenders (in each case including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and the Other Exit Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (c) all other actual and reasonable costs and expenses incurred by the Lenders in connection with the transactions contemplated by the Loan Documents and the Other Exit Loan Documents and any consents, amendments, waivers or other modifications thereto and (d) all costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Lenders in enforcing any Obligations of or in collecting any payments due from the Borrower hereunder or under the other Loan Documents or the Other Exit Loan Documents.

**9.13    Indemnification**.    In addition to the payment of expenses pursuant to Section 9.12, whether or not the transactions contemplated hereby are consummated, the Borrower agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, the Lenders and the officers, partners, members, directors, trustees, advisors,

employees, agents, sub-agents and Affiliates of the Lenders (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities; provided, the Borrower shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from the gross negligence or willful misconduct of that Indemnitee, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 9.13 may be unenforceable in whole or in part because they are violative of any law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

9.14    **Release**.  The Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrowers' liability to repay the Lenders as provided in this Agreement, or to seek affirmative relief or damages of any kind or nature from the Lenders relating to this Agreement.  The Borrower, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Lenders and all of the Lenders' past and present officers, directors, servants, agents, attorneys, assigns, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise, whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Plan, the Confirmation Order and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, provided that solely in the case of attorneys, the provisions of this Section 9.14 shall be limited to the extent that any such release would violate any professional disciplinary rules, including Disciplinary Rule 6-102 of the Code of Professional Conduct, to the extent applicable.

9.15    **Specific Performance**.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specific performance of the terms hereof, this being in addition to any other remedy to which they are entitled at law or in equity.

9.16    **No Marshalling; Payments Set Aside**.  The Lenders shall not be under any obligation to marshal any assets in favor of the Borrower or any other Person or against or in payment of any or all of the Obligations.  To the extent that the Borrower makes a payment or payments to the Lenders, or the Lenders enforce any security interests or exercise their rights of

setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA RESIDUAL TRUST**

By_____
Name:
Title:

THE LENDERS:

**ARGONAUT VENTURES I, L.L.C.**

By_____
Name:
Title:

**MADRONE PARTNERS, LP**

By_____
Name:
Title:

### Annex A - Definitions

Capitalized terms not otherwise defined in this Agreement, including in this Annex A, shall have the meaning set forth in the Plan.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" has the meaning assigned to such term in the preamble hereto."

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as now in effect or hereafter amended.

"**Bankruptcy Court**" has the meaning assigned to such term in the recitals hereto.

"**Borrower**" has the meaning assigned to such term in the preamble hereto.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday in the State of California) on which banks are permitted or required to be open in San Francisco, California.

"**Closing Date**" has the meaning assigned to such term in Section 3.1.

"**Closing Fee**" has the meaning assigned to such term in Section 2.4.

"**Collateral**" has the meaning set forth in the Security Agreement.

"**Confirmation Order**" has the meaning set forth in Section 3.1(e).

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Default Rate**" has the meaning assigned to such term in Section 2.3(b).

"**Default**" means a condition or event that, after notice or lapse of time (or both), would give rise to an Event of Default.

"**DIP Credit Facility**" has the meaning assigned to such term in the Recitals hereto.

"**Disposition**" means any sale or disposition.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, complaint, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal, state or provincial (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities, including common law, relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Borrower or any facility.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Event of Default**" means each of the conditions or events set forth in Section 6.1.

"**Exit Facility Loan**" has the meaning assigned to such term in Section 2.2(a).

"**First Priority**" means, with respect to any security interest or other Lien on property, that such security interest or other Lien is superior to all other security interests and other Liens on such property.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, registration, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement,

removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Exit Facility Loan or the use or intended use of the proceeds thereof, or any enforcement of any of the Loan Documents (including any sale of, collection from, or other realization upon any of the Collateral)) or (ii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Borrowers.

"**Indemnitee**" has the meaning assigned to such term in Section 9.13.

"**Interest Rate**" has the meaning assigned to such term in Section 2.3(a).

"**Lenders**" has the meaning assigned to such term in the preamble hereto.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan Documents**" means this Agreement, the Security Agreement and any document, instrument or agreement executed and delivered hereby.

"**Mandatory Prepayment Amount**" has the meaning assigned to such term in Section 2.2(d).

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business, assets, properties, liabilities, or condition (financial or otherwise) of the Borrower, (ii) the ability of the Borrower to fully and timely perform its Obligations; (iii) the legality, validity, binding effect or enforceability against the Borrower of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, the Lenders under the Exit Facility Loan Document.

"**Maturity Date**" means the earlier of (a) the date of the sale or disposition of any remaining Collateral such that substantially all of the Collateral has been sold or otherwise disposed of and applied as required by this Agreement and (b) the date of the sale or disposition, in any one or series of related transactions, of all or substantially all of the assets of the Borrower.

"**Net Asset Sale Proceeds**" means, with respect to any Disposition, an amount equal to: (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower from such Disposition, minus (ii) any bona fide direct costs incurred in connection with such Disposition, including (a) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Disposition.

"**Obligations**" means, collectively, the Tranche I Obligations and the Tranche II Obligations.

"**Other Exit Loan Documents**" means, collectively, all documents and instruments executed and delivered in connection with the Solyndra Settlement Fund Loan and the WARN Settlement Loan.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Plan**" has the meaning set forth in the Recitals hereof.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Parties**" has the meaning assigned to such term in Section 9.14.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means the security agreement to be executed by the Borrower in favor of the Lenders in form and substance attached as <u>Exhibit A</u> hereto.

"**Tranche I Collateral**" has the meaning set forth in the Security Agreement.

"**Tranche I Exit Facility**" has the meaning set forth in the Recitals hereof.

"**Tranche I Obligations**" means the Tranche I Exit Facility and any obligation of any nature of the Borrower and any other obligations from time to time owed to the Lenders under this Agreement or any other Loan Document in connection with the Tranche I Exit Facility, whether for principal, interest, payments for fees, expenses, indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"**Tranche II Collateral**" has the meaning set forth in the Security Agreement.

"**Tranche II Exit Facility**" has the meaning set forth in the Recitals hereof.

"**Tranche II Obligations**" means the Tranche II Exit Facility and any obligation of any nature of the Borrower and any other obligations from time to time owed to the Lenders under this Agreement or any other Loan Document in connection with the Tranche II Exit Facility, whether for principal, interest, payments for fees, expenses, indemnification or otherwise, whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

**EXHIBIT A**

**SECURITY AGREEMENT**

**THIS SECURITY AGREEMENT** (this "**Agreement**") dated as of October __, 2012 among **ARGONAUT VENTURES I, L.L.C.** and **MADRONE PARTNERS, LP** (each, a "**Secured Party**" and collectively, the "**Secured Parties**") and the **SOLYNDRA RESIDUAL TRUST**, a liquidating trust created under the Plan, as (the "**Borrower**"), is executed and delivered pursuant to that certain **SENIOR SECURED EXIT FACILITY LOAN AGREEMENT** dated the date hereof (the "**Loan Agreement**") among the Borrower and the Secured Parties.

**WHEREAS**, Solyndra LLC ("**Solyndra**") and 360 Degree Solar Holdings, Inc. (collectively, the "**Debtors**") are debtors and debtors-in-possession in jointly administered cases, Case No. 11-12799, pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in In re: Solyndra LLC, et al. under Chapter 11 of the Bankruptcy Code (as defined herein);

**WHEREAS,** the Debtors' Amended Joint Chapter 11 Plan (as amended, supplemented, or modified from time to time, the "**Plan**") provides for, among other items, the establishment of the Borrower and the granting of the Liens pursuant to this Agreement;

**WHEREAS,** the parties hereto have agreed to the terms and conditions contained in this Agreement;

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants contained herein, and for good and valuable consideration, the parties agree as stated above and as follows:

**1**      **DEFINED TERMS.**  Capitalized terms shall have the meaning set forth in this Section 1 and Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Loan Agreement and in the Plan.

"**Collateral**" means, collectively, the Tranche I Collateral and the Tranche II Collateral.

"**Tranche I Collateral**"[1] means, collectively, the Collateral identified as Tranche I Collateral described on Schedule 1 hereto, including, without limitation, all of the real, personal and mixed property (including Equity Interests), whether now existing or hereafter acquired, including, without limitation, any vessels, cash, any investments of such cash, Deposit Accounts (as defined in the Code), Inventory (as defined in the Code), Equipment (as defined in the Code), Goods (as defined in the Code), General Intangibles (as defined in the Code), Accounts (as defined in the Code) and other accounts receivable, other rights to payment whenever arising, Contracts (as defined in the Code), properties, plants, equipment, Documents (as defined in the Code), Instruments (as defined in the Code), interest in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property, Equity Interests, Commercial

---

1 Commercial Tort Claims to include:  Any antitrust and other claims against certain defendants for, inter alia, such defendants' anticompetitive or tortious conduct.

Tort Claims (as defined in the Code and specified on Schedule 1 hereto) and the proceeds of all of the foregoing. Notwithstanding the foregoing, Tranche I Collateral shall not include any Tranche II Collateral.

"**Tranche II Collateral**" means, collectively, the Collateral identified as Tranche II Collateral described on Schedule 1 hereto, including, without limitation, any Distributable Assets of Solyndra as of the Effective Date that are not encumbered by any Liens, including, without limitation, any Retained Rights of Action, but not including the Trust Avoidance Claims or any other Solyndra Settlement Trust Assets. Notwithstanding the foregoing, Tranche II Collateral shall not include any Tranche I Collateral.

## 2    SECURITY INTEREST.

**2.1**    Grant of Security Interest. The Borrower hereby grants the Secured Parties, (i) to secure the payment and performance in full of all of the Tranche I Obligations, a continuing security interest in, and pledges to the Secured Parties, all of the Borrower's right, title and interest in, to and under the Tranche I Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof and (ii) to secure the payment and performance in full of all of the Tranche II Obligations, a continuing security interest in, and pledges to the Secured Parties, all of the Borrower's right, title and interest in, to and under the Tranche II Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. The Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a First Priority perfected security interest in the Collateral (subject, in the case of the Tranche II Collateral, to the Liens in respect of the WARN Settlement Loan in the specified Retained Rights of Action). If the Borrower shall acquire a commercial tort claim (as defined in the Uniform Commercial Code as in effect in the State of New York (the "**Code**")), the Borrower shall promptly notify the Secured Parties in a writing signed by the Borrower of the general details thereof (and further details as may be required by the Secured Parties) and grant to the Secured Parties in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Secured Parties.

**2.2**    Release of Liens. Upon payment in full in cash of the Tranche I Obligations (other than inchoate indemnity obligations) or the occurrence of the Maturity Date, the Secured Parties shall, at Borrower's sole cost and expense, release its Lien in the Tranche I Collateral and all rights therein shall revert to the Borrower. Upon payment in full in cash of the Tranche II Obligations (other than inchoate indemnity obligations) or the occurrence of the Maturity Date, the Secured Parties shall, at Borrower's sole cost and expense, release its Lien in the Tranche II Collateral and all rights therein shall revert to the Borrower. The Secured Parties shall take any action reasonably requested by the Borrower having the effect of releasing any Collateral to the extent necessary to permit consummation of any transaction not prohibited by the Loan Agreement.

**2.3**    Authorization to File Financing Statements. The Borrower hereby authorizes the Secured Parties to file financing statements, without notice to the Borrower, with all appropriate jurisdictions to perfect or protect the Secured Parties' interest or rights hereunder, including a notice that any disposition of the Collateral, by either a Borrower or any other Person, other than

in accordance with this Agreement shall be deemed to violate the rights of the Secured Parties under the Code.

2.4    Borrower Cooperation.  The Borrower shall provide such information, execute and deliver such documents and instruments, and take actions to secure, perfect and protect the Collateral as the Secured Parties may request from time to time.

## 3    EVENTS OF DEFAULT; REMEDIES.

3.1    Defaults and Events of Default.  The occurrence of a Default or an Event of Default under the Loan Agreement shall constitute an Event of Default hereunder.

3.2    Rights and Remedies of the Secured Parties Upon Event of Default.  If any Event of Default shall occur the Secured Parties may declare the Obligations secured by this Agreement to be due and payable, whereupon such Obligations shall become immediately due and payable, all without notice of any kind.  In addition, upon the occurrence of an Event of Default, the Secured Parties may exercise the rights, powers and remedies set forth below.

(a)    In addition to all of their other rights, powers and remedies under this Agreement, the other Loan Documents, and other applicable law, the Secured Parties shall have all of the rights, powers and remedies of a secured party under the Uniform Commercial Code of the state in which such rights, powers and remedies are asserted.

(b)    The Secured Parties shall have the right: (i) to enter upon the premises of the Borrower or any other place or places where Collateral is located, without breaking the peace, through self-help and without judicial process or giving the Borrower notice; (ii) to prepare, assemble, or process Collateral for sale, lease, or other disposition; (iii) to remove Collateral to the premises of the Secured Parties or any agent of the Secured Parties, for such time as the Secured Parties may desire, in order to collect or dispose of Collateral; and (iv) to require the Borrower to assemble Collateral and make it available to the Secured Parties at a place to be designated by the Secured Parties.

(c)    Until the Secured Parties are able to effect a sale, lease, or other disposition of Collateral or any part thereof, the Secured Parties shall have the right to use, process or operate Collateral or any part thereof to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Secured Parties.

(d)    The Secured Parties shall have the right to sell, lease, license, or otherwise dispose of all or any Collateral in its then existing condition, or after any further assembly, manufacturing, or processing thereof, at public or private sale or sales, in lots or in bulk, for cash or on credit, all as the Secured Parties, in their sole reasonable discretion, may deem advisable. Without limitation, the Secured Parties may specifically disclaim any warranties of title and the like.  The Secured Parties shall not be obligated to clean up or otherwise prepare the Collateral for sale.  Such sales may be adjourned and continued from time to time with or without notice. The Secured Parties shall have the right to conduct such sales on the Borrower's premises or elsewhere and shall have the right to use the Borrower's premises without charge for such sales (or preparation for sales) for such time or times as the Secured Parties deem necessary or

advisable. The Secured Parties are hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any property of a similar nature as it pertains to Collateral, in advertising for sale or lease or the disposition of any Collateral. The Secured Parties may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price may set off the amount of such Obligations whether or not such Obligations are matured. The Borrower agrees that any sale of Collateral conducted by the Secured Parties in accordance with the foregoing provisions of this Section shall be deemed to be a commercially reasonable sale under the UCC. The Secured Parties may comply with any applicable laws and regulations in connection with any exercise of remedies hereunder and such compliance shall not be considered to adversely affect the commercial reasonableness of such exercise of remedies.

       **3.3**    <u>Application of Proceeds</u>. Any proceeds received by the Secured Parties in respect of any sale of, collection from, or other realization upon all or any part of the Collateral following the occurrence of an Event of Default may, in the discretion of the Secured Parties, be held by the Secured Parties as collateral for, and/or then or at any time thereafter applied by the Secured Parties as follows: (i) first, to pay all reasonable costs, expenses and charges of every kind (including reasonable attorneys' fees and costs) for pursuing, searching, protecting, taking, removing, storing, safekeeping, caring, preparing for sale, advertising, selling and delivering the Collateral and otherwise enforcing this Agreement and the other Loan Documents; (ii) second, to pay the Obligations in order determined by the Secured Parties in accordance with the Loan Agreement and the Plan.

       **3.4**    <u>Appointment of Secured Parties as Lawful Attorney; Other Rights Upon Event of Default</u>. The Borrower hereby irrevocably makes, constitutes and appoints the Secured Parties and all persons designated by the Secured Parties true and lawful attorneys (and agents-in-fact) upon and after the occurrence of an Event of Default for the purposes set forth in the following sentences of this Section. Upon and after the occurrence of an Event of Default, the Secured Parties or their agent may, without notice to the Borrower and at such time or times thereafter as the Secured Parties or said agent in its sole discretion may determine, in the Borrower's or the Secured Parties' name, (i) enforce payment and exercise all of the Borrower's rights and remedies with respect to the collection of the Collateral, (ii) settle, adjust, compromise, discharge, release, extend or renew obligations of the Borrower; and (iii) receive and direct the disposition of any proceeds of any Collateral.

       **3.5**    <u>Remedies Not Exclusive; Foreclosures</u>. No right or remedy hereunder is exclusive of any other right or remedy. Each and every right and remedy shall be cumulative and shall be in addition to and without prejudice to every other remedy given hereunder, under any other agreement between the Borrower and the Secured Parties or now or hereafter existing at law or in equity, and may be exercised from time to time as often as deemed expedient, separately or concurrently. The giving, taking or enforcement of or execution against any other or additional security, collateral, or guaranty for the payment of the Obligations shall not operate to prejudice, waive or affect any rights, powers or remedies hereunder, nor shall the Secured Parties be required to first look to, enforce, exhaust or execute against such other or additional security, or guarantees prior to so acting against the Collateral. The Secured Parties may

foreclose on or execute against the items of Collateral in such order as the Secured Parties may, in their sole and unfettered discretion, determine.

      **3.6**    <u>Waivers</u>.  The failure or delay of the Secured Parties to insist in any instances upon the performance of any of the terms, covenants or conditions of this Agreement or other Loan Documents, or to exercise any right, remedy or privilege herein or therein conferred, shall not impair or be construed as thereafter waiving any such covenants, remedies, conditions or provisions, but every such term, condition and covenant shall continue and remain in full force and effect; nor shall any waiver of an Event of Default suspend, waive or affect any other Event of Default, whether the same is prior or subsequent thereto and whether of the same or of a different type.

      **3.7**    <u>Waivers by the Borrower</u>.  The Borrower waives:  (i) presentment, demand, and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension, or renewal of any or all Loan Documents under or pursuant to which the Borrower may in any way be liable and hereby ratifies and confirms whatever the Secured Parties may do in this regard; (ii) notice prior to taking possession or control of Collateral or any bond or security that might be required by any court prior to allowing the Secured Parties to exercise any of the Secured Parties' remedies; (iii) the benefit of all valuation, appraisement, and exemption laws; (iv) any right to require the Secured Parties to proceed against any other person or collateral held from any other person; (v) any right to require the Secured Parties to pursue any other remedy in the Secured Parties' power whatsoever; or (vi) any defense arising out of any election by Secured Party to exercise or not exercise any right or remedy it may have against the Borrower, any other person or any security held by it, even though such election operates to impair or extinguish any right of reimbursement to subrogation or other right or remedy of the Borrower against any other person or any such security

      **3.8**    <u>Miscellaneous</u>.  The provisions of Section 7, 8 and 9 of the Loan Agreement are hereby incorporated herein *mutatis mutandis*.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

**SOLYNDRA RESIDUAL TRUST**

By_____
Name:
Title:

THE SECURED PARTIES:

**ARGONAUT VENTURES I, L.L.C.**


By_____

Name:

Title:



**MADRONE PARTNERS, LP**



By_____

Name:

Title:

**Schedule 1 to Security Agreement**