IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No. 11-12799 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hearing Date:  June 20, 2013 at 10:30 AM |
| | ) | Objection Date:  June 12, 2012 |

**MOTION OF KINETIC SYSTEMS, INC. FOR A DETERMINATION
THAT THE PLAN INJUNCTIONS DO NOT PROHIBIT
INSTITUTION OF AN ACTION TO DETERMINE THE PRIORITY
OF MECHANICS LIENS AND THE CREDITORS' RIGHTS TO THE
SEGREGATED ACCOUNT PROVIDED FOR IN THE SALE ORDER
 (OR, IN THE ALTERNATIVE TO MODIFY SUCH INJUNCTIONS)**

Kinetic Systems, Inc. ("Kinetic") hereby moves for a determination that the injunctions in

the Plan and Confirmation Order do not prohibit institution of an action to determine the priority

(as between three groups of non-debtors) of certain liens and those lienholders' rights to the

Segregated Account (defined below) provided for in the Sale Order[2] (or to modify them to

permit such an action), and for related relief.

The grounds for this motion are as follows:

## I.    FACTUAL BACKGROUND

1.    This motion seeks resolution of the narrow issue of whether the

Plan/Confirmation order injunctions prevent Kinetic from seeking to have an inter-creditor

dispute over the priority of its mechanic's liens resolved by a California Court, where the

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows:  Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583).  The Debtors' address is 47488 Kato Road, Freemont, CA 94538.

[2] Order Under 11 U.S.C. §§ 105(A), 363 and 1142 and Fed. R. Bankr. P. 2002, 6004 and 6006: (I) Approving Agreement of Sale and Purchase and Authorizing the Sale of Real Property and Related Property to Seagate Technology LLC or A Higher and Better Bidder; (II) Authorizing the Sale of Property Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(A), (F) And (M) of the Bankruptcy Code, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief (D.I. 1243).

relevant real property was located and where the relevant witnesses and documents are all

located.  The real property involved has now been sold, and the liens at issue have now attached

to a segregated account holding certain proceeds (in which only Kinetic and certain other secured

creditors have an interest); moreover a Plan has been confirmed in this case and there is related

litigation currently pending in the District Court for the Northern District of California.   For the

reasons set forth below, those injunctions should not be interpreted so as to prevent Kinetic from

seeking a resolution in the California Court.

**A.**     **The Bankruptcy and Kinetic's Mechanics' Lien Claim**

2.      On September 1, 2011, Solyndra LLC ("Solyndra") filed a voluntary petition for

relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

3.      Kinetic is a full service process and mechanical contractor specializing in the

design and installation of process, mechanical, plumbing and HVAC systems.  See

www.Kinetic.net/services/services-overview.aspx.  As such, immediately prior to the

bankruptcy, Kinetic was performing contracting work on certain jobsites in or around the

facilities that the Debtors generally refer to as the "Fab 2 Facility" (47488 Kato Road, Fremont,

CA).

4.      Kinetic was not paid for certain of that contracting work, and has filed, perfected

and holds mechanics' liens; notices of such liens in the amount of $1,206,616 (D.I. 196), $7,971

(D.I. 197), $10,023 (D.I. 198), $22,846 (D.I. 199), $1,304 (D.I. 200) and $160,699 (D.I. 359)

have been filed in this bankruptcy case.  Of these filings about $1,375,000 is filed against the Fab

2 Facility at 47488 Kato Road, Freemont, CA (D.I. 196, 197 and 359); of this amount, some has

now been paid, leaving a lien of about $1,187,950 against that property.

**B.**     **The Competing Liens on the Fab 2 Facility**

5.        According to Solyndra's Summary of Schedules and Solyndra's Schedule A and Schedule D, Solyndra's scheduled secured debt before mechanics' liens was $783,755,765.61, all of which was secured by the Fab 2 Facility.  See D.I. 276.

6.        In addition to Kinetic, two other Mechanics Lienholders, Bayside Interiors, Inc. ("Bayside") and RK Electric Inc., ("RK") filed mechanics liens against the Fab 2 Facility.  See, D.I. 259 and 329.  Their liens total $151,676.50.  Kinetic, Bayside and RK are collectively referred to as the "Mechanics Lienholders."

7.        Thus, the total liens against this property were in excess of $785 million.

**C.**     **The Efforts to Sell the Fab 2 Facility**

8.        Prior to 2012, Solyndra had filed various motions seeking to sell substantially all of its assets on a turnkey basis and, alternatively, on a piecemeal basis.  (e.g., D.I. 251, 370, 467).

9.        These sales/proposed sales did not result in the sale of the Debtor's Fab 2 Facility.

10.        In 2012, Solyndra marketed the real estate through a broker and in August 2012 filed the (1) the Motion of Solyndra for the Entry of an Order (A) Approving Procedures for Sale of Real Property and Related Property; (B) Scheduling Auction and Hearing to Consider Approval of Sale and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Forms of Notice and (D) Granting Related Relief (D.I. 1008) (the "Real Estate Sale Procedures Motion"), and (2) the Motion for an Order (1) Approving Agreement of Sale and Authorizing the Sale of Real Property and Related Property to Seagate Technology LLC or a Higher and Better Bidder; (II) Authorizing the Sale of Property Free and Clear of all Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(A), (F) and (M) of the Bankruptcy Code, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief (D.I. 1009)

(the "Motion to Authorize Sale").  Collectively, these are referred to as the "Fab 2 Sale Motions."

11.    The Fab 2 Sale Motions sought approval to sell the Fab 2 Facility to Seagate Technology LLC (the stalking horse bidder) for approximately $90 million, subject to certain sale procedures and an auction process.  Id.

12.    The $90 million sale price was far, far less than the $785 million in liens on the Fab 2 Facility, as more fully described above.

13.    As described below, Seagate was ultimately the winning bidder for the Fab 2 Facility.

**D.    The Mechanics Lien Claimants' Objections to the Sale, and the Creation of A Segregated Account to be Held Pending Resolution of the Priority Dispute Among Certain of the Secured Creditors.**

14.    Since the proposed sale of the Fab 2 Facility would not generate enough money to even pay the secured creditors, all three Mechanics Lienholders filed objections to the sale of the facility free and clear of their mechanics liens.  See D.I. 1069, 1081 and 1082.

15.    In such objections, the Mechanics Lienholders argued that their liens had priority and they should be paid first; certain Secured Lenders[3] disputed these claims and argued that the liens claims of the Mechanics Lienholders were junior to those of the Secured Lenders.  This gave rise to a lien priority dispute between the Mechanics Lienholders and the Secured Lenders (the "Lien Priority Dispute") that remains unresolved.

---

[3] The Purchase Agreement for the Fab 2 facility defines the "Secured Lenders" as "Argonaut Ventures I, L.L.C., as the Prepetition Tranche A Representative and the Prepetition Tranche E Agent and the U.S. Department of Energy, acting by and through the Secretary of Energy, as the Prepetition Tranche BID Agent (together, the "Secured Lenders")."  This definition is incorporated in the Sale Order at footnote 2; this definition itself appears at Exhibit B to the Sale Agreement at ¶2 of the Bid Procedures (D.I. 1009-2).

16.     No party ever argued that the proceeds were sufficient to pay all liens, as it is undisputed that they were not sufficient and thus that the Debtors had no equity in the Fab 2 Facility or right to any proceeds.

17.     To resolve the Mechanics Lienholders' objections (but not the Lien Priority Dispute) and allow the sale to proceed free and clear, the Sale Order established a segregated account to which the liens of the Mechanics Lienholders and the Secured Lenders would attach in the same order and priority as they attached to the Fab 2 Facility.

18.     The operative paragraphs of that Sale Order (D.I. 1243) provide:

"5.     **Resolution of Objections of Kinetic Systems, Inc.; Bayside Interiors, Inc.; and RK Electric, Inc.**  On September 10, 2012, Kinetic Systems, Inc. ("Kinetic") filed a limited objection to the Sale Motion [Docket No. 1069] (the "Kinetic Objection"). On September 19, 2012, Bayside Interiors, Inc. ("Bayside") and RK Electric, Inc. ("RK Electric") and together with Kinetic and Bayside, the "Mechanics") each separately filed joinders to the Kinetic Objection [Docket No. 1081 and Docket No 1082, respectively], (together, the "Joinders" and collectively with the Kinetic Objection, the "Mechanics' Objections").  The Mechanics do not oppose the sale of the Property to the Buyer pursuant to the Sale Motion, but oppose the distribution of the Sale Proceeds pending resolution of the Mechanics' Objections.

6.     Kinetic asserts in its objection that it is owed $1,409,759 in unsatisfied mechanics liens claims and that such claims constitute secured claims against the Sale Proceeds immediately upon the sale the Property (the "Kinetic Claim").  Bayside asserts that it is owed $77,604.78 in unsatisfied mechanics liens claims and that such claims constitute secured claims against the Sale Proceeds immediately upon the sale of the Property (the "Bayside Claim").  RK Electric asserts that is owed $74,071.72 in unsatisfied mechanics' liens claims and that such claims constitute the secured claims against the Sale Proceeds immediately upon the sale of the Property (the "RK Electric Claim, and together with the Kinetic Claim and the Bayside Claim, the "Mechanics' Lien Claims"). The Mechanics each assert that the Mechanics' Lien Claims are secured claims that are senior in priority to the allowed secured claims of the Secured Lenders.[4]  The Debtors, the Trust and the Secured Lenders dispute these assertions and believe that the Mechanics Lien Claims, if any, are junior to the secured claims of the Secured Lenders. In order to resolve the Mechanics' Objections, the Trustee and the Secured Lenders agree to segregate $1,561,435.50 of the Sale Proceeds into a segregated interest bearing

[4] Again, this term is defined as in the Purchase Agreement for the Fab 2 Facility to mean: "Argonaut Ventures I, L.L.C., as the Prepetition Tranche A Representative and the Prepetition Tranche E Agent and the U.S. Department of Energy, acting by and through the Secretary of Energy, as the Prepetition Tranche BID Agent (together, the "Secured Lenders")."  See Fn. 2 of the Sale Order and Fn. 3 of this motion.

account titled in whole or in part in the name of the Trust pending either (i) a determination by the Court of the rights, liens and claims, if any, of each of the Mechanics with respect to the Sale Proceeds or (ii) entry into any agreement or stipulation between the parties pursuant to the terms of the Plan that may be implemented without further order of the Court; provided, however, that such reserved amount shall be reduced to the extent of any payments received by any of the Mechanics, as appropriate, without further order of the Court, and such reduced amounts shall promptly be distributed by the Trust to the Secured Lenders in accordance with the Plan. The liens of the Mechanics, if any, and Secured Lenders shall attach to the Sale Proceeds placed into such segregated account with the same validity, and to the same extent, and in the same order and priority as they attached to the Property.  The Trust, the Mechanics and the Secured Lenders reserve all of their rights and arguments with regard to such issues. The Mechanics' Objections are deemed withdrawn.  No other parties filed any objections to the Sale Motion, either timely or otherwise.

19.    Pursuant to the Sale Order, the Fab 2 Facility was ultimately sold for approximately $90 million – leaving approximately $695 million in liens on the facility unpaid and, of course, nothing for the Debtors.

20.    The required funds were placed in the Segregated Account upon closing of the Sale to Seagate, and no party other than the Mechanics Lienholders or the Secured Creditors has an interest in or lien upon the Segregated Account.  Sale Order ¶6 ("The liens of the Mechanics, if any, and the Secured Lenders shall attach to the Sale Proceeds placed in such segregated account . . .  No other parties filed any objections . . .").

21.    As a result, the funds in the segregated account created by the paragraph of the Sale Order quoted above ("Segregated Account") will either be paid to the Mechanics Lienholders or to the Secured Lenders, leaving nothing for the Debtors/Trust [defined below]. Thus, the Debtors/Trust have no interest in such funds.

**E.    The Plan and Confirmation Order Injunctions**

22.    While the Sale Motion was pending, the Debtors proposed and confirmed a Plan of Reorganization.  See October 22, 2012 Order confirming Debtors Amended Joint Chapter 11 Plan (D.I. 1173).

23.     That Plan (D.I. 1059) became effective in or about November 2012.  Because the Plan vested certain property and rights (including the Fab 2 Facility) in the Solyndra Residual Trust ("Trust") subject to the liens and other claims, the Debtors and Trust and their rights in that facility are referred to collectively as "Debtors/Trust."

24.     After the plan became effective, the Court entered the Sale Order and provided for creation of the Segregated Account.

25.     Both the Confirmation Order and the Plan contain various injunction provisions, e.g., Order ¶ 13; plan section X. A at page 94-97.

26.     These provisions contain very broad language, including language against commencing litigation involving "property of the Debtors . . . or the Solyndra Residual Trust," or enforcing liens.  For convenience, the Confirmation Order Injunction Provisions are attached at Exhibit A and the Plan Injunction Provisions are attached as Exhibit B.

27.     They also provide that they do not enjoin third party actions.  Id.

28.     Although discussions to resolve the competing claims of Kinetic and the Secured Lenders to the Segregated Account have occurred, Kinetic believes that litigation to resolve such claims will be necessary.

29.     Absent the injunctions described above, Kinetic would simply institute such litigation in California as described below; however, Kinetic understands that some or all of the other parties disagree with its interpretation of the injunction language.

30.     While this language was plainly not intended to, and should not, limit the ability of lien creditors to resolve a purely inter-creditor dispute by litigation, Kinetic does not believe that it is advisable to institute such litigation based on its unilateral understanding of these provisions.

31.     Accordingly, Kinetic now brings this matter before the Court for a ruling that the Confirmation Order and Plan, properly interpreted, permit it to proceed with such litigation.

**F.     The Stop Notice Litigation in California**

32.     California mechanics lien law provides unpaid mechanics lien holders such as Kinetic with multiple and concurrent remedies.

33.     One of the remedies that is concurrent with the filing of a mechanics lien is commencement of a Stop Notice action against a construction lender for undisbursed loan proceeds.

34.     Kinetic commenced just such an action against the construction lender in the California Superior Court in 2012.

35.     Because the construction lender was a federal entity, the action was removed by the lender from the California Superior Court to the United States District Court for the Northern District of California. The action is now captioned Kinetic Systems, Inc. v. Federal Financing Bank, et al., Civil Action No. 12-1619-SC (the "Stop Notice Litigation").  A copy of the Complaint in the Stop Notice Litigation (which is from state court) is attached as Exhibit C.

36.     The issues in the Stop Notice Litigation significantly overlap with the issues in any mechanics lien priority litigation between the Mechanics Lienholders and the Secured Lenders; such overlapping legal and factual issues include the extent of and amounts due for the liened work done at the Fab 2 Facility, and thus the principal amount of the mechanics lien/amount due.

37.     Moreover, the District Court hearing the Stop Notice Litigation is already familiar with certain of these issues and, indeed, has already issued a reported opinion construing certain of the relevant California Statutes as applied to the bank in that case.  Kinetic Systems, Inc. v. Federal Financing Bank, 895 F. Supp. 2d. 983, 996-1000 (N.D. Cal. 2012) (copy at Exhibit D).

38.      If this Court concludes that filing such a litigation does not violate the Plan or

Confirmation Order injunctions, Kinetic plans to file the action to determine the Lien Priority

Dispute in the Court hearing the Stop Notice Action as a related action under N.D. Cal. Local

Rule 3-12 ("Related Cases").  A draft of the proposed complaint is attached as Exhibit E so that

this Court may consider the nature of the related proceedings in the analysis below.


## II.      ARGUMENT IN SUPPORT OF MOTION

**A.      The Confirmation Order and Plan Injunctions Should not be Construed to Bar Lien Priority Litigation Between the Non-Debtors (and They Should be Modified if They Could be so Construed).**

39.      As set forth above, there is a Lien Priority Dispute between and among the

Mechanics Lienholders and the Secured Lenders.

40.      In the absence of an agreed resolution, litigation to determine the rights of each of

such secured creditors to the Segregated Account ("Lien Priority Litigation") will be required to

resolve the dispute.

41.      As also set forth above, the $785 million in liens on the Fab 2 Facility greatly

exceeded the $90 million sale price – the liens are 8 or 9 times greater than the sale price.  Thus,

the Debtors had no equity in the Fab 2 Facility and the Debtors/Trust have no rights to the funds

in the Segregated Account - - whatever the resolution of the Lien Priority Dispute may be.

42.      The Confirmation Order and Plan injunctions contain very broad language

enjoining suits against "property of . . . the Solyndra Residual Trust" or "enforcing any lien."

However, they also expressly state that "actions that a third party may have against a person

other than [the Debtors, the estate and the trusts]" are not enjoined.  E.g., Confirmation Order ¶

14 (Exhibit A).

43.     Although the Segregated Account is titled in part in the name of the Trust, since the funds in that account are under no circumstances property of the Debtors, the Estates or the Solyndra Residual Trust (or any other trust created by the Plan), litigation may be instituted to determine the Lien Priority Dispute without violating any of the injunctions.  Indeed, the Trust need not even be a party to such litigation – it is merely a (partial) holder or bailee of the funds.

44.     Accordingly, the Court should clarify that such injunctions do not prohibit Kinetic from instituting litigation to determine the rights to the funds in the Segregated Account.

45.     Kinetic requests that the Court so rule prior to its institution of such litigation[5], so as to avoid any claim of of non-compliance with the injunctions, not to mention actual non-compliance.

46.     Moreover, as will be explained below, if such injunctions do prohibit the Lien Priority Litigation, they should be modified because (1) this Court would have no jurisdiction over such litigation and (2) in any event the Court should abstain from hearing such litigation.

**B.     If the Confirmation Order and Plan Injunctions Reach Litigation Over the Lien Priority Dispute, They Should be Modified Because Such Dispute Cannot and Should Not be Heard in Bankruptcy Court.**

**1)     Since all of the Funds in the Segregated Account Will Go to One Set of Lienholders or the Other, the Debtors/Trust have No Interest and this Court Lacks Subject Matter Jurisdiction over Litigation to Resolve the Lien Priority Dispute.**

47.     As noted above, the sale proceeds on the Fab 2 Facility were far less than the total liens on that property, and thus the Debtors/Trust are entitled to none of those funds.

48.     As to the funds in the Segregated Account specifically, that account was established -- and had to be established -- expressly because the proceeds were insufficient to

---

[5] Kinetic is advised that the claim of the other Mechanics Lien Claimants has been resolved, so that they are no longer involved in any dispute over the Segregated Account and will not be involved in the litigation.

pay the claims of both the Mechanics Lienholders and the Secured Lenders.  This insufficiency of the proceeds is what created the Lien Priority Dispute, and is what requires a determination of which creditors – the Mechanics' Lienholders or the Secured Lenders -- get this fund.  Sale Order ¶ 6.

49.     The dispute over the Segregated Account is now simply a private dispute between two sets of creditors over priority in a fund to which the Debtors/Trust have no right. Accordingly, as will be detailed below, this Court has no subject matter jurisdiction over that dispute.

50.     28 U.S.C. §§157 and 1334 provide for bankruptcy jurisdiction over (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11 and (4) proceedings related to a case under title 11.  In re AE Liquidation, Inc., 435 B.R. 894, 902 (Bankr. D. Del. 2010), leave to appeal denied, 451 B.R. 343 (Dist. D. Del. 2011).

51.     The first three of these items, cases and proceedings arising in or under title 11, are limited to the bankruptcy itself and rights created by the Bankruptcy Code or which otherwise have no existence outside bankruptcy.  Id.  The lien rights and the instant Lien Priority Dispute are created by California mechanics lien and real property law, and thus exist independent of any bankruptcy proceeding.  Thus, only item four, "related to" jurisdiction, is at issue here.

52.     Our Court of Appeals recently addressed such "related to" jurisdiction in In re W.R. Grace & Co., 591 F.3d 164 (3d Cir. 2009), cert. denied, 131 S. Ct. 200 (2010).  In that case, the debtor had sought an injunction against certain litigation (against the State of Montana). That litigation, if decided adversely to Montana, would have given rise to an indemnity claim

against the estate.  The Court of Appeals held that notwithstanding the indemnity claim there was

no bankruptcy subject matter jurisdiction under the proper test for "related to" jurisdiction.

53.    Citing <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3d Cir. 1984)[6], the <u>Grace</u> Court

pointed out that:

> "The usual articulation of the test for determining whether a civil
> proceeding is related to bankruptcy is whether the *outcome of that
> proceeding could conceivably have any effect on the estate being
> administered in bankruptcy.*  … An action is related to bankruptcy if the
> outcome could alter the debtor's rights, liabilities, options or freedom of
> action (either positively or negatively) and which in any way impacts
> upon the handling and administration of the bankruptcy estate."

591 F.3d at 171 (emphasis in original).  Applying that test, the <u>Grace</u> Court held that:

> "In short, our recently reaffirmed precedent dictates that a bankruptcy
> court lacks subject matter jurisdiction over a third-party action if the only
> way in which that third-party action could have an impact on the debtor's
> estate is through the intervention of yet another lawsuit."

<u>Id.</u> at 173.  Here of course, the dispute between the Mechanics Lienholders and Secured Lenders

cannot even impact the estate through the intervention of another lawsuit.  Either the Mechanics'

Lienholders get the Segregated Account funds, or the Secured Lenders get them - - but in no

event do the Debtors/Trust have a legal claim to them.  Thus, applying <u>Grace</u> and <u>Pacor</u>, the

Bankruptcy Courts have no subject matter jurisdiction over this inter-lienholder priority dispute.[7]

54.    Moreover, as will be explained below, other Courts of Appeal and other

Bankruptcy Courts have addressed this precise issue – whether a Bankruptcy Court has

jurisdiction over the claims of competing lienholders to funds fully encumbered by the

---

[6] Overruled in part on other grounds by <u>Things Remembered, Inc. v. Petrarca</u>, 516 U.S. 124, 124-125 (1995)

[7] After <u>Grace</u>, the Third Circuit addressed related-to jurisdiction in <u>Nuveen Mun. Trust v. Withumsmith Brown, P.C.</u>, 692 F.3d 283 (3d Cir. 2012), in which it held that such jurisdiction could reach a creditors' claim against a third party that would (if successful) <u>reduce</u> a claim against the debtor.  <u>Id.</u> at 294-300.  Here of course, the claims of each side (Mechanics Lien Claimants and Secured Lenders) are unaffected – the only question is which lienholder's claim is secured by the Segregated Account.  Moreover, in this case there has long been a confirmed Plan, and while the <u>Nuveen</u> Court said that <u>Pacor</u> does not "entirely bar post-confirmation bankruptcy jurisdiction" nevertheless, "a bankruptcy court's jurisdiction wanes after the confirmation . . ." <u>Id.</u> at 294-95.

competing liens.  In such cases, the Courts have repeatedly held that the Bankruptcy Court has

no jurisdiction since (or once it is determined that) the debtor has no interest in the encumbered

property.[8]

55.    The Court of Appeals for the Seventh Circuit addressed this very issue in In re

Xonics, Inc., 813 F.2d 127 (7th Cir. 1987).  In that case, two creditors (Elscint and First

Wisconsin) had a security interest in debtor Xonics' receivables.  The proceeds were collected

and held for a time by the U.S. Trustee, who eventually sought to be relieved of that duty.  Id. at

129.  Elscint and First Wisconsin then became embroiled in litigation over the proceeds, which

by consent order were then being held in escrow at a third bank; the Trustee disclaimed any

interest since the funds (as here) were fully encumbered.  Id.  A subject matter jurisdiction

dispute ensued, in which it was claimed that the Bankruptcy Court had continuing jurisdiction

and/or jurisdiction to enforce its escrow order.  The Seventh Circuit disagreed, holding that once

the estate had no further interest in the funds, there was no subject matter jurisdiction to decide

the inter-creditor priority dispute:

> Suppose A, B, and C claim interests in a pool of oil.  If A is a
> bankrupt, the bankruptcy court could determine the interests of all
> three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1),
> because only after identifying the "property" of the estate may the
> court apportion that property among creditors.  But if the estate
> should disclaim any interest in the pool, only the dispute between
> B and C would remain.  The resolution of that dispute would not
> affect the creditors of the bankrupt, and there would be no source
> of jurisdiction.  That B and C might also be creditors of the
> bankrupt would not enlarge the court's power; there is no
> jurisdiction to resolve all disputes among creditors of a bankrupt.
> There is jurisdiction under § 157(c)(1) only when the dispute is
> "related to" the bankruptcy – meaning that it affects the amount of
> property available for distribution or the allocation of property

---

[8] These holdings predate Stern v. Marshall, 131 S. Ct. 2594 (2011), but are consistent with and to some extent foreshadow the Stern decision.

among creditors. In re Paso del Norte Oil Co., 755 F.2d 421 (5th Cir. 1985); Pacor, Inc. v. Higgins, 743 F.2d 984, 994-96 (3d Cir. 1984). The bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets. It extends no farther than its purpose. That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt's property have been resolved. [citation omitted]

813 F.2d at 131 (emphasis added). Here, as in Xonics, once any dispute about the debtor's stake is eliminated, there is no subject matter jurisdiction.

56.     The very same conclusion was reached by the Bankruptcy Courts considering inter-creditor/inter-lienholder disputes in In re McKinney, 45 B.R. 790 (Bankr. W.D. Ky 1985) (no jurisdiction to resolve a lien priority dispute between a secured creditor and the holder of a landlord's lien over proceeds of liened property being held by the bankruptcy trustee). In re Alexander, 49 B.R. 733 (Bankr. D.N.D. 1985) (no jurisdiction to resolve a lien priority dispute between secured creditors to proceeds of sale of, and adequate protection payments for, debtor's machinery, some of which proceeds were in the possession of the trustee); In re Denalco Corp., 57 B.R. 392 (Dist. N.D. Ill. 1986) (no jurisdiction to resolve a lien priority dispute over claims to proceeds of sale of the debtor's "Mazak" equipment even though the equipment was sold in the bankruptcy and the proceeds were held in an escrow account by the bankruptcy trustee).

57.     Critically in both McKinney and Denalco, not only was the property sold and proceeds escrowed in the bankruptcy, but the proceeds were held by the trustee. Nevertheless those facts did not confer subject matter jurisdiction over the priority dispute where all proceeds would go only to the secured creditors upon adjudication of the priority dispute by the Court. Per the McKinney court: "mere possession by the trustee of a disputed asset cannot confer jurisdiction." 45 B.R. at 792; see also Denalco, 57 B.R. at 395 (same).

Case 11-12799-MFW    Doc 1436    Filed 05/29/13    Page 15 of 19

58.     The <u>Denalco</u> Court's factual analysis is applicable with equal force here:  "there is nothing to suggest the debtors estate could <u>ever</u> have asserted any colorable interest in the [equipment or] proceeds:  . . . [the] Bank's claim . . . and the government's claim  . . . together exceed the [equipment's] purchase price more than ten times."  <u>Id.</u> at 396.  As in <u>Denalco</u> so too here, the Mechanics' Lienholders' claims and the Secured Lenders' claims together exceed the sale price of the Fab 2 Facility multiple times over.  Thus, the Bankruptcy Courts lack subject matter jurisdiction to resolve the priority dispute between the Mechanics' Lienholders and the Secured Creditors.

59.     In light of this, if the Confirmation Order and Plan injunctions could be read to reach litigation over the Lien Priority Dispute, they should be modified.

### 2)     Even if the Bankruptcy Court Had Subject Matter Jurisdiction, It Should Abstain if this Purely Inter-Creditor Dispute Were Brought Before it.

60.     As demonstrated above, the Court lacks subject matter jurisdiction over the inter-creditor dispute, but for many of the same reasons it should also abstain even if it had jurisdiction.

61.     Pursuant to 28 U.S.C. § 1334(c), the Court may (or must) abstain from hearing disputes of this type.

62.     Permissive or discretionary abstention is appropriate when application of the following factors favors abstention:

    1.    the effect or lack thereof on the efficient administration of the estate;

    2.    the extent to which state law issues predominate over bankruptcy issues;

    3.    the difficulty or unsettled nature of applicable state law;

4.      the presence of a related proceeding commenced in state court or other non-bankruptcy court;

5.      the jurisdictional basis, if any, other than section 1334;

6.      the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

7.      the substance rather than the form of an asserted "core" proceeding;

8.      the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

9       the burden of the court's docket;

10.     the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

11.     the existence of a right to a jury trial; and

12.     the presence of non-debtor parties.

In re LaRoche Industries, Inc., 312 B.R. 249, 253-54 (Bankr. D. Del. 2004) (citations omitted).

63.     Applying these factors to this dispute quickly demonstrates that this matter cries out for abstention. Each of the 12 factors will be addressed in order below:

(1)     Efficient Administration - Resolution of this inter-lien creditor priority dispute will have no effect on the administration of the estate. The outcome – which creditor gets the fund -- only matters to the lien creditors. Moreover, a plan has been confirmed and obviously resolution of this issue is irrelevant to resolution of the bankruptcy case.

(2)     Predominance of State Law Issues - Resolution of the lien priority dispute is not simply predominantly, but in fact is exclusively, governed by California state law issues. Indeed, there do not appear to be any bankruptcy issues involved in the resolution of this inter-creditor dispute.

(3)     Nature of Applicable State Law - Resolution of this lien priority dispute requires determination and application of substantive state mechanics lien law -- which varies widely

among the various states.  In this lien priority dispute,
California state mechanics lien law will govern, and that
law is "an integrated scheme obviously designed to provide
maximum protection to laborers and materialmen."
<u>Kinetic</u>, 895 F.Supp. 2d at 997.  The issues to be resolved
include issues of relation back of the lien under California's
specialized approach to that issue.

(4)    <u>Presence of a Related Proceeding</u> - As noted above, the
Stop Notice Litigation is already pending in a California
Court.  That case was originally filed in state court, and
removed to federal court because a federal agency/entity is
a party.  Resolution of the lien priority dispute at the same
place and together serves judicial efficiency as well as
reduces costs to the parties.

(5)    <u>Jurisdictional Basis</u> – There is no basis for federal
jurisdiction over the lien priority dispute other than the
potential involvement of a federal agency as a claimant.
Typically, this dispute would only be subject to the
jurisdiction of the state courts of California.

(6)    <u>Relatedness to Main Case</u> - Resolution of this inter-creditor
priority dispute is completely unrelated to the main
bankruptcy case.  The debtor has no interest in the outcome
and, indeed, a plan has been confirmed.

(7)    <u>Substance/Form of Core Proceeding</u> - This inter-creditor
priority dispute is not a core proceeding either in substance
or form.  As the <u>Denalco</u> Court held, "because the size of
the total indebtedness and the lien rights left no room for
any debtor interest in the [property or] proceeds . . . this
controversy is not a "core proceeding."  <u>Id.</u>, 57 B.R. at 395.
Indeed, there is no bankruptcy jurisdiction over such a
proceeding at all, <u>id</u>., and cases cited.

(8)    <u>Feasibility of Severance</u> - Severance is not even necessary.
However, allowing the California Court to resolve the case
and enter a judgment, with "enforcement," in the form of
an order of this Court requiring disposition of the
Segregated Account in accordance with the judgment, is
perfectly feasible and sensible here.

(9)    <u>Burden on the Docket</u> - While this court would plainly find
time to resolve this matter, it does place a substantial
burden on an already busy Bankruptcy Court.  It would
require this Court to wade into and resolve a non-

bankruptcy inter-creditor dispute governed by intricate and specialized California state mechanics lien law.  It is both a burden and an unnecessary one (not to mention one that is beyond the jurisdictional limits).

(10)  <u>Forum Shopping</u> - There is no forum shopping issue. However, as a matter of judicial efficiency and less expensive resolution of the matter, it makes sense for this matter to be heard in California where the property is, where the relevant events occurred, where the witnesses/documents are, and where there is already a pending related case involving the Stop Notice Litigation. Indeed, this was the expectation and agreement of the parties pursuant to Solyndra's own purchase orders.  <u>See</u> Exhibit F and discussion below.

(11)  <u>Jury Trial</u> - This is not an issue.

(12)  <u>Presence of Non-debtor Parties</u> - This lien priority dispute involves non-debtor parties exclusively.  This factor weighs heavily – indeed, dispositively -- in favor of abstention.

64.  Indeed, <u>Solyndra's (the Debtors') **own** Terms and Conditions of Purchase,</u>

contained in its Purchase Order to Kinetic, provided for disputes to be resolved in the state or

federal court in Fremont/San Jose, California:

"**GOVERNING LAW:  JURISDICTION**:  This Order shall be governed by the laws of the State of California, without giving effect to choice of law principles, . . .  The parties agree that California courts have jurisdiction over any legal action or other proceeding for any purpose with respect to this Order, that Fremont, California is the appropriate place for venue of any litigation arising hereunder, and <u>that all such litigation shall, to the extent possible, be conducted in Fremont, California or for litigation to be conducted in Federal Court, in San Jose, California.</u>"

Exhibit F (emphasis added).[9]  Thus, resolution of the dispute in California is plainly consistent

with pre-bankruptcy expectations.

---

[9] This Solyndra document was produced in the Stop Notice Litigation and provided informally back to Solyndra and Argonaut during discussions to resolve the Lien Priority Dispute.

65.     As can easily be seen, the permissive abstention factors weigh overwhelmingly in favor of abstention, and thus if this matter were brought before the Bankruptcy Court abstention would be appropriate.[10]

66.     Given the abstention analysis, if the Court concludes that the Confirmation Order/Plan injunctions could be read to reach litigation to resolve the Lien Priority Dispute, it should modify such injunctions to permit such litigation to proceed.

WHEREFORE, the Court should issue an order providing that the Confirmation Order and Plan injunctions do not bar litigation to resolve the Lien Priority Dispute.

Respectfully submitted,

MONTGOMERY, McCRACKEN,
    WALKER & RHOADS, LLP

Dated:   May 29, 2013

Of Counsel:

Scott Hennigh
Mathew Troughton
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA  94111-4109
Phone:  (415) 434-9100

By:____/s/ R.G. Placey_____
    Richard G. Placey (I.D. No. 4206)
    Natalie D. Ramsey (I.D. No. 5378)
    1105 North Market Street, Suite 1500
    Wilmington, Delaware  19801
    Phone:  (302) 504-7880
    Fax:     (302) 504-7820

---

[10] Moreover, abstention is mandatory under § 1334(c) 2 where the following requirements are met:  (1) the motion to abstain must be timely; (2) the action must be based upon a state law claim or cause of action; (3) an action has been commenced in state court; (4) the action can be timely adjudicated; (5) there is no independent basis for federal jurisdiction which would have permitted the action to have been commenced in federal court absent bankruptcy; and (6) the matter before the court must be non-core.  LaRoche, 312 B.R. at 252-53.  In the context of mandatory abstention, it must be noted that an action specifically based on this issue has not been commenced elsewhere; however, the related Stop Notice Litigation has been commenced, and all of the other mandatory abstention requirements are met.  This motion is plainly timely, the lien priority action would be based exclusively on California state mechanics lien and real property law, the lien priority action can be timely adjudicated particularly in light of the existing Stop Notice Litigation, there is no federal question basis for federal jurisdiction although federal party jurisdiction exists because one lien claimant is a federal agency), and the inter-creditor dispute is plainly non-core.

3444125v2