IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Solyndra LLC, *et al.*,[1] | ) | Case No. 11-12799 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hearing Date: June 20, 2013 at 10:30 AM |
| | ) | Objection Date: June 12, 2012 |

# EXHIBITS TO MOTION OF KINETIC SYSTEMS, INC. FOR A DETERMINATION THAT THE PLAN INJUNCTIONS DO NOT PROHIBIT INSTITUTION OF AN ACTION TO DETERMINE THE PRIORITY OF MECHANICS LIENS AND THE CREDITORS' RIGHTS TO THE SEGREGATED ACCOUNT PROVIDED FOR IN THE SALE ORDER (OR, IN THE ALTERNATIVE TO MODIFY SUCH INJUNCTIONS)

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Solyndra LLC (9771) and 360 Degree Solar Holdings, Inc. (5583). The Debtors' address is 47488 Kato Road, Freemont, CA 94538.

# EXHIBIT A

are deemed to have accepted the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors, and their respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing.

12. Exemptions from Taxation. Pursuant to section 1146(c) of the Bankruptcy Code, the making or delivery of an instrument of transfer under a plan may not be taxed under any law imposing a stamp tax or similar tax.

13. Injunction. Except as provided in the Plan or in this Order and subject to Article X(D) of the Plan, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability that is stayed, Impaired or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against property of the Debtors, their Estates, the Solyndra Residual Trust, the Solyndra Residual Trustee, the Solyndra Residual Trust Committee, the Solyndra Settlement Trust, the Solyndra Settlement Trustee, or the Solyndra Settlement Trust Committee on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities that are stayed, Impaired or terminated: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, except as otherwise expressly noted in the Plan, (i) nothing in the Plan shall be construed or is intended to discharge Solyndra from any debt for purposes of section 1141(d) of the Bankruptcy Code, (ii) nothing in the Plan shall affect, enjoin, modify, release or waive any

claims, rights, and actions that a third party may have against a person other than the Debtors, their Estates, the Solyndra Residual Trust, the Solyndra Residual Trustee, the Solyndra Residual Trust Committee, the Solyndra Settlement Trust, the Solyndra Settlement Trustee, or the Solyndra Settlement Trust Committee; and (iii) nothing in the Plan shall affect or diminish any defense to a Retained Right of Action or to any action brought by a third party against a Person other than the Debtors, or the right of any person to assert a right of setoff, right of subrogation or recoupment of any kind.

14. Discharge of Holdings. Article X(A)(3) of the Plan shall be deemed amended and restated as follows: "Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against Holdings or any of its assets or properties, except as to the Holdings Settlement Fund. Upon the Effective Date, Holdings shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted the Plan, *provided, however*, that as to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of Holdings arising on or after the Effective Date; (2) any liability that is not a "claim" within the

# EXHIBIT B

Residual Trustee, on behalf of the Solyndra Residual Trust, and the Solyndra Settlement Trustee, on behalf of the Solyndra Settlement Trust, as applicable, from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

# X.

# INJUNCTION AND EXCULPATION PROVISIONS

## A. Injunctions

### 1. Generally

Unless otherwise provided in the Plan or the Confirmation Order and subject to Article X(D) below, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date. From and after the Effective Date, subject to Article X(D) below, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, (a) seeking to hold (i) the Debtors, their Estates, Reorganized Holdings, the Solyndra Residual Trust, the Solyndra Residual Trustee, the Solyndra Residual Trust Committee, the Creditors' Committee, the Solyndra Settlement Trust, the Solyndra Settlement Trustee, or the Solyndra Settlement Trust Committee, (ii) the property of the Debtors, their Estates, Reorganized Holdings, the Solyndra Residual Trust, or the Solyndra Settlement

Trust, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

**2. Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests**

*Except as provided in the Plan or in the Confirmation Order and subject to Article X(D) below, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability that is stayed, Impaired or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against property of the Debtors, their Estates, the Solyndra Residual Trust, the Solyndra Residual Trustee, the Solyndra Residual Trust Committee, the Solyndra Settlement Trust, the Solyndra Settlement Trustee, or the Solyndra Settlement Trust Committee on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities that are stayed, Impaired or terminated: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan. To avoid any doubt, (i) except as otherwise expressly noted in the Plan, nothing in the Plan shall be construed or is intended to discharge Solyndra from any debt for purposes of section 1141(d) of the Bankruptcy Code, (ii) nothing in the Plan shall affect, enjoin, modify, release or waive any claims, rights, and actions that a third party may have against a person other than the Debtors, their Estates, the Solyndra Residual Trust, the Solyndra Residual Trustee, the Solyndra Residual*

*Trust Committee, the Solyndra Settlement Trust, the Solyndra Settlement Trustee, or the Solyndra Settlement Trust Committee; and (iii) nothing in the Plan shall affect or diminish any defense to a Retained Right of Action or to any action brought by a third party against a Person other than the Debtors, or the right of any person to assert a right of setoff, right of subrogation or recoupment of any kind.*

**3. <u>Discharge of Holdings</u>**

Except as otherwise provided in the Plan or in the Confirmation Order, rights afforded in, and all consideration distributed under, this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against Holdings or any of its assets or properties, except as to the Holdings Settlement Fund. Upon the Effective Date, Holdings shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, without limitation, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Claim based upon such debt is Allowed under Section 501 of the Bankruptcy Code, or (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based upon such debt accepted this Plan, *provided, however*, that as to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall discharge, release, or otherwise preclude: (1) any liability of Holdings arising on or after the Effective Date; (2) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid defense of setoff or recoupment with respect to a Claim; and (4) any liability

of Holdings under environmental law arising after the Effective Date as the owner or operator of property that such entity owns or operates after the Effective Date. The injunction and release provisions set forth in Article X of the Plan and any similar provisions in the Plan or Confirmation Order, are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Date, pursuing any police or regulatory action.

**B. Exculpation**

As of and subject to the occurrence of the Effective Date and subject to Article X(D) below, for good and valuable consideration, including the consideration provided under the Plan, each of the Debtors and their Representatives, and the members of the Creditors' Committee (acting in such capacity) and the Creditors' Committee's Representatives, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases up to and including the Effective Date; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

# EXHIBIT C

SHEPPARD MULLIN RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
SCOTT E. HENNIGH, Cal. Bar No. 184413
shennigh@sheppardmullin.com
MATHEW R. TROUGHTON, Cal. Bar No. 151752
mtroughton@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone: 415-434-9100
Facsimile: 415-434-3947

Attorneys for Plaintiff
KINETIC SYSTEMS, INC.

ENDORSED
FILED
ALAMEDA COUNTY

FEB 2 8 2012

CLERK OF THE SUPERIOR COURT
By Angela Yamsuan

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ALAMEDA

KINETIC SYSTEMS, INC., a California corporation

Plaintiff,

v.

FEDERAL FINANCING BANK, a body corporate, and DOES 1 through 25, inclusive,

Defendants.

Case No. RG12618947

**KINETIC SYSTEMS, INC.'S COMPLAINT TO ENFORCE BONDED STOP NOTICE**

Plaintiff Kinetic Systems, Inc. ("Kinetic Systems") alleges as follows:

**THE PARTIES**

1. Kinetic Systems is, and at all relevant times was, a California corporation duly authorized to transact business in the State of California, and doing business in the State of California. Kinetic Systems is, and at all relevant times was, a properly licensed California contractor holding a license issued by the Contractors State License Board of the Department of Consumer Affairs of the State of California, and such license has not been revoked or suspended.

2. Kinetic Systems is informed and believes, and on that basis alleges, that Defendant Federal Financing Bank (the "FFB") is, and at all relevant times was, a body corporate created by 12 USC section 2283, that acted as construction lender to Solyndra, a manufacturer of solar panel

products, in connection with Solyndra's construction of a manufacturing facility located in Fremont, California.

3. Kinetic Systems is ignorant of the true names and capacities of defendants sued herein as Does 1 through 25, inclusive, and therefore sues said defendants by fictitious names pursuant to California Code of Civil Procedure section 474. Kinetic Systems will amend this complaint to allege the true names and capacities when the same are ascertained. Kinetic Systems is informed and believes that Does 1 through 15, inclusive, are responsible for the actions complained of herein. Whenever in this complaint any allegation is made against an identified defendant, it shall be deemed alleged against Does 1 through 15, inclusive, as well.

4. Kinetic Systems is informed and believes, and on that basis alleges, that at all relevant times, defendant FFB and Does 1 through 15, were acting as the agent, employee, servant, or principal of each of the other Defendants and were acting in that capacity and with the consent, permission, and knowledge of each of the other Defendants.

5. Kinetic Systems is informed and believes, and on that basis alleges, that at all relevant times, Does 16-25 claim some interest in the construction loan funds that are subject to Kinetic Systems' California bonded stop notice, which claimed interests in said construction loan funds Kinetic Systems is informed and believes are subordinate to the interest of Kinetic Systems.

**JURISDICTION AND VENUE**

6. Jurisdiction is proper in this court because Defendant FFB has and has had substantial, systematic, and continuous contacts with the State of California, including but not limited to conducting a significant volume of business in California, and being authorized pursuant to 12 USC section 2289(4) to do business in the State of California, without regard to any qualification or similar statute of the State of California. Moreover, jurisdiction is proper in this court as the contracts at issue in this case were entered into in California and with residents of the State, and have been substantially performed in California.

7. Venue in the Superior Court of California, County of Alameda is proper, under California Code of Civil Procedure sections 395.5, because the relevant contracts were performed

in, the relevant obligation or liability arose in, and the subject construction project is located in, Alameda County.

## GENERAL ALLEGATIONS

8. Kinetic Systems is informed and believes, and on that basis alleges, that the FFB is, and at all relevant times was, a construction lender to Solyndra with regard to the construction of a work of improvement known as the Solyndra solar manufacturing facility (the "Project") located at 47488 Kato Road, Fremont California (the "Property").

9. Kinetic Systems furnished labor, services, equipment and material for the installation of mechanical piping and components (HVAC, plumbing, process) for tool hookup at and as part of the Project pursuant to written contract with Solyndra. With regard to Solyndra purchase orders to Kinetic Systems with remaining unpaid balances, the value of the agreed work to be done or furnished by Kinetic Systems at the Project was $2,967,762, as to which the value of that work already furnished by Kinetic Systems is $2,870,372.

10. Kinetic Systems has been paid or credited under such contracts the sum of $1,682,422, and there remains due and unpaid the sum of $1,187,950, plus interest.

11. On or about August 31, 2011, while construction work at the Project remained underway and incomplete by the contractors, including but not limited to Kinetic Systems, then still constructing the work of improvement, Solyndra announced it was closing its business, and subsequently did so without making payment to Kinetic Systems of all amounts due and unpaid. Kinetic Systems therefore served its "Bonded Stop Notice California Private Work", along with a bond of stop notice, pursuant to California Civil Code sections 3083, 3103 and 3159 et seq., upon defendant FFB. A true and correct copy of the Bonded Stop Notice and bond of stop notice is attached hereto as Exhibit A and incorporated herein by reference.

## FIRST CAUSE OF ACTION

**(Enforcement of Bonded Stop Notice Against FFB and Does 1-25)**

12. Kinetic Systems realleges and incorporates by this reference each and every allegation contained in paragraphs 1 through 11 of this Complaint as though fully set forth herein.

13. Kinetic Systems has complied with all of the statutory requirements to enable it to enforce a bonded stop notice against the FFB.

14. Kinetic Systems is informed and believes, and on that basis alleges, that the FFB is, and at all relevant time was, the construction lender and holder of construction funds allocated to the Project pursuant to a $535 million loan by the FFB to Solyndra.

15. After Kinetic Systems provided the above described labor, services, equipment and material for the Project, and prior to the expiration of the period upon which a bonded stop notice is required to be served, Kinetic Systems duly served upon the FFB a signed and verified Bonded Stop Notice for the Project in the amount of $1,187,950.

16. Kinetic Systems is informed and believes, and thereon alleges, that at and since the time the Bonded Stop Notice was served, there was and is a sufficient amount of undisbursed or otherwise legally available construction loan money to answer and pay the claim of Kinetic Systems, and to allow for the reasonable cost of any litigation hereunder.

17. On information and belief, despite Kinetic Systems' demands for payment from such undisbursed or otherwise legally available construction loan money pursuant to the Bonded Stop Notice, the FFB has failed, neglected, and refused to pay the amount remaining due and unpaid to Kinetic Systems as set forth in the in the Bonded Stop Notice, or any part thereof.

18. Kinetic Systems is informed and believes, and thereon alleges, that its claims to the remaining undisbursed construction loan funds are prior to and superior to any claims by Does 16-25 to said undisbursed construction loan funds.

19. Pursuant to California Civil Code section 3176, Kinetic Systems is entitled to an award of its reasonable attorney's fees in addition to other costs and in addition to any liability for damages. Kinetic Systems has incurred and will continue to incur such attorney's fees, all in an amount subject to proof.

WHEREFORE, Kinetic Systems prays for judgment as set forth below.

**PRAYER**

20. For a judgment that the FFB, pursuant to its liability under the Bonded Stop Notice, pay Kinetic Systems the principal amount of $1,187,950, together with prejudgment interest at the maximum legal rate;

21. For a judgment determining that the lien created by Kinetic Systems' Bonded Stop Notice is prior to and superior to the interests, if any, of Does 16 -25 and that the interests of those parties are subordinate and secondary to Kinetic Systems' interests;

22. For an award of attorneys' fees in an amount subject to proof at trial pursuant to California Civil Code section 3176;

23. For costs of this suit incurred herein; and

24. For such other relief as the Court deems just and proper.

DATED: February 28, 2012

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By ______________________________
SCOTT E. HENNIGH
MATHEW R. TROUGHTON
Attorneys for Plaintiff
KINETIC SYSTEMS, INC.

# Exhibit A

**BONDED STOP NOTICE**
**CALIFORNIA PRIVATE WORK**
**(Civil Code Section 3083, Section 3103, Section 3159, et seq.)**

TO: Federal Financing Bank
(Construction Lender)

U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220
(Address)

PROJECT: Solyndra solar manufacturing facility, 47488 Kato Road, Fremont, California 94538
(Name and Location of Project)

Claimant Kinetic Systems, Inc., 48400 Fremont Blvd., Fremont, CA 94538
(Name and Address)

has furnished labor, services, equipment, materials for installation of mechanical piping and components (HVAC, plumbing, process) for tool hookups
(Labor/equipment/material)

for the benefit of/at the request of

Solyndra, Inc. a/k/a Solyndra, 47700 Kato Road, Fremont, CA 94538.
(Name of person to or for whom it was furnished)

for the private work of improvement described as the Project above.

The value of the whole agreed to be done or furnished by claimant at this Project pursuant to purchase orders with unpaid balances is $2,967,762, as to which the value of that already furnished is $2,870,372. Claimant has been paid or credited thereunder with the sum of $1,682,422, and there remains due and unpaid the sum of $1,187,950, plus interest.

You should refer to California Civil Code § 3161 and § 3162 to determine your duty, if any, upon receipt of this Stop Notice to withhold funds and your duty to notify the claimant of your election regarding the funds.

Dated January 23, 2012

Kinetic Systems, Inc.
(Name of Claimant)

[signature]
(Signature of Claimant or Agent)

Assistant Secretary
(Title)

## VERIFICATION

I, the undersigned, declare:

I am the Assistant Secretary of Kinetic Systems, Inc.
(Title) (Name of Claimant)

the claimant named in the foregoing Stop Notice; I am authorized to make this verification in behalf of the claimant; I have read the foregoing Stop Notice and know the contents thereof, and the same is true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Jan. 23, 2012

Elizabeth T. Smith
Assistant Secretary

Bond Number: 070011852
Premium: $9,925.

BOND OF STOP NOTICE

KNOW ALL MEN BY THESE PRESENTS:

That we, Kinetic Systems, Inc., as Principal, and Safeco Insurance Company of America, a corporation duly organized and existing under the laws of the State of Washington and duly authorized to execute bonds and undertakings as Surety in the State of California, are held and firmly bound unto the Federal Financing Bank, as Obligee, in the sum of One Million Four Hundred Eighty Four Thousand Nine Hundred Thirty Seven Dollars and 50 Cents ($1,484.937.50), lawful money of the United States, for which payment well and truly to be made, we bind ourselves, our heirs, executors, administrators, and successors and assigns, jointly and severally, firmly by these presents.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH THAT:

WHEREAS, said Principal has furnished labor and/or materials, or both to Solyndra Inc. in connection with installation of certain improvements at Solyndra located at 47488 Kato Road, Fremont, California 94538 and,

WHEREAS, the Principal has filed or is about to file concurrently with this bond a stop notice in respect to said labor and/or materials, and pursuant to California Civil Code Section 3083, 3158-3175, has demanded or is by such stop notice about to demand that the Obligee withhold from the borrower or other person to whom it or the owner may be obligated to make payments or advancement out of the construction fund for such project or job as identified in such stop notice, sufficient money to answer the claim and any claim or lien of the Principal for labor and/or materials furnished; and in accordance with California Civil Code Section 3083, the Principal is required to serve and deliver to the Obligee a bond in the sum of One Million Four Hundred Eighty Four Thousand Nine Hundred Thirty Seven Dollars and 50 Cents ($1,484,937.50), being ONE AND ONE-FOURTH times the amount of such claim and any claim of lien;

NOW, THEREFORE, the condition of the above obligation is such that if the defendant recovers judgment in an action brought on by such stop notice (verified claim) or on the lien filed by the Principal, the Principal will pay all costs that may be awarded against the owner, original contractor, Obligee, or any of them, and all damages that such owner, original contractor, or Obligee may sustain by reason of the equitable garnishment effected by the claim or by reason of the lien, not exceeding the sum specified in this bond, then this obligation shall be null and void, otherwise it shall remain in full force and effect.

IN WITNESS THEREOF, the signature of the said Principal is hereto affixed and the corporate seal and name of the said Surety is hereto affixed and attested by its duly authorized Attorney-in-Fact at San Jose, California this 21th day of January, 2012.

**Kinetic Systems, Inc.**

By: [signature]
Elizabeth T. Smith
Assistant Secretary

**Safeco Insurance Company of America**

By: [signature]
Richard S. Svec, Attorney-in-Fact

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.** 4688491

**This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.**

**SAFECO INSURANCE COMPANY OF AMERICA**
**SEATTLE, WASHINGTON**
**POWER OF ATTORNEY**

**KNOW ALL PERSONS BY THESE PRESENTS: That Safeco Insurance Company of America (the "Company"), a Washington stock insurance company, pursuant to and by authority of the By-law and Authorization hereinafter set forth, does hereby name, constitute and appoint** JAMES W. UNTIEDT, MICHAEL E. SHEAHAN, JULIA GRIMES, JEANETTE CONLEY, PATRICK MOUGHAN, RICHARD S. SVEC, ANNA SWEETEN, LINDA K. LAMARR, MICHAEL J. HEFFERNAN, GEOFFREY R. GREEN, ALL OF THE CITY OF SAN JOSE, STATE OF CALIFORNIA........................................

, each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations in the penal sum not exceeding FOUR HUNDRED FIFTY MILLION AND 00/100******************DOLLARS ($ 450,000,000.00******************************) each, and the execution of such undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents, shall be as binding upon the Company as if they had been duly signed by the president and attested by the secretary of the Company in their own proper persons.

That this power is made and executed pursuant to and by authority of the following By-law and Authorization:

> ARTICLE IV - Officers: Section 12. Power of Attorney.
> Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitations as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and executed, such instruments shall be as binding as if signed by the president and attested by the secretary.

By the following instrument the chairman or the president has authorized the officer or other official named therein to appoint attorneys-in-fact:

> Pursuant to Article IV, Section 12 of the By-laws, David M. Carey, Assistant Secretary of Safeco Insurance Company of America, is authorized to appoint such attorneys-in-fact as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

That the By-law and the Authorization set forth above are true copies thereof and are now in full force and effect.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Company and the corporate seal of Safeco Insurance Company of America has been affixed thereto in Plymouth Meeting, Pennsylvania this 11th day of July, 2011.

SAFECO INSURANCE COMPANY OF AMERICA

By [signature]
David M. Carey, Assistant Secretary

COMMONWEALTH OF PENNSYLVANIA ss
COUNTY OF MONTGOMERY

On this 11th day of July, 2011, before me, a Notary Public, personally came David M. Carey, to me known, and acknowledged that he is an Assistant Secretary of Safeco Insurance Company of America; that he knows the seal of said corporation; and that he executed the above Power of Attorney and affixed the corporate seal of Safeco Insurance Company of America thereto with the authority and at the direction of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at Plymouth Meeting, Pennsylvania, on the day and year first above written.

Notarial Seal
Teresa Pastella, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires Mar. 28, 2013
Member, Pennsylvania Association of Notaries

By [signature]
Teresa Pastella, Notary Public

**CERTIFICATE**

I, the undersigned, Vice President of Safeco Insurance Company of America, do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the officer or official who executed the said power of attorney is an Officer specially authorized by the chairman or the president to appoint attorneys-in-fact as provided in Article IV, Section 12 of the By-laws of Safeco Insurance Company of America.

This certificate and the above power of attorney may be signed by facsimile or mechanically reproduced signatures under and by authority of the following vote of the board of directors of Safeco Insurance Company of America at a meeting duly called and held on the 18th day of September, 2009.

> VOTED that the facsimile or mechanically reproduced signature of any assistant secretary of the company, wherever appearing upon a certified copy of any power of attorney issued by the company in connection with surety bonds, shall be valid and binding upon the company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said company, this 21st day of January, 2012.

[signature]
Gregory W. Davenport, Vice President

**Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.**

**To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day.**

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of Santa Clara

On January 21, 2012 before me, L. LaMarr, Notary Public,

personally appeared Richard S. Svec

L. LAMARR
Commission # 1868215
Notary Public - California
Santa Clara County
My Comm. Expires Oct 27, 2013

PLACE NOTARY SEAL ABOVE

who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SIGNATURE OF NOTARY PUBLIC

**OPTIONAL**

Though the data below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**DESCRIPTION OF ATTACHED DOCUMENT**

Title of Type of Document: ______
Dcoument Date: ______ Number of Pages: ______
Signer(s) Other Than Named Above:

**CAPACITY(IES) CLAIMED BY SIGNER(S)**

SIGNER'S NAME: ______
☐ INDIVIDUAL
☐ CORPORATE OFFICER
TITLE(S) ______
☐ PARTNER(S) ☐ LIMITED ☐ GENERAL
☒ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER : ______

SIGNER IS REPRESENTING

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

SIGNER'S NAME: ______
☐ INDIVIDUAL
☐ CORPORATE OFFICER
TITLE(S) ______
☐ PARTNER(S) ☐ LIMITED ☐ GENERAL
☐ ATTORNEY-IN-FACT
☐ TRUSTEE(S)
☐ GUARDIAN/CONSERVATOR
☐ OTHER : ______

SIGNER IS REPRESENTING

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

# EXHIBIT D

895 F.Supp.2d 983
United States District Court,
N.D. California.

KINETIC SYSTEMS, INC., Plaintiff,
v.
FEDERAL FINANCING BANK and Does 1 through 25, Defendants.

Case No. 12–1619–SC. | Sept. 14, 2012.

**Synopsis**

**Background:** Contractor brought action against Federal Financing Bank (FFB) under California stop-notice statute to enforce bonded stop notice for work that it performed for a solar panel technology manufacturer that had sold a promissory note to, and received a loan from FFB. Upon removal to federal court, FFB moved to dismiss.

**Holdings:** The District Court, Samuel Conti, J., held that:

[1] FFB was required to amend its notice of removal to federal court;

[2] FFB not prohibited from amending its notice of removal;

[3] FFB waived sovereign immunity;

[4] FFB was a construction lender for purposes of California stop-notice statute;

[5] FFB was subject to California's stop-notice statute; and

[6] FFB failed to demonstrate that California's stop-notice statute was preempted by either the Energy Policy Act, or the Federal Financing Bank Act (FFBA).

Motion denied.

West Headnotes (21)

[1] **Removal of Cases**
Constitutional and statutory provisions

**Removal of Cases**
Actions against or for acts of United States officers

While the general removal statute is strictly construed to favor remand, the federal-agency removal statute is broadly construed to favor removal. 28 U.S.C.A. §§ 1441, 1442.

[2] **Removal of Cases**
Actions against or for acts of United States officers

A federal defendant removing an action under the federal-agency removal statute must demonstrate three things: (1) it is a person within the meaning of the statute; (2) there is a causal nexus between its actions and plaintiff's claims; and (3) it can assert a colorable federal defense. 28 U.S.C.A. § 1442.

[3] **Federal Courts**
Limited jurisdiction; dependent on constitution or statutes

The judicial power of the United States provided by Article III is broader than the jurisdiction actually exercised by the federal courts, and Congress may tailor that jurisdiction by statute. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 1442.

[4] **Removal of Cases**
Actions against or for acts of United States officers
**Removal of Cases**
Defects in proceedings, objections, amendments, and waiver

Federal Financing Bank (FFB) was required to amend its notice of removal to federal court under federal-agency removal statute to comply with statute providing procedure for removal of civil actions, in contractor's action against FFB to enforce a bonded stop notice for contractor's work, where FFB merely asserted that the case should be removed, but failed to satisfy the three requirements for removal: personhood under the federal-agency removal statute, a causal nexus between its actions and contractor's claims, and that it had a colorable federal defense. 28 U.S.C.A. §§ 1442, 1446(a).

[5] **Removal of Cases**
Time for Taking Proceedings
**Removal of Cases**
Defects in proceedings, objections, amendments, and waiver

Federal Financing Bank (FFB) was not prohibited from amending its notice of removal to comply with statute providing procedure for removal of civil actions under federal-agency removal statute, in contractor's action against FFB to enforce a bonded stop notice, even though procedural statute's thirty-day period for removal had expired, where period applied only to the addition of new reasons for removal, and FFB sought only to clarify the factual underpinnings of its previously asserted basis, that it was an agency and instrumentality of the United States Government. 28 U.S.C.A. §§ 1442, 1446(b).

[6] **United States**
Necessity of waiver or consent

Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.

[7] **United States**
Immunity from suit in general
**United States**
Conditions and restrictions

Sovereign immunity is jurisdictional in nature; indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit.

[8] **United States**
Necessity of waiver or consent
**United States**
Rights of Action Against United States or United States Officers

In the first step of the two-step inquiry for determining whether sovereign immunity shields a government agency from a particular claim, the court must ask whether Congress has waived the government agency's sovereign immunity; if it has, the court asks the second question, which is whether the source of substantive law upon which the claimant relies provides an avenue for relief.

[9] **United States**
Necessity of waiver or consent
**United States**
Rights of Action Against United States or United States Officers

Waiver of sovereign immunity makes liability possible, but only if the underlying claim is one that can reach the federal defendant.

[10] **United States**
Nature of action in general

Federal Financing Bank (FFB) waived sovereign immunity under two-step inquiry for determining if waiver occurred, where Congress waived immunity by giving FFB the right to sue and be sued, and California's stop-notice law gave contractor an avenue for relief against FFB in contractor's action to enforce a bonded stop notice for work it had completed for a solar panel technology manufacturer that had received a loan from FFB. Federal Financing Bank Act of 1973, § 10, 12 U.S.C.A. § 2289; West's Ann.Cal.Civ.Code § 3087 (Repealed).

[11] **United States**
Construction of waiver or consent in general

Sue-and-be-sued waivers enacted by Congress are to be liberally construed, notwithstanding the general rule that waivers of sovereign immunity are to be read narrowly in favor of the sovereign; when Congress launches a governmental agency into the commercial world and endows it with authority to sue or be sued, that agency is not less amenable to judicial process than a private enterprise under like circumstances would be. Federal Financing Bank Act of 1973, § 10, 12 U.S.C.A. § 2289.

[12] **United States**
Mode and sufficiency of waiver or consent

Agencies authorized by Congress to sue and be sued are presumed to have fully waived sovereign immunity. Federal Financing Bank Act of 1973, § 10, 12 U.S.C.A. § 2289.

[13] **Mechanics' Liens**
Notice to owner

California's stop-notice laws are remedial in nature and intended to be liberally construed. West's Ann.Cal.Civ.Code § 3087 (Repealed).

[14] **Mechanics' Liens**
Notice to owner

Under California's stop-notice law, laborers and materialmen may assert the stop-notice remedy against either (1) the owner of the work of an improvement or (2) the project's construction lender. West's Ann.Cal.Civ.Code § 3087 (Repealed).

[15] **Mechanics' Liens**
Notice to owner

Federal Financing Bank (FFB) was a construction lender for purposes of California stop-notice statute that provided a right to assert claims against an improvement work project's construction lender, even though FFB claimed that it had no discretion over money lent to solar panel technology manufacturer that had hired contractor, since the loan was guaranteed by the Department of Energy (DOE), rather than FFB, and there was no dedicated bank account for the funds, where FFB had purchased a promissory note directly from manufacturer, and actually disbursed the funds to manufacturer pursuant to a contractual arrangement giving manufacturer a right to the money. West's Ann.Cal.Civ.Code § 3087 (Repealed).

[16] **Mechanics' Liens**
Notice to owner

Under California stop-notice statute, the statutory definition of "construction lender" applies by its plain language to a variety of parties, such as escrows and unidentified other

parties. West's Ann.Cal.Civ.Code § 3087 (Repealed).

[17] **Mechanics' Liens**
Notice to owner

Federal Financing Bank (FFB) was subject to California's stop-notice statute giving contractor a right to assert claims against FFB as a project construction lender, for money owed to contractor based upon work it performed for a solar panel technology manufacturer that had sold a promissory note to FFB, where Congress, rather than the California legislature had subjected FFB to liability by giving it the right to sue and be sued, and privity of contract was not required to enforce the statute. West's Ann.Cal.Civ.Code § 3087 (Repealed).

[18] **States**
Conflicting or conforming laws or regulations

State law is preempted by federal law to the extent that it actually conflicts with federal law.

[19] **States**
Conflicting or conforming laws or regulations

A state law conflicts with and is thus preempted by federal law, where (1) it is impossible for a private party to comply with both state and federal requirements, or where (2) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

[20] **States**
State police power

Courts must assume that the historic police powers of the states are not preempted unless that is the clear and manifest purpose of Congress; the presumption of nonpreemption does not apply, however, when the state regulates in an area where there has been a history of significant federal presence.

[21] **Mechanics' Liens**
Constitutional and statutory provisions
**Mechanics' Liens**
Notice to owner
**States**
Particular cases, preemption or supersession

Federal Financing Bank (FFB) failed to demonstrate that Federal Financing Bank Act (FFBA), or Energy Policy Act preempted California stop-notice statute giving contractors a right to assert claims against improvement work project construction lenders for money owed to contractor based upon work it performed; stop-notice statute would not impede Energy Policy Act's purpose of providing federally backed loans to makers of innovative energy technologies, and FFBA's diffuse interests in lowering costs were not in conflict with the mere potential for increased lending costs brought about by enforcement of a stop-notice statute against the FFB. Federal Financing Bank Act of 1973, § 2, 12 U.S.C.A. § 2281; Energy Policy Act of 2005, § 1701 et seq., 42 U.S.C.A. § 16511 et seq.
1 Cases that cite this headnote

**Attorneys and Law Firms**

***986** Mathew R. Troughton, Scott E. Hennigh, San Francisco, CA, for Plaintiff.

Steven J. Saltiel, San Francisco, CA, for Defendants.

**Opinion**

***ORDER DENYING PLAINTIFF'S MOTION TO REMAND AND DENYING DEFENDANT'S MOTION TO DISMISS***

SAMUEL CONTI, District Judge.

**I. *INTRODUCTION***

This lawsuit stems from the closure of Solyndra, a Fremont, California-based maker of solar panel technology. In September 2009, the U.S. Department of Energy ("DOE"), Solyndra, and Defendant Federal Financing Bank ("FFB") entered into a series of agreements by which FFB, at the behest of DOE, purchased from Solyndra a promissory note in the amount of $535 million. DOE guaranteed the note. Solyndra used these funds to begin construction on a manufacturing facility (the "Project"), but, in August 2011, before the facility opened, Solyndra abruptly closed.

Plaintiff Kinetic Systems, Inc. ("Plaintiff") is a California contractor. Plaintiff alleges that it performed $2.870 million worth of work on the Project and is still owed roughly $1.187 million. After Solyndra closed, Plaintiff served a bonded stop notice on FFB—that is, it claimed a right to be paid out of excess construction funds allegedly held by FFB. When FFB did not pay, Plaintiff sued FFB in California state court for enforcement of the bonded stop notice, whereupon FFB removed to this Court.

Two motions are now pending, both fully briefed and suitable for decision without oral argument. The first motion, filed by Plaintiff, asks the Court to remand this action to state court. ECF Nos. 10 ("MTR"), 30 ("MTR Opp'n"), 31 ("MTR Reply"). The second motion, filed by FFB, asks the Court to dismiss the case ***987** under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, or, in the alternative, to enter summary judgment in favor of FFB. ECF Nos. 6 ("MTD"), 19 ("MTD Opp'n"), 28 ("MTD Reply"). FFB has moved for dismissal under Rule 12(b)(1) because it asserts the defenses of sovereign immunity and conflict preemption, which are jurisdictional in nature. As for the summary judgment portion of its motion, FFB argues that it is not a "construction lender," as California law defines that term. The question of whether California's stop-notice laws reach FFB appears to be one of first impression, as neither party has cited any case directly addressing the point, nor is the Court aware of any.

For the reasons set forth below, the Court DENIES Plaintiff's motion to remand because FFB has a "colorable federal defense," *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1251 (9th Cir.2006), namely, the federal defenses raised in its Rule 12(b)(1) motion. The Court, however, DENIES FFB's Rule 12(b)(1) motion: Though FFB's jurisdictional defenses are "colorable" for purposes of removal, they are not meritorious. The Court also denies FFB's request for summary judgment because FFB has not shown that it falls outside California's definition of a "construction lender."

**II. *BACKGROUND***

Understanding this dispute requires an understanding of: the nature of FFB; the framework of the program by which FFB provided financing guaranteed by DOE; and the details of the particular arrangement between Solyndra, DOE, and FFB. The Court reviews those topics before recounting the events that led Plaintiff to issue a bonded stop notice to FFB and hence to this lawsuit.

**A. *FFB***

Nearly forty years ago, Congress created FFB by passing the Federal Financing Bank Act of 1973, Pub.L. No. 93–224, 87 Stat. 937 (1973) ("FFB Act"), codified at 12 U.S.C. § 2281 *et seq.* Congress found that "demands for funds through Federal and federally assisted borrowing programs [were] increasing faster than the total supply of credit and that such borrowings [were] not adequately coordinated with overall Federal fiscal and debt management policies." 12 U.S.C. § 2281. Federal agencies administering increasingly popular loan-guarantee programs were using private lenders to furnish the loans, which had the unintended effect of increasing costs to the federal government and disrupting private finance markets. *See generally* Willis–Proctor Decl. Ex. 6 ("McNamar Report") at 8–10, 12–17.[1] The purpose of the FFB Act was "to assure coordination of these programs with the overall economic and fiscal policies of the Government, to reduce the cost of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281.[2] Congress established ***988** FFB as a "body corporate ... subject to the general supervision and direction of the Secretary of the Treasury" and made it "an instrumentality of the United States Government." 12 U.S.C. § 2283.

Congress conferred on FFB a number of general powers. *Id.* § 2289. One of these is the power "to sue and be sued,

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

complain, and defend, in its corporate name." *Id.* § 2289(1). Another is the power "to enter into contracts, to execute instruments to incur liabilities, and to do all things as are necessary or incidental to the proper management of its affairs and the proper conduct of its business." *Id.* § 2289(9). One of the functions of FFB is to purchase or sell any obligation issued, sold, or guaranteed by a federal agency. *Id.* § 2285(a). "Obligation" is a defined term that includes "any note, bond, debenture, or other evidence of indebtedness," with certain exceptions not relevant here. *Id.* § 2282(2). FFB often exercises its power to purchase obligations in order to serve as a lender for programs wherein a federal agency (for example, DOE) guarantees a loan to a private entity (for example, a builder of electrical infrastructure). Generally, FFB provides the financing by purchasing a note which the federal agency then guarantees.[3]

**B. *The Solyndra Financing Arrangement***

The Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (2005) ( "Energy Policy Act"), codified at 42 U.S.C. § 16511 *et seq.,* authorizes the Secretary of Energy ("Secretary") to guarantee loans for certain eligible projects, and appropriates funds to cover the costs of such guarantees. *See* 42 U.S.C. §§ 16511–14. When the Secretary guarantees 100 percent of a loan, the loan must be funded by FFB (as opposed to a private bank). *See* 10 C.F.R. § 609.10(d)(4)(i).

In September 2009, FFB and the Secretary entered into a Program Financing Agreement that supplies the general framework for this financing program. *See* Willis–Proctor Decl. Ex. 1 ("PFA"). The financing process begins when the Secretary designates a borrower. *See id.* § 2.1. The Secretary's formal designation of a borrower places the Secretary and FFB under three separate commitments: (a) FFB and the Secretary must sign "a Note Purchase Agreement with the particular Borrower ... setting forth the terms and conditions under which FFB will purchase a Note issued by such Borrower"; (b) the Secretary must guarantee the note pursuant to the Energy Policy Act; and (c) FFB must purchase the note pursuant to the FFB Act. *Id.* § 2.3. Note Purchase Agreements signed by FFB and designated borrowers require the borrower to offer a promissory note to FFB, which FFB then buys, assuming certain preconditions are satisfied. *Id.* §§ 1.1, 4.1. One of those preconditions is the receipt by FFB of the Secretary's guarantee of the note in the event that a borrower defaults.

The PFA provides that the note shall be a future advance promissory note. *Id.* § 1.1 (definition of "Note"). The amount of the note represents the maximum amount of financing that a borrower may ***989** receive under their particular PFA. Form NPA § 7.3.4.[4] The borrower receives the financing by requesting an advance on the note. *Id.* § 7.2. The borrower usually must specify a third party to receive the advance; in other words, FFB gives money to the borrower's creditors, not to the borrower itself. *Id.* § 7.2(b).[5] The Secretary must approve each request before FFB will disburse the advanced funds. *Id.* § 7.2(a). Advances may be made "only at such time and in such amount as shall be necessary to meet the immediate payment or disbursing need of the Borrower." *Id.*

On September 2, 2009, Solyndra, DOE, and FFB entered into a Note Purchase Agreement. Willis–Proctor Decl. Ex. 2 ("Solyndra NPA"). Under the terms of the Solyndra NPA, Solyndra agreed to offer FFB a note in the amount of $535 million. The Secretary guaranteed the note and FFB purchased it. The terms of the Solyndra NPA tracked the general terms set forth above. That is, the Secretary guaranteed a $535 million note offered by Solyndra and purchased by FFB, against which note Solyndra could request advances of funds which, if approved by the Secretary, FFB would pay directly to Solyndra's creditors according to its "immediate payment or disbursing needs[s]," up to an aggregate maximum of $535 million and repayable with interest.

**C. *Plaintiff's Stop Notice***

The Court takes this portion of its account from the allegations in Plaintiff's state court complaint and FFB's notice of removal. ECF No. 1 (notice of removal ("NOR")) Ex. A ("Compl."). Plaintiff is a California corporation and duly licensed contractor. Compl. ¶ 1. Plaintiff alleges that FFB acted as a "construction lender" to Solyndra with regard to construction of Solyndra's manufacturing facility at 47488 Kato Road, Fremont, California. *Id.* ¶ 8. Plaintiff "furnished labor, services, equipment and material for the installation of mechanical piping and components (HVAC, plumbing, process) for tool hookup ... pursuant to written contract with Solyndra." *Id.* ¶ 9. Before its closure, Solyndra issued purchase orders to Plaintiff for work valued at $2,967,762. *Id.* Plaintiff allegedly completed $2,870,372 worth of work on those orders. *Id.* Plaintiff received partial payment on those purchase orders in the amount of $1,682,422, leaving an unpaid balance of $1,187,950, plus interest. *Id.* ¶ 10. Solyndra suspended operations on August 31, 2011, while work on the Project was still ongoing. *Id.* ¶ 11. In January 2012, Plaintiff served FFB with a bonded stop notice.[6] *Id., id.* Ex. A ("Stop ***990** Not."). FFB refused to set aside funds to satisfy the stop notice. *Id.* ¶ 17.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

On or around February 28, 2012, Plaintiff sued FFB in Alameda County Superior Court for enforcement of the bonded stop notice. Compl. at 1 (state court case number RG12618947). On March 13, the United States Attorney's Office received copies of the state court summons and complaint from the U.S. Department of Treasury. NOR ¶ 4. On April 2, FFB removed the case from state court to this Court, citing, inter alia, the federal-agency removal statute, 28 U.S.C. § 1442.[7] NOR ¶ 5. On April 23, FFB moved to dismiss the case and, on May 2, Plaintiff moved to remand the case back to state court. FFB's motion to dismiss argues that Plaintiff's claim must fail for three reasons: (1) it is barred by the doctrine of sovereign immunity, (2) it conflicts with and therefore is preempted by federal law, and (3) in the alternative, treating the motion as one for summary judgment, the evidence shows that FFB is not a "construction lender" under California law and therefore is not bound by Plaintiff's stop notice. FFB stated none of these defenses in its notice of removal. *Compare* MTD *with* NOR.[8]

## *991 III. *DISCUSSION*

### A. *Motion to Remand*

[1] FFB removed this case from state to federal court on the basis of the federal-agency removal statute, 28 U.S.C. § 1442.[9] *See* NOR ¶ 5. While the general removal statute, § 1441, is strictly construed to favor remand, § 1442 is broadly construed to favor removal. *Durham,* 445 F.3d at 1252–53. This presumption furthers one of the key purposes of the statute: to provide federal defendants who have been haled into state court for acts done in the name of the federal government with an opportunity to have the validity of defenses based on federal law heard in a federal forum. *See Willingham v. Morgan,* 395 U.S. 402, 406–07, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *see also Durham,* 445 F.3d at 1252–53 (alluding to long history of federal agents "get[ting] into trouble when they act within the States—whether they're enforcing unpopular tariffs in South Carolina in the 1830s, killing recalcitrant moonshiners in self-defense in Tennessee in the 1880s, or exposing servicemen to asbestos to make military aircraft in the 1970s"). The Supreme Court has cautioned lower courts not to frustrate this purpose with "a narrow, grudging interpretation" of § 1442. *Willingham,* 395 U.S. at 407, 89 S.Ct. 1813.

[2] Aided by this presumption, a federal defendant removing under § 1442 must demonstrate three things: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions ... and plaintiff's claims; and (c) it can assert a 'colorable federal defense.' " *Durham,* 445 F.3d at 1251. Plaintiff does not challenge FFB on the first two criteria.[10] *See* Reply at 3. Neither does Plaintiff dispute that FFB can assert a colorable federal defense. *See id.* Indeed, it would be difficult to do so credibly, given that FFB has raised two colorable federal defenses in its motion to dismiss. MTD at 7–10 (sovereign immunity), 10–13 (conflict preemption). Rather, Plaintiff argues that remand is necessary because FFB failed to state the grounds of removal—that is, it failed to articulate its federal defenses—in the notice of removal itself. Relying on ***992** the Supreme Court opinion *Mesa v. California,* 489 U.S. 121, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989), Plaintiff argues that a federal defendant's failure to state its federal defenses in the notice of removal itself, as compared to some other paper, strips the federal court of the removal jurisdiction granted by § 1442. MTR Reply at 3–5.

This position misapprehends the holding of *Mesa.* In that case, the government argued that a federal defendant seeking removal under § 1442 only needed to show that he had been summoned to court for an act done under color of office, regardless of whether the act gave rise to a federal defense. *See Mesa,* 489 U.S. at 125, 134, 109 S.Ct. 959. In other words, the government argued that federal defendants need not assert a federal defense to remove under § 1442. The Supreme Court rejected this argument, observing that the government's view would "present grave constitutional problems." *Id.* at 137, 109 S.Ct. 959. That is because a federal defendant could remove a case to federal court even if the case presented no controversy "arising under" federal law, as required by Article III, Section 2 of the Constitution. *Id.* at 136–37, 109 S.Ct. 959. The Court observed:

> Section 1442(a), in our view, is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant. Section 1442(a), therefore, cannot independently support Art. III "arising under" jurisdiction. Rather, it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes. The removal statute itself merely serves to overcome the "well-pleaded complaint" rule which would otherwise preclude removal even if

a federal defense were alleged.

*Id.* at 136, 109 S.Ct. 959. Plaintiff interprets this passage to mean that, unless the removal notice itself articulates a defense arising under federal law, a federal court cannot exercise jurisdiction under § 1442. MTR Reply at 4. Plaintiff's view, though, confuses the constitutional and statutory requirements for removal jurisdiction.

[3] It is axiomatic that the judicial power of the United States provided by Article III is broader than the jurisdiction actually exercised by the federal courts, and that Congress may tailor that jurisdiction by statute. *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 495, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *see also Mireles v. Wells Fargo Bank, N.A.,* 845 F.Supp.2d 1034, 1047 (C.D.Cal.2012) (citing *Libhart v. Santa Monica Dairy Co.,* 592 F.2d 1062, 1064 (9th Cir.1979)) ("The right to remove a case to federal court is entirely a creature of statute."); *Hunter v. United Van Lines,* 746 F.2d 635, 639 (9th Cir.1984) ("Congress plainly has the power to confer removal jurisdiction over cases in which only the defense is based on federal law."). Plaintiff reads *Mesa* as a case about the formal or procedural—that is, the statutory—requirements of § 1442 removal. But *Mesa* is a case about the *constitutional* requirements of § 1442 removal. It holds only that the Constitution requires cases removed under § 1442 to present the federal court with a controversy arising under federal law, but that, in a departure from the usual, "well-pleaded complaint" rule, a defense may supply the constitutionally requisite federal question. This holding simply does not address the question of where and how—i.e., in which paper—the defense must appear.

That *Mesa* does not address this question is no surprise, for although the *Mesa* Court focused on § 1442, it is § 1446 that governs the form of the removal notice. *See Ely Valley Mines, Inc. v. Hartford* ***993** *Acc. & Indem. Co.,* 644 F.2d 1310, 1315 (9th Cir.1981) (applying procedural requirements of § 1446 where right to remove was provided by § 1442). *Durham* suggests that the same presumption in favor of removal that applies to § 1442 applies with equal force to § 1446. *See* 445 F.3d at 1253 (extending pro-removal presumption to § 1446 "where the timeliness of a federal officer's removal is at issue"). Whether it does or not, § 1446 requires a party seeking removal to include nothing more than a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a).

[4] Unfortunately, while FFB's notice of removal does include a "short and plain statement," what it states is not actually the "grounds for removal." The removal notice merely recites, in relevant part: "This action must be removed to federal district court pursuant to 28 U.S.C. [§ ] 1442(a)(1) because it is a civil action against an agency and instrumentality of the United States Government." NOR ¶ 5. This statement is inadequate because it does not supply facts that would permit Plaintiff or the Court to determine that *Durham's* three-pronged test for federal-agency removal had been met, the relevant facts being the agency's "personhood" under the statute, the required causal nexus, and the agency's federal defenses. 445 F.3d at 1251.

Nevertheless, the defect in the removal notice is merely a defect of form that does not strip this Court of jurisdiction. Given that FFB clearly can assert some colorable federal defense, the Court is not inclined to frustrate the Congressional purpose of the federal-agency removal statute with a "grudging, narrow" ruling that would remand this action to state court and thereby deprive FFB of the opportunity to test its federal defenses in a federal forum. The appropriate course of action is for the Court to retain jurisdiction but require FFB to comply with § 1446 by amending its notice of removal to state the *actual* grounds for removal jurisdiction.[11] Frankly, the Court is perplexed as to why the U.S. Attorney did not state them in the first place. The government cannot expect simply to wave toward § 1442 and then waltz into federal court without making any showing that would allow a plaintiff (or a district judge) to determine that removal was proper. *See Gaus v. Miles, Inc.,* 980 F.2d 564, 567 (9th Cir.1992) (rejecting removal notice where defendant baldly concluded that jurisdictional requirements were satisfied, "as if attempting to recite some 'magical incantation' "); *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1213 (9th Cir.1998) (directing district courts to test propriety of removal on basis of the record extant "at the time of removal").[12] Perhaps ***994** aware of this, FFB appears to seek leave to amend its notice of removal in the event that the Court finds it technically deficient. *See* MTR Opp'n at 6.

[5] Plaintiff argues that FFB should not be allowed to amend its removal notice because the thirty-day period for removal provided by § 1446(b) has long since elapsed. MTR Reply at 6–8. Plaintiff is wrong. First, the cases cited by Plaintiff stand only for the uncontroversial proposition that, once the thirty-day period elapses, a defendant is not permitted to amend the notice of removal to add a "separate basis" for removal jurisdiction—that is, to state an entirely new reason. *ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Montana,* 213 F.3d 1108, 1117 (9th Cir.2000); *see also Sonoma Falls Developers, LLC v. Nevada Gold &*

*Casinos, Inc.,* 272 F.Supp.2d 919, 926 (N.D.Cal.2003). That is not what FFB seeks leave to do here. The notice of removal set forth the legal basis for removal, § 1442, as well as facts which purport to justify removal on that ground, namely, the fact that FFB is "an agency and instrumentality of the United States Government." NOR ¶ 5. As explained above, that fact alone is not enough to support removal, and FFB's notice of removal should have supplied facts addressing the jurisdictional requirements enunciated in *Durham.* Nevertheless, amendment at this point would not add a separate basis for jurisdiction; it would merely clarify the factual underpinnings of the previously asserted basis. As the cases cited by Plaintiff recognize, that is permissible. *E.g., ARCO,* 213 F.3d at 1117.

Nothing in *Bays* is inconsistent with this conclusion, contrary to Plaintiff's interpretation of that case. MTR Reply at 7–8 (citing *Bays v. Spectrum Sec. Servs.,* Case No. CV 10–04362 DDP (MANx), 2010 WL 4008330, 2010 U.S. Dist. LEXIS 112057 (C.D.Cal. Oct. 7, 2010)). In *Bays,* the district court specifically found that the defendant "ha[d] not demonstrated that it ha [d] a colorable federal defense...." 2010 WL 4008330, at *2, 2010 U.S. Dist. LEXIS 112057, at *4. As such, the defendant could not satisfy the jurisdictional requirements of Article III. *See Mesa,* 489 U.S. at 136–37, 109 S.Ct. 959. In this case, however, FFB has established that it has such defenses, so *Bays* is inapposite.

In summary, the Court concludes that it has removal jurisdiction over this case because FFB can assert colorable federal defenses and the Court is otherwise satisfied that FFB meets the criteria for removal under § 1442. *Supra* note 10. The deficiencies in the notice of removal are merely technical and hence amendable at any time. The Court therefore DENIES Plaintiff's motion to remand. Consequently, Plaintiff's request for an award of removal-related attorney fees, MTR at 15, is DENIED.

Though the Court retains jurisdiction over this matter, FFB still must comply with the formal requirements of § 1446. Therefore, the Court ORDERS FFB to file, within seven (7) days of the signature date of this Order, an amended notice of removal that sets forth the grounds of removal consistent with § 1446, *Durham,* and the guidance herein.

### B. *Motion to Dismiss*

FFB moves to dismiss Plaintiff's complaint under Rule 12(b)(1) or, in the alternative, to enter summary judgment in its favor. FFB marshals three arguments toward these ends. First, FFB contends ***995** that, because it is an instrumentality of the U.S. government, sovereign immunity shields it from Plaintiff's state—law claim for enforcement of the bonded stop notice. Second, FFB argues that, as applied in the circumstances of this case, California's stop-notice law conflicts with and therefore is preempted by the FFB Act and the Energy Policy Act. Finally, in the event that the Court does not dismiss the case under Rule 12(b)(1), FFB asks the Court to treat its motion as one for summary judgment and find that FFB is not a "construction lender," as California's stop-notice law defines that term. The Court addresses each argument in turn.

#### 1. Sovereign Immunity

##### a. *Legal Standard*

[6] [7] "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). "Sovereign immunity is jurisdictional in nature. Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (internal quotation marks and brackets omitted); *see also Tobar v. United States,* 639 F.3d 1191, 1195 (9th Cir.2011) ("The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction."). Though defendant FFB is the party who has moved to dismiss this case, Plaintiff is the one who bears the burden of establishing that FFB lacks sovereign immunity and hence that federal jurisdiction is proper, notwithstanding Plaintiff's attempts to remand the case. *See Levin v. United States,* 663 F.3d 1059, 1063 (9th Cir.2011) (plaintiff bears burden of establishing waiver of sovereign immunity); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 n. 3, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (burden of establishing federal jurisdiction is borne by the party asserting it at the time it is challenged, regardless of previous positions vis-à-vis removal).

[8] The Supreme Court has set forth a two-step inquiry for determining whether sovereign immunity shields a government agency from a particular claim. *Meyer,* 510 U.S. at 484, 114 S.Ct. 996; *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736, 743, 124 S.Ct. 1321, 158 L.Ed.2d 19 (2004). In the first step, the Court must ask whether Congress has waived the government agency's sovereign immunity. *Meyer,* 510 U.S. at 484, 114 S.Ct. 996; *Flamingo Indus.,* 540 U.S. at 743, 124 S.Ct. 1321. If it has, the Court asks the second question, which is

"whether the source of substantive law upon which the claimant relies provides an avenue for relief." *Meyer,* 510 U.S. at 484, 114 S.Ct. 996; *see also Flamingo Indus.,* 540 U.S. at 743, 124 S.Ct. 1321 (using *Meyer* test).

[9] *Meyer* and *Flamingo Industries* stand for the idea that a waiver of sovereign immunity is a necessary but not sufficient condition for imposing liability on a federal defendant. The waiver makes liability possible, but only if the underlying claim is one that can reach the federal defendant. In *Meyer,* the predecessor to the FDIC, the Federal Savings and Loan Insurance Corporation ("FSLIC"), fired one of its employees. The former employee brought a *Bivens*[13] action on the theory that FSLIC had "deprived him of a property right (his right to continued employment under California law) without due process of law in violation of the Fifth Amendment." 510 U.S. at 474, 114 S.Ct. 996. The Supreme Court held that no ***996** Bivens action could lie against the FSLIC despite the agency's ability to "sue and be sued." *Id.* at 483–84, 114 S.Ct. 996. The Court reasoned that the source of substantive law underlying the plaintiff's claim—the Court's own earlier decision in *Bivens*—provided a cause of action against government *agents,* but not government *agencies* like FSLIC. *Id.* at 483–486, 114 S.Ct. 996.

Similarly, in *Flamingo Industries,* a company that had been supplying mail sacks to the United States Postal Service ("USPS") sued USPS for antitrust violations after USPS terminated its contract. 540 U.S. at 738, 124 S.Ct. 1321. Noting that Congress had authorized USPS to "sue and be sued," a unanimous Supreme Court concluded that the plaintiff nevertheless could not assert an antitrust claim against USPS because the source of substantive law in that case—the Sherman Act—only provided a cause of action against "persons," as defined by the statute. *Id.* at 744–45, 124 S.Ct. 1321. The Court held that USPS, as part of the executive branch of the federal government, was not a "person" within the meaning of the Sherman Act, and therefore the Sherman Act simply did not provide an avenue for relief against USPS, notwithstanding its lack of sovereign immunity. *Id.* at 745–47, 124 S.Ct. 1321.

Thus, the two-step *Meyer* test obligates courts to inquire not only whether Congress waived a federal defendant's sovereign immunity, but also whether the plaintiff's claim can reach the federal defendant, notwithstanding its lack of immunity. The first question asks, in essence, whether the government has put down its shield; the second, whether plaintiff has been given a sword.[14]

### b. *Analysis*

[10] [11] As noted previously, the question of whether California's stop-notice laws reach FFB appears to be one of first impression. Proceeding to the first step in the *Meyer* analysis, the Court agrees with the parties that Congress waived FFB's sovereign immunity by giving FFB the power to "sue and be sued." 12 U.S.C. § 2289; MTD at 7, MTD Opp'n at 10–11. "[S]uch sue-and-be-sued waivers are to be liberally construed, notwithstanding the general rule that waivers of sovereign immunity are to be read narrowly in favor of the sovereign." *Meyer,* 510 U.S. at 480, 114 S.Ct. 996 (internal quotation marks and citations omitted). "It must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Flamingo Indus.,* 540 U.S. at 742, 124 S.Ct. 1321 (quoting *Fed. Hous. Admin., Region No. 4 v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940)) (brackets omitted); *see also Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996 (a government ***997** entity authorized to "sue and be sued" is subject to no less liability than a private corporation).

[12] Hence, "agencies authorized to 'sue and be sued' are presumed to have fully waived immunity." *Meyer,* 510 U.S. at 481, 114 S.Ct. 996 (internal quotation marks omitted).[15] Because Congress authorized FFB to sue and be sued, the Court holds that Congress fully waived FFB's sovereign immunity and, accordingly, proceeds to the second step of the *Meyer* analysis.

In that step, the Court must determine whether the substantive law upon which Plaintiff relies, California's stop-notice law, provides Plaintiff with an "avenue for relief" against FFB. *Meyer,* 510 U.S. at 484, 114 S.Ct. 996. Accordingly, the Court "look[s] to the statute." *Flamingo Indus.,* 540 U.S. at 744, 124 S.Ct. 1321. The Court concludes that California's stop-notice laws do provide Plaintiff with an avenue for relief from FFB. Unlike the *Bivens* action asserted in *Meyer* and the antitrust claim in *Flamingo Industries,* nothing in California's stop-notice law is inconsistent with enforcement against the federal government, or, more specifically, against an instrumentality of the federal government that has been stripped of its immunity and launched into the commercial world.

[13] [14] Before turning to the statutory text, the Court observes that California's stop-notice laws are part of "an integrated scheme obviously designed to provide maximum protection to laborers and materialmen." *Mech. Wholesale Corp. v. Fuji Bank, Ltd.,* 42 Cal.App.4th 1647,

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

1656, 50 Cal.Rptr.2d 466 (Cal.Ct.App.1996). This scheme is "remedial" in nature and intended to be "liberally construed." *Connolly Dev., Inc. v. Sup. Ct.,* 17 Cal.3d 803, 826–27, 132 Cal.Rptr. 477, 553 P.2d 637 (1976). Laborers and materialmen may assert the stop-notice remedy against either (1) the owner of the work of an improvement or (2) the project's "construction lender." *Id.* at 809, 132 Cal.Rptr. 477, 553 P.2d 637. Plaintiff's theory is that FFB was a "construction lender" for purposes of the Solyndra project.

> "Construction lender" means [1] any mortgagee or beneficiary under a deed of trust lending funds with which the cost of the work of improvement is, wholly or in part, to be defrayed, or any assignee or successor in interest of either, or [2] any escrow holder or other party holding any funds furnished or to be furnished by the owner or lender or any other person as a fund from which to pay construction costs.

Cal. Civ.Code § 3087 (brackets added).[16]

Plaintiff argues that FFB falls within the second portion of the definition, which applies to any party who holds any "fund from which to pay construction costs." MTD Opp'n at 11–12. In essence, Plaintiff maintains that because FFB held funds for ***998** Solyndra that were used for construction, FFB is a construction lender and hence subject to Plaintiff's stop notice. The Court agrees.

**[15]** FFB does not dispute that it was a lender, as that term is commonly understood. Indeed, it would be difficult to do so because FFB held a note from Solyndra in which Solyndra agreed to repay FFB the monies advanced. FFB's argument turns, rather, on the notion that it did not "hold" funds. According to FFB, California's "stop notice law was intended to apply to a lender who has loaned a sum certain, but who retains the proceeds as security or in loan fund accounts." MTD at 9. In contradistinction to such a lender, FFB characterizes itself as merely having "purchased a promissory note that was 100% guaranteed by the Secretary of Energy" and "advanced funds only after (1) a request was made by the borrower, and (2) the request was approved by the Secretary of Energy." *Id.* FFB emphasizes that it exercised no discretion over whether to approve advances requested by Solyndra; that discretion resided exclusively with the Secretary. FFB asserts that "[t]here are no undrawn funds sitting in an account at FFB in Solyndra's name," the implication being that there are no funds for Plaintiff to attach.

While FFB offers a number of formal distinctions between itself and a typical, private lender, FFB never establishes how these distinctions amount to a difference. What transpired here, stripped of its labels, is that a bank made a loan to a borrower to fund a construction project. Instead of the usual deed of trust, the bank accepted as security the guarantee of the federal government in the person of the Secretary of Energy. Though the Secretary oversaw whether, when, and to whom the monies would be disbursed, FFB actually disbursed the funds. FFB did so pursuant to a contractual arrangement with Solyndra which committed a maximum amount of money to Solyndra which Solyndra could, and did, use to pay construction costs. In short, Solyndra's right to use money to pay construction costs constituted the "construction fund." The fact that Solyndra had the right to use funds provided by FFB is what made FFB the "construction lender."

**[16]** FFB argues that the stop-notice laws can reach only private banks or like entities who lend a "sum certain" which then resides in a dedicated account. MTD at 9, 10. First, that is not true. The statutory definition of "construction lender" applies by its plain language to a variety of parties, such as escrows and unidentified "other" parties. At least one California treatise notes that even fire or earthquake insurance carriers may be deemed "construction lenders" under the statute. *Cal. Constr. L. Manual* § 6:110 (6th ed.). The definition is simply more expansive than FFB would have it. Second, assuming that FFB's definition were correct and the stop-notice laws contemplated only the lenders of a sum certain who held funds in a dedicated account, it is not clear on the record before the Court that what transpired in this case is meaningfully different from that: A bank, albeit a federal one, made a loan to a borrower to fund a construction project. Third, FFB's position would make the efficacy of California's stop-notice laws depend on the picayune matter of which label is affixed to an account. That result is inconsistent with the California cases that counsel a liberal construction of the stop-notice laws to effect their remedial purpose, that remedial purpose being the vindication of rights to payment held by laborers and materialmen. It also is inconsistent with the statutory definition of a "construction lender," which describes construction funds in a functional way: ***999** They are, simply, "funds furnished or to be furnished ... as a fund from which to pay construction costs." Cal. Civ.Code § 3087 (superseded July 1, 2012). The law says nothing about who must furnish the funds, to whom, or in what manner. The restyled version of the statutory definition makes its functional nature even more plain: It states that the term "construction lender" encompasses persons

providing funds "with which the cost of all or part of a work of improvement is to be paid." *Id.* § 8006. This definition is functional, flexible, and, with respect to the Solyndra loan, applicable to FFB.

Considering FFB in light of its being subject to no less liability than a private corporation, *Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996, the Court sees *A–1 Door* as analogous to this case. *A–1 Door & Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n,* 61 Cal.2d 728, 40 Cal.Rptr. 85, 394 P.2d 829 (Cal.1964). In that case, a defendant savings and loan association ("S & L") made a loan to the owners of unimproved real property so that the owners could build on the land. *Id.* at 731, 40 Cal.Rptr. 85, 394 P.2d 829. The owners executed promissory notes and then assigned the loan proceeds to the S & L, who agreed to disburse them in installments as the project went along. *Id.* Construction halted on the project and the S & L retained the loan proceeds. *Id.* Unpaid materialmen issued a stop notice and then sued the S & L for enforcement. *Id.* The California Supreme Court, in holding that the S & L could not use unexpended loan proceeds to reduce the amount of the owners' indebtedness or to complete construction, described the creation of a construction fund. It said that a construction fund was created when the S & L "lent specified amounts to the owners for construction purposes, and the owners executed promissory notes for, and agreed to pay interest on, the full amount of each loan." *Id.* at 734–35, 40 Cal.Rptr. 85, 394 P.2d 829. That is essentially what happened here, though FFB paid the money to Solyndra's creditors rather than directly to Solyndra itself. FFB's insistence to the contrary merely quibbles on the meaning of the phrase "construction fund." To agree with FFB in light of *A–1 Door,* the Court would have to find that FFB's loan was not one "for construction purposes." No party has asked the Court to find that fact. Accordingly, the Court rejects FFB's contention that it did not make a construction loan to Solyndra and, hence, that it did not serve as a construction lender within the meaning of California's stop-notice laws.

FFB's other arguments are also unavailing. FFB cites *Marcus Garvey Square* for the proposition that the existence of sovereign immunity is determined by the practical test of whether a judgment must be satisfied from the United States Treasury. MTD at 10; MTD Reply at 4–5 (citing *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co. of California, Inc.,* 595 F.2d 1126, 1132 (9th Cir.1979)). The first problem with that position is that, if *Marcus Garvey Square* actually meant what FFB suggests it does, it would be in obvious conflict with the later-decided cases *Meyer* and *Flamingo Industries,* since it would supplant their two-step analysis with the single question of whether the judgment sought by the plaintiff would be satisfied from the U.S. Treasury. The second problem is that *Marcus Garvey Square* does not mean that. It speaks only to the question of whether the United States' sovereign immunity is waived by a statute authorizing an agency head to sue and be sued, when the United States rather than the agency head is the real party in interest. Those are not the facts of this case; FFB has been sued in its own name and Plaintiff does not seek to reach past FFB to the United States itself. The third problem is that, if sovereign ***1000** immunity barred any attempt to secure a judgment against a federal defendant that would be paid from the U.S. Treasury, it is unclear how Congress ever could waive it.

**[17]** FFB also suggests that the California state legislature lacks the authority to "give[ ] a contractor the right to recover from the United States Treasury." MTD at 10; MTD Reply at 4, 5. To the extent that FFB is suggesting that California cannot waive the federal government's sovereign immunity, FFB is correct. But the suggestion misses the point. As the Court discussed during the first step of the *Meyer* analysis, the California state legislature did not waive FFB's sovereign immunity. Congress did. And when Congress did so, it subjected FFB to liability in the manner of a private corporation. Private corporations are subject to stop notices under California law. Accordingly, so is FFB.

FFB suggests in passing that it cannot be subjected to a stop notice because it has and had no contractual relationship with Plaintiff. MTD Reply at 4. But the very nature of a stop notice is to supply laborers and materialmen with a remedy despite their lack of contractual relationship with the construction lender. *E.g., Connolly,* 17 Cal.3d at 809, 132 Cal.Rptr. 477, 553 P.2d 637 ("Failure of the owner or lender to withhold money as required by the [stop] notice may render him personally liable to the claimant, notwithstanding the absence of privity of contract."); *Mech. Wholesale Corp. v. Fuji Bank, Ltd.,* 42 Cal.App.4th 1647, 1659, 50 Cal.Rptr.2d 466 (Cal.Ct.App.1996) (The stop-notice remedy "is a liability which exists in the absence of any contractual privity whatsoever."). The lack of a contract between FFB and Plaintiff presents no bar to the relief Plaintiff seeks.

The root of FFB's objection to Plaintiff's stop notice appears to be that FFB is a government bank rather than a private bank and "simply does not work the way a private bank does." MTD Reply at 7; MTD at 9. But whether FFB "works" like a private bank in all of its particulars is not the question here. The question is whether FFB acted as a construction lender under California's stop-notice laws. The Court concludes that it did. When Congress

launched FFB into the commercial world to serve as a lender for, among other things, construction projects, it waived FFB's sovereign immunity and hence subjected FFB to at least as much potential liability as a private corporation. *See Flamingo Indus.,* 540 U.S. at 742, 124 S.Ct. 1321; *Meyer,* 510 U.S. at 482–83, 114 S.Ct. 996. FFB cannot now escape liability solely by virtue of its status as a federal entity. Congress foreclosed that defense when it allowed FFB to sue and be sued. The only remaining question, then, is whether a California stop notice can reach an entity that loans money for a construction project, as FFB did. It can.

Because (1) Congress fully waived FFB's sovereign immunity and (2) California's stop-notice law provides Plaintiff with an avenue for relief from a construction lender such as FFB, FFB's Rule 12(b)(1) motion to dismiss this action on sovereign immunity grounds is DENIED.

### 2. Conflict Preemption

#### a. *Legal Standard*

FFB argues that Plaintiff's claim for enforcement of its stop notice must be dismissed because enforcement would conflict with, and therefore is preempted by, the FFB Act and the Energy Policy Act. Under the Supremacy Clause of the U.S. Constitution,[17] Congress has the power to ***1001** preempt state law. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Courts usually think of preemption as coming in three kinds: express, field, and conflict.[18] *See id.; Kroske v. U.S. Bank Corp.,* 432 F.3d 976, 981 (9th Cir.2005). FFB invokes only the third kind, conflict preemption.

**[18] [19] [20]** "[S]tate law is preempted by federal law to the extent that it actually conflicts with federal law." *Ctr. for Bio–Ethical Reform, Inc. v. City & Cnty. of Honolulu,* 455 F.3d 910, 917 (9th Cir.2006) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). A state law conflicts and is thus preempted "where [1] it is impossible for a private party to comply with both state and federal requirements, or where [2] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Kroske,* 432 F.3d at 981 (quoting *English,* 496 U.S. at 79, 110 S.Ct. 2270) (brackets added). Additionally, courts must assume that "the historic police powers of the States" are not preempted "unless that [is] the clear and manifest purpose of Congress." *Id.* "The presumption of nonpreemption does not apply, however, when the State regulates in an area where there has been a history of significant federal presence." *Id.* (internal quotation marks omitted).

#### b. *Analysis*

The Court begins by observing that California's stop-notice law lies squarely within an area traditionally regulated by the states pursuant to their historic police powers-construction law generally and specifically the remedial scheme protecting construction contractors' rights to payment on contracts. The stop-notice remedy at issue here is a creature entirely of California statute. *Mech. Wholesale Corp.,* 42 Cal.App.4th at 1657–58, 50 Cal.Rptr.2d 466. Neither party argues that there has been a "history of significant federal presence" in the area of California's mechanics' lien and stop-notice laws, nor is the Court aware of any such presence. Neither do the parties point to any clear or manifest signal that Congress passed the FFB Act or Energy Policy Act with the intent of preempting California's stop-notice law. The Court proceeds, therefore, from the assumption that Congress did not intend to preempt California's stop-notice laws. This presumption means FFB bears the burden of showing Congressional intent to preempt state law. *See Chamberlan v. Ford Motor Co.,* 314 F.Supp.2d 953, 962 (N.D.Cal.2004).

FFB does not argue that compliance with both federal law and California's stop-notice law would be impossible in this case. *See Kroske,* 432 F.3d at 981. Rather, it argues that the stop-notice remedy sought by Plaintiff would present "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.,* specifically, to Congress's purposes and objectives for the Energy Policy Act and the FFB Act. MTD at 11–13, MTD Reply at 7–9. The argument is unavailing.

**[21]** With respect to the Energy Policy Act, FFB simply fails to identify any statutory purpose or objective with which enforcement ***1002** of a stop notice would conflict. This is unsurprising: The Energy Policy Act provides a mechanism for providing federally-backed loans to the makers of innovative energy technologies, and it is difficult to envision how enforcement of a construction contractor's stop notice could impede this scheme. But regardless of whether such an impediment could be envisioned, FFB bears the burden of showing that

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

California's stop-notice law presents an obstacle to Congress's objectives for the Energy Policy Act and, by failing to address those objectives with any specificity, it fails to carry its burden.

With respect to the FFB Act, FFB cites Congress's statement that its purpose in passing the FFB Act was "[1] to assure coordination of [federally assisted borrowing] programs with the overall economic and fiscal policies of the Government, [2] to reduce the cost of Federal and federally assisted borrowings from the public, and [3] to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281 (brackets added). FFB focuses its conflict-preemption argument on the second aspect of Congress's purpose, the reduction of costs borne by the public in financing federal borrowing programs like the one in which Solyndra participated.[19] MTD at 12; MTD Reply at 9. FFB argues that requiring FFB to make good on Plaintiff's stop notice would undermine its ability to limit the cost of federally-backed borrowing programs. *Id.* This argument fails because it proves too much. FFB's position, if accepted, would mean that *any* state law whose enforcement resulted in increased costs for FFB would be conflict-preempted. That cannot possibly have been Congress's intent. A federal agency's diffuse, undifferentiated interest in reducing costs cannot be enough to preempt state law in the face of the presumption against preemption that applies in areas of traditional state regulation.[20] Neither can FFB's argument be squared with Congress's express authorization for FFB to purchase and be sued on obligations like the promissory note it purchased from Solyndra. Enforcement of Plaintiff's stop notice does not clearly or manifestly conflict with the purposes or objectives of the FFB Act.

Because FFB has not met its burden of showing that enforcing California's stop-notice law in this case would impermissibly hamper the purpose and objectives of either the FFB Act or the Energy Policy Act, FFB's Rule 12(b)(1) motion to dismiss ***1003** this action on conflict preemption grounds is DENIED.

### 3. California's Definition of "Construction Lender"

FFB requests that if the Court denies its Rule 12(b)(1) motion, the Court treat the motion as one for summary judgment and enter judgment in its favor on the ground that FFB is not a construction lender under California law. However, as discussed above, FFB was such a construction lender with respect to the Solyndra project. Therefore, to the extent that FFB's motion is one for summary judgment, that motion is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff Kinetic Systems, Inc.'s motion to remand this action to California state court. Defendant Federal Financing Bank is hereby ORDERED to comply with 28 U.S.C. § 1446 by submitting an amended notice of removal within seven (7) days of the signature date of this Order and consistent with the guidance herein.

Additionally, the Court DENIES Defendant Federal Financing Bank's motion to dismiss this action on sovereign-immunity and conflict-preemption grounds. To the extent that Defendant's motion is construed as one seeking summary judgment on the ground that Defendant is not a "construction lender" under California law, that motion, too, is DENIED.

The parties may now commence court-sponsored mediation pursuant to the Court's August 15, 2012 approval of their stipulation to do so. ECF No. 36 ("ADR Order"). The ADR Order set a deadline for completing mediation: ninety (90) days after resolution of the pending motions to remand and dismiss. Those motions now being resolved, the mediation deadline is set. The parties shall complete court-sponsored mediation within ninety (90) days of the signature date of this Order.

Following mediation, both parties shall appear for a case management conference at 10:00 a.m. on Friday, January 11, 2013, in Courtroom One, United States Courthouse, 450 Golden Gate Avenue, San Francisco, California.

IT IS SO ORDERED.

Footnotes

1 In support of its motion to dismiss, FFB submitted the declaration of Cherisse Willis–Proctor, a records officer within the U.S. Department of Treasury who has supplied as exhibits certified copies of various agreements relevant to the case. ECF No. 7 ("Willis–Proctor Decl."). Exhibit 6 contains a statement made to the House Ways and Means Committee on May 12, 1983 by Deputy Secretary of the Treasury R.T. McNamar, in which Deputy Secretary McNamar explained, among other things, the background and purposes of FFB.

2 *See also Pealo v. Farmers Home Admin.,* 412 F.Supp. 561, 563 (D.D.C.1976) *rev'd* 562 F.2d 744 (D.C.Cir.1977) (Congress established FFB "to provide a source of funds for Federal agencies so as to lessen competition among the agencies in the private money market and to provide lower interest cost to the United States.").

3 *E.g., Californians for Renewable Energy v. U.S. Dept. of Energy,* 860 F.Supp.2d 44, 45–47 (D.D.C.2012); *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.,* 8:08CV48, 2011 WL 976482, at *2 (D.Neb. Mar. 15, 2011); *Great Plains Gasification Assocs. v. C.I.R.,* 92 T.C.M. (CCH) 534 (T.C.2006); *Brazos Elec. Power Co-op, Inc. v. United States,* 49 Fed.Cl. 398, 400 (Fed.Cl.2001); *Resolution Trust Corp. v. California,* 851 F.Supp. 1453, 1455 n. 1 (C.D.Cal.1994); *Mason Cnty. Med. Ass'n v. Knebel,* 563 F.2d 256, 260 (6th Cir.1977).

4 The Willis–Proctor Declaration has several exhibits, the first of which is the PFA; the PFA, in turn, has several Annexes consisting of form examples of documents required by the PFA. Annex 3 to the PFA is a form Note Purchase Agreement ("Form NPA").

5 The PFA makes an exception for "[a]dvances to reimburse the Borrower for expenditures that it has made from its own working capital." Form NPA § 7.2(b).

6 A stop notice is "a notice by one who has furnished materials or labor for the construction of improvements, given to the owner of the property, or to a lender of funds to be used for payment of claims against such property, for the purpose of withholding money in the hands of such owner or lender from the contractor so that the materialman or laborer may be paid for his material or services." *See Flintkote Co. v. Presley of N. California,* 154 Cal.App.3d 458, 462, 201 Cal.Rptr. 262 (Cal.Ct.App.1984) (citing *Theisen v. Cnty. of Los Angeles,* 54 Cal.2d 170, 177–179, 5 Cal.Rptr. 161, 352 P.2d 529 (Cal.1960)); *see also* Miller & Starr, 10 *Cal. Real Est.* § 28:78 (3d ed.) ("Miller & Starr"). A bonded stop notice is a stop notice supported by a bond of 125 percent of the amount of the claim contained in the stop notice. Miller & Starr, *supra,* § 28:84. Generally, compliance with a bonded stop notice is mandatory, while compliance with a non-bonded stop notice is permissive. *Manos v. Degen,* 203 Cal.App.3d 1237, 1240, 250 Cal.Rptr. 493 (Cal.Ct.App.1988) (citing Cal. Civ.Code § 3162, *repealed* by Stats. 2010, c. 697 (S.B.189) § 16, operative July 1, 2012); *see also* Cal. Civ.Code § 8536(b) (covering former § 3162). Certain revisions to California's stop-notice laws took effect on July 1, 2012, during the pendency of this motion. The revisions mainly restyled and renumbered the applicable sections of the California Civil Code, and do not substantively change the law applicable to this case. *See* 44 *Cal. Jur.3d* § 69 (section on mechanics' liens and stop notices setting forth definitions which apply under either pre- or post-revision code).

7 A civil action ... that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: [¶] The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

8 Here is the substantive portion of FFB's notice of removal:

1. On February 28, 2012, [Plaintiff] filed a complaint to enforce bonded stop notice in Alameda County Superior Court. Plaintiff seeks $1,187,950.00 together with prejudgment interest.

2. Plaintiff alleges that [Defendant] acted as a "construction lender," as that term is defined under the California Civil Code, to Solyndra, a manufacturer of solar panel products, with regard to the construction of a work of improvement known as the Solyndra solar manufacturing facility (the "Project"). Plaintiff further alleges that [Defendant] was holder of construction funds allocated to the Project.

3. Plaintiff alleges that it furnished labor, services, equipment and material for the installation of mechanical piping and components for tool hookup as part of the Project pursuant to written contract with Solyndra. Plaintiff claims Solyndra made partial payment for the work Plaintiff provided, but on August 31, 2011, Solyndra announced it was closing its business, and did so without paying Plaintiff all of the amounts due and unpaid.

4. On March 13, 2012, the United States Attorney's Office received copies of the Alameda County Superior Court summons and complaint from the U.S. Department of Treasury, which are attached as Exhibit A pursuant to 28 U.S.C. § 1446(a), and which constitute the only process or pleading which have been received. We are advised that an FFB employee received the summons and complaint via U.S. Mail on March 7, 2012. The Summons and Complaint has not yet been served on the United States Attorney's Office as required by Rule 4(i)(1)(A)(i)(ii), Fed. R. Civ. Proc. No trial is scheduled on this case.

5. This action must be removed to federal district court pursuant to 28 U.S.C. §§ 1442(a)(1) [sic] because it is a civil action against an agency and instrumentality of the United States Government. This action may also be removed to federal district court pursuant to 28 U.S.C. § 1331 (civil actions arising under the Constitution, laws or treaties of the United States), and other applicable authorities.

9 FFB's notice of removal also alludes to § 1331 (the federal-question original-jurisdiction statute) and unspecified "other applicable authorities." NOR ¶ 5. As FFB appears to concede, *see* MTR Opp'n at 5, these are insufficient grounds for removal.

pertains to original jurisdiction, not removal jurisdiction. Nor does § 1331 provide a basis for removal under the general removal statute, § 1441, since Plaintiff's complaint sets forth only a state-law claim and does not raise a federal question. Hence, because this Court could not have had original jurisdiction over Plaintiff's claim, FFB cannot remove under § 1441. *See, e.g., Regal Stone Ltd. v. Longs Drug Stores California, L.L.C.,* 881 F.Supp.2d 1123, 1125–27, 2012 WL 685756, at *2 (N.D.Cal.). As to the "other" authorities mentioned in FFB's removal notice, FFB has not identified them and the Court deems that ground abandoned.

10 The Court is satisfied that the first two *Durham* criteria are met. FFB is a "person" within the meaning of § 1442. *See* 12 U.S.C. § 2283 (FFB is a federal corporation); 1 U.S.C. § 1 (in statutes, the word "person" presumptively includes corporations); *Isaacson v. Dow Chem. Co.,* 517 F.3d 129, 135–36 (2d Cir.2008) (nothing in § 1442 indicates intent to overcome presumption that person includes corporations). There also is a "causal nexus" between FFB's acts and Plaintiff's claim: As FFB acknowledges, the Solyndra loan was "a perfect example of how Congress intended the FFB to work," MTD Reply at 12, and in taking the actions giving rise to Plaintiff's claim, FFB clearly acted under color of office. *Durham* also requires that FFB have a colorable federal defense. As explained more fully herein, FFB does have such defenses. They are set forth in FFB's motion to dismiss.

11 *Cf. Russell v. U.S. Department of Housing & Urban Development,* 214 F.Supp.2d 933 (W.D.Ark.2002). In that case, a federal defendant removed to federal court, stating in its notice of removal only that the case was "an action for specific performance against an agency of the United States of America, and [was] thus removable by the United States under [§ 1442]." *Id.* at 934. The plaintiffs moved for remand on the ground that "their complaint does not allege a federal claim and the removal notice does not allege adequate grounds for removal under section 1442(a)(1) because it fails to allege a colorable federal defense." *Id.* The district court inquired whether it was "apparent from the removal notice that [the federal agency] ha[d] a federal defense to the complaint." *Id.* The court found that the removal notice was "deficient in this respect," but retained jurisdiction regardless, since the federal agency had "filed an amended notice of removal" that set forth the specific defense it was raising. *Id.*

12 The removal statutes themselves clearly evince Congressional concern about this sort of rote removal. *See* 28 U.S.C. §§ 1446(a) (reminding attorneys that removal notices are subject to Rule 11), 1447(c) (authorizing courts ordering remand to require defendants to pay the "just costs and any actual expenses, including attorney fees, incurred as a result of the removal").

13 In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court inferred the existence of "a cause of action for damages against federal agents who allegedly violated the Constitution." *Meyer,* 510 U.S. at 473, 114 S.Ct. 996.

14 This second question is often framed as one of Congressional intent, even though in *Meyer* the lawmaking body in question was actually the *Bivens* Court. E.g., *id.* at 744, 124 S.Ct. 1321; *Currier v. Potter,* 379 F.3d 716, 724–26 (9th Cir.2004); *Anselma Crossing, L.P. v. U.S. Postal Serv.,* 637 F.3d 238, 242 n. 6 (3d Cir.2011); *MB Fin. Group, Inc. v. U.S. Postal Serv.,* 545 F.3d 814, 820 (9th Cir.2008) (Tallman, J., dissenting). *Meyer* therefore suggests that the "avenue of relief" analysis does not turn on what the United States Congress intended; rather, it turns on whether the substantive body of law gives plaintiff a claim upon which relief can be granted, regardless of whether Congress is the source of the substantive body of law. This distinction, though admittedly fine, matters: Framing the matter as one of Congressional intent implies that only Congress can provide an "avenue of relief," which, in a case such as this one where a plaintiff appeals to *state* law for relief, unhelpfully suggests the existence of a federalism issue which is not actually present.

15 The government overcomes this presumption only if it makes a clear showing that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority [to sue and be sued] is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the "sue and be sued" clause in a narrow sense.

*Meyer,* 510 U.S. at 480, 114 S.Ct. 996 (quoting *Fed. Hous. Admin., Region No. 4 v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 84 L.Ed. 724 (1940)). FFB has not attempted to make such a showing here.

16 As discussed in note 6, effective July 1, 2012, the California legislature restyled, reorganized, and renumbered the stop-notice laws. The statutory definition of the term "construction lender," formerly set forth at section 3087, is now set forth at section 8006, where it has been reorganized into subsections as suggested by the brackets added herein, but remains substantively the same.

17 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

18 These three categories are not "rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

19 FFB makes glancing reference to Congress's stated object of coordination of federal borrowing programs, MTD Reply at 8, but never explains how enforcement of a stop notice would or even could impede the ability of the federal government to "coordinate" the interactions of federal agencies with the private lending market.

20 Additionally, materials provided by FFB suggest that Congress largely achieved its objective of saving taxpayer funds simply by creating FFB. *See generally* McNamar Report. Before FFB, a multiplicity of federal agencies had engaged in loan-guarantee programs, with the loans being sourced from private lending markets. The influx of federal agencies had the unintended effect of raising demand for private lending and hence increasing interest rates, at the expense of the taxpayer. Congress created FFB in part so that the federal government's left hand would know what its right hand was doing; hence, the emphasis in 12 U.S.C. § 2281 on "coordination" between federal agencies and minimizing "disruption" in private lending markets. The evidence supplied by FFB tends to show that Congress largely accomplished its cost-saving objective simply by creating FFB. *See, e.g., id.* at 14–15. It does not tend to show that Congress intended to shield FFB from any suit under state law which could raise costs for federal taxpayers. One wonders why, if Congress meant to do that, it did not simply preserve FFB's sovereign immunity.

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

*DRAFT*

SHEPPARD MULLIN RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
SCOTT E. HENNIGH, Cal. Bar No. 184413
shennigh@sheppardmullin.com
MATHEW R. TROUGHTON, Cal. Bar No. 151752
mtroughton@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone: 415-434-9100
Facsimile: 415-434-3947

Attorneys for Plaintiff
KINETIC SYSTEMS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

KINETIC SYSTEMS, INC., a California corporation

Plaintiff,

v.

ARGONAUT VENTURES I, L.L.C., an Oklahoma limited liability company, and U.S. Department of Energy, acting by and through the Secretary of Energy

Defendants.

Case No.

**[DRAFT] PLAINTIFF KINETIC SYSTEMS, INC.'S COMPLAINT FOR FORECLOSURE OF MECHANIC'S LIEN**

*DRAFT*

Plaintiff Kinetic Systems, Inc. ("Kinetic Systems") alleges as follows:

**THE PARTIES**

**1.** Kinetic Systems is, and at all relevant times was, a California corporation duly authorized to transact business in the State of California, and doing business in the State of California. Kinetic Systems is, and at all relevant times was, a properly licensed California contractor holding a license issued by the Contractors State License Board of the Department of Consumer Affairs of the State of California, and such license has not been revoked or suspended.

**2.** Kinetic Systems is informed and believes, and on that basis alleges, that Defendant Argonaut Ventures I, L.L.C. ("Argonaut") is, and at all relevant times was, an Oklahoma limited liability company, that in February 2011 purported to advance money to Solyndra, a manufacturer of solar panel products, after Solyndra had already defaulted under other loans made to Solyndra in connection with the construction of a work of improvement known as the Solyndra solar manufacturing facility (the "Project") located at 47488 Kato Road, Fremont, California (the "Property"). Kinetic Systems is informed and believes, and on that basis alleges, that Argonaut contends both that: 1) the advance it made to Solyndra in February 2011 was a loan; and 2) that said loan was secured by the Property and the Project.

**3.** Defendant U.S. Department of Energy ("DOE"), acting by and through the Secretary of Energy, is and at all relevant times was, a department within the United States government, which acted as guarantor of a construction loan made to Solyndra by the Federal Financing Bank ("FFB"). Kinetic Systems is informed and believes that the DOE contends that the DOE loan guaranty was secured by the Property and Project. Kinetics Systems is informed and believes that in February 2011 the DOE subordinated its alleged lien rights against the Property and Project to alleged lien rights of Argonaut arising from the advance Argonaut made to Solyndra in February 2011, which advance was made long after mechanic's liens rights of contractors, including but not limited to Kinetics Systems, had attached to the Property and Project when work was first performed by any of said contractors in connection with the Solyndra Project work of improvement.

*DRAFT*

**4.** Solyndra filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 11-12799 (MFW). By Order dated November 15, 2012 of the Bankruptcy Court (the "Order"), Solyndra was authorized to sell the relevant real property and improvements thereon, provided however, that pursuant to law and the Order the alleged liens of Kinetic Systems, Argonaut and DOE attached to a certain segregated amount of the sale proceeds (the "Segregated Sale Proceeds") with the same validity, and to the same extent, and in the same order and priority as they attached to the Property. A true and correct copy of the Order is attached hereto as Exhibit A.

**5.** [Here describe and attach the Order of the United States Bankruptcy Court for the District of Delaware which may be entered on the MOTION OF KINETIC SYSTEMS, INC. FOR A DETERMINATION THAT THE PLAN INJUNCTIONS DO NOT PROHIBIT INSTITUTION OF AN ACTION TO DETERMINE THE PRIORITY OF MECHANICS LIENS AND THE CREDITORS' RIGHTS TO THE SEGREGATED ACCOUNT PROVIDED FOR IN THE SALE ORDER (OR, IN THE ALTERNATIVE TO MODIFY SUCH INJUNCTIONS) A true and correct copy of the Order is attached hereto as Exhibit B.]

**JURISDICTION AND VENUE**

**6.** Jurisdiction is proper in this Court because the real property and work of improvement thereon are located within the City of Fremont, County of Alameda, California and jurisdiction and venue over mechanic's lien foreclosure actions is ordinarily in the Superior Court for the State of California of the county in which the relevant property and improvements are located. This Court has jurisdiction pursuant to 28 USC 1346(b)(1) and 28 USC 1367 based upon the DOE being a party. Further, Argonaut has and has had substantial, systematic, and continuous contacts with the State of California, including without limitation in connection with the Solyndra project in the City of Fremont, California.

**7.** Venue in this Court is proper because the relevant contracts were performed in, the relevant obligation or liability arose in, and the subject construction project is located in, Alameda County, California.

*DRAFT*

**GENERAL ALLEGATIONS**

**8.** Kinetic Systems furnished labor, services, equipment and material for the installation of mechanical piping and components (HVAC, plumbing, process) for tool hookup at and as part of the Project pursuant to written contract with Solyndra. With regard to Solyndra purchase orders to Kinetic Systems with remaining unpaid balances, the value of the agreed work to be done or furnished by Kinetic Systems at the Project was $2,967,762, as to which the value of that work already furnished by Kinetic Systems is $2,870,372.

**9.** Kinetic Systems has been paid or credited under such contracts the sum of $1,682,422, and there remains due and unpaid the sum of $1,187,950, plus interest.

**10.** On or about August 31, 2011, while construction work at the Project remained underway and incomplete by the contractors, including but not limited to Kinetic Systems, then still constructing the work of improvement, Solyndra announced it was closing its business, and subsequently did so without making payment to Kinetic Systems of all amounts due and unpaid. Kinetic Systems therefore recorded its mechanic's lien in the amount of $1,206,616 (the "Mechanic's Lien") against the Property and Project. A true and correct copy of the Mechanic's Lien is attached hereto as Exhibit C and incorporated herein by reference. Subsequent to the recording of the Mechanic's Lien, certain property of Kinetic Systems was returned to Kinetic Systems the value of which has been credited by Kinetic Systems in order to reduce the outstanding and unsatisfied principal amount of the debt secured by the Mechanic's Lien to $1,187,950.

**FIRST CAUSE OF ACTION**

**(Foreclosure of Mechanic's Lien Against Argonaut and DOE)**

**11.** Kinetic Systems realleges and incorporates by this reference each and every allegation contained in paragraphs 1 through 10 of this Complaint as though fully set forth herein.

**12.** Kinetic Systems is informed and believes and on that basis alleges that Defendant Argonaut claimed some right, title or interest in the Property and Project which it now claims in the Segregated Sale Proceeds, which claim, right, title or interest is junior to, subsequent to, and subject to Kinetic Systems' Mechanic's Lien as hereinafter set forth.

*DRAFT*

**13.** Kinetic Systems is informed and believes and on that basis alleges that Defendant DOE claimed some right, title or interest in the Property and Project and now claims same in the Segregated Sale Proceeds, which claim, right, title or interest is junior to, subsequent to, and subject to Kinetic Systems' Mechanic's Lien as hereinafter set forth.

**14.** Kinetic Systems is informed and believes and on that basis alleges that the whole of said Property and Project was required for the convenient use and occupancy of the improvements situated thereon.

**15.** Kinetic Systems furnished labor and materials to Solyndra for use in the construction of the work of improvement at the Property. The labor and materials were furnished at the special instance and request and upon the promise of the Property and Project owner Solyndra to pay the reasonable value thereof.

**16.** The labor and materials furnished by Kinetic Systems were to be used, and were actually used, in and about the construction of the work of improvement at the Property.

**17.** Solyndra failed to make full payment to Kinetic Systems for the labor and materials which Kinetic Systems furnished for use in the construction of the work of improvement on the Property and the principal sum of $1,187,950, plus interest, remains due, owing and unpaid to Kinetic Systems.

**18.** Within twenty days after first furnishing, delivering and providing labor and materials to the work of improvement at the Property both Kinetic Systems and subcontractors and suppliers to Kinetic Systems caused preliminary notices to be served in connection with the construction of the work of improvement on the Property. Said notices are in accordance with the provisions of applicable section of the California Civil Code.

**19.** On or about September 2, 2011, Kinetic Systems caused to be recorded in the office of the Recorder of the County of Alameda California a Mechanic's Lien against the Property and Project in order to secure its claim against Solyndra. A true and correct copy of said Mechanic's Lien is attached hereto as Exhibit C.

**20.** Thirty days did not elapse from the recordation of any valid notice of completion or notice of cessation on the Project and the recordation of Kinetic Systems' Mechanic's Lien.

*DRAFT*

Ninety days did not elapse from actual completion of the work of improvement and/or any cessation of labor thereon and the recording of Kinetic Systems' Mechanic's Lien.

**21.** On or about October 7, 2011, Kinetic Systems filed in the Solyndra bankruptcy case its "Notice of Mechanic's Lien (47488 Kato Road, Fremont, CA 94538) ($1,206,616.00)" pursuant to Bankruptcy Code section 546(b) in satisfaction of the requirement then set forth in former California Civil Code section 3144. A true and correct copy of that notice is attached hereto as Exhibit D.

**22.** Kinetic Systems has paid a recording fee for recording said Mechanic's Lien, no part of which has been paid by Solyndra or any of the Defendants named herein.

**23.** Neither Solyndra nor Defendants have paid any part of the amount due on Kinetic Systems' Mechanic's Lien, which is the principal sum of $1,187,950, together with interest at the maximum legal rate.

WHEREFORE, Kinetic Systems prays for judgment as set forth below.

**PRAYER**

1. For a judgment declaring that Kinetic Systems is entitled to recover the principal sum of $1,187,950, together with interest thereon at the maximum legal rate;

2. That Kinetic Systems' Mechanic's Lien be adjudged and declared to be the first priority and superior lien on the Segregated Sale Proceeds, and that proceeds of said sale be declared due and owing to Kinetic Systems;

3. That Defendants be barred and foreclosed of all right, title and interest in and to any part of that portion of the Segregated Sale Proceeds due and owing to Kinetic Systems;

4. That it be decreed that the claims and liens of Defendants, or any of them, to any right, title or interest in that portion of the Segregated Sale Proceeds due and owing to Kinetic Systems, if they have any, be subject to, subsequent to and junior to the Mechanic's Lien of Kinetic Systems;

5. For costs of suit; and

6. For such other and further relief as the Court deems just and proper.

*DRAFT*

DATED: June __, 2013

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By *[DRAFT]*

SCOTT E. HENNIGH
MATHEW R. TROUGHTON
Attorneys for Plaintiff
KINETIC SYSTEMS, INC.

-6-

SMRH:408416000.3

[DRAFT] PLAINTIFF KINETIC SYSTEMS, INC.'S COMPLAINT TO FORECLOSE MECHANIC'S LIEN

# EXHIBIT F

KINETICS

# INVOICE

**TO:** **Solyndra Inc.**
PO Box 61239
Sunnyvale, CA 94088
510-440-3542

**Attention:** Accounts Payable

**INVOICE NO.:** **7700975-137539-03**

**DATE:** 8/30/2011

**CONTRACT NO** 137539

**JOB NAME:** Mechanical hookup of TCOX203
Mechanical hookup of TCOX203
Fremont, CA 94538

**JOB NUMBER:** 7700975-137539

**TERMS:** 30 Days

| | |
|---|---|
| Original Contract Sum | $104,679 |
| Total Approved Change Orders Thru: | |
| Current Contract Sum | $104,679 |
| Total Value of Work Completed to Date | $104,679 |
| Retention 0% of Work Completed to Date | |
| Total Earned Less Retainage | $104,679 |
| Less Previous Applications for Payment | $52,340 |

**Current Payment Due:** $52,340

**INTERNAL USE ONLY: (Current Month)**

| | |
|---|---|
| Gross: | $52,340 |
| Retention: | |
| Net: | $52,340 |

Remit To: **FIRST CLASS MAIL ONLY**
Lockbox 778088
Kinetics Systems Inc
8088 Solutions Center
Chicago IL 60677-8000

***PLEASE REFERENCE INVOICE NO. ON REMITTANCE***

File: 03.01
Job Number: 7700975-137539

## SCHEDULE OF VAUES

**Application Date :** 8/30/2011
**Period From :** 4/30/2011
**Period To :** 8/30/2011
**KSI Invoice No.:** 7700975-137539-03

**Kinetics Job No.:** 7700975-137539

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM | DESCRIPTION OF WORK | QUANTITY | WORK VALUE LESS STORED MATERIALS | STORED MATERIAL VALUE | TOTAL SCHEDULED VALUE | WORK COMPLETED (K x D) | | STORED MATERIALS/EQUIPMENT (L x E) | | WORK % COMPL | STORED MATERIAL % COMPL | TOTAL COMPLETE & STORED TO DATE | TOTAL % COMPLETE TO DATE | BALANCE TO FINISH | RETENTION TO DATE @ |
| | | | | | | FROM PREVIOUS APP. | THIS PERIOD | FROM PREVIOUS APP. | THIS PERIOD | | | (G + H + I + J) | (M / F) | (F - M) | |
| 1 | Mechanical hookup of TCOX203 - Labor | 1 | 60,640.00 | - | 60,640.00 | 30,420.00 | 30,420.00 | - | - | 100% | | 60,840.00 | 100.0% | - | - |
| 2 | Mechanical hookup of TCOX203 - Material | 1 | 43,839.00 | - | 43,839.00 | 21,919.50 | 21,919.50 | - | - | 100% | | 43,839.00 | 100.0% | - | - |
| 3 | | 1 | | - | | - | - | - | - | | | | | - | - |
| 4 | | | | - | - | - | - | - | - | | | - | | - | - |
| 5 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 6 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 7 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 8 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 9 | | | | - | - | - | - | - | - | | | - | | - | - |
| 10 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 11 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 12 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 13 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 14 | | 1 | | - | - | - | - | - | - | | | - | | - | - |
| 15 | | | | - | - | - | - | - | - | | | - | | - | - |
| 16 | | | | - | - | - | - | - | - | | | - | | - | - |
| 17 | | | | - | - | - | - | - | - | | | - | | - | - |
| 18 | | | | - | - | - | - | - | - | | | - | | - | - |
| 19 | | | | - | - | - | - | - | - | | | - | | - | - |
| 20 | | | | - | - | - | - | - | - | | | - | | - | - |
| 21 | | | | - | - | - | - | - | - | | | - | | - | - |
| 22 | | | | - | - | - | - | - | - | | | - | | - | - |
| 23 | | | | - | - | - | - | - | - | | | - | | - | - |
| | TOTAL | | 104,679.00 | - | 104,679.00 | 52,339.50 | 52,339.50 | - | - | 100% | | 104,679.00 | 100.0% | - | - |

KNTS0000002

SOLYNDRA Solynda Inc
47700 Kato Road
Fremont CA 94538

# SOLYNDRA PURCHASE ORDER

| Supplier No: 103819 | Ship To: | Bill To: | Order No: 137539 |
|---|---|---|---|
| Kinetic Systems, Inc. | 1055 Page Avenue | Solyndra Inc. | Type: STANDARD |
| 4226 Surles Court, Suite 500 | Fremont,CA 94538 | P.O. Box 61239 | Revision: 0 |
| Durham, NC 27703 | United States | Sunnyvale,CA 94088 | Revision Date: |
| United States | Contact: Receiving | United States | Order Date: 10-FEB-11 |
| | | | Buyer: Remo, Wynn |
| T M | | | Email: wynn.remo@solyndra.com |
| () | | | Fax: 510-662-4718 |
| E-Mail: tim.mesnickow@kinectics.com | | | Work: 510.440.3543 |

Order Description: PR762000 for Adam R
Note: The Contractor shall take all steps necessary to comply with, and in all material respects be in compliance with the Davis-Bacon Act in accordance with the requirements b(1) ? (10) below, in regards to the work on the project(s) hereunder.

| Payment Terms | Freight Terms | Shipping Term | Ship Via | Order Currency |
|---|---|---|---|---|
| NET30 | | | | USD |

| Line | Shpt. Line | Part No | Revision | Description | Supplier part | Unit Price | Quantity | UOM | Promised Date | Extended Price | Taxable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | | Kinetics - Mechanical hookup of TCOX203 in Building 4 - Labor | | 1 60840 | 60840 | EACH | 30-JUN-11 | 60,840.00 | N |
| 2 | 1 | | | Kinetics - Mechanical hookup of TCOX203 in Building 4 - Material | | 1 43839 | 43839 | EACH | 30-JUN-11 | 43,839.00 | Y |

**Total (USD): 104,679.00**

This Order constitutes an offer expressly limited to these terms and conditions in this order including Solyndra's Terms and Conditions of Purchase (collectively "Terms"), attached hereto. Supplier's acceptance of this order is expressly limited to the Terms contained herein. Any additions, changes or deletions by supplier in any supplier document, proposal,

SOLYNDRA
*Solyndra Inc*
*47700 Kato Road*
*Fremont CA 94538*



acknowledgement, invoice or as otherwise communicated to Solyndra shall be deemed as a material alteration and is expressly objected to and rejected by Solyndra.

SOLYNDRA Solyndra Inc
47700 Kato Road
Fremont CA 94538

SOLYNDRA
TERMS AND CONDITIONS OF PURCHASE

**TERMS AND CONDITIONS**: These terms and conditions control the purchase of the goods and/or services set forth in this Purchase Order (the "Order"). In the event of any conflict between the Order's specific terms and provisions, including any exhibits or documents attached hereto or incorporated by reference herein, and the standard terms and conditions set forth herein, specific provisions shall control. These terms and conditions may not be waived or modified except as specifically set forth in writing by Solyndra.

**PRICE AND DELIVERY**: Supplier shall furnish the goods or services in strict accordance with the price and delivery schedule stated herein. TIME IS OF THE ESSENCE with respect to all of Supplier's performance hereunder. Unless otherwise stated: (a) any number of days specified in these Terms and Conditions of Purchase are in calendar days; and (b) prices include all charges for inspection and packaging, all federal, state and municipal sales, use and excise taxes, goods and services tax and any customs duties not otherwise paid or provided for by Solyndra. In the event that Solyndra is prohibited by law from making payments to Supplier unless Solyndra deducts or withholds taxes there from and remits such taxes to the local taxing jurisdiction, then Solyndra shall duly withhold such taxes and shall pay to Supplier the remaining net amount after the taxes have been withheld. Solyndra shall not reimburse Supplier for the amount of such taxes withheld. When goods are delivered and/or services are provided or the benefit of services occurs within jurisdictions in which Supplier's collection and remittance of taxes is required by law, Supplier shall have sole responsibility for payment of said taxes to the appropriate tax authorities. In the event Supplier does not collect tax from Solyndra, and it is subsequently audited by any tax authority, liability of Solyndra will be limited to the tax assessed, with no reimbursement for penalty or interest charges. Prices shall remain fixed until completion of the deliveries contemplated hereunder. Solyndra may return or store at Supplier's expense any goods delivered more than five (5) days in advance of the delivery date. Supplier represents, warrants, and agrees that the prices charged to Solyndra for any good or service, unless otherwise agreed in writing by Solyndra, be equal to or lower than the lowest of the following : (a) the last price charged or quoted to Solyndra for such good or service; (b) Supplier's lowest price charged to any other customer for such good or service regardless of any terms, conditions, rebates or allowances of any nature; (c) reflects any price declines occurring prior to the actual shipping date; and (d) reflects any price decreases occurring after the actual shipping date but before the originally specified shipping date if Solyndra permits shipments to be made before the originally specified shipping date. Solyndra reserves the right to have a confidential third party audit conducted to ensure Supplier's compliance with this Order. Supplier shall immediately notify Solyndra in writing when Supplier first has knowledge of any impending material shortage, governmental regulation, labor dispute or other event or impediment that could result in any delay in the delivery of the goods or performance of the services hereunder. If delivery or performance is not affected within the time stated in this Order, Solyndra may, in addition to Solyndra's other rights and remedies, purchase the goods elsewhere or retain substitute performance of the services, charge Supplier for any resulting expense, loss or damage and/or cancel this Order.

**PAYMENT**: Supplier shall issue invoices only after delivery of the goods and/or completion of the services ordered by Solyndra hereunder. Original invoices shall be submitted and shall include Order number, line item number, part number, and complete bill to address, description of items, quantities, unit price and extended totals. All costs invoiced to Solyndra for reimbursement of expenses agreed under the terms of this Order shall be net of any reclaimable Value Added or Goods and Services Taxes incurred on such expenses. Supplier agrees to invoice Solyndra no later than one hundred eighty (180) days after shipment of goods or performance of the services ordered herein. Solyndra will not be obligated to make payment against any invoices submitted after such period. Solyndra may reject any invoice for noncompliance with any of the provisions of this Order. The time periods for any cash discount or payment shall commence on the later of the date the goods are received or the services are provided (as the case may be) or the date Solyndra receives a proper invoice. Solyndra shall issue payment within forty-five (45) days after its receipt of a correct and conforming Supplier invoice and supporting documentation after receipt of the goods or services, or forty-five (45) days after acceptance of the goods by Solyndra or the performance of the services to Solyndra's satisfaction (as the case may be), whichever is later, provided that if Supplier and Solyndra have agreed to utilize the evaluated receipts settlement process, Solyndra shall issue payment within forty-five (45) days after its acceptance of the goods or the performance of the services to Solyndra's satisfaction (as the case may be). Payment is deemed made when Solyndra's check is mailed or EDI funds transfer initiated. If for any reason Solyndra had made payment for goods or services that were subsequently rejected, such payment shall be refunded by Supplier within ten (10) days after Solyndra's request therefore or, at Solyndra's option, shall be deducted from any other or subsequent payments due or to become due to Supplier.

**SET-OFF; RECOUPMENT**: Solyndra shall have the right at any time to set off or recoup any amount owing from Supplier to Solyndra or any of Solyndra's subsidiaries or affiliates against any amount due and owing from Solyndra or any of its subsidiaries or affiliates to Supplier.

**WARRANTIES**: IN ADDITION TO ANY WARRANTY AND/OR CONDITION IMPLIED BY LAW, SUPPLIER WARRANTS FOR A PERIOD OF ONE (1) YEAR FROM THE DATE OF DELIVERY THAT: (A) ALL GOODS DELIVERED HEREUNDER ARE NEW, OF THE GRADE AND QUALITY SPECIFIED, FREE FROM DEFECTS IN DESIGN, MATERIAL AND WORKMANSHIP AND ARE OF A QUALITY OF WORKMANSHIP THAT IS REQUIRED BY THE BEST PROFESSIONAL PRACTICES AND PROCEDURES IN SIMILAR MANUFACTURING INDUSTRIES; (B) ALL SERVICES ARE PERFORMED IN A GOOD AND WORKMANLIKE MANNER; (C) THE GOODS OR SERVICES PURCHASED HEREUNDER CONFORM TO APPLICABLE SPECIFICATIONS, DRAWINGS, SAMPLES AND OTHER DESCRIPTIONS, IF ANY, REFERENCED HEREIN; AND (D) THE GOODS PURCHASED HEREUNDER ARE MERCHANTABLE AND SUITABLE FOR THE PURPOSES INTENDED. IN ADDITON, SUPPLIER WARRANTS THAT IT HAS GOOD AND MARKETABLE TITLE TO THE GOODS AND HAS CONVEYED SUCH TITLE TO SOLYNDRA FREE FROM ANY ENCUMBRANCES, LIENS, SECURITY INTERESTS OR OTHER DEFECTS IN TITLE, INCLUDING BUT NOT LIMITED TO ANY CLAIMS THAT THE GOODS OR SERVICES INFRINGE ANY THIRD PARTY'S INTELLECTUAL PROPERTY. All warranties set forth in this Order shall survive any inspection, delivery, acceptance, payment, expiration or earlier termination of this Order and such warranties shall run to Solyndra, its successors, assigns, customers and users of its products. Any goods repaired or replaced and services re-performed shall be further warranted as set forth above.

**REMEDIES/NON-WAIVER**: Solyndra's remedies provided herein are cumulative and in addition to any other or further remedies provided by law or in equity. Any waiver of any kind by a party of a breach of this Order must be in writing, shall be effective only to the extent set forth in such writing and shall not operate or be construed as a waiver by such party of any subsequent breach. Any delay or omission in exercising any right, power or remedy pursuant to a breach or default by a party shall not impair any right, power or remedy that such party may have with respect to that or any other future breach or default.

**FORCE MAJEURE**: Solyndra shall not be responsible, in any manner, for any failure or delay in the performance of any of its obligations hereunder caused by a strike, lockout or other industrial disturbance, act of public enemies, any government action, any civil or military action, insurrection, riot, landslide, hurricane, drought, fire, earthquake, explosion, flood, storm, act of God, or any other cause or event not reasonably within Solyndra's control (each, a " Force Majeure Event"). Supplier shall immediately notify Solyndra in writing if its performance hereunder is delayed due to any Force Majeure Event and Solyndra may either (a) extend time of performance, or (b) terminate the uncompleted portion of the Order at no cost to Solyndra.

**ATTORNEYS' FEES AND COSTS**: The prevailing party to any legal action arising out of this Order shall be entitled to recover from the other party, the attorneys' fees and costs it incurred in bringing or defending such action.

**INDEMNITY**: To the fullest extent provided by law, Supplier shall indemnify, defend and hold harmless Solyndra, its affiliates and their respective employees, officers, directors, successors, assigns and customers of any of them (collectively the "Solyndra Parties"), from and against all demands, claims (including claims for contribution or indemnity), losses, liens and liabilities of whatever kind or nature, including attorneys' fees and costs (collectively a "claim" ), incurred by or asserted against any of the Solyndra Parties arising from or related in any way to the acts or omissions of Supplier, Supplier's agents, employees, representatives, subcontractors or assigns, including but not limited to claims asserted against any of the Solyndra Parties as a result of a breach or alleged breach of the representations and warranties set forth in Sections 2 and 5 hereof, the presence of Supplier's agents, employees, representatives, subcontractors or assigns on Solyndra's premises or the use of any goods proven defective.

**INTELLECTUAL PROPERTY INDEMNITY**: Supplier shall indemnify, defend and hold harmless the Solyndra Parties, or any of them, from and against any and all claims and all costs, expenses (including reasonable attorneys' fees and costs), losses, damages, or liabilities incurred because of claims that the goods, services or use of any goods or services purchased hereunder, or any component, part or process thereof or product made therewith, irrespective of whether Solyndra furnishes any specifications to Supplier, infringes any patent, trademark, trade secret, copyright, mask work or application therefore, or other intellectual property right of a third party. If any such claim is asserted against any of the Solyndra Parties, its successors or assigns or the customers of any of them, Supplier shall, with counsel acceptable to Solyndra, defend such action at its expense and shall pay any related costs and damages, including attorneys' fees and costs of both the Solyndra Parties and Supplier. If any injunction shall be obtained against any of the Solyndra Parties in relation to the use of the goods or services or any component thereof provided by the Supplier by reason of infringement, Supplier shall, at its expense and Solyndra's option, either immediately procure for the Solyndra Parties, or any of them, the right to continue using the goods or services or immediately replace or modify the same to become non-infringing but equivalent in form, fit and function. Regardless of which of the foregoing remedies is effected, Supplier shall pay to the Solyndra Parties the rework expenses and incremental costs incurred by any of the Solyndra Parties to procure alternative products required to fill orders placed by Solyndra and accepted by Supplier as of the effective date of the injunction.

**ACKNOWLEDGMENT AND ACCEPTANCE**: The issuance of this Order to Supplier constitutes an offer expressly limited to the terms contained herein. SUPPLIER'S ACCEPTANCE OF THIS ORDER IS EXPRESSLY LIMITED TO THE TERMS AND CONDITIONS CONTAINED HEREIN. ANY ADDITION OR CHANGE TO OR DELETION OF THESE TERMS BY SUPPLIER IN ANY PRIOR PROPOSAL, IN SUPPLIER'S ACKNOWLEDGMENT FORM OR INVOICE OR AS OTHERWISE COMMUNICATED TO SOLYNDRA SHALL BE DEEMED A MATERIAL ALTERATION AND IS EXPRESSLY OBJECTED TO AND REJECTED BY SOLYNDRA. Solyndra may revoke this offer at any time prior to Supplier's acceptance. Unless Supplier notifies Solyndra of its acceptance of this offer within five (5) days of the date hereof, this offer shall expire at Solyndra's option without liability.

**RELATIONSHIP BETWEEN PARTIES**: The relationship between the parties hereto is that of independent contractors. Nothing in this Order shall be construed as creating any partnership, joint venture, or agency between the parties.

**ASSIGNMENT**: Supplier shall not assign, delegate or subcontract this Order or any obligations hereunder without Solyndra's prior written consent. Any such attempted assignment or delegation without Solyndra's prior written consent shall be void and of no force or effect and, at Solyndra's option, shall be cause for Solyndra's termination of this Order. Solyndra shall be entitled at any time to assign, delegate or subcontract this Order or any obligations hereunder to any third party without Supplier's prior written consent.

**INSPECTION; ACCEPTANCE**: Supplier, at its cost, shall inspect all goods prior to shipment to Solyndra. If requested by Solyndra, Supplier shall immediately provide Solyndra with a copy of the inspection results. Solyndra reserves the right to conduct its own pre-shipment inspection and testing wherever such goods are located. If Solyndra conducts pre-shipment inspection or testing on Supplier's premises, Supplier shall provide, without additional charge, all reasonable facilities and assistance for such inspection and tests. Final inspection and acceptance by Solyndra shall be at the Solyndra location designated in this Order unless otherwise specified in this Order. Supplier shall not modify the specifications for any goods or services purchased hereunder without Solyndra's advance written consent. Supplier shall notify Solyndra at least one hundred and eighty (180) days in advance of any changes in the specifications or manufacturing process. Supplier shall cooperate with Solyndra to provide configuration control and traceability systems for goods and/or services supplied hereunder. Payment before or after inspection shall not constitute acceptance of non-conforming goods or services, and neither inspection, testing nor acceptance of the goods or services shall relieve Supplier from its responsibility for latent or patent defects in the goods or other failures to meet the requirements of this Order, fraud or Supplier's warranty obligations. If, at any time before acceptance, Solyndra learns that the goods or services are defective or otherwise not in conformity with the requirements of this Order, including the warranties of Section 5, Solyndra may, in addition to Solyndra's other rights and remedies, upon written notice to Supplier: (a) rescind this Order as to such goods or services; (b) accept such goods or services or part thereof at an equitable reduction in price determined by Solyndra; or (c) reject such goods or services and require, at Solyndra's option, replacement, repair, refurbishment, re-performance, or credit or rebate of the purchase price paid by Solyndra. All replacements and re-performance shall be delivered or undertaken immediately upon Solyndra's request, and if not, Solyndra may either replace or correct such goods and effect substitute performance for services and charge Supplier for the costs incurred thereby, or terminate this Order for cause.

**TECHNICAL INFORMATION**: All specifications, drawings, schematics, technical information, notes, instructions or other information referred to on the face of this Order or contained in attachments or exhibits hereto are deemed to be incorporated herein by reference, and Supplier expressly acknowledges that it has received and read such referenced information and will treat it as Confidential Information in accordance with Section 24, hereof.

**SEVERABILITY; HEADINGS**: If it is determined by a court of competent jurisdiction as part of a final non-appealable ruling, government action or binding arbitration that any provision of this Order (or part thereof) is invalid, illegal, or otherwise unenforceable, such provision shall be enforced as nearly as possible in accordance with the stated intention of the parties, while the remainder of this Order shall remain in full force and effect and bind the parties according to its terms. To the extent any provision (or part thereof) cannot be enforced in accordance with the stated intentions of the parties, such provision (or part thereof) shall be deemed not to be a part of this Order; provided that in such event the parties shall use their best efforts to negotiate, in good faith, a substitute, valid and enforceable provision that most nearly effects the parties' intent in entering into this Order. Headings are inserted solely for convenience of reference, shall not constitute a part of this Order and shall not otherwise affect the interpretation hereof.

**NOTICES**: All notices shall be in writing and deemed effective upon delivery: (a) in person; (b) by verified facsimile transmission; or (c) by registered mail, postage prepaid, return receipt requested, and to the addresses set forth herein, as the same may be changed pursuant to a written notice provided pursuant to this Section 17. Supplier shall also send a copy of any notice to the attention of Solyndra's general counsel at such address.

**GOVERNING LAW; JURISDICTION**: This Order shall be governed by the laws of the State of California, without giving effect to choice of law principles, the 1980 United Nations Convention on Contracts for the International Sale of Goods, and the Sale of Goods (United Nations Convention) Act, Cap 283A. The parties agree that California courts have jurisdiction over any legal action or other proceeding for any purpose with respect to this Order, that Fremont, California is the appropriate place for venue of any litigation arising hereunder, and that all such litigation shall, to the extent possible, be conducted in Fremont, California or for litigation to be conducted in Federal Court, in San Jose, California.

**ELECTRONIC TRANSACTIONS**: Subject to the terms and conditions of this Section 19, the parties agree to accept electronic records and electronic signatures (as such terms are defined in the U.S. Electronic Signatures in Global and National Commerce Act) relating to transactions contemplated by this Order. In connection with system-to-system implementations, the parties will implement the particular transaction sets and/or message specifications mutually agreed upon by the parties. Each party's implementation will comply with applicable standards (e.g., applicable ANSI standards or RosettaNet PIPs), except as otherwise mutually agreed. In the event that any element of an applicable standard conflicts with a provision of this Order, the provision of this Order will control. Where applicable standards require that the receiving party issue a notice to the other confirming message receipt, such notice will not constitute a binding acceptance or acknowledgement of anything more than mere receipt. If a party has adopted an electronic identifier (e.g., a digital signature), the other party is entitled to rely on the authenticity of messages signed by or otherwise associated with such electronic identifier unless and until notified otherwise by the adopter. Either party may use a third party service provider in connection with e-business activities (e.g., to route or translate EDI or XML messages, or to host web based services). The party contracting with a service provider must require that such service provider: (i) use information disclosed to or learned by such service provider in connection with providing services solely for the purpose of providing the applicable services; and (ii) not disclose such information to any third party. Either party may begin to use a service provider that it wishes to engage or may change a service provider that it had previously engaged upon reasonable prior written notice to the other party. Each party will be liable for the acts or omissions of its service provider in connection with activities contemplated by this Order.

**SAFETY COMPLIANCE AND NON-INTERFERENCE**: If Supplier performs any services or delivers any goods on Solyndra's premises, Supplier shall: (a) comply with all of Solyndra's safety and security regulations and all other pertinent safety regulations imposed by law; and (b) provide Solyndra with evidence of insurance in accordance with the minimum limits required by Solyndra. Supplier and its assigns, employees, representatives, subcontractors and agents agree to comply with all directives of Solyndra's supervisory personnel and further agree not to interfere with any of Solyndra's operations. Non-compliance with the foregoing may, at Solyndra's option, result in cancellation of



Solyndra Inc
47700 Kato Road
Fremont CA 94538

this Order for cause.

**HAZARDOUS MATERIALS**: If goods or any services provided hereunder include or use Hazardous Materials, Supplier represents and warrants that Supplier and its assigns, representatives, employees, subcontractors and agents providing such services or goods to Solyndra have been properly trained and understand the nature of and hazards associated with the design and/or service or goods. Hazardous Materials including handling, transportation, storage, use, and disposal of such Hazardous Materials, as applicable to Supplier. Prior to causing Hazardous Materials to be on, in, or near Solyndra's facilities or operations, Supplier shall obtain written approval from Solyndra's Site Environmental Health Safety and Security Group. Supplier will be responsible for and indemnify Solyndra from any liability resulting from the actions of Supplier or its assigns, representatives, employees, subcontractors and agents in connection with: (a) providing such goods containing or comprising such Hazardous Materials to Solyndra; and/or (b) the use of such Hazardous Materials in providing services to Solyndra. Supplier will timely provide Solyndra with material safety data sheets and any other documentation in relation to such Hazardous Materials reasonably necessary to enable Solyndra to comply with applicable laws and regulations. Supplier warrants that goods and services supplied to Solyndra pursuant to this Order comply with all applicable requirements of Solyndra's environmental and safety policies and procedures.

**COMPLIANCE WITH LAWS**: Supplier shall comply with all national, state, and local laws and regulations governing the manufacture, transportation, import, export and the sale of goods and/or the performance of services in the course of this Order, including but not limited to Department of Commerce, including U.S. Export Administration regulations, Securities and Exchange Commission, Environmental Protection Agency, Department of Transportation regulations applicable to Hazardous Materials, Federal Acquisition Regulations or their counter-part for other government agencies and the Foreign Corrupt Practices Act. Neither Supplier nor any of its subsidiaries will export/re-export any technical data, process, product, or service, directly or indirectly (including the release of controlled technology to foreign nationals from controlled countries), to any country for which the United States government or any agency thereof requires an export license or other government approval without first obtaining such license. Supplier shall comply with all applicable laws regarding non-discrimination in terms and conditions of employment, payment of minimum wage and legally mandated employee benefits and mandated work hours. Supplier shall comply with all applicable laws regarding employment of underage or child labor. Supplier agrees to fully comply with Solyndra's Code of Conduct policy as set forth at www.Solyndra.com. Upon Solyndra's request, Supplier shall immediately certify compliance with all such laws and regulations. In addition, Supplier agrees not to provide foreign nationals from controlled countries as employees or contractors for work on any Solyndra site.

**CANCELLATION**: At any time Solyndra may cancel, terminate, suspend, delay or interrupt this Order or any part thereof, with or without cause (including due to a Force Majeure Event), by written notice to Supplier specifying the effective date and the extent of such cancellation, suspension, delay or interruption. Upon receipt of such notice, Supplier shall immediately terminate any affected work under the Order and give immediate notice to its suppliers and subcontractors, if any, to do the same and take all other actions to reduce its costs in connection with any affected goods or services. If Solyndra cancels this Order without cause for other than a Force Majeure Event, Solyndra shall reimburse Supplier for Supplier's reasonable out-of-pocket expenses properly and directly allocable to and resulting from such cancellation, net of any amounts that Supplier receives or should have received if it mitigated the cancellation as required herein by selling to a third party the goods or services that were to be delivered hereunder, as determined by Solyndra according to generally accepted accounting principles. Before assuming any payment obligation under this section, Solyndra may inspect Supplier's work in process and audit all relevant documents. The amount of such reimbursement shall in no event exceed an amount equal to the portion of the price that is allocable to the canceled portion of the Order. Such reimbursement shall be Supplier's sole and exclusive remedy for any such cancellation and must be submitted to Solyndra in writing within thirty (30) days after the receipt of Solyndra's termination notice. Upon payment of Supplier's claim, Solyndra shall be entitled to all goods, work and materials paid for. In addition to Solyndra's other rights and remedies, Solyndra may cancel or suspend this Order, in whole or in part, by written notice to Supplier, for cause if: (a) the goods or services or any part thereof fail any inspection or test hereunder or are defective or non-conforming; (b) the goods or services are not delivered to Solyndra as scheduled; (c) Supplier makes a general assignment for the benefit of creditors, a receiver and/or manager for Supplier is appointed, or a petition for bankruptcy, winding up, judicial management or corporate reorganization under any bankruptcy or similar laws is filed by or against Supplier; or (d) Supplier fails to comply with any of the terms or conditions of this Order. If Solyndra terminates this Order for cause, it shall have no obligation to make any reimbursements or payments hereunder to the Supplier. Any suspension or cancellation for cause by Solyndra that is determined by any court or other authority to be wrongful for any reason shall be deemed for all purposes to be a suspension or cancellation without cause as set forth above.

**CONFIDENTIAL INFORMATION**: "Confidential Information" shall include any information, whether oral, written or observed, regarding the terms or existence of this Order and Solyndra's specifications, requirements, plans, programs, plants, processes, products, costs, equipment, designs, set-up, configurations, sales, operations, finances, or customers that may come within the knowledge of Supplier and its assigns, employees, sub-contractors, representatives and agents. All Confidential Information shall remain the exclusive property of Solyndra and shall immediately be returned, together with all copies thereof, to Solyndra upon request. Supplier shall hold Confidential Information in trust and confidence for Solyndra and shall not disclose such Confidential Information or use it for any purpose other than to perform this Order. Supplier may disclose Confidential Information only to employees and third parties who have signed a confidentiality agreement and who have a need to know such Confidential Information in order for Supplier to perform this Order. In addition, Supplier may not use Solyndra's name or trademarks in any type of advertisement materials, web sites, press releases, interviews, articles, brochures, business cards, project reference or client listings without the other's prior written consent.

**PRIVACY**: If Solyndra transmits any personal information to Supplier, Supplier warrants that Supplier shall not transfer such personal information to any third party or use it for any purpose other than as described in this Order. If Supplier obtains personal information in the course of performance of services for Solyndra, Supplier warrants that Supplier shall not transfer such personal information to any third party or use it for any purpose other than as described in this Order. If Supplier collects personal information on behalf of Solyndra and Solyndra has given notice to Supplier that Solyndra will use such personal information in order to contact the data subject, Supplier shall submit personal information to Solyndra only if the data subject has opted-in to receive information, either from Solyndra or from companies or persons in general. Supplier shall permanently delete all personal information within thirty (30) days after the personal information is no longer being actively used in fulfilling Supplier's obligations to Solyndra under this Order. Supplier shall take all measures necessary to ensure the security of Solyndra's data.

**TECHNOLOGY RIGHTS**: All products, information and technology produced, conceived or otherwise developed under this Order for Solyndra or as a result of technology furnished by Solyndra (collectively "Developments"), shall be deemed works made for hire and the intellectual property rights in such Developments shall vest exclusively in Solyndra. Supplier agrees to use such Developments only in connection with this Order and otherwise to retain them as confidential in accordance with Section 24, above. Supplier, at its cost, hereby assigns to Solyndra all right, title and interest in all Developments and shall fully cooperate with and assist Solyndra in perfecting such right, title and interest. Supplier represents, warrants and agrees that it will not incorporate any third party intellectual property into any Developments, goods or other deliverable provided hereunder without notifying and obtaining the prior written approval of Solyndra. Supplier hereby waives any and all moral rights, including the right to identification of authorship or limitation on subsequent modification that Supplier (or its employees) has or may have in any invention, material, Development or other deliverable assigned to Solyndra hereunder. Supplier warrants that: (a) all of its employees, representatives, agents or contractors who perform work for it hereunder will have entered into written agreements with Supplier which ensure that the work they do is subject to the terms and conditions of this Section 26; and (b) it will not incorporate any Developments into goods or other deliverables to be provided to Solyndra which contain intellectual property not assignable or licensable to Solyndra as provided in this Section 26. Supplier agrees that if in the course of providing the goods and/or services hereunder, Supplier incorporates any Supplier intellectual property into any Development, good or other deliverable provided to Solyndra, Solyndra is hereby granted and shall have a nonexclusive, royalty free, perpetual, irrevocable, worldwide license, including the right to sublicense, to use any such Supplier intellectual property to make, have made, use, import, prepare derivative works of, reproduce, have reproduced, perform, display, offer to sell, sell, or otherwise distribute such invention, improvement, development, concept, discovery, or other proprietary information as part of or in connection with such Development, good or deliverable.

**PACKAGING AND SHIPPING**: Supplier shall package, mark and ship the goods: (a) in accordance with the terms of this Order and good commercial practices; (b) in a manner acceptable to common carriers that will protect against the hazards of shipment and storage; (c) at the lowest practicable rate; and (d) in accordance with all applicable laws. Each package shall legibly be marked with proper handling instructions, shipping information, Order number, part or item number, if any, and the names of Solyndra and Supplier. An itemized packing list shall accompany each shipment. When the goods are ready for shipment, Supplier shall inform Solyndra in writing of such pending shipment and thereafter ship the goods to Solyndra's designated destination. If Solyndra does not provide shipping instructions to Supplier regarding the method of shipment to be used, Supplier shall ship the goods by normal carriage to Solyndra. Solyndra may reject any shipment not meeting these requirements. If, due to Supplier's failure timely to ship the goods, the specified method of transportation would not permit Supplier to meet the delivery date specified in this Order, Supplier shall, at Supplier's sole cost and expense, ship such goods by air transportation or other expedited means acceptable to Solyndra. Upon Solyndra's request, Supplier will promptly provide Solyndra with a statement of origin for all goods and with applicable customs documentation for goods wholly or partially manufactured outside of the country of import.

SOLYNDRA Solyndra Inc
47700 Kato Road
Fremont CA 94538

**SHIPPING TERMS AND RISK OF LOSS**: Unless otherwise stated in the Order, all deliveries of goods shall be made D.D.P. (Incoterms 2000) Solyndra's location (as shown in this Order). Supplier shall bear all risk of loss and damage until final inspection and acceptance of the goods by Solyndra. Notwithstanding any of the above requirements of this Section 28 to the contrary, title and risk of loss or damage to Hazardous Materials supplied by Supplier shall pass to Solyndra upon delivery to Solyndra's point of use for such goods at the Solyndra location designated in the Order and Supplier shall bear all risk of loss or damage until final inspection and acceptance of such goods by Solyndra. Supplier shall also bear all risk of loss and any costs of return and redelivery associated with any goods rejected or returned by Solyndra under this Order.

**SURVIVAL**: Any provisions herein that by their nature extend beyond the expiration, termination or fulfillment of this Order shall survive such expiration, termination or fulfillment.

KINETICS
48400 FREMONT BLVD., FREMONT, CA 94538 USA
TELEPHONE +1 510.683.6000 FACSIMILE +1 510.683.6001
LICENSE NO. 303706
WWW.KINETICS.NET

May 25, 2010

Mario Lopez
Solyndra, Inc.
47700 Kato Road
Fremont, CA 94538

**Subject:** **Solyndra, Inc. – Building 3 and Building 4 Tool Install Project**
**Kinetics Proposal Number 74184 Rev 2**

Dear Mr. Lopez,

Kinetics is pleased to submit a lump sum proposal for the Solyndra – Fab 2 Manufacturing Tool Install in Fremont, CA. Our proposal is based on the following scope of work description, clarifications and exclusions.

**PROJECT SCOPE CLARIFICATIONS**

- Kinetics has included materials and labor to install the piping systems and exhaust for the requested tools (See Attachment to this proposal for tool list).
- Kinetics has included 20 linear feet for each CDA and KR/AR line from the headers provided by others to the POC's on GBF201, GBF202 and GBF203.
- Kinetics has not included heat tracing in this proposal.
- Kinetics has not included seismic engineering, supports and or flex joints in this proposal. Any building drift will have to be handled once the design is understood as a change in scope.
- Kinetics proposal is based on the tool schedule provided with the bid documents. We have included mobilizing and demobilizing once for each tool. It is assumed that each tool will be in place for the install and Kinetics will not have multiple mobilizations for each tool.
- Kinetics has included galvanized supports in this proposal. No powder coated items have been included in this proposal.
- Kinetics has not included scaffolding in this proposal.
- Kinetics has included providing redlines of the drawings that were used to bid this project. No additional drawings are included in this proposal.
- Kinetics has not included 3rd party QA/QC.
- Kinetics has included using the house nitrogen for purging our brazed copper lines.
- Kinetics has bid this project based upon the drawings and specifications and we have included installing the CDA lines as specified in soft soldered copper.
- Kinetics has included insulation for the PHW and HCDA lines on the front end tools only.

- The credit of $255,595.00 for the engineering costs previously awarded to Kinetics has been credited back and is included as part of the tool cost listed below.
- Kinetics has included utilizing the FTP site Box.Net for the remainder of the project at no cost to Solyndra if awarded the project.
- Kinetics will fill out lien releases for each month's billings.

**GENERAL CLARIFICATIONS**

- This proposal is based on a normal continuity of work and free access to all work areas.
- A clean 120V power source to operate our orbital equipment is required.
- We assume the building structure is sized adequately to support the loading of our piping systems and equipment.
- Materials in the process market tend to fluctuate wildly. If, after submission of this bid to Solyndra, Inc. , the price of any material, item or component used in conjunction with the project increases more than 5%, Solyndra, Inc. agrees to issue a change order equal to the amount of the price escalation for the material, component or item plus a reasonable fee. Kinetics will provide all documentation necessary to substantiate this request.
- We assume on-site parking will be available.

**COMMERCIAL AND CONTRACT CLARIFICATIONS**

- Invoicing and Payment:
  - Payment terms are net 30 days, no retention.
  - Bid breakouts are submitted for bid comparison purposes only and are not to be taken as stand-alone prices. We assume all tools will be awarded as one package.
- Proposal Term:
  - This proposal is firm for 30 days.
- This proposal is based on the assumption that the contract that we enter into with Solyndra, Inc. is substantially the same as previously negotiated agreements.

**EXCLUSIONS**

- Architectural cutting and patching
- Architectural sheet metal and flashing

- Cutting and patching of the building
- Final analytical and particulate test for point of use (POU) guarantee
- Fire protection
- Instrumentation and controls
- Labor for pre-commissioning, and commissioning assistance
- Overtime premiums
- Painting: prime, finish, and touch-up
- Permits and fees
- Structural supports, framing or lintels for openings necessary for mechanical piping, ducts, etc.
- Testing, adjusting and balancing of air, water, and steam systems
- Warranty beyond one (1) year from beneficial occupancy
- X-ray (radiography) weld inspections

**PROPOSED COMPENSATION**

Based on the foregoing, Kinetics is pleased to offer a lump sum proposal as detailed below.

**$4,565,738**

**Four Million Five Hundred Sixty Five Thousand Seven Hundred Thirty Eight Dollars**

****Engineering Credit Breakdown:**

**Revised Tool Install Total Cost:** **$4,565,738**

***Bid Breakdown Included in Attachment to this Proposal.**

Thank you for inviting us to prepare this proposal. We look forward to discussing it with you in the future. If we can be of further assistance, please call me at 510.683.6000.

Sincerely,
**KINETICS**

Jamie Conner
Operations Manager

KINETICS.

| Cost Breakdown per Tool | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Tool ID** | **Tool QTY** | **Labor** | **Materials** | **Tax** | **Subs** | **G&A** | **Profit** | **Sum** | **Sum * Qty** |
| **CDSX** | 6 | $111,770 | $78,590 | $8,490 | $1,353 | $14,300 | $23,834 | $238,338 | $1,430,027 |
| **CIGS** | 7 | $68,448 | $41,991 | $4,536 | $0 | $9,785 | $16,309 | $141,070 | $987,487 |
| **CLNR/GIT** | 3 | $38,797 | $18,194 | $1,966 | $0 | $4,211 | $7,019 | $70,187 | $210,562 |
| **CMS** | 3 | $32,401 | $18,021 | $1,947 | $0 | $3,741 | $6,234 | $62,344 | $187,033 |
| **ENCP** | 2 | $85,905 | $42,175 | $4,556 | $0 | $9,474 | $15,790 | $157,900 | $315,801 |
| **GBF** | 3 | $2,563 | $930 | $100 | $0 | $257 | $428 | $4,278 | $12,835 |
| **GBIC** | 2 | $5,437 | $984 | $106 | $0 | $466 | $777 | $7,770 | $15,539 |
| **IVT** | 3 | $7,163 | $2,090 | $226 | $0 | $677 | $1,128 | $11,284 | $33,851 |
| **MBIN** | 2 | $2,587 | $659 | $71 | $0 | $237 | $395 | $3,950 | $7,899 |
| **MOLY** | 3 | $44,760 | $41,984 | $4,536 | $0 | $7,769 | $12,948 | $111,996 | $335,988 |
| **P1SC** | 11 | $16,216 | $5,744 | $621 | $0 | $1,613 | $2,688 | $26,882 | $295,706 |
| **PCIT** | 2 | $2,259 | $640 | $69 | $0 | $212 | $353 | $3,533 | $7,066 |
| **PFLN** | 2 | $11,003 | $2,418 | $261 | $0 | $977 | $1,629 | $16,288 | $32,576 |
| **PFRT** | 2 | $24,358 | $9,390 | $1,014 | $0 | $2,483 | $4,138 | $41,384 | $82,768 |
| **RGAC** | 2 | $67,624 | $41,817 | $4,518 | $0 | $8,140 | $13,567 | $135,665 | $271,330 |
| **TBIN** | 6 | $1,892 | $640 | $69 | $0 | $186 | $310 | $3,096 | $18,574 |
| **TCOX** | 3 | $41,477 | $39,565 | $4,274 | $0 | $7,261 | $12,102 | $104,679 | $314,038 |
| **GIT** | 2 | $1,707 | $984 | $106 | $0 | $200 | $333 | $3,330 | $6,660 |
| | | | | | | | | | **$4,565,738** |

| Pipe Fitters | | | |
|---|---|---|---|
| **Classification** | **Regular** | **1-1/2x** | **2x** |
| Journeyman | $ 106.06 | $ 141.84 | $ 177.59 |
| Foreman | $ 112.77 | $ 151.72 | $ 190.67 |
| General Foreman | $ 119.46 | $ 161.59 | $ 203.72 |

| Sheet Metal | | | |
|---|---|---|---|
| **Classification** | **Regular** | **1-1/2x** | **2x** |
| Journeyman | $ 106.54 | $ 141.28 | $ 176.02 |
| Foreman | $ 116.66 | $ 156.22 | $ 195.76 |
| General Foreman | $ 120.04 | $ 161.20 | $ 202.34 |